1          IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF TEXAS
2                   MARSHALL DIVISION

3

GREE, INC.,                    )(   CIVIL ACTION NOS.
4                              )(   2:19-CV-70-JRG-RSP
      PLAINTIFFS,              )(   2:19-CV-71-JRG-RSP
5                              )(
      VS.                      )(
6                              )(   MARSHALL, TEXAS
SUPERCELL OY,                  )(   SEPTEMBER 10, 2020
7                              )(   9:28 A.M.
      DEFENDANTS.              )(

8

9            TRANSCRIPT OF JURY TRIAL

10          VOLUME 1 - MORNING SESSION

11    BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

12        UNITED STATES CHIEF DISTRICT JUDGE

13

14  APPEARANCES:

15

16  FOR THE PLAINTIFFS:

17

18  MR STEVEN D. MOORE
    KILPATRICK TOWNSEND & STOCKTON LLP
19  Two Embarcadero Center, Suite 1900
    San Francisco, CA 94111
20

21  MS. TAYLOR HIGGINS LUDLAM
    KILPATRICK TOWNSEND & STOCKTON LLP
22  4208 Six Forks Road
    Raleigh, NC 27609
23

24

25

```
 1  FOR THE PLAINTIFF:

 2

 3  MR. ALTON L. ABSHER III
    KILPATRICK TOWNSEND & STOCKTON LLP
 4  1001 West Fourth Street
    Winston-Salem, NC 27101
 5

 6  MR. MICHAEL T. MORLOCK
    KILPATRICK TOWNSEND & STOCKTON LLP
 7  1100 Peachtree Street, NE
    Suite 2800
 8  Atlanta, GA 30309

 9
    MS. TAYLOR J. PFINGST
10  KILPATRICK TOWNSEND & STOCKTON LLP
    Two Embarcadero Center, Suite 1900
11  San Francisco, CA 94111

12
    MS. MELISSA R. SMITH
13  GILLAM & SMITH, LLP
    303 South Washington Avenue
14  Marshall, TX 75670

15

16  FOR THE DEFENDANT:

17

18  MR. MICHAEL J. SACKSTEDER
    MR. BRYAN A. KOHM
19  MR. CHRISTOPHER L. LARSON
    MS. SHANNON E. TURNER
20  FENWICK & WEST LLP
    555 California Street, 12th Floor
21  San Francisco, CA 94104

22
    MR. GEOFFREY R. MILLER
23  FENWICK & WEST LLP
    902 Broadway, Suite 14
24  New York, NY 10010

25
```

```
1   FOR THE DEFENDANT:

2
    MS. JESSICA M. KAEMPF
3   MR. JONATHAN T. MCMICHAEL
    FENWICK & WEST LLP
4   1191 Second Ave., 10th Floor
    Seattle, WA 98101
5

6   MR. DERON DACUS
    THE DACUS FIRM, P.C.
7   821 ESE Loop 323, Suite 430
    Tyler, TX 75701
8

9

10

11

12  COURT REPORTER:      Ms. Shelly Holmes, CSR, TCRR
                         Official Court Reporter
13                       United States District Court
                         Eastern District of Texas
14                       Marshall Division
                         100 E. Houston
15                       Marshall, Texas  75670
                         (903) 923-7464
16

17
    (Proceedings recorded by mechanical stenography, transcript
18  produced on a CAT system.)

19

20

21

22

23

24

25
```

```
                          P R O C E E D I N G S
09:15:45    1
09:15:45    2        COURT SECURITY OFFICER:  All rise.
09:15:46    3        THE COURT:   Thank you.  Be seated.
09:28:26    4        Good morning, ladies and gentlemen.  Thank you all
09:28:37    5   for being here.  My name is Rodney Gilstrap, and I have the
09:28:43    6   privilege of serving as the Chief United States District
09:28:47    7   Judge for the United States District Court for the Eastern
09:28:49    8   District of Texas.
09:28:49    9        I have lived here in Marshall since I got out of
09:28:54   10   law school in 1981.  I've practiced law in this area for 30
09:29:01   11   years, and I was appointed a United States District Judge
09:29:05   12   and confirmed in 2011.  So I've had this job for soon-to-be
09:29:09   13   nine years.
09:29:10   14        I have a confession to make to all of you, I was
09:29:13   15   not born in Texas.  But I got here as quick as I could.
09:29:17   16        I came to Texas to attend college at Baylor
09:29:23   17   University and then stayed and went to law school at the
09:29:27   18   Baylor Law School.
09:29:28   19        I'm married, I have two grown children, and my
09:29:31   20   wife owns and operates a retail floral business here in
09:29:35   21   Marshall.
09:29:35   22        Now, I tell you all these things because in a few
09:29:38   23   minutes, I'm going to ask each of you to tell me the same
09:29:40   24   kind of information about each of yourselves.  And I think
09:29:44   25   you're entitled to know as much about me as I'm going to
```

09:29:46   1   find out about each of you.

09:29:50   2          We're about to engage in the selection of a jury

09:29:52   3   in a civil case involving allegations of patent

09:29:56   4   infringement.  However, before we go any further, I'd like

09:30:01   5   to briefly mention some of the health and safety

09:30:03   6   precautions that we're going to be taking during this

09:30:07   7   trial.

09:30:08   8          As I explained in the letter that I sent attached

09:30:11   9   to the summons that you received to appear here for jury

09:30:15  10   duty, we're implementing several safeguards during jury

09:30:19  11   selection today and the trial that will follow.  These

09:30:22  12   safeguards will be implemented going forward throughout the

09:30:25  13   trial of the case, and I want to go over these with you now

09:30:28  14   in some regard, and I'll go over more of them later.

09:30:31  15          Those of you that will be selected to serve on our

09:30:34  16   jury, and we'll -- we'll select eight members of this

09:30:37  17   venire panel to be the jury in this case -- the eight of

09:30:41  18   you that are selected to serve on this jury, I want you to

09:30:46  19   know that each day of the trial, like this morning, when

09:30:51  20   you enter the courthouse, you'll have your temperature

09:30:55  21   taken with a thermometer by a member of the court staff to

09:31:01  22   assure that there's no problem with your temperature.

09:31:03  23          Once -- once the jury is selected and sworn and

09:31:06  24   seated in the box, the jury box, I'm going to ask you to

09:31:10  25   take off your mask and replace them with a plastic face

| | | |
|---|---|---|
| 09:31:18 | 1 | shield. |
| 09:31:18 | 2 | I do that for two reasons.  Number one, it will |
| 09:31:21 | 3 | provide a level of protection; and, number two, it's |
| 09:31:26 | 4 | important for the Court and the lawyers to be able to see |
| 09:31:29 | 5 | the facial expressions and read the faces of the jurors |
| 09:31:32 | 6 | throughout the trial process.  And you just can't do that |
| 09:31:36 | 7 | with at least 50 percent of your face covered with a mask. |
| 09:31:39 | 8 | If any of you who are selected to serve on the |
| 09:31:42 | 9 | jury feel very strongly that you should keep a mask on |
| 09:31:45 | 10 | regardless, I'm not going to prohibit that.  But unless you |
| 09:31:49 | 11 | feel very strongly about that, I would much prefer that you |
| 09:31:53 | 12 | replace the mask with the face shield, and the face shields |
| 09:31:56 | 13 | are in the chairs in the jury box where you'll be seated. |
| 09:31:58 | 14 | I will tell you with regard to these face shields, |
| 09:32:05 | 15 | there's a plastic film that covers the front and the back |
| 09:32:08 | 16 | of the plastic part.  If you don't take that film off, like |
| 09:32:11 | 17 | I didn't the first time, everything is blurry when you look |
| 09:32:13 | 18 | through here.  So be sure you remove the plastic film on |
| 09:32:17 | 19 | both sides of the plastic face shields. |
| 09:32:19 | 20 | Also, we're going to seat the jury in the box so |
| 09:32:24 | 21 | that there are vacant chairs between you.  You will not be |
| 09:32:28 | 22 | seated directly next to anyone else on the jury.  Those of |
| 09:32:31 | 23 | you in the jury can rely on the fact that every evening |
| 09:32:37 | 24 | when we recess, the Court will have the jury room, the jury |
| 09:32:41 | 25 | box, and the bathrooms that serve the jury room deep |

| | | |
|---|---|---|
| 09:32:45 | 1 | cleaned every evening. |
| 09:32:46 | 2 | Also, throughout the trial, those of you on the |
| 09:32:49 | 3 | jury should be aware that the Court is going to provide |
| 09:32:53 | 4 | lunch for you each day.  It will be brought in in separate |
| 09:32:58 | 5 | boxed lunches, and each of you will have your own |
| 09:33:00 | 6 | individualized lunch. |
| 09:33:01 | 7 | This will keep you from having to leave the |
| 09:33:04 | 8 | courthouse, mingle with the community looking for lunch. |
| 09:33:07 | 9 | It will also save us some time.  It will take less time to |
| 09:33:11 | 10 | cover lunch each day than if you had to leave, go to a |
| 09:33:15 | 11 | restaurant, and then come back. |
| 09:33:16 | 12 | All of these precautions, as I've said, are with |
| 09:33:24 | 13 | an eye toward having not only a fair and an impartial trial |
| 09:33:28 | 14 | but also having a safe trial. |
| 09:33:30 | 15 | Now, if you'll indulge me for just a minute, I'd |
| 09:33:34 | 16 | like to review with you historically how we came to have |
| 09:33:40 | 17 | our American civil jury trial system. |
| 09:33:42 | 18 | If you go back in ancient history to the |
| 09:33:45 | 19 | Pentateuch, the first five books of the Old Testament, |
| 09:33:49 | 20 | you'll find that the ancient Hebrew nation empaneled juries |
| 09:33:53 | 21 | to establish issues and decide issues of property ownership |
| 09:33:56 | 22 | and property value.  The ancient Greeks began using a jury |
| 09:34:01 | 23 | system about 1500 BC. |
| 09:34:04 | 24 | The Romans, as they did with many things, copied |
| 09:34:07 | 25 | the jury system from the Greeks.  And it was the Romans who |

09:34:11  1  brought the jury system to what is now England when they

09:34:15  2  conquered that island in the 4th Century AD.

09:34:18  3        So by the 12th Century AD, the concept of trial by

09:34:22  4  jury had been well established in England for 800 years.

09:34:27  5        But in the 12th Century AD, a tyrannical king came

09:34:32  6  to the throne of England named King John, and he got

09:34:38  7  embroiled in serious disputes with his nobles that led that

09:34:43  8  nation to the brink of a civil war.

09:34:45  9        And one of the particular disputes King John had

09:34:48  10  with his nobles was that they resisted his efforts to

09:34:52  11  curtail and do away with the right to trial by jury.

09:34:55  12        Those disputes did not lead to a civil war, and

09:34:59  13  they were resolved when King John and his nobles met at a

09:35:03  14  place called Runnymede, and they all drew up and signed a

09:35:07  15  document that resolved their disputes and enshrined in

09:35:11  16  English law the right to a trial by jury, among other

09:35:15  17  things.  That document most of you have heard of.  It's

09:35:18  18  called the Magna Carta.

09:35:20  19        As a matter of fact, ladies and gentlemen, 28 of

09:35:26  20  our 50 United States have adopted in their own state

09:35:30  21  constitutions the provisions of the Magna Carta regarding

09:35:35  22  the right to trial by jury verbatim.

09:35:37  23        So you can see with that historical context that

09:35:37  24  when our founding fathers came to these shores as British

09:35:41  25  colonists, the right to trial by jury was deeply

09:35:43  1   ingrained -- ingrained in them, and the right to trial by

09:35:48  2   jury flourished in British colonial America for over a

09:35:53  3   hundred years until another tyrannical king came to the

09:35:56  4   throne of Great Britain.  This time his name was King

09:35:56  5   George, the III.

09:36:01  6          And King George, the III, like King John,

09:36:04  7   attempted to restrict and do away with the right to trial

09:36:07  8   by jury.

09:36:10  9          In fact, when Thomas Jefferson sat down to write

09:36:13  10  the Declaration of Independence, which lists the various

09:36:15  11  disputes and issues that led the American colonists to feel

09:36:20  12  compelled to seek their own independent status as a free

09:36:24  13  and separate nation, the king's efforts to restrict and --

09:36:29  14  and do away with the right to trial by jury is specifically

09:36:33  15  called out in the Declaration of Independence as one of the

09:36:37  16  many reasons that led us to feel we needed to become our

09:36:41  17  own independent nation.

09:36:42  18         And we did become our own independent nation.

09:36:46  19  And, after that, we adopted what is the governing law of

09:36:51  20  our country, the supreme law of our country, the

09:36:54  21  Constitution of the United States.

09:36:55  22         And shortly after the Constitution was adopted, we

09:36:59  23  adopted the first 10 amendments to that Constitution.  And

09:37:04  24  you've all heard those first 10 amendments -- amendments

09:37:08  25  referred to as the Bill of Rights.

```
09:37:09   1          Within the Bill of Rights, which is the Seventh
09:37:13   2    Amendment -- the seventh of those 10 amendments to the
09:37:16   3    Constitution is the amendment that guarantees the right to
09:37:19   4    a jury trial in a civil dispute such as this.  And the
09:37:24   5    Tenth Amendment, as well as the other amendments in the
09:37:26   6    Bill of Rights, were all ratified as a part of our
09:37:29   7    Constitution in 1791.
09:37:31   8          So, ladies and gentlemen, since 1791, every
09:37:37   9    American citizen has had a constitutionally guaranteed
09:37:40  10    right to settle their civil disputes through a trial by
09:37:43  11    jury.
09:37:43  12          So by you being here this morning and
09:37:47  13    participating in this process, in a very real sense, you
09:37:51  14    are doing your part as American citizens to preserve,
09:37:55  15    protect, and defend our Constitution, particularly the
09:37:59  16    Seventh Amendment guaranteeing this right to trial by jury.
09:38:03  17          I always tell citizens who appear for jury duty,
09:38:07  18    as you have this morning, that, in my opinion, personally,
09:38:11  19    jury service is the second highest form of public service
09:38:14  20    that any American can render.  In my personal view, the
09:38:19  21    highest form of public service any American can render are
09:38:23  22    those men and women who serve in our armed forces.
09:38:26  23          Now, when the lawyers address you today, and they
09:38:31  24    will shortly, they're going to ask you various questions.
09:38:34  25    I want all of you to understand that the lawyers are not
```

09:38:38  1  seeking to pry into your personal affairs unduly.  Said

09:38:42  2  another way, ladies and gentlemen, they're not trying to be

09:38:45  3  nosy.  They're simply trying to gain useful information --

09:38:50  4  excuse me -- information so that they can select and we can

09:38:54  5  empanel in this case a fair and an impartial jury to hear

09:38:58  6  the evidence.

09:39:00  7       The important thing for you all to remember is

09:39:04  8  that if you give full, complete, and truthful answers to

09:39:07  9  any question that's asked, then you will have given a

09:39:10  10  proper answer.  Again, there are no wrong answers as long

09:39:13  11  as your response is full, complete, and truthful.

09:39:16  12       I don't know if it will happen today, I will tell

09:39:21  13  you it rarely does, but if there were a question asked to

09:39:26  14  any one of the panel that you believe personally is so

09:39:29  15  private and so sensitive that you are not comfortable

09:39:32  16  answering it in front of the presence of everybody else,

09:39:35  17  then you can simply say, I'd like to talk with Judge

09:39:38  18  Gilstrap about that.

09:39:39  19       And if that's your answer, I'll make an -- I'll

09:39:43  20  provide an opportunity where you can answer that outside of

09:39:45  21  the presence of everyone else on the panel.  But, again,

09:39:48  22  ladies and gentlemen, that -- that does not come up very

09:39:50  23  often.

09:39:51  24       Now, the trial in this case is going to begin

09:39:56  25  today after we select the jury.  It will go through

09:40:00  1  tomorrow, and then I expect it will take most, if not all,

09:40:04  2  of next week.  Today is the 10th of September.  The end of

09:40:09  3  next week on Friday is the 18th of September.

09:40:11  4       So what I need to ask you is if there is anybody

09:40:14  5  on this panel that if you were selected for jury service in

09:40:18  6  this case could not possibly be available to serve over

09:40:23  7  that period of time.  And when I say could not possibly be

09:40:27  8  available, I mean a very serious conflict that would

09:40:31  9  prohibit your participation.

09:40:33  10       If you have -- for example, if you have a surgical

09:40:36  11  procedure scheduled for you or an immediate member of your

09:40:39  12  family that can't be rescheduled, that would be something

09:40:42  13  that would fall in that category.  But anything much less

09:40:48  14  than that would not be in that category.

09:40:50  15       So if there is anything that would keep any of

09:40:56  16  you, if selected, from being available throughout the time

09:40:59  17  I anticipate it will take to try the case, that's something

09:41:01  18  I need to know about.  If there's anybody that falls in

09:41:04  19  that category, would you please raise your hands and let me

09:41:06  20  make a note of it?

09:41:08  21       I don't see anybody raising their hands, except I

09:41:13  22  see a lady with a paper over her head who's had it there

09:41:16  23  the whole time.

09:41:17  24       So you're not raising your hand, are you, ma'am.

09:41:21  25       JUROR PRICE:  No, no, no.

| | | |
|---|---|---|
| 09:41:21 | 1 | THE COURT:  Okay.  Thank you. |
| 09:41:23 | 2 | JUROR PRICE:  This air keeps blowing on my head is |
| 09:41:25 | 3 | what I'm doing. |
| 09:41:26 | 4 | THE COURT:  You keep it right there.  I just want |
| 09:41:28 | 5 | to make sure you're not raising your hand. |
| 09:41:31 | 6 | All right.  Now, at this time, I'm going to call |
| 09:41:33 | 7 | for announcements on the record in the case of GREE, Inc., |
| 09:41:35 | 8 | versus Supercell Oy.  These are civil cases 2:19-CV-70 and |
| 09:41:42 | 9 | 2:19-CV-71. |
| 09:41:44 | 10 | And, counsel, as you give your announcements for |
| 09:41:47 | 11 | the record, please identify yourselves, as well as those at |
| 09:41:52 | 12 | the tables with you, and anyone else as a part of your |
| 09:41:56 | 13 | trial team you think would be appropriate to identify for |
| 09:41:58 | 14 | the panel. |
| 09:41:58 | 15 | We'll begin with the Plaintiff.  What says the |
| 09:42:01 | 16 | Plaintiff? |
| 09:42:01 | 17 | MR. MOORE:  Good morning, Your Honor.  And thank |
| 09:42:03 | 18 | you.  My name is Steve Moore, and I represent the Plaintiff |
| 09:42:07 | 19 | GREE, Incorporated in this case.  With me are my |
| 09:42:11 | 20 | colleagues, Melissa Smith, as well as our colleague, Jamie |
| 09:42:15 | 21 | Laird who's here to help us with jury selection today. |
| 09:42:17 | 22 | Thank you for being here, ladies and gentlemen. |
| 09:42:19 | 23 | THE COURT:  All right.  You're ready to proceed, |
| 09:42:21 | 24 | Mr. -- |
| 09:42:21 | 25 | MR. MOORE:  We are ready to proceed with trial, |

```
09:42:23   1    Your Honor.  Thank you.
09:42:23   2            THE COURT:  What says the Defendant?
09:42:24   3            MR. DACUS:  Good morning, Your Honor.  Deron Dacus
09:42:26   4    here with Mike Sacksteder and Bryan Kohm on behalf of
09:42:33   5    Supercell.  And we're ready to proceed, Your Honor.
09:42:34   6            THE COURT:  Thank you.
09:42:35   7            MR. DACUS:  Thank you.
09:42:35   8            THE COURT:  And, ladies and gentlemen, so there's
09:42:37   9    no confusion in this trial, by agreement of the parties,
09:42:42   10   we're trying two separate cases.  That's why I called out
09:42:45   11   two separate numbers.  But the parties have agreed to try
09:42:48   12   these as one trial.
09:42:49   13           Also, as I told you, this is a case arising under
09:42:57   14   the patent laws of the United States.  And what the
09:43:00   15   Plaintiff, GREE, is claiming is that its patents -- certain
09:43:05   16   of its patents have been infringed by the Defendant,
09:43:08   17   Supercell, and it's seeking money damages because of that
09:43:11   18   infringement.
09:43:11   19           The Defendant, Supercell, denies that it infringes
09:43:15   20   any of the Plaintiff's patents, and they contend that those
09:43:19   21   patents are invalid.
09:43:20   22           Now, what I've just told you is a very shorthand,
09:43:25   23   informal way in layman's terms of telling you about the
09:43:28   24   case.  And I know each of you have seen the patent video
09:43:31   25   film prepared by the Federal Judicial Center.  So with
```

09:43:33   1   that, you already know more about patent cases than most

09:43:37   2   people do when they appear for jury duty.

09:43:39   3            Now, as I've said, the lawyers for both sides are

09:43:43   4   about to question the panel to gather information so they

09:43:45   5   can exercise their prerogatives and complete the process of

09:43:49   6   selecting the eight jurors that will constitute the jury in

09:43:54   7   this case.

09:43:54   8            Again, ladies and gentlemen, there aren't any

09:43:57   9   wrong answers to the questions you may be asked, as long as

09:44:00  10   the answers that you give are full, complete, and truthful.

09:44:05  11            And as I mentioned, the lawyers are simply trying

09:44:08  12   to help secure as a part of the process a fair and an

09:44:11  13   impartial jury.  They're not attempting to be nosy.

09:44:13  14            If for any reason anybody on either side should

09:44:18  15   ask a question that I think is improper, I will certainly

09:44:22  16   stop them.  But you should understand, ladies and

09:44:25  17   gentlemen, these are experienced trial lawyers.  They

09:44:27  18   understand the rules of the Court.  They understand the

09:44:29  19   Federal Rules of Civil Procedure.  And I don't expect that

09:44:32  20   to happen.

09:44:33  21            There is one thing that I want to call your

09:44:36  22   attention to before the lawyers ask any questions, because

09:44:40  23   it's quite possible they will ask you about this in their

09:44:43  24   questioning.

09:44:43  25            And that's the burden of proof.  In a patent case,

09:44:48  1   like this, the jury may be called upon to apply two

09:44:52  2   different burdens of proof.  The jury may apply the burden

09:44:58  3   of proof known as the preponderance of the evidence.

09:45:00  4   That's one of those two burdens of proof.  And I'll -- I'll

09:45:03  5   say that again, the preponderance of the evidence.

09:45:07  6        As well as a second burden of proof known as clear

09:45:10  7   and convincing evidence -- clear and convincing evidence.

09:45:13  8        Now, when you're responding to any questions the

09:45:20  9   lawyers may ask about the burden of proof, I need to

09:45:22  10  instruct you that when a party has the burden of proof on

09:45:24  11  any issue by a preponderance of the evidence, that means

09:45:30  12  that the jury must be persuaded by the credible or

09:45:33  13  believable evidence that that claim or defense is more

09:45:39  14  probably true than not true.  Let me say that again, more

09:45:43  15  probably true than not true.

09:45:45  16       Sometimes this is talked about as being the

09:45:49  17  greater weight and degree of credible testimony.

09:45:54  18       I think everybody can -- in the room can see in

09:45:58  19  front of me and in front of our court reporter a statue of

09:46:02  20  the Lady of Justice.

09:46:03  21       She holds in her right hand lowered at her right

09:46:07  22  side the sword of justice outside of its scabbard.  She is

09:46:12  23  blindfolded, and in her left hand she holds above her the

09:46:18  24  Scales of Justice.  And those scales are equal and balanced

09:46:20  25  in all respects.

09:46:21  1        And when you think about the burden of proof,

09:46:24  2   think about those Scales of Justice and consider that

09:46:26  3   throughout the trial, the evidence put on by the Plaintiff

09:46:28  4   and the evidence put on by the Defendant will -- will go on

09:46:32  5   each of their two respective sides of those scales.  Those

09:46:36  6   scales start off balanced and equal.

09:46:40  7        And if a party has the burden of proof by a

09:46:43  8   preponderance of the evidence, when all the evidence is in

09:46:45  9   and the jury decides if that party has met their burden of

09:46:50  10  proof by a preponderance of the evidence, then if those

09:46:53  11  scales holding the evidence from both sides during the

09:46:57  12  trial tip in favor of the party who has the burden of proof

09:47:02  13  by a preponderance of the evidence, even if they tip ever

09:47:05  14  so slightly in that party's favor, then that party has met

09:47:10  15  its burden of proof by a preponderance of the evidence.

09:47:12  16        If, on the other hand, the issue before the jury

09:47:18  17  requires that the party meet the clear and convincing

09:47:22  18  burden of proof, then when all the evidence is in and it's

09:47:25  19  on both respective sides of those Scales of Justice, the

09:47:30  20  party who has a burden of proof by clear and convincing

09:47:32  21  evidence has to have those scales tip in their favor

09:47:39  22  definitely, not ever so slightly.  They must definitely tip

09:47:42  23  in that party's favor.  And if they do, then that party has

09:47:45  24  met its burden of proof by clear and convincing evidence.

09:47:47  25        Now, I don't want any of you to confuse either of

09:47:56  1   these two burdens of proof with a third burden of proof

09:47:59  2   that I'm sure you've all heard about in the movies and

09:48:03  3   television and media called beyond a reasonable doubt.

09:48:07  4       Beyond a reasonable doubt is a different burden of

09:48:10  5   proof, and it is applied in criminal cases.  It is never

09:48:13  6   applied in a civil case like this.

09:48:19  7       So you should not confuse beyond a reasonable

09:48:21  8   doubt with clear and convincing evidence.  Clear and

09:48:22  9   convincing evidence is more than a preponderance of the

09:48:26  10  evidence, but it is less than beyond a reasonable doubt.

09:48:28  11      Now, I'm giving you these instructions in case

09:48:39  12  some of the lawyers in their questioning asks you about

09:48:41  13  your ability, if you're selected to serve, to apply each of

09:48:45  14  those two burdens of proof fairly to the evidence that's

09:48:48  15  presented over the course of the trial.

09:48:50  16      Now, before the lawyers ask any questions, ladies

09:48:54  17  and gentlemen, each of you should have laminated copies of

09:48:58  18  nine questions available to you, and they should be on the

09:49:02  19  monitor in front of you.

09:49:03  20      If they're not on the monitor, we need to get them

09:49:07  21  on the monitor, Ms. Lockhart.

09:49:08  22      There they are.

09:49:13  23      We're going to let each member of the panel stand

09:49:19  24  and answer these nine questions for us.  This is where I

09:49:22  25  get to learn as much about you as I told you about myself

09:49:25  1   when I came out this morning.

09:49:27  2       I want to explain to you how we're going to do

09:49:29  3   this.  We have two Court Security Officers here in the

09:49:33  4   courtroom, Ms. Denton and Mr. Fitzpatrick.  They're going

09:49:36  5   to have two separate handheld microphones.  We're going to

09:49:42  6   pass those microphones to each member of the panel to use

09:49:44  7   when you answer these nine questions.

09:49:47  8       And when one microphone has been used, it will be

09:49:50  9   wiped down with a disinfecting cloth so that when it's used

09:49:54  10  the next time, it will be clean and sanitized.  And we have

09:49:58  11  two of them so we can rotate them without delaying the

09:50:01  12  process.  So you'll know that when you get a microphone,

09:50:04  13  it's been sanitized immediately before you use it.

09:50:06  14      I'm going to ask each of you, when you answer

09:50:08  15  these questions, to stand, and I'm also going to ask you to

09:50:12  16  take your mask down so that I and the lawyers can see the

09:50:15  17  entirety of your face as you answer those questions and we

09:50:19  18  can hear you.

09:50:21  19      And please don't do what some folks do when they

09:50:24  20  show up for jury duty, and that's take that microphone and

09:50:27  21  then hold it down at their waist, because if you don't hold

09:50:30  22  it up near your mouth, it won't project your sound.  And

09:50:35  23  this is a big courtroom and we've got a lot of people in

09:50:39  24  here, and it's important that way at this end of the

09:50:41  25  courtroom where I am I hear everybody who's at the far back

09:50:44  1  wall and elsewhere in the courtroom.

09:50:45  2       So please use the microphone appropriately.

09:50:50  3  Please pull your mask down when you stand, answer the

09:50:53  4  question, hand the microphone back to the Court Security

09:50:55  5  Officer, pull your mask back up, and have a seat.

09:50:57  6       And later in the process when the lawyers

09:51:01  7  individually ask questions of you, we will do it exactly

09:51:05  8  the same way.  Wait until you get the microphone, stand,

09:51:08  9  pull your mask down, give your answer, hand the microphone

09:51:11  10 back to the Court Security Officer, pull your mask back up,

09:51:14  11 and have a seat.  That's the process that we're going to

09:51:16  12 follow, ladies and gentlemen.

09:51:17  13      So with those instructions, we'll start with Panel

09:51:27  14 Member No. 1, Ms. Smith, and I'll ask you to stand and give

09:51:29  15 us your answers to those nine questions, please.

09:51:32  16      JUROR SMITH:  My name is Laura Smith.  I live in

09:51:34  17 Hughes Springs.  I have two children.  I work at North East

09:51:38  18 Texas Credit Union.  I've been there 26 years.  I have an

09:51:41  19 Associate's degree in accounting.

09:51:42  20      My spouse's name is Brent Smith.  He is actually a

09:51:45  21 retired disabled peace officer.  He worked there for

09:51:50  22 probably 20 -- 22 years, somewhere around there.

09:51:55  23      And, yes, I have actually served on a criminal.

09:52:00  24 It was just a little county case.

09:52:02  25      THE COURT:  How long ago was that, ma'am?  Best

09:52:07   1   guess?

09:52:08   2          JUROR SMITH:  I would say 15, 16 years ago,

09:52:10   3   something like that.

09:52:11   4          THE COURT:  Where was it?

09:52:12   5          JUROR SMITH:  Over in Morris County --

09:52:12   6          THE COURT:  Okay.

09:52:15   7          JUROR SMITH:  -- which I haven't lived there in

09:52:19   8   about 12 years.

09:52:19   9          THE COURT:  Okay.  Thank you very much, Ms. Smith.

09:52:20  10          Next is Ms. Hopkins.

09:52:22  11          JUROR HOPKINS:  Hi.  My name is Yolonda Hopkins.

