1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2                  MARSHALL DIVISION

3
GREE, INC.,                 )(   CIVIL ACTION NOS.
4                           )(   2:19-CV-70-JRG-RSP
      PLAINTIFFS,           )(   2:19-CV-71-JRG-RSP
5                           )(
      VS.                   )(
6                           )(   MARSHALL, TEXAS
SUPERCELL OY,               )(   SEPTEMBER 14, 2020
7                           )(   1:13 P.M.
      DEFENDANTS.           )(
8

9              TRANSCRIPT OF JURY TRIAL

10            VOLUME 6 - AFTERNOON SESSION

11      BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

12          UNITED STATES CHIEF DISTRICT JUDGE

13

14   APPEARANCES:

15

16   FOR THE PLAINTIFFS:

17

18   MR STEVEN D. MOORE
     KILPATRICK TOWNSEND & STOCKTON LLP
19   Two Embarcadero Center, Suite 1900
     San Francisco, CA 94111
20

21   MS. TAYLOR HIGGINS LUDLAM
     KILPATRICK TOWNSEND & STOCKTON LLP
22   4208 Six Forks Road
     Raleigh, NC 27609
23

24

25

1    FOR THE PLAINTIFF:

2

3    MR. ALTON L. ABSHER III
     KILPATRICK TOWNSEND & STOCKTON LLP
4    1001 West Fourth Street
     Winston-Salem, NC 27101
5

6    MR. MICHAEL T. MORLOCK
     KILPATRICK TOWNSEND & STOCKTON LLP
7    1100 Peachtree Street, NE
     Suite 2800
8    Atlanta, GA 30309

9
     MS. TAYLOR J. PFINGST
10   KILPATRICK TOWNSEND & STOCKTON LLP
     Two Embarcadero Center, Suite 1900
11   San Francisco, CA 94111

12
     MS. MELISSA R. SMITH
13   GILLAM & SMITH, LLP
     303 South Washington Avenue
14   Marshall, TX 75670

15

16   FOR THE DEFENDANT:

17

18   MR. MICHAEL J. SACKSTEDER
     MR. BRYAN A. KOHM
19   MR. CHRISTOPHER L. LARSON
     MS. SHANNON E. TURNER
20   FENWICK & WEST LLP
     555 California Street, 12th Floor
21   San Francisco, CA 94104

22
     MR. GEOFFREY R. MILLER
23   FENWICK & WEST LLP
     902 Broadway, Suite 14
24   New York, NY 10010

25

```
 1   FOR THE DEFENDANT:

 2
     MS. JESSICA M. KAEMPF
 3   MR. JONATHAN T. MCMICHAEL
     FENWICK & WEST LLP
 4   1191 Second Ave., 10th Floor
     Seattle, WA 98101
 5

 6   MR. DERON DACUS
     THE DACUS FIRM, P.C.
 7   821 ESE Loop 323, Suite 430
     Tyler, TX 75701
 8

 9

10

11

12   COURT REPORTER:     Ms. Shelly Holmes, CSR, TCRR
                         Official Court Reporter
13                       United States District Court
                         Eastern District of Texas
14                       Marshall Division
                         100 E. Houston
15                       Marshall, Texas  75670
                         (903) 923-7464
16

17
     (Proceedings recorded by mechanical stenography, transcript
18   produced on a CAT system.)

19

20

21

22

23

24

25
```

```
12:58:27    1                 P R O C E E D I N G S

12:58:30    2            (Jury out.)

12:58:31    3            COURT SECURITY OFFICER:  All rise.

12:58:35    4            THE COURT:  Be seated, please.

01:13:55    5            All right.  Counsel, before I bring the jury in

01:14:10    6   and before we continue with Dr. Becker's direct testimony,

01:14:14    7   I met with counsel this morning in chambers regarding

01:14:19    8   disputes that were not resolved in the meet-and-confer

01:14:24    9   process over the weekend.

01:14:26   10            One of the disputes that I took under advisement

01:14:29   11   was objections from the Plaintiff as to three proposed

01:14:36   12   demonstrative slides to be used by the Defendant with Stacy

01:14:46   13   Friedman.

01:14:49   14            As a part of the discussion this morning in

01:14:52   15   chambers, I took down multiple cites from both sides as to

01:14:56   16   where they thought this particular expert's report did or

01:15:00   17   didn't adequately cover those three demonstrative slides.

01:15:10   18   And I've looked at all of that.

01:15:17   19            It's my conclusion that Paragraph 49 in Friedman's

01:15:25   20   rebuttal report in the 70 case, lays out a basis to argue

01:15:33   21   that the selection step involves both touching the icon,

01:15:43   22   moving it, dropping it into the battlefield, and, in

01:15:48   23   effect, combining what Plaintiff argues selection and

01:15:52   24   content removal are.

01:15:54   25            To the extent these three slides are used by the
```

| | |
|---|---|
| 01:16:00 | 1 |
| 01:16:04 | 2 |
| 01:16:08 | 3 |
| 01:16:14 | 4 |
| 01:16:15 | 5 |
| 01:16:19 | 6 |
| 01:16:23 | 7 |
| 01:16:26 | 8 |
| 01:16:33 | 9 |
| 01:16:39 | 10 |
| 01:16:40 | 11 |
| 01:16:44 | 12 |
| 01:16:58 | 13 |
| 01:17:00 | 14 |
| 01:17:04 | 15 |
| 01:17:07 | 16 |
| 01:17:10 | 17 |
| 01:17:12 | 18 |
| 01:17:16 | 19 |
| 01:17:19 | 20 |
| 01:17:22 | 21 |
| 01:17:26 | 22 |
| 01:17:28 | 23 |
| 01:17:32 | 24 |
| 01:17:37 | 25 |

1  Defendant with this witness to present an argument that

2  follows Paragraph 49 of the witness's rebuttal report in

3  the 70 case, they're permitted.  And the objection is

4  overruled.

5       I do not find in all the various other cites to

6  the various iterations of reports for this expert a basis

7  to use them otherwise.  And that will be the Court's ruling

8  on those demonstratives.

9       With that, Dr. Becker, if you'll return to the

10  witness stand.

11       And, Ms. Ludlam, you may return to the podium.

12       MS. LUDLAM:  Thank you, Your Honor.

13       MR. SACKSTEDER:  Your Honor, before we get

14  started, I think we had some -- some disputes over some

15  objections in the trial deposition videos that are to be

16  played by Defendant in Defendant's case.  I think we've

17  resolved at least one of them.

18       So two of those videos, I think, are now clean,

19  but there are a couple that remain on the third one.  And

20  since we have to do some editing before we play it, it

21  might make sense to address that first.

22       THE COURT:  All right.  Well, tell me where you

23  are on that issue.  I don't have everything with me on the

24  bench that we discussed in chambers, including those

25  printed designations and counter-designations.

01:17:42  1          MR. SACKSTEDER:  They're not actually

01:17:45  2   designations, Your Honor.  We -- we actually did the trial

01:17:47  3   depositions of our witnesses and --

01:17:49  4          THE COURT:  Oh.

01:17:50  5          MR. SACKSTEDER:  -- as if they were live.

01:17:53  6          THE COURT:  And I don't have those in front of me

01:17:55  7   either.

01:17:56  8          MR. SACKSTEDER:  Okay.  I apologize, Your Honor.

01:18:03  9   Apparently, we don't have copies --

01:18:05  10          THE COURT:  Let's get an extra copy, and I think

01:18:08  11   we've got enough cleared out that we will get to at least

01:18:12  12   another recess, and we'll take it up during the next

01:18:15  13   recess.

01:18:15  14          MR. SACKSTEDER:  Thank you, Your Honor.

01:18:16  15          THE COURT:  All right.  Let's bring in the jury,

01:18:20  16   please, Mr. Fitzpatrick.

01:18:21  17          COURT SECURITY OFFICER:  Yes, sir.

01:18:23  18          All rise.

01:18:40  19          (Jury in.)

01:18:51  20          THE COURT:  Welcome back from lunch, members of

01:18:55  21   the jury.  Please have a seat.

01:18:57  22          We will continue with the direct examination of

01:19:00  23   Dr. Stephen Becker by Plaintiff's counsel.

01:19:02  24          Ms. Ludlam, you may proceed.

01:19:04  25          MS. LUDLAM:  Thank you, Your Honor.

01:19:04  1        STEPHEN L. BECKER, PH.D., PLAINTIFF'S WITNESS,

01:19:04  2                      PREVIOUSLY SWORN

01:19:04  3                  DIRECT EXAMINATION CONTINUED

01:19:05  4    BY MS. LUDLAM:

01:19:05  5    Q.  Dr. Becker, could you just briefly remind us again what

01:19:09  6    your regression analysis shows for each of the three games?

01:19:13  7    A.  Yes.  So the regression analysis establishes the

01:19:18  8    relationship between time spent in the game and the amount

01:19:21  9    of spending that a particular player has in the game.  And

01:19:24  10   I have that for each of Clash of Clans, Clash Royale, and

01:19:29  11   Brawl Stars.

01:19:30  12   Q.  Okay.  Dr. Becker, let's get into the first patent, if

01:19:33  13   we will.

01:19:34  14        What is your understanding of the feature or

01:19:38  15   elements accused with respect to the '594 patent?

01:19:40  16   A.  So the '594 patent, it relates to Clash of Clans.  And

01:19:45  17   specifically within Clash of Clans, I understand that to be

01:19:48  18   the -- what I call the copy layout feature.  Dr. Akl talked

01:19:52  19   a lot about that.  It's the ability to copy a layout from

01:19:55  20   someone else and then deploy that in your -- in your game.

01:20:00  21   Q.  Okay.  And what did you find when you analyzed the

01:20:02  22   value of this feature?

01:20:03  23   A.  Well, I looked at a number of pieces of evidence -- a

01:20:09  24   number of types of evidence relating to the value of that

01:20:12  25   feature.

01:20:12    1          The first place I went was the -- within

01:20:18    2    Dr. Neal's survey.  Again, I'm trying to focus on this

01:20:22    3    question of what makes paying players -- sort of what --

01:20:27    4    what -- what are the things that distinguish the paying

01:20:30    5    players, where all the revenue comes from, from the

01:20:34    6    non-paying players, and does this particular feature of

01:20:37    7    this game have any indication about -- about that with

01:20:40    8    respect to paying players.

01:20:41    9          So Dr. Neal, as he said in his testimony, that

01:20:45   10    awareness, usage, and importance is significantly higher

01:20:49   11    for paying players on this.  So we see on each one of these

01:20:55   12    measures a significant increase in the usage, awareness,

01:21:01   13    and importance within the set of paying players.

01:21:04   14          And so that was important to me and gave me the

01:21:09   15    beginnings of a way to quantify the value of this feature.

01:21:13   16    Q.  And did you see any other evidence indicating the value

01:21:15   17    of the copy layout feature?

01:21:16   18    A.  Yes.  So I stepped away from Dr. Neal's survey, and

01:21:20   19    went and said, let me look both within Supercell for

01:21:25   20    evidence of essentially why Supercell created this feature

01:21:28   21    and why they put it in the game, what they thought it was

01:21:32   22    going to do, and also amongst industry reviews what people

01:21:38   23    who review these games thought about this feature.

01:21:41   24    Q.  Okay.  Let's talk first about internally at Supercell

01:21:45   25    what you saw.  What are we about to see here?

01:21:48   1   A.  So the next series of slides are five or six -- I think

01:21:52   2   it's maybe five different excerpts from largely an internal

01:21:58   3   chat.  Supercell has a tool called Slack that allows people

01:22:02   4   within the company to essentially -- it's almost like

01:22:04   5   texting each other, but it's a little more formal way to do

01:22:08   6   it.

01:22:08   7          This starts in October of 2017 where I can see

01:22:15   8   this sort of conception of this feature.  Stephan

01:22:17   9   Demirdjian -- I'm not sure I'm pronouncing his name

01:22:22   10   right -- says:  Started wondering if cloning an enemy base

01:22:27   11   layout feature would not only be a great quality of life

01:22:33   12   improvement but could this be one of those small

01:22:33   13   improvements with a big impact.

01:22:35   14          So they've -- thinking -- remember we talked

01:22:36   15   earlier about micro-triggers.  This may be one of those.

01:22:39   16          So if we skip forward, this is literally the same

01:22:42   17   day:  Layout copying could have some abuse scenarios, but

01:22:48   18   anything to help with making Clash of Clans more of a pick

01:22:53   19   up and play game would feel good.

01:22:53   20          If we flip ahead.  Here's Aki Immonen saying that

01:22:59   21   copying a village layout would be a very useful feature.

01:23:02   22   And he's saying that, look, if you have to do this

01:23:06   23   manually, it's a real pain.  And so that's, again, time

01:23:09   24   saving, quality of life improving feature.

01:23:12   25          Here we see the -- this idea of quality of life

01:23:16   1  improvement, both Marika Appel saying that -- when asked:

01:23:21   2  What do you guys think about copy layout?  And then down at

01:23:24   3  the bottom Darian Vorlick says:  It definitely -- it'd

01:23:31   4  definitely save a lot of time and definitely a big quality

01:23:34   5  of life improvement.

01:23:35   6        And Jason Dou -- this is quite a bit later.  We

01:23:39   7  jump forward to June 12th of 2018, and he says:  Cool, by

01:23:45   8  the way, I love the copy layout function.

01:23:47   9        And so, again, I think this is after they have got

01:23:50  10  it in the game and are testing it.

01:23:51  11  Q.  And, Dr. Becker, this PTX-74, you're saying that's

01:23:55  12  after the copy layout feature was included?

01:23:58  13  A.  I believe that -- at least he's looking at -- I don't

01:23:59  14  know if it's been widespread released, but it's definitely

01:24:04  15  after it's in the game.

01:24:05  16  Q.  And those were -- those were all, you said, internal

01:24:09  17  Slack messages from Supercell employees?

01:24:11  18  A.  Yes.

01:24:12  19  Q.  Great.  What conclusions did you draw from this

01:24:14  20  evidence?

01:24:14  21  A.  So that tells me that, quite independent of Dr. Neal's

01:24:20  22  quantitative analysis, we're dealing with a feature that

01:24:23  23  was put in the game for a reason.  They were attempting to

01:24:29  24  not only save people time but generate what we saw a number

01:24:33  25  of times called quality of life improvement.  We see this

| | |
|---|---|
| 01:24:37 | 1 |
| 01:24:41 | 2 |
| 01:24:47 | 3 |
| 01:24:51 | 4 |
| 01:24:55 | 5 |
| 01:24:59 | 6 |
| 01:25:04 | 7 |
| 01:25:08 | 8 |
| 01:25:11 | 9 |
| 01:25:12 | 10 |
| 01:25:17 | 11 |
| 01:25:20 | 12 |
| 01:25:27 | 13 |
| 01:25:32 | 14 |
| 01:25:34 | 15 |
| 01:25:38 | 16 |
| 01:25:39 | 17 |
| 01:25:42 | 18 |
| 01:25:47 | 19 |
| 01:25:49 | 20 |
| 01:25:54 | 21 |
| 01:25:57 | 22 |
| 01:26:00 | 23 |
| 01:26:03 | 24 |
| 01:26:09 | 25 |

1  also being referred to as, you know, more engaging.

2       So I went back to Dr. Neal's survey and his survey

3  results, and said, okay, the evidence, both within the

4  survey in terms of the increase in awareness and usage and

5  importance and the internal Supercell evidence, tells me

6  that this is an important and useful feature.  Let's see

7  what various measures to quantify the value of that are.

8  And the first -- the first one is on the next slide.

9  Q.  And how did you do that?

10  A.  So Dr. Neal, he testified about his logistic

11  regression.  This is the graph for Clash of Clans that

12  shows the probability of making an in-app purchase if a

13  particular Clash of Clans' function is perceived as

14  important by the player.  And he found that there was a

15  9 percent increase in the likelihood of being a paying

16  player.

17       When I take into account the percentage of players

18  who found that feature important, what that tells me, down

19  in the lower right, is that the copy layout feature is

20  associated with 3.36 percent of Clash of Clans revenues.

21  Q.  And how did you use this data, Dr. Becker?

22  A.  So that -- that by itself was a data point that said,

23  okay, that's one way to value the feature is to just look

24  at, is it important to players generally?  And we see that

25  that would give me a basis for saying that 3.36 percent of

01:26:13   1   the revenues were attributed to this feature.

01:26:16   2          I wanted to dig a little deeper and see if I could

01:26:19   3   put a finer point on that, so I went and used some

01:26:22   4   additional data.

01:26:23   5   Q.  Okay.  What other analysis of the incremental value did

01:26:26   6   you perform on the patent?

01:26:28   7   A.  So the next analysis I did was to look at Dr. Neal's

01:26:32   8   survey result where he asked players of Clash of Clans if

01:26:37   9   this feature were gone, what would happen.

01:26:40   10          And we heard him talk about the fact that some

01:26:44   11   number of those players, in particular some number of the

01:26:47   12   paying players, said, look, if you take this away, I'm

01:26:50   13   going to play the game less.

01:26:52   14          So that was -- in terms of paying players who

01:26:55   15   thought the feature was important, out of all players,

01:26:59   16   that's 10.5 percent.  I then took that, and he had another

01:27:06   17   question that asked them, how much time would you decrease?

01:27:12   18   And they said on average, 57.48 percent reduction in

01:27:16   19   playing time.

01:27:18   20          I take those two together, and it gives me an

01:27:20   21   estimate of the overall across all paying players, there

01:27:24   22   would be a 6 percent decline in playtime.

01:27:27   23          I can then take that against that regression

01:27:30   24   analysis of the time versus money and hit it with the 21.1

01:27:36   25   percent.  And what that yields is an estimated revenue

01:27:40  1   impact, if you were to take this feature away, of 1.27

01:27:46  2   percent.

01:27:47  3   Q.  And what did you do next?

01:27:50  4   A.  So to turn this -- this is essentially Supercell's

01:27:56  5   incremental revenue that I've estimated from this feature.

01:28:00  6        So when they earn an extra dollar from having this

01:28:06  7   feature in, the question is, how much of that do they keep?

01:28:10  8   Is it all profit?

01:28:10  9        And just at the margin -- in economics we talk

01:28:14  10  about certain marginal profit, one more dollar.  Well, one

01:28:17  11  thing I know is that even if it's just an additional

01:28:20  12  dollar, Supercell has to pay part of that to Apple and

01:28:23  13  Google because they host the Play Store and the Apple

01:28:31  14  iTunes Store.  So I want to take that out.

01:28:32  15       And the other thing was -- that I noticed from

01:28:34  16  looking at the financial statements and also lots of other

01:28:37  17  evidence about this game in this industry is that marketing

01:28:41  18  spending is a significant part of what drives people to use

01:28:43  19  the games.

01:28:44  20       And since we're talking about a feature that is

01:28:48  21  part of what needs to be promoted in the game, I thought it

01:28:52  22  was reasonable in terms of the negotiated royalty rate to

01:28:56  23  essentially reduce this rate by the factor for the

01:28:58  24  marketing spend that Supercell has to do to create every

01:29:03  25  dollar of revenue.

01:29:04  1   Q.  And, Dr. Becker, is what we're looking at here, is that

01:29:07  2   the reduction that you made for those commissions in

01:29:11  3   marketing?

01:29:11  4   A.  Yeah.  So commissions on average are 29 percent, and

01:29:18  5   marketing spending on average is 16 percent.  Combined,

01:29:20  6   that's 45 percent -- 45 cents out of every dollar.  What

01:29:23  7   that leaves you with is 55 percent of the dollar.

01:29:26  8          So if their revenue is going to go up by 1.27

01:29:30  9   percent, after adjusting for commissions and marketing,

01:29:33  10  that gets me down to .7 percent.

01:29:36  11  Q.  And are there any other costs that we need to take into

01:29:40  12  account in this analysis?

01:29:42  13  A.  No, I don't think there are.  Supercell certainly has

01:29:47  14  lots of other costs, but none of them are on that marginal

01:29:55  15  dollar of revenue.  None of them reasonably would increase

01:29:58  16  if they put this feature in and they make a little more

01:30:01  17  money.  Their marketing spend might go up.  Definitely

01:30:04  18  their commissions go up.  But the cost of their office

01:30:08  19  building in Sweden doesn't go up.  The number of people

01:30:11  20  they have in operations doesn't go up.

01:30:14  21          So in economics, we look at those marginal costs,

01:30:18  22  and I think that the marketing and commissions are the only

01:30:21  23  ones that would be marginally associated with this

01:30:23  24  particular feature.

01:30:25  25  Q.  Okay.  And were there any other results from Dr. Neal's

749

01:30:28  1  survey that you needed to consider here?

01:30:29  2  A.  Yes.  I actually looked at and used in my analysis in

01:30:40  3  terms of the things I considered, some other aspects of his

01:30:43  4  survey.

01:30:43  5        And one of them was something that was talked

01:30:45  6  about earlier today that there were -- a portion of the

01:30:47  7  players who took his survey when asked what would happen if

01:30:54  8  the feature went away, actually said:  Well, I'll spend

01:30:57  9  more time.

01:30:58  10        And so I had to consider, you know, is that

01:31:04  11  additional time?  What is the nature of that additional

01:31:06  12  time?  And is there an economic reason to put it in on an

01:31:11  13  equal basis with the spend less time or is it of a -- is

01:31:15  14  there evidence that will -- that would lead me to the

01:31:18  15  conclusion that it is materially a different sort of time.

01:31:21  16  Q.  So if we were to just consider that piece of data from

01:31:25  17  Dr. Neal without any other context, what would that do to

01:31:29  18  your calculation?

01:31:30  19  A.  Well, if I just blindly said I'm going to ignore the

01:31:34  20  evidence and just look at the survey results and say some

01:31:37  21  people say if you take this feature away, we're not going

01:31:40  22  to play as much, and some other people say we're going to

01:31:43  23  play more, and I net them together, actually net net, it

01:31:47  24  would suggest mathematically that people would play a -- a

01:31:51  25  little bit more.  And mathematically that would reduce this

01:31:57  1   royalty rate literally to zero and say the feature is not

01:31:59  2   worth anything.

01:32:00  3   Q.   Did you consider that to be reasonable?

01:32:01  4   A.   No.   I looked at a significant amount of evidence

01:32:05  5   that -- in the record to really kind of make this decision

01:32:09  6   about whether is it reasonable to net those and reach the

01:32:15  7   conclusion that the feature making people spend more time

01:32:18  8   would be productive in the sense of engagement with the

01:32:23  9   game, or would it be materially some other kind of time.

01:32:26  10  And I -- the evidence is clear that the kind of time that

01:32:30  11  those people would be spending is not productive time.

01:32:34  12  Q.   Okay.   And so you did find evidence in the record about

01:32:38  13  whether or not to net those spending more time versus less

01:32:44  14  time?

01:32:44  15  A.   Yes, I looked at that.   And this is -- you know, the --

01:32:50  16  the -- the chat messages that we talked a little -- that I

01:32:53  17  showed you a few minutes ago really get to this issue that

01:32:57  18  the entire purpose of this feature was time saving.

01:33:01  19        We saw one of the people say if you have to go,

01:33:04  20  you know, take a picture of somebody's layout and write it

01:33:10  21  down and build it by hand, that's a real pain.   It's --

01:33:15  22  certainly they were saying that is detrimental to quality

01:33:17  23  of life within the game.

01:33:19  24        So let's give these people a feature that will

01:33:23  25  save them time and improve their quality of life.   What

01:33:23  1  Mr. Peltola is talking about here is grinding.  That's the

01:33:25  2  term that Supercell uses internally; that if you make

01:33:31  3  people do things that's no fun, it is not a meaningful

01:33:40  4  experience.  And as he says here:  Grinding is generally

01:33:45  5  considered detrimental to a player experience.

01:33:49  6        So all the evidence I had was telling me that that

01:33:51  7  bucket of spend more time made sense that a few people

01:33:54  8  said, yeah, I still got to build this layout somehow, so

01:33:57  9  I'm going to have to do it by hand.  But that's not

01:34:00  10  productive, happy spending time in the game.

01:34:03  11        So I chose to say I'm going to set that aside, not

01:34:07  12  give it as much weight as the spend less time people and

01:34:11  13  use the spend less time in the game if the feature is gone

01:34:14  14  as the basis to value the feature.

01:34:15  15  Q.  So it's not that you simply ignored Dr. Neal's survey

01:34:19  16  results?

01:34:20  17  A.  No.  Actually, the calculations of what would happen if

01:34:24  18  you did it, I've laid all those out in my report.  And then

01:34:27  19  I laid out the reasons why I think the only answer that is

01:34:34  20  consistent with the evidence about why they built this

01:34:36  21  feature in the first place is that we look at the spend

01:34:39  22  less time and value it at that one -- at that .7 percent

01:34:44  23  level.

01:34:44  24  Q.  Great.  And so does that complete your analysis with

01:34:48  25  respect to the '594?

01:34:49  1   A.  It did.

01:34:49  2   Q.  Okay.  What do we do next?

01:34:51  3   A.  So next we go to Clash Royale.  And within Clash

01:34:55  4   Royale, the first place to go is the '655 patent, which is

01:35:00  5   shorthand, card donation patent.

01:35:02  6   Q.  And is the methodology that you used to value the '655

01:35:06  7   patent similar to what we did or the same as what we just

01:35:10  8   did with the '594?

01:35:11  9   A.  Yes.  Essentially, all the steps, all the types of

01:35:14  10  information I looked at, the categories of information, and

01:35:16  11  the analytical and mathematical steps were the same.

01:35:20  12  Q.  Okay.  So let's discuss some of the evidence that you

01:35:22  13  considered was important to determining the value of the

01:35:25  14  '655 patent.

01:35:25  15  A.  Okay.  So, first, I think let's go to -- I had some

01:35:29  16  financial data.  Actually it was one of the few features

01:35:33  17  where I had granular data that I could tie specifically

01:35:40  18  to -- make a correlation between money and the use of the

01:35:43  19  feature.

01:35:44  20       And what I found was that 87 percent of all of the

01:35:47  21  revenue from Clash Royale comes from players who donate,

01:35:53  22  request, and receive cards.  And only 13 percent of the

01:35:56  23  revenue is from players who don't use that whole donation

01:36:00  24  and -- and requesting and receiving cards element of the

01:36:04  25  game.

| | | |
|---|---|---|
| 01:36:04 | 1 | Q.  And, Dr. Becker, did you use PTX-87 in order to |
| 01:36:09 | 2 | determine that -- |
| 01:36:09 | 3 | A.  Yes. |
| 01:36:09 | 4 | Q.  -- calculation? |
| 01:36:13 | 5 | MS. LUDLAM:  Mr. Groat, could you quickly pull up |
| 01:36:17 | 6 | PTX-87 for me? |
| 01:36:21 | 7 | Q.  (By Ms. Ludlam)  And is this the spreadsheet that you |
| 01:36:28 | 8 | used to calculate the information that appeared on your |
| 01:36:31 | 9 | slide? |
| 01:36:31 | 10 | A.  Yes. |
| 01:36:31 | 11 | Q.  Okay.  Thank you. |
| 01:36:33 | 12 | MS. LUDLAM:  Thank you, Mr. Groat. |
| 01:36:35 | 13 | Q.  (By Ms. Ludlam)  Is there any other evidence that you |
| 01:36:37 | 14 | considered in order to determine the value -- value of the |
| 01:36:40 | 15 | '655? |
| 01:36:40 | 16 | A.  Yes.  So in reviewing the evidence in the record, I |
| 01:36:43 | 17 | found that there were some surveys that -- that Supercell |
| 01:36:46 | 18 | had done internally relating to Clash Royale and this -- |
| 01:36:51 | 19 | this feature. |
| 01:36:53 | 20 | And this is one where Clash Royale players were |
| 01:37:00 | 21 | asked:  Which of the following experiences are most central |
| 01:37:02 | 22 | to your enjoyment of Clash Royale? |
| 01:37:06 | 23 | And upgrading cards to make more progress was |
| 01:37:12 | 24 | central to the enjoyment for 58 percent of the people. |
| 01:37:15 | 25 | And, notably, the heavy payers who spend more than |

01:37:18   1   a hundred dollars, actually rated that at 62 percent.

01:37:23   2   Q.  Great.  And that survey, I think, was depicted in the

01:37:28   3   video we just saw --

01:37:29   4   A.  Yes.

01:37:29   5   Q.  -- PTX-61?  Thank you.

01:37:33   6         Was there any other evidence in the record that

01:37:35   7   you considered in valuing the patent?

01:37:37   8   A.  Yes, there was at least one other survey.  This one is

01:37:40   9   from February of 2020 looking -- where they asked:

01:37:45  10   Considering your current clan and clan mates, how

01:37:49  11   interested are you in doing the following?

01:37:51  12         And then present them with a number of possible

01:37:53  13   things.  And helping clan mates to upgrade cards was the

01:37:57  14   highest rated activity that people were interested in

01:38:02  15   doing.  And that out of these activities would be the one

01:38:05  16   that -- sort of within which we would find the -- the --

01:38:08  17   the accused infringing feature.

01:38:09  18   Q.  Okay.  And -- and PTX-97 is what is represented on this

01:38:15  19   screen?

01:38:16  20   A.  Yes.

01:38:16  21   Q.  Okay.  Did you rely on -- just as you did with the

01:38:21  22   '594, did you rely on similar survey results from Dr. Neal?

01:38:24  23   A.  Yes.  So, again, the -- the first step was the

01:38:27  24   high-level awareness, usage, and importance analysis that

01:38:31  25   Dr. Neal did.  He was sort of asking a bunch of questions.

01:38:35   1   I was really focused on the difference between paying

01:38:37   2   players and non-paying players.

01:38:40   3           And, here, just like before, we see that

01:38:44   4   awareness, usage, and importance is significantly higher

01:38:47   5   for paying players when asked specifically about the '655

01:38:53   6   patent card donation feature.

01:38:54   7   Q.  And did you also consider a logit model that Dr. Neal

01:38:59   8   ran for this patent, as well?

01:39:01   9   A.  Yes.  So this data on this slide is sort of a general

01:39:04  10   directional.  Yes, it's more important and more valuable to

01:39:07  11   paying players.

01:39:09  12           The next step is to go to Dr. Neal's logistic

01:39:13  13   regression where he puts a finer point on it to say, what's

01:39:17  14   the probability of making an in-app purchase if you find

01:39:23  15   this card donation feature to be important?

01:39:29  16           When I take his logistic regression results and

01:39:32  17   sort of run them through the economic analysis to say

01:39:35  18   what's the impact on revenue, I get an 8.6 percent impact

01:39:40  19   on Clash Royale revenues.

01:39:41  20   Q.  And did you also consider your time versus spending

01:39:44  21   regression results with respect to Clash Royale?

01:39:47  22   A.  Yes.

01:39:49  23   Q.  Okay.  So what did you ultimately conclude, after

01:39:51  24   looking at all of this evidence, that the impact on

01:39:55  25   Supercell's revenue was that's associated with the card

01:39:59  1   donation patent?

01:39:59  2   A.  So I ultimately -- if we go to the next slide, we can

01:40:02  3   see I started with the percent of paying players who would

01:40:07  4   spend less time in the game.

01:40:09  5        For this feature, it was 24.9.  The average

01:40:16  6   percent decrease in time, multiply those together, I get

01:40:19  7   the net -- well, not the net, the -- the reduction in

01:40:24  8   playing time across all players, 11.6 -- 11.76 percent.

01:40:30  9        That then needs to be multiplied by that

01:40:34  10  regression coefficient of time versus spending of .169 for

01:40:40  11  this game, and that gets to a revenue impact of 1.99

01:40:43  12  percent.

01:40:44  13       That's Supercell's marginal revenue, but I need to

01:40:47  14  turn that into a reasonable royalty rate that they would

01:40:50  15  agree to.  If I take out the commissions and marketing,

01:40:54  16  just like I did before, that gets to a 1.1 percent royalty

01:40:59  17  rate.

01:40:59  18  Q.  And, Dr. Becker, again, did you consider the other

01:41:04  19  information from Dr. Neal's survey in arriving at your

01:41:08  20  final rate here?