09:52:29  12   I live in Pittsburg, Texas.  I have one adult daughter.

09:52:33  13          THE COURT:  Would you hold the microphone a little

09:52:35  14   closer, please?

09:52:37  15          JUROR HOPKINS:  I have one adult daughter.  I work

09:52:39  16   for U.S. Steel Emergency Services as a first responder.

09:52:44  17   I've been there for, like, 15 years.

09:52:49  18          I went to Pittsburg High School.  I also attended

09:52:53  19   North Texas Community College, criminal justice and EMT,

09:52:59  20   also Texas University -- Texas A&M University, interior and

09:53:06  21   exterior fire.

09:53:07  22          My husband is Henry Hopkins.  He works for

09:53:12  23   Pilgrim's in the labor department.  He's been there, like,

09:53:15  24   28 years.

09:53:15  25          And I have served on civil and criminal cases.

```
09:53:19   1              THE COURT:  When was the last time you served on a
09:53:21   2    civil jury, and where was it, ma'am?
09:53:24   3              JUROR HOPKINS:  It's been a few months ago in
09:53:26   4    Pittsburg, Camp County.
09:53:28   5              THE COURT:  Okay.  Thank you very much.
09:53:29   6              Next is Panel Member No. 3, Ms. Adams.
09:53:32   7              JUROR ADAMS:  Hi.  I'm Stacy Adams.  My husband
09:53:35   8    and I do not have any children.  I am currently retired.  I
09:53:38   9    retired from the Riverside County Fire Department.  I
09:53:43  10    worked there for 25 years.
09:53:45  11              THE COURT:  That's Riverside County, California?
09:53:48  12              JUROR ADAMS:  California, yes, sir.
09:53:50  13              THE COURT:  Okay.
09:53:50  14              JUROR ADAMS:  Yeah, I'm not from Texas either.
09:53:52  15              THE COURT:  They may need you back in California
09:53:55  16    to put out fires now.
09:53:56  17              JUROR ADAMS:  It's just so sad.  So sad.
09:53:59  18              THE COURT:  Please go ahead.
09:54:01  19              JUROR ADAMS:  I graduated from high school.  I
09:54:03  20    have taken various accounting courses.
09:54:04  21              My husband's name is Bill Adams.  Bill is also
09:54:08  22    retired, and he's a retired police officer from the City of
09:54:11  23    Southgate in California.  He worked there 20-plus years.
09:54:15  24              And I served on a criminal case about two years
09:54:19  25    ago.
```

| | | |
|---|---|---|
| 09:54:19 | 1 | THE COURT:  And where was that? |
| 09:54:20 | 2 | JUROR ADAMS:  In Cass County. |
| 09:54:22 | 3 | THE COURT:  Okay.  Thank you, ma'am. |
| 09:54:23 | 4 | Next is Panel Member No. 4, Ms. Derrick. |
| 09:54:29 | 5 | JUROR DERRICK:  Good morning.  My name is Maria |

09:54:31  6  Carmen Derrick.  And I live in Omaha, Texas.  I have two --

09:54:35  7  two boys, and I am currently employed by Dewey Moore Ford

09:54:40  8  as their officer manager.  I've been with them for four

09:54:44  9  years.

09:54:44  10  I have graduated from college with an Associate's

09:54:48  11  of Science major in accounting.

09:54:51  12  My spouse's named Shannon Derrick, and he is a

09:54:54  13  salesman for Sammon Motors in Mt. Pleasant, and he's been

09:54:57  14  there five years.

09:54:58  15  I have no prior jury service.

09:55:01  16  THE COURT:  All right.  Thank you, ma'am.

09:55:03  17  Next is No. 5, Ms. Thompson McCoy.

09:55:08  18  JUROR THOMPSON MCCOY:  Only -- or McCoy now.

09:55:10  19  THE COURT:  Okay.

09:55:11  20  JUROR THOMPSON MCCOY:  Okay.  My name is Patricia

09:55:13  21  McCoy.  I live in Gilmer, Texas currently.  I have one

09:55:17  22  child and one grown stepchild.  I am currently on work

09:55:24  23  hiatus due to COVID.  I work in dentistry, and I'm a

09:55:29  24  co-owner of a dental consulting company.  I've worked in

09:55:35  25  dentistry for the last 32 years.

| | | |
|---|---|---|
| 09:55:40 | 1 | My educational background is in -- working as a |
| 09:55:40 | 2 | dental assistant. |
| 09:55:42 | 3 | And my spouse's name is -- what's his name -- |
| 09:55:51 | 4 | freshly married -- Derrick McCoy.  He is -- he works in |
| 09:55:57 | 5 | sales from home.  And, let's see, he has been doing that |
| 09:56:01 | 6 | for years and years. |
| 09:56:02 | 7 | And I have never worked -- or never done jury |
| 09:56:05 | 8 | service before. |
| 09:56:06 | 9 | THE COURT:  All right.  Thank you very much, |
| 09:56:07 | 10 | ma'am. |
| 09:56:08 | 11 | Next is No. 6 on the panel, Ms. Brown. |
| 09:56:11 | 12 | JUROR BROWN:  My name is Eleanor Jeanine Brown. |
| 09:56:16 | 13 | And I live in Atlanta, Texas.  I have no children of my |
| 09:56:20 | 14 | own, but I have two grown stepchildren.  I am not what you |
| 09:56:26 | 15 | would call retired. |
| 09:56:28 | 16 | About four years ago, my company was bought out, |
| 09:56:32 | 17 | and the company that bought them out closed our service |
| 09:56:35 | 18 | center down, and so I lost my job.  I was in -- customer |
| 09:56:40 | 19 | service representative and administrative assistant.  And |
| 09:56:46 | 20 | I -- I had worked there for several years. |
| 09:56:48 | 21 | THE COURT:  What kind of business was that? |
| 09:56:49 | 22 | JUROR BROWN:  It was Conway Freight. |
| 09:56:52 | 23 | THE COURT:  Okay. |
| 09:56:53 | 24 | JUROR BROWN:  And it got bought out by XPO |
| 09:56:56 | 25 | Logistics.  I did finish high school, and I had a year and |

09:57:03  1   a half of college going toward an Associate's degree in

09:57:06  2   secretarial -- secretarial science.

09:57:08  3         And my spouse's name is Tommy Brown.  And he works

09:57:14  4   ChromaScape.  He is the transportation manager there.  He's

09:57:19  5   worked there, I think about 38 years.

09:57:22  6         And I have been in -- I have a -- have been a jury

09:57:27  7   member of a civil and criminal case; and it was about eight

09:57:30  8   years ago for both of them in Miller County, Arkansas.

09:57:34  9         THE COURT:  Okay.  Thank you very much, Ms. Brown.

09:57:36 10         Next is No. 7, Ms. Griffin.

09:57:40 11         JUROR GRIFFIN:  Good morning.

09:57:43 12         THE COURT:  Good morning.

09:57:44 13         JUROR GRIFFIN:  My name is Phyllis Griffin.  I

09:57:48 14   have no children.  I am not employed.  I am retired.  Heavy

09:57:59 15   construction, traveled.  I did that for 30-plus years.  I

09:58:09 16   went back to school and got a GED.

09:58:12 17         I've never been married.  And --

09:58:16 18         THE COURT:  Prior jury -- prior jury service?

09:58:19 19         JUROR GRIFFIN:  My prior jury service, sir, was a

09:58:22 20   few months back, Cass County.  It was a -- I guess you

09:58:27 21   would call it criminal.  It was a -- a guard and an inmate

09:58:35 22   thing, and I was an alternate, and I don't -- I don't know

09:58:38 23   what happened there.

09:58:39 24         THE COURT:  Okay.

09:58:39 25         JUROR GRIFFIN:  I got to go home.

09:58:41 1          THE COURT:  Other than that, you haven't served on

09:58:43 2     a jury?

09:58:44 3          JUROR GRIFFIN:  No, sir.

09:58:44 4          THE COURT:  Thank you very much.

09:58:45 5          JUROR GRIFFIN:  Yes, sir.

09:58:46 6          THE COURT:  Next is No. 8, Ms. Jones.

09:58:49 7          JUROR JONES:  My name is Staci Jones.  I live in

09:58:53 8     Omaha, Texas.  I have four grown children.  I currently am

09:58:59 9     employed at Hughes Springs ISD.  I'm the secretary to the

09:59:03 10    principal there.  I've been there four years.

09:59:08 11         I have some college.  I have -- I had -- I held a

09:59:13 12    state license for massage.

09:59:20 13         My husband's name is Lane.  He works for

09:59:23 14    Windstream.  He's been there 39 years.

09:59:26 15         And last year I was the alternate on a criminal

09:59:30 16    case in Morris County.

09:59:31 17         THE COURT:  All right.  Thank you very much.

09:59:33 18         Next is Ms. Arnold, No. 9.

09:59:38 19         JUROR ARNOLD:  My name is Vickie Arnold, and I

09:59:45 20    live here in Marshall, Texas.  I have three grown daughters

09:59:49 21    and two grown stepdaughters.  I retired from Hallsville

09:59:55 22    Independent School District where I worked in human

09:59:56 23    resources.  I retired there after 23 years.

10:00:03 24         I graduated from college, and I have some -- I

10:00:06 25    graduated from high school, and I have some college and a

| | | |
|---|---|---|
| 10:00:09 | 1 | lot of business and computer courses. |
| 10:00:12 | 2 | My spouse's name is Richie Arnold.  He's a realtor |
| 10:00:16 | 3 | here in Marshall.  He's worked there for 14 years.  Before |
| 10:00:23 | 4 | that, he put in the Subway stores and the UPS Store here in |
| 10:00:28 | 5 | Marshall. |
| 10:00:30 | 6 | And I've never served on a prior jury. |
| 10:00:33 | 7 | THE COURT:  Thank you, Ms. Arnold. |
| 10:00:35 | 8 | JUROR ARNOLD:  Thank you. |
| 10:00:35 | 9 | THE COURT:  Next is No. 10, Mr. Cato. |
| 10:00:39 | 10 | JUROR CATO:  Yeah, I'm Terry Cato.  I live in |
| 10:00:46 | 11 | Hughes Springs, Texas.  I got two children.  They're grown. |
| 10:00:51 | 12 | I work at Texas Tubular.  I worked there maybe 30 years. |
| 10:01:00 | 13 | And 9th grade as far as I went in school. |
| 10:01:05 | 14 | THE COURT:  Excuse me just a minute, sir. |
| 10:01:07 | 15 | Ms. Denton, would you make sure you're not |
| 10:01:09 | 16 | blocking any of the lawyers' view of Mr. Cato.  Thank you. |
| 10:01:13 | 17 | Go ahead, sir. |
| 10:01:15 | 18 | JUROR CATO:  I'm divorced for nine years. |
| 10:01:19 | 19 | And I have never served. |
| 10:01:20 | 20 | THE COURT:  Never served on a jury? |
| 10:01:22 | 21 | JUROR CATO:  No. |
| 10:01:23 | 22 | THE COURT:  Thank you very much, sir. |
| 10:01:24 | 23 | Next is No. 11, Ms. Leathers. |
| 10:01:27 | 24 | JUROR LEATHERS:  My name is Rachel Leathers, and I |
| 10:01:31 | 25 | live in Hallsville, and I -- I currently chase around an |

```
10:01:35  1   energetic five-year-old son every day.
10:01:37  2          My employment is I work at Cisco Foods, and I'm a
10:01:41  3   sales consultant there.  I've worked there about six years.
10:01:44  4          I graduated from LeTourneau with a Bachelor's
10:01:48  5   degree.
10:01:48  6          I'm single.
10:01:48  7          And I've never served on a jury.
10:01:51  8          THE COURT:  And what was your Bachelor's degree
10:01:52  9   in?
10:01:54  10         JUROR LEATHERS:  Education.
10:01:54  11         THE COURT:  Thank you very much, ma'am.
10:01:55  12         Next is No. 12, Ms. Johnson.
10:01:58  13         JUROR JOHNSON:  My name is Tamekia Johnson.  I
10:02:03  14   live here in Marshall, Texas, and born and raised here.  I
10:02:06  15   have one son.  His name is Julius Robert Johnson.
10:02:09  16         I'm currently employed as the principal of William
10:02:13  17   B. Travis Elementary here in Marshall.  I've been the
10:02:18  18   principal there for three years but been in education for
10:02:20  19   15 years.
10:02:21  20         I have a Master's degree in educational
10:02:24  21   leadership, and I also have a Master's degree in sociology.
10:02:27  22         I am divorced and been divorced for 12 years now.
10:02:32  23         And I was on a jury about 15 years ago.
10:02:36  24         THE COURT:  And where was that, ma'am?
10:02:38  25         JUROR JOHNSON:  It was in Smith County.
```

10:02:39  1              THE COURT:  And was it a civil case or a criminal

10:02:41  2    case?

10:02:44  3              JUROR JOHNSON:  It was a civil case.

10:02:45  4              THE COURT:  All right.  Thank you very much,

10:02:46  5    Ms. Johnson.

10:02:46  6              Next is No. 13, Mr. Hawkins.

10:02:54  7              JUROR HAWKINS:  My name is Whitey Cub Hawkins.

10:02:57  8    I've got two grown sons and two grandchildren.  I work for

10:03:02  9    Crosby Lebus in Longview, Texas.  Been there 23 years.

10:03:10 10              I got a high school diploma, and I've done some

10:03:13 11    extra training with TSTC and some other things over the

10:03:18 12    years on CNC machines.

10:03:21 13              My wife's name is Angela Hawkins.  She's a

10:03:27 14    supervisor at Longview Regional in specials.  She's been

10:03:32 15    there for 20 years.

10:03:35 16              And I've served on a criminal case here in

10:03:40 17    Marshall.  I guess it's been seven, eight years ago.

10:03:43 18              THE COURT:  And that was in state court?

10:03:46 19              JUROR HAWKINS:  Federal.

10:03:47 20              THE COURT:  Was it in this building?

10:03:50 21              JUROR HAWKINS:  I want -- I want to say it was

10:03:53 22    across on the other side.

10:03:54 23              THE COURT:  Okay.

10:03:56 24              JUROR HAWKINS:  It may not have been a federal.

10:03:59 25    It was a murder trial.

| | | |
|---|---|---|
| 10:04:00 | 1 | THE COURT:  If it was in the Harrison County |
| 10:04:02 | 2 | Courthouse, it would have been a state case. |
| 10:04:04 | 3 | JUROR HAWKINS:  Yes, sir. |
| 10:04:05 | 4 | THE COURT:  Okay.  That clarifies it.  Thank you, |
| 10:04:06 | 5 | Mr. Hawkins. |
| 10:04:08 | 6 | Next is Ms. 14. |
| 10:04:12 | 7 | JUROR EHRLISH:  Good morning. |
| 10:04:12 | 8 | THE COURT:  Ms. Ehrlish? |
| 10:04:13 | 9 | JUROR EHRLISH:  Yes.  Rhonda Ehrlish, I live here |
| 10:04:14 | 10 | in Omaha.  I have one daughter.  I work for Goodman |
| 10:04:17 | 11 | Insurance.  I'm an insurance representative.  I've worked |
| 10:04:19 | 12 | there 27 years. |
| 10:04:20 | 13 | I graduated from Pewitt school. |
| 10:04:22 | 14 | My husband's name is Brent Ehrlish.  He works for |
| 10:04:26 | 15 | Graphic Packaging, and he has been there since May of this |
| 10:04:29 | 16 | year. |
| 10:04:30 | 17 | My prior jury service was over 12 years ago.  It |
| 10:04:34 | 18 | was not criminal -- I mean civil or criminal.  It was in |
| 10:04:37 | 19 | Titus County.  It was just -- I really can't remember, but |
| 10:04:40 | 20 | it wasn't criminal or civil. |
| 10:04:42 | 21 | THE COURT:  All right.  Thank you, ma'am. |
| 10:04:44 | 22 | JUROR EHRLISH:  Thank you. |
| 10:04:45 | 23 | THE COURT:  Next is No. 15, Ms. Ball. |
| 10:04:48 | 24 | JUROR BALL:  Good morning.  My name is Stephanie |
| 10:04:53 | 25 | Ball, and I live in Hughes Springs, Texas.  We have two |

| | | |
|---|---|---|
| 10:04:57 | 1 | grown children.  I work at Guaranty Bank & Trust in |
| 10:05:02 | 2 | Mt. Pleasant, and I work in the loan operations department, |
| 10:05:08 | 3 | central doc processing.  I worked there 10 years, since |
| 10:05:12 | 4 | 2010. |
| 10:05:13 | 5 | My educational background, I graduated from Forney |
| 10:05:17 | 6 | High School, and I graduated from Tyler Junior College with |
| 10:05:20 | 7 | an Associate's degree in liberal arts. |
| 10:05:25 | 8 | My spouse's name is Greg Ball.  He works at Delta |
| 10:05:30 | 9 | Fabrication in Daingerfield.  He's worked there nine years. |
| 10:05:34 | 10 | And I've never served on a jury. |
| 10:05:35 | 11 | THE COURT:  Thank you, ma'am. |
| 10:05:36 | 12 | Next is No 16. |
| 10:05:38 | 13 | JUROR KNABENSHUE:  Hi, my name is Sherry |
| 10:05:45 | 14 | Knabenshue.  I live in Harleton.  I've got four grown |
| 10:05:50 | 15 | daughters, two granddaughters. |
| 10:05:52 | 16 | I work for Harleton ISD.  I'm a cook in the high |
| 10:05:58 | 17 | school cafeteria.  I previously worked 22 years at a local |
| 10:06:01 | 18 | supermarket in our town. |
| 10:06:05 | 19 | I graduated from Gilmer High School. |
| 10:06:08 | 20 | My husband's name is Robert Knabenshue.  He is a |
| 10:06:10 | 21 | retired marine.  He worked for General Cable for about 15 |
| 10:06:15 | 22 | years, and he's retired from there now. |
| 10:06:19 | 23 | I've sat on a -- two workman comp's cases in the |
| 10:06:24 | 24 | district -- the other courthouse, and I was on a personal |
| 10:06:28 | 25 | injury case here in this one. |

```
10:06:30   1              THE COURT:  How long ago has that been?
10:06:32   2              JUROR KNABENSHUE:  Probably a little over 10 years
10:06:34   3   ago probably.
10:06:35   4              THE COURT:  And I assume the grocery store is
10:06:39   5   Wright Bros?
10:06:39   6              JUROR KNABENSHUE:  Right.  That was me.
10:06:40   7              THE COURT:  Okay.  Thank you, ma'am.
10:06:42   8              No. 17 is next, Ms. Norris.
10:06:44   9              JUROR NORRIS:  I am Patsy Norris, and I live in
10:06:49  10   Gilmer, Texas, and I have three grown children.  I work at
10:06:53  11   Daddy T's.  I'm a cashier and a cook.  And I've been there
10:07:01  12   five years and nine months.
10:07:03  13              THE COURT:  Ms. Norris, I'm a little bit afraid to
10:07:06  14   ask, but what is Daddy T's?
10:07:12  15              JUROR NORRIS:  It's a convenience store.
10:07:12  16              THE COURT:  Okay.
10:07:15  17              JUROR NORRIS:  I have a high school education.
10:07:17  18              I am divorced.
10:07:18  19              I've never served.
10:07:19  20              THE COURT:  Thank you, ma'am.
10:07:20  21              Next is No. 18, Ms. Price.
10:07:23  22              JUROR PRICE:  Yes, my name is LaCarole Price.  I'm
10:07:28  23   originally from Karnack, Texas, but I live now in Marshall,
10:07:31  24   Texas.  I have two grown sons.  I work at Electrotechnics,
10:07:38  25   short for ELTEC.  We do solar work on school systems.  I
```

| | | |
|---|---|---|
| 10:07:44 | 1 | have worked there for 25 years. |
| 10:07:46 | 2 | I have a high school education. |
| 10:07:47 | 3 | I am divorced for 12 years. |
| 10:07:49 | 4 | And I have never served on a jury. |
| 10:07:51 | 5 | THE COURT:  What do you do at ELTEC, ma'am? |
| 10:07:55 | 6 | JUROR PRICE:  I do the production work.  I build |
| 10:07:56 | 7 | the system for them to -- for the school system -- I -- I'm |
| 10:08:00 | 8 | sorry. |
| 10:08:00 | 9 | THE COURT:  No, I heard you. |
| 10:08:01 | 10 | JUROR PRICE:  Okay. |
| 10:08:02 | 11 | THE COURT:  Thank you, ma'am. |
| 10:08:03 | 12 | All right.  Next is No. 19.  Ms. Patel. |
| 10:08:08 | 13 | JUROR PATEL:  Hello, my name is Reena Patel.  I |
| 10:08:12 | 14 | live in Marshall, Texas.  I have two children.  I work at |
| 10:08:15 | 15 | the Econo Lodge in Marshall.  It's -- it's -- 14 years. |
| 10:08:19 | 16 | And I did high school and college studies in |
| 10:08:26 | 17 | India. |
| 10:08:26 | 18 | My spouse name is Forest Patel.  He owns motel in |
| 10:08:32 | 19 | Marshall.  It's about like 22 years. |
| 10:08:34 | 20 | And I never do jury. |
| 10:08:36 | 21 | THE COURT:  Thank you, ma'am. |
| 10:08:37 | 22 | Next is No. 20, Ms. Rains. |
| 10:08:40 | 23 | JUROR RAINS:  Glenda Rains.  I live here in |
| 10:08:43 | 24 | Marshall, Texas.  I've got new teeth so everything sounds |
| 10:08:48 | 25 | funny. |

10:08:48  1      I have three grown children.  I don't work.  I
10:08:51  2  have retired.  My last job I worked for my friend at
10:08:56  3  Adair's Liquor Store in Marshall.  I was a cashier for
10:08:58  4  about a year.  And they shut it down.
10:09:01  5      I did have a high school education.
10:09:04  6      My husband is Bruce.  He worked -- he decided to
10:09:07  7  retire this summer.  So he has been working for 20 years
10:09:11  8  over at Deep South Equipment in Shreveport, Louisiana.  He
10:09:14  9  was a supervisor.
10:09:16 10      And I have not been on jury duty ever.
10:09:18 11      THE COURT:  All right.  Thank you, Ms. Rains.
10:09:20 12      Next is Panel Member No. 21, Ms. Gleason.
10:09:26 13      JUROR GLEASON:  My name is Barbara Gleason.  I
10:09:30 14  live right down the road in Harleton, Texas.  I have two
10:09:33 15  children.  I am retired, but I do work part time as a
10:09:39 16  substitute teacher at Harleton ISD.  I have worked there
10:09:45 17  since -- off and on since about 2010.
10:09:48 18      I have some college.  I got a certification in
10:09:52 19  surgical technology of which I retired from working 25
10:09:57 20  years in the OR.
10:09:58 21      I'm married to Michael Gleason.  He has -- he
10:10:03 22  retired from Texas Eastman but then kind of worked at
10:10:07 23  Harleton ISD again as a grounds keeper.  So since our
10:10:12 24  youngest graduated in 2018, we both kind of have been just
10:10:16 25  taking it easy.

| | | |
|---|---|---|
| 10:10:19 | 1 | THE COURT:  Have you ever served on a jury before? |
| 10:10:23 | 2 | JUROR GLEASON:  I have never served on a jury |
| 10:10:24 | 3 | before. |
| 10:10:24 | 4 | THE COURT:  Okay.  Thank you, Ms. Gleason. |
| 10:10:27 | 5 | Next is No. 22.  Mr. McRight. |
| 10:10:30 | 6 | JUROR MCRIGHT:  My name is Steve McRight.  I live |
| 10:10:32 | 7 | in Omaha, Texas.  I have two children.  I work for Frito |
| 10:10:35 | 8 | Lay in Mt. Pleasant Texas.  I've been there 30 years. |
| 10:10:39 | 9 | THE COURT:  Mr. McRight, hold the microphone a |
| 10:10:41 | 10 | little closer, please. |
| 10:10:43 | 11 | JUROR MCRIGHT:  Okay.  I've been with Frito Lay |
| 10:10:45 | 12 | for 30 years. |
| 10:10:46 | 13 | My background in education is I have an |
| 10:10:48 | 14 | Associate's degree, general degree, from TJC in Tyler. |
| 10:10:52 | 15 | My spouse's name is Tamara, and she's a teacher at |
| 10:10:56 | 16 | Paul Pewitt High School, and she's been a teacher for 35 |
| 10:11:00 | 17 | years. |
| 10:11:01 | 18 | I served on a -- one jury here about five years |
| 10:11:05 | 19 | ago.  And it was a civil case, and it was dismissed after |
| 10:11:09 | 20 | the first break, so we really didn't get to hear a lot of |
| 10:11:12 | 21 | it, but it was -- I was picked for the jury, so... |
| 10:11:16 | 22 | THE COURT:  Do you know what they told you the |
| 10:11:18 | 23 | case was about? |
| 10:11:19 | 24 | JUROR MCRIGHT:  Someone slipped and fell at |
| 10:11:21 | 25 | Walmart. |

| | | |
|---|---|---|
| 10:11:22 | 1 | THE COURT:  Okay. |
| 10:11:22 | 2 | JUROR MCRIGHT:  And they were working on that. |
| 10:11:23 | 3 | They come and told us that they had decided that it should |
| 10:11:27 | 4 | have been in a different court or something, so... |
| 10:11:30 | 5 | THE COURT:  That's fine.  Thank you.  Thank you, |
| 10:11:32 | 6 | sir. |
| 10:11:33 | 7 | All right.  Next is Panel Member No. 23, |
| 10:11:37 | 8 | Ms. Barron. |
| 10:11:38 | 9 | JUROR BARRON:  Good morning.  Yolanda Barron.  I |
| 10:11:40 | 10 | live in Gilmer.  I have two grown children and two bonus |
| 10:11:45 | 11 | grown children. |
| 10:11:46 | 12 | I'm the owner of Spring Hill Storage & Rental |
| 10:11:52 | 13 | Properties for the last four years. |
| 10:11:52 | 14 | High school. |
| 10:11:56 | 15 | Husband is Paul Kelly Barron who has worked over |
| 10:11:59 | 16 | 42 years at REMTEX as a superintendent and owner. |
| 10:12:05 | 17 | And no jury service. |
| 10:12:06 | 18 | THE COURT:  All right.  Thank you very much. |
| 10:12:07 | 19 | Next is Panel Member No. 24, Ms. Burns. |
| 10:12:12 | 20 | JUROR BURNS:  My name is Tambree Burns.  And I |
| 10:12:14 | 21 | have no children.  I'm actually a caregiver for my |
| 10:12:18 | 22 | grandparents right now.  I started in August of this year. |
| 10:12:22 | 23 | I have a high school diploma and a phlebotomy |
| 10:12:27 | 24 | certificate with college. |
| 10:12:28 | 25 | My spouse's name is Blake Porter.  He works for |

| | | |
|---|---|---|
| 10:12:32 | 1 | B & R Wireline, and that's an oilfield.  He's worked there |
| 10:12:37 | 2 | for two years. |
| 10:12:38 | 3 | And I have never been in a jury case before. |
| 10:12:40 | 4 | THE COURT:  All right.  Thank you, Ms. Burns. |
| 10:12:42 | 5 | Next is Panel Member No. 25. |
| 10:12:45 | 6 | JUROR CLUBB:  Hello.  My name is Sean Clubb.  I'm |
| 10:12:48 | 7 | from Daingerfield, Texas.  I have two grown children. |
| 10:12:51 | 8 | Currently work for Lowe's Home Improvement.  I'm an |
| 10:12:54 | 9 | operations supervisor at the regional distribution center |
| 10:13:00 | 10 | in Mt. Vernon.  I've been there about three and a half |
| 10:13:04 | 11 | years. |
| 10:13:05 | 12 | I'm not married. |
| 10:13:06 | 13 | And I served in the late '90s in Brazoria County |
| 10:13:11 | 14 | as a juror -- juror for traffic court. |
| 10:13:13 | 15 | THE COURT:  All right, sir.  Thank you very much. |
| 10:13:14 | 16 | Next is No. 26, Ms. Jarvis. |
| 10:13:18 | 17 | JUROR JARVIS:  I'm Tracy Jarvis.  And I live in |
| 10:13:22 | 18 | Omaha, Texas.  I have two grown children, a boy and a girl. |
| 10:13:24 | 19 | And I worked at -- I work for Pewitt CISD as a kindergarten |
| 10:13:32 | 20 | teacher.  I've been there for -- going on 16 years. |
| 10:13:34 | 21 | THE COURT:  Ms. Jarvis, could you speak a little |
| 10:13:38 | 22 | louder?  I'm having trouble hearing you. |
| 10:13:41 | 23 | JUROR JARVIS:  Okay.  I've been at Paul Pewitt for |
| 10:13:43 | 24 | 16 years as a kindergarten teacher -- |
| 10:13:43 | 25 | THE COURT:  Okay. |

```
10:13:46   1              JUROR JARVIS:  -- or, well, for the last 16 years
10:13:48   2    it's been kindergarten.  I have a Bachelor's in education.
10:13:51   3              My husband's name is Michael Jarvis.  He works
10:13:54   4    for -- as a sales manager at Top Hat Industries, and he's
10:13:58   5    been there for, I think, 17 or 18 years.  And I was on a
10:14:03   6    criminal case exactly this time last year.
10:14:06   7              THE COURT:  And where was that?
10:14:08   8              JUROR JARVIS:  It was in Morris County, because
10:14:10   9    today is his birthday -- my husband's birthday, and I know
10:14:15  10    that's when I got picked for that jury.
10:14:18  11              THE COURT:  Well, we'll see if it happens again.
10:14:21  12    Thank you.
10:14:21  13              All right.  Next is Panel Member No. No. 27,
10:14:24  14    Mr. Wallace.
10:14:26  15              JUROR WALLACE:  My name is Vance Wallace.  I don't
10:14:29  16    have any kids.  I work at Lakeview Baptist Assembly in Lone
10:14:31  17    Star where I live.  I do, like, personnel management and
10:14:33  18    groundskeeping.  I've worked there for about 13 years.
10:14:37  19              I have an Associate's in general studies from
10:14:42  20    NTCC.
10:14:42  21              I'm unmarried.
10:14:43  22              And I've never served on a jury.
10:14:46  23              THE COURT:  All right.  Thank you very much, sir.
10:14:47  24              Next is No. 28, Mr. Kilgore.
10:14:50  25              JUROR KILGORE:  My name is William Kilgore.  And
```

10:14:53  1   if you call me William, I might not answer because nobody

10:14:57  2   calls me that; they call me Bill.  I have three grown

10:14:59  3   children.