01:41:09  21  A.  Yes.  There -- absolutely in his survey was this other

01:41:17  22  bucket of respondents that said:  Well, gosh, if you take

01:41:20  23  that feature away, I'm going to have to spend more time.

01:41:24  24       And so for essentially all the same reasons, I

01:41:25  25  went and did the same kind of research into the nature of

01:41:28   1   the additional time that they would spend.

01:41:29   2          I concluded that that additional time would be

01:41:32   3   grinding time, that non-productive quality of life

01:41:39   4   detrimental time, and that, therefore, I would set that

01:41:41   5   aside.  And even though I ran the numbers, they actually

01:41:47   6   would have reduced this royalty from 1.1 percent to .45

01:41:53   7   percent.

01:41:53   8          But the question is, is that reasonable?  Well,

01:41:55   9   no.  I mean, they put this feature into the game for a

01:41:59  10   purpose, to improve people's quality of life.  And it makes

01:42:03  11   sense that for some people, if you take it away, they're

01:42:06  12   going to have to grind away to get the same upgrades that

01:42:10  13   they otherwise would have with this feature.

01:42:12  14   Q.  Okay.  If we go back to your summary slide, we can fill

01:42:16  15   in the rate for the '655?

01:42:17  16   A.  Yes.

01:42:18  17   Q.  Okay.  Now, what's next?

01:42:18  18   A.  So next we go to the '137 and '481 patents, which is

01:42:24  19   the Elixir feature within Clash Royale.

01:42:26  20   Q.  Okay.  And is the methodology that you use to value the

01:42:30  21   '137 and the '481 the same as what we just saw?

01:42:33  22   A.  No.  No, it differs in some substantial ways.

01:42:36  23   Q.  Why does it differ?

01:42:38  24   A.  Well, the nature of the feature that's accused here is

01:42:42  25   fundamentally different.  With the card donation feature

01:42:45  1  and the copy layout feature, these are relatively small

01:42:52  2  aspects of the game.  You don't encounter it every time you

01:42:55  3  play the game, and they're optional.  I mean, we saw that

01:42:58  4  some people don't even use it.  Some players aren't even

01:43:01  5  aware of the card donation and copy layout.

01:43:04  6        Talking to Dr. Akl, I understood that the --

01:43:07  7  what's accused with respect to the '137 and '481 is core to

01:43:14  8  the nature of the gameplay.  It's essentially kind of woven

01:43:18  9  into the fabric of the game.  And so it's not something

01:43:21  10  that you can say do you like this or not.

01:43:24  11        That's like asking somebody if they -- do they

01:43:26  12  like playing golf without golf clubs.  Well, that would

01:43:29  13  be -- that wouldn't be a very interesting question to ask

01:43:34  14  because the clubs in your bag are kind of woven into the

01:43:38  15  fabric of playing the game.  And what I understood was,

01:43:41  16  Elixir is the same way.

01:43:42  17  Q.  Okay.  So what evidence did you consider to form your

01:43:45  18  determinations with respect to these patents?

01:43:47  19  A.  So, first, I went to look at -- just sort of industry

01:43:50  20  and any -- any kind of evidence I could find that would

01:43:59  21  tell me, how important is this?

01:44:01  22        I mean, Dr. Akl says it's in the fabric of the

01:44:03  23  game.  Everybody is going to encounter it, but there are

01:44:06  24  things clearly in the game that you encounter that aren't

01:44:10  25  important and other things are.

01:44:11   1        So I went and looked at -- for evidence of how

01:44:15   2   important this was.  And I've got three things here.  There

01:44:18   3   were others.  These are reviews of the game.

01:44:21   4        The first one says each card has its own Elixir

01:44:25   5   cost, and managing this is the heart of the game.

01:44:28   6        The Forbes article on Clash Royale says right

01:44:32   7   upfront:  It's all about Elixir.

01:44:34   8        The -- this article on the right-hand side says:

01:44:41   9   Elixir is the most important thing of any match in Clash

01:44:43   10  Royale.  And they say it's the key to winning matches

01:44:46   11  online.

01:44:46   12  Q.  So how does this information impact your analysis?

01:44:49   13  A.  So that tells me that this is something at -- you know,

01:44:55   14  again, we're ultimately trying to figure out what the

01:44:57   15  parties would agree to sitting at the table.  This is one

01:45:01   16  where sitting at that table, GREE is going to know and

01:45:05   17  Supercell is going to know that these patents get to the

01:45:07   18  heart of one of the most important -- something that is key

01:45:11   19  to the game.

01:45:13   20       And so that tells me directionally that this is

01:45:16   21  going to be more valuable than an optional feature within

01:45:20   22  the game.  This -- this evidence and other evidence tells

01:45:23   23  me that.

01:45:24   24  Q.  So how did you use this to establish a royalty rate for

01:45:29   25  the '137 and '481?

01:45:31   1   A.   So I did something that's not unlike if you were trying

01:45:35   2   to figure out a house -- you know, green house on the

01:45:38   3   corner is worth, but you haven't -- you need to appraise

01:45:42   4   that, but you have a comp from the blue house in the middle

01:45:45   5   of the block.   Maybe it's a little bit smaller, not as

01:45:48   6   important, not as prominent.   But you do -- you do know

01:45:52   7   what the value of that house in the middle of block is, or

01:45:54   8   at least you have an appraisal of it.

01:45:57   9           So I talked to Dr. Akl and said:   Are there any

01:46:00   10   comps that I can look to for the '137 and '481 patents?

01:46:06   11   And he told me that the '655 patent, which is the optional

01:46:10   12   card donation feature, was comparable, not the same in

01:46:14   13   value, but it's comparable.   And so I decided to use that

01:46:18   14   as a comp in this negotiation for valuing the '137 and '481

01:46:26   15   Elixir patents.

01:46:27   16   Q.   Okay.   So if we start with the 19 -- 1.99 percent,

01:46:33   17   where do you go from there?

01:46:34   18   A.   Yeah.   So this -- this starting rate, it's not the

01:46:37   19   royalty, but it's the -- that incremental revenue impact

01:46:44   20   that after looking at my regression and various parts of

01:46:47   21   Dr. Neal's survey, I was able to determine that the

01:46:49   22   optional card donation feature is responsible for 1.99

01:46:53   23   percent of Supercell's Clash Royale revenue.   That's my

01:46:59   24   comp.

01:47:00   25           So now I need to adjust it, just like if the house

01:47:03  1  on the corner has 20 percent more square footage, you're

01:47:07  2  going to need to up the price.

01:47:09  3         So the measure that I used to make the adjustment

01:47:12  4  is the extent of use.  The optional feature, we know from

01:47:17  5  Dr. Neal's survey, is used 68.5 percent of the time -- or

01:47:22  6  by 68.5 percent of the users.  Elixir is used by everybody.

01:47:28  7         Dr. Akl tells me that, and the articles make it

01:47:30  8  clear that you can't even play the game without using

01:47:32  9  Elixir.  So that's a hundred percent.  A hundred percent is

01:47:38  10 1.46 times as big as 68-and-a-half percent.

01:47:41  11        So it's like a square footage adjustment in a

01:47:45  12 house appraisal.  I increase the 1.99 percent valuation

01:47:52  13 to -- if you'll click, it will do the math for me -- 2.9

01:47:56  14 percent.

01:47:57  15        That then gives me an estimated valuation in total

01:48:00  16 that I need to then take down to a royalty.  And to that, I

01:48:05  17 apply the same commissions and marketing adjustment, and I

01:48:08  18 get a royalty rate of 1.6 percent.

01:48:11  19 Q.  And is that the final royalty rate that you determined

01:48:15  20 for the '137/'481?

01:48:18  21 A.  It is.

01:48:19  22 Q.  We can go back and fill in your chart.

01:48:22  23        And it looks like Brawl Stars is next.

01:48:25  24 A.  Yeah, that's the last one, the '873.

01:48:28  25 Q.  Okay.  And is the methodology to arrive at the '873

01:48:31  1  similar to the approach we took for the last two patents,

01:48:36  2  the '137 and '481?

01:48:38  3  A.  Yeah, it's essentially just like the Elixir and unlike

01:48:42  4  the card donation and the copy layout.  The shooting and

01:48:46  5  aiming control, is, again, based on my discussion with

01:48:49  6  Dr. Akl, central, core to the game.  You can't play the

01:48:53  7  game without using the aiming controls and the shooting

01:48:57  8  controls.  So I follow the same path.

01:48:59  9       First look to some evidence about whether this is,

01:49:03  10  in fact, important and valuable, and then find a comp and

01:49:09  11  then adjust the comp.

01:49:11  12  Q.  Okay.  Let's look at that evidence.

01:49:13  13  A.  Okay.  Interesting thing with Brawl Stars in this

01:49:17  14  particular feature is they actually -- Supercell did a soft

01:49:19  15  release of the game without these controls.  They had a

01:49:25  16  different way of controlling the gameplay.  So we have kind

01:49:28  17  of a natural experiment here where they put a

01:49:31  18  non-infringing version of this out into the marketplace,

01:49:35  19  and they were able to get some reviews back.

01:49:37  20       Here, we're looking at an internal discussion

01:49:42  21  from -- let me see, this is from March of 2017, and they're

01:49:45  22  talking about the -- the top dislikes from the latest

01:49:50  23  survey, and the top three griefs.

01:49:55  24       And the No. 1 grief and complaint about this game

01:49:59  25  was that the controls didn't work.  They -- they didn't

01:50:02  1  feel comfortable with the controls.

01:50:03  2          So if we go to the next one, that last one was

01:50:09  3  internal Supercell.  These are external reviews of the

01:50:12  4  game, and what they're reviewing here specifically is the

01:50:14  5  soft launch version that did not have the accused control

01:50:23  6  in it.  And we see, again, same thing, nobody liked it.

01:50:26  7          The one on the left says that it's -- they said

01:50:29  8  that once people started playing, the developers realized

01:50:33  9  that movement wasn't working.

01:50:34  10          Over on the right, they said the second

01:50:37  11  fundamental issue that:  The game's action phase has tried

01:50:40  12  and failed to solve multiple times is how complex and

01:50:43  13  imprecise the controls are.

01:50:44  14          Clearly, the controls are a problem.  What did

01:50:47  15  they do?  They completely revamped them.  I think we heard

01:50:51  16  some testimony about that.  And they put in place the one

01:50:56  17  that's accused of infringing in this case.

01:50:58  18          And I went and looked, what did people say about

01:51:02  19  with that one.  That one came out -- here's a review after

01:51:05  20  it came out and saying:  The most surprising thing about

01:51:08  21  Brawl Stars is how good it feels.  Mobile shooters are

01:51:12  22  notoriously frustrating due to the inaccuracy of the

01:51:18  23  touchscreens.  Brawl Stars isn't perfect, but somehow I

01:51:21  24  never found myself fighting with the controls.

01:51:23  25          So this -- they essentially fixed the problem.

| | | |
|---|---|---|
| 01:51:27 | 1 | Q.  How did you use this evidence to establish a royalty |
| 01:51:29 | 2 | rate related to the '873? |
| 01:51:30 | 3 | A.  So, again, this told me that this was something that |
| 01:51:33 | 4 | was sitting at the negotiating table.  Everybody is going |
| 01:51:34 | 5 | to realize that we're talking about something that's -- |
| 01:51:37 | 6 | that was put in the game on purpose and solved an important |
| 01:51:41 | 7 | problem and, thus, has value that I think is reasonable to |
| 01:51:44 | 8 | assume is more important and more valuable than an optional |
| 01:51:49 | 9 | feature.  So I then just need to find a comp and adjust it. |
| 01:51:54 | 10 | Q.  And why did you use this -- this comparable rate again? |
| 01:51:59 | 11 | A.  So the comp here is, again, the same '655 marginal |
| 01:52:03 | 12 | revenue impact that I concluded for the '655 patent.  I |
| 01:52:06 | 13 | talked to Dr. Akl about the comparability of the '655 to |
| 01:52:13 | 14 | the '873, and he said that they were technologically |
| 01:52:16 | 15 | comparable. |
| 01:52:18 | 16 | That sort of gave me comfort to use this as a |
| 01:52:21 | 17 | comp.  I then just need to do an adjustment kind of for |
| 01:52:25 | 18 | the -- this is not the house on the corner.  This is a |
| 01:52:28 | 19 | house down the block that I need to adjust. |
| 01:52:30 | 20 | Q.  So let's talk about those additional adjustments.  What |
| 01:52:33 | 21 | was the first one that you had to make? |
| 01:52:34 | 22 | A.  So there's two adjustments here.  First, is just that |
| 01:52:38 | 23 | same usage.  Everybody uses -- every player uses the |
| 01:52:43 | 24 | shooting controls.  Only 68.5 percent use the '655 patent. |
| 01:52:48 | 25 | That's a 1.46 adjustment. |

01:52:52   1        The other thing is we're talking about Clash -- or

01:52:55   2   Brawl Stars here, which that regression of the time versus

01:52:58   3   spending tells me that the monetization within Brawl Stars

01:53:05   4   is higher.  It takes less time to get the same amount of

01:53:09   5   increase in revenue.

01:53:10   6        And so adjusting for that higher monetization is a

01:53:14   7   1.526 factor using the regression results I had.

01:53:19   8        That gets me to a revenue impact for the '873

01:53:23   9   shooting system of 4.43 percent.

01:53:27  10   Q.  And then did you have to make additional adjustments?

01:53:31  11   A.  So that's -- that's the benefit that Supercell gets.

01:53:33  12   And the question is, how much of that benefit is reasonable

01:53:35  13   to pay as a royalty?  I make the same commissions and

01:53:38  14   marketing adjustments to that, and I get to a royalty of

01:53:42  15   2.4 percent.

01:53:43  16   Q.  We'll go back to your chart and fill that in.

01:53:47  17        Dr. Becker, have we now covered everything that

01:53:51  18   you considered in forming your opinions in this case?

01:53:53  19   A.  We've covered the quantitative analysis.  There are a

01:53:56  20   couple of things from that initial list of 15 factors that

01:53:59  21   I just need to go sort of check off to make sure that

01:54:02  22   we've -- we've touched on everything.

01:54:03  23   Q.  Okay.  What do we need to consider?  What else do we

01:54:05  24   need to consider, I should say?

01:54:07  25   A.  So the first thing under one of the technical factors,

| | | |
|---|---|---|
| 01:54:11 | 1 | which is generally looked at under Factor 9, is a question |
| 01:54:14 | 2 | of what we call non-infringing alternatives. |
| 01:54:17 | 3 | In cases where an accused infringer could switch |
| 01:54:21 | 4 | to something different and still get all the same benefits, |
| 01:54:25 | 5 | that can impact what they'd be willing to pay.  So the |
| 01:54:30 | 6 | question is, do we have any non-infringing alternatives |
| 01:54:31 | 7 | here? |
| 01:54:32 | 8 | Q.  And do we have any non-infringing alternatives that you |
| 01:54:34 | 9 | considered? |
| 01:54:35 | 10 | A.  There aren't any.  I talked to Dr. Akl about this and |
| 01:54:40 | 11 | about the things that Supercell had proposed as |
| 01:54:43 | 12 | alternatives.  We see with the -- like on the Brawl Stars |
| 01:54:49 | 13 | shooting, they had an alternative before they put this one |
| 01:54:53 | 14 | in, and it was a failure in the marketplace. |
| 01:54:55 | 15 | So you always could take something out.  The |
| 01:54:57 | 16 | question is, is it acceptable, and according to Dr. Akl, |
| 01:55:02 | 17 | none of the alternatives that they've proposed are |
| 01:55:06 | 18 | technically or -- or qualify as non-infringing |
| 01:55:11 | 19 | alternatives. |
| 01:55:11 | 20 | Q.  Okay.  Are there any other factors that we need to |
| 01:55:14 | 21 | consider? |
| 01:55:14 | 22 | A.  So back to the checklist, that -- there are three |
| 01:55:19 | 23 | factors here that look at licensing considerations. |
| 01:55:24 | 24 | Sometimes the patents that I'm looking at in a particular |
| 01:55:26 | 25 | case have been licensed to someone else. |

767

01:55:29   1          It would be like saying, well, this house that I'm

01:55:31   2   trying to appraise was just sold a year ago, and so we can

01:55:36   3   just look at that sale and see as a go-by.

01:55:40   4          The question here is, have any of the patents in

01:55:43   5   this suit been licensed or have any comparable

01:55:46   6   situations -- exist?  And I looked at that, and the answer

01:55:49   7   is no.

01:55:49   8   Q.  And do you know whether Supercell's damages expert

01:55:56   9   agrees with you with respect to the comparable -- any

01:56:01  10   comparable licenses?

01:56:01  11   A.  I believe he looked at these three factors and

01:56:04  12   concluded that there were no comparable licenses.

01:56:06  13   Q.  Okay.  Did you consider whether GREE ever licensed any

01:56:09  14   of these five U.S. patents that are in this case to anyone?

01:56:13  15   A.  They have not licensed these five patents.

01:56:16  16   Q.  Okay.  Are you aware of the prior settlement agreement

01:56:20  17   between GREE and Supercell in Japan?

01:56:23  18   A.  Yes.

01:56:24  19   Q.  Have you reviewed it?

01:56:25  20   A.  I did study that agreement, yes.

01:56:26  21   Q.  Did you consider whether it was comparable?

01:56:29  22   A.  I looked at that question in detail and reached the

01:56:29  23   conclusion that it is not comparable, for a number of

01:56:32  24   reasons.

01:56:32  25   Q.  And why is it not comparable?

01:56:35  1   A.  Well, it's -- there's a long list of reasons why it's

01:56:38  2   not comparable.

01:56:40  3        One of the most fundamental issues is that the

01:56:42  4   markets are very different; that licensed patents only in

01:56:47  5   Japan -- excuse me.  And the Japanese market is vastly

01:56:50  6   different.  If we look here just kind of directionally, the

01:56:54  7   United States market for Supercell is many, many times

01:56:58  8   larger than the Japanese market.

01:57:00  9        So if -- you know, you can't just look at what was

01:57:06  10  paid in Japan and have any sense of what would be

01:57:09  11  reasonable here without at least taking this into account.

01:57:11  12  Q.  Are there any other adjustments that you would have to

01:57:13  13  take into account?

01:57:14  14  A.  I looked also at the question of whether just the --

01:57:17  15  the sort of whole patent damages world in Japan is the same

01:57:22  16  or comparable to the U.S., and found that -- at least one

01:57:27  17  study that said that there are dramatic differences in the

01:57:31  18  way patentholders get compensated for people -- from people

01:57:35  19  who are infringing in the two jurisdictions.  I think I saw

01:57:40  20  one study that said that U.S. was maybe 10 times higher

01:57:44  21  than Japan.

01:57:46  22  Q.  And is there anything else that we need to consider

01:57:48  23  with respect to that license?

01:57:51  24  A.  Well, the final thing is that that was a settlement.

01:57:53  25  Remember back to the negotiating table, we had -- this was

01:57:56   1   a situation where I'm supposed to -- you know, the parties

01:57:59   2   are sitting at the table with no question about the

01:58:02   3   validity and infringement of the patents.  They're willing

01:58:06   4   to take a license.  They're not disputing any of those

01:58:09   5   things.

01:58:10   6          Quite the opposite is true in Japan.  They were in

01:58:14   7   the midst of a big dispute over these patents and

01:58:16   8   ultimately decided to compromise and settle.

01:58:19   9          And so that's another element of non-comparability

01:58:24   10   that you really can't -- given all those factors, I think

01:58:27   11   you can't look at that Japanese settlement.

01:58:29   12   Q.  Are there any other Georgia-Pacific factors that we

01:58:33   13   need to consider?

01:58:33   14   A.  The last category, in terms of -- well, two more.  One

01:58:39   15   is these competitive considerations.

01:58:46   16          In some cases you look at the competitive factors

01:58:49   17   here, 4 and 5, and find that the two people that I'm trying

01:58:52   18   to put at that table are head-to-head competitors.  I mean,

01:58:57   19   they're just -- they're just right like that.  And that

01:59:00   20   could have an impact on the royalty rate.

01:59:02   21          There's oftentimes a justification for a much

01:59:05   22   higher royalty if you're licensing a direct competitor who

01:59:09   23   is going to then come take sales from you.

01:59:11   24          Here, I looked at the evidence, and I think we

01:59:13   25   heard Mr. Sheppard say:  Largely by the time these

01:59:16   1   negotiations would be happening, GREE was out of the U.S.

01:59:20   2   market.

01:59:20   3          So I considered it and concluded that this would

01:59:23   4   not -- it would be neutral with respect to the rate.

01:59:26   5   Q.  Okay.  And any other factors?

01:59:29   6   A.  The last thing is just to outline and sort of define

01:59:33   7   the nature and scope of the license, how long it would

01:59:39   8   last, and what, then, would be the outcome of the

01:59:41   9   negotiation?

01:59:42   10         And, here, the specific elements in terms of

01:59:45   11   nature and scope are that this would be a non-exclusive

01:59:49   12   license to practice just these five patents in just the

01:59:54   13   United States, and that the structure of the royalty there

01:59:56   14   would be a running royalty.

01:59:58   15   Q.  And why a running royalty?

02:00:01   16   A.  Well, the -- all the evidence that I saw and that I

02:00:05   17   considered tells me that the benefits that Supercell gets

02:00:11   18   come from the extent to which these things are used.  And

02:00:13   19   so the only form of royalty that gives you sort of a pay as

02:00:19   20   you go, the more you use it, the more you owe, the less you

02:00:22   21   use it, the less you owe, is a running royalty.

02:00:25   22         The alternative is just to agree to pay a lump

02:00:28   23   sum, one and done.  Doesn't matter how much you use it,

02:00:32   24   that's the royalty for the license.  But that doesn't fit

02:00:37   25   the economics of these patents.

| | | |
|---|---|---|
| 02:00:38 | 1 | Q.  And now that we have these rates, Dr. Becker, did you |
| 02:00:41 | 2 | calculate what the royalties would be from the date of |
| 02:00:44 | 3 | first infringement through  -- I think the date we have is |
| 02:00:52 | 4 | July 31st? |
| 02:00:53 | 5 | A.  I did. |
| 02:00:55 | 6 | Q.  Okay. |
| 02:00:55 | 7 | A.  So I took these rates, and I took the revenue data that |
| 02:01:00 | 8 | Supercell produced.  And it's important to note these are |
| 02:01:04 | 9 | from the first date through July 31st.  Even though we're |
| 02:01:08 | 10 | sitting here today, we only have financial data from |
| 02:01:10 | 11 | Supercell through July 31st.  So these quantifications are |
| 02:01:14 | 12 | as of July 31st of 2020. |
| 02:01:16 | 13 | For the '594 patent at a .7 percent rate, that |
| 02:01:21 | 14 | would be $4,106,296. |
| 02:01:25 | 15 | For the '655 patent, you'll see I have two |
| 02:01:29 | 16 | numbers, and I can -- |
| 02:01:30 | 17 | Q.  Let me -- yes, let's -- can you explain why you have |
| 02:01:34 | 18 | two different dates for the -- both of the Clash Royale |
| 02:01:37 | 19 | patents? |
| 02:01:37 | 20 | A.  Right.  So I was asked to do this.  I understand from |
| 02:01:42 | 21 | counsel that GREE has a claim, at least, that it should |
| 02:01:47 | 22 | receive damages from the date that it sent a letter to |
| 02:01:52 | 23 | Supercell saying:  Hey, we have some patents that you need |
| 02:01:56 | 24 | to think about. |
| 02:02:01 | 25 | That may or may not be the right date.  I think |

02:02:04   1   that's something that the jury is going to decide.  So I

02:02:07   2   have to do two things, one quantification from that letter

02:02:11   3   date or from the date the patent issued.

02:02:13   4   Q.  Okay.  And is that represented here in these two

02:02:18   5   columns?

02:02:19   6   A.  Yes.  So the column from the patent date is from when

02:02:23   7   the patent issued.  That would be for the '655 patent,

02:02:26   8   $4,131,448.00.  If it's from the letter date, that would be

02:02:36   9   7,437,809.

02:02:41  10          And, again, same issue with the dates for the

02:02:44  11   '137/'481, $7,968,142.00 if it's from the patent date, or

02:02:54  12   $10,818,632.00 if it's from the letter date.

02:03:00  13          For Brawl Stars, we don't have that issue.  It's

02:03:02  14   just from the -- from the patent date.  Actually, I think

02:03:05  15   it's the date they put the feature in.  And this is

02:03:07  16   $2,303,265.00.

02:03:11  17   Q.  Thank you, Dr. Becker.  I appreciate your time.

02:03:15  18          MS. LUDLAM:  Pass the witness.

02:03:16  19          THE COURT:  All right.  Cross-examination by the

02:03:18  20   Defendant?

02:03:24  21          MR. DACUS:  Thank you, Your Honor.  May we pass

02:03:25  22   out binders while we get ready?

02:03:27  23          THE COURT:  You may.  You may.

02:03:30  24          MR. DACUS:  Thank you, Your Honor.

02:03:44  25          Your Honor, may I approach?

| | | |
|---|---|---|
| 02:03:46 | 1 | THE COURT:  You may. |
| 02:03:49 | 2 | THE WITNESS:  Thank you, sir. |
| 02:03:57 | 3 | THE COURT:  All right.  Mr. Dacus, you may proceed |
| 02:04:01 | 4 | with cross-examination. |
| 02:04:02 | 5 | MR. DACUS:  Thank you, Your Honor. |
| 02:04:02 | 6 | CROSS-EXAMINATION |
| 02:04:04 | 7 | BY MR. DACUS: |
| 02:04:04 | 8 | Q.  Good afternoon, Dr. Becker. |
| 02:04:05 | 9 | A.  Good afternoon. |
| 02:04:06 | 10 | Q.  Were you here when the Judge gave his preliminary |
| 02:04:09 | 11 | instructions and for opening statements, sir? |
| 02:04:10 | 12 | A.  No. |
| 02:04:11 | 13 | Q.  Okay.  Have you had an opportunity to read the |
| 02:04:13 | 14 | transcript of the opening statement and the Judge's |
| 02:04:16 | 15 | instructions? |
| 02:04:17 | 16 | A.  I -- I reviewed it.  I didn't -- I was more looking at |
| 02:04:20 | 17 | Dr. Akl's testimony, so I -- I can't say that I reviewed |
| 02:04:25 | 18 | that in detail. |
| 02:04:26 | 19 | Q.  You've testified enough, as you told the jury, that you |
| 02:04:30 | 20 | know that one of the things this jury has to do and one of |
| 02:04:34 | 21 | the things the Judge has told them to do is to assess the |
| 02:04:38 | 22 | credibility of each witness that takes the stand, correct? |
| 02:04:41 | 23 | A.  Yes. |
| 02:04:41 | 24 | Q.  And in -- specifically for experts, they need to look |
| 02:04:45 | 25 | at the qualifications and experience related to the |

02:04:49  1  particular area in which the expert is testifying, true?

02:04:52  2  A.  Yes.

02:04:55  3  Q.  Okay.  Now, as I understand it, you're here telling

02:04:58  4  this jury what you believe a royalty should be based on a

02:05:05  5  negotiation of a patent license, correct?

02:05:07  6  A.  Yes.

02:05:08  7  Q.  Now, it is true, sir, that in your professional life,

02:05:12  8  you have only negotiated personally two licenses, correct?

02:05:16  9  A.  Yes.

02:05:17  10  Q.  In the entirety of your career, correct?

02:05:20  11  A.  That's correct.  In terms of being the person sitting

02:05:23  12  at the table figuratively, negotiating a license, that's

02:05:27  13  correct.

02:05:27  14  Q.  And it's also true, sir, that, although you're here

02:05:29  15  telling this jury what these folks would have negotiated

02:05:33  16  for a video game patent license, you personally have never

02:05:36  17  negotiated a video game patent license; isn't that true?

02:05:39  18  A.  That's true.

02:05:40  19  Q.  You have never worked at any business or company that

02:05:49  20  is involved or was involved in designing or selling video

02:05:53  21  games; isn't that true?

02:05:54  22  A.  That's true.

02:05:55  23  Q.  Including mobile video games that we're here about;

02:05:58  24  isn't that fair?

02:05:59  25  A.  Correct.

02:05:59  1   Q.  It's also true, sir, that at the time that you gave

02:06:06  2   your opinions in this case and you calculated these

02:06:09  3   damages, you had actually never even played these games;

02:06:13  4   isn't that true?

02:06:13  5   A.  That's true.  I hadn't played through the games.  I

02:06:17  6   reviewed lots of videos and things of people playing, but I

02:06:22  7   hadn't -- I'm not a player of these games myself.

02:06:24  8   Q.  It's true, sir, that if -- you do not know how many

02:06:27  9   other features there are in these games beyond the five

02:06:32  10  patented features that you're talking about; isn't that

02:06:35  11  true?

02:06:35  12  A.  I wouldn't say that I don't know any of the features.

02:06:39  13  Certainly, Dr. Neal's survey looked at -- he had control

02:06:43  14  questions on other features.  But in terms of the totality

02:06:47  15  of features that exist in these games, I don't have a

02:06:50  16  listing of those.

02:06:51  17  Q.  You do have at least enough knowledge to know that

02:06:53  18  there are hundreds and hundreds, if not thousands, of other

02:06:59  19  features, correct?

02:06:59  20  A.  Yeah, I think depending of how granular you get about a

02:07:04  21  feature, the color of some little guy's shirt, if you call

02:07:10  22  that a feature, yeah, there may be thousands of features.

02:07:12  23  Q.  And in this case, sir, you made no attempt at all to

02:07:15  24  try and value those other features; isn't that true?

02:07:17  25  A.  That's true.  My assignment here was to value these

02:07:21   1   five -- four features.

02:07:23   2   Q.  And -- and I want to be clear with you and make sure

02:07:29   3   that I and the jury understand what you've said as to what

02:07:32   4   you're going to be here to do today and not do.  Does that

02:07:36   5   sound fair to get that straight?

02:07:36   6   A.  Sure.

02:07:36   7   Q.  Okay.  You are not here to offer any opinion on whether

02:07:40   8   or not Supercell infringes these patents, correct?

02:07:45   9   A.  That is correct.

02:07:45   10  Q.  You're not here to give any opinion on whether or not

02:07:47   11  these patents are valid, true?

02:07:50   12  A.  Correct.

02:07:51   13  Q.  Candidly, from what you said, when you did your work,

02:07:54   14  you just assumed that these patents are infringed and that

02:07:58   15  they are valid, correct?

02:07:59   16  A.  Yes.  I think it's key to understand that I -- I must

02:08:02   17  assume that.  I mean, the -- it's not that I just chose to

02:08:05   18  say, well, I'm just going to assume this.  I must assume

02:08:09   19  that as part of my analysis.  Every damage expert has to

02:08:13   20  assume it to make their analysis relevant.

02:08:15   21  Q.  And you, of course, understand that Supercell says they

02:08:19   22  do not use or infringe these patents, correct?

02:08:21   23  A.  I understand that's their position.