10:15:01  4        I am retired from the insurance business.  I

10:15:04  5   worked in the insurance business for 35 years, retired from

10:15:07  6   that.  I am a local business owner here in town.

10:15:13  7        I have a high school diploma and some college.

10:15:16  8        My wife's name is Rhonda.  She is a retired

10:15:20  9   registered nurse.  She did that for 25-plus years.  She

10:15:26  10  does some part-time work for a local eye doctor here now.

10:15:30  11       And I had some prior jury service in Judge

10:15:34  12  Ammerman's court for a traffic ticket.

10:15:38  13       THE COURT:  All right.  Mr. Kilgore, when you say

10:15:40  14  you were in the insurance business, were you in sales or

10:15:42  15  were you in adjusting or what did you do?

10:15:44  16       JUROR KILGORE:  Sales.

10:15:45  17       THE COURT:  Sales.  Okay.  Thank you, sir.

10:15:47  18       All right.  Next is Panel Member No. 29.

10:15:50  19       JUROR FRASE:  I'm Larry Frase.  I live in

10:15:54  20  Longview, Texas.  I work for Texas Oncology.  I'm a medical

10:15:58  21  oncologist/hematologist.  I've worked there for about 23

10:16:00  22  years.

10:16:00  23       I have a Bachelor's degree in chemistry from

10:16:03  24  Baylor University, and I went to medical school at the

10:16:05  25  University of Texas Southwestern Medical School in Dallas.

| | | |
|---|---|---|
| 10:16:09 | 1 | My wife is Debra.  She's a housewife. |
| 10:16:12 | 2 | And I've served in a criminal jury maybe 25 years |
| 10:16:16 | 3 | ago in Gregg County. |
| 10:16:17 | 4 | THE COURT:  All right.  Thank you, Dr. Frase. |
| 10:16:20 | 5 | Next is Panel Member No. 30, Ms. Peterson. |
| 10:16:23 | 6 | JUROR PETERSON:  My name is Yvonne Peterson.  I |
| 10:16:27 | 7 | live in Linden, Texas.  I have one child.  I work at |
| 10:16:30 | 8 | Ameripack Foods -- just started working there. |
| 10:16:33 | 9 | Graduated from high school. |
| 10:16:34 | 10 | I don't -- I've never been married. |
| 10:16:35 | 11 | And I never served on a jury. |
| 10:16:39 | 12 | THE COURT:  Tell me, ma'am -- tell me, ma'am, what |
| 10:16:41 | 13 | do you do at Ameripack Foods? |
| 10:16:44 | 14 | JUROR PETERSON:  Production. |
| 10:16:45 | 15 | THE COURT:  Production. |
| 10:16:46 | 16 | JUROR PETERSON:  Production. |
| 10:16:47 | 17 | THE COURT:  Thank you, ma'am. |
| 10:16:48 | 18 | All right.  Next is No. 31, Mr. Nelson. |
| 10:16:51 | 19 | JUROR NELSON:  Name is Owen Nelson.  I have one |
| 10:16:55 | 20 | grown son and one granddaughter.  I work at a trucking |
| 10:17:00 | 21 | logistics and warehouse facility in Longview.  I've been |
| 10:17:03 | 22 | there probably -- it will be six years this January. |
| 10:17:08 | 23 | I got a high school and some college, mainly |
| 10:17:11 | 24 | technical. |
| 10:17:13 | 25 | My wife's name is Betty.  She worked at various |

| | | |
|---|---|---|
| 10:17:18 | 1 | schools in the area as a cafeteria cook.  She retired, |
| 10:17:24 | 2 | worked there for 20 some-odd years. |
| 10:17:28 | 3 | Prior jury duty, criminal case, Upshur County, |
| 10:17:35 | 4 | about seven years ago. |
| 10:17:36 | 5 | THE COURT:  All right, sir.  Thank you, |
| 10:17:38 | 6 | Mr. Nelson. |
| 10:17:38 | 7 | Next is No. 32, Ms. Livingston. |
| 10:17:41 | 8 | JUROR LIVINGSTON:  My name is Mishelle Livingston. |
| 10:17:44 | 9 | I live in Daingerfield.  I have no children.  I work at |
| 10:17:51 | 10 | Lakes Regional Mental Health Clinic in Mt. Pleasant as a |
| 10:17:54 | 11 | medical receptionist, and I also am a reserve deputy at |
| 10:17:58 | 12 | Titus County Sheriff's Office.  Been at Lakes Regional |
| 10:18:02 | 13 | about four years, Titus County for eight years. |
| 10:18:02 | 14 | I have some college.  I have a peace officer's |
| 10:18:07 | 15 | certificate and EMT certificate. |
| 10:18:08 | 16 | My husband's name is John Livingston.  He works at |
| 10:18:13 | 17 | Titus County Sheriff's Office as chief deputy for about 21 |
| 10:18:17 | 18 | years. |
| 10:18:17 | 19 | And about 20 years ago I served on a criminal case |
| 10:18:21 | 20 | in Titus County. |
| 10:18:22 | 21 | THE COURT:  That's your only jury service? |
| 10:18:24 | 22 | JUROR LIVINGSTON:  Yes, sir. |
| 10:18:25 | 23 | THE COURT:  Thank you, ma'am. |
| 10:18:26 | 24 | Next is No. 33, Mr. Baker. |
| 10:18:28 | 25 | JUROR BAKER:  My name is Caleb Baker.  I live in |

10:18:32  1  Pittsburg, Texas.  I work at Pittsburg Steel as a

10:18:36  2  programming and head of IT.  I've been there about three

10:18:36  3  years now.  I started there when I graduated college from

10:18:39  4  Texas A&M Commerce with my computer science degree.

10:18:45  5       My wife's name is Tori.  She's currently in school

10:18:48  6  to be a teacher right now.  She's been there for three

10:18:51  7  years, about, so she's graduating this year.

10:18:53  8       And I've never served on a jury before.

10:18:55  9       THE COURT:  All right.  Thank you.

10:18:56  10      Next is No. 34, Ms. McClain.

10:18:59  11      JUROR MCCLAIN:  My name is Kathy McClain.  I live

10:19:02  12  in Gilmer, Texas.  I have no children.  I have two

10:19:06  13  stepchildren.  I was employed as an elementary classroom

10:19:11  14  teacher, and I'm retired now.  And I did it for 32 years.

10:19:15  15      I have a Master's of Education and specialty is

10:19:20  16  supervision.

10:19:21  17      My husband's name is James.  He was a postal clerk

10:19:26  18  for the United States Postal Service for 36 years.

10:19:29  19      And I've never had any prior jury service.  I was

10:19:32  20  selected, but both the cases I was chosen for were settled

10:19:37  21  out of court.

10:19:39  22      THE COURT:  All right.  Thank you very much.

10:19:40  23      Next is No. 35, Mr. Galusha.

10:19:42  24      JUROR GALUSHA:  Yes, sir.  My name is Keith

10:19:45  25  Galusha.  I have five children, two are grown.  My place of

```
10:19:48   1   employment is the City of Longview.  I'm the supervisor of
10:19:51   2   the street department.  As of tomorrow, I've been there 18
10:19:56   3   years.
10:19:56   4          My education is high school.  I served four years
10:20:00   5   active duty in the Marine Corps.
10:20:02   6          My spouse's name is Elizabeth.  She is the -- my
10:20:06   7   homemaker and the educator of our children.  And she's put
10:20:09   8   up with me for 20 years.
10:20:11   9          My prior jury -- jury service is traffic court in
10:20:14  10   the City of Longview.
10:20:15  11          THE COURT:  How long ago was that?
10:20:17  12          JUROR GALUSHA:  10 years ago.
10:20:18  13          THE COURT:  All right.  Thank you very much.
10:20:19  14          Next is No. 36, Ms. Oliver.
10:20:23  15          JUROR OLIVER:  My name is Virginia Oliver.  I live
10:20:26  16   here in Marshall, Texas.  I have one grown stepchild.  I
10:20:29  17   work at Walmart.  I have held various positions there.  I'm
10:20:33  18   currently in the vision center as an optician.  I've been
10:20:36  19   there for 32 years.
10:20:38  20          I have a high school diploma.
10:20:41  21          My spouse's name is Steve.  He retired from Radio
10:20:46  22   Shack with 20-plus years.  He currently is a driver for an
10:20:49  23   oversized escort service.
10:20:52  24          And I've done one criminal case about five years
10:20:55  25   ago here in Harrison County.
```

| | | |
|---|---|---|
| 10:20:56 | 1 | THE COURT:  Thank you very much, ma'am. |
| 10:20:57 | 2 | Next is No. 37, Ms. Strawn. |
| 10:21:02 | 3 | JUROR STRAWN JACKSON:  It's Jackson. |
| 10:21:04 | 4 | THE COURT:  Jackson.  Okay.  Thank you. |
| 10:21:05 | 5 | JUROR STRAWN JACKSON:  My name is Malena Jackson. |
| 10:21:07 | 6 | I live in Hughes Springs.  I've lived there going on 22 |
| 10:21:10 | 7 | years now.  I work for the Springs Nursing Center.  I'm the |
| 10:21:14 | 8 | environmental specialist.  I'm the housekeeping laundry |
| 10:21:17 | 9 | supervisor basically.  Been doing nursing home work for 33 |
| 10:21:20 | 10 | years.  I got one living child and one deceased child. |
| 10:21:24 | 11 | Divorced. |
| 10:21:25 | 12 | And never done jury service. |
| 10:21:27 | 13 | THE COURT:  All right.  Thank you very much, |
| 10:21:29 | 14 | ma'am. |
| 10:21:29 | 15 | Next is No. 38, Ms. Neal. |
| 10:21:33 | 16 | JUROR NEAL:  My name is Verna Neal.  I live in |
| 10:21:36 | 17 | Queen City, Texas.  I have three children, three |
| 10:21:40 | 18 | grandchildren. |
| 10:21:41 | 19 | THE COURT:  Ms. Neal, could you -- Ms. Neal, could |
| 10:21:42 | 20 | you hold the microphone up? |
| 10:21:44 | 21 | JUROR NEAL:  Oh, I'm sorry. |
| 10:21:45 | 22 | THE COURT:  That's fine. |
| 10:21:46 | 23 | JUROR NEAL:  My last place I worked -- I worked -- |
| 10:21:48 | 24 | I retired from Bloomburg High School ISD as a cafeteria |
| 10:21:56 | 25 | worker.  And I live -- I worked there for five years before |

10:21:59  1  I retired.

10:22:00  2          I have some -- I graduated from Brightstar High

10:22:07  3  School in Brightstar, Arkansas.  I have a college degree.

10:22:11  4          My spouse's name is Edward Louis Neal.  He retired

10:22:15  5  from Cooper Tire in Texarkana, Arkansas.  He had worked

10:22:21  6  there for over 20-plus years.

10:22:23  7          I have had some service -- jury service for

10:22:27  8  less -- oh, about 20 some-odd years or longer.

10:22:30  9          THE COURT:  Where was that, ma'am?

10:22:32  10         JUROR NEAL:  In Cass County.

10:22:33  11         THE COURT:  All right.  Do you remember if it was

10:22:34  12  a civil case or a criminal case?

10:22:36  13         JUROR NEAL:  One of them was a civil case, because

10:22:41  14  they were suing someone.

10:22:42  15         THE COURT:  But it's been over 20 years?

10:22:46  16         JUROR NEAL:  It's been over 20-plus years, I know.

10:22:48  17         THE COURT:  Okay.  Thank you, Ms. Neal.

10:22:50  18         JUROR NEAL:  Uh-huh.

10:22:51  19         THE COURT:  Next is No. 39, Mr. Martin.

10:22:54  20         JUROR MARTIN:  My name is Walter Martin.  I live

10:22:57  21  in Hughes Springs.  No children.  Retired from Exxon Mobil

10:23:01  22  after 30 years, but I'm back working contract in accounting

10:23:04  23  on -- working from home, so doing some special project work

10:23:08  24  for them.  Same thing I did before I retired, really, but

10:23:12  25  been doing that for two years.

10:23:16  1          I got a BBA in accounting.

10:23:18  2          My spouse's name is Jill Martin.  She's a retired

10:23:22  3   accountant also.  She did payroll accounting for central --

10:23:28  4   it was the last place she worked, and retired back in 2011

10:23:30  5   or something like that.

10:23:34  6          And prior jury service, 30 years ago on a criminal

10:23:37  7   case, Morris County; 20-something years ago in Dallas

10:23:41  8   County; and a civil case with Bank of America; and then

10:23:46  9   another civil case in Midland that got -- like one of the

10:23:49 10   other ladies said, we got ready to go to trial, and they

10:23:52 11   settled out of court.

10:23:54 12          THE COURT:  All right.  Thank you, Mr. Martin.

10:23:56 13          Next is No. 40, Mr. Ball.

10:23:59 14          JUROR BALL:  My name is Michael Ball.  I live in

10:24:04 15   Jefferson, Texas.  I have two sons, two daughters.  I'm

10:24:09 16   employed with Ryder Truck Rentals in Texarkana, Arkansas.

10:24:15 17   I've been with them for 36 years.

10:24:17 18          I did not graduate high school.  I went to 11th

10:24:20 19   grade.

10:24:21 20          My spouse's name is Josie.  She's employed with

10:24:25 21   the First National Bank in Jefferson, Texas.  She's a loan

10:24:29 22   processor.  She's been there for 15 years.

10:24:32 23          And I have no prior jury service.

10:24:34 24          THE COURT:  All right.  Thank you, Mr. Ball.

10:24:37 25          Thank you very much, ladies and gentlemen.

10:24:42  1          Now, I need to say a couple more things to you

10:24:46  2   before I turn the questioning over to the lawyers.

10:24:49  3          The jurors that will be selected to serve in this

10:24:52  4   case will serve in the role as the judges of the facts, and

10:24:58  5   the jurors will make the sole determination about what the

10:25:00  6   facts are in this case.

10:25:01  7          My job as the Judge is to rule on questions of

10:25:05  8   law, evidence, and procedure; to maintain the decorum of

10:25:09  9   the courtroom; and to oversee the flow of the evidence in

10:25:11 10   the trial.

10:25:13 11          Also, I want to say a couple things to you about

10:25:15 12   our judicial system that I hope will put things in a proper

10:25:19 13   perspective.  In every jury trial, including this one,

10:25:24 14   besides the parties themselves, there are always three

10:25:26 15   participants, the jury, the judge, and the lawyers.

10:25:31 16          With regard to the lawyers, I think it's important

10:25:34 17   for each of you to understand that our American judicial

10:25:39 18   system is an adversary system, which simply means that

10:25:42 19   during the trial of each case, the parties will seek to

10:25:47 20   present their respective cases to the jury in the very best

10:25:51 21   light possible.

10:25:51 22          Now, it's no surprise to any of you that lawyers

10:25:55 23   are sometimes criticized in the media and in the public,

10:25:59 24   but the Court's observed that at least some of that

10:26:01 25   criticism comes from a basic misunderstanding of our

10:26:05   1   adversary system in which the lawyers act as competing

10:26:09   2   advocates for the parties.  And as an advocate, a lawyer is

10:26:14   3   ethically and legally obligated to zealously assert his or

10:26:21   4   her client's position under the rules of our adversary

10:26:24   5   system.

10:26:24   6        And by presenting the best case possible for their

10:26:27   7   clients, the lawyers hopefully will enable the jury to

10:26:30   8   better weigh the relevant evidence to determine the truth

10:26:34   9   and arrive at a just verdict based on that evidence.

10:26:37  10        Now, this American system of justice has served

10:26:41  11   our country well for over 200 years, and America's lawyers

10:26:45  12   have always been and will continue to be an indispensable

10:26:50  13   part of that process.

10:26:51  14        So as we go forward, even though it's possible

10:26:55  15   over the course of this trial I might frown or even grumble

10:26:59  16   at the lawyers from time to time, it's simply because I'm

10:27:01  17   trying to make sure that their advocacy doesn't get outside

10:27:05  18   the bounds of our adversary system and the rules of the

10:27:11  19   court.

10:27:12  20        But please keep in mind, ladies and gentlemen,

10:27:14  21   they are doing their jobs, and I think it's important for

10:27:16  22   all of you to be aware of that as we go forward.

10:27:19  23        Also, ladies and gentlemen, I want you to

10:27:21  24   understand as we go forward, I am going to do my very best

10:27:24  25   to make sure that no one on the jury has any idea about

| | | |
|---|---|---|
| 10:27:29 | 1 | what I think about the evidence in this case, because |
| 10:27:33 | 2 | evaluating the evidence and determining what the facts are |
| 10:27:36 | 3 | in this case is the -- is the job of the jury.  It's not my |
| 10:27:40 | 4 | job. |
| 10:27:40 | 5 | So you -- if you're selected to serve on this |
| 10:27:44 | 6 | jury, you should not take anything you think you hear or |
| 10:27:48 | 7 | see as coming from me as something to take into account in |
| 10:27:51 | 8 | making your ultimate decision about what the facts are in |
| 10:27:54 | 9 | this case. |
| 10:27:56 | 10 | All right.  At this time, the lawyers are going to |
| 10:27:59 | 11 | examine the panel from the podium.  We'll begin with the |
| 10:28:03 | 12 | Plaintiff. |
| 10:28:03 | 13 | Ms. Smith, you may address the panel on behalf of |
| 10:28:06 | 14 | the Plaintiff. |
| 10:28:07 | 15 | MS. SMITH:  Thank you, Your Honor. |
| 10:28:07 | 16 | THE COURT:  Would you like a warning on your time? |
| 10:28:10 | 17 | MS. SMITH:  Your Honor, if I may have a warning at |
| 10:28:12 | 18 | five minutes and one minute, please. |
| 10:28:14 | 19 | THE COURT:  All right.  You may proceed when |
| 10:28:16 | 20 | you're ready. |
| 10:28:17 | 21 | MS. SMITH:  Thank you. |
| 10:28:17 | 22 | May it please the Court. |
| 10:28:32 | 23 | THE COURT:  Please proceed. |
| 10:28:33 | 24 | MS. SMITH:  Good morning, everyone.  Again, my |
| 10:28:37 | 25 | name is Melissa Smith, and I'm here today representing the |

| | | |
|---|---|---|
| 10:28:40 | 1 | Plaintiff, GREE. |
| 10:28:41 | 2 | Now, the first thing I'm going to do and probably |
| 10:28:44 | 3 | the most important thing I'll do all day is thank you for |
| 10:28:46 | 4 | your service on behalf of my client. |
| 10:28:50 | 5 | I looked yesterday, some of you are coming from as |
| 10:28:54 | 6 | far as Omaha and Big Sandy and Gilmer.  And when I woke up |
| 10:28:58 | 7 | this morning when I was getting ready, it was pouring down |
| 10:29:03 | 8 | rain.  And so I know some of you didn't have a very easy |
| 10:29:03 | 9 | commute this morning. |
| 10:29:04 | 10 | I also know that even before your service actually |
| 10:29:06 | 11 | started, even before you got here today -- because you |
| 10:29:09 | 12 | filled out those pretty lengthy questionnaires for us -- I |
| 10:29:12 | 13 | know that doing these things takes time away from your |
| 10:29:16 | 14 | friends, your family, and your work.  And on behalf of my |
| 10:29:19 | 15 | client, we appreciate it. |
| 10:29:20 | 16 | Now, you all have been generous in answering a few |
| 10:29:25 | 17 | personal questions about yourself, and I'm going to have a |
| 10:29:26 | 18 | few more questions for you, but before I dive into those, |
| 10:29:28 | 19 | I'll tell you a little bit about myself. |
| 10:29:30 | 20 | I went to University of Texas at Austin undergrad, |
| 10:29:35 | 21 | and then, like Judge Gilstrap, I went on to Baylor Law |
| 10:29:39 | 22 | School.  That was about 23 years ago. |
| 10:29:41 | 23 | From Baylor Law School, I moved to Jefferson, |
| 10:29:44 | 24 | Texas.  I still live in Jefferson, Texas.  I started |
| 10:29:47 | 25 | practicing law here in Marshall, Texas. |

10:29:49  1          My boss, the gentleman that hired me, his name is

10:29:52  2     Gil Gillam.  We -- after about eight years, I turned into

10:29:56  3     his law partner instead of having him as my boss.  And

10:30:01  4     we've actually practiced together for each of my 23 years.

10:30:05  5     Our law firm is Gillam & Smith.  And some of you may have

10:30:08  6     seen it when you drive to this courthouse.  It's the old

10:30:11  7     yellow Victorian building that sits right behind this

10:30:15  8     courthouse.

10:30:15  9          Personally, I am married.  My husband is mostly --

10:30:18 10     I say mostly retired law enforcement.  He still holds his

10:30:21 11     commission.  But we have a seven-year-old girl in second

10:30:25 12     grade and a nine-year-old boy in fourth grade.  And so even

10:30:28 13     though he holds that commission, for the last few months,

10:30:31 14     he's been mostly homeschooling our kids until we could

10:30:34 15     finally get them back in school.

10:30:36 16          Now, His Honor gives us about three minutes to

10:30:42 17     introduce -- to further introduce our client to you and our

10:30:45 18     case.  And so I'm going to take that opportunity.

10:30:47 19          Our client, again, is GREE, and that's G-R-E-E.

10:30:51 20     It's just like green without the N.  I don't want anybody

10:30:56 21     to get confused that it's not the air conditioning company

10:30:59 22     by the same name that's fairly common.  GREE is actually a

10:31:03 23     pioneering video game and entertainment company based out

10:31:07 24     of Tokyo, Japan.

10:31:09 25          GREE has about 1,700 employees, but more

10:31:14  1  interestingly, GREE has about a few over 1,500 patents and

10:31:19  2  patent applications worldwide.

10:31:21  3       And so, to understand how they came to having that

10:31:25  4  many patents and the history of GREE's innovation, you

10:31:29  5  actually have to go back -- and some of you are young, you

10:31:32  6  might not be able to do this, but I can, you have to go

10:31:35  7  back to the early 2000s and look at what was happening in

10:31:38  8  2000 -- in the early 2000s with social media.

10:31:42  9       It was just kicking off, and I think some of you

10:31:44  10  will remember MySpace.  That may ring a bell.  I see

10:31:48  11  some -- some heads shaking.

10:31:50  12       No. 7.

10:31:52  13       And video gaming at that time, for those of you

10:31:54  14  with grown kids, you can probably look back to that time

10:31:57  15  and remember video games were always on consoles, your Xbox

10:32:01  16  or your Nintendo.  Playing multi-player games meant you

10:32:05  17  were sitting beside your buddy and you both had a control.

10:32:08  18       Games were expensive, too.  I was -- you know, I'd

10:32:11  19  asked my parents for a game, and, you know, if I was lucky

10:32:15  20  enough to go to GameStop or Walmart or something like that,

10:32:18  21  they weren't -- they certainly weren't the price of games

10:32:22  22  nowadays.  They would be 40 and $50.00.

10:32:24  23       And so GREE saw that, and GREE came along and they

10:32:29  24  actually started -- the company started as a social media

10:32:32  25  platform in Japan in 2004.  But they saw an opportunity to

10:32:36  1    create kind of a brand-new way of communicating through

10:32:40  2    multi-player social video games, played on multi -- on

10:32:49  3    mobile devices.

10:32:49  4         And whether coincidence or not, the timing was

10:32:53  5    unbelievable because that was right at about the time that

10:32:57  6    smartphones were gaining in popularity.

10:33:00  7         And so GREE went on to release the first mobile

10:33:03  8    social game, and that was in 2007.  It was actually a

10:33:07  9    fishing game called Fishing Star.  And that gives you a

10:33:11  10   little -- a little history of GREE.

10:33:12  11        So you ask why -- why are we here today?  It's --

10:33:15  12   now you heard we've got a patent case on our hands.  It's a

10:33:17  13   patent case where five U.S. patents that were awarded to

10:33:23  14   GREE are at issue.

10:33:25  15        Now, the patents in this case, we're going to fast

10:33:28  16   forward from that history of GREE that I gave you, and the

10:33:30  17   patent -- the five patents, the U.S. patents GREE has in

10:33:34  18   this case are some of their more recent inventions, and

10:33:40  19   they're inventions that actually -- I call it increase user

10:33:45  20   engagement in something called freemium games.

10:33:49  21        And some of you in your questionnaires had some

10:33:50  22   mention of freemium games.  So some of you are familiar

10:33:52  23   with those.

10:33:55  24        Long gone are the days where you go to GameStop

10:33:58  25   and pay $50.00 for the game, get it home, decide you don't

| | | |
|--|--|--|
| 10:34:01 | 1 | really like it and you wasted $50.00. |
| 10:34:04 | 2 | Now we have the luxury of trying -- trying before |
| 10:34:06 | 3 | you buy many, many games.  They're free on our mobile |
| 10:34:09 | 4 | devices, and then you have an opportunity to -- to pay some |
| 10:34:13 | 5 | extra money to gain additional features or additional |
| 10:34:17 | 6 | functions and services with those games. |
| 10:34:19 | 7 | And that's what GREE's technology and their |
| 10:34:23 | 8 | inventions and the five U.S. patents relate to. |
| 10:34:26 | 9 | So we're here because it's our position that |
| 10:34:30 | 10 | Supercell, sitting here at the Defense table, is |
| 10:34:33 | 11 | trespassing or is using each of our five patents without |
| 10:34:37 | 12 | permission.  And they're doing that through selling games |
| 10:34:41 | 13 | in the U.S. called Clash of Clans, Clash Royale, and Brawl |
| 10:34:48 | 14 | Stars. |
| 10:34:48 | 15 | We believe that Supercell has, quite frankly, and |
| 10:34:53 | 16 | I don't -- I don't think anyone is going to dispute this, |
| 10:34:56 | 17 | has made a tremendous amount of money from these games. |
| 10:34:59 | 18 | So our case is first going to involve showing you |
| 10:35:04 | 19 | that Supercell has trespassed on our patents, and the |
| 10:35:07 | 20 | second thing we're going to do is sort through that |
| 10:35:09 | 21 | tremendous amount of money and try to figure out what |
| 10:35:12 | 22 | portion of that money is due to GREE's five U.S. patents. |
| 10:35:18 | 23 | THE COURT:  We need to proceed with specific |
| 10:35:20 | 24 | questions. |
| 10:35:21 | 25 | MS. SMITH:  Thank you, Your Honor. |

10:35:21  1        Now, just like life, lawsuits aren't one size fits

10:35:27  2   all.  So what I'm going to do is I'm going to ask you some

10:35:30  3   questions now, as the Judge just told you, to get to know

10:35:33  4   you better and to try to figure out for a reason personal,

10:35:38  5   religious, life experience, you might not be the best fit

10:35:42  6   for this case.

10:35:42  7        And sometimes jurors tell me I'm really -- I was

10:35:45  8   really hesitant to offer this opinion or to tell you this,

10:35:48  9   and I'll tell you, if you're not the best fit for this

10:35:51  10  case, I would rather know today than after you have to

10:35:54  11  serve on a jury and I find that out a week later.

10:35:57  12        And I see some of you shaking your heads, and so I

10:36:00  13  appreciate that.

10:36:00  14        I'm going to start with an easy question, and I'm

10:36:03  15  go to ask you if any of you -- you heard the introductions

10:36:06  16  in court today -- if any of you knew anybody sitting at the

10:36:13  17  table of Defense counsel.  And when I say "know," I mean in

10:36:16  18  the broadest sense.

10:36:16  19        I heard some of you folks are from Gilmer.

10:36:20  20  Mr. Dacus is originally from -- from Gilmer.  He lives in

10:36:23  21  Tyler now.  He's married to another lawyer, Shannon Dacus.

10:36:26  22  By a showing of hands, does anyone know Mr. Dacus?  I don't

10:36:31  23  see any hands.