02:08:22   24  Q.  And you understand that Supercell says four of the five

02:08:25   25  patents are actually invalid?

| | | |
|---|---|---|
| 02:08:27 | 1 | A.  I understand that. |
| 02:08:28 | 2 | Q.  And if this jury were to find either that the patent is |
| 02:08:32 | 3 | invalid or that Supercell does not use it, there would be |
| 02:08:36 | 4 | no damages, correct? |
| 02:08:37 | 5 | A.  Correct. |
| 02:08:38 | 6 | Q.  And with all due respect to you, if they find either |
| 02:08:42 | 7 | one of those, they can ignore your testimony, true? |
| 02:08:45 | 8 | A.  I think that's fair, yes. |
| 02:08:47 | 9 | Q.  Okay.  Now, you understand that the jury gets to make |
| 02:08:51 | 10 | that decision on infringement and validity, not me, |
| 02:08:54 | 11 | correct? |
| 02:08:54 | 12 | A.  Yes. |
| 02:08:55 | 13 | Q.  So I don't know what they're going to find.  You |
| 02:08:58 | 14 | understand that? |
| 02:08:58 | 15 | A.  Yes. |
| 02:08:59 | 16 | Q.  And if they find infringement, then I need to ask you |
| 02:09:02 | 17 | some questions related to damages so that they have all of |
| 02:09:06 | 18 | the evidence in front of them.  Does that sound fair? |
| 02:09:08 | 19 | A.  That's fair. |
| 02:09:10 | 20 | Q.  Okay.  Now, one of the things the jury is going to |
| 02:09:14 | 21 | determine is whether or not the form of this license should |
| 02:09:17 | 22 | be either a lump sum or a running royalty, correct? |
| 02:09:23 | 23 | A.  I -- I honestly don't know whether they're going to be |
| 02:09:25 | 24 | asked that question. |
| 02:09:27 | 25 | Q.  Okay.  If they are, you agree that they should base the |

```
02:09:30   1   answer on the evidence, correct?
02:09:31   2   A.  Yes.
02:09:32   3   Q.  And your proposal is that the jury award a running
02:09:38   4   royalty, a percentage royalty, fair?
02:09:39   5   A.  I do -- yes, I think it's fair that the form of the
02:09:43   6   royalty that I use to come up with the damage amounts that
02:09:46   7   I presented is clearly a running royalty.
02:09:49   8   Q.  Right.  And this percentage that you've multiplied, you
02:09:55   9   multiplied it by revenues or sales; isn't that correct?
02:10:00  10   A.  By revenues, yes.
02:10:01  11   Q.  Okay.  And you multiply -- multiplied it by the
02:10:04  12   revenues for the entire game; isn't that true?
02:10:09  13   A.  Yes, the nature of the analytics is to come up with a
02:10:12  14   rate that would apply to the whole game.
02:10:13  15   Q.  And you, of course, know, sir, that there's a
02:10:17  16   difference between revenues or sales and profits, correct?
02:10:20  17   A.  Oh, absolutely, yes.
02:10:21  18   Q.  And so these numbers that the GREE lawyers showed in
02:10:26  19   opening and the numbers that you showed here during your
02:10:29  20   presentation, those -- those were revenue numbers, correct?
02:10:32  21   A.  Not exclusively.  I had a slide that also showed
02:10:35  22   profits.
02:10:35  23   Q.  Ultimately, you multiply your percentage by a revenue
02:10:38  24   number, correct?
02:10:39  25   A.  Yes, it's been adjusted for some of the costs, but
```

| | | |
|---|---|---|
| 02:10:43 | 1 | ultimately the royalty rate goes against gross revenue. |
| 02:10:49 | 2 | Q.  You -- you understand, sir, that Supercell says in this |
| 02:10:51 | 3 | case a lump sum is the appropriate form of royalty if the |
| 02:10:56 | 4 | jury decides that issue? |
| 02:10:58 | 5 | A.  I -- I understand that that's their position. |
| 02:11:00 | 6 | Q.  Okay.  And -- and you, of course, know that a lump sum |
| 02:11:03 | 7 | means that you make a one-time payment, and then you have |
| 02:11:08 | 8 | the right to use that patent for as much as you want, |
| 02:11:14 | 9 | correct? |
| 02:11:14 | 10 | A.  Right.  Both in terms of the quantity and the time.  If |
| 02:11:18 | 11 | you make a one-time payment, it would be typically for the |
| 02:11:21 | 12 | life of the patent and that amount of money, whether you |
| 02:11:23 | 13 | made a dollar off of it or a billion dollars off of it. |
| 02:11:27 | 14 | Q.  And you agree a lump sum royalty is an appropriate form |
| 02:11:30 | 15 | of royalty, correct? |
| 02:11:31 | 16 | A.  It -- it can be.  It's one of two typical forms, and it |
| 02:11:35 | 17 | depends on the economics of the case. |
| 02:11:36 | 18 | Q.  You yourself have given an opinion from a witness stand |
| 02:11:39 | 19 | many times that a lump sum is appropriate, correct? |
| 02:11:41 | 20 | A.  Yes. |
| 02:11:43 | 21 | Q.  So you agree that in this case, the jury should make |
| 02:11:47 | 22 | its decision based on the evidence, fair? |
| 02:11:49 | 23 | A.  Yes. |
| 02:11:51 | 24 | Q.  And as you said earlier, what the jury is attempting to |
| 02:11:54 | 25 | do is determine what these two parties, if they sat down at |

| | | |
|---|---|---|
| 02:11:58 | 1 | this hypothetical negotiation table, what they would have |
| 02:12:00 | 2 | negotiated, fair? |
| 02:12:02 | 3 | A.  Fair, under the circumstances that I have to assume are |
| 02:12:09 | 4 | present at that negotiation. |
| 02:12:10 | 5 | Q.  And part of the evidence that the jury should use and, |
| 02:12:12 | 6 | frankly, you should utilize also is what the parties have |
| 02:12:17 | 7 | done in the past; isn't that true? |
| 02:12:19 | 8 | A.  I only think that would be appropriate if what they've |
| 02:12:22 | 9 | done in the past is a comparable economic circumstance. |
| 02:12:25 | 10 | Q.  Well, we know that GREE and Supercell sat down in |
| 02:12:27 | 11 | February of 2019 and negotiated a license, correct? |
| 02:12:30 | 12 | A.  Yes. |
| 02:12:30 | 13 | Q.  Over these Japanese patents, correct? |
| 02:12:32 | 14 | A.  You say "these."  They -- they were over Japanese |
| 02:12:35 | 15 | patents. |
| 02:12:36 | 16 | Q.  Okay.  And that was a lump sum agreement that they came |
| 02:12:39 | 17 | to? |
| 02:12:39 | 18 | A.  It was. |
| 02:12:47 | 19 | Q.  You also know from what you've reviewed in this case, |
| 02:12:51 | 20 | that Supercell actually negotiated a license with a company |
| 02:12:55 | 21 | called Thompson, correct? |
| 02:12:56 | 22 | A.  Yes. |
| 02:12:57 | 23 | Q.  They actually negotiated three licenses with Thompson, |
| 02:12:59 | 24 | fair? |
| 02:13:00 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 02:13:00 | 1 | Q. And all three of those licenses were lump sum; isn't |
| 02:13:06 | 2 | that true? |
| 02:13:06 | 3 | A. That's my recollection, yes. |
| 02:13:08 | 4 | Q. All three were for an amount of $2,500.00, and all |
| 02:13:12 | 5 | three were lump sum; isn't that a true statement? |
| 02:13:15 | 6 | A. Yes. |
| 02:13:16 | 7 | Q. It is also true, sir, that you are not aware -- are not |
| 02:13:18 | 8 | aware of any percentage or running royalties that are |
| 02:13:23 | 9 | customary in this particular industry; isn't that a true |
| 02:13:26 | 10 | statement? |
| 02:13:26 | 11 | A. That's true. |
| 02:13:27 | 12 | Q. Okay. So the evidence in front of this jury is |
| 02:13:31 | 13 | Supercell/GREE license was a lump sum, Supercell's license |
| 02:13:37 | 14 | with Thompson were all lump sum, and you're not aware of |
| 02:13:40 | 15 | any licenses that are customary in this industry other than |
| 02:13:45 | 16 | lump sum. Correct? |
| 02:13:46 | 17 | A. Well, I think with respect to that third one, it's that |
| 02:13:50 | 18 | there are no established royalty rates in the industry. |
| 02:13:56 | 19 | I'm not aware -- I'm not saying in that that there have |
| 02:14:01 | 20 | never been licenses in a running royalty form or a lump sum |
| 02:14:04 | 21 | form in the industry. We just don't know. But there's not |
| 02:14:07 | 22 | a -- sort of customary rate in the gaming industry that I'm |
| 02:14:12 | 23 | aware of. |
| 02:14:24 | 24 | Q. Now, I want to ask you some questions not about the |
| 02:14:27 | 25 | form but about your actual amount; does that sound fair? |

02:14:29   1   A.   That's fair.

02:14:30   2   Q.   You agree, sir, that the law allows for a reasonable

02:14:34   3   royalty, correct?

02:14:34   4   A.   I think, technically, it's no less than a reasonable

02:14:37   5   royalty.

02:14:37   6   Q.   So, ultimately, the jury needs to determine whether or

02:14:40   7   not your calculation is reasonable; is that fair?

02:14:43   8   A.   That is absolutely fair.

02:14:44   9   Q.   And GREE has the burden of proof to prove damages;

02:14:51   10  isn't that true?

02:14:51   11  A.   Yes.

02:14:52   12  Q.   And you would agree with me, sir, that there are some

02:14:55   13  fundamentals of -- or at least principles that you as an

02:15:03   14  expert and the jury as someone determining these decisions

02:15:06   15  should adhere to; you agree with that?

02:15:08   16  A.   That's a pretty broad statement.  I think there are

02:15:11   17  certainly things that I know I should adhere to.  But maybe

02:15:14   18  you could be more specific.

02:15:16   19  Q.   Thank you.

02:15:17   20       MR. DACUS:  Your Honor, may I have leave to

02:15:19   21  approach the whiteboard?

02:15:20   22       THE COURT:  You may.

02:15:21   23       MR. DACUS:  Thank you.

02:15:23   24  Q.   (By Mr. Dacus)  You would agree, Dr. Becker, that

02:15:36   25  Supercell and you, as their representative, should provide

02:15:39  1  to this jury the best evidence you have available to it?

02:15:45  2  You agree with that?

02:15:45  3  A.  I think you said Supercell, but I think you meant GREE.

02:15:49  4  Q.  I did.  And thank you for correcting me.

02:15:52  5         GREE, and you as GREE's representative, should

02:15:55  6  provide the best evidence that you have available to you,

02:15:58  7  correct?

02:15:58  8  A.  I think that's fair.

02:16:00  9  Q.  And that's -- that's -- is particularly true when

02:16:05  10  you're asking for somewhere between 70 and 20-something

02:16:09  11  million dollars, you agree?

02:16:10  12  A.  I think -- I think that's a fair statement whether --

02:16:14  13  regardless of the size of the -- the damages.

02:16:17  14  Q.  And as you said to this jury earlier, you should be as

02:16:22  15  precise, you should have as much precision in your

02:16:25  16  calculation as is available to you, isn't that fair?

02:16:27  17  A.  I think it's fair that I need to be as reasonable and

02:16:32  18  have that ultimate answer be as consistent with the

02:16:35  19  evidence as I can.

02:16:37  20  Q.  You need to be as precise as you can; isn't that true,

02:16:43  21  sir?

02:16:43  22  A.  I think there's -- there's an attempt to be as precise

02:16:45  23  as you can, but it's a fairly imprecise process, given the

02:16:49  24  evidence that we have.  But I would agree, it needs to be

02:16:51  25  as precise as possible.

02:16:53  1  Q.  What you said to the jury just a few minutes ago is one

02:16:55  2  of the reasons you did this alleged regression analysis is

02:16:58  3  to provide as much precision as you thought you could;

02:17:01  4  isn't that true?

02:17:02  5  A.  Right.  As much as I can.  It doesn't mean that you get

02:17:05  6  all the way to perfection on the precision.

02:17:09  7  Q.  And you agree, sir, that you, as someone on behalf of

02:17:13  8  GREE, you should provide all the evidence that you have;

02:17:15  9  you agree with that, correct?

02:17:16  10  A.  I think I have a duty to present relevant evidence.

02:17:21  11  Clearly, in an hour, I can't present everything that I

02:17:26  12  looked at.

02:17:26  13  Q.  You should prevent -- you should present all relevant

02:17:30  14  and material evidence; you agree with that?

02:17:32  15  A.  Everything that I felt was relevant to the -- to -- to

02:17:36  16  satisfy -- or that I felt was relevant in reaching my

02:17:39  17  conclusion.

02:17:40  18  Q.  You know, sir, that experts in your situation often

02:17:50  19  rely on what's called the market approach, correct?

02:17:52  20  A.  Yes.

02:17:53  21  Q.  And that market approach is essentially relying on

02:17:58  22  royalties paid in licenses that involve the same patented

02:18:03  23  technology or similar technology; isn't that true?

02:18:05  24  A.  Yes.

02:18:05  25  Q.  And this market approach is sort of subsumed or

02:18:12  1    encompassed in those Georgia-Pacific factors that you

02:18:15  2    pointed the jury to, correct?

02:18:16  3    A.  Yes.

02:18:16  4    Q.  And, specifically, they're in Georgia-Pacific Factor

02:18:19  5    No. 1 and No. 2?

02:18:20  6    A.  Yes.

02:18:22  7    Q.  And I know you used the house analogy.  But the reason

02:18:27  8    people look at licenses for the patented technology is

02:18:33  9    similar to purchasing a house; isn't that correct?

02:18:36  10   A.  I -- I've used that analogy before, yes.

02:18:39  11   Q.  In other words, if you're going to go buy a house, you

02:18:42  12   want to know first and foremost has this house been sold in

02:18:47  13   the recent past and for how much, correct?

02:18:50  14   A.  Yes.

02:18:50  15   Q.  And, as you said to the jury, if that specific house

02:18:53  16   has not been sold, then you might look to comparables to

02:18:56  17   try to make an assessment of what that particular house is

02:18:59  18   worth; isn't that correct?

02:19:00  19   A.  That's correct.

02:19:01  20   Q.  And that's basically behind -- the rationale behind

02:19:07  21   Georgia-Pacific Factor 1 and 2, true?

02:19:09  22   A.  It is.

02:19:09  23   Q.  Now, it is true, sir, that the very first place that

02:19:17  24   you as an expert always go is to see if that patented

02:19:21  25   technology in suit has been licensed; isn't that correct?

| | | |
|---|---|---|
| 02:19:24 | 1 | A.  Yes.  I mean, if it's -- if it's not the very first |
| 02:19:28 | 2 | question, it's one of the first questions I always ask. |
| 02:19:31 | 3 | Q.  And you agree it should be the first question you ask, |
| 02:19:34 | 4 | correct? |
| 02:19:34 | 5 | A.  Yes. |
| 02:19:34 | 6 | Q.  And the reason that that's the first question is |
| 02:19:38 | 7 | because if there is, in fact, a license to the patented |
| 02:19:42 | 8 | technology at issue, then we don't need to do some |
| 02:19:45 | 9 | theoretical calculation or survey if the marketplace has |
| 02:19:50 | 10 | already spoken as to the value of that technology, correct? |
| 02:19:52 | 11 | A.  I disagree with that question in terms of if there is a |
| 02:19:57 | 12 | license.  It needs to be a comparable license. |
| 02:20:00 | 13 | Q.  Okay.  So if there is a license related to the patented |
| 02:20:04 | 14 | technology at issue, you agree that we do not need to look |
| 02:20:08 | 15 | at some theoretical calculation or survey, correct? |
| 02:20:13 | 16 | A.  No, I disagree with that question.  I mean, you -- |
| 02:20:18 | 17 | again, you're just saying if there is a license.  You've |
| 02:20:20 | 18 | only included maybe a little bit of the comparability |
| 02:20:25 | 19 | analysis in your question.  It needs to be technologically |
| 02:20:28 | 20 | and economically comparable before you use it. |
| 02:20:32 | 21 | Just because it's a house, doesn't make it a comp. |
| 02:20:36 | 22 | If it's of a fundamentally different nature in a different |
| 02:20:41 | 23 | city, maybe even in a different country, I don't know many |
| 02:20:45 | 24 | appraisers who would use that as a comp in valuing a house |
| 02:20:48 | 25 | here in Marshall, Texas. |

| | | |
|---|---|---|
| 02:20:49 | 1 | Q.  What if it's the same house, should we look for that |
| 02:20:52 | 2 | and determine what the value is? |
| 02:20:54 | 3 | A.  If -- if it's the same house and the economics of the |
| 02:20:57 | 4 | transaction were comparable, yes, I think you could use it. |
| 02:21:01 | 5 | Q.  So, here, this license between GREE and Supercell |
| 02:21:06 | 6 | related to the Japanese patents, actually licensed 1,079 of |
| 02:21:15 | 7 | GREE's patents, correct? |
| 02:21:16 | 8 | A.  Ultimately, yes, that was included -- something of that |
| 02:21:18 | 9 | order.  I don't have an exact count. |
| 02:21:23 | 10 | MR. DACUS:  Can we pull up, Mr. Smith, |
| 02:21:27 | 11 | Dr. Becker's report at Page 33, Paragraph 93, sub 1? |
| 02:21:41 | 12 | Q.  (By Mr. Dacus)  While we're doing this, Dr. Becker, in |
| 02:21:45 | 13 | these cases you actually submit a written report to the |
| 02:21:48 | 14 | Court and to us, relating to your findings and opinions in |
| 02:21:50 | 15 | this case, correct? |
| 02:21:51 | 16 | A.  I do, yes. |
| 02:21:52 | 17 | Q.  And you sign that report to affirm that what's |
| 02:21:55 | 18 | contained in the report is true, correct? |
| 02:21:57 | 19 | A.  Yes. |
| 02:21:58 | 20 | Q.  And you did that in this case? |
| 02:22:00 | 21 | A.  Yes. |
| 02:22:00 | 22 | Q.  And this is part of your report that you submitted in |
| 02:22:03 | 23 | this case, true? |
| 02:22:04 | 24 | A.  Yes. |
| 02:22:04 | 25 | Q.  And you see there in Paragraph 93, sub 1, it says: |

| | | |
|---|---|---|
| 02:22:13 | 1 | GREE granted Supercell a license to the use of 1,079 |
| 02:22:18 | 2 | Japanese patents and patent applications. |
| 02:22:20 | 3 | That's a true statement, correct? |
| 02:22:22 | 4 | A.  It is. |
| 02:22:23 | 5 | MR. DACUS:  All right.  Thank you, Mr. Smith. |
| 02:22:25 | 6 | Q.  (By Mr. Dacus)  And it's true that GREE granted to |
| 02:22:28 | 7 | Supercell the right to those patents through the expiration |
| 02:22:33 | 8 | of those patents' life, correct? |
| 02:22:34 | 9 | A.  Correct. |
| 02:22:35 | 10 | Q.  And in many instances, you know, sir, that that would |
| 02:22:40 | 11 | have been far more than 10 years into the future for many |
| 02:22:43 | 12 | of these patents, correct? |
| 02:22:45 | 13 | A.  Yes. |
| 02:22:45 | 14 | Q.  And Supercell paid a lump-sum amount, correct? |
| 02:22:48 | 15 | A.  They did. |
| 02:22:52 | 16 | Q.  And they got the right to use those patents as much as |
| 02:22:55 | 17 | they want; isn't that fair? |
| 02:22:57 | 18 | A.  Yes. |
| 02:22:57 | 19 | Q.  So let's be specific here -- and, by the way, the |
| 02:23:00 | 20 | amount of the license was for $4.5 million, correct? |
| 02:23:04 | 21 | A.  Correct. |
| 02:23:04 | 22 | Q.  So for $4.5 million, Supercell had the right to use |
| 02:23:09 | 23 | 1,079 patents for as much as they want through the life of |
| 02:23:13 | 24 | the patents, correct? |
| 02:23:15 | 25 | A.  Correct. |

02:23:15   1   Q.   And -- and so that we put a fine point on this, it's

02:23:18   2   true, sir, that if GREE -- I mean, if Supercell had sales

02:23:22   3   in Japan after the date of the license that were 100 times

02:23:29   4   bigger than what they had sell -- sold before the license,

02:23:34   5   they didn't have to pay a penny more, correct?

02:23:37   6   A.   Correct.

02:23:38   7   Q.   If they had sales that were 1,000 times more, they

02:23:41   8   never had to pay a penny more --

02:23:43   9   A.   That's correct.

02:23:44   10   Q.   -- correct?  And we can keep going, but if Supercell

02:23:49   11   had sales in Japan that were one trillion times what they

02:23:53   12   had been in the past, they still didn't have to pay a penny

02:23:56   13   more than $4.5 million; isn't that right?

02:24:01   14   A.   That's true.

02:24:02   15   Q.   It's also true, sir, that within those 1,079 patents,

02:24:07   16   it included the very same patented technology that we're

02:24:11   17   talking about in this case; isn't that true?

02:24:12   18   A.   I think some of it was the -- what we call the Japanese

02:24:17   19   counterparts to some of these patents.  I don't know if it

02:24:20   20   was every one of them.  It might have been.  But,

02:24:23   21   certainly, some of the technology in those thousand-odd

02:24:27   22   Japanese patents is similar, if not identical, to this

02:24:29   23   technology.

02:24:31   24   Q.   Did you read GREE's opening statement that it gave in

02:24:35   25   this case?

| | | |
|---|---|---|
| 02:24:36 | 1 | A.  No. |
| 02:24:39 | 2 | MR. DACUS:  Can -- can we pull up from GREE's |
| 02:24:42 | 3 | opening statement, 204, 9 through 17, Mr. Smith? |
| 02:25:10 | 4 | Q.  (By Mr. Dacus)  Do you see here, sir -- this is from |
| 02:25:13 | 5 | GREE's opening statement. |
| 02:25:13 | 6 | A.  I see that, yeah. |
| 02:25:14 | 7 | Q.  That second paragraph says:  But Supercell has refused |
| 02:25:18 | 8 | to pay to use the same types of inventions in the United |
| 02:25:22 | 9 | States. |
| 02:25:22 | 10 | Do you see that? |
| 02:25:23 | 11 | A.  Yes. |
| 02:25:23 | 12 | MR. DACUS:  We can take that down, Mr. Smith. |
| 02:25:26 | 13 | Q.  (By Mr. Dacus)  So at least GREE's counsel has told |
| 02:25:28 | 14 | this jury that the Japanese license included the same |
| 02:25:32 | 15 | technologies that are involved in this case, correct? |
| 02:25:33 | 16 | A.  The same type of technology, yes. |
| 02:25:36 | 17 | Q.  As you said, the Japanese counterparts? |
| 02:25:39 | 18 | A.  Yes. |
| 02:25:40 | 19 | Q.  Japanese equivalents, correct? |
| 02:25:43 | 20 | A.  Yes, to at least some of the patents. |
| 02:25:45 | 21 | Q.  So this jury is not here to decide the value of 1,079 |
| 02:25:50 | 22 | patents; they're only here to decide the value of five, |
| 02:25:53 | 23 | correct? |
| 02:25:53 | 24 | A.  Correct. |
| 02:25:53 | 25 | Q.  But we know what was paid for 1,074 more patents |

| | | |
|---|---|---|
| 02:25:59 | 1 | than -- than just these five, correct? |
| 02:26:05 | 2 | A.  Yes. |
| 02:26:06 | 3 | Q.  Now, within that license, sir, you know that Supercell |
| 02:26:19 | 4 | did not agree that it used those particular patents, |
| 02:26:26 | 5 | correct, the Japanese patents? |
| 02:26:28 | 6 | A.  I'm not sure I understand the question. |
| 02:26:31 | 7 | Q.  Let's do this. |
| 02:26:32 | 8 |      MR. DACUS:  Mr. Smith, can you pull up the trial |
| 02:26:35 | 9 | transcript from September 10th P.M., 204, 6 through 11, |
| 02:26:52 | 10 | please? |
| 02:26:52 | 11 | Q.  (By Mr. Dacus)  This is also from GREE's opening |
| 02:26:54 | 12 | statement, and it says:  And we're here because Supercell |
| 02:26:57 | 13 | simply won't take responsibility for its actions. |
| 02:27:00 | 14 | Supercell knows that it is using GREE's patented |
| 02:27:04 | 15 | technology. |
| 02:27:06 | 16 |      Why do I say it knows?  Because Supercell agreed |
| 02:27:10 | 17 | to a license with GREE to use GREE's patents in Japan. |
| 02:27:13 | 18 |      Do you see that, sir? |
| 02:27:14 | 19 | A.  I see that. |
| 02:27:15 | 20 |      MR. DACUS:  Take that down, Mr. Smith. |
| 02:27:17 | 21 | Q.  (By Mr. Dacus)  Now, that's GREE's lawyer saying to |
| 02:27:23 | 22 | this jury that Supercell has admitted that it used this |
| 02:27:25 | 23 | patented technology because it took a license, correct? |
| 02:27:27 | 24 | A.  I mean, the words will speak for themselves.  I -- he's |
| 02:27:32 | 25 | saying they agreed to take a license in Japan. |

```
02:27:35  1   Q.  You know, sir, from looking at this license and
02:27:38  2   reviewing it, that Supercell in no way agreed that it used
02:27:44  3   those patents or that patented technology, correct?
02:27:46  4   A.  I don't remember the exact language, but I'm sure
02:27:49  5   there's a disclaimer in there that says Supercell is not
02:27:54  6   admitting that it is infringing any of the patents.
02:27:56  7   Q.  Well, there's more than that in this license.  There's
02:28:00  8   an express representation and a promise by both parties
02:28:04  9   that neither would represent that either had done a
02:28:07  10  wrongdoing; isn't that correct?
02:28:08  11  A.  I -- you'd need to point me to it.  I don't recall
02:28:11  12  that.
02:28:11  13         MR. DACUS:  Mr. Smith, can you pull up the -- it's
02:28:18  14  PTX-480, and go to Page 9 and Paragraph 5.7, please?
02:28:27  15  Q.  (By Mr. Dacus)  This is the Supercell/GREE Japanese
02:28:31  16  license, correct, sir?
02:28:33  17  A.  This -- I do recognize this as the license from
02:28:36  18  February of 2019.
02:28:38  19         MR. DACUS:  And can you go to Page 9, Mr. Smith?
02:28:41  20  And can you blow up Paragraph 5.7?
02:28:45  21  Q.  (By Mr. Dacus)  So Paragraph 5.7, Dr. Becker, says:  No
02:28:54  22  Admission of Liability.
02:28:57  23         Correct?  You see that?
02:28:58  24  A.  I do.
02:28:59  25  Q.  It says:  The parties acknowledge -- and then I'm going
```

02:29:03  1   to read (b) -- as in boy -- neither this agreement nor

02:29:08  2   payment of the settlement payment or other transactions

02:29:11  3   undertaken pursuant thereto constitutes or shall be

02:29:14  4   construed as an admission of liability by Supercell or GREE

02:29:19  5   or as an admission that either party engaged in any

02:29:23  6   wrongful, tortious, or unlawful activity.

02:29:27  7        And then it says:  Nor shall they be so

02:29:30  8   characterized by either party.

02:29:31  9        Do you see that, sir?

02:29:32  10  A.  I do.

02:29:33  11  Q.  So Supercell -- well, more importantly, GREE promised

02:29:39  12  in this agreement that they would not characterize to

02:29:42  13  anyone that Supercell had done anything wrong; isn't that

02:29:46  14  true?

02:29:46  15  A.  I -- that seems to be what this says.  But I -- I --

02:29:53  16  I'm not a lawyer -- I don't know what -- what this -- what

02:29:55  17  the legal implication of this is.

02:29:57  18  Q.  You would agree with me, sir, that to the extent that

02:30:00  19  GREE's lawyer left the impression with this jury that

02:30:04  20  Supercell had admitted some sort of wrongdoing by taking a

02:30:07  21  license, that's absolutely contrary to what this agreement

02:30:11  22  says; isn't that true?

02:30:14  23  A.  I don't have an opinion about that.

02:30:16  24  Q.  You do agree, sir, just because you can read the

02:30:20  25  English language, that GREE promised that they would not

02:30:23  1  characterize to any -- that any party infringed or did

02:30:29  2  anything wrong; isn't that true?

02:30:31  3  A.  Well, there -- there are some promises in here that

02:30:33  4  they -- about characterizing any wrongful, tortious, or

02:30:40  5  unlawful activity.  But beyond that, I don't really know

02:30:43  6  what that -- the legal implications of that are.

02:30:46  7  Q.  You also know that in this agreement, GREE made

02:30:49  8  Supercell promise that it would not challenge the validity

02:30:52  9  of these patents in Japan, correct?

02:30:54  10  A.  Yes.

02:30:56  11        MR. DACUS:  We can take that down, Mr. Smith.

02:30:58  12  Q.  (By Mr. Dacus)  And -- and let's make sure we're clear

02:31:01  13  on the scenario of this license in Japan, because you

02:31:03  14  mentioned economic circumstances.  Can I ask you some

02:31:06  15  questions on that, sir?

02:31:07  16  A.  Sure.

02:31:08  17  Q.  Now, it's true that Japan is GREE's home turf or

02:31:14  18  homeland, correct?

02:31:15  19  A.  Yes.

02:31:15  20  Q.  GREE is very successful in Japan, correct?

02:31:17  21  A.  Yes.

02:31:18  22  Q.  They have this big social networking web media

02:31:24  23  platform, correct?

02:31:24  24  A.  Yes.