10:36:32  24        Now, there's some other attorneys at the table

10:36:35  25  with Mr. Dacus, Mr. Mike Sacksteder and Mr. Bryan Kohm, and

```
10:36:41   1   they're here all the way from San Francisco.  Does anyone
10:36:43   2   know these two gentlemen?  Thank you.
10:36:45   3        Similar question about -- about jurors.  Did
10:36:51   4   anybody show up today for jury duty and know someone else
10:36:55   5   on the panel?  If you could raise your hand if that's the
10:36:57   6   case.  This is always amazing to me.  It reminds me what a
10:37:02   7   small community we have.
10:37:03   8        All right.  I'm going to start with Ms. Smith, and
10:37:08   9   unfortunately for you we share a name and you're No. 1.  So
10:37:08  10   I'm going to call on you probably a good bit over this time
10:37:12  11   and I apologize in advance.
10:37:15  12        But, Ms. Smith, if you could tell me who you knew
10:37:18  13   coming in today.
10:37:19  14        JUROR SMITH:  Well, there's several.  I worked
10:37:22  15   with the lady -- the juror, No. 4, I think.  I worked with
10:37:25  16   her for several years.
10:37:26  17        MS. SMITH:  Ms. Derrick?
10:37:27  18        JUROR SMITH:  Uh-huh.
10:37:28  19        MS. SMITH:  And where did you guys work together?
10:37:30  20        JUROR SMITH:  North East Texas Credit Union.
10:37:32  21        MS. SMITH:  Thank you.
10:37:33  22        JUROR SMITH:  And I know Ms. Jones.
10:37:35  23        MS. SMITH:  Okay.  How do you know Ms. Jones?
10:37:37  24        JUROR SMITH:  She -- my son and my daughter both
10:37:39  25   went through high school there.  My son actually worked at
```

| | | |
|---|---|---|
| 10:37:40 | 1 | the high school with her for a little bit, and my sister |
| 10:37:41 | 2 | works there at the school district, also. |
| 10:37:44 | 3 | MS. SMITH:  And that's in Hallsville or Harleton, |
| 10:37:45 | 4 | I can't remember? |
| 10:37:46 | 5 | JUROR SMITH:  No, that's Hughes Springs. |
| 10:37:48 | 6 | MS. SMITH:  Hughes Springs, I apologize. |
| 10:37:48 | 7 | JUROR SMITH:  Uh-huh. |
| 10:37:50 | 8 | MS. SMITH:  Okay.  Okay. |
| 10:37:51 | 9 | JUROR SMITH:  And the others I recognize names, |
| 10:37:54 | 10 | but I don't really know them. |
| 10:37:55 | 11 | MS. SMITH:  Okay.  They may help you out on that. |
| 10:37:57 | 12 | JUROR SMITH:  Okay. |
| 10:37:58 | 13 | MS. SMITH:  Thank you.  Thank you, Ms. Smith. |
| 10:37:59 | 14 | All right.  Other hands of people that we haven't |
| 10:38:04 | 15 | discussed with Ms. Smith -- I don't need to hear from |
| 10:38:07 | 16 | Ms. Derrick again, but I see one -- Juror No. 25, |
| 10:38:14 | 17 | Mr. Clubb? |
| 10:38:15 | 18 | JUROR CLUBB:  No. 27 is my nephew. |
| 10:38:18 | 19 | MS. SMITH:  All right.  All right.  What are the |
| 10:38:20 | 20 | chances?  Thank you.  I won't ask you how long you've known |
| 10:38:23 | 21 | him then.  I'll skip that question. |
| 10:38:25 | 22 | All right.  Anybody else?  No. 16? |
| 10:38:32 | 23 | JUROR KNABENSHUE:  I know Ms. Gleason right back |
| 10:38:36 | 24 | here.  We -- we worked at the high school together. |
| 10:38:36 | 25 | THE COURT:  Ma'am, would you mind standing up? |

| | | |
|---|---|---|
| 10:38:38 | 1 | JUROR KNABENSHUE:  Oh, I'm sorry. |
| 10:38:39 | 2 | THE COURT:  That's fine.  And do you mind pulling |
| 10:38:42 | 3 | your mask down? |
| 10:38:45 | 4 | JUROR KNABENSHUE:  Barbara Gleason -- Barbara |
| 10:38:45 | 5 | Gleason -- |
| 10:38:45 | 6 | THE COURT:  Do you mind -- |
| 10:38:48 | 7 | JUROR KNABENSHUE:  -- works for Harleton also, and |
| 10:38:50 | 8 | I've worked with her -- there, I'll get it right in a |
| 10:38:54 | 9 | minute. |
| 10:38:55 | 10 | THE COURT:  Thank you. |
| 10:38:56 | 11 | JUROR KNABENSHUE:  I do this daily.  I've worked |
| 10:38:56 | 12 | with Barbara Gleason at the Harleton High School.  That's |
| 10:39:00 | 13 | the only one I know. |
| 10:39:01 | 14 | THE COURT:  Thank you very much. |
| 10:39:01 | 15 | MS. SMITH:  Thank you, Ms. Knabenshue. |
| 10:39:03 | 16 | Anybody else that I missed? |
| 10:39:05 | 17 | Juror No. 14? |
| 10:39:09 | 18 | JUROR EHRLISH:  I know Tracy Jarvis. |
| 10:39:14 | 19 | MS. SMITH:  Okay. |
| 10:39:14 | 20 | JUROR EHRLISH:  I know Tracy Jarvis.  She's a -- |
| 10:39:14 | 21 | she's a high school friend. |
| 10:39:15 | 22 | THE COURT:  Ma'am? |
| 10:39:16 | 23 | JUROR EHRLISH:  I'm sorry. |
| 10:39:16 | 24 | JUROR SMITH:  One more -- one more time, |
| 10:39:17 | 25 | everybody.  Please stand up, please pull your mask down, |

| | | |
|---|---|---|
| 10:39:21 | 1 | and please -- |
| 10:39:23 | 2 | JUROR EHRLISH:  I know him -- |
| 10:39:23 | 3 | MS. SMITH:  Okay.  So you know Ms. Jarvis, No. 26, |
| 10:39:23 | 4 | from -- you graduated with her? |
| 10:39:23 | 5 | JUROR EHRLISH:  High school, uh-huh. |
| 10:39:28 | 6 | MS. SMITH:  Okay.  And who is the second one?  I |
| 10:39:30 | 7 | apologize. |
| 10:39:30 | 8 | JUROR EHRLISH:  Steve McRight. |
| 10:39:32 | 9 | MS. SMITH:  And how do you know Mr. McRight? |
| 10:39:32 | 10 | JUROR EHRLISH:  Just -- just knowing him, going to |
| 10:39:34 | 11 | church. |
| 10:39:34 | 12 | MS. SMITH:  Just growing up, okay.  Thank you. |
| 10:39:36 | 13 | THE COURT:  And let me interrupt for just a |
| 10:39:38 | 14 | second.  Just so we don't have to repeat the instructions, |
| 10:39:40 | 15 | please wait until you get the microphone, please stand up, |
| 10:39:43 | 16 | please pull your mask down or take it off, answer the |
| 10:39:47 | 17 | question, put your mask back on, hand the microphone back, |
| 10:39:51 | 18 | and have a seat.  Please do that with each answer to each |
| 10:39:55 | 19 | question. |
| 10:39:55 | 20 | Okay.  Ms. Smith, please continue. |
| 10:39:57 | 21 | MS. SMITH:  Thank you, Your Honor. |
| 10:39:59 | 22 | All right.  When you arrived today, you heard a |
| 10:40:02 | 23 | little bit about the parties in the case, and they were |
| 10:40:04 | 24 | also listed in your questionnaire. |
| 10:40:05 | 25 | The Defendant here that's being accused of |

| | | |
|---|---|---|
| 10:40:08 | 1 | infringement and trespass is Supercell.  Prior to coming in |
| 10:40:12 | 2 | today, had any of you ever heard of Supercell?  Showing of |
| 10:40:17 | 3 | hands? |
| 10:40:18 | 4 | Okay.  Jury No. 33, Mr. Baker?  Tell me a little |
| 10:40:24 | 5 | bit about what you know about Supercell. |
| 10:40:28 | 6 | JUROR BAKER:  I was in high school I guess at the |
| 10:40:30 | 7 | time Clash of Clans came out, and I played it with a bunch |
| 10:40:33 | 8 | of friends in high school. |
| 10:40:34 | 9 | MS. SMITH:  Okay. |
| 10:40:34 | 10 | JUROR BAKER:  That's about it. |
| 10:40:35 | 11 | MS. SMITH:  When was the last time you played |
| 10:40:37 | 12 | Clash of Clans? |
| 10:40:37 | 13 | JUROR BAKER:  Maybe a year ago, maybe a year and a |
| 10:40:41 | 14 | half ago. |
| 10:40:41 | 15 | MS. SMITH:  Thank you, sir. |
| 10:40:42 | 16 | And, Ms. Smith, I may not have gotten this right, |
| 10:40:45 | 17 | but I saw on your questionnaire you might have said your |
| 10:40:49 | 18 | son played Clash of Clans; is that correct? |
| 10:40:50 | 19 | JUROR SMITH:  Yes, ma'am. |
| 10:40:51 | 20 | MS. SMITH:  Did you ever play with him -- I -- I |
| 10:40:54 | 21 | apologize, I'm not waiting for the mic, Your Honor. |
| 10:40:57 | 22 | THE COURT:  We need a -- we need a verbal answer |
| 10:40:59 | 23 | so we can get it on the record. |
| 10:41:02 | 24 | JUROR SMITH:  My son did say that he played.  I |
| 10:41:04 | 25 | didn't have a clue that it was Supercell.  And I did not |

10:41:08  1  play with him.  That is not my --

10:41:08  2          MS. SMITH:  So you're not coming into the

10:41:10  3  courtroom with any special knowledge of the game?

10:41:12  4          JUROR SMITH:  No.

10:41:13  5          MS. SMITH:  Thank you.  Thank you, ma'am.

10:41:14  6          Now, I'm going to switch up the question a little

10:41:16  7  bit.  I was surprised at how many of you had somewhat

10:41:21  8  negative opinions of video games generally in filling out

10:41:26  9  your questionnaires.

10:41:27  10         And so as you can imagine, that's something that

10:41:29  11  might concern me because I represent a game maker.  The bad

10:41:33  12  news for those of you that have negative opinions is

10:41:37  13  there's game makers on both sides.

10:41:39  14         So if I could have a showing of hands -- and I'm

10:41:41  15  going to start on Ms. Smith's row, the front row, of those

10:41:44  16  of you that have generally a negative opinion of video

10:41:46  17  games.

10:41:46  18         Anyone on the front row?

10:41:48  19         Ms. Hopkins, I haven't -- I know you're not

10:41:55  20  raising your hand, but I haven't yet spoken with you.

10:42:00  21         May she have the mic, please?

10:42:05  22         COURT SECURITY OFFICER:  Which number?

10:42:06  23         MS. SMITH:  I'm sorry, 2 -- No. 2.

10:42:09  24         Ms. Hopkins, do you have an opinion one way or

10:42:11  25  another that you come into the courtroom with about video

| | | |
|---|---|---|
| 10:42:14 | 1 | games? |
| 10:42:15 | 2 | JUROR HOPKINS:  No, not at all. |
| 10:42:16 | 3 | MS. SMITH:  No?  Okay. |
| 10:42:16 | 4 | JUROR HOPKINS:  I mean -- |
| 10:42:17 | 5 | MS. SMITH:  Have you spent any time playing them? |
| 10:42:20 | 6 | JUROR HOPKINS:  Yes, I play them.  I play them |
| 10:42:22 | 7 | with my daughter. |
| 10:42:22 | 8 | MS. SMITH:  Okay.  How old is your daughter? |
| 10:42:25 | 9 | JUROR HOPKINS:  She's 27. |
| 10:42:26 | 10 | MS. SMITH:  Okay.  What games do you guys play |
| 10:42:27 | 11 | together? |
| 10:42:28 | 12 | JUROR HOPKINS:  Every game.  I can't think of all |
| 10:42:29 | 13 | the names.  We play a lot of games together. |
| 10:42:30 | 14 | MS. SMITH:  Do you mostly play consoles, or do you |
| 10:42:33 | 15 | do the social gaming -- |
| 10:42:34 | 16 | JUROR HOPKINS:  Both. |
| 10:42:35 | 17 | MS. SMITH:  Okay.  So you're familiar with playing |
| 10:42:37 | 18 | games using mobile iPad -- |
| 10:42:39 | 19 | JUROR HOPKINS:  PlayStation, Xbox, we play all of |
| 10:42:42 | 20 | those. |
| 10:42:42 | 21 | MS. SMITH:  Okay.  And mobile devices, as well? |
| 10:42:44 | 22 | JUROR HOPKINS:  Yes. |
| 10:42:45 | 23 | MS. SMITH:  Thank you.  I apologize for calling on |
| 10:42:49 | 24 | you, but I appreciate it. |
| 10:42:50 | 25 | MS. HOPKINS:  No problem. |

| | |
|---|---|
| 10:42:50 | 1 |
| 10:42:51 | 2 |
| 10:42:55 | 3 |
| 10:42:58 | 4 |

10:42:50  1          MS. SMITH:  All right.  Let's go to the second

10:42:51  2  row.  I will call it Juror No. 7, Ms. Griffin's row.

10:42:55  3  Anybody on that second row that has generally kind of a

10:42:58  4  negative opinion of video games?

10:43:02  5          Juror No. 8, Ms. Jones?  Why don't you tell me

10:43:07  6  where that opinion comes from.

10:43:08  7          JUROR JONES:  I have 12 grandchildren, the last --

10:43:14  8  a little over a year.  My daughter and her family lived --

10:43:19  9  lived with us while they were building a house.  My three

10:43:24  10  grandchildren, 9, 11, and now 15 were -- are big gamers.

10:43:31  11          And when your nine-year-old grandson says he wants

10:43:36  12  to kill himself because he's playing a violent game and his

10:43:40  13  brother's keep killing him, it's very disheartening.  And I

10:43:47  14  tried to tell him and his father and his mother that life

10:43:53  15  is not a game.  And if you kill yourself, you die.  And

10:43:58  16  there's no do-overs.

10:44:01  17          And after that happened, the games were taken out

10:44:05  18  of my house, and life got better.  And they started playing

10:44:12  19  again and being children again.  And it just is very

10:44:20  20  concerning that there's evil in them.

10:44:23  21          MS. SMITH:  And I -- I can't tell you how much

10:44:25  22  I -- I appreciate your honesty.  And I think what I'm

10:44:29  23  probably hearing you say is that this -- this isn't the

10:44:32  24  right case for you to sit on.

10:44:33  25          JUROR JONES:  It is not.

10:44:35   1          MS. SMITH:  And not only because of your feelings
10:44:36   2   but because of the emotion --
10:44:38   3          JUROR JONES:  Yes.
10:44:38   4          MS. SMITH:  -- that it would bring related to our
10:44:41   5   grandkids --
10:44:42   6          JUROR JONES:  Yes, true.
10:44:43   7          MS. SMITH:  Thank you, ma'am.  I appreciate it.
10:44:45   8          Juror No. 9, Ms. Arnold?
10:44:55   9          JUROR ARNOLD:  I kind of have the same feeling she
10:44:56  10   does.  I have six small grandchildren, all under the age of
10:45:00  11   12.  And I know their parents all -- which are my daughters
10:45:04  12   and their husbands -- have had issues with language and
10:45:04  13   with violence.
10:45:14  14          And I don't allow them in my house.  I don't like
10:45:18  15   them.  I think children should play and not play on a video
10:45:19  16   game all day.  And as my two oldest grandsons, 12 and 10,
10:45:22  17   get older, they're more involved in these games.  And I
10:45:27  18   know my daughters have both talked to me about concerns
10:45:29  19   about the games and things that they're learning from these
10:45:32  20   video games.
10:45:33  21          And like one little boy went around the house all
10:45:37  22   day saying, I've got to kill the Zombies, I've got to kill
10:45:41  23   the Zombies.  And it just -- I just don't like them.  I
10:45:44  24   just have to be frank and honest.  I do not like video
10:45:49  25   games.  I've never played them.  I played Mario --

10:45:53  1            MS. SMITH:  Mario.

10:45:55  2            JUROR ARNOLD:  -- when it first came out, and

10:45:56  3   that's the only video game I know or played.  But my

10:46:00  4   grandsons and my grandchildren can tell you about them, and

10:46:02  5   they can tell you that their parents don't allow very many

10:46:05  6   of them at all in their homes.

10:46:07  7            MS. SMITH:  So I think -- I think, Ms. Arnold,

10:46:09  8   you'd probably join Ms. Jones in saying you're probably not

10:46:12  9   the right fit for --

10:46:14  10           JUROR ARNOLD:  I don't think so, because I do not

10:46:16  11  like video games.

10:46:17  12           MS. SMITH:  And because this ultimately is a case

10:46:20  13  where there would be some money potentially paid, you --

10:46:24  14  you probably couldn't be fair in awarding any kind of money

10:46:29  15  to --

10:46:29  16           JUROR ARNOLD:  No.

10:46:30  17           MS. SMITH:  -- to a video game maker?

10:46:32  18           JUROR ARNOLD:  I don't even know about the games,

10:46:34  19  the names, the prices, I don't know any of that, because I

10:46:36  20  never allowed it.  My girls were already grown by the time

10:46:42  21  the video game -- besides for Donkey Kong and Mario, that's

10:46:45  22  all we -- and PacMan.

10:46:46  23           MS. SMITH:  Thank you.  Thank you.

10:46:47  24           JUROR ARNOLD:  Thank you.

10:46:48  25           MS. SMITH:  Thank you.

| | | |
|---|---|---|
| 10:46:48 | 1 | Continuing on, down the second row, anybody else |
| 10:46:52 | 2 | have any negative opinions they'd like to share with me |
| 10:46:56 | 3 | about video games? |
| 10:47:03 | 4 | Juror No. 11, Ms. Leathers. |
| 10:47:07 | 5 | JUROR LEATHERS:  Mine is just I have a |
| 10:47:10 | 6 | five-year-old.  So we just really limit tablet time and |
| 10:47:13 | 7 | game time.  So we don't do tablet during the week because |
| 10:47:16 | 8 | he just started school, so I don't think he needs it.  And |
| 10:47:16 | 9 | then just -- knowing in the future just limiting the |
| 10:47:20 | 10 | violence he's exposed to I guess. |
| 10:47:20 | 11 | MS. SMITH:  Okay.  Thank you, thank you, ma'am. |
| 10:47:22 | 12 | Anybody else in the rest of the second row? |
| 10:47:28 | 13 | Yes, ma'am?  Juror No. 7, Ms. Griffin? |
| 10:47:32 | 14 | JUROR GRIFFIN:  My opinion about -- about it is -- |
| 10:47:36 | 15 | is kind of flip flop.  I think it should be a monitored |
| 10:47:39 | 16 | thing, and the negative about it is it does take its -- |
| 10:47:46 | 17 | it's time-consuming and, you know, for children doing other |
| 10:47:50 | 18 | things. |
| 10:47:51 | 19 | MS. SMITH:  There's a lot of screen time right now |
| 10:47:53 | 20 | with homeschooling, as well, I can tell you firsthand. |
| 10:47:57 | 21 | JUROR GRIFFIN:  I used to play, but I don't -- I |
| 10:47:59 | 22 | don't anymore.  I don't at all anymore. |
| 10:48:02 | 23 | MS. SMITH:  What did you play when you used to |
| 10:48:03 | 24 | play? |
| 10:48:04 | 25 | JUROR GRIFFIN:  Well, it was, you know, back in |

10:48:07  1   the old days of Donkey Kong and Space Invaders and things

10:48:13  2   like that.

10:48:13  3         MS. SMITH:  Those are things I'm familiar with.

10:48:15  4         JUROR GRIFFIN:  Like the space games.

10:48:17  5         MS. SMITH:  Thank you.  Thank you, ma'am.

10:48:19  6         Now, I am going to skip to the third row led by

10:48:23  7   Juror No. 14, Ms. Ehrlish.

10:48:25  8         Anyone on that row have -- I see a shake --

10:48:29  9   No. 17, Ms. Norris?  What can you tell me about your

10:48:33 10   feelings about video games?

10:48:36 11         JUROR NORRIS:  Well, when my children were young,

10:48:39 12   they played them.  I let them.  They spent more time

10:48:43 13   playing these games and not wanting to go outside and play.

10:48:47 14   I finally had to throw them in the trash so I could get

10:48:50 15   them to go outside.

10:48:51 16         And still today, since they're grown, they still

10:48:54 17   want to play them.  I can't get them to do nothing else,

10:48:58 18   unless my youngest one, if the fire department gets a call,

10:49:02 19   he gone.  If I need him to do something around the house,

10:49:07 20   oh, mom, I'll get it later or in a minute.  He's still

10:49:10 21   either playing or watching TV.  And I'm ready to chunk them

10:49:15 22   out the door, even my TVs.

10:49:17 23         MS. SMITH:  Well, so you tell me, ma'am, in your

10:49:20 24   heart of hearts, do you think that would -- would that

10:49:23 25   prevent you from being fair to a video game maker that's

| | |
|---|---|
| 10:49:26 | 1 |
| 10:49:27 | 2 |
| 10:49:29 | 3 |
| 10:49:33 | 4 |
| 10:49:38 | 5 |
| 10:49:40 | 6 |
| 10:49:40 | 7 |
| 10:49:44 | 8 |
| 10:49:47 | 9 |
| 10:49:50 | 10 |
| 10:49:51 | 11 |
| 10:49:52 | 12 |
| 10:49:54 | 13 |
| 10:49:54 | 14 |
| 10:49:58 | 15 |
| 10:50:02 | 16 |
| 10:50:03 | 17 |
| 10:50:03 | 18 |
| 10:50:05 | 19 |
| 10:50:09 | 20 |
| 10:50:12 | 21 |
| 10:50:14 | 22 |
| 10:50:17 | 23 |
| 10:50:21 | 24 |
| 10:50:25 | 25 |

here --

JUROR NORRIS:  I do play a video game with my kids -- my son now, and I'm ready to take it off because all it is is violence, and it's getting worse.

MS. SMITH:  And what video game is that that you play?

JUROR NORRIS:  aBANdoned.  And if they would put out some good games where there's no violence.  Kids, they get bored of them, they quit playing them.

MS. SMITH:  Thank you, ma'am.

JUROR NORRIS:  Thank you.

MS. SMITH:  I appreciate your honesty.

JUROR NORRIS:  Sure.

MS. SMITH:  All right.  Juror No. 18, I can't tell if you're swatting the AC or you're raising your hand.  I apologize.

JUROR PRICE:  Yes.

MS. SMITH:  Ms. Price.

JUROR PRICE:  Yes.  My son was like I guess eight years old when I bought him a game system, and today he's 30 years old and he's still in that game system.

I mean, I can go visit -- I just told him last week, I think, that's the worst thing I ever did in my life was buy you that game system.  He have kids, he don't have time.  He come in from work, and he go straight to that

10:50:29    1    video game.  I -- I really do.  I really hate I ever gave

10:50:33    2    him that first system.  I really do.

10:50:35    3           MS. SMITH:  Well, you know what question is coming

10:50:37    4    from me, I understand your aggravation, but -- but do you

10:50:40    5    think that that would prevent you from being fair to a game

10:50:43    6    maker who's here trying to seek damages for somebody

10:50:48    7    trespassing on their patents?

10:50:49    8           JUROR PRICE:  Well, I -- I guess it's really

10:50:52    9    depend on what did they do to defend them.  I mean, they're

10:50:57   10    messing with their patent.  But I -- but I really don't

10:51:00   11    like video games, I tell you.  I never played one before in

10:51:03   12    my life, and I don't never intend to play one.

10:51:06   13           MS. SMITH:  Do you think, though, that you could

10:51:08   14    set aside your feelings about video games and just judge

10:51:12   15    whether or not these Defendants here are trespassing on

10:51:14   16    someone's patent in this case?

10:51:16   17           JUROR PRICE:  I -- I really can't say because I

10:51:21   18    need to find out what the case is going to be about first.

10:51:23   19           MS. SMITH:  Absolutely.

10:51:24   20           JUROR PRICE:  And that's it.

10:51:25   21           MS. SMITH:  Thank you, ma'am.

10:51:27   22           JUROR PRICE:  Uh-huh.

10:51:27   23           MS. SMITH:  Thank you.

10:51:28   24           All right.  Anybody else, Ms. Patel, or Juror

10:51:32   25    No. 20?

10:51:34    1          And I'm going to -- I'm going to just do a

10:51:38    2   raise -- by raising your hand on the final three rows, if

10:51:41    3   you could just -- I'm not going to individually question

10:51:45    4   you, but if you could raise your hand if you have negative

10:51:48    5   opinions about video games.

10:51:50    6          Okay.  Juror No. 28, 29, I'm not actually going to

10:51:54    7   visit with them.  I'm just doing a -- because the good news

10:51:57    8   about being further back is you sometimes don't get

10:52:00    9   reached.  So I'm not going to spend quite as much time with

10:52:03   10   you guys.  But I want to know your opinion, so over on the

10:52:07   11   right-hand side who was raising their hands on negative

10:52:10   12   opinions.  Juror No. 24.

10:52:14   13          JUROR NEAL:  38.

10:52:14   14          MS. SMITH:  Thank you, ma'am.  Thank you, thank

10:52:16   15   you.

10:52:16   16          Now, I'm going to go out on a limb here and see

10:52:21   17   who is left.  Is there anyone out there that has positive

10:52:25   18   views of video games?  All right.  Help me out, Juror

10:52:29   19   No. 5, please?  Tell me about those, Ms. McCoy.

10:52:35   20          JUROR THOMPSON MCCOY:  I personally do not play

10:52:36   21   video games since I do not have enough time.  I will

10:52:40   22   occasionally play things on my phone to -- you know, if I'm

10:52:43   23   stuck in an airport or something like that.  But my son,

10:52:46   24   who is 11, is an avid gamer.  I have very positive views on

10:52:53   25   it because I started him with a lot of knowledge of -- all

10:52:59   1   of the video games have ratings for age limits and what is

10:53:04   2   appropriate for them, and I started him on the LeapPad,

10:53:09   3   LeapFrog system when he was very young.

10:53:10   4        Those games are geared toward little kids.  I

10:53:14   5   thought it was invaluable.  It taught him so much.  And as

10:53:19   6   he has gotten older, I've paid very close attention to the

10:53:24   7   games that he plays because there are so many games.

10:53:27   8        And I know you can say, oh, they get bored with

10:53:31   9   them.  There's a lot of games out there, all the Lego games

10:53:33   10  out there that are on video.  Because he plays with Legos,

10:53:37   11  he played with the games, and a lot of them interact.

10:53:40   12       The Disney Infinity I wish they stop -- or had not

10:53:43   13  stopped that because it allows the kids to be so creative.

10:53:48   14  And my son does a lot of stop motion stuff himself with his

10:53:54   15  phone, and the apps that -- that are into it -- so, I mean,

10:53:59   16  they -- eye-hand coordination that goes into it I think it

10:54:03   17  actually has taught him a lot.  Because as we go into the

10:54:07   18  future, they're going to need it.  So that's my personal

10:54:09   19  view on that.

10:54:10   20            MS. SMITH:  Thank you, Ms. McCoy.

10:54:11   21       Is there anybody else that agrees with Ms. McCoy?

10:54:17   22       Let's go to Juror No. 7 first, please.

10:54:21   23       Ms. Griffin?

10:54:23   24            JUROR GRIFFIN:  There are a lot of pros and cons

10:54:26   25  like just like the questions you were asking.  And I think

| | | |
|---|---|---|
| 10:54:31 | 1 | one of the pros is just what she said, you know, the eye |
| 10:54:35 | 2 | coordination, hand coordination, you know, the mind -- |
| 10:54:39 | 3 | keeping their mind moving, you know, it's -- I think it can |
| 10:54:44 | 4 | be -- I think it could be very good for even elderly folks |
| 10:54:48 | 5 | that are, you know -- have mental -- you know, like |
| 10:54:51 | 6 | forgetfulness and things like that because there are games |
| 10:54:55 | 7 | that, you know, you can play that ask you to remember where |
| 10:54:59 | 8 | things are.  Things like Minecraft. |
| 10:55:03 | 9 | MS. SMITH:  Right.  We play a lot of that at my |
| 10:55:05 | 10 | house.  Thank you. |
| 10:55:08 | 11 | Juror No. 12, Ms. Johnson.  You know why I'm |
| 10:55:14 | 12 | asking you this question, you're a high school principal? |
| 10:55:18 | 13 | JUROR JOHNSON:  Elementary. |
| 10:55:19 | 14 | MS. SMITH:  Elementary, I'm sorry.  I think we |
| 10:55:19 | 15 | have a mutual friend in Jennifer Truelove. |
| 10:55:23 | 16 | JUROR JOHNSON:  Yes. |
| 10:55:23 | 17 | MS. SMITH:  You're in charge of Saturday school. |
| 10:55:26 | 18 | JUROR JOHNSON:  Yes, yes. |
| 10:55:27 | 19 | MS. SMITH:  Okay.  Well, thank you for that. |
| 10:55:29 | 20 | Thank you for that. |
| 10:55:30 | 21 | I want to know, you see all kinds of kids, what |
| 10:55:33 | 22 | are your views on video games? |
| 10:55:35 | 23 | JUROR JOHNSON:  Oh, my.  I'm not going to be a |
| 10:55:37 | 24 | hypocrite.  As an elementary principal, I use it as an |
| 10:55:41 | 25 | incentive.  Out of my activity fund I pay for a game bus -- |

| | | |
|---|---|---|
| 10:55:47 | 1 | or game buses to come to the campus.  It's a great |
| 10:55:50 | 2 | incentive tool to help kids stay focused or to give them -- |
| 10:55:56 | 3 | help them to set goals. |
| 10:55:56 | 4 | And they already know when the game bus is coming, |
| 10:55:58 | 5 | and I mean they put forth that extra energy because it's |
| 10:56:01 | 6 | free, and so they get on there and they get to play all |
| 10:56:04 | 7 | kinds of games. |
| 10:56:06 | 8 | And my mother, who's deceased, she loved them. |
| 10:56:10 | 9 | God rest her soul.  And I could never pull her off of them, |
| 10:56:14 | 10 | which I'm not a video game person. |
| 10:56:16 | 11 | I have a son, he's turning 15 next week.  And he |
| 10:56:20 | 12 | loves them.  So the only negative I would have is the cost. |
| 10:56:24 | 13 | So it just -- you know, he finishes with this game, he |
| 10:56:28 | 14 | wants something else.  So -- |
| 10:56:30 | 15 | MS. SMITH:  Well, that's an interesting place to |
| 10:56:32 | 16 | end, thank you. |
| 10:56:33 | 17 | JUROR JOHNSON:  And I will say this, the last |
| 10:56:35 | 18 | thing.  Before I became a principal, I was an assistant |
| 10:56:38 | 19 | principal at Sam Houston Stem Academy. |
| 10:56:42 | 20 | MS. SMITH:  Yes, ma'am. |
| 10:56:43 | 21 | JUROR JOHNSON:  And we taught kids coding, and so |
| 10:56:46 | 22 | we're creating learners for the future.  And so this was a |
| 10:56:49 | 23 | big part of coding, you know, when kids are really into |
| 10:56:53 | 24 | things like that, they want to create their own games, they |
| 10:56:57 | 25 | want to become inventors.  So that's where I stand with it. |

```
10:57:01   1              MS. SMITH:  Thank you, thank you, I appreciate.
10:57:03   2              Now, Ms. Johnson brought up price, and that's what
10:57:06   3    I want to visit with you guys about.  I described the
10:57:10   4    business model that GREE has contributed to inventing as
10:57:17   5    being freemium games.  Does anyone have an experience with
10:57:21   6    freemium games where you get on your mobile device and you
10:57:23   7    can play for free?
10:57:25   8              Okay.  Juror number -- I'm just going to see by
10:57:26   9    raising hands, No. 33 and -- I need my readers -- I need my
10:57:32  10    glasses, sorry.
10:57:32  11              THE COURT:  39.
10:57:32  12              MS. SMITH:  32.  Okay, thank you all.
10:57:32  13              Juror No. 32, tell me a little bit about your
10:57:36  14    experience with freemium games.
10:57:36  15              JUROR LIVINGSTON:  I just play online with my
10:57:44  16    nephew.
10:57:44  17              MS. SMITH:  Okay.
10:57:45  18              JUROR LIVINGSTON:  Play PUBG.
10:57:47  19              MS. SMITH:  Play what?
10:57:49  20              JUROR LIVINGSTON:  PUBG, PlayersUnknown
10:57:51  21    Battleground.
10:57:51  22              MS. SMITH:  Any complaints about --
10:57:54  23              JUROR LIVINGSTON:  No, we love it.
10:57:55  24              MS. SMITH:  Okay.  Thank you.  Thank you.
10:57:56  25              Is there anybody familiar with the term open
```

| | | |
|---|---|---|
| 10:58:01 | 1 | source when talking about software?  I see -- is it |
| 10:58:05 | 2 | Mr. Baker?  Baker?  33.  I'm learning your names. |
| 10:58:09 | 3 | All right.  Anyone other than Mr. Baker that's |
| 10:58:12 | 4 | familiar with the term "open source"? |
| 10:58:15 | 5 | Okay.  Juror No. 5.  Mr. Frase.  Mr. Frase, do you |
| 10:58:26 | 6 | have a daughter named Laura? |
| 10:58:26 | 7 | JUROR MARTIN:  I do. |
| 10:58:26 | 8 | MS. SMITH:  I believe my law partner coached her |
| 10:58:29 | 9 | in youth sports.  Do you have any recollection of Gil |
| 10:58:33 | 10 | Gillam?  Okay.  Okay.  Well, it's nice to see you.  Gil |
| 10:58:33 | 11 | told me you'd be showing up today. |
| 10:58:38 | 12 | All right.  There are people that when somebody's |
| 10:58:44 | 13 | phone breaks, they -- they hand it to their husband or |
| 10:58:46 | 14 | their friend or their -- you know, whatever, and say, hey, |
| 10:58:48 | 15 | can you -- can you help me out with this?  And then there |
| 10:58:52 | 16 | are the people who get the phones handed to them that are a |
| 10:58:56 | 17 | little more tech savvy. |
| 10:58:57 | 18 | So what I'm looking for is I'm going to divide |
| 10:59:00 | 19 | you, just by raising hands, into two groups.  The first |
| 10:59:04 | 20 | group is you're a little more -- you put yourself in a |
| 10:59:06 | 21 | group of a little more tech savvy than the next person. |
| 10:59:09 | 22 | You know, you're the one that fixes things around the |
| 10:59:14 | 23 | house -- I've already got No. 5 raising her hand.  I knew |
| 10:59:18 | 24 | that.  I knew that.  A little more you're the person in the |
| 10:59:20 | 25 | household where people come to solve their technical |

10:59:23    1    problems.