02:31:25  25  Q.  Something similar to Facebook?

| | | |
|---|---|---|
| 02:31:28 | 1 | A.  Yes. |
| 02:31:28 | 2 | Q.  And I think Mr. Araki testified that they're actually |
| 02:31:31 | 3 | traded on the Tokyo stock exchange, true? |
| 02:31:34 | 4 | A.  Yes, it's a publicly-traded company in Japan. |
| 02:31:39 | 5 | Q.  That's equivalent of the New York Stock Exchange? |
| 02:31:42 | 6 | A.  Yes. |
| 02:31:43 | 7 | Q.  And I think he said they have some 30 million users, |
| 02:31:48 | 8 | correct? |
| 02:31:48 | 9 | A.  Yes. |
| 02:31:48 | 10 | Q.  And Mr. Araki said that they actually -- that GREE |
| 02:31:51 | 11 | filed a lawsuit against Supercell in Japan.  Were you here |
| 02:31:56 | 12 | for that testimony? |
| 02:31:57 | 13 | A.  I was not here for that, but I am aware of the |
| 02:31:59 | 14 | infringement action that was filed in Japan. |
| 02:32:01 | 15 | Q.  Well -- and that's what I want to ask you about.  It |
| 02:32:03 | 16 | wasn't an infringement action, was it, sir? |
| 02:32:05 | 17 | A.  There were multiple. |
| 02:32:06 | 18 | Q.  39, correct? |
| 02:32:09 | 19 | A.  Yes. |
| 02:32:10 | 20 | Q.  They filed 39 lawsuits against Supercell in Japan in |
| 02:32:18 | 21 | their homeland, correct? |
| 02:32:19 | 22 | A.  Yes. |
| 02:32:19 | 23 | Q.  You understand, sir, there is no jury trial in Japan, |
| 02:32:23 | 24 | correct? |
| 02:32:23 | 25 | A.  Yes, I understand that. |

| | | |
|---|---|---|
| 02:32:25 | 1 | Q.  You also know that GREE was threatening Supercell with |
| 02:32:30 | 2 | an injunction?  You understand that? |
| 02:32:33 | 3 | A.  Yes, that's typical in a case like that, that one of |
| 02:32:37 | 4 | the remedies is to enjoin the other party if they're found |
| 02:32:42 | 5 | to infringe, from continuing to do that. |
| 02:32:44 | 6 | Q.  So what that means is GREE was threatening Supercell in |
| 02:32:48 | 7 | Japan, in its homeland, that if any technical part of |
| 02:32:51 | 8 | Supercell's games were found to infringe, Supercell would |
| 02:32:56 | 9 | have to take the game completely off the market; isn't that |
| 02:32:59 | 10 | true? |
| 02:32:59 | 11 | A.  I don't know the extent to which there would have to be |
| 02:33:02 | 12 | a finding of infringement before an injunction would kick |
| 02:33:05 | 13 | in, but, certainly that's one of the remedies they were |
| 02:33:08 | 14 | asking for.  And if they met the burden of getting that |
| 02:33:11 | 15 | remedy, that's what would happen. |
| 02:33:13 | 16 | Q.  And you also know, sir, that GREE asked Supercell -- |
| 02:33:16 | 17 | demanded that Supercell take -- take a license to these |
| 02:33:20 | 18 | U.S. patents during those negotiations; isn't that true? |
| 02:33:22 | 19 | A.  I don't recall that specifically, no.  I know that |
| 02:33:27 | 20 | ultimately they didn't.  But I don't -- I don't know that. |
| 02:33:30 | 21 | Q.  Of course, in the United States, Supercell gets a jury |
| 02:33:36 | 22 | trial, correct? |
| 02:33:37 | 23 | A.  They do. |
| 02:33:38 | 24 | Q.  At the end of the day, sir, in this license, GREE, who |
| 02:33:44 | 25 | is the same GREE that sits down at this hypothetical |

| | | |
|---|---|---|
| 02:33:50 | 1 | negotiation, they negotiated for a price of $4.5 million |
| 02:33:55 | 2 | for Supercell to have unlimited rights to 1,079 patents, |
| 02:34:00 | 3 | correct? |
| 02:34:00 | 4 | A.   Correct. |
| 02:34:00 | 5 | Q.   And this jury is here to decide the number for five, |
| 02:34:16 | 6 | true? |
| 02:34:17 | 7 | A.   Yes. |
| 02:34:17 | 8 | Q.   Now, with respect to your calculation of these |
| 02:34:22 | 9 | percentages, I want to talk to you about how you -- some of |
| 02:34:25 | 10 | the details related to that; is that fair? |
| 02:34:27 | 11 | A.   Yes. |
| 02:34:27 | 12 | Q.   The basis of your calculation, as I understood it, was |
| 02:34:38 | 13 | the heading that you had on one of these slides that said: |
| 02:34:41 | 14 | Time in game equals revenue or money. |
| 02:34:44 | 15 | Correct? |
| 02:34:44 | 16 | A.   That's one of the elements of the valuation that I do |
| 02:34:50 | 17 | for the two optional patents -- or two optional features. |
| 02:34:56 | 18 | Q.   I mean, ultimately, that -- that's the basis of your |
| 02:35:02 | 19 | calculation is that additional time on these games created |
| 02:35:08 | 20 | by these patented features leads to a benefit or revenue to |
| 02:35:12 | 21 | Supercell?  At a high level, that's -- that's your |
| 02:35:15 | 22 | calculation? |
| 02:35:16 | 23 | A.   At a high level, that is the calculation that I did to |
| 02:35:18 | 24 | come up with a value for the two optional features.  And |
| 02:35:25 | 25 | then I'm using one of those as a comparable to value the |

| | | |
|---|---|---|
| 02:35:29 | 1 | other -- the core features. |
| 02:35:31 | 2 | Q.  Let's -- let's go through that. |
| 02:35:36 | 3 | Now, each patented feature for the '655, the '594, |
| 02:35:39 | 4 | the '873, '137, and '481, those are all different features, |
| 02:35:45 | 5 | are they not? |
| 02:35:46 | 6 | A.  Yes. |
| 02:35:50 | 7 | Q.  And we know they're different because there's a |
| 02:35:52 | 8 | different patent for each one; isn't that fair? |
| 02:35:55 | 9 | A.  I think it's fair that -- I mean, you've got five |
| 02:36:02 | 10 | columns there.  I -- I grouped the '137 and '481 together. |
| 02:36:06 | 11 | Q.  Okay. |
| 02:36:06 | 12 | A.  But I think they're -- certainly there are four |
| 02:36:09 | 13 | distinct features spread across the five patents. |
| 02:36:12 | 14 | Q.  And in theory, what Dr. Neal did, the survey expert, he |
| 02:36:16 | 15 | did a survey to determine whether or not players would play |
| 02:36:20 | 16 | these games more or less if the patented feature was |
| 02:36:23 | 17 | removed; isn't that true? |
| 02:36:24 | 18 | A.  For two of the features, yes. |
| 02:36:26 | 19 | Q.  For two of the features.  And that -- that's what I |
| 02:36:29 | 20 | want to talk about. |
| 02:36:30 | 21 | MR. DACUS:  May I approach the whiteboard, |
| 02:36:33 | 22 | Your Honor? |
| 02:36:33 | 23 | THE COURT:  You may. |
| 02:36:34 | 24 | MR. DACUS:  Thank you. |
| 02:36:35 | 25 | Q.  (By Mr. Dacus)  So the survey, Dr. Becker, was done for |

| | | |
|---|---|---|
| 02:36:47 | 1 | the '655 patent and the '594 patent, correct? |
| 02:36:51 | 2 | A.   Yes. |
| 02:36:53 | 3 | Q.   And only for those two patents; isn't that true? |
| 02:36:56 | 4 | A.   Absolutely, yes. |
| 02:36:56 | 5 | Q.   And at the end of the day, there was no survey done for |
| 02:37:03 | 6 | the '137, '481, and '873, correct? |
| 02:37:07 | 7 | A.   Correct. |
| 02:37:09 | 8 | Q.   And the '655, that feature relates to a video game, |
| 02:37:16 | 9 | that's a fair statement, correct? |
| 02:37:17 | 10 | A.   You used -- I think you're dating yourself and myself |
| 02:37:22 | 11 | to call it a video game.  It's a mobile game. |
| 02:37:25 | 12 | Q.   A mobile video game, is that fair, or just a mobile |
| 02:37:29 | 13 | game? |
| 02:37:30 | 14 | A.   Mobile game.  I mean, there's no video.  Video is like |
| 02:37:33 | 15 | an old-styled TV. |
| 02:37:35 | 16 | Q.   Now, the '655, at least in theory, the purpose was to |
| 02:37:43 | 17 | increase player time -- or player engagement on the game; |
| 02:37:47 | 18 | isn't that true? |
| 02:37:48 | 19 | A.   It is a player engagement, player-enjoyment focused |
| 02:37:55 | 20 | game, yes -- I mean, focused feature. |
| 02:37:56 | 21 | Q.   So that -- that's true not only for the '655 but also |
| 02:38:02 | 22 | for the '594, isn't that correct, that it relates to a |
| 02:38:05 | 23 | mobile game and the purpose is to increase the time or |
| 02:38:11 | 24 | engagement?  Isn't that correct? |
| 02:38:13 | 25 | A.   Quality -- we'll see -- we talk about quality of life, |

02:38:17  1   its engagement.  Generally, I think if you use the term

02:38:20  2   "engagement," you'll -- it will be the appropriate thing.

02:38:28  3   Q.  Now, if I understood you correctly earlier, sir, you

02:38:31  4   said that -- that these two features you consider somewhat

02:38:34  5   minor in relation to the other three?

02:38:38  6   A.  Well, they're optional, and, thus, they're -- they're

02:38:42  7   certainly used less, and I think the evidence that I

02:38:44  8   would -- that I reviewed suggests that they're less

02:38:49  9   important.

02:38:49  10  Q.  So you did a survey for the two features that are less

02:38:53  11  important, and you did not do a survey for the three that

02:38:56  12  are, as you said, core features and key to the games; do I

02:38:59  13  have that correct?

02:39:00  14  A.  That's correct.  I didn't -- just to be clear, I didn't

02:39:03  15  do the survey.  Dr. Neal did.

02:39:04  16  Q.  You understand, sir, that none of my questions to you

02:39:07  17  am I being personally critical of you?

02:39:09  18  A.  No, no, I understand that.

02:39:11  19  Q.  Okay.  You understand -- well, let me ask this

02:39:16  20  question, sir:  You do not know why a survey was not done

02:39:19  21  for the '137, '481, and '873, do you?

02:39:28  22  A.  I don't know what decision process Dr. Neal used.  I

02:39:31  23  can tell you economically, I would not have attempted to

02:39:35  24  survey the '137/'481, for example, as an economic matter.

02:39:41  25  But I -- I don't know what -- in the discussion that

02:39:45  1    Dr. Neal had, I did not make that decision for him.

02:39:49  2    Q.  Who did?  The lawyers?

02:39:52  3    A.  I -- I don't know.  I wasn't involved in the process of

02:39:55  4    designing or implementing the survey.

02:39:57  5    Q.  You also know, so that we're clear, sir, that the

02:40:04  6    survey that was done by Dr. Neal did not actually ask how

02:40:09  7    much amount of time, either more or less, these

02:40:11  8    participants would play these games if the feature was

02:40:14  9    removed, correct?

02:40:17  10   A.  It asked percentage change in time.  It did not ask for

02:40:26  11   an absolute number of minutes or hours.

02:40:30  12   Q.  Correct.  And so if someone played this game for one

02:40:33  13   minute, all this survey told you was whether or not they

02:40:37  14   were increasing their time by a certain percentage,

02:40:40  15   correct?

02:40:40  16   A.  Right.  That's true.  And that's what I needed for my

02:40:43  17   analysis was a percentage change, not absolute minutes.

02:40:46  18   Q.  Is there anything, to your knowledge, that would have

02:40:49  19   prevented in an analysis where we're trying to determine

02:40:52  20   how much more people play -- how much less people play

02:40:58  21   these games if the feature was removed, is there anything

02:41:01  22   that would have prevented from simply asking that direct

02:41:04  23   question?

02:41:04  24   A.  I'm not a survey expert, so I have no idea whether

02:41:11  25   that's something that would be valid to ask.

02:41:13  1   Q.  What you ultimately did, sir, as you explained, is you

02:41:19  2   took the results for the '655 patent and you applied to the

02:41:23  3   '137, '481, and '873, correct?

02:41:29  4   A.  When you say "applied," I used the '655 as a comp -- as

02:41:34  5   a comparable data point from a valuation standpoint to then

02:41:39  6   assess the value of the '137/'481 combined and the '873.

02:41:48  7         MR. DACUS:  Your Honor, may I approach?

02:41:50  8         THE COURT:  You may.

02:41:51  9         MR. DACUS:  Thank you.

02:41:51  10  Q.  (By Mr. Dacus)  What you did, Dr. Becker, is you used

02:41:59  11  the royalty rate that you gathered from the survey

02:42:06  12  information as a starting point for the '137, '481, and

02:42:13  13  '873, correct?

02:42:14  14  A.  That's -- I think that's a fair statement.  What I

02:42:17  15  ultimately concluded as the royalty rate for those first

02:42:21  16  two patents, I then selected out of the two a comp and used

02:42:26  17  it to value the other two.

02:42:28  18  Q.  So the royalty rate that you used based on the survey

02:42:38  19  from the '655 was 1.1 percent, that's what you just showed

02:42:42  20  the jury, correct?

02:42:43  21  A.  Yes.

02:42:45  22  Q.  And for the '594, it was .7 percent, correct?

02:42:54  23  A.  0.7, yes.

02:42:59  24  Q.  And you used this 1.1 percent as a starting point for

02:43:03  25  the '137 and '481 patents, correct?

| | | |
|---|---|---|
| 02:43:08 | 1 | A.  Combined, yes. |
| 02:43:10 | 2 | Q.  And you ultimately concluded that the royalty rate for |
| 02:43:12 | 3 | those two was actually 1.6 percent; isn't that correct? |
| 02:43:16 | 4 | A.  Correct. |
| 02:43:17 | 5 | Q.  And then for the '873 you concluded that the royalty |
| 02:43:26 | 6 | rate is actually 2.4 percent, correct? |
| 02:43:29 | 7 | A.  Correct. |
| 02:43:29 | 8 | Q.  It is true, sir, that it would have been absolutely |
| 02:43:44 | 9 | economically appropriate to use the royalty rate from this |
| 02:43:52 | 10 | '594 patent to calculate the '137, '481, and '873, correct? |
| 02:43:58 | 11 | A.  In terms of absolutely appropriate, I certainly had the |
| 02:44:03 | 12 | '594 as a potential starting point for those other two.  I |
| 02:44:07 | 13 | think with respect to the '137/'481, there's -- you know, |
| 02:44:12 | 14 | we're talking about a comp -- selecting a comp from within |
| 02:44:16 | 15 | the same game, which then means that I have fewer |
| 02:44:21 | 16 | adjustments to make. |
| 02:44:22 | 17 | So I wouldn't agree that it's absolutely okay, but |
| 02:44:25 | 18 | certainly within the realm of possible things that I could |
| 02:44:28 | 19 | have done; those are both potential comps. |
| 02:44:31 | 20 | Q.  I mean, the only reason, sir, that you felt comfortable |
| 02:44:35 | 21 | using the '655 as a comp for the '137, '481, and '873 was |
| 02:44:40 | 22 | because all of them related to mobile games, and they |
| 02:44:45 | 23 | were -- the purpose of them was to increase player time, |
| 02:44:49 | 24 | correct? |
| 02:44:49 | 25 | A.  Increase player engagement. |

02:44:51  1        That's not the only consideration that I made in

02:44:55  2  selecting the comps, but that is one dimension of what

02:45:02  3  makes them available comps.

02:45:03  4  Q.  And you agree that the '594 has both of those same

02:45:06  5  attributes; that is, it's a mobile game, and the purpose is

02:45:09  6  to increase player engagement or time, correct?

02:45:12  7  A.  Yes.

02:45:17  8  Q.  From this survey, sir, you know that features that are

02:45:23  9  in a mobile game and whose purpose is to increase player

02:45:28  10  engagement or time, can have very different results when it

02:45:33  11  comes to their effect on revenue, correct?

02:45:35  12  A.  I think with -- yes, some of them could.  Others -- I

02:45:41  13  think the effect is more binary if you take -- if you take

02:45:46  14  Elixir out or you take the shooting controls out of a game,

02:45:50  15  you don't have the game.

02:45:51  16        So I think with respect to the core patents, I --

02:45:57  17  I disagree with that.  But with respect to ones that are

02:46:00  18  what I call optional features, yes, they all could have

02:46:04  19  different impacts.

02:46:06  20        MR. DACUS:  Can we pull up Dr. Becker's report,

02:46:09  21  the 070 report, Exhibit 4A, please, Mr. Smith?

02:46:18  22  Q.  (By Mr. Dacus)  You -- you do agree, while we're

02:46:21  23  pulling that up, sir, that what the survey showed is that

02:46:24  24  the '594 feature is less important than the '655 feature,

02:46:32  25  correct?  I'm not referring to what's on the screen, sir.

02:46:34  1   A.  Oh, oh, oh, yeah.  I would have to look and see what

02:46:37  2   the -- the -- what the survey results showed.

02:46:42  3   Q.  Well, you know that what they showed is, according to

02:46:46  4   your calculation, that the royalty for the '594 should be

02:46:51  5   .7 percent and for the '655 should be 1.1 percent, correct?

02:46:55  6   A.  Yes.  Definitely the royalty rate is lower, but that's

02:47:01  7   the result of a number of considerations other than just

02:47:03  8   the survey.

02:47:04  9   Q.  At the end of the day, sir, you know that the surveys

02:47:08  10  indicate that the '594 patent is less important than the

02:47:11  11  '655, correct?

02:47:12  12  A.  Again, I'd need to refer to the survey results to know

02:47:18  13  if with respect to the survey, it says it's less important.

02:47:22  14          MR. DACUS:  Can we pull up Dr. Becker's deposition

02:47:24  15  at Page 68, Line 22 through 69, Line 4?

02:47:33  16  Q.  (By Mr. Dacus)  While we're doing that, Dr. Becker, you

02:47:35  17  gave a deposition in this case, correct?

02:47:37  18  A.  Yes.

02:47:37  19  Q.  You were sworn under oath in that deposition, correct?

02:47:40  20  A.  Yes.

02:47:40  21  Q.  You gave that deposition after you gave us your report

02:47:43  22  in this case, correct?

02:47:45  23  A.  Correct.

02:47:45  24  Q.  And you were sworn under oath just like you are today,

02:47:49  25  fair?

02:47:50  1   A.  Fair.

02:47:52  2   Q.  If we look at 68:22, the question to you was:  You

02:47:58  3   testified a little bit earlier on the same subject.  You

02:48:01  4   said, when I look at these overall results for the '594

02:48:04  5   patent, we see kind of a systemic result that the accused

02:48:07  6   feature in the '594 patent is sort of less, appears to be

02:48:11  7   the less important overall than the feature for the '655

02:48:15  8   patent, Clash Royale, correct?

02:48:17  9        And your answer was:  Yes, that was my testimony.

02:48:21  10       Correct?

02:48:22  11  A.  Yes.

02:48:22  12  Q.  That was truthful testimony, correct?

02:48:24  13  A.  Yes.

02:48:24  14  Q.  So does that remind you that from the survey, you knew

02:48:28  15  that the '594 was less important than the '655?

02:48:30  16  A.  That seems to indicate that in the deposition I was

02:48:33  17  looking at the survey results, and it looked like there was

02:48:36  18  a systematic lower importance for the '594.

02:48:43  19       MR. DACUS:  We can take that down, Mr. Smith.

02:48:46  20       And if you would pull back up Exhibit 4A from the

02:48:55  21  070 report.

02:48:55  22  Q.  (By Mr. Dacus)  Now, this is from your report, correct,

02:48:57  23  sir?

02:48:57  24  A.  Yes.

02:48:57  25  Q.  And this is showing that you multiplied that 2.4

02:49:02   1   percent number by the accused revenues for Brawl Stars,

02:49:05   2   correct?

02:49:05   3   A.   Yes.

02:49:05   4   Q.   Now, you would agree, sir, that the 2.4 percent is the

02:49:08   5   highest percentage royalty that you used, correct?

02:49:12   6   A.   It is.

02:49:12   7   Q.   And you use -- you came to that number without a survey

02:49:19   8   on this specific '873 feature, correct?

02:49:24   9   A.   Correct.

02:49:24   10   Q.   Indeed, no survey was even done on the Brawl Stars game

02:49:29   11   to which this feature applies, correct?

02:49:31   12   A.   That's true.

02:49:32   13   Q.   So the only survey information we have of the '655 and

02:49:38   14   '594, you more than tripled the '594 value without a shred

02:49:45   15   of additional survey evidence, correct?

02:49:47   16   A.   Well, I didn't -- I -- I ended up at a rate that

02:49:51   17   mathematically is about three times the '594.  That --

02:49:56   18   that's a mathematical truth.  The question implied that I

02:50:01   19   used the '594 to get there, but I didn't.

02:50:03   20   Q.   Yes, sir.  You understand that you certainly could have

02:50:06   21   used the .7 percent just as equally valid as using the 1.1

02:50:12   22   as a starting point, correct?

02:50:14   23   A.   With respect to Brawl Stars, I -- I could have started

02:50:16   24   there.  That the -- the adjustments would have been

02:50:20   25   different.  It -- it wouldn't follow that the lower amount

| | | |
|---|---|---|
| 02:50:26 | 1 | for the '594 would mean that you end up with kind of the |
| 02:50:31 | 2 | similar factor over in the '873. |
| 02:50:38 | 3 | Q.  At end of the day, sir, we do not know -- this jury |
| 02:50:42 | 4 | does not know and you do not know what the survey would |
| 02:50:44 | 5 | have shown for the Brawl Stars game and the '873 patented |
| 02:50:47 | 6 | feature, correct? |
| 02:50:47 | 7 | A.  It -- if some survey had been fielded with respect to |
| 02:50:51 | 8 | that, we don't -- I don't think anybody knows what that |
| 02:50:54 | 9 | would have said. |
| 02:50:55 | 10 | Q.  And as you sit here, you have no explanation to this |
| 02:50:57 | 11 | jury as to why one was not done, do you, sir? |
| 02:51:01 | 12 | A.  I think I gave an explanation as an economist why you |
| 02:51:05 | 13 | wouldn't do it.  I said:  I don't have any idea why |
| 02:51:08 | 14 | Dr. Neal as a survey expert didn't do it.  But as an |
| 02:51:13 | 15 | economist, I know I wouldn't do it. |
| 02:51:16 | 16 | Q.  Dr. Neal didn't offer any explanation as to why he did |
| 02:51:20 | 17 | not either, did he, sir? |
| 02:51:20 | 18 | A.  I -- I didn't hear him give one. |
| 02:51:22 | 19 | Q.  Do you know what a pilot survey is, sir? |
| 02:51:22 | 20 | A.  Yes. |
| 02:51:24 | 21 | Q.  What is that? |
| 02:51:24 | 22 | A.  Well, it's my understanding from dealing with survey |
| 02:51:27 | 23 | experts that surveys can be piloted.  I think Dr. Neal |
| 02:51:30 | 24 | talked about, you know, you -- you test your questions to |
| 02:51:32 | 25 | make sure they're understandable. |

| | | |
|---|---|---|
| 02:51:34 | 1 | And that's not uncommon.  I think it's part of the |
| 02:51:37 | 2 | regular process once you've decided to do a survey to, |
| 02:51:40 | 3 | before you launch it full scale, you actually sort of do |
| 02:51:44 | 4 | some testing on it. |
| 02:51:45 | 5 | Q.  Do you have any idea, sir, whether or not there was a |
| 02:51:47 | 6 | pilot survey done of these three patents, and you just were |
| 02:51:52 | 7 | not shown the results? |
| 02:51:53 | 8 | A.  I have no idea. |
| 02:51:54 | 9 | Q.  So it could have happened? |
| 02:51:55 | 10 | A.  I mean, I -- I mean, given that I don't know what was |
| 02:52:00 | 11 | done, I was provided with Dr. Neal's results.  I don't |
| 02:52:05 | 12 | know. |
| 02:52:05 | 13 | Q.  It's also true, sir, that the '137/'481, as you showed |
| 02:52:11 | 14 | this jury, that's actually the claim where you want |
| 02:52:13 | 15 | $10 million, correct? |
| 02:52:16 | 16 | A.  It's -- when you say I want $10 million, I don't have |
| 02:52:20 | 17 | an interest in this outcome.  I'm simply giving this jury |
| 02:52:24 | 18 | what I think is the reasonable royalty rate, and then I do |
| 02:52:27 | 19 | the math on what the result is. |
| 02:52:30 | 20 | Q.  Those are the two patents where you've asked this jury |
| 02:52:34 | 21 | to award $10.8 million against Supercell; isn't that |
| 02:52:34 | 22 | correct? |
| 02:52:38 | 23 | A.  I -- those are my numbers for those patents, yes. |
| 02:52:41 | 24 | Q.  And, likewise, you have -- there's no survey |
| 02:52:43 | 25 | information for those two, correct? |

| | | |
|---|---|---|
| 02:52:45 | 1 | A.  Correct. |
| 02:52:45 | 2 | Q.  So your highest royalty rate and the two patents for |
| 02:52:48 | 3 | which you seek the most amount of money, you have zero |
| 02:52:54 | 4 | survey evidence related to those specific features or even |
| 02:52:58 | 5 | to this game, correct? |
| 02:53:00 | 6 | A.  Correct. |
| 02:53:04 | 7 | Q.  Do you remember where we started this, sir? |
| 02:53:09 | 8 | A.  Yes. |
| 02:53:10 | 9 | Q.  We started by saying you ought to give the best |
| 02:53:14 | 10 | evidence that you have available; isn't that correct? |
| 02:53:16 | 11 | A.  Yes. |
| 02:53:16 | 12 | Q.  That could have been a survey, correct? |
| 02:53:19 | 13 | A.  In my economic opinion, I -- I've -- economic reasons |
| 02:53:24 | 14 | why I think there would have been -- it would not have |
| 02:53:27 | 15 | given me the kind evidence I need to ask people a survey |
| 02:53:32 | 16 | question about these particular features of Brawl Stars and |
| 02:53:38 | 17 | Clash Royale.  But, you know, in the abstract, one could do |
| 02:53:41 | 18 | a survey.  You could try. |
| 02:53:44 | 19 | Q.  Didn't try, did they? |
| 02:53:46 | 20 | A.  I -- I'm not the survey expert.  I'm here to evaluate |
| 02:53:49 | 21 | the economic evidence. |
| 02:53:50 | 22 | Q.  Now, not only did Supercell not do a survey for these |
| 02:53:59 | 23 | three patents, sir, the truth is for the '655 and '594, you |
| 02:54:04 | 24 | actually cherry picked the information that you wanted to |
| 02:54:08 | 25 | use and -- and present to this jury; isn't that fair? |

02:54:11  1  A.  No, that's -- I don't think that's fair.  I considered

02:54:14  2  all of the information in Dr. Neal's survey.

02:54:18  3        MR. DACUS:  Can we pull up Exhibit 1B to the 070

02:54:23  4  report, please, Mr. Smith?  Can we blow up that first

02:54:33  5  table?  Thank you.

02:54:35  6  Q.  (By Mr. Dacus)  Dr. Becker, this is part of your

02:54:42  7  report, correct?

02:54:42  8  A.  It is.

02:54:43  9  Q.  This is the calculation you did for the '655 patent,

02:54:47  10  correct?

02:54:47  11  A.  It is.

02:54:49  12  Q.  And you have labeled on the right-hand side A through

02:54:55  13  E.  Do you see those items?

02:54:57  14  A.  Yes.

02:54:58  15  Q.  Those are all items that come from -- they're parts of

02:55:04  16  your calculation, first of all, correct?

02:55:06  17  A.  Yes.

02:55:06  18  Q.  Those are things that come from Dr. Neal's survey,

02:55:11  19  correct?

02:55:11  20  A.  A and B do.  A, B, and D do.  The rest -- C and E is

02:55:18  21  math that I'm doing.

02:55:19  22  Q.  Let me ask a better question.  That is, all of these

02:55:23  23  numbers, A through E, are dependent on Dr. Neal's surveys,

02:55:29  24  correct?

02:55:29  25  A.  Correct.

| | | |
|---|---|---|
| 02:55:29 | 1 | Q.  And what this shows is that 241 participants were total |
| 02:55:34 | 2 | paying respondents to the survey who played the -- this |
| 02:55:39 | 3 | particular game, correct? |
| 02:55:42 | 4 | A.  Yes. |
| 02:55:43 | 5 | Q.  Now, that 241 is out of millions and millions of people |
| 02:55:46 | 6 | who have actually played the game, correct? |
| 02:55:48 | 7 | A.  Correct. |
| 02:55:48 | 8 | Q.  And 60 of those 241 said that the feature was |
| 02:55:53 | 9 | important, and that they would play less if it was removed, |
| 02:55:57 | 10 | correct? |
| 02:55:57 | 11 | A.  Correct. |
| 02:55:57 | 12 | MR. DACUS:  Now, can we pan back out, Mr. Smith, |
| 02:56:00 | 13 | and show both tables and maybe blow up both of them, if we |
| 02:56:05 | 14 | could?  Thank you. |
| 02:56:10 | 15 | Q.  (By Mr. Dacus)  Now, this top table is the 1.1 percent |
| 02:56:15 | 16 | royalty rate that you actually used, correct? |
| 02:56:17 | 17 | A.  Correct. |
| 02:56:17 | 18 | Q.  But what's reflected in the table below is the fact |
| 02:56:20 | 19 | that actually 26 of the respondents said the feature was |
| 02:56:27 | 20 | important, but they would actually play the game more if |
| 02:56:30 | 21 | the feature was removed, correct? |
| 02:56:32 | 22 | A.  Yes.  We talked about that. |
| 02:56:33 | 23 | Q.  But -- and if those -- that number of participants and |
| 02:56:36 | 24 | that information was actually included, then the royalty |
| 02:56:40 | 25 | rate would actually be .45 percent; isn't that true? |

02:56:45  1    A.  Mathematically, yes.  If you included those and treated

02:56:48  2    them without consideration of the other evidence in the

02:56:51  3    case, it would be .45.

02:56:52  4              MR. DACUS:  Your Honor, may I approach the easel?

02:56:55  5              THE COURT:  You may.

02:56:55  6              MR. DACUS:  Thank you.

02:56:56  7    Q.  (By Mr. Dacus)  So it's a true statement, sir, that if

02:57:22  8    you were to consider all of the survey respondents and you

02:57:27  9    were to consider all of the evidence, those -- both those

02:57:30  10   who said they would play the game more and those who said

02:57:34  11   they would play the game less, it would reduce your royalty

02:57:38  12   that you used by significantly more than half, correct?

02:57:43  13   A.  No, I disagree.  You said if I consider all the

02:57:47  14   evidence.

02:57:47  15   Q.  If -- if you consider both categories of respondents in

02:57:54  16   Dr. Neal's survey, it would reduce your royalty by more

02:57:58  17   than half, correct?

02:58:00  18   A.  If I blindly consider both buckets of respondents

02:58:05  19   without considering the other evidence, all of the

02:58:08  20   evidence, I would mathematically get to a royalty -- I -- I

02:58:13  21   wouldn't label it the true royalty, but it is a recomputed

02:58:16  22   royalty of .45 percent.

02:58:18  23   Q.  And you've said that word "blindly" three or four

02:58:22  24   times.  The reason you're saying that is you gave this jury

02:58:26  25   some explanation to say you think you should disregard the

| | | |
|---|---|---|
| 02:58:29 | 1 | participants in the lower table because you consider |
| 02:58:31 | 2 | them -- that they would actually be spending their time |
| 02:58:34 | 3 | grinding, correct? |
| 02:58:34 | 4 | A.   I think my testimony was more expansive than that, but |
| 02:58:41 | 5 | ultimately I concluded -- I concluded that it was -- that |
| 02:58:44 | 6 | the reasonable -- that it was reasonable to treat that |
| 02:58:46 | 7 | bucket of spend more time for this particular feature as |
| 02:58:49 | 8 | non-productive time, and, thus, to not include it in the |
| 02:58:52 | 9 | royalty calculation. |
| 02:58:53 | 10 | Q.   At a high level, sir, what you did is when the |
| 02:58:56 | 11 | information was favorable to GREE, you used that |
| 02:59:00 | 12 | information in your royalty calculation, correct? |
| 02:59:05 | 13 | A.   No, I -- I don't think that that's a fair statement at |
| 02:59:08 | 14 | a high level at all.   I had other data that led to an |
| 02:59:13 | 15 | even -- a royalty rate that was three times the size of |
| 02:59:16 | 16 | this royalty rate, and I picked out all the evidence -- |
| 02:59:20 | 17 | what I thought was the most reasonable. |
| 02:59:22 | 18 | Q.   That other royalty rate that you just referenced, sir, |
| 02:59:25 | 19 | was not a measure of time, correct?   It wasn't a measure -- |
| 02:59:29 | 20 | a measure of how much time a player spent in a game, |
| 02:59:32 | 21 | correct? |
| 02:59:32 | 22 | A.   That's correct.   It was -- it was another way of |
| 02:59:34 | 23 | looking at it based on the probability that somebody would |
| 02:59:37 | 24 | make an in-app purchase -- |
| 02:59:38 | 25 | Q.   Correct. |

02:59:39   1   A.   -- which is another very important thing.

02:59:48   2          MR. DACUS:   Can we pull up Exhibit 1B from the 071

02:59:52   3   report, Mr. Smith?

03:00:07   4   Q.   (By Mr. Dacus)   What's shown on the screen there,

03:00:09   5   Dr. Becker, is your calculation related -- of royalty

03:00:13   6   related to the '594 patent, correct?

03:00:15   7   A.   Yes.

03:00:16   8   Q.   And, again, what Dr. Neal's survey showed is that out

03:00:20   9   of 238 participants in the survey, 25 would spend less time

03:00:25  10   playing the game if the feature was removed, correct?

03:00:28  11   A.   Out of the paying participants, yes.

03:00:31  12   Q.   But it also showed, if we look at the bottom, that 20

03:00:35  13   of those paying participants said they would actually

03:00:40  14   increase or play the game more if it -- the feature was

03:00:43  15   removed, correct?

03:00:44  16   A.   Absolutely, yes.

03:00:45  17   Q.   And it's true, sir, that if you were to take all the

03:00:49  18   evidence, which is where we started this, as it relates to

03:00:52  19   Dr. Neal's survey, the royalty for the '594 would actually

03:00:56  20   be zero percent; isn't that true?

03:00:58  21   A.   No.   I disagree that if you consider all the evidence.

03:01:02  22   Again, if you just plug the numbers in, it would lead to

03:01:06  23   zero.

03:01:06  24   Q.   If you consider all of the information from Dr. Neal's

03:01:11  25   survey, both those who would play less and those who would

03:01:14  1  play more, the royalty would be zero.  That is a true

03:01:18  2  statement, correct?

03:01:18  3  A.  That's a true statement.  If I only look at the survey

03:01:21  4  and no other evidence.

03:01:22  5       MR. DACUS:  May I approach, Your Honor?

03:01:23  6       THE COURT:  Yes.

03:01:24  7       MR. DACUS:  Thank you.

03:01:25  8  Q.  (By Mr. Dacus)  The truth is, sir, if -- if we look at

03:01:41  9  the bottom table in your report, you see next to Item P --

03:01:45  10  as in Paul -- it says negative .04 percent.  Do you see

03:01:51  11  that?

03:01:51  12  A.  Yes.

03:01:51  13  Q.  This means that by removing the feature, players would

03:01:56  14  actually play more; isn't that correct?

03:01:57  15  A.  Yes, that's -- that's an important finding, yes.