10:59:23    2           Starting with Ms. Smith, a raise of hands on the

10:59:27    3    first row.

10:59:27    4           Okay.  I -- No. 5.

10:59:28    5           And then I haven't yet spoken with Juror No. 6,

10:59:32    6    Ms. Brown.  Tell me why you say that.

10:59:34    7           JUROR BROWN:  Well, actually, it's usually my

10:59:39    8    parents that call me for it.

10:59:42    9           MS. SMITH:  Okay.  Me, too.

10:59:44   10           JUROR BROWN:  There's only two of us in our

10:59:46   11    household, so...

10:59:47   12           MS. SMITH:  Okay.

10:59:48   13           JUROR BROWN:  But my parents are always calling me

10:59:50   14    for -- whether it's on the computer, whether, you know,

10:59:52   15    it's the phone, any kind of tech problem.

10:59:54   16           MS. SMITH:  And do you have special training or

10:59:56   17    just kind of would you call it on-the-job training, trial

11:00:00   18    and error?

11:00:00   19           JUROR BROWN:  More on-the-job training.  I worked

11:00:02   20    at Wadley Regional Medical Center for 16 and a half years

11:00:08   21    in the dietary department.  And when they had -- they put

11:00:11   22    everything on the computer, they literally just handed me

11:00:15   23    the book and said, okay, if anything goes wrong, you figure

11:00:18   24    it out.

11:00:19   25           So I mean, I kind of just had to jump in and read

| | | |
|---|---|---|
| 11:00:22 | 1 | a lot and try to figure it all out, but no -- no real |
| 11:00:26 | 2 | training. |
| 11:00:26 | 3 | MS. SMITH:  Thank you, Ms. Brown. |
| 11:00:27 | 4 | So Ms. McCoy and Ms. Brown on the front row would |
| 11:00:32 | 5 | say they're a little more tech savvy. |
| 11:00:35 | 6 | What about Juror No. 7 on the second row? |
| 11:00:40 | 7 | Juror No. 7, please.  Thank you. |
| 11:00:43 | 8 | Ms. Griffin, why would you say that about |
| 11:00:45 | 9 | yourself? |
| 11:00:46 | 10 | JUROR GRIFFIN:  My mom calls me a lot. |
| 11:00:48 | 11 | MS. SMITH:  Okay. |
| 11:00:48 | 12 | JUROR GRIFFIN:  And when I first got my -- bought |
| 11:00:51 | 13 | a Gateway, I took it back.  I didn't know how to turn it |
| 11:00:54 | 14 | on.  And I thought it was broke.  And I found out the |
| 11:01:01 | 15 | modem, the button way down there -- |
| 11:01:03 | 16 | MS. SMITH:  Right. |
| 11:01:05 | 17 | JUROR GRIFFIN:  -- and then I self-taught myself |
| 11:01:07 | 18 | how to use my computer.  And it finally -- it finally ended |
| 11:01:12 | 19 | up that I -- I went through a lot with that computer, but |
| 11:01:14 | 20 | it finally ended up that the modem was crashed.  And all |
| 11:01:15 | 21 | this time I had been trying to fix it so -- for months.  So |
| 11:01:19 | 22 | I learned quite a bit that way, by trial and error. |
| 11:01:22 | 23 | MS. SMITH:  Okay.  Great.  Thank you. |
| 11:01:24 | 24 | Okay.  Ms. Leathers, are you the one that everyone |
| 11:01:35 | 25 | comes to when their phone shuts down? |

| | | |
|---|---|---|
| 11:01:38 | 1 | JUROR LEATHERS:  Yes. |
| 11:01:39 | 2 | MS. SMITH:  Why is that? |
| 11:01:40 | 3 | JUROR LEATHERS:  Just a -- I do use a lot of |
| 11:01:42 | 4 | technology at home, so I have literally a little smart |
| 11:01:45 | 5 | Amazon home with all the smart plugs -- |
| 11:01:45 | 6 | MS. SMITH:  Okay. |
| 11:01:48 | 7 | JUROR LEATHERS:  -- and Amazon devices.  And then |
| 11:01:49 | 8 | my work jokingly calls me The Millennial all the time on |
| 11:01:56 | 9 | our team, so when new work technology comes out, they call |
| 11:01:57 | 10 | me to try to figure out how to -- |
| 11:01:57 | 11 | MS. SMITH:  To fix it.  Thank you. |
| 11:01:59 | 12 | MS. LEATHERS:  -- use it. |
| 11:02:00 | 13 | MS. SMITH:  Now, Mr. Hawkins, I haven't heard much |
| 11:02:02 | 14 | from you today.  I -- and I'd like to.  So which bucket do |
| 11:02:05 | 15 | you fit in?  Are you the -- are you the fixer around the |
| 11:02:08 | 16 | house or with your friends?  Are you the one that hands it |
| 11:02:11 | 17 | to someone else to fix? |
| 11:02:12 | 18 | JUROR HAWKINS:  Well, I wouldn't say I'm, you |
| 11:02:15 | 19 | know, big into phones or fixing phones.  I mean, you know, |
| 11:02:18 | 20 | but my job is C & Cs and they're computers. |
| 11:02:22 | 21 | MS. SMITH:  Okay. |
| 11:02:22 | 22 | JUROR HAWKINS:  And, you know, that's what I've |
| 11:02:24 | 23 | done all -- you know, 20-something years. |
| 11:02:26 | 24 | MS. SMITH:  Okay.  So you can -- you can fix a lot |
| 11:02:28 | 25 | more than phones is what you're telling me? |

| | | |
|---|---|---|
| 11:02:30 | 1 | JUROR HAWKINS:  I can write programs. |
| 11:02:32 | 2 | MS. SMITH:  Okay.  So you're familiar with coding |
| 11:02:33 | 3 | and do -- |
| 11:02:36 | 4 | JUROR HAWKINS:  X, Y, Z. |
| 11:02:39 | 5 | MS. SMITH:  Okay.  Okay. |
| 11:02:39 | 6 | JUROR HAWKINS:  You know -- |
| 11:02:40 | 7 | MS. SMITH:  Thank you, sir. |
| 11:02:41 | 8 | Do I have anyone else on the panel that's ever |
| 11:02:44 | 9 | done any computer programming like Mr. Hawkins has? |
| 11:02:48 | 10 | Okay.  Mr. Clubb and Mr. Baker.  Thank you. |
| 11:02:52 | 11 | All right.  Third row, anyone on that third row |
| 11:02:56 | 12 | consider themselves a little more tech savvy or a go-to |
| 11:02:59 | 13 | when things break? |
| 11:03:01 | 14 | Juror No. 15, you're shaking your head no. |
| 11:03:07 | 15 | Tell -- tell -- tell me about -- tell me about that. |
| 11:03:08 | 16 | JUROR BALL:  That would be my husband. |
| 11:03:10 | 17 | MS. SMITH:  Okay. |
| 11:03:11 | 18 | JUROR BALL:  Or my son. |
| 11:03:12 | 19 | MS. SMITH:  Okay.  How old is your son? |
| 11:03:14 | 20 | JUROR BALL:  He's 27, so... |
| 11:03:16 | 21 | MS. SMITH:  Thank you. |
| 11:03:18 | 22 | JUROR BALL:  You're welcome. |
| 11:03:21 | 23 | THE COURT:  You have five minutes remaining. |
| 11:03:23 | 24 | MS. SMITH:  Thank you, Your Honor. |
| 11:03:23 | 25 | Now, GREE and Supercell are both foreign |

11:03:27  1   companies.  You heard that GREE's a Japanese company, and

11:03:30  2   the Defendant in this case is a Finnish company.  And we're

11:03:33  3   here in U.S. court.  We're here in U.S. court because we're

11:03:37  4   talking about products sold in the U.S. and U.S. patents

11:03:40  5   that GREE has been awarded.

11:03:42  6        But is there anyone sitting out there that takes

11:03:45  7   issue with the fact that two foreign companies are going to

11:03:49  8   take a week and -- in trial here and they just really

11:03:56  9   shouldn't be here?  Is there anyone who has that feeling by

11:04:00  10  a raise of hands?

11:04:01  11       Is there anybody that -- is there anybody that

11:04:06  12  feels like there are too many lawsuits?

11:04:09  13       Is there anybody that doesn't -- I actually raised

11:04:13  14  my hand because it's kind of the frivolous lawsuits that

11:04:16  15  keep my lawsuits, quite frankly, from getting to the

11:04:20  16  courthouse, so I'll raise my hand.

11:04:22  17       Is there anybody who thinks there are too many

11:04:27  18  patent lawsuits?  I see no hands.

11:04:30  19       Okay.  Now, who thinks the government can make a

11:04:37  20  mistake?

11:04:40  21       All right.  This is a little bit different

11:04:44  22  question.  Now, sometimes in these cases, you may have --

11:04:47  23  you may have four or five patents.  And the Defendant will

11:04:50  24  say, well, you know, we don't trespass or we don't

11:04:52  25  infringe, but if we do, your patents aren't any good.

11:04:57   1          And by saying the patents aren't any good, they

11:05:00   2   mean the PTO got it wrong -- the United States Patent

11:05:03   3   Office got it wrong by awarding the company patents.  And

11:05:07   4   they may say it as to one patent or two patents or three

11:05:10   5   patents or even four patents.

11:05:12   6          Is there anybody that thinks that the government

11:05:14   7   gets it -- so they say about four out of five patents.  Is

11:05:18   8   there anybody that thinks that the government gets it wrong

11:05:21   9   most all of the time?

11:05:22  10          Juror No. 2?  All right.

11:05:25  11          Anybody else other than Juror No. 2?

11:05:28  12          Juror No. 18, are you just swatting the AC?

11:05:33  13          JUROR PRICE:  No, I -- yeah, I am swatting the AC.

11:05:36  14          MS. SMITH:  Okay.  I just want to make sure your

11:05:38  15   voice is heard.  So Juror No. 18 agrees, as well.

11:05:43  16          All right.  We're going to talk about damages for

11:05:45  17   just a brief minute.  You will hear that when a Defendant

11:05:48  18   infringes or trespasses on somebody's patent, that the

11:05:52  19   Plaintiff, like GREE, is owed a reasonable royalty.

11:05:56  20          In this case, you may hear evidence that the

11:06:00  21   reasonable royalty would be between 18 and $24 million.

11:06:05  22   And I'm not going to run away from that number because

11:06:07  23   you're also going to hear what Supercell is making on their

11:06:10  24   video games.

11:06:11  25          So my question is not specific to this case

| | | |
|---|---|---|
| 11:06:15 | 1 | because you haven't heard any of the evidence yet. |
| 11:06:18 | 2 | My question is this:  Knowing that this is a case |
| 11:06:21 | 3 | about 18 to $24 million, is there anyone sitting there that |
| 11:06:25 | 4 | says, you know, I don't care what the evidence is, I could |
| 11:06:28 | 5 | never award that amount of money? |
| 11:06:31 | 6 | Juror No. 2, Ms. Hopkins? |
| 11:06:34 | 7 | JUROR HOPKINS:  Yes, ma'am. |
| 11:06:35 | 8 | MS. SMITH:  Anybody else join Ms. Hopkins?  Juror |
| 11:06:39 | 9 | No. 18; Juror No. 24; Juror No. 15; 30; and 36. |
| 11:06:44 | 10 | Thank you all. |
| 11:06:47 | 11 | Now, final question.  You probably can see this |
| 11:06:54 | 12 | about me already.  I don't always ask just the -- the right |
| 11:06:58 | 13 | question in these sessions, and I have precious little |
| 11:07:02 | 14 | time.  And so if somebody is sitting out there thinking, |
| 11:07:06 | 15 | you know, if Ms. Smith would have just asked me this |
| 11:07:09 | 16 | question, I would have told her that I'm not the right |
| 11:07:11 | 17 | person for either this jury or I'm not the right person |
| 11:07:14 | 18 | for -- for GREE.  You know, I'm not the right person on a |
| 11:07:18 | 19 | video game.  And we talked to some of those people. |
| 11:07:21 | 20 | Is there somebody sitting out there thinking, you |
| 11:07:24 | 21 | know, if she just would have asked me this question, I |
| 11:07:27 | 22 | would have told her I'm not the right person for this jury? |
| 11:07:31 | 23 | Juror No. 2, tell me about that. |
| 11:07:33 | 24 | THE COURT:  You have one minute remaining. |
| 11:07:34 | 25 | MS. SMITH:  It's my last question, Your Honor. |

| | | |
|---|---|---|
| 11:07:39 | 1 | JUROR HOPKINS:  Well, I just feel that I'm not the |
| 11:07:45 | 2 | one for this because -- for one, I mean, the award amount. |
| 11:07:53 | 3 | MS. SMITH:  Yes, ma'am. |
| 11:07:56 | 4 | JUROR HOPKINS:  That's crazy. |
| 11:07:58 | 5 | MS. SMITH:  Okay.  So it wouldn't matter what the |
| 11:07:59 | 6 | evidence was? |
| 11:07:59 | 7 | JUROR HOPKINS:  No. |
| 11:08:00 | 8 | MS. SMITH:  If I told you a company was making a |
| 11:08:02 | 9 | billion dollars -- and that's with a capital B -- still |
| 11:08:06 | 10 | wouldn't matter? |
| 11:08:07 | 11 | JUROR HOPKINS:  No, still wouldn't matter. |
| 11:08:08 | 12 | MS. SMITH:  I appreciate your honesty.  Thank you. |
| 11:08:11 | 13 | THE COURT:  All right.  Counsel, your time has |
| 11:08:13 | 14 | expired. |
| 11:08:14 | 15 | MS. SMITH:  Thank you. |
| 11:08:15 | 16 | THE COURT:  We'll hear from Defense counsel at |
| 11:08:18 | 17 | this time. |
| 11:08:18 | 18 | MS. SMITH:  Thank you, Your Honor. |
| 11:08:21 | 19 | THE COURT:  Mr. Dacus, would you like a warning on |
| 11:08:24 | 20 | your time? |
| 11:08:24 | 21 | MR. DACUS:  If you'd let me know when I have five |
| 11:08:26 | 22 | minutes, please, Your Honor. |
| 11:08:28 | 23 | THE COURT:  I will.  You may proceed. |
| 11:08:29 | 24 | MR. DACUS:  Thank you. |
| 11:08:30 | 25 | Good morning.  By way of reintroduction, I'm Deron |

| | | |
|---|---|---|
| 11:08:37 | 1 | Dacus.  And along with Mike Sacksteder and Bryan Kohm, we |
| 11:08:41 | 2 | represent Supercell. |
| 11:08:42 | 3 | As Ms. Smith said to you, the Judge gives us just |
| 11:08:45 | 4 | a few minutes to give you an overview of the case.  And I |
| 11:08:48 | 5 | want to do that so that as I talk to you this morning |
| 11:08:51 | 6 | and -- and you answer questions, I want you to have in mind |
| 11:08:54 | 7 | what -- what the case is about and what we expect to -- to |
| 11:08:56 | 8 | show you over the next few days. |
| 11:08:58 | 9 | Supercell is a video game maker.  They have |
| 11:09:04 | 10 | developed and released five games in the United States. |
| 11:09:08 | 11 | Those games are primarily family-oriented.  I've heard some |
| 11:09:12 | 12 | conversation this morning.  I heard someone say that games |
| 11:09:15 | 13 | are rated -- their games are rated for nine-year-olds and |
| 11:09:20 | 14 | older.  They have, by most accounts, been successful. |
| 11:09:24 | 15 | It's a company that was started in 2010, very |
| 11:09:28 | 16 | humble beginnings, literally with a few young programmers |
| 11:09:31 | 17 | sitting on a cardboard box with their computer, developing |
| 11:09:35 | 18 | games.  And over those 10 years, they've now released five |
| 11:09:38 | 19 | different games here in the United States. |
| 11:09:40 | 20 | You have -- you have GREE sitting at this other |
| 11:09:45 | 21 | table.  Their history is a little different.  If you sit on |
| 11:09:49 | 22 | this jury, you'll hear more about the history of GREE.  But |
| 11:09:52 | 23 | for purposes of what we're talking about this morning, |
| 11:09:55 | 24 | certainly GREE has five patents.  They accuse Supercell of |
| 11:09:59 | 25 | using those patents. |

11:10:02   1        If you sit on this jury, I think what you'll

11:10:04   2   ultimately hear from the evidence is that the patents that

11:10:08   3   these folks have, our games simply do not use them.  We'll

11:10:12   4   have our employees who develop these games testify.  We'll

11:10:17   5   have video game experts.  I think three total will testify,

11:10:21   6   explain to you how our games work and how they differ from

11:10:25   7   the patents.

11:10:26   8        In addition to that, and I think equally

11:10:29   9   important, at least from Supercell's standpoint, is four of

11:10:33   10  these five patents that they assert should have never been

11:10:36   11  issued.  You heard on your video this morning from the

11:10:39   12  Judge that in order to issue a valid patent, it needs to be

11:10:43   13  something new.  It needs to be something novel.

11:10:47   14       And I think, ultimately, the evidence in this case

11:10:49   15  will show to you that what these folks wrote down in their

11:10:53   16  patent claims had been done in prior video games in the

11:10:57   17  United States.

11:10:57   18       That's a very brief overview of -- of what I think

11:11:01   19  you'll -- you'll hear if you -- if you ultimately sit as a

11:11:06   20  juror or in this case.

11:11:07   21       Now, I want to ask some questions.  That's --

11:11:11   22  that's no surprise to you.  But before I do it, I

11:11:14   23  want to -- I want to pause.  And I want to say this to you.

11:11:18   24       This is a very important case for Supercell.  We

11:11:22   25  would not have you here in this courtroom if it was not an

11:11:25  1    important case.

11:11:26  2         And I know the folks at Supercell want me to say

11:11:28  3    to you a very sincere thank you for showing up for jury

11:11:32  4    duty.  I know each one of you absolutely has other things

11:11:35  5    you want to be doing and you need to be doing.  You got

11:11:39  6    kids to tend to, grandkids to tend to, jobs to tend to.

11:11:46  7    That is not lost on anyone at this table.  And so I do want

11:11:49  8    to start there by saying a very sincere thanks.

11:11:53  9         The Judge was kind enough, Ms. Smith was kind

11:11:56  10   enough to give you some information about them.  You all

11:12:00  11   were kind enough to give us information about yourself.  I

11:12:00  12   feel obligated to do that.  I wish I could tell you that

11:12:00  13   the information that I'm going to give you is worth writing

11:12:06  14   a book over.  It's not, regrettably.

11:12:09  15        I grew up in Gilmer, Texas.  I actually grew up

11:12:13  16   out in the country between Gilmer and Diana.  I went to

11:12:16  17   Gilmer High School.  Graduated.  Was fortunate enough to

11:12:20  18   get a baseball scholarship to Texas A&M.

11:12:23  19        After I got out of there, I went to law school,

11:12:25  20   like the Judge, like Ms. Smith, at Baylor, where I met my

11:12:28  21   wife, to whom I've now been married for 26 years.

11:12:32  22        Since Ms. Smith -- I mean, since Ms. Holmes is

11:12:34  23   dictating, I should say very happily married, and if you'd

11:12:39  24   put that in the record, please.

11:12:41  25        We have two college-aged kids.  So being married

| | | |
|---|---|---|
| 11:12:44 | 1 | to another lawyer, having two college-aged kids means |
| 11:12:48 | 2 | really -- means a lot of things, but it means one thing in |
| 11:12:51 | 3 | particular.  Nobody at my house cares a whole lot about my |
| 11:12:55 | 4 | opinion.  Nobody listens to me a lot.  I'm happy to have a |
| 11:12:59 | 5 | captive audience this morning, at least for a small amount |
| 11:13:05 | 6 | of time. |
| 11:13:05 | 7 | Let me -- let me do this just by -- to make sure |
| 11:13:08 | 8 | that we've covered all the bases.  Ms. Smith introduced |
| 11:13:13 | 9 | you -- Melissa Smith and her partner, Gil Gillam, have an |
| 11:13:17 | 10 | office here in Marshall.  And I know she said to a couple |
| 11:13:21 | 11 | of folks that you have mutual friends.  But do any of you |
| 11:13:25 | 12 | know Melissa Smith or Gil Gillam?  Would you just let me |
| 11:13:28 | 13 | know by raising your hand? |
| 11:13:29 | 14 | Okay.  Yes, sir, Dr. Frase?  You know Mr. Gillam, |
| 11:13:29 | 15 | right? |
| 11:13:36 | 16 | JUROR FRASE:  I know of him and -- |
| 11:13:38 | 17 | THE COURT:  We going to need -- we're going to |
| 11:13:38 | 18 | need you to stand and use the microphone so we can hear it, |
| 11:13:38 | 19 | please. |
| 11:13:41 | 20 | JUROR FRASE:  I do know of him.  I knew him in the |
| 11:13:43 | 21 | past, but I've not had relationships in a number of years. |
| 11:13:48 | 22 | MR. DACUS:  If you sat on this jury, could you be |
| 11:13:50 | 23 | fair to me even if -- |
| 11:13:52 | 24 | JUROR FRASE:  Yes. |
| 11:13:53 | 25 | MR. DACUS:  Thank you, sir. |

| | | |
|---|---|---|
| 11:13:53 | 1 | And just -- just so we've covered all the bases, |
| 11:13:57 | 2 | sitting at this table is -- is Steve Moore.  Mr. Moore is |
| 11:14:01 | 3 | with the law firm of Kilpatrick & Townsend.  Again, he's |
| 11:14:04 | 4 | here from San Francisco.  Does anybody happen to know that |
| 11:14:08 | 5 | firm Kilpatrick Townsend or Mr. Moore?  Would you let me |
| 11:14:11 | 6 | know by raising your hand? |
| 11:14:13 | 7 | Okay.  I don't see any hands.  Thank you. |
| 11:14:15 | 8 | One other basis to cover before I talk to you a |
| 11:14:20 | 9 | little more specifically.  You've heard these folks say, |
| 11:14:23 | 10 | GREE, that they are a Japanese company, okay?  Is there |
| 11:14:28 | 11 | anyone who has ever lived in Japan?  If you'd raise your |
| 11:14:32 | 12 | hand and let me know that. |
| 11:14:34 | 13 | Yes, ma'am.  No. 9.  That is Ms. Arnold.  You have |
| 11:14:40 | 14 | lived in Japan? |
| 11:14:42 | 15 | JUROR ARNOLD:  I lived in Okinawa as a child.  My |
| 11:14:45 | 16 | father was in the military. |
| 11:14:47 | 17 | MR. DACUS:  Yes, ma'am. |
| 11:14:48 | 18 | JUROR ARNOLD:  I went to school there. |
| 11:14:49 | 19 | MR. DACUS:  Okay.  Is there any reason, based on |
| 11:14:51 | 20 | your experience, that you think you would favor the folks |
| 11:14:53 | 21 | at GREE because you've had some experience living in that |
| 11:14:57 | 22 | country? |
| 11:14:58 | 23 | JUROR ARNOLD:  I don't think so.  I didn't really |
| 11:15:00 | 24 | like it.  There were too many crabs coming in my house at |
| 11:15:05 | 25 | night.  We lived right by the seawall. |

```
11:15:08   1            MR. DACUS:  Okay.  But you -- you -- you think you
11:15:10   2   could be fair -- you understand why the Supercell folks
11:15:12   3   would maybe want to know -- ensure that you could be fair,
11:15:16   4   and what I heard you say is you believe you could be?
11:15:18   5            JUROR ARNOLD:  I think I could be.
11:15:20   6            MR. DACUS:  Thank you very much, ma'am.
11:15:26   7            Anybody else who has ever lived in Japan?  Is
11:15:31   8   there anyone here -- and I need to ask because I'm always
11:15:34   9   surprised -- that speaks Japanese?  I don't see any hands.
11:15:37  10            And I guess just to close this out because so that
11:15:39  11   we're -- so that I can sleep better at night, is there
11:15:42  12   anyone here who, for whatever reason, would tend to favor
11:15:47  13   GREE because it is a Japanese company?  Anyone that would
11:15:50  14   lean that way just a little bit?  Would you raise your hand
11:15:53  15   and just let me know?
11:15:55  16            Okay.  I don't see any hands.  Thank you.
11:15:57  17            I have written down here to ask anyone on the
11:16:03  18   panel if they know each other, but -- but Ms. Smith asked
11:16:06  19   that.  And it caused me to wonder if there's anyone left in
11:16:11  20   Omaha today.  Sounds like half of Omaha and Hughes Springs
11:16:15  21   is -- is on this panel.
11:16:17  22            The one thing she didn't ask, is there anyone --
11:16:22  23   some of you were up towards the front that knew each other.
11:16:27  24   And I don't think she asked, but I'm curious, and maybe you
11:16:31  25   don't want to say, but would there be any problem or
```

| | | |
|---|---|---|
| 11:16:35 | 1 | controversy in serving with the people that you know on |
| 11:16:38 | 2 | this jury if both of you happen to wind up on it?  If you |
| 11:16:42 | 3 | find yourself in that boat, would you raise your hand? |
| 11:16:45 | 4 | Okay.  We're all friends.  That's good. |
| 11:16:47 | 5 | Let me ask this -- and I'm not asking sort of in a |
| 11:16:55 | 6 | formal way.  I'm not asking about a court proceeding.  But |
| 11:16:59 | 7 | has anyone ever been wrongly or falsely accused of doing |
| 11:17:05 | 8 | something?  Would you raise your hand and let me know? |
| 11:17:07 | 9 | And, again, I'm not talking about just formal in |
| 11:17:10 | 10 | court.  I'm just talking about in everyday life.  Has |
| 11:17:14 | 11 | anybody ever falsely accused -- when I didn't see any |
| 11:17:16 | 12 | hands, I knew I asked a poor question. |
| 11:17:18 | 13 | So did you raise your hand, No. 3? |
| 11:17:21 | 14 | JUROR ADAMS:  Yes, I did. |
| 11:17:22 | 15 | MR. DACUS:  May I talk you about that?  And just |
| 11:17:28 | 16 | so you know, I'm not going to ask you details. |
| 11:17:30 | 17 | JUROR ADAMS:  Yes. |
| 11:17:31 | 18 | MR. DACUS:  Here's what I want to know.  When you |
| 11:17:33 | 19 | were wrongly accused, how did it make you feel? |
| 11:17:37 | 20 | JUROR ADAMS:  I was mad. |
| 11:17:38 | 21 | MR. DACUS:  You were mad? |
| 11:17:39 | 22 | JUROR ADAMS:  Mad. |
| 11:17:40 | 23 | MR. DACUS:  Did you feel like you had the right to |
| 11:17:42 | 24 | defend yourself? |
| 11:17:43 | 25 | JUROR ADAMS:  Yes. |

11:17:43  1          MR. DACUS:  Okay.

11:17:45  2          JUROR ADAMS:  It was -- it was a --

11:17:46  3          MR. DACUS:  Just so you know, I'm more than happy

11:17:49  4  for you to tell me details, but so that I'm clear, I'm not

11:17:52  5  asking for details.  I'm not -- the Judge said earlier that

11:17:56  6  I would not pry into your private life, and I'm not trying

11:18:00  7  to, okay?  So I just want you to know that.

11:18:02  8          But -- but you felt like you had the right to

11:18:04  9  defend yourself, correct?

11:18:06 10          JUROR ADAMS:  I did, yes.

11:18:06 11          MR. DACUS:  Okay.  You understand that Supercell

11:18:09 12  sits here at this table, and we believe we've been wrongly

11:18:13 13  accused of using these folks' patents.  You understand

11:18:18 14  that?

11:18:18 15          JUROR ADAMS:  Yes, sir.

11:18:19 16          MR. DACUS:  Do you agree that we have the right to

11:18:21 17  come to court, just like that video said this morning, and

11:18:25 18  defend ourselves?

11:18:26 19          JUROR ADAMS:  Yes, sir.