03:01:59  16  Q.  So the logic to that is, if you remove the feature

03:02:06  17  which you claim is so valuable, Supercell would actually

03:02:09  18  make more money, correct?

03:02:12  19  A.  No.  And that's -- that's the crux of this point is

03:02:15  20  that the kind of time that they would spend to play more is

03:02:20  21  clearly not productive time.

03:02:23  22  Q.  Well, that's where we have a disagreement, correct?

03:02:27  23  A.  Well, I -- I mean, I respectfully disagree.  And I

03:02:29  24  think the evidence from Supercell disagrees with you.

03:02:33  25  Q.  Because what your slide said to this jury just about an

| | | |
|---|---|---|
| 03:02:37 | 1 | hour ago was time spent playing equals revenue.  That's |
| 03:02:41 | 2 | what your slide said, isn't it? |
| 03:02:42 | 3 | A.  That the time in the game as it is designed |
| 03:02:48 | 4 | encourages -- has a relationship between time in the game |
| 03:02:52 | 5 | and money. |
| 03:02:53 | 6 | Q.  It -- it would have been, sir, absolutely economically |
| 03:02:57 | 7 | appropriate for you to utilize the results of the '594 |
| 03:03:03 | 8 | patent as reflected by Dr. Neal's survey and apply those to |
| 03:03:08 | 9 | the '137, '481, and '873 because they all relate to mobile |
| 03:03:13 | 10 | games and they all allegedly increase or enhance player |
| 03:03:17 | 11 | time.  Isn't that true? |
| 03:03:19 | 12 | A.  They -- I mean, they increase player engagement. |
| 03:03:28 | 13 | I've -- you could have done that.  I think there are issues |
| 03:03:33 | 14 | when the '655 patent is not -- doesn't stand on an equal |
| 03:03:37 | 15 | footing as a comp with the '594 with respect to the other |
| 03:03:41 | 16 | Clash Royale feature.  But with respect to Brawl Stars, I |
| 03:03:43 | 17 | don't disagree with you. |
| 03:03:44 | 18 | Q.  So we can at least agree that with respect to Brawl |
| 03:03:47 | 19 | Stars, the '873 patent, it would have been perfectly |
| 03:03:53 | 20 | economically appropriate to take the results from the '594 |
| 03:03:55 | 21 | and use those for the '873, correct? |
| 03:03:57 | 22 | A.  Yes. |
| 03:03:57 | 23 | Q.  And if we took all of Dr. Neal's survey -- I understand |
| 03:04:02 | 24 | you don't want to -- but if we did, that number would be |
| 03:04:07 | 25 | zero instead of 2.4 percent; isn't that correct, sir? |

03:04:10  1   A.  Mathematically, that's what the result would be, yes.

03:04:21  2        MR. DACUS:  We can take that down, Mr. Smith.

03:04:25  3   Thank you.

03:04:26  4        Now, can you pull up PTX-105, Mr. Smith?

03:04:41  5   Q.  (By Mr. Dacus)  Now, for the '655 and the '137/'481 you

03:04:47  6   had these alternative calculations based on whether or not

03:04:50  7   Supercell had notice of the patents, correct?

03:04:52  8   A.  Correct.

03:04:52  9   Q.  And as I understand, your position and Supercell's

03:04:59  10  position is -- you claim -- or Supercell claims -- I'm

03:05:01  11  sorry, GREE claims that Supercell had notice of those three

03:05:03  12  patents as far back as September 12th of 2016, correct?

03:05:10  13  A.  I -- honestly, I'm only vaguely aware of the nature of

03:05:14  14  that claim.  I was simply told to calculate royalties

03:05:19  15  beginning in September of 2016.  And as somebody who works

03:05:24  16  in this area, I understand kind of vaguely the legal theory

03:05:27  17  behind that, but I haven't looked at this question at all.

03:05:30  18        MR. DACUS:  So, Mr. Smith, you have up Plaintiff's

03:05:32  19  Exhibit 105, correct?  Can you show the entirety of that

03:05:36  20  document, please, sir?

03:05:37  21  Q.  (By Mr. Dacus)  Do you even know enough, sir, to know

03:05:40  22  that what Supercell claims is that this September 12th,

03:05:43  23  2016, letter, which is Plaintiff's Exhibit 105, is what

03:05:47  24  gave Supercell notice of those three patents?  Do you?

03:05:51  25  A.  I can infer from its prominence in these proceedings

03:05:56  1   that when I was told there was a letter and the date of

03:05:59  2   that letter would trigger the notice date, that this must

03:06:02  3   be that letter.  But beyond that, honestly I haven't been

03:06:05  4   asked to look at this question at all.

03:06:15  5   Q.  Ultimately, sir, for these three patents, if we wanted

03:06:18  6   to know what the true royalty was that included all

03:06:26  7   respondents to a survey, both those who would play more and

03:06:29  8   those who would play less, we just don't know, do we,

03:06:36  9   because there hasn't been a survey done?  Isn't that

03:06:36  10  correct?

03:06:40  11  A.  Well, I -- I believe that their -- that the true

03:06:43  12  royalty -- the most reasonable royalty is the ones that I

03:06:47  13  presented that considers all the available evidence that I

03:06:49  14  had in this case.

03:06:49  15  Q.  In the end, sir, these numbers that you used, despite

03:06:53  16  the fact that all the evidence that you showed this jury,

03:06:56  17  all those emails and Slack, you got your number from

03:07:02  18  Dr. Neal's survey, correct?

03:07:04  19  A.  Not only from his survey.  I mean, it's -- I've

03:07:08  20  considered a tremendous amount of evidence in this case,

03:07:11  21  millions and millions of records of player data to reach

03:07:15  22  those rates that you have on this -- on the chart there.

03:07:19  23  Q.  Dr. Neal's survey showed that for the '655 patent, if

03:07:23  24  you calculate the royalty, just based on one category, it

03:07:28  25  was 1.1 percent.  That's what his survey showed?

820

```
03:07:31   1    A.   No.
03:07:32   2    Q.   That's -- that's what led you to that calculation of
03:07:35   3    1.1 percent?
03:07:36   4    A.   It -- the process that I used to get to the 1.1 was
03:07:40   5    based in part, but only in part, on consideration of
03:07:45   6    Dr. Neal's survey.
03:07:46   7    Q.   And, likewise, for the .7 percent, correct?
03:07:49   8    A.   Correct.
03:07:52   9            MR. DACUS:  That's all I have, Your Honor.  I pass
03:07:53  10    the witness.
03:07:54  11            THE COURT:  All right.  Redirect, Ms. Ludlam?
03:07:57  12            MS. LUDLAM:  Yes.  Thank you, Your Honor.
03:08:03  13            THE COURT:  Mr. Dacus, you need to move the easel
03:08:07  14    back.
03:08:08  15            MR. DACUS:  Yes, Your Honor.
03:08:10  16            THE COURT:  And turn it to a clean sheet.
03:08:13  17            MR. DACUS:  Thank you.  I apologize.
03:08:17  18            THE COURT:  Let's turn it to a clean sheet, not
03:08:19  19    one --
03:08:20  20            MR. DACUS:  Oh, I'm sorry.
03:08:21  21            THE COURT:  Not one with the seven times on it.
03:08:24  22            MR. DACUS:  I'll be happy to turn that one over.
03:08:27  23            THE COURT:  Thank you.  All right.  We'll proceed
03:08:29  24    with redirect.
03:08:31  25            MS. LUDLAM:  Thank you.
```

REDIRECT EXAMINATION

BY MS. LUDLAM:

Q.  Dr. Becker, are you aware if Supercell has ever removed any of the features that you analyzed from the damages perspective in this case?

A.  No, it's my understanding that they have not.

Q.  Okay.  And, Dr. Becker, Mr. Dacus seemed to imply that you could use the '594 rate to determine the rate for the '137, '481, and '873 patents; do you remember that?

A.  Yes.

Q.  If you were to use that rate to determine the value of the others, would your royalties change?

A.  Not materially, no.

Q.  And why is that?

A.  Well, the -- the .7 percent rate is lower math -- the biggest driver of why it's lower is that the extent of use of that feature was significantly lower.  I think it's 40-something percent of users use that.  And recall it -- the '137/'481 patents are used by a hundred percent of the players.  And the '873 Brawl Stars patent is used by a hundred percent of the players.

       So if I start, yes, it would be a lower starting point, .7.  But the adjustment from a feature that's used by 40 percent of the players up to a hundred percent would effectively adjust for that difference between .7 percent

03:09:54  1  and 1.1 percent.

03:09:56  2  Q.  Okay.  And, Dr. Becker, from an economic perspective,

03:10:01  3  why wouldn't you survey the '137, '481, or '873 patents?

03:10:05  4  A.  Well, economically, it would be -- excuse me, you'd be

03:10:09  5  asking people -- again, I'm not a survey expert, but the

03:10:14  6  economic choice you're presenting them is, would you like

03:10:17  7  this game without its core feature?

03:10:21  8       And I think the analogy I use would be if you --

03:10:25  9  you know, are you going to field a survey to ask golfers if

03:10:29  10  they like playing golf without their golf clubs.

03:10:32  11       I think you could go ask people at a golf course,

03:10:35  12  do you like the 9th hole the way it bends to the left?

03:10:40  13  Because every golf course could be designed in a different

03:10:43  14  way.

03:10:43  15       But if you're talking about fundamentally removing

03:10:46  16  a core element, you know, I'm not sure that the survey --

03:10:51  17  you know, what would that be?  What would you ask them as

03:10:54  18  the alternative?  Not playing?  Well, then it's just,

03:10:57  19  what's the value of the game as a whole?

03:11:00  20  Q.  And, Dr. Becker, Mr. Dacus spent a lot of time talking

03:11:03  21  with you about the license in Japan, correct?

03:11:05  22  A.  Yes.

03:11:06  23  Q.  And their own expert -- Supercell's own expert agreed

03:11:10  24  with you that that license is not comparable, correct?

03:11:14  25  A.  That's true.  He -- it's not comparable, and so it's --

| | | |
|---|---|---|
| 03:11:18 | 1 | it's not relevant. |
| 03:11:19 | 2 | Q.  Great. |
| 03:11:20 | 3 | MS. LUDLAM:  I have no further questions, |
| 03:11:22 | 4 | Your Honor. |
| 03:11:22 | 5 | THE COURT:  All right.  Additional cross, |
| 03:11:23 | 6 | Mr. Dacus? |
| 03:11:24 | 7 | MR. DACUS:  Just a couple, Your Honor. |
| 03:11:24 | 8 | RECROSS-EXAMINATION |
| 03:11:33 | 9 | BY MR. DACUS: |
| 03:11:33 | 10 | Q.  You said, Dr. Becker, that Supercell has not removed |
| 03:11:38 | 11 | any of these features from its games? |
| 03:11:40 | 12 | A.  I'm not aware that they have. |
| 03:11:43 | 13 | Q.  You agree, sir, that if Supercell believes it does not |
| 03:11:45 | 14 | use these patented features, they should not have to remove |
| 03:11:48 | 15 | them?  They should be able to come to this jury and present |
| 03:11:52 | 16 | the facts and the evidence and let this jury determine |
| 03:11:56 | 17 | that; isn't that true? |
| 03:11:56 | 18 | A.  Well, they ultimately have the right to -- to get a |
| 03:11:59 | 19 | ruling from this jury on that, but as to the economic |
| 03:12:02 | 20 | question, if I'm evaluating -- like the -- one of the |
| 03:12:08 | 21 | pieces of math you took me to that's -- that if you blindly |
| 03:12:12 | 22 | do the math with all of the survey results, it suggests |
| 03:12:20 | 23 | that they would make more money if they took out this |
| 03:12:22 | 24 | feature we saw on the slide message as saying they thought |
| 03:12:25 | 25 | it was a pretty cool feature. |

03:12:27   1           Completely independent of this lawsuit, if that

03:12:30   2   were actually the case, it would be rational for them to

03:12:33   3   take the feature out and to have never put it in in the

03:12:37   4   first place.

03:12:37   5   Q.  And did I understand you to say, sir, when asked just

03:12:44   6   now, that you do not believe it is appropriate to conduct a

03:12:48   7   survey on the '137, '481, and '873 because they're core

03:12:52   8   features; is that what you just said?

03:12:54   9   A.  Not necessarily to appropriateness.  I just -- I think

03:12:57  10   the question was as -- as an economic matter, would I think

03:13:04  11   that a survey would be useful.  And I don't think it would

03:13:07  12   be.

03:13:07  13   Q.  Yet -- yet you use survey information to calculate the

03:13:11  14   percentages, correct?

03:13:13  15   A.  Well, I used things -- I used information from things

03:13:17  16   that I think are surveyable and used those as comparables

03:13:21  17   to value the core features.

03:13:24  18           MR. DACUS:  That's all I have, Your Honor.  I pass

03:13:25  19   the witness.

03:13:26  20           THE COURT:  Further direct?

03:13:27  21           MS. LUDLAM:  No further questions, Your Honor.

03:13:29  22           THE COURT:  All right.  You may step down,

03:13:30  23   Dr. Becker.

03:13:43  24           Plaintiffs, call your next witness.

03:13:45  25           MR. MOORE:  Your Honor, the Plaintiff rests its

| | | |
|---|---|---|
| 03:13:47 | 1 | case-in-chief. |
| 03:13:47 | 2 | THE COURT:  All right.  Ladies and gentlemen of |
| 03:13:50 | 3 | the jury, the Plaintiff has rested its case-in-chief. |
| 03:13:52 | 4 | We're going to use this as a good juncture to take |
| 03:13:58 | 5 | a recess.  After you return from recess, we'll proceed with |
| 03:14:02 | 6 | the Defendant's case-in-chief and have them call their |
| 03:14:05 | 7 | first witness. |
| 03:14:06 | 8 | Please follow all the instructions I've given you, |
| 03:14:10 | 9 | including not to talk about the case with each other. |
| 03:14:12 | 10 | Simply leave your notebooks in your chairs, leave them |
| 03:14:15 | 11 | closed in your chairs, if you will, and we'll have you back |
| 03:14:18 | 12 | in here shortly to continue with the Defendant's |
| 03:14:21 | 13 | case-in-chief. |
| 03:14:21 | 14 | The jury is excused for recess. |
| 03:14:27 | 15 | COURT SECURITY OFFICER:  All rise. |
| 03:14:32 | 16 | (Jury out.) |
| 03:14:32 | 17 | THE COURT:  Counsel, take five minutes for a |
| 03:14:49 | 18 | restroom break, and then see me in chambers about this |
| 03:14:53 | 19 | remaining issue concerning the objections to trial |
| 03:14:57 | 20 | depositions. |
| 03:14:57 | 21 | The Court stands in recess. |
| 03:15:00 | 22 | (Recess.) |
| 03:33:33 | 23 | (Jury out.) |
| 03:33:33 | 24 | COURT SECURITY OFFICER:  All rise. |
| 03:33:34 | 25 | THE COURT:  Be seated, please. |

| | | |
|---|---|---|
| 03:51:37 | 1 | Mr. Sacksteder, is the Defendant prepared to go |
| 03:51:48 | 2 | forward with its case-in-chief? |
| 03:51:50 | 3 | MR. SACKSTEDER:  We are, Your Honor. |
| 03:51:51 | 4 | THE COURT:  Let's bring in the jury, please. |
| 03:51:54 | 5 | COURT SECURITY OFFICER:  All rise. |
| 03:51:55 | 6 | (Jury in.) |
| 03:52:24 | 7 | THE COURT:  Please be seated. |
| 03:52:24 | 8 | Before we recessed for a brief break, ladies and |
| 03:52:35 | 9 | gentlemen, the Plaintiff rested its case-in-chief. |
| 03:52:37 | 10 | We'll now proceed with the Defendant's |
| 03:52:39 | 11 | case-in-chief. |
| 03:52:40 | 12 | Mr. Sacksteder, please call the Defendant's first |
| 03:52:43 | 13 | witness. |
| 03:52:44 | 14 | MR. SACKSTEDER:  Thank you, Your Honor.  Supercell |
| 03:52:45 | 15 | calls Greg Harper. |
| 03:52:46 | 16 | THE COURT:  All right.  If you'll come forward, |
| 03:52:50 | 17 | Mr. Harper, and be sworn.  Doesn't matter how you get |
| 03:53:04 | 18 | there. |
| 03:53:05 | 19 | (Witness sworn.) |
| 03:53:13 | 20 | THE COURT:  Please come around this way, and have |
| 03:53:15 | 21 | a seat on the witness stand. |
| 03:53:28 | 22 | All right.  Counsel, you may proceed with your |
| 03:53:31 | 23 | direct examination. |
| 03:53:33 | 24 | MR. SACKSTEDER:  Thank you, Your Honor. |
| 03:53:33 | 25 | GREG HARPER, DEFENDANT'S WITNESS |

DIRECT EXAMINATION

BY MR. SACKSTEDER:

Q.  Good afternoon, Mr. Harper.

A.  Good afternoon.

Q.  Would you please introduce yourself to the jury?

A.  Hi.  My name is Gregory Kent Harper.

Q.  Will you tell the jury a little bit about yourself?

A.  So I've been in the Bay Area for a little over 30 years, and I've spent 25 of those 30 years working in the games industry.  I live just north of San Francisco.

        I have a daughter named Delilah, who next week turns 10; and a son, Graham, who is 6.

Q.  Where do you work?

A.  I work at Supercell.

Q.  How long have you worked at Supercell?

A.  Been there a little over eight years.  Started in January 2012.

Q.  What's your role at Supercell?

A.  I'm the general manager.  I also sit on our board of directors and am part of our leadership team.

Q.  Where is your office?

A.  San Francisco.

Q.  And is that the same office that Mr. Ostler works in?

A.  It is.

Q.  Can you tell us your background of what you did before

03:54:36  1   you worked for Supercell?

03:54:37  2   A.   So since the age of 15, I've been starting companies.

03:54:47  3   I've started about 11 of them.  Nine of them have failed.

03:54:50  4   And I am part of seven other game companies and consulted

03:54:53  5   for numerous companies.

03:54:54  6   Q.   You're on the leadership team at Supercell?

03:54:57  7   A.   Correct.

03:54:57  8   Q.   What is that?

03:54:58  9   A.   So the leadership team is essentially our management

03:55:01  10  team.  It consists of three of us:  myself; Ilkka Paananen,

03:55:09  11  our CEO; and Janne Snellman, our CFO and COO.

03:55:09  12         THE COURT:  Mr. Harper, pull that microphone a

03:55:11  13  little closer to you, please, sir.

03:55:13  14         THE WITNESS:  Sure.

03:55:13  15         THE COURT:  Thank you.

03:55:16  16  Q.   (By Mr. Sacksteder)  I need to take you through a

03:55:18  17  little bit of the alphabet soup, if you can let me do that.

03:55:21  18  Is that okay?  You said CEO.  What is the CEO?

03:55:25  19  A.   Chief executive officer.

03:55:28  20  Q.   And then there's someone who is both CFO and COO.  What

03:55:33  21  do those folks do?

03:55:34  22  A.   Chief financial officer and chief operating officer.

03:55:38  23         MR. SACKSTEDER:  Can we, Mr. Smith, look at

03:55:41  24  DX-1190, Page 12, please?

03:55:43  25  Q.   (By Mr. Sacksteder)  Can you walk the jury through the

| 03:55:46 | 1 | typical structure for a game company's organization? |
| 03:55:51 | 2 | A.  So this is an organization structure where you have the |
| 03:55:57 | 3 | CEO and the executive team at the top, where most of the |
| 03:56:02 | 4 | power and decision-making is concentrated.  And everybody |
| 03:56:06 | 5 | else is below, usually having to go through approval |
| 03:56:12 | 6 | processes to get their work and ideas passed. |
| 03:56:14 | 7 | Q.  What's the little light bulb at the top? |
| 03:56:17 | 8 | A.  That is meant to represent where the big ideas come |
| 03:56:21 | 9 | from. |
| 03:56:22 | 10 | MR. SACKSTEDER:  Can we see Page 14, Mr. Smith? |
| 03:56:24 | 11 | Q.  (By Mr. Sacksteder)  What are we looking at now? |
| 03:56:30 | 12 | A.  So this is really our view of how the org structure |
| 03:56:37 | 13 | works at Supercell where the big ideas and the |
| 03:56:40 | 14 | decision-making happens within the game teams. |
| 03:56:44 | 15 | And the leadership team, including myself, is here |
| 03:56:47 | 16 | at the bottom.  And our main role is simply to support |
| 03:56:50 | 17 | those teams. |
| 03:56:51 | 18 | Q.  What's the purpose of doing it that way? |
| 03:56:53 | 19 | A.  We believe that this is -- allows us to attract the |
| 03:56:59 | 20 | best talent, because this is the kind of environment where |
| 03:57:02 | 21 | they want to work, where they have that control and ability |
| 03:57:04 | 22 | and where their ideas are respected and they're |
| 03:57:09 | 23 | independent. |
| 03:57:09 | 24 | Q.  Does Supercell have a mission statement? |
| 03:57:10 | 25 | A.  We do.  We refer to it as our dream, but it is to |

| | | |
|---|---|---|
| 03:57:17 | 1 | create great games that are played by as many people as |
| 03:57:22 | 2 | possible for years and years and remembered forever. |
| 03:57:25 | 3 | Q.  Has Supercell fulfilled that dream, as you called it? |
| 03:57:29 | 4 | A.  Well, we take a very long view of that dream.  And |
| 03:57:33 | 5 | while even today we have millions of people playing our |
| 03:57:37 | 6 | first two games, Clash of Clans and Hay Day, a full eight |
| 03:57:43 | 7 | years later, we still think it's very, very early in that |
| 03:57:46 | 8 | journey, but we're still working on it.  But so far, so |
| 03:57:51 | 9 | good. |
| 03:57:51 | 10 | Q.  How did you come to join Supercell? |
| 03:57:55 | 11 | A.  I was introduced to Ilkka, our CEO, in the fall of 2011 |
| 03:57:59 | 12 | by a recruiter and was initially attracted to the boldness |
| 03:58:03 | 13 | of their vision, as well as this idea of creating a |
| 03:58:05 | 14 | different kind of company where culture was at the heart of |
| 03:58:08 | 15 | the company.  And they wanted to do things differently. |
| 03:58:14 | 16 | Q.  When was Supercell founded? |
| 03:58:16 | 17 | A.  The company was founded in May of 2010. |
| 03:58:21 | 18 |       MR. SACKSTEDER:  Can we look at DX-1190, Page 6, |
| 03:58:25 | 19 | please, Mr. Smith? |
| 03:58:27 | 20 | Q.  (By Mr. Sacksteder)  What are we seeing on the screen |
| 03:58:29 | 21 | here, Mr. Harper? |
| 03:58:29 | 22 | A.  This is a photo of our very first office. |
| 03:58:32 | 23 | Q.  Can you describe it a little bit? |
| 03:58:34 | 24 | A.  It's very small and pretty much representative of the |
| 03:58:44 | 25 | scrappy new start-up. |

03:58:45   1   Q.  And this was 2010?

03:58:46   2   A.  2010, yes.

03:58:48   3          MR. SACKSTEDER:  And can we look at Page 8,

03:58:50   4   please?

03:58:50   5   Q.  (By Mr. Sacksteder)  Who's the guy working on the

03:59:00   6   cardboard box?

03:59:00   7   A.  So this is Ilkka, our CEO.  And when we added some more

03:59:05   8   people and outgrew that small room we were in, he decided

03:59:09   9   that he would be the one to move out first.  And so he's --

03:59:14  10   this is him in the hall working at his new office setup so

03:59:19  11   that he could allow the other folks to focus on the games

03:59:23  12   and what's important.

03:59:26  13          THE COURT:  Let me ask -- let me ask you this,

03:59:27  14   Mr. Harper.  What is the gentleman's full name?

03:59:31  15          THE WITNESS:  Ilkka Paananen.

03:59:33  16          THE COURT:  Okay.  If you would, let's not refer

03:59:35  17   to him by first name only.  Please refer to him as whatever

03:59:35  18   his last name is or both names, but not first name only,

03:59:43  19   okay?

03:59:43  20          THE WITNESS:  Yes, sir.

03:59:43  21          THE COURT:  All right.  Let's continue.

03:59:45  22   Q.  (By Mr. Sacksteder)  What was Supercell's original

03:59:48  23   product strategy?

03:59:49  24   A.  So at the start, our original project strategy was to

03:59:49  25   focus on social, multiplayer games that were being played

| | | |
|---|---|---|
| 03:59:56 | 1 | across multiple platforms starting with Facebook. |
| 03:59:57 | 2 | Q.  Did that strategy change at some point? |
| 04:00:00 | 3 | A.  It did, about a year later. |
| 04:00:01 | 4 | Q.  What happened? |
| 04:00:02 | 5 | A.  Well, we had moderate success with that strategy, and |
| 04:00:06 | 6 | then in mid-2011, we became fascinated with tablets and |
| 04:00:13 | 7 | iPads and the opportunity there.  We saw the iPad as sort |
| 04:00:18 | 8 | of the ultimate games platform and shifted strategy to |
| 04:00:22 | 9 | focus entirely on that. |
| 04:00:24 | 10 | Q.  Would that be mobile games? |
| 04:00:25 | 11 | A.  Correct. |
| 04:00:27 | 12 | Q.  What was the first mobile game that Supercell released? |
| 04:00:31 | 13 | A.  So in June of 2012, we launched Hay Day, our first |
| 04:00:37 | 14 | game. |
| 04:00:37 | 15 |          MR. SACKSTEDER:  Can we see DM 12, Page 2, please, |
| 04:00:43 | 16 | Mr. Smith? |
| 04:00:43 | 17 | Q.  (By Mr. Sacksteder)  What is Hay Day? |
| 04:00:45 | 18 | A.  Hay Day is a farming simulation game. |
| 04:00:48 | 19 | Q.  And what do the players do in Hay Day? |
| 04:00:51 | 20 | A.  They tend to their farm and grow their farm. |
| 04:00:57 | 21 | Q.  Hay Day is still around? |
| 04:00:58 | 22 | A.  It is. |
| 04:00:59 | 23 | Q.  And what was the next game that Supercell released? |
| 04:01:02 | 24 | A.  So two months later, in August, we released Clash of |
| 04:01:07 | 25 | Clans. |

04:01:07   1   Q.  What does Supercell, the name, refer to?

04:01:11   2   A.  So at the core of our company, we believe in small

04:01:15   3   independent teams, or as we refer to them, as cells, and so

04:01:20   4   the company is the Supercell.

04:01:23   5           MR. SACKSTEDER:  Can we look at DX-1190, Page 15,

04:01:26   6   please, Mr. Smith?

04:01:28   7   Q.  (By Mr. Sacksteder)  What are the values that the team

04:01:34   8   members at Supercell strive for?

04:01:37   9   A.  So this -- this picture here represents those four core

04:01:42   10  values for us.  It's independence, quality, responsibility,

04:01:46   11  and learning.

04:01:50   12          And so underneath all that is a foundation of the

04:01:53   13  sense of trust.  And when all those things come together

04:01:56   14  and work well at the company, we see considerable impact

04:01:59   15  for the business.

04:02:01   16  Q.  And how has the company grown?

04:02:05   17  A.  So we are now about 320 people across four offices, and

04:02:12   18  we have five live games operating in the market today.

04:02:16   19  Q.  So 320 Supercellians?

04:02:21   20  A.  That's what we refer to ourselves as, yes.

04:02:23   21  Q.  Is that how you pronounce it?

04:02:25   22  A.  Yes.

04:02:26   23  Q.  All right.  Thank you.

04:02:28   24          Has -- having this company this size, how has that

04:02:35   25  affected the culture of the company?

04:02:36  1    A.  We have grown very slow, so it's been important for us

04:02:41  2    to preserve the culture as we grow.

04:02:44  3            So far, I'd say we've been able to maintain that

04:02:49  4    culture throughout our growth.

04:02:51  5            MR. SACKSTEDER:  Can we see the next slide,

04:02:53  6    Mr. Smith?

04:02:54  7    Q.  (By Mr. Sacksteder)  Those are the game -- strike that.

04:02:57  8            What are we looking at on the screen?

04:02:59  9    A.  These are the five live games that are in the market

04:03:02  10   today.

04:03:02  11   Q.  What are those five games?

04:03:05  12   A.  So our first one was Hay Day, followed by Clash of

04:03:08  13   Clans, and then we released Boom Beach.  After Boom was

04:03:14  14   Clash Royale and most recently Brawl Stars.

04:03:16  15   Q.  Beyond the games that we're looking at on the screen,

04:03:19  16   are there any other games that have been developed by

04:03:21  17   Supercell?

04:03:21  18   A.  We have developed several other games.

04:03:23  19   Q.  Have they been released?

04:03:25  20   A.  No, we decided not to release them.

04:03:27  21   Q.  Why not?

04:03:28  22   A.  So in the end, we decided -- and the teams themselves

04:03:34  23   make the decision -- that the games would not align with

04:03:37  24   our vision of a game that would be played for years and

04:03:39  25   years and remembered forever.

04:03:43  1   Q.   How does Supercell view competition?

04:03:46  2   A.   I think like most people in the industry, we subscribe

04:03:49  3   to services that provide industry research and reports.

04:03:56  4   But, generally, we don't look at other companies.  We tend

04:03:59  5   to focus just inwardly and try to figure out what we can do

04:04:05  6   to make ourselves better and improve.  So it's really

04:04:08  7   internal.

04:04:09  8   Q.   Before this case, were you aware of GREE?

04:04:11  9   A.   I was.

04:04:12  10  Q.   Have you ever met with anybody at GREE?

04:04:14  11  A.   I did.

04:04:15  12  Q.   Can you tell the jury the circumstances?

04:04:17  13  A.   In 2013, we took a trip to Japan to evaluate whether we

04:04:21  14  should enter the market there, and we met with several

04:04:25  15  companies, including GREE.

04:04:27  16  Q.   And why did you meet with GREE?

04:04:28  17  A.   We tried to meet with as many companies as possible

04:04:32  18  during the week we were there, to help us evaluate the

04:04:36  19  market.

04:04:36  20  Q.   Did GREE offer a distribution platform at that time?

04:04:39  21  A.   They did.

04:04:42  22  Q.   And what is a distribution platform?

04:04:44  23  A.   It's a place where you can distribute your games to

04:04:49  24  players.