11:18:26 20          MR. DACUS:  Thank you very much.

11:18:28 21          So here's what I want to know.  A lot of you said

11:18:30 22  you had experienced this in life, being wrongly accused.

11:18:34 23  We've all been through that.  Here's what I need to know so

11:18:36 24  that I can sleep better at night during this trial.

11:18:39 25          Is there anybody who thinks when you're wrongly

| | | |
|---|---|---|
| 11:18:42 | 1 | accused, you do not have the right to defend yourself? |
| 11:18:45 | 2 | Raise your hand if you fall in that category. |
| 11:18:49 | 3 | Okay.  Good.  That's what I would have expected, |
| 11:18:52 | 4 | but I always need to -- to make sure. |
| 11:18:55 | 5 | Ms. Knabenshue, can I pick on you just for a |
| 11:19:00 | 6 | second, ma'am?  And I'm going to tell you why I'm doing it. |
| 11:19:03 | 7 | When y'all -- when everybody said how many kids they had, I |
| 11:19:06 | 8 | wrote down that you had the most, four; is that right? |
| 11:19:08 | 9 | JUROR KNABENSHUE:  I have four daughters. |
| 11:19:10 | 10 | MR. DACUS:  Four daughters. |
| 11:19:11 | 11 | JUROR KNABENSHUE:  Uh-huh, twins in the middle. |
| 11:19:13 | 12 | MR. DACUS:  Twins in the middle. |
| 11:19:14 | 13 | So here's what I want to ask you, when those kids |
| 11:19:17 | 14 | were growing up, did they ever get in little spats or |
| 11:19:21 | 15 | fights or squabbles? |
| 11:19:22 | 16 | JUROR KNABENSHUE:  Always. |
| 11:19:24 | 17 | MR. DACUS:  Always.  And so I'm glad I picked you. |
| 11:19:28 | 18 | So am I correct that when they got caught in a fight either |
| 11:19:32 | 19 | by their dad or anybody else, and they came to momma, did |
| 11:19:37 | 20 | they walk to you or did they run to you to tell you their |
| 11:19:41 | 21 | story? |
| 11:19:42 | 22 | JUROR KNABENSHUE:  Some ran to me, but -- but |
| 11:19:44 | 23 | usually I was in the middle of it.  As soon as I heard the |
| 11:19:47 | 24 | noise, I was in the middle of it. |
| 11:19:48 | 25 | MR. DACUS:  Let me ask you -- let me tell you why |

```
11:19:50   1   I asked this.  There's something instinctive in us that
11:19:56   2   makes us want to tell our story first, right?
11:20:00   3            JUROR KNABENSHUE:  Right.
11:20:01   4            MR. DACUS:  We think there's something important
11:20:02   5   about doing that.  And do you understand that because these
11:20:05   6   folks at GREE filed this lawsuit, they get to go first?
11:20:09   7            JUROR KNABENSHUE:  I understand, yes.
11:20:11   8            MR. DACUS:  Here's what I want to ask about you as
11:20:15   9   a good momma, as I know you were, when that first daughter
11:20:18  10   ran to you and told her story, did you just accept that
11:20:22  11   first story, or did you wait and get that opposite side of
11:20:24  12   the coin story from daughter number two?
11:20:28  13            JUROR KNABENSHUE:  I always wanted to hear the
11:20:29  14   other side also to see if I could figure out exactly what
11:20:33  15   happened.
11:20:33  16            MR. DACUS:  And that's what I want to ask you.
11:20:35  17   And I'm not digging into your private life, but did
11:20:39  18   daughter number one always tell you the truth, the complete
11:20:42  19   truth?
11:20:42  20            JUROR KNABENSHUE:  No.
11:20:43  21            MR. DACUS:  No, okay.  So that's a long-winded way
11:20:45  22   of me saying to you or asking you, since these folks get to
11:20:48  23   go first over here, will you be able to sit and wait and
11:20:54  24   hear -- they're probably going tell their story today and
11:20:59  25   tomorrow.  I'm going to have to sit all through the weekend
```

| | | |
|---|---|---|
| 11:21:00 | 1 | biting my tongue and lip and I probably won't get to tell |
| 11:21:02 | 2 | my story until Monday.  Can you wait until next week to |
| 11:21:04 | 3 | make a decision on this case? |
| 11:21:06 | 4 | JUROR KNABENSHUE:  Yes, I always like to hear both |
| 11:21:08 | 5 | sides before I consider -- |
| 11:21:10 | 6 | MR. DACUS:  You probably see my smile.  That's |
| 11:21:13 | 7 | what I need to hear from you. |
| 11:21:14 | 8 | JUROR KNABENSHUE:  Okay. |
| 11:21:14 | 9 | MR. DACUS:  So I'm going to ask everybody the same |
| 11:21:17 | 10 | question, and you can understand why this is important to |
| 11:21:22 | 11 | me.  I mean, they're going to get to tell their story |
| 11:21:24 | 12 | first, you're going to have a whole weekend to think about |
| 11:21:28 | 13 | it and then we're going to get to go. |
| 11:21:31 | 14 | Can you just let me know by raising your hand if |
| 11:21:38 | 15 | you will promise if you serve on this jury to wait and hear |
| 11:21:38 | 16 | all the evidence before you make a decision?  Will you |
| 11:21:40 | 17 | raise your hand and let me know? |
| 11:21:42 | 18 | Mr. Cato, will you wait -- |
| 11:21:42 | 19 | JUROR CATO:  All right. |
| 11:21:42 | 20 | MR. DACUS:  I don't have a blood pressure monitor |
| 11:21:52 | 21 | up here, but -- will you wait -- let -- let me ask you, |
| 11:21:54 | 22 | sir, will you wait and hear all the evidence -- |
| 11:21:58 | 23 | JUROR CATO:  Yes. |
| 11:21:59 | 24 | MR. DACUS:  -- before you make a decision? |
| 11:22:01 | 25 | JUROR CATO:  Yes, sir, I would. |

11:22:02  1          MR. DACUS:  All right.  Thank you very much.

11:22:04  2          Now, Ms. Hopkins, I thought you might be slow

11:22:07  3  putting your hand up.  What -- did I misjudge that?

11:22:11  4          JUROR HOPKINS:  Huh-uh.

11:22:12  5          MR. DACUS:  Let me let you get the microphone.

11:22:16  6  Will you wait and hear all the evidence before you make a

11:22:18  7  decision, or do you think you already lean one way or the

11:22:21  8  other on this?

11:22:23  9          JUROR HOPKINS:  I mean -- yeah, I can wait.  Yeah,

11:22:31  10  I can wait.

11:22:31  11          MR. DACUS:  You could wait?  And you'd be -- and

11:22:34  12  you would do that if you were to serve on the jury?

11:22:36  13          JUROR HOPKINS:  Yeah.

11:22:37  14          MR. DACUS:  Okay.

11:22:39  15          JUROR HOPKINS:  I -- I could.

11:22:40  16          MR. DACUS:  And I know you could.  But would you

11:22:43  17  do that?  I mean, so the Judge told you earlier that the

11:22:46  18  most important part of this process is just being honest.

11:22:49  19          JUROR HOPKINS:  Uh-huh.

11:22:50  20          MR. DACUS:  And so, I agree with that a hundred

11:22:52  21  percent.

11:22:52  22          JUROR HOPKINS:  Uh-huh.

11:22:53  23          MR. DACUS:  And so I'm just trying to figure out,

11:22:55  24  you know -- as Ms. Smith said, some people are right for

11:22:58  25  this jury, some people are right for other juries.  And

| | | |
|---|---|---|
| 11:23:01 | 1 | would you actually wait and hear all the evidence in this |
| 11:23:03 | 2 | case before you made a decision? |
| 11:23:05 | 3 | JUROR HOPKINS:  Yes, I could wait. |
| 11:23:06 | 4 | MR. DACUS:  All right.  Thank you very much, |
| 11:23:08 | 5 | ma'am. |
| 11:23:09 | 6 | Let me ask you a question.  Did you say you have |
| 11:23:12 | 7 | some criminal justice training or degree?  Did I hear you |
| 11:23:15 | 8 | say that? |
| 11:23:15 | 9 | JUROR HOPKINS:  Yes. |
| 11:23:16 | 10 | MR. DACUS:  Where did you get that? |
| 11:23:17 | 11 | JUROR HOPKINS:  North Texas Community College. |
| 11:23:20 | 12 | MR. DACUS:  Did you actually get a degree or just |
| 11:23:21 | 13 | some courses? |
| 11:23:23 | 14 | JUROR HOPKINS:  I just went through the academy. |
| 11:23:24 | 15 | MR. DACUS:  Oh, the police academy? |
| 11:23:26 | 16 | JUROR HOPKINS:  Yes. |
| 11:23:26 | 17 | MR. DACUS:  Oh, okay.  Great. |
| 11:23:28 | 18 | JUROR HOPKINS:  But I do have my EMT and fire |
| 11:23:31 | 19 | designation. |
| 11:23:31 | 20 | MR. DACUS:  Right.  You worked out at -- what used |
| 11:23:34 | 21 | to be Lone -- I still call it Lone Star Steel -- U.S. |
| 11:23:36 | 22 | Steel. |
| 11:23:36 | 23 | JUROR HOPKINS:  I still work there, U.S. Steel. |
| 11:23:38 | 24 | MR. DACUS:  All right.  Thank you very much, |
| 11:23:40 | 25 | ma'am. |

| | | |
|---|---|---|
| 11:23:40 | 1 | Y'all were all kind enough to fill out a |
| 11:23:49 | 2 | questionnaire, and so I know there are going to be some |
| 11:23:51 | 3 | hands that go up.  And I apologize that I could not |
| 11:23:54 | 4 | memorize them all.  I didn't memorize many of them |
| 11:23:58 | 5 | actually. |
| 11:23:58 | 6 | But who here has ever applied or received a patent |
| 11:24:01 | 7 | or you had a close relative who applied for a patent? |
| 11:24:04 | 8 | Would you raise your hand? |
| 11:24:07 | 9 | I see Dr. Frase has his hand up, but I thought |
| 11:24:15 | 10 | from the questionnaire there was more. |
| 11:24:17 | 11 | Let's see, Mr. Hawkins, let me let you get the |
| 11:24:19 | 12 | microphone, please, sir. |
| 11:24:21 | 13 | Is that you that applied or somebody else? |
| 11:24:24 | 14 | JUROR HAWKINS:  My brother -- brother-in-law. |
| 11:24:26 | 15 | MR. DACUS:  Brother-in-law? |
| 11:24:27 | 16 | JUROR HAWKINS:  Yes, sir. |
| 11:24:28 | 17 | MR. DACUS:  What kind of patent did he apply for? |
| 11:24:30 | 18 | JUROR HAWKINS:  It was actually a -- a level -- a |
| 11:24:33 | 19 | drill. |
| 11:24:33 | 20 | MR. DACUS:  Okay.  Did he get a patent? |
| 11:24:36 | 21 | JUROR HAWKINS:  I believe he did. |
| 11:24:37 | 22 | MR. DACUS:  Okay. |
| 11:24:38 | 23 | JUROR HAWKINS:  I mean, it's been -- it's been a |
| 11:24:40 | 24 | few years ago. |
| 11:24:41 | 25 | MR. DACUS:  Is there -- the reason I'm asking, |

11:24:44   1   these folks over here claim they have a patent.  And is

11:24:47   2   there anything about your experience or your brother-in-law

11:24:50   3   getting a patent that would cause you to tend to favor

11:24:53   4   these folks even in the slightest?  That's what I need to

11:24:57   5   know.

11:24:58   6            JUROR HAWKINS:  No, sir.

11:24:58   7            MR. DACUS:  Okay.  You -- I could sleep well at

11:25:02   8   night --

11:25:02   9            JUROR HAWKINS:  You can sleep well.

11:25:04  10            MR. DACUS:  -- you could judge the evidence here

11:25:07  11   just based on what you hear?  Yes, sir?

11:25:10  12            JUROR HAWKINS:  I've got no -- you know, I have to

11:25:12  13   hear everything before I make a decision.

11:25:14  14            MR. DACUS:  Perfect.  Thank you so much.

11:25:15  15            Did anybody -- who else raised their hand that

11:25:19  16   they had a patent?  Dr. Frase?  Am I pronouncing that

11:25:22  17   right, Dr. Frase?

11:25:25  18            JUROR FRASE:  Yes, sir.

11:25:25  19            MR. DACUS:  Dr. Frase, do you have a patent or

11:25:28  20   someone you know?

11:25:28  21            JUROR FRASE:  My son-in-law has applied for a

11:25:30  22   patent for an environmental abatement system.

11:25:32  23            MR. DACUS:  Okay.  So when you said "applied,"

11:25:34  24   he's not yet received one?

11:25:36  25            JUROR FRASE:  Has not yet received one.

```
11:25:38   1            MR. DACUS:  Anything about that experience that
11:25:39   2   would cause you to tend to favor the folks at GREE?
11:25:42   3            JUROR FRASE:  No, sir.
11:25:43   4            MR. DACUS:  You'd be fair if you sat on this jury?
11:25:47   5            JUROR FRASE:  Yes.
11:25:47   6            MR. DACUS:  All right.  Anybody else that either
11:25:50   7   applied for a patent or has a close family member?  I don't
11:25:55   8   see any hands.  Thank you.
11:25:56   9            I know Mr. Hawkins said he had a -- a little bit
11:26:03  10   of coding -- computer coding experience.  And I didn't see
11:26:06  11   any other hands when Ms. Smith followed up with that, but I
11:26:11  12   want to broaden that question a little bit.
11:26:12  13            Does anyone have any what they consider special
11:26:17  14   expertise in computers?  Not -- I mean, most of us these
11:26:20  15   days use computers, but does anybody have sort of special
11:26:26  16   expertise?
11:26:27  17            And, Mr. Baker, I know you do.  I heard you say
11:26:31  18   you were in IT.
11:26:34  19            Let's see, Mr. Clubb, let me have you grab the
11:26:38  20   microphone.  Can you tell me what it is your expertise is,
11:26:41  21   sir?
11:26:42  22            JUROR CLUBB:  My first job in 1989, I got hired by
11:26:46  23   Fiserv Incorporated.  It was a data -- data processing
11:26:51  24   company.  We had main frame systems that did bank
11:26:55  25   processing, and I wrote coding.  And we called it JCL.
```

| | | |
|---|---|---|
| 11:26:57 | 1 | It's Java controlled language, setting up programs to run |
| 11:27:03 | 2 | the flow for processing bank services and department |
| 11:27:06 | 3 | stores. |
| 11:27:07 | 4 | MR. DACUS:  What -- did you write code in a |
| 11:27:09 | 5 | certain language? |
| 11:27:11 | 6 | JUROR CLUBB:  Yeah, it was -- we had MCR main |
| 11:27:15 | 7 | frames.  It was a VRX platform, and they're -- they're -- I |
| 11:27:18 | 8 | guess their own proprietary code that they had in that |
| 11:27:21 | 9 | system, I would write that and sequence the programs to run |
| 11:27:25 | 10 | at night when we did the bank processing. |
| 11:27:27 | 11 | MR. DACUS:  Okay.  That's exactly what I needed to |
| 11:27:29 | 12 | know.  Thank you, sir. |
| 11:27:30 | 13 | So, Mr. Baker, I know you -- you actually worked |
| 11:27:42 | 14 | in IT, right? |
| 11:27:44 | 15 | JUROR BAKER:  (Nods head affirmatively.) |
| 11:27:46 | 16 | MR. DACUS:  And did you -- did I hear you say |
| 11:27:48 | 17 | earlier that you had played the Clash of Clans game? |
| 11:27:51 | 18 | JUROR BAKER:  Yes, sir. |
| 11:27:51 | 19 | MR. DACUS:  I'm scared to ask, but did you enjoy |
| 11:27:55 | 20 | it? |
| 11:27:56 | 21 | JUROR BAKER:  I did. |
| 11:27:56 | 22 | MR. DACUS:  Did you play for several years? |
| 11:27:58 | 23 | JUROR BAKER:  I probably started as a sophomore in |
| 11:28:01 | 24 | high school, and I probably played until my sophomore year |
| 11:28:04 | 25 | in college, so four years, roughly. |

| | | |
|---|---|---|
| 11:28:07 | 1 | MR. DACUS:  Okay.  Good.  That's a game where you |
| 11:28:08 | 2 | can play with other people, your friends? |
| 11:28:11 | 3 | JUROR BAKER:  Yeah, I started playing with my |
| 11:28:13 | 4 | friends, but probably about the end of high school, |
| 11:28:15 | 5 | everyone else had stopped playing. |
| 11:28:16 | 6 | MR. DACUS:  Gotcha.  All right.  That's what I |
| 11:28:18 | 7 | needed to know.  Thank you, sir. |
| 11:28:19 | 8 | Let me ask this, and let me say before I do, that |
| 11:28:36 | 9 | I'm not going to ask any details about this, so feel free |
| 11:28:41 | 10 | when you -- when I ask you the question to -- don't be |
| 11:28:44 | 11 | reserved about raising your hand, because I'm not going to |
| 11:28:47 | 12 | ask you any details. |
| 11:28:48 | 13 | But if you have filed a lawsuit, you've actually |
| 11:28:51 | 14 | filed a lawsuit, would you raise your hand and let me know? |
| 11:28:56 | 15 | So I see Juror No. 12, 20, 21, and 31.  Did I get |
| 11:29:06 | 16 | everybody that has filed a lawsuit? |
| 11:29:08 | 17 | All right.  Perfect.  Thank you. |
| 11:29:10 | 18 | Is there anything about that fact that you filed a |
| 11:29:14 | 19 | lawsuit -- and I'll talk to you, Ms. Johnson.  I wanted to |
| 11:29:23 | 20 | say Ms. Principal.  I figured that wasn't right. |
| 11:29:27 | 21 | And I'm not asking you details, ma'am, okay? |
| 11:29:32 | 22 | JUROR JOHNSON:  Okay. |
| 11:29:33 | 23 | MR. DACUS:  Is there anything about the fact that |
| 11:29:34 | 24 | you have filed a lawsuit -- you understand that GREE is the |
| 11:29:38 | 25 | one filing this lawsuit.  I'm the one having to -- to |

| | | |
|---|---|---|
| 11:29:41 | 1 | defend Supercell.  You understand that? |
| 11:29:43 | 2 | JUROR JOHNSON:  Yes, sir. |
| 11:29:44 | 3 | MR. DACUS:  Is there anything about the fact that |
| 11:29:45 | 4 | you've been in the past a Plaintiff or filed a lawsuit, |
| 11:29:50 | 5 | that would tend for you to favor these folks over here at |
| 11:29:52 | 6 | this table? |
| 11:29:55 | 7 | JUROR JOHNSON:  Absolutely not. |
| 11:29:56 | 8 | MR. DACUS:  Absolutely not. |
| 11:29:57 | 9 | Okay.  And did I -- I made a note -- did your mom |
| 11:30:01 | 10 | work at the Carlile Firm here? |
| 11:30:04 | 11 | JUROR JOHNSON:  She did.  She worked there -- she |
| 11:30:07 | 12 | worked at the Carlile Law Firm for 20 years, but prior to |
| 11:30:14 | 13 | her -- she died three years ago, and prior to that, she |
| 11:30:14 | 14 | hadn't worked there, I want to say, for eight years. |
| 11:30:17 | 15 | MR. DACUS:  Okay.  And when you say Carlile Firm, |
| 11:30:19 | 16 | we're talking about a law firm, right? |
| 11:30:21 | 17 | JUROR JOHNSON:  Yes, sir. |
| 11:30:22 | 18 | MR. DACUS:  And what did she do there? |
| 11:30:24 | 19 | JUROR JOHNSON:  She was a secretary. |
| 11:30:26 | 20 | MR. DACUS:  Okay.  Perfect.  I was trying to look |
| 11:30:28 | 21 | to see if I had any other questions for you while I have |
| 11:30:31 | 22 | you up. |
| 11:30:31 | 23 | I will ask you this.  I -- I talked to folks about |
| 11:30:34 | 24 | raising their kids and settling disputes.  I suspect you've |
| 11:30:39 | 25 | settled a dispute or two as principal of an elementary |

11:30:44   1   school?

11:30:45   2           JUROR JOHNSON:  God, yes.

11:30:45   3           MR. DACUS:  Probably spend too much of your time.

11:30:47   4           JUROR JOHNSON:  Yes, yes, yes.

11:30:49   5           MR. DACUS:  And do you agree that -- that you need

11:30:51   6   to get both sides of the story?  You may not get the full

11:30:52   7   and complete truth from that first --

11:30:53   8           JUROR JOHNSON:  I absolutely agree.  All kids are

11:30:56   9   entitled to due process.

11:30:57  10           MR. DACUS:  Okay.  And -- and what about video

11:30:59  11   game companies?

11:31:01  12           JUROR JOHNSON:  Oh, I'm sorry, I always go back to

11:31:07  13   the school.  Yes.  Yes, definitely.

11:31:08  14           MR. DACUS:  All right.  Thank you very much.

11:31:09  15           I'm going to ask you a question that's going to

11:31:12  16   sound a little different to you, but -- and I want you to

11:31:15  17   think about it a little bit before -- before you answer.

11:31:19  18           And so here's my question.  Some people are quick

11:31:22  19   decision makers -- in other words, they look at the facts

11:31:25  20   really quick, make a decision really quick, and they go

11:31:28  21   with it.  Other people like to take their time, contemplate

11:31:32  22   the facts, think about it for a while, and then make a

11:31:36  23   decision.  So I need to know which of those two you fall

11:31:43  24   into.

11:31:44  25           So if you're the type of person who looks at facts

11:31:48   1   really quickly, assesses them quickly, makes your decision,

11:31:51   2   and you go with it, can you raise your hand and let me

11:31:54   3   know?

11:31:58   4        Okay.  18, 2, No. 33 -- Mr. Martin, what are you,

11:32:04   5   39?

11:32:04   6        Dr. Frase, what number are you, sir?

11:32:08   7        JUROR FRASE:  29.

11:32:10   8        MR. DACUS:  29.  Thank you.

11:32:12   9        All aright.  So is it true that the rest of you

11:32:15  10   are more deliberative thinkers -- in other words, you like

11:32:18  11   to look at the facts, contemplate things, really assess

11:32:20  12   them?  If you're in that category, raise your hand.

11:32:24  13   That's -- that's the remainder of them.  Good.  Thank you.

11:32:25  14        It's always interesting to see how folks see

11:32:29  15   themselves.

11:32:30  16        Let me ask you one other question about how you

11:32:34  17   see yourselves.  I'm going to ask you, and I'm going to let

11:32:37  18   you think about it, whether or not you see yourself as a

11:32:40  19   leader or not.  You know, the world is made up of all kinds

11:32:44  20   of folks, leaders, followers, and everything in between.

11:32:49  21   If you see yourself and view yourself as a leader, would

11:32:52  22   you raise your hand and let me know?

11:32:53  23        So on the first row, that's 2, 3, 4, 5.  Second is

11:32:57  24   7, 8, 12 -- I knew you'd have your hand up -- 18, and then

11:33:05  25   21, 25.  And I'm going to stop there because the rest -- as

11:33:10  1    Ms. Smith said, the rest of you are probably fairly safe.

11:33:14  2         Let me talk to you, Ms. Gleason, if I could.  You

11:33:29  3    had your hand up, right, ma'am?  Are you a leader in any

11:33:31  4    organizations or -- well, let me ask a better question.

11:33:31  5    Why did you raise your hand?

11:33:33  6         JUROR GLEASON:  Because I'm not a follower.

11:33:35  7         MR. DACUS:  Okay.

11:33:36  8         JUROR GLEASON:  I just -- I see something that I

11:33:38  9    need to do and I just kind of take charge, and I think

11:33:42  10   that's a good attribute for a mom and somebody who works in

11:33:47  11   a school.

11:33:48  12        MR. DACUS:  Right.  You -- you worked at Paul

11:33:52  13   Pewitt -- where did you work?

11:33:54  14        JUROR GLEASON:  Harleton.

11:33:56  15        MR. DACUS:  Oh.

11:33:56  16        JUROR GLEASON:  Harleton ISD.

11:33:56  17        MR. DACUS:  Yeah, I had that wrong.

11:33:57  18        JUROR GLEASON:  And I worked in the OR for many,

11:34:00  19   many years.

11:34:00  20        MR. DACUS:  Folks in the OR --

11:34:02  21        JUROR GLEASON:  We have to make split decisions,

11:34:06  22   but then, again, I think that's something different from

11:34:08  23   what we're talking about.

11:34:08  24        MR. DACUS:  Understood.  Did I remember that your

11:34:10  25   husband worked at Eastman?

11:34:13  1          JUROR GLEASON:  Yes.

11:34:14  2          MR. DACUS:  What did he do out there?

11:34:16  3          JUROR GLEASON:  I did not know him then.

11:34:19  4          MR. DACUS:  Okay.  Did he tell you what he did?

11:34:21  5          JUROR GLEASON:  He did insulating work.

11:34:23  6          MR. DACUS:  Insulating.  Okay, all right.

11:34:24  7          JUROR GLEASON:  And mainly contractor like with

11:34:26  8  Stuart or Brown & Root.

11:34:27  9          MR. DACUS:  Gotcha, all right.

11:34:30 10          JUROR GLEASON:  When they split he took his --

11:34:33 11  his -- he left with the contractors.

11:34:34 12          MR. DACUS:  Okay.  Thank you very much.

11:34:40 13      I want to talk to you and ask some questions about

11:34:44 14  this patent process.  I've already told you that we think

11:34:48 15  the evidence in this case is going to show that four of

11:34:51 16  these five patents that these folks have really were not

11:34:56 17  new.  These things existed in video games before they filed

11:35:00 18  their patent applications.  And so I want to ask you some

11:35:03 19  questions about that.

11:35:04 20      How many of you -- you all saw the -- the video

11:35:11 21  this morning.  How many of you knew before you came to the

11:35:16 22  courthouse that this patent process by which you acquire a

11:35:20 23  patent was a secret process?  "Secret" meaning the only

11:35:24 24  people that know about it are the Patent Office and the

11:35:28 25  person applying.

11:35:29   1          How many of you knew that before you came today?

11:35:32   2   One?  Okay.  Ms. Griffin knew.

11:35:36   3          So let me -- let me ask you, Ms. Thompson, if I

11:35:44   4   could -- yes -- No. 5.

11:35:48   5          JUROR THOMPSON MCCOY:  Oh, McCoy.

11:35:49   6          MR. DACUS:  McCoy, I apologize.

11:35:51   7          So, Ms. McCoy, when you heard on the video this

11:35:56   8   morning that this patent process was sort of a secret

11:35:59   9   process just between the applicant and the Patent and

11:36:02  10   Trademark Office, that was news to you?

11:36:04  11          JUROR THOMPSON MCCOY:  Well, I never really

11:36:05  12   thought about it I guess.

11:36:07  13          MR. DACUS:  Yeah.

11:36:08  14          JUROR THOMPSON MCCOY:  But it makes sense.

11:36:09  15          MR. DACUS:  And --

11:36:10  16          JUROR THOMPSON MCCOY:  I mean, you wouldn't want

11:36:11  17   to tell people you -- if you have something that you want

11:36:14  18   to, you know -- somebody else will jump on it.

11:36:16  19          MR. DACUS:  Understood.

11:36:17  20          JUROR THOMPSON MCCOY:  Yeah.

11:36:19  21          MR. DACUS:  So you understand that what we plan to

11:36:22  22   do here, as you heard on the video this morning, is provide

11:36:27  23   you with evidence that the Patent Office did not have,

11:36:32  24   okay?

11:36:32  25          JUROR THOMPSON MCCOY:  Okay.

| | | |
|---|---|---|
| 11:36:33 | 1 | MR. DACUS:  And if we were to do that, I want to |
| 11:36:35 | 2 | ask you a question. |
| 11:36:37 | 3 | JUROR THOMPSON MCCOY:  Okay. |
| 11:36:38 | 4 | MR. DACUS:  If we were to do that, could you find |
| 11:36:40 | 5 | that the patent is, in fact, invalid even though it's been |
| 11:36:44 | 6 | issued?  Could you do that? |
| 11:36:47 | 7 | JUROR THOMPSON MCCOY:  Oh, yeah. |
| 11:36:48 | 8 | MR. DACUS:  You could? |
| 11:36:49 | 9 | JUROR THOMPSON MCCOY:  Yeah. |
| 11:36:50 | 10 | MR. DACUS:  And so -- I appreciate that.  So let |
| 11:36:52 | 11 | me ask, this is an important question, a patent has been |
| 11:36:57 | 12 | issued, but we believe the evidence is going to show that, |
| 11:37:03 | 13 | in fact, there was games in the United States containing |
| 11:37:08 | 14 | these patented features before there was a patent |
| 11:37:10 | 15 | application. |
| 11:37:10 | 16 | So what I need to know is, is there anyone sitting |
| 11:37:13 | 17 | here who says, look, if the Patent Office issued the |
| 11:37:17 | 18 | patent, I don't think that I can and I don't feel |
| 11:37:20 | 19 | comfortable invalidating this patent?  Is there anybody in |
| 11:37:23 | 20 | that camp?  Okay.  That's what I need to know. |
| 11:37:26 | 21 | No. 2 and No. 18. |
| 11:37:28 | 22 | Anybody else?  Everybody else -- so let me ask it |
| 11:37:38 | 23 | affirmatively.  There you go, Ms. Griffin, do you think you |
| 11:37:42 | 24 | would have a hard time doing that? |
| 11:37:44 | 25 | JUROR GRIFFIN:  Well, I'm not really too sure. |

11:37:47  1  That's a -- a government thing.  I know they make mistakes,

11:37:54  2  but sometimes, you know, once it's put -- put in place,

11:37:59  3  that's it.  I mean, there's not a whole lot you can do

11:38:03  4  about it.

11:38:03  5       MR. DACUS:  Let me -- let me not challenge you,

11:38:05  6  but let me ask you a few questions about that.

11:38:08  7       You remember on the video this morning that the

11:38:11  8  Judge showed you, it said that the ultimate person that

11:38:15  9  determines whether or not a patent is valid is a jury.  You

11:38:18  10  remember it said that?

11:38:20  11       JUROR GRIFFIN:  Yes, yes, that's correct.