04:04:51  25  Q.   What did Supercell decide to do after making that trip

| | | |
|---|---|---|
| 04:04:54 | 1 | to Japan you referred to? |
| 04:04:56 | 2 | A.  In the end, we did decide to enter the market.  We |
| 04:04:59 | 3 | concluded that we did not need to change our games.  They |
| 04:05:04 | 4 | could be released as-is.  And we decided to distribute them |
| 04:05:12 | 5 | through our existing partnership with Apple and Google. |
| 04:05:16 | 6 | Q.  So are those also distribution platforms? |
| 04:05:20 | 7 | A.  They are. |
| 04:05:20 | 8 | Q.  After the first set of meetings, did Supercell have any |
| 04:05:25 | 9 | more contact with GREE? |
| 04:05:25 | 10 | A.  We had some follow-up exchanges, but I don't believe it |
| 04:05:29 | 11 | went anywhere. |
| 04:05:29 | 12 | Q.  Have you ever heard of a company called Funzio? |
| 04:05:34 | 13 | A.  I have. |
| 04:05:35 | 14 | Q.  Have you ever met with anybody at Funzio? |
| 04:05:38 | 15 | A.  We met with the founders of Funzio. |
| 04:05:41 | 16 | Q.  Why? |
| 04:05:42 | 17 | A.  So in the early days, before we were launching our |
| 04:05:47 | 18 | games, we met with them.  And they were gracious enough to |
| 04:05:51 | 19 | share some of their learnings from their launches, and so |
| 04:05:57 | 20 | they helped us there. |
| 04:05:58 | 21 | Q.  Do you have any understanding of whether there's a |
| 04:06:00 | 22 | relationship now between Funzio and GREE? |
| 04:06:04 | 23 | A.  My understanding is that GREE had acquired Funzio. |
| 04:06:10 | 24 | Q.  Has Supercell ever tracked or monitored GREE's patents, |
| 04:06:14 | 25 | to your knowledge? |

| | | |
|---|---|---|
| 04:06:14 | 1 | A.  Not to my knowledge. |
| 04:06:15 | 2 | Q.  What are Supercell's thoughts on patents in general? |
| 04:06:17 | 3 | A.  We respect patents and the key role they play in |
| 04:06:23 | 4 | inventions. |
| 04:06:24 | 5 | MR. SACKSTEDER:  Mr. Smith, can we look at PX-480, |
| 04:06:29 | 6 | please? |
| 04:06:31 | 7 | Q.  (By Mr. Sacksteder)  You testified that you're a member |
| 04:06:33 | 8 | of the board of directors at Supercell, correct? |
| 04:06:35 | 9 | A.  Correct. |
| 04:06:35 | 10 | Q.  Were you aware of a license agreement between GREE and |
| 04:06:39 | 11 | Supercell? |
| 04:06:39 | 12 | A.  Yes. |
| 04:06:40 | 13 | Q.  And are we looking at that agreement on the screen? |
| 04:06:43 | 14 | A.  Yes. |
| 04:06:43 | 15 | Q.  How did you become aware of that agreement? |
| 04:06:46 | 16 | A.  It was brought before the board for approval. |
| 04:06:50 | 17 | Q.  Why did the board approve the license agreement? |
| 04:06:53 | 18 | A.  The board approved because we made the decision that it |
| 04:07:02 | 19 | was better to resolve this now than to have it continue and |
| 04:07:06 | 20 | be this potentially more costly thing that distracted us |
| 04:07:12 | 21 | from our core business. |
| 04:07:14 | 22 | Q.  Is this case important to Supercell? |
| 04:07:16 | 23 | A.  It's very important to us. |
| 04:07:18 | 24 | Q.  Why? |
| 04:07:19 | 25 | A.  Well, for two -- two reasons, really.  We're very proud |

| | | |
|---|---|---|
| 04:07:24 | 1 | of our -- our people and our -- our games, and we don't |
| 04:07:29 | 2 | believe we've done anything wrong here.  And we're |
| 04:07:33 | 3 | confident that in a trial before a jury in the United |
| 04:07:40 | 4 | States, that will be proven true. |
| 04:07:43 | 5 | Q.  Thank you, Mr. Harper. |
| 04:07:47 | 6 | MR. SACKSTEDER:  I'll pass the witness. |
| 04:07:48 | 7 | THE COURT:  Cross-examination by the Plaintiff. |
| 04:07:50 | 8 | MR. MOORE:  Thank you, Your Honor. |
| 04:08:01 | 9 | THE COURT:  Are there binders to distribute for |
| 04:08:03 | 10 | this witness, Mr. Moore? |
| 04:08:04 | 11 | MR. MOORE:  I'm sorry.  There are.  Thank you for |
| 04:08:05 | 12 | the reminder, Your Honor. |
| 04:08:20 | 13 | MS. SMITH:  May I approach, Your Honor? |
| 04:08:21 | 14 | THE COURT:  You may. |
| 04:08:32 | 15 | All right.  Whenever you're ready, you may proceed |
| 04:08:37 | 16 | with cross-examination, Mr. Moore. |
| 04:08:39 | 17 | MR. MOORE:  Thank you, Your Honor. |
| 04:08:39 | 18 | CROSS-EXAMINATION |
| 04:08:39 | 19 | BY MR. MOORE: |
| 04:08:39 | 20 | Q.  Good afternoon, Mr. Harper. |
| 04:08:42 | 21 | A.  Good afternoon. |
| 04:08:42 | 22 | Q.  I'm Steve Moore.  We met at your depositions, correct? |
| 04:08:46 | 23 | A.  Correct. |
| 04:08:47 | 24 | Q.  All right.  And I'm going to ask you a few questions, |
| 04:08:49 | 25 | okay? |

04:08:50   1           Now, you are not here as Supercell's corporate

04:08:54   2   representative at this trial, right?

04:08:56   3   A.  Right, correct.

04:08:56   4   Q.  You haven't been here the whole trial?

04:08:59   5   A.  Correct.

04:08:59   6   Q.  In fact, Mr. Ostler here sitting at counsel table is

04:09:04   7   Supercell's corporate representative for the trial,

04:09:06   8   correct?

04:09:06   9   A.  Correct.

04:09:06  10   Q.  And as I believe, his job is in marketing and financing

04:09:10  11   with the U.S. business unit of Supercell; is that right?

04:09:13  12   A.  He wears many -- many hats at Supercell, including

04:09:18  13   those that you mentioned.

04:09:19  14   Q.  Okay.  And he reports to you as a general manager of

04:09:22  15   that business?

04:09:23  16   A.  Yes.

04:09:23  17   Q.  All right.  Now, in your direct examination with

04:09:26  18   Mr. Sacksteder, you didn't testify about whether Supercell

04:09:30  19   infringes the GREE patents, correct?

04:09:33  20   A.  Correct.

04:09:34  21   Q.  And you didn't testify about whether the GREE patents

04:09:37  22   are valid, correct?

04:09:39  23   A.  Correct.

04:09:40  24   Q.  And --

04:09:42  25           THE COURT:  Wait a minute, Mr. Harper.  You're

| | | |
|---|---|---|
| 04:09:44 | 1 | going to need to speak up.  I can barely hear you, and I'm |
| 04:09:48 | 2 | six feet away from you. |
| 04:09:50 | 3 | THE WITNESS:  Correct. |
| 04:09:50 | 4 | THE COURT:  Go ahead, counsel. |
| 04:09:54 | 5 | MR. MOORE:  Thank you, Your Honor. |
| 04:09:56 | 6 | Q.  (By Mr. Moore)  And you understand that if this jury |
| 04:09:56 | 7 | finds that GREE's patents are valid and infringed, that |
| 04:09:56 | 8 | Supercell then must pay GREE a reasonable royalty, correct? |
| 04:10:00 | 9 | A.  I don't know specifically how it works, but -- |
| 04:10:06 | 10 | Q.  All right.  But in your direct examination, you didn't |
| 04:10:08 | 11 | say what amount of money Supercell would owe if it is found |
| 04:10:14 | 12 | to infringe GREE's patents, right? |
| 04:10:17 | 13 | A.  Right. |
| 04:10:17 | 14 | Q.  Now, Supercell has been successful, hasn't it? |
| 04:10:20 | 15 | A.  Yes. |
| 04:10:20 | 16 | Q.  And it makes more money than GREE does in the United |
| 04:10:23 | 17 | States, right? |
| 04:10:23 | 18 | A.  I don't know how much money GREE makes in the United |
| 04:10:27 | 19 | States. |
| 04:10:27 | 20 | Q.  It has more hit games than GREE in the United States? |
| 04:10:32 | 21 | A.  Yes, it does. |
| 04:10:33 | 22 | Q.  But being more successful is not a defense to patent |
| 04:10:36 | 23 | infringement, is it, Mr. Harper? |
| 04:10:40 | 24 | A.  I don't know. |
| 04:10:42 | 25 | Q.  Now, in addition to being on the board of directors for |

04:10:47   1   Supercell, you are also the general manager of Supercell's

04:10:51   2   United States and other international offices, correct?

04:10:55   3   A.   Correct.

04:10:56   4   Q.   And the headquarters of Supercell is located in

04:10:59   5   Helsinki, Finland, correct?

04:11:00   6   A.   Correct.

04:11:01   7   Q.   And -- and Helsinki is where the company was originally

04:11:07   8   founded by Mr. Paananen at that office that you showed; is

04:11:12   9   that right?

04:11:12  10   A.   There were six founders, but it was founded there in

04:11:17  11   Helsinki, correct?

04:11:18  12   Q.   And he was one of those six, correct?

04:11:20  13   A.   Correct.

04:11:20  14   Q.   All right.  And you opened the United States office for

04:11:23  15   Supercell in 2012, correct?

04:11:26  16   A.   Correct.

04:11:26  17   Q.   And that was also the same year that Supercell launched

04:11:28  18   its first mobile game, right?

04:11:30  19   A.   Correct.

04:11:30  20        MR. MOORE:  Can we pull up Slide No. 4 for

04:11:34  21   Mr. Harper's slides, please?

04:11:35  22   Q.   (By Mr. Moore)  And I'm going to show you a slide that

04:11:37  23   your counsel showed you in a moment here.

04:11:48  24        MR. MOORE:  Okay.  We're having trouble getting

04:11:50  25   that up.  I'll proceed without it.

| | | |
|---|---|---|
| 04:11:54 | 1 | Q. (By Mr. Moore)  Do you recall the slide that had the |
| 04:11:54 | 2 | big group of people, and it said that there were 320 |
| 04:11:57 | 3 | Supercellians, correct? |
| 04:11:57 | 4 | A. Yes, I do. |
| 04:11:57 | 5 | Q. But Supercell is not publicly owned, is it? |
| 04:12:00 | 6 | A. No. |
| 04:12:00 | 7 | Q. You didn't tell the jury that the majority owner of |
| 04:12:02 | 8 | Supercell is a company called Tencent, correct? |
| 04:12:06 | 9 | A. Correct. |
| 04:12:07 | 10 | Q. And, in fact, Tencent, that's a very large overseas |
| 04:12:13 | 11 | conglomerate; is that right? |
| 04:12:16 | 12 | A. That's right. |
| 04:12:16 | 13 | Q. They have interests in media gaming, social media, |
| 04:12:22 | 14 | correct? |
| 04:12:22 | 15 | A. Correct. |
| 04:12:23 | 16 | Q. All right.  And, in fact, you're one of five members of |
| 04:12:27 | 17 | the board of directors at Supercell, right? |
| 04:12:29 | 18 | A. Correct. |
| 04:12:31 | 19 | Q. Super -- sorry, Tencent, has three of those five seats, |
| 04:12:38 | 20 | correct? |
| 04:12:38 | 21 | A. That's right. |
| 04:12:38 | 22 | Q. The other two are you and Mr. Paananen, the CEO, right? |
| 04:12:44 | 23 | A. Yes. |
| 04:12:44 | 24 | Q. So in a disputed vote, Tencent would win, right? |
| 04:12:48 | 25 | A. Correct. |

843

| | | |
|---|---|---|
| 04:12:49 | 1 | Q.  Now, how many employees does Tencent have? |
| 04:12:54 | 2 | A.  I don't know. |
| 04:12:54 | 3 | Q.  Would it surprise you that it has more than 60,000 |
| 04:12:59 | 4 | employees? |
| 04:12:59 | 5 | A.  No. |
| 04:13:00 | 6 | Q.  All right.  You personally have never designed a video |
| 04:13:03 | 7 | game, have you? |
| 04:13:04 | 8 | A.  No. |
| 04:13:04 | 9 | Q.  You've never written code for a game? |
| 04:13:07 | 10 | A.  No. |
| 04:13:07 | 11 | Q.  And you don't know how to write code for a game, right? |
| 04:13:10 | 12 | A.  No, I do not. |
| 04:13:11 | 13 | Q.  You also don't read source code, do you? |
| 04:13:15 | 14 | A.  No. |
| 04:13:15 | 15 | Q.  So you didn't do any design or development work for the |
| 04:13:19 | 16 | three games at issue in this case, Clash of Clans, Clash |
| 04:13:23 | 17 | Royale and Brawl Stars, correct? |
| 04:13:25 | 18 | A.  No, I did not. |
| 04:13:26 | 19 | Q.  And you're not here to give the jury any specific |
| 04:13:28 | 20 | details about how those games work, are you? |
| 04:13:30 | 21 | A.  No, I'm not. |
| 04:13:31 | 22 | Q.  You didn't talk about any source code in your direct |
| 04:13:34 | 23 | examination, right? |
| 04:13:35 | 24 | A.  No. |
| 04:13:35 | 25 | Q.  So, for example, you're not able to tell this jury any |

844

| | | |
|---|---|---|
| 04:13:38 | 1 | of the details for how the Elixir feature works in Clash |
| 04:13:42 | 2 | Royale? |
| 04:13:42 | 3 | A.  No. |
| 04:13:42 | 4 | Q.  Nor can you tell them about how the donation and |
| 04:13:45 | 5 | upgrade features work in Clash Royale, correct? |
| 04:13:47 | 6 | A.  No. |
| 04:13:48 | 7 | Q.  In fact, you don't really even play Supercell games |
| 04:13:51 | 8 | anymore, do you? |
| 04:13:52 | 9 | A.  Not the live games, no. |
| 04:13:54 | 10 | Q.  Not the ones you've actually released, the five that |
| 04:13:58 | 11 | you talked about on direct? |
| 04:14:00 | 12 | A.  Correct. |
| 04:14:00 | 13 | Q.  All right.  You did talk about, though, GREE.  And GREE |
| 04:14:04 | 14 | is well-known in the gaming industry, right? |
| 04:14:06 | 15 | A.  Relatively. |
| 04:14:08 | 16 | Q.  Okay.  And GREE has been in the space for many years, |
| 04:14:11 | 17 | haven't they? |
| 04:14:11 | 18 | A.  Yes, they have. |
| 04:14:13 | 19 | Q.  You know an individual named Andrew Sheppard? |
| 04:14:16 | 20 | A.  I know Andrew, yes. |
| 04:14:18 | 21 | Q.  And he was previously the CEO of GREE's United States |
| 04:14:21 | 22 | subsidiary, right? |
| 04:14:22 | 23 | A.  I don't recall. |
| 04:14:24 | 24 | Q.  Well, in any event, he's been in the gaming industry a |
| 04:14:27 | 25 | long time? |

845

04:14:28    1   A.   That's right.

04:14:28    2   Q.   And you believe he has a good reputation in the

04:14:32    3   industry?

04:14:32    4   A.   He does.

04:14:33    5   Q.   And he's someone who is passionate about games?

04:14:36    6   A.   Yes.

04:14:36    7   Q.   And you've never heard anything negative about him,

04:14:40    8   have you?

04:14:40    9   A.   No.

04:14:40   10   Q.   Do you know Mr. Eiji Araki, who is sitting here at

04:14:44   11   counsel table for GREE?

04:14:47   12   A.   I do not.

04:14:47   13   Q.   All right.  Do you have a binder there in front of you?

04:14:51   14   A.   Yes.

04:14:51   15   Q.   Would you please turn to the tab that is PTX-607?

04:14:56   16        MR. MOORE:  And thank you, Mr. Groat.  If we could

04:15:00   17   blow this up, please?

04:15:03   18   Q.   (By Mr. Moore)  All right.  This is an email that you

04:15:06   19   sent in September of 2012 to the CEO, Mr. Paananen and

04:15:11   20   others at Supercell, correct?

04:15:13   21   A.   Correct.

04:15:14   22   Q.   And you say in the email -- well, first of all, you're

04:15:19   23   forwarding something called inside mobile apps, right?

04:15:23   24   A.   Yes.

04:15:23   25   Q.   And in the first line of the email you say:  See

| | | |
|---|---|---|
| 04:15:28 | 1 | comments highlighted in red for quick scan, correct? |
| 04:15:31 | 2 | A.  Yes. |
| 04:15:32 | 3 | MR. MOORE:  And so could we -- could we show the |
| 04:15:34 | 4 | whole page, please, Mr. Groat?  No, go ahead and blow up |
| 04:15:37 | 5 | the bottom half, please, including the title of the |
| 04:15:40 | 6 | article. |
| 04:15:43 | 7 | Q.  (By Mr. Moore)  So what you forwarded to the CEO and |
| 04:15:49 | 8 | others at Supercell is an interview that was published in |
| 04:15:51 | 9 | an article, correct? |
| 04:15:51 | 10 | A.  Correct. |
| 04:15:52 | 11 | Q.  And the title of the article is GREE's Eiji Araki on |
| 04:15:57 | 12 | monetization, Japanese versus Western players, and what |
| 04:16:01 | 13 | makes successful social games, correct? |
| 04:16:04 | 14 | A.  Correct. |
| 04:16:04 | 15 | Q.  And that's the same Mr. Araki that's sitting here in |
| 04:16:07 | 16 | the courtroom? |
| 04:16:07 | 17 | A.  I don't know. |
| 04:16:08 | 18 | Q.  All right.  The last sentence on the first page |
| 04:16:10 | 19 | reads -- of the article reads:  We recently sat down with |
| 04:16:14 | 20 | Eiji Araki, GREE International's senior vice president of |
| 04:16:22 | 21 | social games, to find out how Japanese companies are able |
| 04:16:25 | 22 | to make the most lucrative mobile-social games in the |
| 04:16:29 | 23 | world, and how GREE plans to bring its Japanese gaming |
| 04:16:32 | 24 | expertise to North America. |
| 04:16:34 | 25 | Do you see that? |

847

04:16:34    1    A.   I do.

04:16:35    2           MR. MOORE:   All right.   Could we go ahead and take

04:16:37    3    down the blow-out, Mr. Groat?   And flip forward through the

04:16:41    4    article, please, Mr. Groat.

04:16:43    5    Q.   (By Mr. Moore)   And you're welcome to do the same in

04:16:46    6    your binder.   And the rest of the article is an interview

04:16:50    7    by this publication with Mr. Araki where he's answering

04:16:50    8    questions about GREE and its social mobile games, correct?

04:16:55    9    A.   Correct.

04:16:56   10           MR. MOORE:   All right.   Now, could you go back to

04:16:58   11    the first page, please, Mr. Groat?   Again, blow up the top.

04:17:01   12    Q.   (By Mr. Moore)   Where you said see comments highlighted

04:17:05   13    in red for the quick scan?   All right.   Could we go --  do

04:17:05   14    you see that, sir?

04:17:06   15    A.   Yes, I do.

04:17:07   16    Q.   Thank you.

04:17:08   17           MR. MOORE:   And can you go, please, to the second

04:17:12   18    page now of PTX-607, and blow up that answer right there,

04:17:16   19    the question and answer right there where your cursor is at

04:17:20   20    the top, please, Mr. Groat?   All the way to the top.   Thank

04:17:26   21    you.   Right there.

04:17:27   22    Q.   (By Mr. Moore)   And one of the things you highlighted

04:17:28   23    in red was part of Mr. Araki's answer to the question, what

04:17:33   24    do you think makes social games so successful, social and

04:17:38   25    profitable in Japan?   Do you see that?

04:17:40   1   A.   I do.

04:17:40   2   Q.   And the statement you highlighted in red and shared

04:17:43   3   with the CEO and others at Supercell was:  Not just gifting

04:17:48   4   or adding friends but competing or cooperating to achieve a

04:17:51   5   common goal.  I believe deeply connected social features

04:17:54   6   encourage the player to continue to play with their friends

04:17:56   7   and pay money to compete against other players or help

04:18:00   8   their friends.

04:18:01   9         You highlight that -- those sentences, correct?

04:18:03   10  A.   I did.

04:18:04   11  Q.   You see the word "gifting" in in that sentence?

04:18:07   12  A.   I do.

04:18:08   13  Q.   And then in the next paragraph?

04:18:10   14         MR. MOORE:  If you could -- you could go to the

04:18:11   15  next paragraph.

04:18:12   16  Q.   (By Mr. Moore)  You highlighted a sentence that says:

04:18:15   17  Japanese mobile-social games are much more advanced in

04:18:19   18  terms of how they integrate social features.

04:18:23   19         Correct?

04:18:23   20  A.   Correct.

04:18:24   21  Q.   And you highlighted that for the CEO and others at

04:18:27   22  Supercell?

04:18:27   23  A.   Right.

04:18:27   24  Q.   All right.  Let's go back to the first page, please.

04:18:28   25         And your comment below the one we highlighted

04:18:31   1   says:  It's all about social when it comes to LTV.

04:18:35   2       Is that right?

04:18:36   3   A.  That's right.

04:18:37   4   Q.  And LTV stands for lifetime value?

04:18:40   5   A.  It does.

04:18:40   6   Q.  And what lifetime value is, is the measure of value of

04:18:44   7   a player -- of a game player to a company over the lifespan

04:18:45   8   that the player is with the company, correct?

04:18:48   9   A.  That's correct.

04:18:49   10   Q.  In other words, the total amount of money the player

04:18:52   11   spends the entire time they're playing the games of that

04:18:55   12   company, right?

04:18:56   13   A.  Well, there are a lot of different ways you can

04:18:58   14   calculate LTV, but that is one of them.

04:19:00   15   Q.  Okay.  But you wrote these words in an email to the CEO

04:19:03   16   and others at Supercell and hit send, right?

04:19:07   17   A.  I did.

04:19:09   18   Q.  Now, that's not the first time that someone from

04:19:12   19   Supercell noticed an article about GREE, is it?

04:19:15   20   A.  I don't -- don't recall.

04:19:18   21   Q.  Would you please turn to the tab marked PTX-637 in your

04:19:24   22   binder?

04:19:25   23       MR. MOORE:  And, Mr. Groat, if we could put that

04:19:28   24   up on the screen, please?

04:19:29   25       THE COURT:  And, Mr. Moore, could you slow down

| | | |
|---|---|---|
| 04:19:32 | 1 | just a little bit? |
| 04:19:32 | 2 | MR. MOORE:  I will do that.  Thank you, |
| 04:19:32 | 3 | Your Honor. |
| 04:19:35 | 4 | THE COURT:  All right. |
| 04:19:35 | 5 | A.  What was the tab? |
| 04:19:37 | 6 | Q.  (By Mr. Moore)  637. |
| 04:19:57 | 7 | A.  Okay. |
| 04:19:57 | 8 | Q.  Now, this is an email you received from Mr. Paananen, |
| 04:20:00 | 9 | the CEO, correct? |
| 04:20:02 | 10 | A.  Correct. |
| 04:20:02 | 11 | Q.  And the subject of the article is -- of the email is: |
| 04:20:07 | 12 | Terrific article on GREE and the market in general. |
| 04:20:10 | 13 | Correct? |
| 04:20:10 | 14 | A.  Oh, I'm sorry, I'm looking at the wrong one. |
| 04:20:18 | 15 | Q.  Sure.  It's 637.  It's also on the screen. |
| 04:20:22 | 16 | A.  Okay.  I have it.  Yes. |
| 04:20:24 | 17 | Q.  Is that correct? |
| 04:20:25 | 18 | A.  That's correct. |
| 04:20:25 | 19 | Q.  Thank you. |
| 04:20:27 | 20 | And in the second sentence, Mr. Paananen's email |
| 04:20:32 | 21 | to the -- well, strike that. |
| 04:20:33 | 22 | This is an email to the entire company at that |
| 04:20:36 | 23 | time, right? |
| 04:20:37 | 24 | A.  That's right. |
| 04:20:38 | 25 | Q.  It says "all." |

851

| | | |
|---|---|---|
| 04:20:41 | 1 | A.  Yes. |
| 04:20:41 | 2 | Q.  And in the second sentence of his email to the entire |
| 04:20:44 | 3 | country -- company, Mr. Paananen says:  In short, this year |
| 04:20:48 | 4 | will be the most interesting in games ever, due to the |
| 04:20:50 | 5 | inevitable clash of giants on the development side, GREE, |
| 04:20:55 | 6 | DeNa, Zynga, EA, Nexon, Tencent. |
| 04:21:01 | 7 | Do you see that? |
| 04:21:02 | 8 | A.  I do. |
| 04:21:06 | 9 | Q.  And then he writes:  BTW, let's hope that the CEO of |
| 04:21:11 | 10 | GREE is right here. |
| 04:21:13 | 11 | And includes some quotes from the article, right? |
| 04:21:15 | 12 | A.  Right. |
| 04:21:18 | 13 | Q.  Now, I think you said on your direct testimony that -- |
| 04:21:24 | 14 | let me get the quote -- that Supercell doesn't look at |
| 04:21:27 | 15 | other companies, right?  Did you say that on direct? |
| 04:21:32 | 16 | A.  I believe I said we don't focus on other companies. |
| 04:21:35 | 17 | Q.  Okay.  Well, I had written down "look." |
| 04:21:38 | 18 | A.  Okay. |
| 04:21:38 | 19 | Q.  Maybe I wrote it wrong. |
| 04:21:40 | 20 | MR. MOORE:  In any event, could we please put up |
| 04:21:44 | 21 | Plaintiff's Exhibit 625? |
| 04:21:46 | 22 | Q.  (By Mr. Moore)  And you may certainly look at that in |
| 04:21:47 | 23 | your binder, if you like, as well.  Do you see that this is |
| 04:21:59 | 24 | another email from Mr. Paananen, the Supercell CEO? |
| 04:22:01 | 25 | A.  I do. |

| | | |
|---|---|---|
| 04:22:02 | 1 | Q.  And he sends it to a few individuals, as well as a |
| 04:22:06 | 2 | group called "biweekly," right? |
| 04:22:06 | 3 | A.  Right. |
| 04:22:09 | 4 | Q.  And you were on this email group at this time, weren't |
| 04:22:11 | 5 | you? |
| 04:22:12 | 6 | A.  I was. |
| 04:22:12 | 7 | Q.  And you see the subject is walk-through: #1 game in |
| 04:22:18 | 8 | Japan? |
| 04:22:18 | 9 | A.  Yes. |
| 04:22:18 | 10 | Q.  And the attachment includes an attachment named GREE, |
| 04:22:22 | 11 | social game walk-through. |
| 04:22:24 | 12 | Correct? |
| 04:22:24 | 13 | A.  Correct. |
| 04:22:25 | 14 | Q.  And Mr. Paananen says:  Wanted to share the enclosed |
| 04:22:29 | 15 | walk-through of a top mobile social game in Japan.  This |
| 04:22:32 | 16 | game makes about $25 million per month. |
| 04:22:37 | 17 | Do you see that? |
| 04:22:38 | 18 | A.  I do. |
| 04:22:38 | 19 | MR. MOORE:  All right.  And let's pull up one |
| 04:22:40 | 20 | more, please, PTX-634.  Now, let's go down a little bit, |
| 04:22:51 | 21 | please, Mr. Groat, to the bottommost email there.  If you'd |
| 04:22:57 | 22 | please blow up the one from an individual named Riku |
| 04:23:03 | 23 | Rikala.  Right there -- you have.  Thank you. |
| 04:23:04 | 24 | Q.  (By Mr. Moore)  And Mr. Rikala was an employee of |
| 04:23:08 | 25 | Supercell at the time of this document, correct? |

04:23:10  1   A.  Yes.

04:23:11  2   Q.  And he's talking about a game released -- or created by

04:23:15  3   GREE's San Francisco's studio, right?

04:23:17  4   A.  That's what it looks like, yes.

04:23:17  5   Q.  A game named Zombie Jombie?

04:23:22  6   A.  Yes.

04:23:23  7   Q.  Okay.

04:23:23  8        MR. MOORE:  Let's go up to the top, please.  Keep

04:23:25  9   going a little bit more.

04:23:27  10  Q.  (By Mr. Moore)  And do you see that the topmost email

04:23:29  11  in the chain is from Mr. Paananen, the CEO?

04:23:32  12  A.  Yes.

04:23:33  13  Q.  All right.  And he includes comments there such as in

04:23:42  14  the second line:  This is like Zynga's Mafia Wars but on

04:23:49  15  steroids.  Wow, with an exclamation point.

04:23:53  16        Correct?

04:23:53  17  A.  Correct.

04:23:55  18  Q.  All right.

04:23:55  19        MR. MOORE:  Thank you, Mr. Groat.  You may take

04:23:57  20  that down.

04:24:04  21  Q.  (By Mr. Moore)  Now, you talked a little bit about your

04:24:07  22  role in the dispute between GREE and Supercell as a board

04:24:10  23  member.  Do you recall that?

04:24:11  24  A.  I do.

04:24:12  25  Q.  All right.  But before I showed it to you at your

04:24:16  1  deposition back in April of this year, you had never seen

04:24:19  2  the letter that GREE sent to Supercell in September of

04:24:21  3  2016, had you?

04:24:22  4  A.  I don't recall seeing it.

04:24:24  5  Q.  And you didn't know then if it had been provided to you

04:24:27  6  at any time, right?

04:24:29  7  A.  That was several years ago.  I just didn't recall.

04:24:32  8  Q.  Now, you are not aware of any actions that Supercell

04:24:36  9  took to make sure that it wasn't infringing GREE's patents

04:24:40  10  after it got this letter, are you?

04:24:43  11  A.  I don't recall.

04:24:45  12  Q.  Okay.  In fact, when I asked you, what did Supercell do

04:24:48  13  after Mr. Paananen reviewed this letter, you said:  I don't

04:24:53  14  know.

04:24:53  15       Right?

04:24:53  16  A.  I -- I don't recall.

04:24:55  17  Q.  Okay.  And you also didn't remember ever talking about

04:24:59  18  the letter with Mr. Paananen, did you?

04:25:02  19  A.  I -- I don't recall.

04:25:05  20  Q.  All right.

04:25:05  21       MR. MOORE:  Could we -- just for the record, could

04:25:08  22  you pull up, please, PTX-105?

04:25:11  23  Q.  (By Mr. Moore)  And this is a letter that we discussed

04:25:16  24  at your deposition, correct?

04:25:18  25  A.  I don't remember.

| | | |
|---|---|---|
| 04:25:33 | 1 | Q.  And you -- you don't recall -- at your deposition, you |
| 04:25:39 | 2 | didn't recall ever talking about the lawsuits between GREE |
| 04:25:41 | 3 | and Supercell with the Supercell leadership team, right? |
| 04:25:44 | 4 | A.  At the deposition, no. |
| 04:25:45 | 5 | Q.  And the leadership team is you; the CEO, Mr. Paananen; |
| 04:25:50 | 6 | and the COO/CFO, Mr. Snellman, right? |
| 04:25:57 | 7 | A.  That's right. |
| 04:25:58 | 8 | Q.  In fact in 26 -- well, strike that. |
| 04:26:02 | 9 | After Supercell received this letter from GREE, |
| 04:26:06 | 10 | you personally didn't bother to read any of the patents |
| 04:26:09 | 11 | listed in this letter, did you? |
| 04:26:10 | 12 | A.  I don't recall if I read them or not. |
| 04:26:12 | 13 | Q.  Okay.  And almost four years after this letter, at the |
| 04:26:15 | 14 | time of your deposition for this case, you still had not |
| 04:26:17 | 15 | reviewed any of the -- the five United States patents that |
| 04:26:21 | 16 | GREE is asserting against Supercell in this lawsuit, |
| 04:26:24 | 17 | correct? |
| 04:26:24 | 18 | THE COURT:  Slow down, Mr. Moore. |
| 04:26:26 | 19 | MR. MOORE:  Thank you, sir. |
| 04:26:27 | 20 | THE COURT:  I'll stop reminding you when you start |
| 04:26:30 | 21 | doing it. |
| 04:26:32 | 22 | Answer the question, please, Mr. Harper. |
| 04:26:35 | 23 | THE WITNESS:  Yes, sir. |
| 04:26:36 | 24 | A.  I don't recall if I reviewed them at the time or not. |
| 04:26:38 | 25 | I may have. |

| | | |
|---|---|---|
| 04:26:39 | 1 | Q.  (By Mr. Moore)  When I asked you at your deposition, |
| 04:26:43 | 2 | have you ever seen any of the United States patents that |
| 04:26:46 | 3 | GREE is asserting in this lawsuit against Supercell, your |
| 04:26:51 | 4 | answer was:  Not to my knowledge. |
| 04:26:52 | 5 | Isn't that right? |
| 04:26:56 | 6 | A.  I don't recall what my exact answer was, but if you say |
| 04:26:58 | 7 | it was "not to my knowledge"... |
| 04:27:02 | 8 | Q.  Okay. |
| 04:27:03 | 9 | MR. MOORE:  Let's -- can we please pull up the |
| 04:27:06 | 10 | transcript to refresh the witness's memory from the April |
| 04:27:09 | 11 | 24th deposition at Page 84? |
| 04:27:11 | 12 | Q.  (By Mr. Moore)  There is a copy in your binder, sir, if |
| 04:27:15 | 13 | you'd like to review there. |
| 04:27:28 | 14 | MR. SACKSTEDER:  Your Honor, are we publishing |
| 04:27:29 | 15 | this to the jury if it's being used to refresh his |
| 04:27:32 | 16 | recollection? |
| 04:27:38 | 17 | THE COURT:  What's the purpose of this segment of |
| 04:27:40 | 18 | his prior deposition testimony, Mr. Moore? |
| 04:27:42 | 19 | MR. MOORE:  At this point I would like to simply |
| 04:27:45 | 20 | refresh his recollection, so I have no objection to not |
| 04:27:48 | 21 | publishing it until he does that. |
| 04:27:48 | 22 | THE COURT:  It's in his binder? |
| 04:27:49 | 23 | MR. MOORE:  It is, sir, yes. |
| 04:27:50 | 24 | THE COURT:  Refer him to the binder without |
| 04:27:53 | 25 | publishing it on the screen, please. |

| | | |
|---|---|---|
| 04:27:55 | 1 | MR. MOORE:  Okay. |
| 04:27:55 | 2 | Q.  (By Mr. Moore)  If you could go in your binder to |
| 04:27:57 | 3 | Page 84, Lines 9 to 13, please. |
| 04:28:04 | 4 | A.  I'm sorry, Page? |
| 04:28:06 | 5 | Q.  84? |
| 04:28:19 | 6 | A.  Okay. |
| 04:28:19 | 7 | Q.  Having read that question and answer, does that refresh |
| 04:28:22 | 8 | your memory as to what your response was at your |
| 04:28:24 | 9 | deposition? |
| 04:28:24 | 10 | A.  Well, I see -- I see my response there, yes. |
| 04:28:29 | 11 | Q.  And what was it? |
| 04:28:29 | 12 | A.  "Not to my knowledge." |
| 04:28:31 | 13 | Q.  Okay.  Now, you are aware of the litigation that |
| 04:28:42 | 14 | happened between GREE and Supercell in Japan, correct? |
| 04:28:44 | 15 | A.  Correct. |
| 04:28:44 | 16 | Q.  All right.  Did you have any involvement with that |
| 04:28:50 | 17 | litigation? |
| 04:28:51 | 18 | A.  At the board level, approving the final resolution of |
| 04:28:55 | 19 | it. |
| 04:28:56 | 20 | Q.  Okay.  Do you recall that I asked you that same |
| 04:29:00 | 21 | question at your deposition? |
| 04:29:03 | 22 | A.  I don't recall. |
| 04:29:04 | 23 | Q.  Okay. |
| 04:29:05 | 24 | MR. MOORE:  Your Honor, I would like to play the |
| 04:29:08 | 25 | clip, please, from the deposition for impeachment purposes, |

04:29:13   1   rather than refreshing.