11:38:22  12       MR. DACUS:  Okay.  And do you remember that video

11:38:23  13  said at times, the Patent Office may not have had all the

11:38:29  14  information that it needed; do you remember that?

11:38:30  15       JUROR GRIFFIN:  Yes, I do, yes, sir.

11:38:32  16       MR. DACUS:  So let me ask you a life question --

11:38:35  17  have you ever -- and I'll plead guilty to this, but have

11:38:39  18  you ever made a decision and you were very confident in

11:38:41  19  your decision, but then you later found out that you did

11:38:43  20  not have all the facts and maybe the decision you made was

11:38:49  21  not right?

11:38:50  22       JUROR GRIFFIN:  Absolutely.

11:38:51  23       MR. DACUS:  So you would agree with me that in

11:38:54  24  order to make -- we'll call it the right decision, you need

11:38:57  25  to have all the facts?

| | | |
|---|---|---|
| 11:38:58 | 1 | JUROR GRIFFIN:  Yes, sir. |
| 11:38:59 | 2 | MR. DACUS:  You don't need a law degree to figure |
| 11:39:01 | 3 | that out. |
| 11:39:02 | 4 | JUROR GRIFFIN:  Yes, sir, I -- I agree. |
| 11:39:04 | 5 | MR. DACUS:  And so, kind of knowing that, do you |
| 11:39:08 | 6 | still feel like you would have a hard time invalidating a |
| 11:39:11 | 7 | patent if we showed you facts that the Patent Office did |
| 11:39:13 | 8 | not have? |
| 11:39:14 | 9 | JUROR GRIFFIN:  You're correct, I -- |
| 11:39:16 | 10 | MR. DACUS:  And I'm not trying to be correct.  I'm |
| 11:39:18 | 11 | just trying to understand. |
| 11:39:19 | 12 | JUROR GRIFFIN:  No, I understand.  I understand |
| 11:39:21 | 13 | more. |
| 11:39:21 | 14 | MR. DACUS:  All right.  Perfect.  So you think if |
| 11:39:22 | 15 | we proved it to you, that you could invalidate a patent? |
| 11:39:26 | 16 | JUROR GRIFFIN:  Right.  Yes, yes, I could. |
| 11:39:28 | 17 | MR. DACUS:  All right.  Perfect, thank you very |
| 11:39:29 | 18 | much. |
| 11:39:29 | 19 | During the course of this case -- I don't think I |
| 11:39:34 | 20 | heard the Judge say it this morning, but I expect he |
| 11:39:36 | 21 | will -- he'll tell you that a patent is presumed valid. |
| 11:39:41 | 22 | Even though the jury ultimately determines, there's this |
| 11:39:46 | 23 | presumption that the patent is valid.  And I want to ask |
| 11:39:49 | 24 | you a few questions about that. |
| 11:39:51 | 25 | Mr. Hawkins, I might start with you.  Did I -- and |

11:39:57  1  I'll let you get the microphone, it's No. 13, thank you.

11:40:03  2          Did I understand you to say you served on a murder

11:40:06  3  trial, sir?

11:40:07  4          JUROR HAWKINS:  Yes, sir.

11:40:07  5          MR. DACUS:  Did y'all find the Defendant guilty?

11:40:10  6          JUROR HAWKINS:  Yes, sir.

11:40:11  7          MR. DACUS:  Do you remember that in that case that

11:40:13  8  the Judge told you the Defendant had -- was entitled to

11:40:16  9  constitutionally a presumption of innocence?

11:40:18  10         JUROR HAWKINS:  Correct.

11:40:19  11         MR. DACUS:  Right.  So what I'm supposing, you

11:40:21  12  correct me if I'm wrong, is the state put on enough

11:40:25  13  evidence that it overcame that presumption, and you found

11:40:27  14  the Defendant guilty despite that presumption of innocence;

11:40:34  15  is that fair?

11:40:35  16         JUROR HAWKINS:  Yes, sir.

11:40:35  17         MR. DACUS:  And you -- likewise in this case, if

11:40:37  18  the Judge instructs you that there's this presumption of

11:40:40  19  validity, if we put on evidence and overcome it, you can

11:40:44  20  find that the patents are invalid; is that fair?

11:40:48  21         JUROR HAWKINS:  That's fair.

11:40:49  22         MR. DACUS:  All right.  Anybody feel

11:40:51  23  differently -- I know I'm asking this -- probably repeating

11:40:52  24  a bit -- anybody feel different from Mr. Hawkins that you

11:40:55  25  think I just don't know if I can invalidate a patent?

```
11:40:58   1   Anybody in that category?  Just raise your hand and let me
11:41:01   2   know.  All right.  I don't see --
11:41:04   3            Yes, ma'am.  18, you told me, you told me.
11:41:08   4            JUROR PRICE:  Okay.
11:41:08   5            MR. DACUS:  I don't want to stop you from saying
11:41:11   6   something if you feel like you want to say something, I
11:41:14   7   understand.
11:41:14   8            JUROR PRICE:  No, I'm fine.
11:41:16   9            MR. DACUS:  Let me ask you -- let me ask you this.
11:41:19  10            JUROR PRICE:  Okay.
11:41:19  11            MR. DACUS:  You understand I'm the one trying to
11:41:22  12   say these patents are invalid?
11:41:23  13            JUROR PRICE:  Right.
11:41:24  14            MR. DACUS:  Or actually Supercell is.
11:41:25  15            JUROR PRICE:  Right.
11:41:26  16            MR. DACUS:  So you understand your answer worries
11:41:28  17   me a little bit.
11:41:29  18            JUROR PRICE:  I'm sorry.
11:41:31  19            MR. DACUS:  No, that's okay.
11:41:32  20            JUROR PRICE:  That's the way -- that's the way I
11:41:34  21   feel.
11:41:34  22            MR. DACUS:  No, no, and I'm very proud of you for
11:41:37  23   telling me how you feel.
11:41:39  24            JUROR PRICE:  Right.
11:41:39  25            MR. DACUS:  Do you think because of how you feel,
```

11:41:42  1   though, you might not be the best juror to serve in this

11:41:44  2   case?

11:41:45  3          JUROR PRICE:  I know I wouldn't be the best juror

11:41:47  4   to serve in this case, because after you said about the

11:41:49  5   patent, they already gotten it.  You said four out of five

11:41:53  6   of them might not have been, but the government, that --

11:41:57  7   wasn't that their job to make sure this patent was what

11:42:00  8   they needed before they issued it?

11:42:02  9          MR. DACUS:  That is their job, yes, ma'am.  But as

11:42:04  10  you heard on the video --

11:42:07  11         JUROR PRICE:  Yeah, you're right.

11:42:08  12         MR. DACUS:  It's -- all right.  I do appreciate

11:42:11  13  you being very honest with me, thank you so much.

11:42:14  14         JUROR PRICE:  Uh-huh.

11:42:16  15         MR. DACUS:  You heard GREE's lawyer say to you

11:42:28  16  this morning that they're going to ask for tens of millions

11:42:30  17  of dollars in this case.  And here's -- here's what I need

11:42:32  18  to know about that.  Will you require -- if you actually

11:42:38  19  find that Supercell uses these patents, will you require

11:42:42  20  GREE to prove to you that they're entitled to that amount

11:42:46  21  of money?  Would you just raise your hand and just confirm

11:42:49  22  for me that you will require evidence for that?

11:42:53  23         Okay.  I see everybody's hand.

11:42:58  24         Now, let me ask you -- let me do this.

11:43:01  25         Ms. Norris, can I ask you a question?  I'm going

| | | |
|---|---|---|
| 11:43:07 | 1 | to give you a little hypothetical scenario, Ms. Norris. |
| 11:43:14 | 2 | Let's presume that Daddy T's was real happy with you and |
| 11:43:18 | 3 | they gave you a $25,000.00 bonus at the end of your year, |
| 11:43:26 | 4 | okay. |
| 11:43:26 | 5 | JUROR NORRIS:  That would be a miracle. |
| 11:43:28 | 6 | MR. DACUS:  I said it was a hypothetical.  But |
| 11:43:30 | 7 | then do you have a neighbor?  Do you live by people? |
| 11:43:34 | 8 | JUROR NORRIS:  Yes. |
| 11:43:34 | 9 | MR. DACUS:  Let's assume your neighbor, who maybe |
| 11:43:36 | 10 | doesn't work -- this is hypothetical, not your actual -- |
| 11:43:39 | 11 | THE COURT:  You have five minutes remaining. |
| 11:43:41 | 12 | MR. DACUS:  Thank you, Your Honor. |
| 11:43:41 | 13 | Let's assume that neighbor who maybe doesn't work |
| 11:43:44 | 14 | as hard as you, doesn't do all the right things, but knows |
| 11:43:47 | 15 | you got this bonus, says, hey, I want $1,000.00 of your |
| 11:43:53 | 16 | 25,000, and he says to you, that's only 4 percent of what |
| 11:43:58 | 17 | you got.  You got 25,000.  Can't you give me as your |
| 11:44:02 | 18 | neighbor a thousand?  Does that sound right to you? |
| 11:44:05 | 19 | JUROR NORRIS:  No, sir. |
| 11:44:05 | 20 | MR. DACUS:  Is that something you'd be inclined to |
| 11:44:07 | 21 | do is just give them a thousand dollars if they hadn't done |
| 11:44:10 | 22 | anything to earn it? |
| 11:44:12 | 23 | JUROR NORRIS:  No, sir, because I don't know |
| 11:44:15 | 24 | nobody that lives around me. |
| 11:44:17 | 25 | MR. DACUS:  Okay.  But even if you knew them, |

11:44:21  1  would you be inclined to give them your hard earned money?

11:44:27  2         JUROR NORRIS:  No, sir.

11:44:27  3         MR. DACUS:  Okay.  All right.  That's all I have.

11:44:29  4  Thank you.

11:44:29  5         Now, I'm going to sit down because the Judge told

11:44:34  6  me I need to, but like Ms. Smith, I know one thing, and

11:44:39  7  that is I may not ask all the right questions.  And you may

11:44:43  8  be sitting there thinking, boy, if that Supercell lawyer

11:44:46  9  knew this about me, he would not want me on this jury, but

11:44:49  10 he hasn't asked the right question.

11:44:52  11        Is there anybody sitting there who's thinking,

11:44:55  12 boy, he would really want to know this, but he hasn't asked

11:44:58  13 me the right question?  Anybody in that camp?  Would you

11:45:01  14 raise your hand and let me know?

11:45:03  15        Yes, ma'am, that's Ms. Peterson?  Tell me what I

11:45:08  16 failed to ask.

11:45:10  17        JUROR PETERSON:  Well, I don't believe in the

11:45:13  18 justice system.

11:45:14  19        MR. DACUS:  Okay.

11:45:15  20        JUROR PETERSON:  And I wouldn't be fair in this

11:45:17  21 case, neither one of them.

11:45:18  22        MR. DACUS:  All right.  Ms. Peterson, I appreciate

11:45:20  23 you being honest with us.

11:45:21  24        Anybody else feel like there's something that

11:45:25  25 you -- I should know?

11:45:26   1                Yes, ma'am?  That's Ms. Hopkins.

11:45:31   2                JUROR HOPKINS:  Well, I'm just still hung up on

11:45:34   3      the patent thing.  I mean, I know we watched a video, but,

11:45:40   4      I mean, the government already done issued those patents.

11:45:43   5      I don't understand how we can judge to, you know, overthrow

11:45:47   6      that.  I -- I just don't get that.

11:45:49   7                MR. DACUS:  Okay.  Thank you very much.  I

11:45:50   8      appreciate you being honest.

11:45:52   9                Anybody else?  Those are great answers.

11:45:56  10                That is Ms. Neal?  I don't think we've heard from

11:46:02  11      you, Ms. Neal.

11:46:04  12                JUROR NEAL:  I have been raising my hand though.

11:46:08  13                MR. DACUS:  You have?

11:46:09  14                JUROR NEAL:  Yeah.  I'm short, so you just don't

11:46:12  15      see me.

11:46:13  16                MR. DACUS:  I apologize, I did not see you.

11:46:15  17                JUROR NEAL:  I'm like this, I don't believe in

11:46:17  18      suing no one.  That's my belief.

11:46:21  19                Now, you have to, yeah, maybe do.  But to my

11:46:24  20      ideas, you know, when you copy, you just copy.  But I don't

11:46:30  21      believe into suing no one.

11:46:32  22                MR. DACUS:  Thank you, ma'am.

11:46:34  23                JUROR NEAL:  Uh-huh.

11:46:35  24                MR. DACUS:  All right.  That's all the questions I

11:46:38  25      have for you.

11:46:38    1        Again, on behalf of Supercell, we're very, very

11:46:41    2   appreciative of you being here this morning.  We know it's

11:46:44    3   a tremendous inconvenience, and we would not be here if it

11:46:48    4   wasn't important.  Thank you.

11:46:49    5        Thank you, Your Honor.

11:46:50    6        THE COURT:  Thank you, counsel.

11:46:51    7        Ladies and gentlemen, there are matters I need to

11:46:54    8   discuss with counsel outside of your presence.  And given

11:46:58    9   the precautions that we're taking and the social

11:47:03   10   distancing, really the only way for me to do that is as

11:47:06   11   follows:

11:47:07   12        I'm going to leave the bench in a moment.  I'm

11:47:09   13   going to go into the jury room.  I'm going to take the

11:47:12   14   court reporter with me.  And I'm going to ask Ms. Smith and

11:47:16   15   Mr. Dacus to join me there.  We'll have that discussion

11:47:18   16   outside of your presence, and then I'll come back in the

11:47:21   17   courtroom, and I'll give you instructions based on that

11:47:24   18   discussion once we get there.

11:47:25   19        I don't think this is going to take more than five

11:47:28   20   or six minutes.  That's my best guess, but I'm going to

11:47:32   21   have to do it outside of your presence.

11:47:34   22        While I'm out of the courtroom, you need to stay

11:47:37   23   in your seats.  And you can certainly visit with your

11:47:40   24   neighbor quietly if you want to.  You're not required to.

11:47:45   25   If you want to just sit there silently, that's fine, as

| | | |
|---|---|---|
| 11:47:48 | 1 | well. |
| 11:47:48 | 2 | But if you talk with anyone around you quietly, |
| 11:47:52 | 3 | don't discuss anything that's happened this morning in |
| 11:47:57 | 4 | court. |
| 11:47:57 | 5 | Because let me remind you of something, you have |
| 11:48:00 | 6 | not heard any evidence in this case whatsoever.  And what |
| 11:48:03 | 7 | the lawyers tell you through the jury selection process and |
| 11:48:09 | 8 | throughout the trial is not evidence. |
| 11:48:11 | 9 | So don't discuss anything about what's happened so |
| 11:48:13 | 10 | far since you got to the courthouse this morning, but if |
| 11:48:16 | 11 | you'd like to talk about grandchildren or sports or weather |
| 11:48:20 | 12 | or anything else, that's perfectly fine. |
| 11:48:22 | 13 | If you will remain in your seats, I'll be back |
| 11:48:25 | 14 | shortly after I've had that conversation outside of your |
| 11:48:27 | 15 | presence. |
| 11:48:28 | 16 | At this time, I'll adjourn to the jury room, and, |
| 11:48:32 | 17 | Ms. Smith, and, Mr. Dacus, if you'll join me there. |
| 11:48:36 | 18 | COURT SECURITY OFFICER:  All rise. |
| 11:48:38 | 19 | (Bench conference outside presence of the venire |
| 11:52:14 | 20 | panel.) |
| 11:52:14 | 21 | THE COURT:  All right.  Let's go back on the |
| 11:53:11 | 22 | record. |
| 11:53:11 | 23 | Ms. Smith, does Plaintiff wish to make any |
| 11:53:19 | 24 | challenges for cause with regard to any of the members of |
| 11:53:22 | 25 | the panel? |

11:53:22  1          MS. SMITH:  Yes, Your Honor.  The Plaintiff

11:53:25  2  challenges No. 8, Ms. Jones; No. 9, Ms. Arnold; and No. 17,

11:53:31  3  Norris -- Ms. Norris.

11:53:33  4          THE COURT:  All right.  Mr. Dacus, does the

11:53:35  5  Defendant wish to offer any challenges for cause?

11:53:37  6          MR. DACUS:  Yes, Your Honor.  We would challenge

11:53:40  7  No. 2.  And I think we would agree with No. 8.

11:53:49  8          MS. SMITH:  Thank you.

11:53:51  9          THE COURT:  All right.  Given that the parties --

11:53:53 10          MR. DACUS:  And then --

11:53:55 11          THE COURT:  I'm sorry.

11:53:55 12          MR. DACUS:  I apologize, Your Honor, I paused.

11:53:59 13  18, also.  And I don't think we would reach, but Nos. 30

11:54:09 14  and 38.

11:54:11 15          THE COURT:  All right.  I'll mark them, but I

11:54:14 16  don't think we'll reach them either.

11:54:15 17          MR. DACUS:  No, sir.

11:54:15 18          THE COURT:  Okay.  Given that both Plaintiff and

11:54:22 19  Defendant have challenged No. 8 for cause, I will excuse

11:54:29 20  No. 8.  And I'll sustain the mutual challenge without

11:54:31 21  actually interviewing the venire member.

11:54:36 22          I did not have any notes that anybody said they

11:54:41 23  couldn't be here for a scheduling problem.  Did either of

11:54:43 24  you?

11:54:44 25          MR. DACUS:  I did not.

11:54:44  1          MS. SMITH:  No.

11:54:45  2          THE COURT:  Okay.  That means I'll bring back and

11:54:53  3  we'll interview here in the jury room Panel Member No. 2,

11:54:56  4  Ms. Hopkins; Panel Member No. 9, Ms. Arnold; Panel No. 17,

11:55:06  5  Ms. Norris; Panel Member No. 18.

11:55:09  6          And at that point, the next challenge doesn't show

11:55:14  7  up until No. 30.  I'll wait to bring No. 30 back until

11:55:21  8  we've dealt with those first four.  Because based on where

11:55:27  9  we are at that point, we may not be able to reach her

11:55:31 10  either way.

11:55:32 11          MR. DACUS:  Okay.

11:55:33 12          THE COURT:  Okay.  Ms. Lockhart, would you ask

11:55:35 13  either Ms. Denton or Mr. Fitzpatrick to step back here,

11:55:40 14  please?

11:55:40 15          COURTROOM DEPUTY:  Yes, sir.

11:56:01 16          COURT SECURITY OFFICER:  Yes, sir.

11:56:01 17          THE COURT:  I need you to bring back Panel Member

11:56:05 18  No. 2, Ms. Hopkins --

11:56:05 19          COURT SECURITY OFFICER:  Yes, sir.

11:56:09 20          THE COURT:  -- if you'll escort her in.

11:56:13 21          COURT SECURITY OFFICER:  Yes, sir.

11:56:14 22          (Juror brought into jury room.)

11:56:14 23          THE COURT:  Good morning, Ms. Hopkins.  Would you

11:56:40 24  mind having a seat right there?

11:56:41 25          JUROR HOPKINS:  Yes, sir.

11:56:42  1         THE COURT:  Thank you.  Ms. Hopkins, you gave

11:56:48  2  several answers during the examination of the panel by both

11:56:52  3  the Plaintiff and the Defendant that I wanted to visit with

11:56:56  4  you about.

11:56:57  5         JUROR HOPKINS:  Okay.

11:56:58  6         THE COURT:  You said toward the end of the

11:57:03  7  questioning you don't know if you could -- I believe you

11:57:06  8  said overthrow a patent.

11:57:08  9         Are you telling me that you don't think under any

11:57:10  10  circumstances, if the Defendants proved it by clear and

11:57:13  11  convincing evidence, you could ever find that a patent was

11:57:16  12  invalid?

11:57:17  13         JUROR HOPKINS:  Well, I just don't get that

11:57:20  14  process.  I mean, if a patent was already issued, and it is

11:57:24  15  issued through the government, you know, I just -- I don't

11:57:27  16  get -- I understand the government makes mistakes and says

11:57:31  17  the other party doesn't make mistakes -- you know, I just

11:57:35  18  don't get it.

11:57:36  19         THE COURT:  Okay.  Let me ask it this way:  Do you

11:57:38  20  think that you could listen to the evidence and you could

11:57:42  21  follow my instructions and even if my instructions are

11:57:48  22  something unusual to you, you could still follow them and

11:57:51  23  do what the Court instructs you to do based on the evidence

11:57:54  24  that you would hear during the course of the trial, or in

11:57:58  25  the alternative, as you say, since you don't get it, do you

11:58:02    1    just think you couldn't do it no matter what the

11:58:05    2    instructions I might give you would be?

11:58:07    3            JUROR HOPKINS:  I'm not sure.

11:58:11    4            THE COURT:  Okay.

11:58:12    5            JUROR HOPKINS:  I'm just not sure.

11:58:14    6            THE COURT:  One other thing you said during the

11:58:17    7    examination was -- oh, at least I think you said this --

11:58:21    8    when Ms. Smith talked about the amount of money in the

11:58:24    9    millions that the Plaintiff is going to ask the jury to

11:58:26   10    award against the Defendant, I thought you said you could

11:58:29   11    never award that kind of money.  Did I -- did I hear that

11:58:33   12    correctly?

11:58:33   13            JUROR HOPKINS:  Uh-huh, correct.

11:58:35   14            THE COURT:  And I take it then you're telling me

11:58:37   15    that no matter what the evidence is, no matter how bad it

11:58:41   16    was, no matter how clear, you just couldn't award that

11:58:44   17    amount of money regardless of the evidence?  Is that what

11:58:48   18    you're telling me, or are you saying something different?

11:58:51   19            JUROR HOPKINS:  Well, what I'm saying is, is going

11:58:53   20    back to the I don't get it part.  The patent was already

11:58:58   21    established, and I just don't -- I just don't get that

11:59:04   22    whole thing.  I just don't get it.

11:59:06   23            THE COURT:  Okay.  Well, let's take the validity

11:59:08   24    question out for right now.  Let's say that the patent's

11:59:12   25    valid.  If the Plaintiff proved to you that the Defendants

| | | |
|---|---|---|
| 11:59:17 | 1 | had infringed their patents, trespassed on their property, |
| 11:59:21 | 2 | as the Plaintiff called it today, and they tried to put on |
| 11:59:27 | 3 | evidence and did put on evidence about what the -- the |
| 11:59:31 | 4 | financial value of that trespassing was, are you telling me |
| 11:59:36 | 5 | that no matter what that evidence was, you couldn't award |
| 11:59:39 | 6 | the kind of money that Plaintiff indicated they'd be asking |
| 11:59:42 | 7 | for?  Or are you telling me you might could award that |
| 11:59:46 | 8 | sizeable sum if the evidence supported it?  Which of those |
| 11:59:51 | 9 | two answers do you come down on? |
| 11:59:52 | 10 | JUROR HOPKINS:  I guess I -- I might. |
| 11:59:56 | 11 | THE COURT:  I'm sorry? |
| 11:59:57 | 12 | JUROR HOPKINS:  I might, if I -- I guess if I |
| 12:00:00 | 13 | heard all the evidence or whatever, I guess I might. |
| 12:00:03 | 14 | THE COURT:  Okay.  Okay.  All right.  Mr. Dacus, |
| 12:00:11 | 15 | do you have questions for Ms. Hopkins? |
| 12:00:13 | 16 | MR. DACUS:  I don't have anything further, |
| 12:00:15 | 17 | Your Honor.  Thank you. |
| 12:00:16 | 18 | THE COURT:  Ms. Smith, do you have any questions? |
| 12:00:18 | 19 | MS. SMITH:  Ms. Hopkins, you're a peace |
| 12:00:20 | 20 | officer or -- |
| 12:00:21 | 21 | JUROR HOPKINS:  No. |
| 12:00:22 | 22 | MS. SMITH:  No?  What -- explain to me -- |
| 12:00:23 | 23 | JUROR HOPKINS:  I went through criminal justice. |
| 12:00:25 | 24 | I do have an EMT certification and fire. |
| 12:00:29 | 25 | MS. SMITH:  Well, in that schooling you did for |

12:00:31  1  criminal justice, you realized how important it is to

12:00:35  2  follow the laws, right?

12:00:37  3          JUROR HOPKINS:  Uh-huh.

12:00:38  4          MS. SMITH:  You of all people would know how

12:00:40  5  important that is?

12:00:40  6          JUROR HOPKINS:  Of course.

12:00:41  7          MS. SMITH:  And what I'll tell you is at the end

12:00:43  8  of this case, if you're lucky enough to be chosen,

12:00:47  9  Judge Gilstrap is going to give you a lengthy set of

12:00:50  10  instructions on the law in this case to -- that you can

12:00:51  11  follow.  Do you understand that?

12:00:52  12          JUROR HOPKINS:  Uh-huh.

12:00:53  13          MS. SMITH:  So there shouldn't be any lack of

12:00:55  14  understanding on your part.  He's going to clear everything

12:00:57  15  up with his instructions.  Do you understand that part?

12:00:59  16          JUROR HOPKINS:  Yes.

12:01:00  17          MS. SMITH:  And you could follow his instructions

12:01:02  18  both as to the reasonable royalty and the validity issue,

12:01:05  19  could you not?

12:01:07  20          JUROR HOPKINS:  Yes.

12:01:08  21          MS. SMITH:  Thank you, ma'am.

12:01:09  22          THE COURT:  Let me ask you one last question,

12:01:12  23  Ms. Hopkins.  Is there any doubt in your mind that you can

12:01:16  24  be fair and impartial in this case, or is there any

12:01:20  25  doubt -- do you think you could?  Or do you have any doubt

| | | |
|---|---|---|
| 12:01:24 | 1 | that you might not be able to?  And now is the time to tell |
| 12:01:31 | 2 | me, not after we're at the end of the process. |
| 12:01:34 | 3 | JUROR HOPKINS:  I do have some doubt, to be |
| 12:01:37 | 4 | honest.  I just -- I have doubt. |
| 12:01:40 | 5 | THE COURT:  Okay.  I'm going to let |
| 12:01:41 | 6 | Mr. Fitzpatrick take you back to your seat in the |
| 12:01:45 | 7 | courtroom, and as I said to the rest of the group, feel |
| 12:01:47 | 8 | free to chat with those people around you quietly, if you |
| 12:01:51 | 9 | choose to, but don't discuss anything we've talked about in |
| 12:01:54 | 10 | here. |
| 12:01:55 | 11 | JUROR HOPKINS:  Of course. |
| 12:01:56 | 12 | THE COURT:  Thank you so much, Ms. Hopkins. |
| 12:01:59 | 13 | MR. DACUS:  Thank you. |
| 12:02:00 | 14 | MS. SMITH:  Thank you, ma'am. |
| 12:02:03 | 15 | (Juror excused to return to courtroom.) |
| 12:02:03 | 16 | THE COURT:  And Mr. Fitzpatrick, I need No. 9 |
| 12:02:06 | 17 | when you get her seated. |
| 12:02:08 | 18 | COURT SECURITY OFFICER:  Yes, sir.  Yes, sir. |
| 12:02:10 | 19 | THE COURT:  All right.  I'm going to excuse |
| 12:02:13 | 20 | Ms. Hopkins for cause. |
| 12:02:15 | 21 | I've excused Ms. Jones, No. 8 based on the joint |
| 12:02:26 | 22 | and mutual objections to her -- challenge to her. |
| 12:02:31 | 23 | MR. DACUS:  That was because Ms. Smith made her |
| 12:02:34 | 24 | cry. |
| 12:02:40 | 25 | (Juror brought into jury room.) |

| | | |
|---|---|---|
| 12:02:40 | 1 | THE COURT:  Come in, Ms. Arnold.  Would you mind |
| 12:02:47 | 2 | having a seat there? |
| 12:02:48 | 3 | JUROR ARNOLD:  Sure.  Hello, how are y'all?  Hi. |
| 12:02:52 | 4 | THE COURT:  I'm glad to meet Richie's wife.  I |
| 12:02:52 | 5 | know Richie quite well. |
| 12:02:54 | 6 | JUROR ARNOLD:  I thought you did. |
| 12:02:55 | 7 | THE COURT:  Let me ask you a couple questions. |
| 12:03:00 | 8 | They asked you about living in Okinawa and being exposed to |
| 12:03:05 | 9 | the Japanese culture and -- and at the end of all that, you |
| 12:03:09 | 10 | were asked if you could be fair. |
| 12:03:12 | 11 | And I wrote down that your answer was, I think I |
| 12:03:14 | 12 | could be fair.  What I need to know is do you have any |
| 12:03:18 | 13 | doubts that you could be fair, or are you sure you could be |
| 12:03:21 | 14 | fair. |
| 12:03:21 | 15 | JUROR ARNOLD:  Are you referring to if I could be |
| 12:03:23 | 16 | fair because they're from Japan? |
| 12:03:26 | 17 | THE COURT:  For that or for any reason. |
| 12:03:28 | 18 | JUROR ARNOLD:  Oh, yes, I would be fair no matter |
| 12:03:30 | 19 | what. |
| 12:03:31 | 20 | THE COURT:  Okay.  Okay.  I just wrote -- |
| 12:03:31 | 21 | JUROR ARNOLD:  If I said I think I would be fair, |
| 12:03:35 | 22 | I misunderstood or I didn't clearly say. |
| 12:03:37 | 23 | THE COURT:  I could have written it down wrong. |
| 12:03:41 | 24 | But that's why we're back here to get that all clarified. |
| 12:03:46 | 25 | JUROR ARNOLD:  Okay. |

| | | |
|---|---|---|
| 12:03:47 | 1 | THE COURT:  Ms. Jones who sat next to you, No. 8, |
| 12:03:50 | 2 | gave a passionate statement about video games and the |
| 12:03:53 | 3 | impact on her family, and I wrote down that you made a |
| 12:03:57 | 4 | comment that, I do not like video games. |
| 12:03:59 | 5 | JUROR ARNOLD:  I don't. |
| 12:04:01 | 6 | THE COURT:  Just like No. 8. |
| 12:04:03 | 7 | JUROR ARNOLD:  I don't.  I've heard the violence |
| 12:04:06 | 8 | that's used on them, maybe I'm not seeing the right video |
| 12:04:11 | 9 | games because I don't have children at home or small |
| 12:04:12 | 10 | children.  And when my children were at home, those kind of |
| 12:04:16 | 11 | games weren't out yet.  But I do hear adult -- you know, |
| 12:04:19 | 12 | young people talking about the problems they have with all |
| 12:04:23 | 13 | the violence and the language that's used and trying to |
| 12:04:25 | 14 | keep up -- you know, make sure that their kids are only |
| 12:04:29 | 15 | playing the games they want them to. |
| 12:04:31 | 16 | THE COURT:  All right.  Now you understand that |
| 12:04:33 | 17 | both GREE and Supercell are competitors, they're both in |
| 12:04:38 | 18 | the video game business, but the three video games that |
| 12:04:41 | 19 | this jury is going to hear about are Supercell's video |
| 12:04:46 | 20 | games.  And you're probably not going to see video games |
| 12:04:49 | 21 | that GREE makes and sells, and you're probably not going to |
| 12:04:53 | 22 | see video games that Supercell makes and sells other than |
| 12:04:57 | 23 | the three particular ones that are challenged here. |
| 12:05:00 | 24 | Now, understanding they're both in the same |
| 12:05:03 | 25 | business and competing in this global market, does your |

12:05:08  1    general feeling about violence and -- and profanity and

12:05:14  2    negative things out of video games, does that change

12:05:17  3    anything about how you feel?  Putting it in that context,

12:05:20  4    or are you still pretty much where you were?