04:29:15   2        THE COURT:  Why don't you proceed.  If there's an

04:29:16   3   objection, I'll hear the objection when it's presented.

04:29:19   4   Q.  (By Mr. Moore)  Okay.  Could you please --

04:29:22   5        MR. SACKSTEDER:  Your Honor, may I see the -- hear

04:29:24   6   the page and line numbers first?

04:29:25   7        MR. MOORE:  Yes.  It is 76, Line 8.

04:29:37   8        MR. SACKSTEDER:  Which deposition?

04:29:43   9        MR. MOORE:  8.

04:30:04  10        MR. SACKSTEDER:  Your Honor, I don't think this

04:30:05  11   addresses the question and answer that was asked

04:30:12  12   previously.

04:30:12  13        THE COURT:  Well, I don't have the benefit of it

04:30:14  14   before me.

04:30:21  15        Ladies and gentlemen, I'm going to ask you to

04:30:24  16   retire to the jury room for a minute.  I need to discuss

04:30:26  17   this in greater detail with counsel.  I'll have you back in

04:30:29  18   just a minute.  And I'll be in a position to give them some

04:30:32  19   guidance on how we should proceed.

04:30:34  20        Please leave your notebooks in your chairs, don't

04:30:36  21   discuss the case with each other, and I'll have you back in

04:30:39  22   here as soon as possible.

04:30:40  23        The jury should retire to the jury room now.

04:30:43  24        COURT SECURITY OFFICER:  All rise.

04:31:07  25        (Jury out.)

04:31:08  1          THE COURT:  Be seated.

04:31:09  2          All right.  What are we trying to do here,

04:31:11  3  gentlemen?

04:31:12  4          MR. MOORE:  Your Honor, may we excuse the witness

04:31:14  5  while we discuss?  Would that be appropriate?

04:31:18  6          THE COURT:  That's probably appropriate.

04:31:21  7          Mr. Harper, I'm going to ask you to step outside

04:31:24  8  the courtroom.  If you'll exit through the double doors,

04:31:28  9  but don't go far, sir.

04:31:29  10          THE WITNESS:  Yes, sir.

04:31:30  11          THE COURT:  Stay close by.

04:31:47  12          All right.  Mr. Moore, what are you trying to do,

04:31:50  13  are you trying to refresh the recollection of the witness

04:31:53  14  or are you trying to impeach the witness?

04:31:54  15          MR. MOORE:  To impeach, Your Honor, because he

04:31:56  16  gave a different answer than he did at his deposition.

04:31:59  17          THE COURT:  Well, let me just be real

04:32:01  18  straightforward with you, the way you impeach a witness is

04:32:03  19  you call the prior inconsistent statement to their

04:32:06  20  attention without publishing it.  You inquire of the

04:32:10  21  witness, did you make this statement?  If it's a

04:32:13  22  deposition, were you under oath?

04:32:14  23          You confirm that the precise statement is, in

04:32:16  24  fact, a prior, accurate, inconsistent statement.  Once

04:32:21  25  that's confirmed, then you publish it to the jury to show

04:32:23  1  the inconsistency.  That's not how it's been done this

04:32:28  2  entire trial.  But that's the way I expect it to be done on

04:32:32  3  both sides going forward.

04:32:32  4       MR. MOORE:  I understand, Your Honor.  And that's

04:32:34  5  how I typically do it.  That's exactly why I asked the

04:32:37  6  question because opposing counsel has not done that.  And

04:32:39  7  so I wanted to make sure --

04:32:42  8       THE COURT:  Well, you haven't -- you haven't

04:32:44  9  objected to it.  So while we have this learning moment with

04:32:47  10  everybody present, I'm going to make it clear that's how I

04:32:51  11  expect it to be done on both sides going forward.

04:32:53  12       MR. MOORE:  So -- just so I'm clear, and it's in

04:32:56  13  addition to asking him if it was -- at his deposition if

04:32:58  14  that's what he said, would you want me to have him read the

04:33:01  15  prior testimony before we display it out loud or simply

04:33:05  16  read it to himself and establish the inconsistency?

04:33:08  17       THE COURT:  If it's in his binder and it's his

04:33:11  18  prior deposition, then you should in that case call it to

04:33:13  19  his attention by page and line number, ask him to read it,

04:33:17  20  ask to himself, ask him to let you know when he has

04:33:22  21  completed that.

04:33:23  22       When he tells you he has, confirm for him that at

04:33:27  23  that time, date, and place, is it correct that you made --

04:33:29  24  that you gave those answers to those questions under oath?

04:33:32  25       And then if he confirms that, in fact, it is his

861

04:33:35  1  testimony, then you can publish it for -- to the jury for

04:33:39  2  purposes of impeachment.

04:33:40  3      MR. MOORE:  Thank you.  And in this --

04:33:42  4      MR. SACKSTEDER:  Your Honor --

04:33:43  5      MR. MOORE:  In this instance, I would propose to

04:33:45  6  do -- I would do so by video.

04:33:48  7      THE COURT:  If it's -- you need to refer him to

04:33:51  8  his written transcript --

04:33:52  9      MR. MOORE:  Yes.

04:33:53  10      THE COURT:  -- to confirm it.  If you have a video

04:33:56  11  recording of the deposition rather than publishing the

04:33:59  12  written transcript, you're at liberty to publish the clip

04:33:59  13  from the video deposition that corresponds with that

04:34:05  14  section of the transcript.

04:34:05  15      MR. MOORE:  Understood.

04:34:05  16      THE COURT:  Mr. Sacksteder.

04:34:09  17      MR. SACKSTEDER:  Thank you, Your Honor.  My issue

04:34:10  18  is that I don't -- I don't think this is the same question

04:34:12  19  and answer that is being impeached.  And maybe I heard --

04:34:16  20  heard the question incorrectly.

04:34:20  21      THE COURT:  Well, it wouldn't be the first time

04:34:22  22  I've seen a lawyer impeach somebody with something that

04:34:26  23  didn't turn out to be a prior inconsistent statement.  But

04:34:29  24  I'm not going to micromanage you or opposing counsel to

04:34:32  25  choose what you think might be an effective impeachment

04:34:37  1  inconsistent statement.

04:34:38  2          MR. SACKSTEDER:  Okay.  Your Honor.  It's fine and

04:34:39  3  I looked at it -- and I think the question is very close,

04:34:42  4  if not identical.

04:34:43  5          THE COURT:  That's fine.

04:34:44  6          MR. SACKSTEDER:  There's no answer really.

04:34:46  7  It's -- the witness didn't understand the question.

04:34:48  8          THE COURT:  And while we're at this juncture, let

04:34:50  9  me just make it very clear -- and this has been a problem

04:34:54  10  that I have not mentioned heretofore throughout this trial,

04:34:58  11  but I'll mention it now.

04:35:00  12          When the Court begins to speak, counsel should be

04:35:03  13  quiet.  There's been too much talking over the Court when I

04:35:07  14  try to interject and either give you instruction or address

04:35:11  15  something.

04:35:12  16          So when I start talking, whoever has been talking

04:35:16  17  should stop immediately.  That -- that will promote greater

04:35:20  18  clarity in the record, and it will be much more efficient.

04:35:23  19  And it will comport with the proper decorum in this

04:35:27  20  courtroom.  So I expect that.

04:35:30  21          All right.  Are there questions about refreshing

04:35:33  22  the recollection of the witness, because, quite honestly, I

04:35:36  23  couldn't tell if you were trying to do that or you were

04:35:38  24  trying to impeach him.

04:35:40  25          MR. MOORE:  The first one I was trying to refresh,

04:35:42  1   Your Honor, and that's what I was doing.  This one I think

04:35:44  2   it's a straight impeachment.

04:35:45  3        THE COURT:  Well, unless -- just to avoid any

04:35:48  4   doubt, you don't refresh their recollection by publishing

04:35:51  5   the document that's refreshing to the jury first.  You do

04:35:53  6   it much like the impeachment.  You call their attention to

04:35:57  7   it and ask them to review it, tell you when they have, and

04:36:01  8   then ask them if that refreshes their recollection.

04:36:04  9        And if they say it does and then they give you an

04:36:07  10  inconsistent statement, then you can proceed to impeach

04:36:10  11  them.

04:36:10  12        MR. MOORE:  Understood.

04:36:11  13        THE COURT:  All right.  Is there anything else we

04:36:13  14  need to take up while the jury is out of the courtroom and

04:36:16  15  the witness is off the witness stand?

04:36:18  16        Anything from you, Mr. Sacksteder?

04:36:21  17        MR. SACKSTEDER:  No, Your Honor.

04:36:22  18        THE COURT:  Anything further from you, Mr. Moore?

04:36:24  19        MR. MOORE:  No, Your Honor.

04:36:24  20        THE COURT:  All right.  Let's ask Mr. Harper to

04:36:29  21  return.

04:36:29  22        (The witness returns to the stand.)

04:36:37  23        THE COURT:  Thank you for your indulgence,

04:36:40  24  Mr. Harper.  If you'd return to the witness stand, please.

04:36:47  25  And I'll remind you that you remain under oath.

| | | |
|---|---|---|
| 04:36:49 | 1 | Once he's seated, I'll ask the Court Security |
| 04:36:52 | 2 | Officer to bring the jury back in. |
| 04:36:54 | 3 | COURT SECURITY OFFICER:  All rise. |
| 04:36:56 | 4 | (Jury in.) |
| 04:37:23 | 5 | THE COURT:  Thank you, ladies and gentlemen. |
| 04:37:34 | 6 | Please be seated. |
| 04:37:34 | 7 | For purposes of clarity, I'm overruling any |
| 04:37:37 | 8 | objection from the Defense that led to me asking you to |
| 04:37:42 | 9 | step out. |
| 04:37:42 | 10 | Mr. Moore, proceed with either your next question |
| 04:37:46 | 11 | or pursue the line you were on at the time this issue |
| 04:37:50 | 12 | arose. |
| 04:37:51 | 13 | MR. MOORE:  Thank you, Your Honor. |
| 04:37:51 | 14 | Q.  (By Mr. Moore)  Mr. Harper, before we took the brief |
| 04:37:55 | 15 | break, you had said that you were aware of the litigation |
| 04:37:58 | 16 | in Japan between GREE and Supercell, correct? |
| 04:38:00 | 17 | A.  Correct. |
| 04:38:01 | 18 | Q.  And when I asked you did you have any involvement with |
| 04:38:04 | 19 | litigation, you said you were aware of it through your role |
| 04:38:08 | 20 | on the board of directors, correct? |
| 04:38:10 | 21 | A.  Correct. |
| 04:38:13 | 22 | Q.  All right.  You recall the deposition that you gave in |
| 04:38:15 | 23 | April of this year where I asked you questions? |
| 04:38:18 | 24 | A.  Deposition was like six hours.  I remember it took |
| 04:38:22 | 25 | place.  I don't remember all the details. |

04:38:25  1   Q.  Okay.  And, as I mentioned, you have a copy of your

04:38:28  2   transcript from that deposition in your binder.  Would you

04:38:30  3   please turn to that, sir?

04:38:32  4   A.  Where would you like me to turn?

04:38:35  5   Q.  Please turn to Page 76 at Line 8.  And beginning at

04:38:41  6   Line -- read please beginning at Line 8 through the rest of

04:38:46  7   that page and on to Line 2 of the following page.  Please

04:38:50  8   just let me know when you're finished.

04:38:52  9   A.  So this -- Page 76, you said?

04:38:56  10  Q.  That's correct.

04:38:57  11  A.  Line 8.  Did you have --

04:38:59  12  Q.  No.  Sorry.  To yourself.  I'm sorry.

04:39:01  13  A.  Oh, I'm sorry.  I'm sorry.  How far did you want?

04:39:38  14  Q.  To page -- Line 2 on the following Page 77.  Have you

04:39:43  15  read that now?

04:39:44  16  A.  Yep.

04:39:45  17  Q.  And you recall you were given an oath at the beginning

04:39:48  18  of that deposition much like you were here today?

04:39:50  19  A.  I do.

04:39:50  20  Q.  And that was the testimony that you gave at that

04:39:53  21  deposition that you just read to yourself; is that right?

04:39:55  22  A.  Yes.

04:39:56  23  Q.  Your Honor, we would like to play the clip, please.

04:40:00  24           MR. MOORE:  Mr. Groat?

04:40:07  25           (Videoclip played.)

04:40:08  1          QUESTION:  Are you aware of litigation that

04:40:10  2    happened between GREE and Supercell in Japan?

04:40:10  3          ANSWER:  Yes.

04:40:16  4          QUESTION:  Did you have any involvement with that

04:40:18  5    litigation?

04:40:19  6          ANSWER:  What do you mean by involvement?

04:40:26  7          QUESTION:  What is unclear about that to you?

04:40:32  8          ANSWER:  The definition.

04:40:42  9          QUESTION:  Okay.  You need me to further clarify

04:40:44  10   what I mean by involvement?

04:40:48  11         ANSWER:  If you want me to answer the question.

04:40:55  12         QUESTION:  All right.  What did you do regarding

04:40:57  13   the GREE and Supercell litigation in Japan?

04:41:08  14         ANSWER:  What did I do?  Yeah, I don't understand

04:41:12  15   what did I do.

04:41:14  16         (Videoclip ends.)

04:41:15  17         MR. MOORE:  Thank you.

04:41:15  18   Q.  (By Mr. Moore)  And that was your testimony at the

04:41:17  19   deposition, correct?

04:41:18  20   A.  Correct.

04:41:18  21   Q.  Thank you.

04:41:19  22         Now, you also testified on direct that you were

04:41:23  23   familiar with and aware of the license agreement between

04:41:26  24   GREE and Supercell relating to GREE's Japanese patents,

04:41:31  25   correct?

04:41:31  1   A.  Correct.

04:41:31  2   Q.  And I think you told me that -- why the board -- or you

04:41:36  3   told us why the board of directors approved that license,

04:41:38  4   didn't you?

04:41:38  5   A.  I did.

04:41:41  6   Q.  But at your deposition, you testified that you don't

04:41:44  7   recall -- you didn't recall being aware of a license

04:41:47  8   agreement between GREE and Supercell relating to GREE's

04:41:51  9   Japanese patents, didn't you?

04:41:53  10  A.  I don't recall what my exact testimony at deposition

04:41:58  11  was about my awareness.  But if it's in here, I'm happy to

04:42:02  12  look at it.

04:42:02  13  Q.  Please do.  Please go to Page 89 of your April

04:42:06  14  deposition.

04:42:10  15  A.  Okay.

04:42:10  16  Q.  And read Lines 2 to 6 to yourself, and let me know when

04:42:14  17  you're finished.

04:42:14  18  A.  Okay.

04:42:30  19  Q.  Does that now refresh your recollection as to your

04:42:36  20  testimony at that deposition about whether you recall being

04:42:39  21  aware of the license agreement?

04:42:41  22  A.  That looks like my testimony, yeah.

04:42:43  23  Q.  Would you please read it aloud?

04:42:48  24  A.  Starting at Line 2?

04:42:49  25  Q.  Yes, and you can skip Line 5.  Would you please read

04:42:53  1   the question, Lines 2 to 4 and your answer at Line 6?

04:42:56  2   A.   Are you aware -- are you aware of the license agreement

04:42:59  3   between GREE and Supercell relating to GREE's Japanese

04:43:05  4   patents portfolio?

04:43:06  5        I don't recall.

04:43:07  6        Were you ever --

04:43:07  7   Q.   That's fine.  You can stop there.  So you did not

04:43:10  8   recall in April anything about the license agreement,

04:43:13  9   correct?

04:43:13  10  A.   Correct.

04:43:13  11  Q.   And you also didn't know then anything about why

04:43:17  12  Supercell decided to enter into that agreement when I asked

04:43:20  13  you that question at your deposition, did you?

04:43:22  14  A.   Is that here, as well?

04:43:29  15  Q.   I'm asking you the question.

04:43:30  16  A.   I thought you were asking me about the deposition.  So

04:43:34  17  if it's here, I'm happy to review it again.

04:43:37  18        THE COURT:  All right.  Restate the question.

04:43:38  19        MR. MOORE:  Thank you.

04:43:39  20        THE COURT:  And, Mr. Harper, either answer the

04:43:41  21  question, or tell counsel you don't understand the

04:43:44  22  question, okay?

04:43:45  23        THE WITNESS:  Okay.

04:43:45  24        THE COURT:  Restate your question, Mr. Moore.

04:43:47  25        MR. MOORE:  Thank you.  Thank you, Your Honor.

04:43:48   1   Q.   (By Mr. Moore)   You told me at your April deposition

04:43:52   2   that you didn't know why Supercell decided to enter into

04:43:58   3   the license agreement with GREE relating to Japanese

04:44:01   4   patents; isn't that true, sir?

04:44:03   5   A.   I don't recall what I told you in the deposition.

04:44:05   6   Q.   All right.   Let's go back to Page 89 of your

04:44:08   7   deposition, please.   And read from Line 24 on that page

04:44:16   8   through Line 4 on Page 90.

04:44:36   9   A.   Okay.

04:44:36   10   Q.   Does that refresh your testimony as to what you -- as

04:44:40   11   to what you said at the deposition on this topic?

04:44:42   12   A.   That looks like my testimony, yeah.

04:44:45   13   Q.   All right.   Please read it aloud.   You can skip Lines 2

04:44:47   14   and 3.

04:44:47   15   A.   Do you have any knowledge of why Supercell decided to

04:44:51   16   enter into any license agreement with GREE relating to

04:44:53   17   Japanese patents?

04:44:54   18        Yeah, I don't know.

04:44:57   19   Q.   And that's what you told me under oath in April when I

04:45:01   20   took your deposition, right?

04:45:02   21   A.   Right.

04:45:03   22   Q.   Okay.   Now, you also didn't remember at that deposition

04:45:09   23   whether the board of directors of Supercell was even asked

04:45:13   24   to approve the license, correct?

04:45:16   25   A.   I'd like to review the testimony again.   I can't

04:45:21   1   recall.

04:45:22   2   Q.  So you can't recall whether you did recall or not?

04:45:24   3   A.  I can't recall what I said in the deposition.

04:45:27   4   Q.  All right.  Let's do it one more time.

04:45:29   5         Please go, again, to Page 89, this time starting

04:45:33   6   at Line 8, and read through Line 16 to yourself.  And let

04:45:36   7   me know when you're finished.

04:45:38   8   A.  Okay.

04:45:52   9   Q.  Does that refresh your memory as to what you told me

04:45:55   10  back in your deposition last April on this topic?

04:45:58   11  A.  Yeah, that looks like my testimony.

04:46:00   12  Q.  Okay.  Would you please read aloud my question at

04:46:04   13  Line 8 --

04:46:04   14         THE COURT:  No, no, no.  You've refreshed his

04:46:07   15  recollection.  Now ask him your question again.  Don't have

04:46:10   16  him read the transcript.

04:46:11   17         MR. MOORE:  Okay.

04:46:12   18  Q.  (By Mr. Moore)  Mr. Harper, at your deposition in

04:46:13   19  April, you didn't recall whether the board of directors of

04:46:19   20  Supercell had been asked to approve the license agreement

04:46:24   21  between GREE and Supercell in Japan, correct?

04:46:26   22  A.  Based on my deposition, it looks like -- that looks

04:46:30   23  right.

04:46:31   24  Q.  All right.  Thank you.

04:46:36   25         Now, Mr. Harper, I want to ask you about somewhat

04:46:38  1   of a hypothetical scenario and I -- because I understand

04:46:40  2   that you have two -- two residences, right?

04:46:43  3   A.  I do.

04:46:44  4   Q.  Okay.  Now, let's imagine a scenario where you and your

04:46:50  5   family are staying at one of those residences, but you're

04:46:53  6   not using the other one.  Are you with me?

04:46:55  7   A.  Okay.

04:46:57  8   Q.  All right.  No one is there, but you still own that --

04:46:59  9   that other second property that you're not using, right?

04:47:04  10  A.  Okay.

04:47:05  11  Q.  Okay.  And let's say you've got some valuable

04:47:07  12  possessions in that house, okay?  Are you with me still?

04:47:14  13  A.  I am.

04:47:14  14  Q.  All right.  Now, imagine that somebody goes to that

04:47:17  15  second property that you're not using and trespasses on it

04:47:20  16  by starting to live there without your permission.  You

04:47:22  17  understand that?

04:47:22  18         MR. SACKSTEDER:  Objection, Your Honor.  This is

04:47:24  19  seeking speculation, is asking an opinion question of a

04:47:29  20  fact witness, and is an improper hypothetical.

04:47:36  21         THE COURT:  What's your response, Mr. Moore?

04:47:37  22         MR. MOORE:  I think it's entirely proper to -- to

04:47:41  23  ask the person who's testifying as the face of Supercell

04:47:44  24  about this because it relates directly to Supercell's

04:47:47  25  arguments in this case, by analogy.

04:47:49  1        THE COURT:  I'll allow a hypothetical.  I'll

04:47:52  2   overrule the objection.

04:47:58  3   Q.  (By Mr. Moore)  Okay.  So, to recap, we've got your

04:48:00  4   other residence, you're not there, someone else is living

04:48:03  5   there while you're away, correct?

04:48:07  6   A.  Okay.

04:48:08  7   Q.  All right.  Now, if you found that out and you wanted

04:48:11  8   to sue the person for trespassing, it wouldn't be a defense

04:48:15  9   for them to say, well, Mr. Harper wasn't living there so it

04:48:19  10  doesn't matter that I used it without permission, would it?

04:48:23  11  A.  No.

04:48:24  12  Q.  Okay.  That's not a defense to trespass, right?

04:48:27  13  A.  I don't know --

04:48:29  14        THE COURT:  Are you asking him a legal conclusion,

04:48:32  15  counselor?

04:48:33  16        MR. MOORE:  I'll move on, Your Honor.

04:48:34  17        THE COURT:  Let's move on.

04:48:36  18  Q.  (By Mr. Moore)  And the same is true in patent law,

04:48:38  19  right?

04:48:38  20  A.  I don't -- I don't know patent law.

04:48:41  21  Q.  Okay.

04:48:43  22        THE COURT:  You have an objection?

04:48:44  23        MR. SACKSTEDER:  Yes, Your Honor.

04:48:45  24        THE COURT:  State your objection.

04:48:46  25        MR. SACKSTEDER:  He's seeking a legal conclusion

04:48:50    1    from a witness.

04:48:52    2            THE COURT:  Sustained.

04:48:53    3            Let's move on.

04:48:54    4    Q.  (By Mr. Moore)  Do you believe that Supercell --

04:48:56    5    that -- strike that.

04:48:57    6            Do you believe it's okay for Supercell to infringe

04:49:01    7    GREE's patents merely because GREE is not using the

04:49:05    8    inventions in the United States?

04:49:06    9    A.  I don't believe we've infringed patents.

04:49:18   10    Q.  All right.  But do you believe that if the jury were to

04:49:20   11    disagree with you, that an excuse would be, well, it's

04:49:23   12    okay, we can do that, because GREE is not using the patents

04:49:26   13    in the United States?

04:49:30   14    A.  I'm sorry, restate the question.

04:49:33   15    Q.  If the jury were to disagree with you on that question,

04:49:36   16    do you believe that an excuse for that would be to say it's

04:49:40   17    okay because GREE is not using those patents in the United

04:49:44   18    States?

04:49:44   19    A.  I assume the jury has the final word, so I don't know

04:49:48   20    if excuses matter.

04:49:51   21    Q.  Thank you, sir.

04:49:52   22            MR. MOORE:  I'll pass the witness.

04:49:53   23            THE COURT:  Redirect?

04:49:57   24            MR. SACKSTEDER:  Thank you, Your Honor.

04:49:57   25                    REDIRECT EXAMINATION

04:49:58   1   BY MR. SACKSTEDER:

04:49:58   2   Q.  Mr. Harper, may I ask you about one thing that

04:50:04   3   Mr. Moore asked you?

04:50:05   4        He asked you about Mr. Ostler being here as the

04:50:11   5   company representative at the counsel table instead of you.

04:50:14   6   You remember that?

04:50:15   7   A.  I do.

04:50:15   8   Q.  Why is Mr. Ostler here instead of you?

04:50:18   9   A.  So Jeff Ostler is essentially my right hand at the

04:50:24   10   company, and he handles many important matters for us, such

04:50:27   11   as representing us here at the trial, but I trust him

04:50:31   12   completely.

04:50:33   13        MR. SACKSTEDER:  Pass the witness.

04:50:34   14        THE COURT:  Further cross-examination?

04:50:35   15        MR. MOORE:  No, Your Honor.

04:50:38   16        THE COURT:  All right.  You may step down,

04:50:39   17   Mr. Harper.

04:50:40   18        Is there a request for this witness to be excused?

04:50:50   19        MR. SACKSTEDER:  Yes, Your Honor.

04:50:51   20        THE COURT:  Is there objection?

04:50:52   21        MR. MOORE:  No objections, Your Honor.

04:50:53   22        THE COURT:  Mr. Harper, you're excused.  That

04:50:55   23   means you're free to leave if you'd like.  You're also free

04:50:58   24   to stay.  It's up to you.

04:51:01   25        All right.  Defendants, proceed with your next

```
04:51:04   1    witness.
04:51:04   2            MR. SACKSTEDER:  Supercell calls Jon Franzas by
04:51:09   3    video.
04:51:09   4            THE COURT:  Video deposition?
04:51:11   5            MR. SACKSTEDER:  That's correct.  Well, it's video
04:51:13   6    trial deposition.
04:51:14   7            THE COURT:  Right.  Proceed.
04:51:16   8            (Videoclip played.)
04:51:17   9            QUESTION:  Hello, Mr. Franzas.  Can you please
04:51:28  10    state your full name for the record?
04:51:28  11            ANSWER:  Hello.  My name is Jon Franzas.
04:51:33  12            QUESTION:  And where are you testifying from
04:51:35  13    today, Mr. Franzas?
04:51:36  14            ANSWER:  From Helsinki, Finland.
04:51:38  15            QUESTION:  And why are you testifying from Finland
04:51:40  16    today?
04:51:42  17            ANSWER:  Because of the COVID situation, so
04:51:46  18    there's a lot of travel restrictions and bans around the
04:51:51  19    world, so it would have been almost impossible for me to
04:51:55  20    come there.
04:51:55  21            QUESTION:  Where do you work, Mr. Franzas?
04:51:58  22            ANSWER:  I work at Supercell.
04:51:59  23            QUESTION:  And how long you have worked at
04:52:01  24    Supercell?
04:52:01  25            ANSWER:  Around nine years.
```

04:52:05  1          QUESTION:  What is your current game -- or current

04:52:08  2  job title?

04:52:10  3          ANSWER:  My job title is senior game programmer.

04:52:14  4          QUESTION:  Have you worked on a game called Brawl

04:52:18  5  Stars?

04:52:18  6          ANSWER:  Yes, I have.

04:52:19  7          QUESTION:  Are you currently on the Brawl Stars

04:52:22  8  team?

04:52:23  9          ANSWER:  No, I'm not.  I -- I left the team

04:52:26  10  roughly a year ago, I believe.

04:52:28  11          QUESTION:  So while you were on that Brawl Stars

04:52:30  12  team, what was your goal on the team?

04:52:38  13          (Videoclip ends.)

04:52:40  14          MR. DACUS:  Your Honor?

04:52:40  15          THE COURT:  Yes.

04:52:40  16          MR. DACUS:  We had the deposition paused.

04:52:42  17  Mr. Sacksteder and I realized that there is source code

04:52:45  18  information that is discussed during the course of this

04:52:48  19  deposition.  And consistent with the Court's practice and

04:52:50  20  procedure, we would ask that the Court seal the courtroom.

04:52:53  21          THE COURT:  All right.  Then based on counsel's

04:52:55  22  request, I'll order the courtroom sealed.