12:05:23  5         JUROR ARNOLD:  I'm still pretty much where I was.

12:05:25  6    I just have a -- I just have a negative feeling when it

12:05:28  7    comes to video games.

12:05:29  8         THE COURT:  Okay.  And I guess the follow-up I

12:05:32  9    have to ask you is, is that negativity going to be applied

12:05:36  10   equally to both of these parties, or are you going to --

12:05:38  11   are you going to place that negativity primarily on the

12:05:42  12   Defendant's side because it's their three video games

12:05:45  13   that's going to be talked about and shown --

12:05:48  14        JUROR ARNOLD:  I think it would probably be

12:05:50  15   equally.  I just -- I just have that feeling in general

12:05:54  16   about video games.

12:05:55  17        THE COURT:  Okay.  Okay.  Well, it's important for

12:05:56  18   me to know because at the end of the day, if you can treat

12:05:59  19   both sides the same, that's a completely different thing

12:06:03  20   than if you feel like you're going to have to because of

12:06:06  21   your beliefs treat one side differently than the other.

12:06:09  22        JUROR ARNOLD:  Okay.  I --

12:06:11  23        THE COURT:  What I hear you saying is you would

12:06:12  24   treat both sides the same.

12:06:13  25        JUROR ARNOLD:  I would treat both sides the same.

12:06:15  1          THE COURT:  Even if you didn't like their

12:06:17  2  products?

12:06:18  3          JUROR ARNOLD:  Even if I didn't like their

12:06:19  4  products.

12:06:20  5          THE COURT:  Okay.  And I take it as a part of that

12:06:22  6  you would do your best to be fair to both sides regardless

12:06:27  7  of your personal feelings about their products.

12:06:28  8          JUROR ARNOLD:  I would.  I would like to mention,

12:06:30  9  and I didn't send this in my thing, that I have a lot of

12:06:35  10  medical problems.  I have severe migraines and fibromyalgia

12:06:42  11  to the point that sometimes I can't get out of the bed.

12:06:45  12  I'm under a lot of medications right now, and I also have a

12:06:48  13  knee replacement pending, and so I have a lot of medical

12:06:51  14  things going on.

12:06:52  15          THE COURT:  Okay.

12:06:53  16          JUROR ARNOLD:  And I didn't want to say I couldn't

12:06:55  17  come, but if it were to go on for like a week --

12:06:59  18          THE COURT:  Let me tell you what I think is going

12:07:01  19  to happen, we'll be here the rest of the day and we'll be

12:07:04  20  here Friday, tomorrow, and then I think we'll be through by

12:07:09  21  probably Thursday of next week, but I think it will go

12:07:12  22  definitely through Wednesday and into Thursday.

12:07:14  23          Now, we could be here through all of next week.  I

12:07:17  24  said that out there just to be cautious.  I don't think

12:07:21  25  we'll be here the entirety of next week.  And also,

12:07:24  1    Ms. Arnold, once we start the actual trial and the jury is

12:07:28  2    seated in the jury box, we're going to take regular breaks

12:07:34  3    every hour and a half or so.  Quite honestly, these ladies

12:07:39  4    that work with me are not going to let me sit up there

12:07:42  5    three hours without taking a break.  We're going to break

12:07:46  6    regularly.

12:07:47  7         JUROR ARNOLD:  That's good.

12:07:47  8         THE COURT:  And you'll have a chance to --

12:07:48  9         JUROR ARNOLD:  I just wanted to mention that --

12:07:48  10        THE COURT:  But if --

12:07:50  11        JUROR ARNOLD:  -- because for a week for me every

12:07:52  12   day all day would be hard.

12:07:52  13        THE COURT:  Well, with --

12:07:53  14        JUROR ARNOLD:  It would be really hard.

12:07:55  15        THE COURT:  With regular breaks like that, do you

12:07:59  16   think you could do that?

12:08:01  17        JUROR ARNOLD:  If I had a good day like I'm having

12:08:03  18   a pretty good day today.  But there's so many days where I

12:08:07  19   have bad days and where I just don't feel like I could

12:08:09  20   function.  That's why I had to leave my employment early.

12:08:13  21   I had to take TRS disability because I was so sick.

12:08:17  22        THE COURT:  Well, only you can tell me this, but

12:08:20  23   over the course of tomorrow and some part, probably a

12:08:22  24   majority of next week, based on the history you've

12:08:26  25   experienced up until now, is it likely that there's going

| | | |
|---|---|---|
| 12:08:31 | 1 | to be one of those days that you can't get out of bed, or |
| 12:08:34 | 2 | is -- |
| 12:08:34 | 3 | JUROR ARNOLD:  It's very likely. |
| 12:08:36 | 4 | THE COURT:  I don't know how often this problem |
| 12:08:41 | 5 | visits itself on you. |
| 12:08:42 | 6 | JUROR ARNOLD:  It's very likely.  Because with the |
| 12:08:44 | 7 | weather change, I've had a lot of -- more problems, and the |
| 12:08:48 | 8 | weather is supposed to be changing more, and it affects all |
| 12:08:52 | 9 | my nervous system. |
| 12:08:53 | 10 | THE COURT:  Okay.  All right. |
| 12:08:54 | 11 | JUROR ARNOLD:  I mean I want to serve, that's why |
| 12:08:56 | 12 | I felt compelled to come, and I feel it's everyone's duty |
| 12:08:59 | 13 | to serve, but, on the other hand, I'm -- I'm afraid that |
| 12:09:03 | 14 | what if I get involved and I'm picked and then I -- I |
| 12:09:07 | 15 | can't.  I physically can't come? |
| 12:09:11 | 16 | THE COURT:  Well, I -- I appreciate you being |
| 12:09:13 | 17 | honest with us.  And it's so much better that we know it |
| 12:09:16 | 18 | now rather than later. |
| 12:09:18 | 19 | JUROR ARNOLD:  If it was just going to be today |
| 12:09:19 | 20 | and tomorrow, I would say, sure, I can hang.  I think I can |
| 12:09:23 | 21 | make it.  But knowing that it could go on most of next week |
| 12:09:27 | 22 | or all of next week, I'm afraid that would be really hard |
| 12:09:29 | 23 | on me. |
| 12:09:30 | 24 | THE COURT:  Okay.  Ms. Smith, do you have any |
| 12:09:32 | 25 | questions of Ms. Arnold? |

| | | |
|---|---|---|
| 12:09:33 | 1 | MS. SMITH:  No, Your Honor. |
| 12:09:34 | 2 | THE COURT:  Mr. Dacus? |
| 12:09:35 | 3 | MR. DACUS:  No, sir. |
| 12:09:35 | 4 | THE COURT:  Okay.  Ms. Arnold, I'm going to let |
| 12:09:38 | 5 | you join the rest of the panel back in the courtroom, and |
| 12:09:40 | 6 | if you would like to, visit with your neighbors.  If not, |
| 12:09:43 | 7 | sit there quietly.  But if you do choose to talk with folks |
| 12:09:47 | 8 | around you, don't discuss anything we've talked about in |
| 12:09:50 | 9 | here. |
| 12:09:51 | 10 | JUROR ARNOLD:  Okay.  I sure will. |
| 12:09:51 | 11 | THE COURT:  Thank you so much. |
| 12:09:52 | 12 | JUROR ARNOLD:  Thank you all for listening. |
| 12:09:54 | 13 | THE COURT:  Appreciate you. |
| 12:09:56 | 14 | MS. SMITH:  Thank you. |
| 12:09:56 | 15 | MR. DACUS:  Thank you. |
| 12:09:57 | 16 | JUROR ARNOLD:  Appreciate y'all. |
| 12:10:01 | 17 | (Juror excused to return to courtroom.) |
| 12:10:01 | 18 | THE COURT:  And, Mr. Fitzpatrick, I need No. 17 |
| 12:10:05 | 19 | next. |
| 12:10:05 | 20 | COURT SECURITY OFFICER:  Yes. |
| 12:10:07 | 21 | THE COURT:  I'm going to excuse Ms. Arnold for |
| 12:10:09 | 22 | cause. |
| 12:10:18 | 23 | MS. SMITH:  Thank you, Your Honor. |
| 12:10:19 | 24 | THE COURT:  I don't need her in the bed with a |
| 12:10:22 | 25 | migraine in the middle of a trial. |

| | | |
|---|---|---|
| 12:10:24 | 1 | MR. DACUS:  There are some miracle migraine drugs |
| 12:10:27 | 2 | that have just come out.  I didn't want to give medical |
| 12:10:31 | 3 | advice, but... |
| 12:10:32 | 4 | (Juror brought into jury room.) |
| 12:10:32 | 5 | THE COURT:  Good morning, Ms. Norris. |
| 12:10:40 | 6 | JUROR NORRIS:  Hey. |
| 12:10:41 | 7 | THE COURT:  Please have a seat. |
| 12:10:42 | 8 | Just a couple questions.  During the examination |
| 12:10:47 | 9 | by the lawyers this morning, you talked about your views on |
| 12:10:53 | 10 | video games. |
| 12:10:54 | 11 | JUROR NORRIS:  Uh-huh. |
| 12:10:55 | 12 | THE COURT:  And I wrote down in my notes, and I |
| 12:10:57 | 13 | may not have written it accurately, but what I have in my |
| 12:11:02 | 14 | notes is you were ready to chunk them in the trash because |
| 12:11:05 | 15 | of the violence. |
| 12:11:07 | 16 | JUROR NORRIS:  Yes. |
| 12:11:07 | 17 | THE COURT:  Let me ask you this and let me give |
| 12:11:10 | 18 | you a little more context:  GREE is in the video game |
| 12:11:13 | 19 | business; Supercell is in the video game business.  These |
| 12:11:15 | 20 | are global competitors in the same business. |
| 12:11:20 | 21 | Now, the games that are going to be the subject of |
| 12:11:22 | 22 | this trial because they're alleged to infringe the |
| 12:11:27 | 23 | Plaintiff's patents are three games that Supercell |
| 12:11:32 | 24 | manufactures and sells. |
| 12:11:36 | 25 | So this jury is going to hear about those three |

12:11:39  1    games in great detail.  They're probably not going to hear

12:11:42  2    about any of GREE's games or any other games that Supercell

12:11:45  3    has.  The focus is going to be on these three.

12:11:48  4         And whether you come away, if you're on the jury,

12:11:52  5    thinking those are bad and violent and not good or whether

12:11:57  6    you don't have any problem with them, you're not going to

12:12:00  7    see all the video games the Plaintiff makes and you're not

12:12:04  8    going to see the rest of the video games the Defendant

12:12:08  9    makes.

12:12:09  10        JUROR NORRIS:  Right.

12:12:09  11        THE COURT:  Now, knowing they're in the same

12:12:11  12   business, does that lead you to the point where you tell me

12:12:17  13   because of your negative feelings about video games, that

12:12:20  14   you couldn't be fair to both of these sides?  If you're

12:12:25  15   going to see the Defendant's games and see them in detail

12:12:28  16   and learn about them, is your negativity about video games

12:12:33  17   going to cause you to treat the Defendant any differently

12:12:36  18   than you treat the Plaintiff, knowing that the -- that the

12:12:40  19   Plaintiff's in the video game business but you're not going

12:12:44  20   to see what they do make, you're going to focus and

12:12:46  21   concentrate on the three primary games that are alleged to

12:12:50  22   infringe in this case that are made by the Defendant?

12:12:53  23        At the end of the day, I accept that you have

12:12:59  24   negative feelings about video games.  What matters to the

12:13:03  25   Court is will those negative feelings cause you to treat

12:13:07    1    one of these parties any differently than the way you treat

12:13:10    2    the other one?  If you can treat them both the same, even

12:13:14    3    if you don't like either one of them, that's one thing.

12:13:17    4         But if because of your dislike of video games, as

12:13:21    5    expressed in the courtroom, if that's -- in your mind, if

12:13:26    6    that's going to cause you to be more in favor of one side

12:13:30    7    and less in favor of the other side before we even start or

12:13:35    8    you're worried that you might end up being that way, that's

12:13:37    9    what I need you to talk to me about.  I hope that's clear.

12:13:41   10         JUROR NORRIS:  I am -- I am worried that I would

12:13:43   11    end up that way.

12:13:43   12         THE COURT:  Okay.  Only you know the answer to

12:13:45   13    that.

12:13:46   14         JUROR NORRIS:  Yes, sir.

12:13:46   15         THE COURT:  But you feel like there is some risk

12:13:48   16    that you might treat one side differently than the other?

12:13:53   17         JUROR NORRIS:  Yes.

12:13:53   18         THE COURT:  Okay.  Ms. Smith, do you have

12:13:56   19    questions?

12:13:56   20         MS. SMITH:  No, Your Honor.

12:13:57   21         THE COURT:  Mr. Dacus?

12:13:57   22         MR. DACUS:  No, sir.

12:13:58   23         THE COURT:  Ms. Norris, that answers the questions

12:14:01   24    I have.  And I appreciate your candor.  I'm going to let

12:14:05   25    you go back in the courtroom and return to your seat.

| | | |
|---|---|---|
| 12:14:07 | 1 | JUROR NORRIS:  Okay. |
| 12:14:08 | 2 | THE COURT:  If you visit with your neighbors |
| 12:14:11 | 3 | quietly, that's fine.  But if you do, don't discuss |
| 12:14:15 | 4 | anything we've talked about in here. |
| 12:14:18 | 5 | JUROR NORRIS:  Yes, sir. |
| 12:14:19 | 6 | THE COURT:  Thank you so much. |
| 12:14:19 | 7 | JUROR NORRIS:  Thank you. |
| 12:14:19 | 8 | (Juror excused to return to courtroom.) |
| 12:14:19 | 9 | THE COURT:  And I need No. 18 next, |
| 12:14:22 | 10 | Mr. Fitzpatrick. |
| 12:14:25 | 11 | COURT SECURITY OFFICER:  Yes, sir. |
| 12:14:25 | 12 | THE COURT:  I'm going to excuse Ms. Norris for |
| 12:14:28 | 13 | cause. |
| 12:14:28 | 14 | (Juror brought into jury room.) |
| 12:14:50 | 15 | Hello, Ms. Price.  Please come in. |
| 12:14:54 | 16 | JUROR PRICE:  Hello.  How y'all doing? |
| 12:14:56 | 17 | THE COURT:  Please have a seat right there. |
| 12:14:56 | 18 | JUROR PRICE:  Uh-huh. |
| 12:14:58 | 19 | THE COURT:  Thank you for coming back and visiting |
| 12:15:02 | 20 | with us. |
| 12:15:02 | 21 | JUROR PRICE:  Sure. |
| 12:15:03 | 22 | THE COURT:  During the examination of the jury |
| 12:15:06 | 23 | panel this morning by the lawyers, I wrote down several |
| 12:15:09 | 24 | things that I need to ask you about, Ms. Price. |
| 12:15:12 | 25 | JUROR PRICE:  Okay. |

12:15:12  1          THE COURT:  I heard you say that the government

12:15:15  2   gets it wrong most of the time.  Do you -- do you believe

12:15:17  3   that?

12:15:18  4          JUROR PRICE:  Well, sometimes --

12:15:19  5          THE COURT:  I know government is a broad term --

12:15:21  6          JUROR PRICE:  Right.

12:15:22  7          THE COURT:  -- because I work for the government.

12:15:24  8          JUROR PRICE:  No, not all the time, but sometimes.

12:15:27  9          THE COURT:  Okay.  We're talking primarily here

12:15:30 10   about the U.S. Patent and Trademark Office.

12:15:32 11          JUROR PRICE:  Yeah.

12:15:33 12          THE COURT:  And their issuance of these five

12:15:35 13   patents that the Plaintiff is using to bring this lawsuit.

12:15:38 14          JUROR PRICE:  Right.

12:15:38 15          THE COURT:  If you feel like the Patent Office

12:15:42 16   gets it wrong most of the time, that may impact how you

12:15:46 17   deal with the evidence that's going to come out in this

12:15:49 18   trial.  If -- if your answer was the government gets it

12:15:54 19   wrong most of the time, you were thinking about the IRS or

12:15:57 20   some other part of the government.

12:15:58 21          JUROR PRICE:  I really was.

12:16:00 22          THE COURT:  Well, then, I need you to clarify that

12:16:03 23   for me.

12:16:03 24          JUROR PRICE:  That's what I was -- that's what I

12:16:04 25   was talking about.  But when he said something about the

12:16:07   1   patent, four or five of them -- he said four or five of

12:16:11   2   them was going to show -- but the way I felt about it, if

12:16:14   3   the government should have -- they should have really

12:16:17   4   researched this.  If they didn't really research it and got

12:16:22   5   it -- get it right, I don't -- I don't see -- I feel they

12:16:26   6   should have did that.  That was they job.  That's what they

12:16:30   7   got paid for.

12:16:30   8           THE COURT:  Well, this jury is going to at the end

12:16:32   9   of the day be asked to decide if the government got it

12:16:38   10  right.  And they may have gotten it right.  They may have

12:16:40   11  gotten it wrong because they messed up.  They may have

12:16:44   12  gotten it wrong because they didn't have everything in

12:16:46   13  front of them to make a good decision when they did decide.

12:16:49   14  I don't know what the evidence is going to show.

12:16:50   15          JUROR PRICE:  Right.

12:16:51   16          THE COURT:  The evidence may show something else.

12:16:53   17          But the question is, given that the law requires

12:17:00   18  that a valid United States patent is presumed to be valid

12:17:02   19  but it can be invalid if the jury finds from clear and

12:17:08   20  convincing evidence that it shouldn't have been issued in

12:17:10   21  the first place, do you think you can listen to the

12:17:12   22  evidence on that and you can follow my instructions in that

12:17:16   23  regard in making your decision?  That's what I need you to

12:17:20   24  answer.

12:17:21   25          JUROR PRICE:  I know, but I -- I might could, but

```
12:17:25   1   I don't --
12:17:26   2           THE COURT:  Are you sure?
12:17:27   3           JUROR PRICE:  I might.
12:17:28   4           THE COURT:  Okay.  You're using the word "might."
12:17:31   5           JUROR PRICE:  I know.
12:17:32   6           THE COURT:  Does that mean you're not completely
12:17:34   7   sure?
12:17:35   8           JUROR PRICE:  I'm not completely sure.
12:17:36   9           THE COURT:  Okay.  One other -- another question
12:17:39  10   or two.
12:17:39  11       When the Plaintiff talked about the several
12:17:49  12   million dollars they were going to ask the jury to award, I
12:17:53  13   think I -- my notes say that you said or raised your hand
12:17:57  14   that you could never award that kind of many.
12:18:00  15           JUROR PRICE:  No, that's ridiculous.
12:18:02  16           THE COURT:  So are you telling me no matter what
12:18:04  17   the evidence is, you couldn't award that kind of money?
12:18:08  18           JUROR PRICE:  No, that's -- that's too much money.
12:18:09  19           THE COURT:  Okay.  So I want to be clear that I'm
12:18:09  20   understanding you.  You're telling me that no matter what
12:18:11  21   the evidence is, you could never award that kind of money?
12:18:14  22           JUROR PRICE:  I don't think so.
12:18:14  23           THE COURT:  Okay.
12:18:16  24           JUROR PRICE:  I don't see nothing would be that --
12:18:18  25   they couldn't have did nothing that bad to get that much
```

| | | |
|---|---|---|
| 12:18:21 | 1 | money. |
| 12:18:21 | 2 | THE COURT:  All right.  And one other question.  I |
| 12:18:23 | 3 | have in my notes that you said:  I know I'm not right for |
| 12:18:25 | 4 | this case. |
| 12:18:26 | 5 | JUROR PRICE:  Uh-huh. |
| 12:18:27 | 6 | THE COURT:  Can you tell me just as simply as you |
| 12:18:30 | 7 | can why you believe you're not right for this case? |
| 12:18:34 | 8 | JUROR PRICE:  One thing, I really don't like video |
| 12:18:37 | 9 | games.  I just -- to me, they're just a waste. |
| 12:18:43 | 10 | THE COURT:  Now, let me explain this to you, |
| 12:18:46 | 11 | Ms. Price.  GREE, the Plaintiff, represented by Ms. Smith, |
| 12:18:48 | 12 | is in the video game business. |
| 12:18:49 | 13 | JUROR PRICE:  I know. |
| 12:18:50 | 14 | THE COURT:  And Supercell, the Defendant, |
| 12:18:52 | 15 | represented by Mr. Dacus, is in the video game business. |
| 12:18:56 | 16 | JUROR PRICE:  Uh-huh, right. |
| 12:18:58 | 17 | THE COURT:  Now, there are three particular video |
| 12:19:00 | 18 | games made and sold by Supercell that are going to be the |
| 12:19:02 | 19 | focus of this lawsuit. |
| 12:19:03 | 20 | JUROR PRICE:  Uh-huh. |
| 12:19:04 | 21 | THE COURT:  But understanding that both parties |
| 12:19:08 | 22 | are in the same business and they both make and sell video |
| 12:19:11 | 23 | games around the world, but the jury is just going to hear |
| 12:19:15 | 24 | about the three video games that Supercell makes that the |
| 12:19:18 | 25 | Plaintiff has challenged in this lawsuit, but understanding |

| | | |
|---|---|---|
| 12:19:23 | 1 | they're both in the same business -- |
| 12:19:25 | 2 | JUROR PRICE:  Uh-huh. |
| 12:19:26 | 3 | THE COURT:  -- does your dislike of video games -- |
| 12:19:29 | 4 | and I -- I understand that. |
| 12:19:32 | 5 | JUROR PRICE:  Uh-huh. |
| 12:19:33 | 6 | THE COURT:  Does your negative views on video |
| 12:19:36 | 7 | games, would it cause you in your mind to treat the |
| 12:19:38 | 8 | Defendants any differently than the Plaintiff or the |
| 12:19:40 | 9 | Plaintiff any differently than the Defendant or -- |
| 12:19:44 | 10 | JUROR PRICE:  About the same. |
| 12:19:44 | 11 | THE COURT:  Would you be able to say you would |
| 12:19:46 | 12 | treat them both the same? |
| 12:19:48 | 13 | JUROR PRICE:  Probably the same. |
| 12:19:49 | 14 | THE COURT:  All right.  Thank you, ma'am. |
| 12:19:51 | 15 | Mr. Dacus, do you have questions of Ms. Price? |
| 12:19:55 | 16 | MR. DACUS:  I do not, Your Honor.  Thank you. |
| 12:19:57 | 17 | THE COURT:  Ms. Smith? |
| 12:19:58 | 18 | MS. SMITH:  No, Your Honor. |
| 12:19:59 | 19 | THE COURT:  Ms. Price, I'm going to let |
| 12:20:01 | 20 | Mr. Fitzpatrick escort you back to your seat.  And if you'd |
| 12:20:06 | 21 | like to visit with your neighbors quietly; if not, you |
| 12:20:07 | 22 | certainly don't have to.  But if you do visit with your |
| 12:20:07 | 23 | neighbors, don't talk about anything we've talked about in |
| 12:20:09 | 24 | here. |
| 12:20:09 | 25 | JUROR PRICE:  Oh, sure.  Sure. |

| | | |
|---|---|---|
| 12:20:10 | 1 | THE COURT:  Okay.  Thank you, Ms. Price. |
| 12:20:12 | 2 | JUROR PRICE:  All right. |
| 12:20:14 | 3 | (Juror excused to return to courtroom.) |
| 12:20:14 | 4 | THE COURT:  Mr. Fitzpatrick, if you will escort |
| 12:20:20 | 5 | her back and then check back with me. |
| 12:20:23 | 6 | COURT SECURITY OFFICER:  Yes, sir. |
| 12:20:24 | 7 | THE COURT:  Thank you. |
| 12:20:24 | 8 | I'm going to excuse Ms. Price for cause. |
| 12:20:26 | 9 | I don't think we're -- I don't think we're going |
| 12:20:43 | 10 | to get past the ones you -- we've actually talked to, do |
| 12:20:47 | 11 | you all? |
| 12:20:47 | 12 | MR. DACUS:  I do not. |
| 12:20:48 | 13 | MS. SMITH:  That's correct. |
| 12:20:48 | 14 | MR. DACUS:  It looks like we would strike through |
| 12:20:51 | 15 | 21 -- through and including 21. |
| 12:20:53 | 16 | THE COURT:  That's -- that's my calculation. |
| 12:20:55 | 17 | Eight jurors, eight total peremptory challenges, 16, five |
| 12:21:02 | 18 | excuses or granted challenges for cause gets us to 21. |
| 12:21:05 | 19 | And the next challenged venire member after that |
| 12:21:11 | 20 | doesn't show up until 30. |
| 12:21:12 | 21 | Okay.  20 minutes after 12:00.  How long do you |
| 12:21:18 | 22 | two need to strike your lists? |
| 12:21:21 | 23 | MR. DACUS:  I've got a bunch of folks in my room. |
| 12:21:24 | 24 | I'd like 20 minutes. |
| 12:21:25 | 25 | MS. SMITH:  That would be wonderful.  I was going |

12:21:28  1  to say 15.  I like 20 better if the Court will entertain

12:21:30  2  that.

12:21:31  3          THE COURT:  I'll give you until 12:45.

12:21:35  4          MR. DACUS:  Perfect.

12:21:36  5          MS. SMITH:  Perfect.  Thank you.

12:21:39  6          THE COURT:  If you'll take your seats in the

12:21:41  7  courtroom, I'll explain to the panel what we're going to do

12:21:43  8  next.

12:22:47  9          (Bench conference concluded and the Court and the

12:22:48  10         parties return to the courtroom.)

12:22:48  11         THE COURT:  Ladies and gentlemen, the lawyers are

12:22:54  12 going to take a few minutes -- I'm going to give them until

12:23:00  13 12:45 to exercise their peremptory challenges.

12:23:06  14         While that happens, I will recess and be off the

12:23:11  15 bench.  During this recess, I can't allow all of you to get

12:23:15  16 up and just walk around the courthouse.  That will defeat

12:23:18  17 all the public safety and public health protocols we've put

12:23:24  18 in place.

12:23:25  19         So while we're in this short recess that's coming

12:23:28  20 up, again, 20, 25 minutes, a couple things, the Court

12:23:36  21 Security Officers, Mr. Fitzpatrick and Ms. Denton, will

12:23:38  22 come by and row-by-row they will check and see if any of

12:23:41  23 you need a restroom break or something like that.

12:23:43  24         And because we're going to try to maintain --

12:23:45  25 we're going to maintain social distancing, if anybody on

12:23:49  1   that particular row needs to have a bathroom break, they'll

12:23:52  2   take you out of the courtroom to the restroom, and when

12:23:55  3   you're finished, bring you back and put you back on your

12:23:58  4   row, and then they'll go to the next row.  We'll do it kind

12:24:03  5   of like church service, one row at a time.

12:24:06  6        Also, during this time, I know we're past noon, I

12:24:11  7   don't know if any of you have low blood sugar or any other

12:24:15  8   problems, so I'm going to do something I never do -- in

12:24:18  9   nine years I've only done it once and that was the last

12:24:19 10   trial that just took place last month.  I'm going to let

12:24:22 11   the clerk's office bring in bottles of water and packages

12:24:25 12   of peanut butter crackers.

12:24:29 13        And if somebody wants something to eat or

12:24:31 14   something to drink during this recess, you're going to get

12:24:34 15   to eat and drink in my courtroom, and I promise you, that's

12:24:37 16   never happened before.  But I don't want anybody to be -- I

12:24:41 17   don't want anybody to be in a bad way because we have to

12:24:44 18   maintain the positioning that we have.

12:24:47 19        If you'd like a bottle of water or some crackers,

12:24:51 20   let one of the Court Security Officers know, and

12:24:53 21   Ms. Clendening will probably be in here shortly with the

12:24:56 22   clerk's office, and you can certainly let her know.

12:24:59 23        Also, feel free while you're seated to do just

12:25:02 24   what you've been doing while I've been in the jury room,

12:25:06 25   and that is either keep to yourself and be quiet, or if

| | |
|---|---|
| 12:25:10 | 1 |
| 12:25:15 | 2 |
| 12:25:18 | 3 |
| 12:25:21 | 4 |
| 12:25:21 | 5 |
| 12:25:26 | 6 |
| 12:25:28 | 7 |
| 12:25:31 | 8 |

1  you'd like to visit with somebody close by, feel free to do

2  that.  But do not discuss anything that's happened in the

3  courtroom this morning since you arrived and came through

4  security.  Don't discuss anything that's happened today.

5          With that, until 12:45, the Court stands in

6  recess.

7          COURT SECURITY OFFICER:  All rise.

8          (Recess.)

9

10                      CERTIFICATION

11

12      I HEREBY CERTIFY that the foregoing is a true and

13  correct transcript from the stenographic notes of the

14  proceedings in the above-entitled matter to the best of my

15  ability.

16

17

18   /S/ Shelly Holmes                9/10/2020
     SHELLY HOLMES, CSR, TCRR        Date
19  OFFICIAL REPORTER
     State of Texas No.: 7804
20  Expiration Date: 12/31/20

21

22

23

24

25