04:52:58  23          Anyone present who's not subject to the protective

04:53:01  24  order that's been entered in this case should excuse

04:53:03  25  themselves until the courtroom is unsealed.

```
04:53:11   1              MR. DACUS:  Thank you, Your Honor.

04:53:12   2              THE COURT:  And, counsel, I'll rely on you to make

04:53:15   3    sure as you look around the room there's nobody that falls

04:53:17   4    within this who has not exited.

04:53:21   5              (Courtroom sealed.)

04:53:21   6              (This portion of the transcript is sealed.

04:53:21   7              and filed under separate cover as

04:53:21   8              Sealed Portion No. 2.)

05:25:00   9              (Courtroom unsealed.)

05:25:01  10              THE COURT:  Ladies and gentlemen, we have one more

05:25:01  11    deposition we need to cover today.  It's going to take

05:25:02  12    about 20 minutes, but we're going to take about a 10-minute

05:25:04  13    recess.  Then we'll come back, we'll do this remaining

05:25:07  14    deposition for about 20 minutes, and that should finish us

05:25:11  15    for the day.

05:25:11  16              If you will close your notebooks and leave them in

05:25:14  17    your chairs, follow all my instructions, and we'll be back

05:25:17  18    in 10 minutes, and we'll continue at that time.

05:25:20  19              The Court stands in recess.

05:25:22  20              COURT SECURITY OFFICER:  All rise.

05:25:24  21              (Jury out.)

05:25:25  22              THE COURT:  The Court stands in recess.

05:34:52  23              (Recess.)

05:34:54  24              (Jury out.)

05:34:55  25              COURT SECURITY OFFICER:  All rise.
```

878

| | | |
|---|---|---|
| 05:34:56 | 1 | THE COURT:  Be seated, please. |
| 05:34:58 | 2 | Defendants, who is your next witness? |
| 05:35:06 | 3 | MR. SACKSTEDER:  Supercell calls Lauri Ahlgren -- |
| 05:35:12 | 4 | or that is our next witness.  I don't see a jury over |
| 05:35:15 | 5 | there. |
| 05:35:16 | 6 | THE COURT:  This is by trial deposition? |
| 05:35:18 | 7 | MR. SACKSTEDER:  Yes, that's correct, Your Honor. |
| 05:35:20 | 8 | THE COURT:  And approximately 20 minutes? |
| 05:35:22 | 9 | MR. SACKSTEDER:  I believe so.  Our -- our portion |
| 05:35:25 | 10 | is 16. |
| 05:35:25 | 11 | THE COURT:  All right. |
| 05:35:26 | 12 | MR. SACKSTEDER:  And I think they've cut some of |
| 05:35:29 | 13 | theirs down. |
| 05:35:30 | 14 | THE COURT:  All right.  This will probably be our |
| 05:35:33 | 15 | last witness for the day. |
| 05:35:34 | 16 | Let's bring in the jury, please. |
| 05:35:37 | 17 | COURT SECURITY OFFICER:  All rise. |
| 05:35:38 | 18 | (Jury in.) |
| 05:36:04 | 19 | THE COURT:  Please be seated. |
| 05:36:05 | 20 | Defendant, call your next witness. |
| 05:36:11 | 21 | MR. SACKSTEDER:  Thank you, Your Honor. |
| 05:36:12 | 22 | Supercell calls Lauri Ahlgren.  And the deposition |
| 05:36:16 | 23 | will include Exhibits PX-75, PX-131, PX-133, and PX-142. |
| 05:36:24 | 24 | THE COURT:  All right.  Proceed with this witness. |
| 05:36:27 | 25 | (Videoclip played.) |

| | | |
|---|---|---|
| 05:36:30 | 1 | QUESTION:  Hello, Mr. Ahlgren.  Would you please |
| 05:36:36 | 2 | state your name for the jury? |
| 05:36:37 | 3 | ANSWER:  So Lauri Ahlgren, L-a-u-r-i |
| 05:36:40 | 4 | A-h-l-g-r-e-n. |
| 05:36:40 | 5 | QUESTION:  Who is your current employer? |
| 05:36:42 | 6 | ANSWER:  My current employer is Supercell. |
| 05:36:45 | 7 | QUESTION:  And what is your role within Supercell? |
| 05:36:47 | 8 | ANSWER:  My role is the game lead of Clash Royale. |
| 05:36:52 | 9 | QUESTION:  And where are you located? |
| 05:36:55 | 10 | ANSWER:  I'm located in Helsinki, Finland. |
| 05:36:58 | 11 | QUESTION:  Where are you testifying from today? |
| 05:36:59 | 12 | ANSWER:  I'm testifying from Helsinki, Finland. |
| 05:37:01 | 13 | QUESTION:  And why is that? |
| 05:37:03 | 14 | ANSWER:  It's because of the COVID-19 situation, |
| 05:37:07 | 15 | so, basically, it's -- it's not possible to travel -- |
| 05:37:10 | 16 | travel from Finland to Texas. |
| 05:37:12 | 17 | QUESTION:  What does game lead mean? |
| 05:37:15 | 18 | ANSWER:  A game lead means that I'm basically |
| 05:37:22 | 19 | responsible for the team that is developing Clash Royale |
| 05:37:27 | 20 | and also sort of like a vision holder of the game. |
| 05:37:30 | 21 | QUESTION:  Briefly, what other jobs did you have |
| 05:37:32 | 22 | before joining Supercell? |
| 05:37:33 | 23 | ANSWER:  I used to work in the film industry.  I |
| 05:37:36 | 24 | started my own production company first, and then actually |
| 05:37:43 | 25 | a digital advertising agency.  And after that, I joined |

05:37:47  1  Supercell.

05:37:47  2          QUESTION:  What made you switch to the mobile

05:37:49  3  gaming industry?

05:37:50  4          ANSWER:  I think I got maybe a little bit bored of

05:37:53  5  sort of like the advertising industry, and then I got the

05:37:55  6  possibility to join -- join Supercell.  And, yeah, I have

05:38:00  7  never looked back since.

05:38:01  8          QUESTION:  And why is that?

05:38:04  9          ANSWER:  I had two of my own companies, and I feel

05:38:08  10  that I have more, like, freedom and responsibility inside

05:38:10  11  Supercell.  So I think that's one of the biggest reasons.

05:38:15  12  It's -- it's a great company to work at.

05:38:18  13          QUESTION:  When did you join Supercell?

05:38:20  14          ANSWER:  I joined Supercell about five years ago,

05:38:23  15  in 2015.

05:38:25  16          QUESTION:  What was your position when you joined

05:38:30  17  Supercell?

05:38:30  18          ANSWER:  It was called digital communications.  So

05:38:32  19  there was a team of three.  We were working on, like,

05:38:38  20  digital advertising or marketing things for -- for the

05:38:41  21  games.

05:38:42  22          QUESTION:  Before you became game lead, did you

05:38:46  23  hold any other positions at Supercell?

05:38:47  24          ANSWER:  Yeah, I actually joined Clash Royale team

05:38:51  25  in 2017 as a live ops manager.

05:38:58  1          QUESTION:  And when did you became game lead?

05:39:01  2          ANSWER:  I became game lead of Clash Royale in

05:39:06  3  summer 2018.

05:39:06  4          QUESTION:  Let's take a step back.  Can you please

05:39:09  5  explain to the jury what Clash Royale is?

05:39:10  6          ANSWER:  So Clash Royale is a mobile game.  It's a

05:39:12  7  card battle game that you play -- where you play with

05:39:16  8  characters on this arena and try to destroy their enemy's

05:39:20  9  buildings.  And you're playing against another player in

05:39:23  10 real-time.

05:39:23  11         QUESTION:  When was Clash Royale released?

05:39:25  12         ANSWER:  Clash Royale was released first in beta

05:39:31  13 just in couple of markets in January 3rd, 2016, and then

05:39:39  14 actually to sort of like the whole world -- the global

05:39:43  15 release was March 2016.

05:39:47  16         ATTORNEY:  Mr. Smith, can you please call up

05:39:51  17 PX-131?

05:39:54  18         QUESTION:  Mr. Ahlgren, can you please tell the

05:40:00  19 jury what this document is?

05:40:02  20         ANSWER:  Yes.  So this is the first -- or like the

05:40:04  21 website freshly released on January the 3rd with the beta

05:40:11  22 release.  Yeah, that's it -- that's what it is.

05:40:14  23         ATTORNEY:  Mr. Smith, can you please call out the

05:40:16  24 screenshots there?

05:40:17  25         QUESTION:  Mr. Ahlgren, can you tell me what's

05:40:21  1   happening in these screenshots here?

05:40:23  2         ANSWER:  So these screenshots, basically you can

05:40:25  3   see how the gameplay works.  So there's characters on the

05:40:26  4   battlefield of the arena going towards the enemy's towers,

05:40:30  5   and those towers are the ones that you try to destroy.  All

05:40:33  6   the different characters have different abilities, and you

05:40:35  7   use eight of them in -- in your deck that you choose for

05:40:38  8   each battle.

05:40:39  9         QUESTION:  How do users obtain cards in Clash

05:40:44  10  Royale?

05:40:44  11        ANSWER:  So you can open cards by -- if you win a

05:40:47  12  battle, you earn a chest.  And then there's a timer

05:40:51  13  basically -- and when you unlock the chest, you get cards

05:40:56  14  out of it, and you might unlock new cards or get more cards

05:41:00  15  to the ones that you already own.  And then basically the

05:41:04  16  chests -- chests are the thing.

05:41:08  17        QUESTION:  What are some other ways to obtain

05:41:10  18  cards?

05:41:10  19        ANSWER:  So you can buy the chest from the shop if

05:41:13  20  you want to -- sort of like make your progress faster.  You

05:41:17  21  can win cards or chests in challenges.  You can buy this

05:41:24  22  monthly pass called Pass Royale and get cards as rewards by

05:41:32  23  earning crowns that you get for destroying towers.  And

05:41:33  24  then you also can -- if you are -- if you belong into a

05:41:36  25  clan, you can also ask your clan mates to donate cards for

05:41:40  1   you.

05:41:41  2        QUESTION:  Can you briefly explain how users

05:41:43  3   obtain donated cards?

05:41:45  4        ANSWER:  So, yeah, first of all, you have to be in

05:41:47  5   a clan.  And then you can ask for your clan mates to donate

05:41:54  6   certain amount of card that you already have unlocked.  And

05:41:59  7   then the request appears in the clan chats, and then your

05:42:04  8   clan mates basically give you the donated cards.

05:42:05  9        QUESTION:  If the user receives a donated card,

05:42:09  10  can the user then upgrade that card?

05:42:11  11       ANSWER:  Not automatically.  So you always have to

05:42:13  12  have, like, certain amount of cards to upgrade it to the

05:42:19  13  next level when you -- when you also get more power to the

05:42:22  14  card, but you also have to use gold to complete the

05:42:26  15  upgrade.  Gold is one of the currencies in the game.

05:42:34  16       ATTORNEY:  Mr. Smith, can you please pull up a

05:42:40  17  still from PX-142 at the 15-second mark?

05:42:40  18       QUESTION:  Mr. Ahlgren, can you please explain how

05:42:44  19  a user plays its cards during a battle in Clash Royale?

05:42:47  20       ANSWER:  So in these images, you can see there's

05:42:50  21  four cards available like below, and then there's this

05:42:54  22  Elixir meter.

05:42:54  23       So each card has their own amount of Elixir needed

05:42:59  24  to be used.  And then basically the player use their finger

05:43:04  25  to choose the card, and then use their finger -- finger to

05:43:10  1   put it on the -- on the battlefield or the arena.

05:43:13  2         And you can only put the card in there if there's

05:43:17  3   more Elixir in the Elixir meter than the card uses.

05:43:20  4         ATTORNEY:  Mr. Smith, can you please pull up

05:43:24  5   PX-133 at the 27-second mark?

05:43:27  6         QUESTION:  Mr. Ahlgren, what is on the screen

05:43:30  7   right now?

05:43:30  8         ANSWER:  Yeah, here you can actually see how the

05:43:32  9   gameplay works.  This video was released when we released

05:43:35  10  the -- the beta of the game.

05:43:37  11        Yeah, so player is choosing cards that they can

05:43:40  12  use that are less Elixir than you have in the Elixir meter.

05:43:47  13        QUESTION:  You just mentioned the word "Elixir."

05:43:49  14  What is Elixir?

05:43:50  15        ANSWER:  So in many games, they call it mana, but

05:43:54  16  we call it Elixir.  So -- so Elixir is basically a currency

05:44:00  17  in the battle that keeps flowing all the time.  And when

05:44:03  18  the player has enough Elixir to use a certain card, then

05:44:06  19  they can use the card.

05:44:09  20        QUESTION:  Mr. Ahlgren, do you follow what's

05:44:11  21  happening in the mobile gaming industry?

05:44:13  22        ANSWER:  Yes, quite high-level.  So -- so, like,

05:44:19  23  big things, what's happening with Fortnite, different kind

05:44:24  24  of like bigger markets, but mostly concentrated on the --

05:44:30  25  sort of like the top 10 games.

| | | |
|---|---|---|
| 05:44:31 | 1 | QUESTION:  I want to talk a little bit about GREE. |
| 05:44:34 | 2 | To your knowledge, has Supercell ever tracked or |
| 05:44:37 | 3 | followed GREE? |
| 05:44:39 | 4 | ANSWER:  No, not to my knowledge. |
| 05:44:40 | 5 | QUESTION:  And, to your knowledge, has Supercell |
| 05:44:43 | 6 | ever tracked or followed GREE's games? |
| 05:44:46 | 7 | ANSWER:  No, not to my knowledge. |
| 05:44:48 | 8 | QUESTION:  And, to your knowledge, has Supercell |
| 05:44:50 | 9 | ever tracked or followed GREE's patents? |
| 05:44:53 | 10 | ANSWER:  No, not to my knowledge. |
| 05:44:57 | 11 | QUESTION:  You understand that GREE has accused |
| 05:44:58 | 12 | the card donation and Elixir features of infringement, |
| 05:45:03 | 13 | correct? |
| 05:45:03 | 14 | ANSWER:  Yes, I understand. |
| 05:45:05 | 15 | QUESTION:  And has Supercell made any changes to |
| 05:45:08 | 16 | these features based on GREE's allegations in this case? |
| 05:45:10 | 17 | ANSWER:  No, we haven't done any changes. |
| 05:45:13 | 18 | QUESTION:  Would it be possible to make any |
| 05:45:15 | 19 | changes? |
| 05:45:16 | 20 | ANSWER:  Yes, it would be possible to make |
| 05:45:18 | 21 | changes. |
| 05:45:19 | 22 | QUESTION:  And if changing these features is |
| 05:45:21 | 23 | possible, why hasn't Supercell done that? |
| 05:45:25 | 24 | ANSWER:  Because we're not -- we don't think we're |
| 05:45:27 | 25 | doing anything wrong, so that's the reason. |

05:45:32  1        QUESTION:  And what are some alternatives to these

05:45:34  2   features?

05:45:35  3        ANSWER:  So for the card donation feature, we

05:45:37  4   could basically make it work in a way that when you ask

05:45:43  5   donated cards, it wouldn't get the card actually operating.

05:45:49  6   You can still get the final card, for example, from chests

05:45:52  7   or shop or challenges or -- or, like, some other place in

05:45:56  8   the game.

05:45:58  9        QUESTION:  And what about the Elixir feature?

05:46:00  10        ANSWER:  So the Elixir feature, we could just

05:46:05  11   change the sort of like order of -- of the sequence

05:46:09  12   happening on the background, and the players wouldn't

05:46:13  13   notice any -- actually any change in the -- in the feature.

05:46:15  14        QUESTION:  Switching gears a little bit.  How does

05:46:19  15   Supercell make money from Clash Royale?

05:46:21  16        ANSWER:  So, mainly, first of all, like most of

05:46:26  17   the players, they don't use any money to the game.  So the

05:46:28  18   game is designed in a way that you don't have to spend

05:46:31  19   money.  You can still -- still play the game and enjoy,

05:46:36  20   like, almost all the features.

05:46:38  21        And then the upgrading of the cards is the thing

05:46:42  22   where usually players want to boost their progress by

05:46:46  23   spending money.  So you -- they might buy chests from the

05:46:50  24   shop.  They might buy the monthly pass, which is more like

05:46:55  25   engagement base.  So you collect crowns to earn -- earn

| | | |
|---|---|---|
| 05:46:58 | 1 | rewards. |
| 05:46:59 | 2 | And then we also have these live ops offers or |
| 05:47:04 | 3 | sales happening -- happening in the game, and that's one of |
| 05:47:06 | 4 | the revenue streams. |
| 05:47:07 | 5 | QUESTION:  What keeps players coming back to Clash |
| 05:47:10 | 6 | Royale? |
| 05:47:10 | 7 | ANSWER:  So I think the main reason is just like |
| 05:47:13 | 8 | the core gameplay and the strategy.  It's a game that is |
| 05:47:16 | 9 | easy to learn but hard to master.  So that's kind of like a |
| 05:47:21 | 10 | long learning curve in the battles and sort of like in the |
| 05:47:26 | 11 | upgrading. |
| 05:47:27 | 12 | And then -- then we just keep, like, constantly |
| 05:47:31 | 13 | adding fresh content to the game with the updates.  So the |
| 05:47:36 | 14 | game keeps updating about every three months.  So that's -- |
| 05:47:39 | 15 | that's one big reason to come back. |
| 05:47:41 | 16 | QUESTION:  What kind of updates does Supercell do |
| 05:47:44 | 17 | to Clash Royale? |
| 05:47:45 | 18 | ANSWER:  We do new features, add new content as |
| 05:47:50 | 19 | cards, or just, like, change the game balance like how the |
| 05:47:53 | 20 | cards work between each other. |
| 05:47:55 | 21 | QUESTION:  What are some examples of these balance |
| 05:47:57 | 22 | changes? |
| 05:47:58 | 23 | ANSWER:  So example of balance change is that we |
| 05:48:01 | 24 | might have one card that is just, like, used a lot, and the |
| 05:48:08 | 25 | win rates are high.  Players are playing a lot, and we |

05:48:11  1  actually might get some -- some even complaints about it.

05:48:16  2          And then we decide -- decide to take the power

05:48:18  3  level a little bit down just to make the other -- other

05:48:21  4  cards feel better, and it kind of like keeps the game

05:48:25  5  fresh.

05:48:25  6          QUESTION:  How often does Supercell make these

05:48:28  7  balance changes?

05:48:28  8          ANSWER:  We might do them with the updates --

05:48:31  9  nowadays we do it actually on monthly basis.  Like whenever

05:48:34  10  a new season starts, there's balance changes coming in.

05:48:40  11          ATTORNEY:  Mr. Smith, can you please pull up

05:48:43  12  PX-76?

05:48:44  13          QUESTION:  Mr. Ahlgren, can you please explain to

05:48:55  14  the jury what this document is?

05:48:56  15          ANSWER:  Yes.  So this is release notes from one

05:49:01  16  of our sort of like smaller updates I would say.

05:49:05  17          So in the release notes, we basically just write

05:49:09  18  down whatever has happened or whatever has changed in the

05:49:14  19  current -- current client build.

05:49:16  20          QUESTION:  And would this include the balance

05:49:19  21  changes you referred to before?

05:49:21  22          ANSWER:  Yes, this -- I think in this update, I

05:49:27  23  think there's probably some balance changes in -- yeah, but

05:49:30  24  anyways, like, it's -- we might put the balance changes in

05:49:34  25  with the updates or -- or with a game maintenance.

05:49:40  1          QUESTION:  Mr. Ahlgren, you mentioned live ops

05:49:43  2   before.   What are live ops?

05:49:46  3          ANSWER:  So live ops -- we call live ops things

05:49:50  4   that we can change dynamically in the game without these

05:49:54  5   client updates.

05:49:55  6          So, for example, the shop in the game works in a

05:50:00  7   way that we can -- let's say there's a big holiday coming

05:50:04  8   and we want to put holiday sales in the shop.   Those are

05:50:08  9   live ops events for us.   And then we might have, like, a

05:50:11  10  special weekend challenge, different kind of, like,

05:50:15  11  gameplay mode for the players, and that's also called live

05:50:18  12  ops.

05:50:18  13         QUESTION:  And are live ops connected to revenue?

05:50:21  14         ANSWER:  Yes, they are.   Like I mentioned, it's --

05:50:24  15  it's -- it's the sales, offers, those things, they are

05:50:29  16  considered as live ops.

05:50:30  17         QUESTION:  What gameplay features in Clash Royale

05:50:32  18  are most important to users?

05:50:35  19         ANSWER:  I would say it's the whole package of the

05:50:39  20  game.   It's really hard to put something above others.

05:50:44  21  It's -- it's the battle -- it's the battle gameplay

05:50:50  22  progressing in the game, kind of like players like to have

05:50:54  23  fun and progress, basically.

05:50:56  24         QUESTION:  Can you put a monetary value on any of

05:50:59  25  the gameplay features in Clash Royale?

| | | |
|---|---|---|
| 05:51:01 | 1 | ANSWER:  I wouldn't put a monetary value.  It's, |
| 05:51:05 | 2 | once again, about the whole package.  It's the -- it's -- |
| 05:51:08 | 3 | it's like a complex game put into a simple -- simple |
| 05:51:12 | 4 | package.  I would say that's -- that's the -- that's the |
| 05:51:15 | 5 | thing. |
| 05:51:16 | 6 | QUESTION:  Thank you, Mr. Ahlgren. |
| 05:51:18 | 7 | ATTORNEY:  I have no further questions.  I'll pass |
| 05:51:20 | 8 | the witness. |
| 05:51:21 | 9 | QUESTION:  Good morning, Mr. Ahlgren.  It's nice |
| 05:51:24 | 10 | to see you again. |
| 05:51:25 | 11 | ANSWER:  Good morning.  Nice to see you again. |
| 05:51:28 | 12 | QUESTION:  My name is Taylor Pfingst, and we met |
| 05:51:32 | 13 | previously at your deposition, correct? |
| 05:51:33 | 14 | ANSWER:  Yes, that's correct. |
| 05:51:35 | 15 | QUESTION:  And Supercell has named you as a |
| 05:51:39 | 16 | corporate representative in this case; is that correct? |
| 05:51:40 | 17 | ANSWER:  Yes, that's correct. |
| 05:51:45 | 18 | QUESTION:  Mr. Ahlgren, you don't have a computer |
| 05:51:47 | 19 | science degree, right? |
| 05:51:50 | 20 | ANSWER:  No, I don't have one. |
| 05:51:53 | 21 | QUESTION:  Okay.  So you don't write source code, |
| 05:51:55 | 22 | do you? |
| 05:51:55 | 23 | ANSWER:  No, I don't write source code. |
| 05:51:57 | 24 | QUESTION:  And you don't read source code either, |
| 05:52:02 | 25 | then, correct? |

05:52:03  1          ANSWER:  Yes, that's correct.

05:52:04  2          QUESTION:  And, Mr. Ahlgren, you've never reviewed

05:52:07  3  any patents before, right?

05:52:08  4          ANSWER:  No, I haven't.

05:52:14  5          QUESTION:  And you testified earlier today about

05:52:15  6  the Elixir feature in Clash Royale.  Do you recall that

05:52:18  7  testimony?

05:52:20  8          ANSWER:  Yes.

05:52:22  9          QUESTION:  In Clash Royale, each card has an

05:52:26  10  Elixir cost, correct?

05:52:27  11          ANSWER:  Yes, that's correct.

05:52:29  12          QUESTION:  But you can only play a particular card

05:52:32  13  when its Elixir cost is less than or equal to the current

05:52:37  14  amount of the Elixir you have, correct?

05:52:39  15          ANSWER:  Yes, that's correct.

05:52:40  16          QUESTION:  Because the Elixir disappears when you

05:52:44  17  play a card, right?

05:52:46  18          ANSWER:  There's Elixir disappearing, but it's

05:52:49  19  actually -- like it's flowing at the same time.  So it's --

05:52:53  20  when you play the card, it's like if your half Elixir

05:52:59  21  flowing, it's still there.  So that's how it works.

05:53:02  22          QUESTION:  Mr. Ahlgren, the troops of a card are

05:53:08  23  deployed in the arena when a player plays a card, right?

05:53:11  24          ANSWER:  Yeah -- yes, correct.

05:53:16  25          QUESTION:  And one of the goals of Supercell as a

05:53:18  1  company is the key player is engaged in the game for a long

05:53:23  2  period of time rather than simply have them spend the most

05:53:28  3  amount of hours possible right now; is that correct?

05:53:30  4       ANSWER:  We are trying to design games that you

05:53:38  5  don't have to -- like you can play, like, small amounts at

05:53:41  6  a time, and that's at least with Royale, yes.

05:53:45  7       QUESTION:  All right.  And Supercell also tries to

05:53:51  8  avoid having players grind in its games, correct?

05:53:54  9       ANSWER:  It's also like we are trying to design

05:53:57  10  games that are -- that are sort of like easy to play.  Some

05:54:00  11  of the players might still grind the games, it's -- it's

05:54:03  12  possible.  But that's kind of the goal.

05:54:04  13       QUESTION:  Now, you testified earlier today that

05:54:10  14  you started working at Supercell about five years ago,

05:54:13  15  right?

05:54:13  16       ANSWER:  Yes.

05:54:14  17       QUESTION:  And you've been lead of Clash Royale

05:54:20  18  for a little over two years; is that correct?

05:54:22  19       ANSWER:  Yes, that's correct.

05:54:23  20       QUESTION:  So you weren't part of the Clash Royale

05:54:25  21  team when Supercell developed the card donation feature you

05:54:29  22  testified to earlier, correct?

05:54:31  23       ANSWER:  That's correct.  I was not part of the

05:54:33  24  team.

05:54:34  25       QUESTION:  But as the game lead for Clash Royale,

05:54:38  1   you're familiar with the game, correct?

05:54:39  2        ANSWER:  Yes, I am familiar, and I play the game.

05:54:42  3        QUESTION:  And you testified earlier about the

05:54:47  4   card donation feature in Clash Royale.  Do you recall that

05:54:49  5   testimony?

05:54:49  6        ANSWER:  Yes.

05:54:51  7        QUESTION:  And one of the perks of the card

05:54:54  8   donation feature is that you can request a specific card

05:54:58  9   you want from one of your clan mates, correct?

05:55:01  10       ANSWER:  Yes.

05:55:04  11       QUESTION:  You also testified earlier regarding

05:55:07  12  the ability to upgrade a card after you've received a clan

05:55:12  13  mate's donation.  Do you recall that testimony?

05:55:14  14       ANSWER:  Yes.

05:55:15  15       QUESTION:  Mr. Ahlgren, you testified earlier that

05:55:22  16  the core gameplay keeps players coming back to the game,

05:55:25  17  right?

05:55:25  18       ANSWER:  Yes, that's -- that's one of the things,

05:55:27  19  yes.

05:55:27  20       QUESTION:  And Supercell hasn't changed its core

05:55:34  21  gameplay for Clash Royale, right?

05:55:37  22       ANSWER:  There's -- there's the battle -- battle

05:55:40  23  and getting cards and kind of like the -- the mental game

05:55:43  24  of getting chests that has been similar since the

05:55:46  25  beginning.

05:55:53  1          QUESTION:  And the ability to upgrade your cards

05:55:55  2  in Clash Royale is a feature that Supercell users enjoy,

05:55:59  3  right?

05:55:59  4          ANSWER:  Yes, I would say like at least myself as

05:56:02  5  a player, I enjoy upgrading the cards.  It's -- it's -- it

05:56:07  6  helps you progress in the game.  So -- so I think it's --

05:56:10  7  it's a good thing for the players, and they enjoy it.

05:56:14  8          QUESTION:  And one of the reasons that Supercell

05:56:18  9  players make purchases in Clash Royale is to progress

05:56:21  10  faster in the game, right?

05:56:23  11          ANSWER:  Yes, that's, I would say, the main --

05:56:26  12  main reason, and then there's also -- also cosmetics that

05:56:31  13  you can buy, but the main reason is the card upgrades.

05:56:36  14          QUESTION:  And the ability to upgrade is also an

05:56:38  15  incentive for players to spend money, right?

05:56:42  16          ANSWER:  Yes, it is an incentive to spend money to

05:56:46  17  progress faster.

05:56:47  18          QUESTION:  But is it true that only a small amount

05:56:49  19  of players spend money in Clash Royale, as little as 4 to 6

05:56:54  20  percent, right?

05:56:54  21          ANSWER:  Yes, that's true that it's a small

05:56:57  22  percentage.

05:56:57  23          QUESTION:  And you testified earlier that

05:57:04  24  Supercell hasn't made any changes to the game as a result

05:57:06  25  of this litigation, correct?

| | | |
|---|---|---|
| 05:57:07 | 1 | ANSWER:  Yes, that's correct. |
| 05:57:11 | 2 | QUESTION:  Okay. |
| 05:57:12 | 3 | ATTORNEY:  I can pass the witness, Shannon -- |
| 05:57:18 | 4 | Ms. Turner. |
| 05:57:21 | 5 | QUESTION:  Mr. Ahlgren, Ms. Pfingst was just |
| 05:57:25 | 6 | asking about upgrading cards. |
| 05:57:27 | 7 | What are the ways that players usually gain cards |
| 05:57:30 | 8 | to upgrade them? |
| 05:57:32 | 9 | ANSWER:  User game cards to upgrade them -- so |
| 05:57:36 | 10 | it's like I mentioned earlier in the -- in the testimony, |
| 05:57:38 | 11 | it's -- it's from the chests that you earn from the game by |
| 05:57:42 | 12 | playing the battles, winning the battles, or winning them |
| 05:57:46 | 13 | from -- from challenges or buying them from the -- from the |
| 05:57:50 | 14 | shop, or actually getting higher up in the arena so you can |
| 05:57:54 | 15 | also un -- unlock cards when you -- when you earn trophies |
| 05:57:59 | 16 | from winning -- winning battles in the arena, you earn |
| 05:58:03 | 17 | trophies, and you also progress and unlock new arenas with |
| 05:58:08 | 18 | new cards in them.  Those are the ways. |
| 05:58:10 | 19 | QUESTION:  Thank you. |
| 05:58:11 | 20 | ATTORNEY:  I have no further questions. |
| 05:58:14 | 21 | ATTORNEY:  No further questions. |
| 05:58:16 | 22 | (Videoclip ends.) |
| 05:58:17 | 23 | THE COURT:  Does that -- does that complete this |
| 05:58:19 | 24 | witness? |
| 05:58:19 | 25 | MR. SACKSTEDER:  It does, Your Honor. |

896

05:58:20   1            THE COURT:  All right.  Ladies and gentlemen of

05:58:23   2    the jury, as I indicated, we're going to recess for the day

05:58:26   3    at this juncture.

05:58:28   4            I'll ask you to take your notebooks and leave them

05:58:31   5    closed on the table in the jury room.  Please be available

05:58:36   6    and ready to reconvene as close to 8:30 as possible in the

05:58:40   7    morning.

05:58:40   8            We got a late start this morning.  That was my

05:58:43   9    fault, not yours.  I'll try to be closer to our appointed

05:58:49   10   time in the morning.

05:58:50   11           Travel safely.  I think we all noticed there was

05:58:53   12   some rain outside, so the streets may be wet.

05:58:56   13           Please follow all my instructions, including, of

05:58:56   14   course, you would expect me to remind you, not to discuss

05:58:59   15   the case with anyone.  Follow all the other instructions

05:59:01   16   I've given you.  Travel safely to your homes.  And I will

05:59:04   17   see you in the morning.

05:59:05   18           The jury is excused at this time.

05:59:07   19           COURT SECURITY OFFICER:  All rise.

05:59:08   20           (Jury out. )

05:59:30   21           THE COURT:  All right.  Be seated, please.

05:59:31   22           Counsel, let -- let me remind you of my earlier

05:59:38   23   instruction to have a revised and updated jointly submitted

05:59:44   24   final jury instructions and charge available to be

05:59:46   25   submitted to the Court by 6:00 p.m. tomorrow.

05:59:49  1          You'll need to meet and confer, obviously, in

05:59:52  2     updating this.  Be sure that the Court receives your

05:59:55  3     competing proposals and the joint submission in which

06:00:01  4     they're contained in Word format.

06:00:03  5          This morning, at 7:00 o'clock, pursuant to my

06:00:06  6     earlier instruction, binders were delivered to the Court --

06:00:10  7     to the chambers of the Court.  We got three copies.  We

06:00:14  8     need four copies.  So please make it four copies in the

06:00:18  9     morning to the extent there are surviving disputes that

06:00:21  10    can't be resolved overnight through your ongoing

06:00:24  11    meet-and-confer efforts.

06:00:25  12         I'll be available in chambers by no later than

06:00:28  13    7:30 to meet with you in that event.

06:00:31  14         And we will, as we did today, read into the record

06:00:35  15    the items from the list of the pre-admitted exhibits used

06:00:38  16    during today's portion of the trial before I bring in the

06:00:41  17    jury.

06:00:41  18         Also, I'd like lead counsel for both sides to have

06:00:46  19    a conversation tonight with their local counsel to review

06:00:49  20    the proper procedures for impeaching witnesses.  It would

06:00:53  21    probably be beneficial, and it shouldn't take more than

06:00:56  22    about 20 minutes.

06:00:58  23         Both of your local counsel are experienced trial

06:01:00  24    lawyers known to this Court to be well-versed in the proper

06:01:04  25    way to impeach a witness.

```
06:01:06   1        All right.  With that, we stand in recess until
06:01:08   2   tomorrow morning.
06:01:09   3        COURT SECURITY OFFICER:  All rise.
06:01:14   4        (Recess.)
           5
           6
           7                      CERTIFICATION
           8
           9        I HEREBY CERTIFY that the foregoing is a true and
          10   correct transcript from the stenographic notes of the
          11   proceedings in the above-entitled matter to the best of my
          12   ability.
          13
          14
          15    /S/ Shelly Holmes                    9/14/2020
               SHELLY HOLMES, CSR, TCRR              Date
          16   OFFICIAL REPORTER
               State of Texas No.: 7804
          17   Expiration Date: 12/31/2020
          18
          19
          20
          21
          22
          23
          24
          25
```