08:09:43

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION


GREE, INC.,                    )(   CIVIL ACTION NOS.
                              )(   2:19-CV-70-JRG-RSP
    PLAINTIFFS,               )(   2:19-CV-71-JRG-RSP
                              )(
VS.                           )(
                              )(   MARSHALL, TEXAS
SUPERCELL OY,                 )(   SEPTEMBER 16, 2020
                              )(   8:44 A.M.
    DEFENDANTS.               )(


TRANSCRIPT OF JURY TRIAL

VOLUME 9 - MORNING SESSION

BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

UNITED STATES CHIEF DISTRICT JUDGE


APPEARANCES:


FOR THE PLAINTIFFS:


MR STEVEN D. MOORE
KILPATRICK TOWNSEND & STOCKTON LLP
Two Embarcadero Center, Suite 1900
San Francisco, CA 94111


MS. TAYLOR HIGGINS LUDLAM
KILPATRICK TOWNSEND & STOCKTON LLP
4208 Six Forks Road
Raleigh, NC 27609

1   FOR THE PLAINTIFF:

2

3   MR. ALTON L. ABSHER III
    KILPATRICK TOWNSEND & STOCKTON LLP
4   1001 West Fourth Street
    Winston-Salem, NC 27101
5

6   MR. MICHAEL T. MORLOCK
    KILPATRICK TOWNSEND & STOCKTON LLP
7   1100 Peachtree Street, NE
    Suite 2800
8   Atlanta, GA 30309

9
    MS. TAYLOR J. PFINGST
10  KILPATRICK TOWNSEND & STOCKTON LLP
    Two Embarcadero Center, Suite 1900
11  San Francisco, CA 94111

12
    MS. MELISSA R. SMITH
13  GILLAM & SMITH, LLP
    303 South Washington Avenue
14  Marshall, TX 75670

15

16  FOR THE DEFENDANT:

17

18  MR. MICHAEL J. SACKSTEDER
    MR. BRYAN A. KOHM
19  MR. CHRISTOPHER L. LARSON
    MS. SHANNON E. TURNER
20  FENWICK & WEST LLP
    555 California Street, 12th Floor
21  San Francisco, CA 94104

22
    MR. GEOFFREY R. MILLER
23  FENWICK & WEST LLP
    902 Broadway, Suite 14
24  New York, NY 10010

25

```
 1   FOR THE DEFENDANT:

 2
     MS. JESSICA M. KAEMPF
 3   MR. JONATHAN T. MCMICHAEL
     FENWICK & WEST LLP
 4   1191 Second Ave., 10th Floor
     Seattle, WA 98101
 5

 6   MR. DERON DACUS
     THE DACUS FIRM, P.C.
 7   821 ESE Loop 323, Suite 430
     Tyler, TX 75701
 8

 9

10

11

12   COURT REPORTER:    Ms. Shelly Holmes, CSR, TCRR
                        Official Court Reporter
13                      United States District Court
                        Eastern District of Texas
14                      Marshall Division
                        100 E. Houston
15                      Marshall, Texas  75670
                        (903) 923-7464
16

17
     (Proceedings recorded by mechanical stenography, transcript
18   produced on a CAT system.)

19

20

21

22

23

24

25
```

```
08:29:34   1                    P R O C E E D I N G S

08:29:34   2              (Jury out.)

08:29:35   3              COURT SECURITY OFFICER:  All rise.

08:29:36   4              THE COURT:  Be seated, please.

08:44:03   5              Are the parties prepared to read into the record

08:44:10   6    those items from the list of pre-admitted exhibits used

08:44:13   7    during yesterday's portion of the trial?

08:44:14   8              MR. MOORE:  Yes, Your Honor, we are.

08:44:16   9              THE COURT:  Please proceed.

08:44:20  10              MS. PFINGST:  May I proceed, Your Honor?

08:44:32  11              THE COURT:  Please do.

08:44:33  12              MS. PFINGST:  Thank you.

08:44:35  13              PTX-68, PTX-73, PTX-129, PTX-458, PTX-606.  Thank

08:44:46  14    you.

08:44:46  15              THE COURT:  All right.  Is there any objection to

08:44:47  16    that rendition?

08:44:48  17              MR. DACUS:  No objection, Your Honor.

08:44:49  18              THE COURT:  Do Defendants have a similar rendition

08:44:51  19    to offer into the record?

08:44:52  20              MR. DACUS:  Yes, we do, Your Honor.  Thank you.

08:44:54  21              THE COURT:  Please proceed.

08:44:56  22              MR. MCMICHAEL:  Good morning, Your Honor.

08:44:59  23              Defendant's Exhibits are DX-27A, DX-27B, DX-29A,

08:45:08  24    DX-29B, DX-51, DX-198, DX-498, DX-514, DX-519, DX-531,

08:45:21  25    DX-532, DX-533, DX-540, DX-566, DX-570, DX-588, DX-620,
```

| | | |
|---|---|---|
| 08:45:33 | 1 | DX-636, DX-649, DX-652, DX-666, DX-698, DX-705, DX-706, |
| 08:45:46 | 2 | DX-708, DX-938, DX-943, DX-945, DX-947, DX-949, DX-957, |
| 08:46:01 | 3 | DX-1018, DX-1030, DX-1044, DX-1053, DX-1054, DX-1076.1348, |
| 08:46:13 | 4 | DX-1076.1362, DX-1076.1732 to 1733, and DX-1076.1738, |
| 08:46:31 | 5 | DX-1197, PTX-3, PTX-4, PTX-5, PTX-33, PTX-68, PTX-140, |
| 08:46:41 | 6 | PTX-150, PTX-159, PTX-172, PTX-173, PTX-174, PTX-446, |
| 08:46:53 | 7 | PTX-598, and PTX-601. |
| 08:46:56 | 8 | THE COURT:  All right.  Thank you for that |
| 08:46:59 | 9 | rendition. |
| 08:47:00 | 10 | Does Plaintiff have any objection to the same? |
| 08:47:03 | 11 | MR. MOORE:  No, Your Honor, no objection. |
| 08:47:05 | 12 | THE COURT:  All right.  Counsel, are you aware of |
| 08:47:10 | 13 | anything we should take up before I bring in the jury and |
| 08:47:14 | 14 | proceed with the Defendant's case-in-chief? |
| 08:47:16 | 15 | MR. MOORE:  Nothing from Plaintiff, Your Honor. |
| 08:47:19 | 16 | MR. DACUS:  Nothing from Defendant. |
| 08:47:21 | 17 | THE COURT:  Let's bring in the jury, |
| 08:47:24 | 18 | Mr. Fitzpatrick. |
| 08:47:29 | 19 | COURT SECURITY OFFICER:  Yes, Your Honor. |
| 08:47:30 | 20 | All rise. |
| 08:47:33 | 21 | (Jury in.) |
| 08:47:40 | 22 | THE COURT:  Good morning and welcome back, ladies |
| 08:47:49 | 23 | and gentlemen.  Please have a seat. |
| 08:47:50 | 24 | We'll proceed with the Defendant's case-in-chief. |
| 08:47:56 | 25 | Defendant, call your next witness. |

08:47:58    1          MR. DACUS:  Thank you, Your Honor.  Supercell

08:48:00    2    calls Robert Klein.  Mr. Klein is Supercell's survey

08:48:04    3    expert, and we call him by video trial deposition,

08:48:07    4    Your Honor.

08:48:07    5          THE COURT:  Proceed with the witness by

08:48:08    6    deposition.

08:48:09    7          MR. DACUS:  Thank you.

08:48:10    8          (Videoclip played.)

08:48:10    9          QUESTION:  Good afternoon, Mr. Klein.  Would you

08:48:23   10    please state your name for the jury.

08:48:25   11          ANSWER:  Yes, Robert Klein, K-l-e-i-n.

08:48:30   12          QUESTION:  Mr. Klein, were you retained by

08:48:32   13    Supercell in this case.

08:48:33   14          ANSWER:  Yes, I was.

08:48:34   15          QUESTION:  What were you retained to do.

08:48:36   16          ANSWER:  I was retained to do two things.  First,

08:48:38   17    to review Dr. Neal's survey and report and determine

08:48:43   18    whether it could be used as a basis for calculating

08:48:47   19    damages.

08:48:47   20          And, secondly, to conduct surveys of my own.  I

08:48:51   21    conducted three surveys, directed at the specific features

08:48:56   22    that are accused in the three separate games.

08:48:58   23          QUESTION:  Thank you, Mr. Klein.

08:49:01   24          I'd like to start discussing your educational

08:49:03   25    background.

08:49:04  1          Could you please summarize that for us?

08:49:07  2          ANSWER:  Sure.  I have an undergraduate degree,

08:49:11  3  Bachelor of Science degree from MIT in mechanical

08:49:16  4  engineering in 1966 and a Master of Science degree in

08:49:20  5  management from the MIT Sloan School of Management in 1968.

08:49:24  6          QUESTION:  And, Mr. Klein, I'd like to next turn

08:49:32  7  to your professional history.  Could you please summarize

08:49:34  8  that for us.

08:49:35  9          ANSWER:  Sure.  After graduating from MIT, I spent

08:49:37  10  two years as a commissioned officer in the U.S. Public

08:49:42  11  Health Service, stationed at the National Institutes of

08:49:45  12  Health in Bethesda, Maryland, in the division of computer

08:49:52  13  research and technology.

08:49:53  14          In 1970, I returned to Boston to join two of my

08:49:57  15  former professors and started Management Decision Systems,

08:50:02  16  a market research, marketing consulting company.  Over the

08:50:07  17  15 -- next 15 years, Management Decision Systems grew to

08:50:13  18  about 250 employees with offices throughout the U.S., as

08:50:16  19  well as in Europe and Asia.

08:50:19  20          In 1985, Management Decision Systems was acquired

08:50:23  21  by Information Resources, which was then the fourth largest

08:50:28  22  market research company in the world.  I became executive

08:50:32  23  vice president of Information Resources.

08:50:34  24          I left then in 1989 to start Applied Marketing

08:50:39  25  Science, working with another MIT professor.  And so for

08:50:47  1  the last 31, now, years, we've been applying market

08:50:52  2  research techniques to issues of understanding customer

08:50:56  3  wants and needs, as well as supporting litigation.

08:51:02  4      QUESTION:  Have you conducted consumer surveys.

08:51:05  5      ANSWER:  Yes, I have.  I've conducted over a

08:51:08  6  thousand consumer surveys, primarily for commercial

08:51:12  7  clients, not for litigation.

08:51:13  8      QUESTION:  Have you ever conducted a survey for

08:51:15  9  litigation.

08:51:15  10     ANSWER:  Yes, I've conducted approximately 200

08:51:19  11  surveys for use in litigation.

08:51:24  12     QUESTION:  When did you conduct your first

08:51:26  13  consumer survey.

08:51:27  14     ANSWER:  The first survey I conducted was in 1971

08:51:31  15  where we were predicting how successful new products would

08:51:37  16  be before they came onto the market.  And it was a process

08:51:40  17  that involved interviewing people in shopping malls and --

08:51:43  18  and then telephone interviews, following them up.

08:51:48  19     QUESTION:  Have you ever been invited to speak as

08:51:52  20  a guest lecturer.

08:51:54  21     ANSWER:  Yes.  I've spoken a number of times to

08:51:56  22  classes at MIT, Boston University, and University of Iowa.

08:52:03  23  These were all on the nature of how to understand customer

08:52:06  24  wants and needs, how to interview customers, consumers, and

08:52:13  25  so on.

08:52:13  1      QUESTION:  Since you have been conducting surveys

08:52:20  2  since 1971, do you have any experience with surveys for

08:52:24  3  video games.

08:52:24  4      ANSWER:  Yes, I do.  In -- in the early '80s, we

08:52:29  5  were actually -- I was actually working with Atari in

08:52:34  6  predicting how successful their new games were going to be.

08:52:38  7  And we actually developed the procedure that Atari used to

08:52:45  8  predict the sales of a new video game by bringing teenage

08:52:49  9  boys in to play the games and then interview them after use

08:52:53  10  of -- after they'd had a chance to play the game to see

08:52:56  11  what their attitude and interest was.

08:52:58  12      QUESTION:  Turning here a little bit, Mr. Klein,

08:53:07  13  do you have any involvement in professional organizations.

08:53:09  14      ANSWER:  Yes, I do.  I'm a member of the American

08:53:13  15  Association for Public Opinion Research; member of the

08:53:16  16  Product Development Management Association; I'm a member of

08:53:20  17  INFORMS, which is the Institute for Operations Research and

08:53:24  18  the Management Science.

08:53:25  19      And I represented my company, AMS, on the Council

08:53:29  20  of American Survey Research Organizations and to the

08:53:34  21  International Trademark Association.  And as part of my

08:53:36  22  work with the International Trademark Association, I've

08:53:41  23  been on their Proof of Confusion subcommittee for four

08:53:45  24  years, and I was a member of their Opposition &

08:53:48  25  Cancellation Standards & Procedures subcommittee for two

```
08:53:52   1   years.
08:53:56   2           ATTORNEY:  At this time, I'd like to offer
08:53:58   3   Mr. Klein as an expert in market research and consumer
08:54:02   4   surveys.
08:54:02   5           Any objection, counsel?
08:54:06   6           ATTORNEY:  No objection.
08:54:10   7           QUESTION:  Mr. Klein, you mentioned that you were
08:54:12   8   retained to do some surveys.  How many surveys did you
08:54:16   9   conduct.
08:54:16  10           ANSWER:  I conducted three separate surveys.
08:54:21  11           QUESTION:  And approximately how many individuals
08:54:25  12   completed those surveys.
08:54:26  13           ANSWER:  Each of the surveys had between 200, 300,
08:54:31  14   and 600 respondents.
08:54:33  15           QUESTION:  And what was the first survey you
08:54:38  16   conducted.
08:54:39  17           ANSWER:  The first survey was -- was focused on
08:54:42  18   Brawl Stars.  And -- and specifically focused on the issue
08:54:47  19   of the beam style for the weapon.
08:54:52  20           And what we did was interviewed two different
08:54:57  21   groups of people, current players of Brawl Stars, as well
08:55:05  22   as people who had never played Brawl Stars before.  And we
08:55:08  23   showed them the existing beam style of weapon and then
08:55:17  24   showed them an alternative beam style and asked their
08:55:22  25   interest in playing Brawl Stars, depending on the -- how
```

08:55:28  1  the weapon's beam style were to change.

08:55:31  2       And so what you see on the screen are the actual

08:55:35  3  questions that were asked.

08:55:37  4       The first question, top one, is the one that was

08:55:41  5  directed to people who had never played Brawl Stars before.

08:55:45  6  So we introduced them to Brawl Stars, and then showed them

08:55:50  7  the -- the particular style of the -- of the beam -- weapon

08:55:55  8  beam.

08:55:56  9       The second question is the one that was directed

08:55:59  10  at current players where we ask if the style of the

08:56:05  11  weapon's beam were to change, how would this impact your

08:56:08  12  interest in playing Brawl Stars?

08:56:11  13       QUESTION:  Why did you include prospective players

08:56:15  14  in this survey.

08:56:15  15       ANSWER:  The weapon's beam style is something that

08:56:23  16  would be apparent both to current players -- certainly

08:56:27  17  apparent to current players, but would also be seen by

08:56:31  18  potential players when they look at the Brawl Stars app and

08:56:34  19  information in -- on -- in the App Store.

08:56:36  20       And so we wanted to see whether there was going to

08:56:39  21  be any impact on prospective players due to this change,

08:56:44  22  which they would know about before actually starting to

08:56:50  23  play the game.

08:56:52  24       QUESTION:  Well, let's turn to the results of the

08:56:55  25  survey.

08:56:55  1          What did the results show?

08:56:57  2          ANSWER:  The results show that there would

08:57:01  3  certainly not be a negative impact on consumer interest if

08:57:06  4  the weapon's beam style would change.

08:57:09  5          This is the -- these are the results for the

08:57:12  6  current players and shows that seven -- only 7.6 percent

08:57:18  7  indicated that if the weapon's beam style were to change,

08:57:22  8  it would diminish their interest.  23.3 [sic] percent said

08:57:26  9  it would have no impact at all on their interest, and

08:57:31  10 69.5 percent indicated that it would increase their

08:57:34  11 interest.

08:57:43  12          QUESTION:  All right.  Mr. Klein, I'd like to move

08:57:45  13 on to the second survey.  What was that survey.

08:57:47  14          ANSWER:  The second survey was -- was for Clash

08:57:51  15 Royale, and here we were focusing specifically on the card

08:57:55  16 donation feature.  And so here we interviewed only current

08:58:02  17 players of Clash Royale, or past players, but people who

08:58:08  18 would have had an opportunity to experience and understand

08:58:13  19 what the card donation process was like.

08:58:16  20          And so we described the current process, which --

08:58:24  21 in which if you receive a card via donation from another

08:58:29  22 clan member, you can -- and if that card fills your upgrade

08:58:32  23 meter, then you can upgrade that card immediately.

08:58:36  24          And we described an alternative in which you could

08:58:39  25 still receive donated cards from a clan member, but it

08:58:46  1  couldn't be the card that filled your upgrade meter.  You'd

08:58:49  2  still be able to keep that card, but the card that fills

08:58:52  3  your upgrade meter and triggers the ability to upgrade that

08:58:57  4  card would have to be obtained from some other way, either

08:59:02  5  by winning it or finding it in a chest or something like

08:59:04  6  that.

08:59:04  7       QUESTION:  Why did you not include prospective

08:59:11  8  players in this survey.

08:59:12  9       ANSWER:  Prospective players wouldn't have the

08:59:19  10  basis for understanding the card donation process or the

08:59:24  11  way in which cards are upgraded.  And so it wouldn't be

08:59:30  12  appropriate to include them in -- in a survey asking them

08:59:34  13  about how if something was to change that they had really

08:59:39  14  had no experience with.

08:59:40  15       QUESTION:  Thank you.

08:59:41  16       And turning to the results of your survey, what

08:59:45  17  impact would -- would modifying the feature have on the

08:59:52  18  interest of users' game play that play the game?

08:59:55  19       ANSWER:  As -- as -- as in the case of Brawl

09:00:02  20  Stars, 25 percent indicated that their interest would be

09:00:05  21  diminished if they were no longer able to upgrade a card

09:00:09  22  that filled their upgrade meter if it was received through

09:00:13  23  a donation.

09:00:13  24       18.6 percent included it would have -- indicated

09:00:19  25  it would have no impact on their interest.  And 56.4 said

09:00:24    1    this change would increase their interest.  So, certainly,

09:00:28    2    no net negative impact on consumer interest in playing

09:00:29    3    Clash Royale.

09:00:32    4         QUESTION:  What is your understanding as to why

09:00:40    5    the change may increase interest.

09:00:46    6         ANSWER:  It -- it tends to level the playing

09:00:51    7    field.  It's -- you know, if you're a member of a generous

09:00:58    8    plan that donates a lot, then you -- you have an

09:01:01    9    opportunity to get more cards.  This levels the playing

09:01:05    10   field.  It's similar to the way in which Supercell makes

09:01:11    11   balancing adjustments over time to, as I say, level --

09:01:19    12   level the playing field and -- and have people working at

09:01:26    13   basically the same level.

09:01:27    14        QUESTION:  Thank you.

09:01:28    15        Let's turn to your third survey.  And what was

09:01:30    16   that a survey of?

09:01:32    17        ANSWER:  So this survey was for Clash of Clans and

09:01:35    18   was specifically targeting the issue of the layout button

09:01:40    19   or copy layout button.

09:01:47    20        And the -- in this case, we actually asked people

09:01:49    21   about 10 -- asked respondents about 10 different features

09:01:54    22   of the game, one of which was the copy layout button, which

09:01:59    23   is the ability to copy a village layout from another clan

09:02:04    24   member.

09:02:04    25        And -- and we asked for each of the 10 items, if

09:02:09   1   they were aware of that item, if they had ever used that

09:02:13   2   item, and -- and in this -- and here's the ultimate

09:02:19   3   QUESTION:   If that item or feature became unavailable, how

09:02:22   4   would that impact your interest in playing Clash of Clans?

09:02:31   5        QUESTION:  And for -- what was your qualified

09:02:36   6   group of respondents for this survey.

09:02:40   7        ANSWER:  And, again, here, we were talking with

09:02:43   8   current and -- and past players of the game.  These are --

09:02:53   9   the features that we were describing to people were ones

09:02:56  10   that would only be apparent to someone who was actually

09:03:01  11   playing the game, would not be apparent to someone who had

09:03:06  12   -- had never played the game.

09:03:08  13        QUESTION:  Thank you.

09:03:09  14        Let's turn to the results.  What were -- what did

09:03:13  15   the results show with respect to the copy layout?

09:03:16  16        ANSWER:  With respect to the copy layout button,

09:03:21  17   no one said it would significantly -- its absence would

09:03:25  18   significantly decrease their interest in playing the game.

09:03:29  19        1.6 percent said it would moderately decrease

09:03:35  20   their interest, 4.2 percent said it would slightly decrease

09:03:41  21   their interest, 9 percent said it would have no impact on

09:03:45  22   their interest, 3.2 said it would slightly increase their

09:03:49  23   interest, 4.8 moderately increase their interest, and 2.9

09:03:57  24   significantly increase their interest.

09:03:58  25        So here we've got something that is, again, not a

1196

09:04:03    1   net negative impact, and very small numbers in terms of the

09:04:07    2   effect of decreasing their interest.

09:04:08    3            QUESTION:  You testified earlier that you reviewed

09:04:16    4   a number -- or surveyed a number of other features.  Did

09:04:19    5   some of those other features exhibit a more significant

09:04:25    6   decrease in interest than copy layout.

09:04:27    7            ANSWER:  Yes.  About half of them were considered

09:04:36    8   by players to be a more significant change.  For example,

09:04:39    9   the ability to change your user name, here 1.6 percent of

09:04:43   10   the respondents said it would significantly decrease their

09:04:46   11   interest.

09:04:47   12            And you can look across the -- the -- the page and

09:04:53   13   see that there's, you know, a greater -- more people say it

09:05:00   14   would decrease their interest than -- than for the ability

09:05:05   15   to use the copy layout button.

09:05:08   16            QUESTION:  Let's talk about another feature.

09:05:10   17            How about the ability to participate in clan

09:05:13   18   claims to earn rewards?

09:05:16   19            ANSWER:  So here's a -- a feature that would have

09:05:23   20   a net negative effect on customer consumer interest if --

09:05:31   21   if it were removed.

09:05:32   22            You see 5.8 percent said it would significantly

09:05:36   23   decrease their interest, 7 percent say it would

09:05:39   24   significantly -- it would moderately decrease their

09:05:41   25   interest, 11.8 percent slightly decrease their interest,

1197

09:05:45  1   numbers that are much greater than for the copy layout

09:05:47  2   button.

09:05:48  3          QUESTION:  Let's talk about another feature, the

09:05:52  4   ability to toggle between clan castle mode and between

09:05:57  5   guard and sleep.

09:05:59  6          ANSWER:  So, here, you can see that -- that even

09:06:01  7   for what is a relatively obscure feature, the ability to

09:06:09  8   use the copy layout button is -- gives smaller numbers on

09:06:13  9   the negative side than -- than this -- this particular

09:06:17  10  feature.

09:06:17  11         QUESTION:  And let's just do one more, the ability

09:06:24  12  to share replays with other clan members.  What did the

09:06:28  13  results show with that feature.

09:06:30  14         ANSWER:  And here again, if you -- if that were

09:06:33  15  not available as a feature in the game, more people would

09:06:37  16  react negatively than they would to the rule of the copy

09:06:43  17  layout button.

09:06:44  18         QUESTION:  And I -- just to be clear, how many

09:06:50  19  other features were included in this survey.

09:06:52  20         ANSWER:  There were five other features included

09:06:55  21  in the survey.

09:06:57  22         QUESTION:  Could you just briefly summarize the --

09:07:02  23  the general nature of those results.

09:07:04  24         ANSWER:  They were in a similar range to this sort

09:07:08  25  of showing that for all of these features, they are

09:07:14  1  considered relatively minor and would not have a major

09:07:17  2  impact on interests in the game, with the exception of the

09:07:26  3  ability to participate in the clan wars -- clan games.

09:07:29  4       ATTORNEY:  Mr. Smith, you can take down this

09:07:31  5  demonstrative.  Thank you.

09:07:33  6       QUESTION:  Did you conduct a survey with respect

09:07:38  7  to the Elixir functionality in one of Supercell's games.

09:07:42  8       ANSWER:  No, I did not.

09:07:43  9       QUESTION:  Why not.

09:07:45  10       ANSWER:  Well, the specific feature of the Elixir

09:07:56  11  calculation and -- and the way in which the units of Elixir

09:08:03  12  are added and subtracted, I was informed, could be adjusted

09:08:08  13  so that it would not be an infringing alternative and that

09:08:16  14  that change would be imperceptible to the user.

09:08:20  15       And so if you have something that is imperceptible

09:08:24  16  to the user, it's simply inappropriate to even try and ask

09:08:28  17  them what they -- what they would think about such an

09:08:37  18  imperceptible change.

09:08:38  19       QUESTION:  I may have misheard you.  I think you

09:08:41  20  said it would not be an infringing alternative.  Is that

09:08:46  21  what you said?  Or explain what you meant by that.

09:08:49  22       ANSWER:  Well, that by -- by a simple resequencing

09:08:52  23  of the activities of the way in which the Elixir meter is

09:08:59  24  incremented and decremented when cards are played or added,

09:09:03  25  would -- that resequencing would result in a

09:09:11  1  non-infringement or would not be considered infringing.

09:09:22  2       And so since that would be a change that would not

09:09:25  3  be perceived perceptible to a player, it wouldn't be

09:09:29  4  appropriate to use it for a survey.

09:09:31  5       QUESTION:  Thank you.

09:09:31  6       Did you form any opinions regarding Dr. Neal's

09:09:35  7  survey?

09:09:35  8       ANSWER:  Yes, I did.

09:09:36  9       QUESTION:  Could you briefly summarize your

09:09:42  10  opinion.

09:09:43  11       ANSWER:  I believe that it's my opinion that

09:09:45  12  Dr. Neal's survey is fundamentally and fatally flawed for a

09:09:53  13  number of reasons, and certainly could not serve as a basis

09:09:57  14  for any calculations related to damages in this -- in this

09:10:03  15  matter.

09:10:04  16       In particular, the description that Dr. Neal used

09:10:10  17  of the specific features is overly broad and covers much

09:10:15  18  more than the specific element that is at issue in the --

09:10:20  19  in the patent.

09:10:22  20       For example, in the Clash Royale survey, Dr. Neal

09:10:33  21  described the feature as receive a donated card and upgrade

09:10:37  22  that card.

09:10:40  23       And so the -- that includes not just receive a

09:10:49  24  card and immediately be able to upgrade a card, but it

09:10:52  25  includes receiving a card at some point and then maybe

| | |
|---|---|
| 09:10:55 | 1 | days, weeks, months later getting the card that fills your |
| 09:11:00 | 2 | upgrade meter and -- and -- and using it at that point. |
| 09:11:03 | 3 | And so this overly broad description of how card |
| 09:11:11 | 4 | donations work means that you're including a lot more than |
| 09:11:18 | 5 | just the specific ability to immediately be able to upgrade |
| 09:11:23 | 6 | your card if it fills the -- fills your upgrade meter. |
| 09:11:28 | 7 | QUESTION:  Thank you. |
| 09:11:29 | 8 | ATTORNEY:  I'll pass the witness at this time. |
| 09:11:32 | 9 | QUESTION:  Good afternoon, Mr. Klein.  It is nice |
| 09:11:36 | 10 | to see you again.  My name is Taylor Ludlam. |
| 09:11:41 | 11 | ANSWER:  Hi. |
| 09:11:42 | 12 | QUESTION:  I attended your deposition back on May |
| 09:11:45 | 13 | 29th. |
| 09:11:45 | 14 | Mr. Klein, Supercell has not implemented the |
| 09:11:48 | 15 | alternative beam style that you surveyed in the Brawl Stars |
| 09:11:51 | 16 | game, correct? |
| 09:11:52 | 17 | ANSWER:  I -- I'm not sure how I can -- how I |
| 09:12:00 | 18 | answer that.  I haven't -- I don't think I played Brawl |
| 09:12:03 | 19 | Stars recently, so I don't -- I'm not in a position to say |
| 09:12:07 | 20 | whether they've implemented it or not. |
| 09:12:10 | 21 | QUESTION:  Okay.  You don't know whether they've |
| 09:12:11 | 22 | implemented the alternative beam style that you surveyed. |
| 09:12:15 | 23 | ANSWER:  That's correct. |
| 09:12:16 | 24 | QUESTION:  Okay.  Supercell has also not |
| 09:12:18 | 25 | implemented the alternative card donation feature that you |

| | | |
|---|---|---|
| 09:12:21 | 1 | surveyed in Clash Royale; is that correct. |
| 09:12:24 | 2 | ANSWER:  Again, I -- I really don't have any -- |
| 09:12:29 | 3 | any direct knowledge as to whether Supercell has |
| 09:12:34 | 4 | implemented that or not. |
| 09:12:35 | 5 | QUESTION:  Mr. Klein, you recall you had a |
| 09:12:40 | 6 | deposition back on May 29th, correct? |
| 09:12:42 | 7 | ANSWER:  Yes. |
| 09:12:42 | 8 | QUESTION:  Okay. |
| 09:12:46 | 9 | ATTORNEY:  Ms. Moore, could you please bring up |
| 09:12:49 | 10 | Mr. Klein's deposition, Page 75? |
| 09:12:59 | 11 | QUESTION:  Mr. Klein, if you recall in your |
| 09:13:01 | 12 | deposition, you were asked:  And are you aware of Supercell |
| 09:13:04 | 13 | ever implementing the alleged non-infringing alternative |
| 09:13:06 | 14 | that you suggest for Clash Royale? |
| 09:13:10 | 15 | ATTORNEY:  Ms. Moore, if you could scroll down, |
| 09:13:16 | 16 | please. |
| 09:13:16 | 17 | QUESTION:  And you answered:  No, I'm not aware of |
| 09:13:19 | 18 | that. |
| 09:13:20 | 19 | Do you recall that testimony? |
| 09:13:21 | 20 | ANSWER:  Yeah -- yes.  Isn't that what I just |
| 09:13:28 | 21 | said? |
| 09:13:28 | 22 | QUESTION:  So you're not aware that Supercell has |
| 09:13:31 | 23 | implemented the change that you surveyed for Clash Royale, |
| 09:13:33 | 24 | correct? |
| 09:13:33 | 25 | ANSWER:  Double negatives are -- are getting me |

09:13:38   1   here.

09:13:39   2        I -- I -- I have no knowledge as to whether

09:13:43   3   Supercell has implemented any of the alternative

09:13:51   4   non-infringing features.

09:13:53   5        QUESTION:  Okay.  And are you -- and Supercell has

09:13:57   6   not removed the copy layout feature from Clash of Clans

09:14:05   7   either, have they.

09:14:05   8        ANSWER:  That's -- that is my understanding, yes,

09:14:08   9   they have not --

09:14:08   10        QUESTION:  Okay.

09:14:09   11        ANSWER:  -- removed it.

09:14:11   12        QUESTION:  And in your Clash of Clans survey, you

09:14:17   13   confirmed that players in the U.S. use copy layout in their

09:14:22   14   gameplay, correct?

09:14:22   15        ANSWER:  That was one of the questions we asked,

09:14:25   16   yes.

09:14:25   17        QUESTION:  And you confirmed that users in the

09:14:29   18   U.S., the respondents, had used the copy layout feature in

09:14:33   19   their gameplay, correct?

09:14:34   20        ANSWER:  As I said, that's -- that was one of the

09:14:37   21   questions we asked, and -- and that was -- and the answers

09:14:42   22   were tabulated in my report.  Excuse me.

09:14:44   23        QUESTION:  Let's go to your report and take a look

09:14:52   24   at that briefly.

09:14:54   25        ATTORNEY:  Susie, could you please pull up

09:14:58  1   Paragraph 147 of his -- of Mr. Klein's report?  Ms. Moore,

09:15:19  2   are you able to scroll to Paragraph 147?

09:15:42  3          QUESTION:  Mr. -- Mr. Klein, you asked respondents

09:15:48  4   in your survey -- there we go -- next respondents were

09:15:52  5   asked how many times they had used each feature, and that

09:15:58  6   top line there confirms that respondents in your survey

09:16:02  7   used the copy layout feature, correct?

09:16:04  8          ANSWER:  That's correct.

09:16:07  9          ATTORNEY:  No further questions.

09:16:13  10          QUESTION:  Just one quick question for you,

09:16:15  11   Mr. Klein, I believe.

09:16:17  12          Ms. Taylor just asked you that that table you saw

09:16:22  13   confirmed the respondents used the copy layout feature in

09:16:27  14   the United States.  Were you referring to some respondents

09:16:35  15   or all respondents?

09:16:36  16          ANSWER:  The table tabulated the number of

09:16:42  17   respondents who answered that they had used it.  So it

09:16:45  18   was -- I think if my memory serves my correctly, 83 of the

09:16:55  19   313 respondents that we surveyed indicated that they had

09:17:00  20   used the copy layout button.

09:17:01  21          QUESTION:  Thank you.

09:17:06  22          ATTORNEY:  No further questions.

09:17:07  23          (Videoclip ends.)

09:17:09  24          THE COURT:  Does that complete this witness by

09:17:11  25   deposition?

| | | |
|---|---|---|
| 09:17:11 | 1 | MR. DACUS:  It does, Your Honor.  Thank you. |
| 09:17:13 | 2 | THE COURT:  Call your next witness. |
| 09:17:14 | 3 | MR. DACUS:  Your Honor, Supercell calls Chris |
| 09:17:17 | 4 | Bakewell. |
| 09:17:17 | 5 | THE COURT:  All right. |
| 09:17:18 | 6 | MR. DACUS:  May I approach and pass out binders, |
| 09:17:21 | 7 | Your Honor? |
| 09:17:21 | 8 | THE COURT:  You may. |
| 09:17:22 | 9 | Mr. Bakewell, if you'll come forward and be sworn. |
| 09:17:42 | 10 | (Witness sworn.) |
| 09:17:43 | 11 | THE COURT:  Please come around, have a seat on the |
| 09:17:45 | 12 | witness stand, sir. |
| 09:17:46 | 13 | THE WITNESS:  Thank you. |
| 09:17:48 | 14 | COURT SECURITY OFFICER:  Yes, sir. |
| 09:17:50 | 15 | THE COURT:  Mr. Dacus, you may proceed. |
| 09:17:58 | 16 | MR. DACUS:  Thank you, Your Honor. |
| 09:17:58 | 17 | CHRIS BAKEWELL, DEFENDANT'S WITNESS, SWORN |
| 09:17:58 | 18 | DIRECT EXAMINATION |
| 09:17:59 | 19 | BY MR. DACUS: |
| 09:17:59 | 20 | Q.  Mr. Bakewell, would you introduce yourself to the jury, |
| 09:18:02 | 21 | please, sir? |
| 09:18:03 | 22 | A.  Yes, hi, good morning.  My name is Chris Bakewell. |
| 09:18:06 | 23 | Q.  Where do you live, Mr. Bakewell? |
| 09:18:08 | 24 | A.  I live in Sugar Land, Texas, outside of Houston. |
| 09:18:12 | 25 | Q.  And what are you here today to talk with the jury |

09:18:14  1   about, sir?

09:18:15  2   A.  Well, I'm here to talk about damages.

09:18:17  3   Q.  Can you please explain to the jury what you do for a

09:18:20  4   living?

09:18:20  5   A.  I am a managing director at a firm called Duff &

09:18:26  6   Phelps, and the work that I do focuses on the valuation of

09:18:29  7   intellectual property and technology-rich businesses.  I'm

09:18:36  8   a valuation expert, is the shortest way to say it.

09:18:38  9   Q.  And in what -- what areas do you value -- value

09:18:42  10  intellectual property in patents?

09:18:44  11  A.  So I do it in a variety of context.  Sometimes it's in

09:18:50  12  a dispute context, litigation like this.  Sometimes it's

09:18:53  13  when companies buy or sell other companies, you have to do

09:18:57  14  something called a purchase price allocation and value all

09:19:00  15  the assets of the business, including patents and

09:19:03  16  intangible assets.

09:19:06  17        Sometimes for licensing, companies will ask me for

09:19:09  18  help in trying to figure out how much to pay in like a

09:19:12  19  real-world license and sometimes strategy types of things.

09:19:16  20  So it can be for a variety of reasons.

09:19:18  21  Q.  And about how many times have you valued intellectual

09:19:21  22  property over the course of your professional career?

09:19:23  23  A.  Well, it's been a lot.  It's been hundreds, many

09:19:27  24  hundreds.

09:19:27  25  Q.  Would you please give the jury just a brief description

09:19:30  1   of your educational background, please, sir?

09:19:32  2   A.   Sure.   So I have two degrees.   I have an undergraduate

09:19:36  3   degree, a Bachelor of Science degree from a liberal arts

09:19:42  4   college called Bradley University.   I studied finance and

09:19:45  5   also computer science.

09:19:46  6        After that, I went and programmed computers for --

09:19:53  7   it was some of the earliest cellular systems at Motorola.

09:19:56  8        Then I went to graduate school at the University

09:19:59  9   of Maryland and got an MBA.   I focused -- again, it was --

09:20:05  10  the concentration was in finance and information systems.

09:20:10  11       So those are the two degrees, an MBA in finance

09:20:13  12  information systems and a Bachelor of Science degree.

09:20:15  13  Q.   Who do you work for now, Mr. Bakewell?

09:20:17  14  A.   The firm is called Duff & Phelps.

09:20:19  15  Q.   Okay.   And what do you do there?   What are your job

09:20:22  16  responsibilities?

09:20:23  17  A.   So I have several.   I -- I have client

09:20:25  18  responsibilities, as I described a moment ago, relating to

09:20:28  19  intellectual property rights and technology-rich

09:20:32  20  businesses.

09:20:32  21       I run our Houston office.   I lead our intellectual

09:20:36  22  property practice.   And I sit on something like a

09:20:40  23  management committee in the firm.

09:20:42  24  Q.   And before you worked at Duff -- how long have you

09:20:46  25  worked at Duff & Phelps, first of all?

1207

09:20:49  1    A.  About 12 years.

09:20:49  2    Q.  And so give the jury some indication of what you did

09:20:52  3    before you went to work at Duff & Phelps?

09:20:55  4    A.  So I worked for another -- two other consulting firms

09:20:58  5    before that.  And then, before that, I spent eight years

09:21:02  6    working for a company that built power plants and systems

09:21:05  7    that went on ships.

09:21:07  8         The focus was the -- of the technology was to turn

09:21:10  9    the power generation on and off very quickly.  I did that

09:21:17  10   for about eight years.  I lived in Amsterdam and Houston

09:21:21  11   and on the East Coast while I did that.  And that's where I

09:21:24  12   had the opportunity to lead financial teams and negotiate

09:21:29  13   licenses, set business strategy.

09:21:32  14        And then I described how, before I went to

09:21:35  15   graduate school, I worked and did computer programming.  So

09:21:38  16   that's been -- that's kind of a synopsis of my 30 years

09:21:43  17   that I've been working or so.

09:21:45  18   Q.  In addition to your degrees, do you have any

09:21:48  19   professional certifications that are relevant to the

09:21:50  20   opinions that you're giving here today?

09:21:51  21   A.  I do.  I have two.  I have a certification called

09:21:55  22   Certified Licensing Professional.  That's the type of

09:21:58  23   licensing that we talked about -- or we'll talk about in a

09:22:04  24   moment.

09:22:05  25        We -- we've seen licenses in this case, as I've

09:22:09  1   been sitting here through trial.  That's a designation that

09:22:11  2   is awarded by an organization called the Licensing

09:22:16  3   Executive Society.

09:22:17  4        I'm also an accredited senior appraiser.  That's

09:22:20  5   called an ASA.  That's somebody who appraises or is

09:22:25  6   certified to appraise assets.  My focus has been on

09:22:30  7   appraisal of intellectual property assets throughout my

09:22:33  8   career, as I described.

09:22:34  9   Q.  In your career, have you actually negotiated patent

09:22:38  10  licenses?

09:22:38  11  A.  I have, in -- in a variety of contexts.  When I was in

09:22:42  12  industry, as I just explained, I would be the person who

09:22:46  13  would lead the negotiations.  I would either interact with

09:22:50  14  people directly, or I would have a team of people or

09:22:53  15  policies or strategies that I would help set.

09:22:57  16       And then as a consultant, I've assisted people

09:23:00  17  like that in negotiating licenses and performed analyses

09:23:04  18  and -- and helped out in -- in that way.

09:23:06  19  Q.  Do you have specific experience in licensing and

09:23:10  20  valuing damages related to video games?

09:23:14  21  A.  I actually do.  I've -- I have a couple of examples.

09:23:20  22  One of them I'll talk about briefly.  I worked for a

09:23:24  23  company that had the intellectual property for Atari, both

09:23:30  24  patents, as well as other IP, like trademarks.  And I

09:23:36  25  helped that company negotiate licenses.

09:23:38   1          MR. DACUS:  Your Honor, at this time, we would

09:23:40   2   offer Mr. Bakewell as an expert in intellectual property

09:23:43   3   valuation and patent damages.

09:23:45   4          THE COURT:  Is there objection?

09:23:45   5          MS. LUDLAM:  No objection, Your Honor.

09:23:47   6          THE COURT:  Without objection, the Court will

09:23:50   7   recognize this witness as an expert in those designated

09:23:52   8   fields.

09:23:53   9          MR. DACUS:  Thank you.

09:23:53   10          THE COURT:  Please continue.

09:23:54   11          MR. DACUS:  Thank you, Your Honor.

09:23:56   12   Q.  (By Mr. Dacus)  Mr. Bakewell, can you tell the jury

09:23:58   13   what it is specifically you were asked to do in this case?

09:24:00   14   A.  So I was asked to do two things.  You all heard

09:24:04   15   Dr. Becker testify.  I was asked to review his work, and I

09:24:09   16   was asked to form my own independent opinion should you all

09:24:12   17   get to the question of what a reasonable royalty might be.

09:24:16   18   Q.  And -- and give the jury, if you would, please, sir,

09:24:19   19   some indication of what type of information you reviewed in

09:24:23   20   reaching your opinions in this case.

09:24:24   21   A.  Well, I think being one of the last witnesses, it's an

09:24:31   22   advantage to be able to describe that because you've seen

09:24:33   23   many of those types of things.

09:24:35   24          I -- I reviewed expert reports.  Dr. Becker wrote

09:24:39   25   an expert report.  Mr. Klein wrote an expert report.  I

09:24:43   1   interviewed Mr. Klein.  I reviewed documents that were

09:24:47   2   produced by the parties.  There were other deposition

09:24:52   3   transcripts.  There were legal pleadings and the like.  So

09:24:56   4   all the types of things that you've seen, I've -- those are

09:25:02   5   the types of materials that I've seen.

09:25:04   6          I made a point of reviewing all the materials that

09:25:08   7   Dr. Becker has, and then we've heard -- I mean, he didn't

09:25:11   8   talk about Mr. Klein.

09:25:12   9          I talked to Mr. Klein.  For example, I reviewed

09:25:15  10   Dr. Neal's survey, as well.  So that's the type of

09:25:18  11   materials I reviewed.

09:25:19  12   Q.  Did you have an opportunity to talk with and interview

09:25:22  13   Supercell's technical experts that have testified in this

09:25:25  14   case?

09:25:25  15   A.  I did.  I had the opportunity to -- to talk to them.

09:25:29  16   I've been here through most of the trial, so I've heard

09:25:33  17   them all testify, as well.  I reviewed their reports and

09:25:37  18   their deposition transcripts, too.

09:25:40  19   Q.  Mr. Bakewell, did you prepare some slides to assist the

09:25:44  20   jury with your -- your testimony today related to

09:25:48  21   reasonable royalties and damages?

09:25:50  22   A.  Yes, sir.

09:25:52  23   Q.  Can we just start, and can you explain at a high level,

09:25:55  24   before we get into the details the summary of your

09:25:57  25   opinions?

09:25:57    1    A.   Sure.   So this slide is in two parts, and I think it's

09:26:02    2    important that it's in two parts.

09:26:05    3            The top part says if the patents-in-suit are

09:26:07    4    invalid, there's no damages.

09:26:11    5            And if the patents-in-suit are not infringed,

09:26:13    6    there's no damages.

09:26:14    7            So you don't get to the point -- if you find

09:26:17    8    either of those things, you don't have to pay attention to

09:26:19    9    my testimony or -- or Dr. Becker's testimony.   And I think

09:26:25   10    that's an important distinction.

09:26:27   11            So I -- my testimony only applies if you get to

09:26:30   12    the question of, hey, what is a reasonable royalty?   And

09:26:34   13    that's what I put at the bottom of this slide.

09:26:36   14            So it says if -- like if you get to this question,

09:26:40   15    what's a reasonable royalty like?   And that's the -- let's

09:26:44   16    call that the construct or like the paradigm that I have to

09:26:49   17    operate under.

09:26:50   18            And in -- in that regard, my opinion is

09:26:52   19    realistically, the evidence shows that a reasonable royalty

09:26:55   20    would be in the form of a lump sum.   So it'd be a one-time

09:27:01   21    payment.   It wouldn't be a percentage-based running

09:27:05   22    royalty.   And we'll talk about that.   There's no evidence

09:27:07   23    to support that.

09:27:08   24            And that the value of these patents, when you look

09:27:10   25    at them and value them, it's -- they're not significant.

1212

09:27:14  1   Or "de minimus" is the word we use in our field.  That

09:27:19  2   means not significant or -- but we'll talk about that, too.

09:27:23  3   Q.  Tell us, if you would, sir, just at a high level,

09:27:28  4   what -- what issues you had with -- with Dr. Becker's

09:27:31  5   opinions and -- and with GREE's damages theories in this

09:27:35  6   case before we dig into the details?

09:27:37  7   A.  Sure.  So we'll, I think, come back to this slide a

09:27:41  8   couple of times.  This is a little bit of a roadmap of what

09:27:44  9   my opinions are.

09:27:45  10          First of all, is that there hasn't been

09:27:48  11  significant value shown.  Dr. Becker didn't show that there

09:27:52  12  was significant value, for a couple of reasons.  He didn't

09:27:55  13  focus on the patents-in-suit, and he disregarded some data,

09:27:59  14  like Mr. Klein's survey would be an example.

09:28:04  15          And then the second X on this slide is the Japan

09:28:07  16  license, which we heard about.  And that's a license that

09:28:11  17  has 1,079 patents, and it provided a broad operating

09:28:18  18  freedom.  And we'll come back to this and describe what --

09:28:22  19  what that means.

09:28:22  20  Q.  Now, Dr. Becker told the jury about this hypothetical

09:28:26  21  negotiation, which is basically how you, as experts, and

09:28:30  22  the jury are to -- to view this valuation?

09:28:33  23          Did you use that same type of scenario or

09:28:36  24  construct?

09:28:36  25  A.  Yes, I did.

09:28:37  1   Q.  And who are the two parties at this hypothetical

09:28:41  2   negotiation over the value of these five patents?

09:28:43  3   A.  It's GREE and Supercell.

09:28:44  4   Q.  Let's -- let's talk about this first bullet point that

09:28:54  5   says:  No significant value shown.  Did not focus on the

09:28:57  6   patents-in-suit.

09:28:58  7        Explain to the jury why -- why you say that and

09:29:01  8   why you have that criticism.

09:29:03  9   A.  Sure.  So we just saw that -- saw that video of

09:29:07  10  Mr. Klein.  And when he testified, he talked about

09:29:13  11  alternatives and measuring the val -- or doing his survey

09:29:16  12  relative to alternatives or non-infringing alternatives.

09:29:23  13       And that's important because we're talking about

09:29:26  14  patents here that have specific claims.  I mean, we've

09:29:29  15  heard the technical experts go through and talk about

09:29:31  16  claims, and they have checkmarks on charts.

09:29:34  17       And they're like, this is what the patent covers.

09:29:37  18  And you need to be very specific when you're valuing

09:29:40  19  patents to figure out what the patents cover and what they

09:29:42  20  don't.

09:29:43  21       And the way that you do that, a tool is

09:29:47  22  non-infringing alternatives.

09:29:50  23       And Dr. Neal, when he spoke, he talked about

09:29:54  24  removing the entire feature, right, not what you could do

09:29:57  25  instead.

09:29:58    1          Mr. Klein, his discussion was different.  He -- he
09:30:03    2    discussed how when he conducted his survey, he looked at
09:30:06    3    one way of doing things versus another way of doing things.
09:30:10    4          Like, a beam style versus another beam style that
09:30:14    5    he and I understand from the technical experts is not
09:30:20    6    infringing.  That's the way that -- if you want to value a
09:30:22    7    patent right and get specific to the patent right, that's
09:30:25    8    the right way of doing it.
09:30:26    9          So that's an issue with Dr. Neal's survey.  He
09:30:29   10    didn't consider non-infringing alternatives.  Instead, he
09:30:31   11    studied removing two features.
09:30:35   12          I'll let you ask another question.  I'm going on
09:30:38   13    for a while now.
09:30:39   14              MR. DACUS:  Your Honor, may I --
09:30:41   15              THE COURT:  That'd be a good idea.
09:30:43   16              MR. DACUS:  Thank you, Your Honor.
09:30:43   17          May I approach the flip chart?
09:30:45   18              THE COURT:  You may.
09:30:47   19    Q.  (By Mr. Dacus)  So what do you mean, Mr. Bakewell, when
09:30:49   20    you say that Dr. Neal only studied removing two features?
09:30:53   21    A.  So we talked about the removing part.  He only surveyed
09:30:57   22    two features.  He didn't survey all four.  And Dr. Klein --
09:31:05   23    or Mr. Klein's had surveyed three, and he discussed why he
09:31:08   24    couldn't survey the fourth.  So he actually considered
09:31:12   25    surveying four features.  Dr. Neal only talked about two

09:31:16   1   features, as we've heard.

09:31:17   2   Q.  Do you think it's economically appropriate for purposes

09:31:20   3   of valuing these patents to utilize surveys for -- for one

09:31:29   4   feature and apply it to three others?

09:31:30   5   A.  No.  I think it's best if you can survey those features

09:31:38   6   directly and ask questions about those.  Or if you have

09:31:41   7   enough evidence, as Mr. Klein did, to reach a conclusion

09:31:44   8   regarding a particular feature, you can do that.

09:31:47   9        It's -- it's -- if you're going to try to value

09:31:51   10  particular -- particular patent rights or an asset, try to

09:31:54   11  value that specific asset if you can.  So it's better

09:31:59   12  practice to value the specific assets.

09:32:02   13  Q.  Did you look at the specific features as they relate to

09:32:05   14  each of the three games, in your analysis, Mr. Bakewell?

09:32:08   15  A.  I did.

09:32:10   16  Q.  Let -- let's start with Clash Royale?

09:32:13   17       Can you explain to the jury what you're attempting

09:32:18   18  to convey in this slide and what you looked at with respect

09:32:22   19  to whether or not these patents add value to the Clash

09:32:26   20  Royale game?

09:32:26   21  A.  So if we think about the broader context of what we're

09:32:31   22  doing here in this patent case, we're talking about three

09:32:35   23  patents here that relate specifically to Clash Royale, and

09:32:41   24  I have the patents on the left of the screen.

09:32:44   25       And on the right, just a few things from Clash

09:32:49  1   Royale that we've heard testimony about throughout the past

09:32:52  2   few days that make the game successful.

09:32:55  3        It's important for context to keep this type of

09:32:58  4   stuff in mind.  The story line, the characters, all of the

09:33:04  5   features, the changes, I mean, that's what creates value.

09:33:09  6   That's what -- what we refer to as driving demand for the

09:33:14  7   product.

09:33:14  8        And when you -- when you have a situation like

09:33:16  9   that where the patented features, the patents relate only

09:33:20  10  to specific aspects, trying to figure out a rate and apply

09:33:24  11  it to all the revenues from the game, that's a problem.

09:33:27  12  That creates the possibility for error.

09:33:31  13        And keeping this context in mind I think is -- is

09:33:35  14  very important.

09:33:36  15  Q.  Did -- did you talk to the Supercell technical experts

09:33:40  16  related to whether or not these patents contribute value?

09:33:42  17  And, if so, how much to these games?

09:33:47  18  A.  I did.  I said, hey, you guys have really dug into

09:33:50  19  these patents and these products.  So let me ask you what

09:33:53  20  you think.

09:33:53  21        And these are the two experts that we've heard

09:33:55  22  from over the last couple of days, Mr. Friedman and I think

09:34:01  23  it's Dr. Zagal, the technical experts for the patents that

09:34:07  24  relate to Clash Royale.

09:34:08  25        I asked them, I said, hey, is -- is there a way

09:34:12   1   that these patents, from your perspective, are linked to

09:34:15   2   revenues?  Is there any way that they generate additional

09:34:19   3   revenues from a technical point of view?  And they told me

09:34:24   4   no.

09:34:24   5          In particular, Dr. Zagal said, hey, the 6 -- the

09:34:28   6   '655 patent doesn't have anything to do really with the

09:34:30   7   technology of -- of the games.  It's -- relates more to an

09:34:34   8   idea.

09:34:34   9          And there's other ideas and features that are more

09:34:38   10  important in Clash Royale, and I've listed them out.  We

09:34:40   11  just talked about them a moment ago.  They told me the same

09:34:44   12  type of thing from a technical point of view.

09:34:46   13  Q.  In rendering your opinions, did you also consider

09:34:49   14  information from the game leads at Supercell, including

09:34:54   15  their testimony here at trial, in -- in trying to determine

09:34:57   16  whether or not these features add value to the Clash Royale

09:35:01   17  game?

09:35:02   18  A.  I did.  So I interviewed Mr. Ahlgren in this case, and

09:35:06   19  we saw his testimony, as well.  This is some of that actual

09:35:14   20  testimony that we saw.

09:35:15   21         He was asked -- this is just an example of some of

09:35:18   22  the things that he and I talked about.

09:35:19   23         What -- what's the most important things to users

09:35:23   24  of Clash Royale?

09:35:24   25         And the answer there, he said:  I'd say it's the

1218

09:35:28  1  whole game, it's the battle, the gameplay, the players, the

09:35:36  2  progress, like the story line, that's what he said in his

09:35:39  3  first answer.

09:35:40  4       And I asked him if Supercell valued these features

09:35:45  5  on a day-to-day basis.  Was there anything in Supercell's

09:35:49  6  records where they kept track of profits or revenues

09:35:54  7  associated with these features?

09:35:55  8       And he said, no, he wouldn't put a monetary value

09:35:58  9  on it.  It's a complex game.  It's the entire game that --

09:36:03  10  with all the features assembled together, like we talked --

09:36:05  11  excuse me -- talked about that Supercell looks at.

09:36:09  12  Q.  Did you look outside of Supercell as sort of that third

09:36:13  13  party, people who don't have a dog in the fight, to see if

09:36:17  14  they had -- there was any information in the public domain

09:36:19  15  that might tell you whether or not these patented features

09:36:22  16  versus other features were important to the Clash Royale

09:36:28  17  game?

09:36:28  18  A.  I did.  I looked at articles that -- and did my own

09:36:32  19  independent research, and this is an example of one of

09:36:35  20  those articles.

09:36:36  21       It says:  7 Reasons Why You Can't Stop Playing

09:36:40  22  Clash Royale.  And I've listed those on the right-hand side

09:36:47  23  of this slide.  Updates, the clan, friends, that's what

09:36:51  24  people talked about in the -- what we call the public

09:36:54  25  domain.  And session length is another one that's

09:36:58  1  important.

09:36:58  2  Q.  Let's pause on that one.  So session length, what did

09:37:02  3  you understand that to mean based on the article?

09:37:04  4  A.  So the article and when I spoke with people at

09:37:07  5  Supercell and the technical experts -- this is true for all

09:37:15  6  the games, but it's probably worth talking about here

09:37:19  7  briefly.

09:37:19  8        So there's trade-offs in the game, right?  They

09:37:21  9  want users to stay engaged and to play the game, obviously,

09:37:24  10  because that's how you become successful.  But they also

09:37:27  11  want it to be a length where people will set down the game

09:37:34  12  after a period of time and not get tired of playing, and

09:37:37  13  pick it up again.

09:37:38  14        So there's -- there's a trade-off in terms of the

09:37:41  15  length of time.  It's not just like more time is better,

09:37:44  16  and that's why it's described this -- this way in this

09:37:46  17  article.  It's not like you play more and it's better, play

09:37:53  18  forever.

09:37:54  19        The games are designed to have particular session

09:37:58  20  lengths so the people's interest is maintained over a

09:38:02  21  longer period of time.  So there's pros and cons.  You have

09:38:04  22  to consider both sides.  Sometimes shorter is better, and

09:38:06  23  sometimes longer is better, and it's really a combination

09:38:10  24  that they're seeking to achieve with these games.

09:38:13  25  Q.  And, finally, in looking at Clash Royale in rendering

09:38:17   1   your opinions, did you review and rely on the information

09:38:21   2   from Mr. Klein who we just heard from?

09:38:24   3   A.  I did.  So I talked to Mr. Klein along the way, and I

09:38:28   4   read his expert report and I saw his testimony just like

09:38:33   5   you all did, so I -- I don't have to read this entire

09:38:37   6   slide.

09:38:38   7        But this is an excerpt from what he said where he

09:38:40   8   talked about the pros and cons of the features, that some

09:38:45   9   people said, hey, we're more interested, and some people

09:38:48   10  said they're less interested.

09:38:50   11       In terms of the '655 patent, which is the one that

09:38:53   12  he studied for Clash Royale, some people said that their

09:39:00   13  interest would be diminished, and some people said that

09:39:04   14  their interest would change if a non-infringing alternative

09:39:07   15  was implemented.  Remember, we talked about that a moment

09:39:10   16  ago, too.

09:39:11   17  Q.  Was the net effect -- your understanding of the net

09:39:14   18  effect that if you took this '655 patented feature out,

09:39:18   19  that the net effect was that it wouldn't change on a net

09:39:22   20  basis?  If you took all the information on a net basis, it

09:39:25   21  wouldn't change the amount of time that people played the

09:39:28   22  game?

09:39:28   23  A.  That's right.  That's what Mr. Klein said, that's what

09:39:31   24  his conclusion was, and that's what other people said, as

09:39:34   25  well; technical experts, articles, people from Supercell.

09:39:37   1   Q.  Did you also look at the Brawl Stars game in an effort

09:39:43   2   to determine whether or not the '873 patent contributed

09:39:47   3   value to the Brawl Stars game?

09:39:49   4   A.  Yes.  And this is conveying the same sort of ideas we

09:39:52   5   just spoke about with the Clash Royale, that there's --

09:39:57   6   there's a lot here in the game, and the patent relates to

09:40:03   7   only to one feature.

09:40:03   8   Q.  And in doing so, did you rely on your conversations

09:40:06   9   with people at Supercell and their testimony that they gave

09:40:09   10  here at this trial?

09:40:11   11  A.  Yes, I did.

09:40:13   12  Q.  And what -- what did you -- what was important to you

09:40:16   13  in your analysis and what do you believe is important to

09:40:19   14  the jury in that regard?

09:40:20   15  A.  Well, this is similar.  So Mr. Franzas is the lead

09:40:23   16  programmer at Supercell, and we saw his video -- I think it

09:40:28   17  was yesterday.

09:40:29   18          He was asked what the most important features are

09:40:32   19  in Brawl Stars.

09:40:33   20          He talked about progress, game modes, maps, and

09:40:39   21  that type of stuff.  That's at the top of this slide.  And

09:40:44   22  at the bottom about user engagement, he talked about how

09:40:49   23  they develop new brawlers.  And the one part that I'd like

09:40:53   24  to call out from his testimony there is he said there's

09:40:57   25  hundreds of things that are done, even thousands.

09:40:59  1   Q.  And consistent with what you did for the Clash Royale

09:41:04  2   analysis, did you also look at third-party information and

09:41:08  3   Dr. -- I mean, Mr. Klein's survey in determining whether or

09:41:11  4   not the '873 added value to the Brawl Stars game?

09:41:14  5   A.  Yes, I did.

09:41:15  6   Q.  And what did you find?

09:41:16  7   A.  So Mr. Klein spoke about this a moment ago by video.

09:41:21  8   He said that if the beam style for the weapon was to

09:41:30  9   change, that actually for most of the people would increase

09:41:36  10  interest if you put in an alternative beam style, and for

09:41:40  11  some of the people it would decrease their interest.

09:41:44  12          And so, again, he said in terms of creating value

09:41:48  13  from a survey perspective that the net effect is -- is

09:41:51  14  basically zero.

09:41:54  15  Q.  And, of course, we -- we saw that when -- even -- even

09:41:57  16  for Dr. Neal's survey, when you include all of the survey

09:42:02  17  results, the net effect, even in his own survey was zero in

09:42:07  18  some instances, correct?

09:42:09  19  A.  That's right.  When you considered the net effect, it

09:42:12  20  was zero in some instances, or it diminished the number

09:42:17  21  significantly.

09:42:17  22  Q.  Did you also look specifically at the Clash of Clans

09:42:20  23  game and whether or not this '594 patent, which is the one

09:42:23  24  I think where the net effect was zero, whether or not that

09:42:26  25  added value to the Clash of Clans game?

09:42:28   1   A.   Yes.   So same idea here is what this slide is

09:42:33   2   communicating, that it's just one of many aspects of the

09:42:35   3   overall game.

09:42:37   4   Q.   Did you rely, as you did on the others, on your

09:42:41   5   conversations with Mr. Joas and his testimony that he gave

09:42:45   6   here in the trial of this case?

09:42:47   7   A.   Yes.

09:42:48   8   Q.   Okay.   What -- what did that tell you?   What did that

09:42:50   9   reveal?

09:42:50   10   A.   So he was asked about quality of life features like

09:42:55   11   copy layout, and he said that people don't play Clash of

09:43:00   12   Clans because of quality of life features.   That's what --

09:43:06   13   the top answer.

09:43:07   14          And the bottom, he was asked about the copy

09:43:09   15   layout, and he said that there's no connection to buying

09:43:13   16   gems.   He said, I don't think copy layout actually

09:43:15   17   contributes to gem sales at all.

09:43:17   18   Q.   And you rely -- you heard that Mr. -- Dr. Claypool

09:43:23   19   testify here, correct?

09:43:24   20   A.   Right.   He was on video yesterday.

09:43:27   21   Q.   And Dr. Claypool identified many of the features that

09:43:29   22   are included in the Clash of Clans game, correct?

09:43:31   23   A.   Correct.

09:43:32   24   Q.   Did you likewise rely on Mr. Klein's survey that he

09:43:37   25   just testified about with respect to whether or not this

09:43:41  1   '594 copy layout feature increases the value of the Clash

09:43:46  2   of Clans game?

09:43:47  3   A.  I did.  And this is similar testimony that we saw with

09:43:50  4   the other three surveys that he did.  He said there's pros

09:43:54  5   and cons.  That's what's on the screen here.

09:43:56  6   Q.  So is it fair to say that Mr. Klein's survey, when you

09:44:00  7   consider all the information, is consistent with actually

09:44:04  8   GREE's survey that shows there's zero percent increased

09:44:10  9   time related to the copy layout feature in the Clash of

09:44:15  10  Clans game?

09:44:15  11  A.  Correct.  If you consider all the information, the pros

09:44:17  12  and the cons, the pros and the cons of non-infringing

09:44:22  13  alternatives, the pros and the cons of session length,

09:44:26  14  right, longer is not always better.  It's a trade-off.

09:44:30  15  There's no significant impact from these particular

09:44:36  16  features.

09:44:37  17  Q.  Now, we've talked a lot about Supercell evidence and

09:44:40  18  evidence that came from Supercell folks and Super --

09:44:45  19  Supercell documents.  Did you also find evidence within

09:44:47  20  GREE documents that helped you value these patents and told

09:44:51  21  you whether or not these patents added value to the games?

09:44:54  22  A.  Yes, I did.

09:44:55  23  Q.  And what did you find?

09:44:56  24  A.  Well, here's two examples.  In GREE's documents, they

09:45:03  25  talk about how it's the entirety of the game that's

09:45:07  1  creating value from GREE's perspective.  It's not any

09:45:11  2  particular feature.

09:45:13  3          So at the top, it says:  GREE -- I highlighted the

09:45:19  4  part -- it says:  If Clash of Clans is the bar, we have a

09:45:22  5  lot of work do it.

09:45:24  6          I think it means we have a lot of work to do.

09:45:28  7  It's a very polished and well-thought-out game.

09:45:32  8          And the bottom -- this comes from DX-1217.  The

09:45:35  9  other one came from DX-1218.  It says:  My biggest concern

09:45:41  10  is that Clash of Clans is a very well-done game from a game

09:45:45  11  design perspective.

09:45:46  12  Q.  And that's GREE speaking, correct?

09:45:48  13  A.  That's GREE.

09:45:50  14  Q.  Were you also here when Mr. Sheppard, who was the

09:45:54  15  former chief executive officer of GREE, testified?

09:45:56  16  A.  Yes.

09:45:56  17  Q.  Did you hear Mr. Sheppard talk about the Supercell

09:46:00  18  games and what attributes make them successful or valuable?

09:46:04  19  A.  I did.

09:46:04  20  Q.  We have his testimony here on the screen.  Is that

09:46:11  21  consistent with what you've been telling the jury?

09:46:13  22  A.  Yes, it's consistent with all of the evidence on

09:46:17  23  balance in this case.  They said there's a lot of things

09:46:19  24  that make Clash of Clans successful.  They talk about some

09:46:25  25  of the business reasons, too.  Like, first to market,

09:46:28   1   that's what's on his testimony on this slide.

09:46:31   2   Q.  Mr. Sheppard, as the former CEO of GREE through 2017,

09:46:37   3   did you hear him say or testify in any way that Supercell

09:46:41   4   had taken GREE's technology or used their patents?

09:46:45   5   A.  I didn't hear him say that, no.

09:46:47   6   Q.  Certainly, he had the incentive to say that as -- as

09:46:51   7   the former CEO, correct?

09:46:53   8   A.  Well, I don't know if he had the incentive, but he --

09:46:56   9   he didn't say that.

09:46:58   10  Q.  And -- and what about GREE's success or lack of success

09:47:05   11  for its games in the United States, is that a factor in

09:47:08   12  what you look at?

09:47:09   13  A.  It is.  It is.

09:47:11   14  Q.  Is it a factor that the jury should consider, and

09:47:15   15  tell us -- tell us why?

09:47:16   16  A.  So it's Georgia-Pacific Factor No. 8, and that factor

09:47:20   17  relates to the commercial success of the products that use

09:47:26   18  the patents.  So not just the products that are accused,

09:47:30   19  but all of the products that use the patents.

09:47:34   20       And as we've heard, GREE tried to use these

09:47:37   21  patents in products, and those products weren't successful.

09:47:42   22       So what that means is that it's not the patents

09:47:44   23  that are causing success, it's other things.  And we've

09:47:47   24  talked about what those other things are, the story line

09:47:51   25  and content and the types of things that Mr. Sheppard

09:47:54  1   talked about on this slide.

09:47:56  2   Q.  We've -- we've heard some questions from GREE about

09:48:00  3   whether or not Supercell is trying to say it's excused from

09:48:03  4   patent infringement because GREE has been unsuccessful.  Is

09:48:07  5   that your understanding of Supercell's position?

09:48:10  6   A.  Of Supercell's position?

09:48:12  7   Q.  Yeah.

09:48:13  8   A.  No, I don't understand that to be Supercell's position.

09:48:15  9   Q.  But the success or lack of success of GREE's games and

09:48:20  10  their failure to use patented technology in their games,

09:48:24  11  does that speak to whether or not there is value in these

09:48:27  12  patents?

09:48:28  13  A.  It does.  That relates to a lack of value in these

09:48:31  14  patents.  The fact that GREE wasn't successful, despite

09:48:35  15  trying to, what we say, commercialize products using these

09:48:39  16  patents, that shows that the patents are not valuable.

09:48:45  17  Q.  Let's talk about whether or not you looked at licenses

09:48:47  18  in this case, Mr. Bakewell.

09:48:50  19       And tell the jury what you did in that regard.

09:48:53  20  A.  So I did look at licenses.  There's licenses that were

09:48:57  21  produced by the parties.

09:48:59  22       Here they are on a slide.  And as this shows on

09:49:03  23  the right-hand side, they're all lump sums.

09:49:06  24  Q.  Is that a question that you understand the jury may be

09:49:08  25  asked ultimately as to whether or not a running royalty or

09:49:12  1  a lump sum is the appropriate form?

09:49:14  2  A.  I understand that might be possible.

09:49:15  3  Q.  And what is your opinion in that regard?

09:49:17  4  A.  Well, the evidence shows that the type of -- of a

09:49:22  5  royalty -- we call this the form of the royalty -- would be

09:49:25  6  a lump sum.

09:49:26  7       So the licenses are actually lump sums, and then

09:49:29  8  when you have a case like this where the features are a

09:49:35  9  minor part, especially in the way we talk about, royalty in

09:49:40  10  the form of a lump sum makes sense.

09:49:42  11  Q.  Did you also in this case, sir, review this Japanese

09:49:45  12  license between GREE and Supercell?

09:49:48  13  A.  I did.

09:49:48  14  Q.  And what was there factually of note that you think the

09:49:53  15  jury should take note of related to that license?

09:49:56  16  A.  Well, that was also a lump-sum agreement.  It was for

09:50:02  17  1,079 patents.  And the total payment was four-and-a-half

09:50:08  18  million dollars.  And we've heard -- we heard about that

09:50:11  19  license over the last couple of days.

09:50:13  20  Q.  And do you agree with Dr. Becker that a license to the

09:50:15  21  patented technology is, in fact, what y'all call

09:50:18  22  Georgia-Pacific Factor No. 1?  It's the first factor you

09:50:21  23  should look at.  Do you agree with him in that regard?

09:50:24  24  A.  That's true.

09:50:25  25  Q.  Now, before we wrap up here, to remind the jury what

09:50:29   1   you're doing -- what they're trying to do is put themselves

09:50:33   2   at this hypothetical negotiation between GREE and

09:50:36   3   Supercell, correct?

09:50:36   4   A.   That's correct.

09:50:37   5   Q.   And so we know that GREE is at that hypothetical

09:50:42   6   negotiation table, correct?

09:50:43   7   A.   Right.

09:50:43   8   Q.   We also know that GREE was at this table to negotiate a

09:50:46   9   license for the Japanese patents, correct?

09:50:49   10  A.   That's correct.

09:50:50   11  Q.   And we know exactly what GREE agreed to with respect to

09:50:56   12  a thousand patents and unlimited use of those patents; is

09:50:56   13  that fair?

09:51:01   14  A.   We do.   It's four-and-a-half million dollars.

09:51:03   15  Q.   And I don't think we need to go through these in

09:51:07   16  detail.   But you've -- you've talked about these

09:51:08   17  Georgia-Pacific factors as we've gone through today,

09:51:12   18  correct, Mr. Bakewell?

09:51:13   19  A.   That's right.   We've talked about the -- those factors.

09:51:15   20  I think the jury may see those in the -- in the jury

09:51:19   21  instructions, and we -- that's the framework that I've

09:51:21   22  used.

09:51:23   23  Q.   And as we wrap up, Mr. Bakewell, this is where we

09:51:25   24  started.   When you say the -- the value of these patents is

09:51:29   25  not significant, give the jury some indication of what

| | | |
|---|---|---|
| 09:51:31 | 1 | you're talking about from a monetary or money -- |
| 09:51:35 | 2 | A.  So, as I mentioned, the -- the term we use is |
| 09:51:38 | 3 | "de minimus."  That means minimal.  Like in a case like |
| 09:51:42 | 4 | this, the -- relative to the claims in the patents, that's |
| 09:51:47 | 5 | a number that's like less than $5,000.00 per patent. |
| 09:51:50 | 6 | Q.  Per patent, sir? |
| 09:51:51 | 7 | A.  Correct. |
| 09:51:53 | 8 | MR. DACUS:  That's all I have, Your Honor.  I pass |
| 09:51:54 | 9 | the witness. |
| 09:51:55 | 10 | THE COURT:  Cross-examination by the Plaintiff? |
| 09:51:57 | 11 | MS. LUDLAM:  Thank you, Your Honor. |
| 09:52:02 | 12 | And we have some notebooks to hand out, if we may |
| 09:52:06 | 13 | approach. |
| 09:52:06 | 14 | THE COURT:  You may approach. |
| 09:52:07 | 15 | MS. LUDLAM:  Thank you. |
| 09:52:15 | 16 | THE WITNESS:  Thank you. |
| 09:52:16 | 17 | COURT SECURITY OFFICER:  Yes, sir. |
| 09:52:25 | 18 | THE COURT:  You may proceed when you're ready, |
| 09:52:40 | 19 | Ms. Ludlam. |
| 09:52:41 | 20 | MS. LUDLAM:  Thank you, Your Honor. |
| 09:52:41 | 21 | CROSS-EXAMINATION |
| 09:52:41 | 22 | BY MS. LUDLAM: |
| 09:52:41 | 23 | Q.  Good morning, Mr. Bakewell. |
| 09:52:43 | 24 | A.  Good morning. |
| 09:52:43 | 25 | Q.  It's good to see you again.  We met at your deposition |

| | | |
|---|---|---|
| 09:52:46 | 1 | back in June.  Do you remember that? |
| 09:52:48 | 2 | A.  By video. |
| 09:52:49 | 3 | Q.  Yes. |
| 09:52:51 | 4 | Mr. Bakewell, when we met back in June, you told |
| 09:52:55 | 5 | me that you had charged more than $400,000.00 for the work |
| 09:52:59 | 6 | that you have done for Supercell in the dispute between |
| 09:53:04 | 7 | these parties; is that correct? |
| 09:53:05 | 8 | A.  That's not exactly correct, no.  There's -- this -- if |
| 09:53:15 | 9 | you say disputes, that would be correct. |
| 09:53:18 | 10 | Q.  Okay.  So more than $400,000.00 between the -- for the |
| 09:53:24 | 11 | disputes between these parties, the work you've done for |
| 09:53:27 | 12 | Supercell? |
| 09:53:27 | 13 | A.  Related to disputes between these parties. |
| 09:53:31 | 14 | Q.  And after all of that work, I understand you did |
| 09:53:34 | 15 | upwards of a hundred hours on this case; is that correct? |
| 09:53:37 | 16 | A.  Yes. |
| 09:53:38 | 17 | Q.  Okay.  And after all that work, you still haven't come |
| 09:53:42 | 18 | here today with a number for this jury? |
| 09:53:44 | 19 | A.  I just said it's less than $5,000.00 per patents.  It's |
| 09:53:49 | 20 | de minimus. |
| 09:53:50 | 21 | Q.  Less than $5,000.00.  Okay.  And you understand that if |
| 09:53:53 | 22 | Supercell infringes, the Court shall award damages adequate |
| 09:53:58 | 23 | to compensate it for the infringement but in no event less |
| 09:54:04 | 24 | than a reasonable royalty? |
| 09:54:05 | 25 | A.  That's true. |

1232

09:54:06  1    Q.  Okay.

09:54:08  2         MS. LUDLAM:  Mr. Groat, could you please publish

09:54:11  3    Slide No. 4 from Mr. Becker's report?

09:54:17  4    Q.  (By Ms. Ludlam)  Okay.  And that's consistent with

09:54:18  5    Title 35, United States Code, Section 2 -- 284, right?

09:54:24  6    A.  Yes.

09:54:24  7    Q.  And so is it really your opinion today that no -- in

09:54:33  8    event no less than a reasonable royalty, it's only

09:54:35  9    $5,000.00 per patent?

09:54:37  10   A.  Correct.

09:54:37  11   Q.  Okay.  And you -- you agree that Dr. Becker presented a

09:54:45  12   royalty rate for each patent, correct?

09:54:46  13   A.  Yes.

09:54:47  14   Q.  Okay.

09:54:48  15        MS. LUDLAM:  Mr. Groat, can you please pull up the

09:54:51  16   last slide of Dr. Becker's presentation from yesterday?

09:54:56  17   Q.  (By Ms. Ludlam)  And you agree with -- I know you don't

09:54:59  18   agree with his numbers, but you agree that Dr. Becker

09:55:02  19   reached a specific opinion with respect to each and every

09:55:06  20   patent, correct?

09:55:07  21   A.  He did.

09:55:08  22   Q.  And he has a specific royalty rate for each patent?

09:55:12  23   A.  Yes.

09:55:13  24   Q.  And he actually calculated down to the penny what the

09:55:17  25   past damages would be for each case?

09:55:20  1   A.  He did.

09:55:22  2   Q.  Okay.  But you don't have that kind of precision here

09:55:25  3   today, do you?

09:55:26  4   A.  I don't think I agree with that.  I think there's

09:55:33  5   something called false precision, if that's what you're

09:55:37  6   suggesting, and that's a big issue.  So I think my opinions

09:55:41  7   are precise, and these are not precise for that reason.

09:55:44  8   Q.  You just offered a round number for each patent?

09:55:46  9   A.  That's true.

09:55:47  10  Q.  All right.  And, Mr. Bakewell, do you recall

09:55:50  11  criticizing Dr. Neal for, in your words, not considering

09:55:55  12  alternatives but, instead, surveying the removal of two

09:55:58  13  features?

09:55:58  14  A.  Yes.

09:55:59  15  Q.  And you understand, however, Mr. Bakewell, that that's

09:56:02  16  precisely what Supercell's own survey expert did, right?

09:56:06  17  A.  No.  I think that for three of the patents he focused

09:56:16  18  on -- actually for all of them, he considered

09:56:19  19  non-infringing alternatives.

09:56:20  20       MS. LUDLAM:  Objection, Your Honor, not

09:56:21  21  responsive.

09:56:22  22       THE COURT:  After the witness said "no," that

09:56:24  23  answers the question.  I'll sustain the objection and

09:56:26  24  strike the remainder of the response.

09:56:28  25       MS. LUDLAM:  Thank you, Your Honor.

| | | |
|---|---|---|
| 09:56:29 | 1 | THE COURT:  As you know -- as you know, |
| 09:56:31 | 2 | Mr. Bakewell, Mr. Dacus will get a chance to ask more |
| 09:56:34 | 3 | questions later, so limit your answers to the questions |
| 09:56:37 | 4 | asked, please. |
| 09:56:37 | 5 | THE WITNESS:  Yes, Your Honor. |
| 09:56:38 | 6 | THE COURT:  Thank you. |
| 09:56:39 | 7 | Q.  (By Ms. Ludlam)  Mr. Klein surveyed simply the removal |
| 09:56:43 | 8 | of the copy layout button, did he not? |
| 09:56:45 | 9 | A.  For that feature, yes. |
| 09:56:47 | 10 | Q.  Okay.  So he did just survey the removal of a feature? |
| 09:56:53 | 11 | A.  A feature. |
| 09:56:54 | 12 | Q.  Correct.  And you understand that the removal of the |
| 09:56:59 | 13 | copy layout button is the only alternative that Supercell |
| 09:57:02 | 14 | has offered in this case, correct? |
| 09:57:05 | 15 | A.  Yes. |
| 09:57:06 | 16 | Q.  And now you claim that these patents are not very |
| 09:57:15 | 17 | valuable, in part because Supercell alleges there are |
| 09:57:20 | 18 | alternatives, correct? |
| 09:57:21 | 19 | A.  Correct. |
| 09:57:22 | 20 | Q.  And for your assumption that there are non-infringing |
| 09:57:24 | 21 | alternatives, you're relying on Supercell's technical |
| 09:57:28 | 22 | experts, correct? |
| 09:57:28 | 23 | A.  Yes. |
| 09:57:28 | 24 | Q.  And if the jury disagrees with you and finds that those |
| 09:57:33 | 25 | alternatives either infringe or are not non-infringing |

| | | |
|---|---|---|
| 09:57:36 | 1 | alternatives, they should disregard your opinion on that |
| 09:57:40 | 2 | aspect, correct? |
| 09:57:43 | 3 | A. Just that aspect. There's other evidence that supports |
| 09:57:47 | 4 | my conclusion, but -- |
| 09:57:50 | 5 | Q. Again -- |
| 09:57:51 | 6 | A. -- just that aspect, yes. |
| 09:57:53 | 7 | Q. Okay. Thank you. |
| 09:57:53 | 8 | And we just heard from Mr. -- we just heard |
| 09:57:57 | 9 | Mr. Klein testify, right? |
| 09:57:58 | 10 | A. We did. |
| 09:57:59 | 11 | Q. And he didn't conduct a survey of the '137 or '481 |
| 09:58:04 | 12 | patents, correct? |
| 09:58:05 | 13 | A. Correct. |
| 09:58:06 | 14 | Q. And, Mr. Bakewell, you also told the jury all about |
| 09:58:11 | 15 | this license between the parties in Japan, did you not? |
| 09:58:14 | 16 | A. I did. |
| 09:58:17 | 17 | Q. Now, to be clear, this is just a license in Japan, |
| 09:58:20 | 18 | correct? |
| 09:58:20 | 19 | A. Yes. |
| 09:58:22 | 20 | Q. It is not a license in the United States? |
| 09:58:28 | 21 | A. I'm going -- I'll assume that. I don't -- I'll -- |
| 09:58:34 | 22 | I'll -- that's what I've assumed; that's what I'll say. |
| 09:58:37 | 23 | Q. Okay. And you understand that if this jury finds the |
| 09:58:40 | 24 | patents in this case, the United States patents valid and |
| 09:58:43 | 25 | infringed, its damages award would be for the United |

09:58:47  1   States?

09:58:47  2   A.  Correct.

09:58:49  3   Q.  Okay.  But you didn't tell the jury about Supercell's

09:58:53  4   Japanese revenues with respect to the accused games, did

09:58:56  5   you?

09:58:56  6   A.  I did not.

09:58:58  7        MS. LUDLAM:  Mr. Groat, could you please pull up

09:59:01  8   PTX-690?

09:59:03  9   Q.  (By Ms. Ludlam)  Mr. Bakewell, have you seen this

09:59:12  10  document before?

09:59:15  11  A.  I believe so.

09:59:17  12  Q.  And you understand that this is a document Supercell

09:59:20  13  produced showing its revenues of the accused games in

09:59:25  14  Japan; is that fair?

09:59:26  15  A.  Yes.

09:59:26  16  Q.  Okay.  And are you aware that Supercell's U.S. revenues

09:59:32  17  for these same three games is seven times that of in Japan?

09:59:37  18  A.  That sounds right to me.

09:59:41  19        MS. LUDLAM:  You can take that down, Mr. Groat.

09:59:43  20  Thank you.

09:59:45  21  Q.  (By Ms. Ludlam)  Now, you also told the jury that the

09:59:48  22  royalty in this case should be a lump sum, correct?

09:59:49  23  A.  Yes.

09:59:50  24  Q.  Okay.  And with a lump sum, that means the parties pay

09:59:56  25  one amount for the entire life of the patents, correct?

| | | |
|---|---|---|
| 09:59:59 | 1 | A.  Correct. |
| 09:59:59 | 2 | Q.  But you didn't tell the jury what these patents |
| 10:00:03 | 3 | expired, did you? |
| 10:00:04 | 4 | A.  I didn't mention that, that's correct. |
| 10:00:07 | 5 | Q.  And so you didn't mention that none of the five patents |
| 10:00:11 | 6 | in this case expire until 2034, correct? |
| 10:00:15 | 7 | A.  That's true. |
| 10:00:16 | 8 | Q.  So 14 years of additional life on all of these patents |
| 10:00:20 | 9 | that they would have to account for under a lump sum? |
| 10:00:23 | 10 | A.  That's how lump sum licenses work, that's correct. |
| 10:00:28 | 11 | Q.  Okay.  And the other thing you did not tell this jury |
| 10:00:32 | 12 | was, as we were sitting here today, is that the copy layout |
| 10:00:35 | 13 | feature that you said could simply be removed has never |
| 10:00:38 | 14 | been removed, correct? |
| 10:00:41 | 15 | A.  That's true.  It has not been removed. |
| 10:00:43 | 16 | Q.  Okay.  And Mr. -- when Mr. Klein filed his report and |
| 10:00:47 | 17 | told Supercell that he believed that more people would be |
| 10:00:50 | 18 | interested in the game if that feature were removed, |
| 10:00:53 | 19 | Supercell still didn't remove it, did they? |
| 10:00:55 | 20 | A.  That's true. |
| 10:00:56 | 21 | Q.  And even after they paid you for your report in this |
| 10:01:01 | 22 | case suggesting that these features are no more valuable |
| 10:01:03 | 23 | than $5,000.00, they still didn't remove it, did they? |
| 10:01:08 | 24 | A.  Correct. |
| 10:01:09 | 25 | Q.  And, in fact, Supercell still hasn't implemented a |

10:01:13   1   single alternative that you've discussed today, for any of

10:01:16   2   the patents?

10:01:16   3   A.   That's very true, correct.

10:01:23   4   Q.   Now, Mr. Bakewell, were you here on Monday when you

10:01:27   5   heard Dr. Becker testify?

10:01:29   6   A.   Yes.

10:01:30   7   Q.   Okay.

10:01:31   8        MS. LUDLAM:   Ms. Lockhart, would you mind

10:01:34   9   switching to the ELMO for me?   Thank you very much.

10:01:38  10   Q.   (By Ms. Ludlam)   Now, I will tell you -- let's see --

10:01:44  11   that, I don't know, did you hear Supercell's counsel talk

10:01:47  12   about the evidence that the jury must consider --

10:01:52  13   A.   Yes.

10:01:52  14   Q.   -- during this case?   And he said you have to consider

10:01:56  15   the best evidence?

10:01:57  16   A.   Correct.

10:01:57  17   Q.   The most precise evidence?

10:01:59  18   A.   He did.

10:02:00  19   Q.   And all the evidence, correct?

10:02:02  20   A.   He did, yes.

10:02:02  21   Q.   Okay.   And would you agree with me that with respect to

10:02:05  22   the design of the copy layout feature that's in Clash of

10:02:10  23   Clans, Supercell's design team likely knows a lot more

10:02:15  24   about that feature than either you or I?

10:02:17  25   A.   Oh, sure, of course.

1239

10:02:18   1   Q.  Okay.  So if we're going to look for the best evidence
10:02:21   2   or the most precise evidence and all the evidence relating
10:02:25   3   to that feature, we'd need to consider what Supercell's
10:02:27   4   designers said about it; is that fair?
10:02:30   5   A.  That would be -- if you want to consider all of it,
10:02:34   6   that would be part of it.
10:02:36   7   Q.  Okay.  Well, let's look at the evidence that you didn't
10:02:38   8   tell the jury about.
10:02:40   9            MS. LUDLAM:  Mr. Groat, could you please pull up
10:02:43   10  PTX-72, please?
10:02:56   11            Oh, I'm sorry.  Thank you, Ms. Lockhart.
10:02:59   12            And if you could, please scroll to Page 4,
10:03:03   13  Mr. Groat.  And there you see -- if you could blow up in
10:03:12   14  the middle of the page a comment from Mr. Demirdjian.
10:03:16   15  Q.  (By Ms. Ludlam)  And you understand, Mr. Bakewell, that
10:03:19   16  Mr. Demirdjian is a part of the Clash of Clans team?
10:03:22   17  A.  Yes, I think we've heard that, or I understand that.
10:03:27   18  Q.  Okay.  And in the middle of that page, he says:  I'm
10:03:30   19  way too lazy to redo my base layout, and I wasn't alone in
10:03:36   20  that sentiment.  Started wondering if cloning an enemy base
10:03:42   21  layout feature wouldn't not only be a great quality of life
10:03:46   22  improvement, but it could also be one of those smaller
10:03:50   23  improvements with bigger impact?
10:03:52   24            Do you see that?
10:03:53   25  A.  I do.

10:03:54  1  Q.  Okay.  And you didn't show the jury this document, did

10:03:56  2  you?

10:03:56  3  A.  Correct, I did not.

10:03:57  4  Q.  Okay.

10:03:57  5       MS. LUDLAM:  You can take that down, Mr. Groat,

10:04:00  6  thank you.

10:04:01  7       Could you please pull up PTX- -- oh, I'm sorry,

10:04:03  8  we're going to go back to that and scroll down to Page 5

10:04:08  9  towards the bottom.  There we go.

10:04:10  10  Q.  (By Ms. Ludlam)  Mr. -- this is the same document,

10:04:14  11  Mr. Bakewell.  And towards the bottom, you'll see an entry

10:04:18  12  from Mr. Immonen -- I probably butchered that name, I

10:04:24  13  apologize.  And do you -- could you read that first line

10:04:27  14  for me, please?

10:04:29  15  A.  You'd like for me to read it?

10:04:31  16  Q.  Please.

10:04:32  17  A.  It said:  Copying a village layout would be a very --

10:04:36  18  would be a very useful feature, copying layout manually is

10:04:41  19  really pita.

10:04:43  20  Q.  Okay.  And -- and you understand, he was saying that

10:04:47  21  having to build your own layout manually is a real pain,

10:04:52  22  right?

10:04:52  23  A.  That's what he was saying in that parentheses, yes.

10:04:56  24  Q.  Okay.  And -- and you didn't show the jury this, did

10:04:58  25  you?

| | | |
|---|---|---|
| 10:04:59 | 1 | A.  That's correct. |
| 10:05:06 | 2 | MS. LUDLAM:  You can take that down, Mr. Groat. |
| 10:05:09 | 3 | Can you move to PTX-73, please? |
| 10:05:12 | 4 | Q.  (By Ms. Ludlam)  And, again, this is a Slack message, |
| 10:05:15 | 5 | you understand, for Clash of Clans's team? |
| 10:05:17 | 6 | A.  Yes. |
| 10:05:18 | 7 | Q.  Okay. |
| 10:05:19 | 8 | MS. LUDLAM:  And if we could go to Page 6, please. |
| 10:05:23 | 9 | The second bullet point under Ms. Appel, all the way down |
| 10:05:31 | 10 | past Mr. Vorlick.  Thank you. |
| 10:05:38 | 11 | Q.  (By Ms. Ludlam)  And, again, you see the question was: |
| 10:05:40 | 12 | Copy layout, what do you think?  And at the bottom, could |
| 10:05:43 | 13 | you read what Mr. Vorlick said? |
| 10:05:49 | 14 | A.  He said:  It'd definitely save a lot of time and |
| 10:05:53 | 15 | definitely be a big QoL improvement. |
| 10:05:56 | 16 | Q.  Okay.  And you also didn't show this to the jury today, |
| 10:05:59 | 17 | did you? |
| 10:05:59 | 18 | A.  Correct. |
| 10:06:00 | 19 | Q.  Okay. |
| 10:06:00 | 20 | MS. LUDLAM:  Thank you, Mr. Bakewell.  No further |
| 10:06:05 | 21 | questions. |
| 10:06:05 | 22 | THE COURT:  You pass the witness, counsel? |
| 10:06:06 | 23 | MS. LUDLAM:  Pass the witness. |
| 10:06:07 | 24 | THE COURT:  Redirect, Mr. Dacus? |
| 10:06:11 | 25 | MR. DACUS:  Thank you, Your Honor. |

1242

REDIRECT EXAMINATION

10:06:11  1

10:06:11  2  BY MR. DACUS:

10:06:14  3  Q.  Let's pick up right there, Mr. Bakewell, on this copy

10:06:14  4  layout feature, the '594 patent and the Clash of Clans

10:06:16  5  game.  You just saw those emails that Ms. Ludlam showed

10:06:20  6  you, correct?

10:06:20  7  A.  I did.

10:06:21  8  Q.  Both GREE and Supercell surveyed whether or not that

10:06:27  9  '594 feature had any impact on a game's playing time -- a

10:06:32  10  player's playing time in a game, correct?

10:06:35  11  A.  Correct.  Both companies did.

10:06:36  12  Q.  And when you take all the evidence from GREE's survey,

10:06:39  13  what number did it come to?

10:06:40  14  A.  Zero.

10:06:41  15  Q.  And when you take Mr. Klein's survey, what number does

10:06:44  16  it come to?

10:06:44  17  A.  Zero.

10:06:45  18  Q.  So, regardless of what emails say, the two surveys say

10:06:49  19  the impact is zero; is that fair?

10:06:49  20  A.  When you consider the pros and the cons, it nets out to

10:06:53  21  zero.  That's what we talked about.

10:06:58  22  Q.  Now, there was some discussion about whether or not

10:07:00  23  this '137 and '481 features were surveyed by Mr. Klein.

10:07:08  24  And they were not, correct?

10:07:09  25  A.  That's true.

10:07:09  1   Q.  Did you understand what he said as to why?

10:07:11  2   A.  Yes.

10:07:12  3   Q.  What did he say?

10:07:13  4   A.  Well, Mr. Klein -- and he and I actually spoke about

10:07:18  5   this at length.  When you consider non-infringing

10:07:20  6   alternatives, like I talked about at the beginning of my

10:07:24  7   testimony, it's not perceptible to users, the changes you'd

10:07:28  8   have to make to the ordering of the code or the steps that

10:07:31  9   things would occur under, and so you couldn't survey that.

10:07:35  10          And he and I actually spoke about that at length

10:07:40  11  and tried to figure out of a way that you could.  But you

10:07:44  12  can't.  If users can't perceive that there's a difference

10:07:47  13  from implementing a change, you can't survey that.

10:07:50  14  Q.  Despite the fact that it's unsurveyable, Mr. Bakewell,

10:07:55  15  is it your understanding that Dr. Becker actually used

10:07:57  16  survey information of a different feature to come to his

10:08:02  17  more than $10 million in damages for those two patents?

10:08:05  18  A.  Yes, he did.

10:08:06  19  Q.  Do you think that's economically prudent?

10:08:10  20  A.  I don't.

10:08:11  21  Q.  Last question, sir.  On this removal of these features,

10:08:15  22  based on your experience, sir, is it a slippery slope to

10:08:19  23  start down of removing features from your products or games

10:08:22  24  when you're wrongfully accused of infringing somebody's

10:08:26  25  patent?

10:08:26  1   A.  Well, everybody, citizen or company, in this country

10:08:30  2   has the right to stand up for themselves when they're

10:08:34  3   accused of something that they don't think is -- is true,

10:08:42  4   like -- that applies to all of us as citizens.

10:08:45  5          And if we're accused of something, sometimes --

10:08:49  6   and it's wrong, sometimes we all decide in life to stand up

10:08:52  7   for ourselves and over the principle of the -- of the

10:08:58  8   issue.  And that's why we have a rule of law and courts

10:09:04  9   like this.  That's the -- the way things work in this

10:09:07  10  country.

10:09:07  11         And I think that's the slippery slope that you're

10:09:12  12  talking about.  You know, if you just give in when people

10:09:16  13  accuse you of something wrongfully, well, what happens the

10:09:20  14  next time and the next time?  Sometimes you have to stand

10:09:23  15  up for -- for your rights.  And my understanding is that's

10:09:26  16  why we're here.

10:09:27  17         MR. DACUS:  That's all I have, Your Honor.  I pass

10:09:28  18  the witness.  Thank you.

10:09:29  19         THE COURT:  Further cross-examination?

10:09:31  20         MS. LUDLAM:  No further questions, Your Honor.

10:09:32  21  Thank you.

10:09:33  22         THE COURT:  All right.  You may step down,

10:09:35  23  Mr. Bakewell.

10:09:35  24         THE WITNESS:  Thank you, Your Honor.

10:09:40  25         THE COURT:  Defendant, call your next witness.

| | | |
|---|---|---|
| 10:09:44 | 1 | MR. DACUS:  Your Honor, at this time, Supercell |
| 10:09:47 | 2 | rests its case. |
| 10:09:49 | 3 | THE COURT:  All right.  Ladies and gentlemen of |
| 10:09:51 | 4 | the jury, both Plaintiff and Defendant have rested their |
| 10:09:54 | 5 | case-in-chief.  We're going to take a short recess.  When |
| 10:09:58 | 6 | we come back, we'll proceed with the Plaintiff's rebuttal |
| 10:10:01 | 7 | case. |
| 10:10:01 | 8 | Please simply close your notebooks and leave them |
| 10:10:05 | 9 | in your chairs.  Follow all my instructions about your |
| 10:10:09 | 10 | conduct during the trial, including, of course, not to |
| 10:10:11 | 11 | discuss the case among yourselves, and we'll be back in |
| 10:10:14 | 12 | here shortly to continue, as I say, with the Plaintiff's |
| 10:10:17 | 13 | rebuttal case. |
| 10:10:18 | 14 | The jury is excused for recess. |
| 10:10:21 | 15 | COURT SECURITY OFFICER:  All rise. |
| 10:10:22 | 16 | (Jury out.) |
| 10:10:22 | 17 | THE COURT:  The Court stands in recess. |
| 10:26:46 | 18 | (Recess.) |
| 10:26:49 | 19 | (Jury out.) |
| 10:26:49 | 20 | COURT SECURITY OFFICER:  All rise. |
| 10:26:50 | 21 | THE COURT:  Be seated, please. |
| 10:28:51 | 22 | Mr. Moore, is the Plaintiff prepared to go forward |
| 10:28:58 | 23 | with its rebuttal case? |
| 10:29:00 | 24 | MR. MOORE:  Yes, Your Honor, we are. |
| 10:29:01 | 25 | THE COURT:  And who do you intend to call as your |

| 10:29:05 | 1 | first rebuttal witness? |
| 10:29:06 | 2 | MR. MOORE:  Dr. Robert Akl, and he will be our |
| 10:29:09 | 3 | only rebuttal witness. |
| 10:29:11 | 4 | THE COURT:  All right.  Mr. Dacus, you're |
| 10:29:13 | 5 | standing.  Do you have something before I bring the jury |
| 10:29:15 | 6 | in? |
| 10:29:15 | 7 | MR. DACUS:  If I might, Your Honor.  I was just |
| 10:29:19 | 8 | wondering if the Court would be kind enough to give us an |
| 10:29:22 | 9 | update on how much time we have left, if that's possible. |
| 10:29:26 | 10 | THE COURT:  Just a minute. |
| 10:29:27 | 11 | MR. DACUS:  Thank you. |
| 10:29:27 | 12 | THE COURT:  According to the Court's calculations, |
| 10:29:40 | 13 | the Plaintiff has remaining 1 hour and 14 minutes.  The |
| 10:29:46 | 14 | Defendant has 23 minutes remaining. |
| 10:29:48 | 15 | MR. DACUS:  Thank you very much, Your Honor. |
| 10:29:49 | 16 | THE COURT:  Let's bring in the jury, please, |
| 10:29:51 | 17 | Mr. Fitzpatrick. |
| 10:29:52 | 18 | COURT SECURITY OFFICER:  Yes, sir. |
| 10:29:52 | 19 | All rise. |
| 10:29:54 | 20 | (Jury in.) |
| 10:29:55 | 21 | THE COURT:  Please be seated. |
| 10:30:18 | 22 | As I indicated, ladies and gentlemen, we'll now |
| 10:30:26 | 23 | proceed with the Plaintiff's rebuttal case. |
| 10:30:27 | 24 | Plaintiff, call your first witness. |
| 10:30:30 | 25 | MR. MOORE:  Thank you, Your Honor. |

| | | |
|---|---|---|
| 10:30:31 | 1 | For its first witness, Plaintiff would recall to |
| 10:30:34 | 2 | the stand Dr. Robert Akl. |
| 10:30:35 | 3 | THE COURT:  All right.  Dr. Akl, if you'll return |
| 10:30:37 | 4 | to the witness stand.  And I remind you, sir -- remind you, |
| 10:30:40 | 5 | sir, you remain under oath. |
| 10:30:43 | 6 | THE WITNESS:  Yes, Your Honor. |
| 10:30:48 | 7 | THE COURT:  Are there binders to distribute, |
| 10:30:51 | 8 | counsel? |
| 10:30:51 | 9 | MR. MOORE:  Yes, Your Honor.  May we do that now? |
| 10:30:54 | 10 | THE COURT:  Let's do that now. |
| 10:30:56 | 11 | MR. MOORE:  Thank you. |
| 10:31:10 | 12 | THE COURT:  All right.  You may proceed, |
| 10:31:12 | 13 | Mr. Moore. |
| 10:31:13 | 14 | MR. MOORE:  Thank you, Your Honor. |
| 10:31:13 | 15 | Before I do so, we are almost immediately going to |
| 10:31:16 | 16 | get into the Supercell's confidential source code, and so I |
| 10:31:21 | 17 | would ask if the Court would seal the courtroom.  Our |
| 10:31:23 | 18 | client representatives have already remained outside. |
| 10:31:26 | 19 | THE COURT:  All right.  Based on counsel's request |
| 10:31:28 | 20 | and their representations, I'll order the courtroom sealed |
| 10:31:31 | 21 | at this time. |
| 10:31:32 | 22 | Anyone present not subject to the protective order |
| 10:31:36 | 23 | that's been entered in this case should excuse themselves |
| 10:31:39 | 24 | and remain outside the courtroom until it is unsealed. |
| 10:31:43 | 25 | (Courtroom sealed.) |

10:31:43  1          (This portion of the transcript is sealed

10:31:43  2          and filed under separate cover as

10:31:44  3          Sealed Portion No. 6.)

11:09:29  4          (Courtroom unsealed.)

11:09:29  5          THE COURT:  The courtroom is unsealed.

11:10:00  6          You may continue.

11:10:02  7          MR. MOORE:  Thank you, Your Honor.

11:10:03  8  Q.  (By Mr. Moore)  All right.  Let's turn to the prior art

11:10:04  9  that Mr. Friedman showed the jury relating to the battle

11:10:10  10  patents.  Do you recall him testifying about these games

11:10:16  11  Magic and BattleForge yesterday?

11:10:17  12  A.  Yes.

11:10:17  13  Q.  Now, first of all, did you see any source code from

11:10:17  14  those games?

11:10:18  15  A.  No.

11:10:18  16  Q.  And what impact does that have on your opinions about

11:10:22  17  whether the prior art could possibly invalidate the battle

11:10:26  18  patents?

11:10:26  19  A.  For infringement we look a lot at source code, because

11:10:27  20  even when you see a video sometimes, the video isn't clear

11:10:28  21  what is happening until we go to the source code.  So

11:10:31  22  without source code, even if we have a video or manual,

11:10:34  23  it's very difficult to truly assess what the disclosure is.

11:10:42  24  Q.  All right.

11:10:43  25          MR. MOORE:  Now, Mr. Groat, could you please pull

11:10:46   1   up the Dr. Claypool trial testimony from yesterday?

11:10:52   2   Q.  (By Mr. Moore)  And you heard that testimony, correct,

11:10:55   3   Dr. Akl?

11:10:55   4   A.  Yes.

11:10:55   5   Q.  All right.  Do you recall that -- this is at Page 44 of

11:10:55   6   the transcript?

11:11:07   7         MR. MOORE:  You can go ahead and blow up, please,

11:11:09   8   Lines 17 to 25, thank you, that's perfect.

11:11:13   9   Q.  (By Mr. Moore)  Do you recall Dr. Claypool giving the

11:11:15   10   testimony shown here beginning at Line 17?

11:11:18   11   A.  Yes.

11:11:18   12   Q.  And what in this answer helps inform your testimony

11:11:22   13   about why the source code would be relevant to the prior

11:11:25   14   art games?

11:11:25   15   A.  Right.  So he says:  The code is actually what happens.

11:11:30   16   The interface and the demos and the videos and the use

11:11:33   17   gives you a sort of high-level confidence.  But to know

11:11:38   18   what's happening, you go to the source code.

11:11:40   19         MR. MOORE:  If we could scroll down a little bit.

11:11:43   20   Q.  (By Mr. Moore)  Do you see what he says there at the

11:11:46   21   top of the next page?

11:11:47   22   A.  Yes.

11:11:47   23   Q.  Now, you understand he wasn't talking about the prior

11:11:50   24   art when he talked about -- when he gave this testimony?

11:11:53   25   A.  Correct.

| | | |
|---|---|---|
| 11:11:53 | 1 | Q.  He was talking about Clash of Clans, I think? |
| 11:11:55 | 2 | A.  Yes. |
| 11:11:55 | 3 | Q.  But is it also true for the prior art that we're |
| 11:11:58 | 4 | looking at? |
| 11:11:58 | 5 | A.  Yes, my understanding is the standard is the same. |
| 11:12:02 | 6 | When you're looking for infringement and you're looking at |
| 11:12:04 | 7 | prior art, you do the same thing. |
| 11:12:08 | 8 | Q.  All right.  Thank you. |
| 11:12:09 | 9 | MR. MOORE:  Go back to our slides, please. |
| 11:12:12 | 10 | Q.  (By Mr. Moore)  Now, is the burden of proof relevant to |
| 11:12:14 | 11 | the question of invalidity, as well? |
| 11:12:15 | 12 | A.  Yes. |
| 11:12:16 | 13 | Q.  And how so? |
| 11:12:17 | 14 | A.  The burden of proof -- it's the Defendant's burden of |
| 11:12:19 | 15 | proof by clear and convincing evidence.  It's what's |
| 11:12:24 | 16 | required for invalidity. |
| 11:12:25 | 17 | Q.  And is that a higher burden of proof than the one that |
| 11:12:28 | 18 | applies to the Plaintiff to show infringement? |
| 11:12:30 | 19 | A.  Yes.  So for infringement it's preponderance of the |
| 11:12:33 | 20 | evidence. |
| 11:12:33 | 21 | Q.  What is your understanding of why the Defendant has a |
| 11:12:37 | 22 | higher burden of proof for invalidity than the Plaintiff |
| 11:12:39 | 23 | does for infringement? |
| 11:12:40 | 24 | A.  Because the patents first are assumed to be valid. |
| 11:12:44 | 25 | They've already gone through an examination by the Patent |

| | | |
|---|---|---|
| 11:12:46 | 1 | Office, and the examiner allowed the patents.  So there's |
| 11:12:50 | 2 | been a process in place. |
| 11:12:52 | 3 | Q.  All right.  Even from what you were able to look at |
| 11:12:55 | 4 | regarding Magic and BattleForge, did you find claim |
| 11:13:01 | 5 | elements in the -- in the battle patents that were not |
| 11:13:04 | 6 | present in those games? |
| 11:13:05 | 7 | A.  I did. |
| 11:13:06 | 8 | MR. MOORE:  And let's -- let's -- |
| 11:13:08 | 9 | Q.  (By Mr. Moore)  Start with BattleForge, which claim |
| 11:13:10 | 10 | elements are we discussing here that you found to be |
| 11:13:13 | 11 | missing from BattleForge? |
| 11:13:14 | 12 | A.  Element 1h and 14h, and Element d of Claim 1 in the |
| 11:13:22 | 13 | '481 patent -- sorry, Element 1h and 14h of the '137 |
| 11:13:26 | 14 | patent. |
| 11:13:26 | 15 | Q.  Okay.  And do you have -- are there two reasons that |
| 11:13:32 | 16 | you list here why this claim element is not present? |
| 11:13:35 | 17 | A.  Yes. |
| 11:13:36 | 18 | Q.  All right.  Start with the second one, actually.  No |
| 11:13:38 | 19 | appropriate timing.  Do you recall that the Court has |
| 11:13:41 | 20 | construed this claim term as at a predetermined time? |
| 11:13:45 | 21 | A.  Yes. |
| 11:13:45 | 22 | Q.  And do you recall Mr. Friedman's testimony that in |
| 11:13:48 | 23 | BattleForge, he believed that the power was restored at a |
| 11:13:52 | 24 | constant rate? |
| 11:13:53 | 25 | A.  Correct. |

11:13:54   1   Q.  And is that accurate?

11:13:55   2   A.  No.  The -- if you remember, the BattleForge game had

11:14:00   3   the little power and it was a little circle in the top

11:14:03   4   right.  It's actually not -- it's restored at variable

11:14:07   5   times.

11:14:07   6   Q.  And is there anything in Mr. Friedman's own report that

11:14:10   7   supports your opinion on that?

11:14:11   8   A.  Yeah, he states that in his own report.

11:14:14   9        MR. MOORE:  Can we pull up, please, Mr. Friedman's

11:14:16   10  opening report at Page 1 -- 138 -- I'm sorry, yes, 138 of

11:14:23   11  the PDF.  And if you go to the next page, actually, scroll

11:14:25   12  down to the bottom of this Paragraph 260.  Keep going a

11:14:32   13  little bit more.

11:14:32   14  Q.  Do you see about three lines up before the image the

11:14:36   15  sentence begins second?

11:14:39   16  A.  Yes.

11:14:39   17  Q.  And what -- does that support your opinion that in

11:14:42   18  BattleForge, it is at a variable rate the power is

11:14:45   19  restored?

11:14:46   20  A.  Yes.  So power is this number here, the 50 in this

11:14:49   21  example.  And power is returned to the player from the void

11:14:54   22  at a variable rate based on a percentage of power

11:14:59   23  previously spent.

11:14:59   24  Q.  And does that mean that Supercell has shown that this

11:15:02   25  game restores points at a predetermined time?

11:15:06  1   A.   No.

11:15:08  2   Q.   Okay.

11:15:09  3        MR. MOORE:   You may take that down, thank you.

11:15:11  4   Q.   (By Mr. Moore)   Now, regarding the -- the sequence

11:15:13  5   issue of select, subtract, and add, you were here yesterday

11:15:17  6   when I walked Mr. Friedman through his own expert report on

11:15:20  7   this issue?

11:15:21  8   A.   Yes.

11:15:22  9   Q.   And remind us, please, what -- what did he write in his

11:15:25  10  report about this sequence issue?

11:15:26  11  A.   So we were talking a lot about the sequence where the

11:15:29  12  claims require a specific sequence.

11:15:32  13       In BattleForge, if the player starts with 91 power

11:15:37  14  and then they place a card that's 50 power, what happens

11:15:42  15  actually the -- following the placement, so after you've

11:15:48  16  played your card, you actually get more power.   So it goes

11:15:53  17  up by 4, and then you get the subtraction.   And so the

11:15:56  18  sequence does not follow the required sequence in the

11:15:58  19  claims.

11:15:58  20  Q.   So in BattleForge, it's select, add, subtract, instead

11:16:03  21  of select, subtract, and add?

11:16:06  22  A.   Yes.

11:16:09  23  Q.   Now, looking at the remove and upstate -- update steps

11:16:14  24  of Claims 2 and 15 of the '137 and Claim 1 of the '481, did

11:16:20  25  Mr. Friedman and Supercell show that BattleForge had these

11:16:25   1   claim elements?

11:16:26   2   A.   No.

11:16:26   3   Q.   All right.   And did you see anything -- strike that?

11:16:29   4        MR. MOORE:   Mr. Groat, could you please pull up

11:16:33   5   Mr. Friedman's report again at Page 183 and zoom in on the

11:16:39   6   image?

11:16:39   7   Q.   (By Mr. Moore)   These are the claim elements that

11:16:42   8   require that when a player plays the game content, it's

11:16:46   9   removed from their hand and then a new one is added; is

11:16:48  10   that right?

11:16:48  11   A.   Yes.

11:16:49  12        MR. MOORE:   Could you go to the -- I'm sorry, I

11:16:51  13   think it's going to be at 176 instead.   Go -- go back a

11:17:04  14   little bit.   Okay.   Go forward, sorry, keep -- keep going.

11:17:10  15   It should be the document Page 144, so go forward three

11:17:15  16   pages.

11:17:19  17   Q.   (By Mr. Moore)   All right.   Well, we're having some

11:17:23  18   difficulties with this?

11:17:24  19        Let me just ask you, could you please describe

11:17:25  20   what -- how the hand of cards is shown in BattleForge and

11:17:28  21   why there's no removal and update.

11:17:31  22   A.   So BattleForge, at the bottom, you had your cards, and

11:17:35  23   they stayed there.   So even when you played a card at the

11:17:38  24   bottom -- if we can blow up this part here in red.

11:17:42  25        So this is a screenshot from BattleForge, and you

```
11:17:45   1   had your cards at the bottom, and the cards are not removed
11:17:48   2   after you play them.  They -- you know, they're shown a
11:17:51   3   little smaller, but they're still there.  They're --
11:17:53   4   they're not gone.  You don't get another card in their
11:17:56   5   place.  So that claim element is not met.
11:18:00   6   Q.  All right.  Thank you.
11:18:00   7       MR. MOORE:  Go back to our slides, please.
11:18:02   8   Q.  (By Mr. Moore)  And let's talk about the Magic game.
11:18:05   9       Now, what are the claim -- what's -- what's the
11:18:11  10   first claim element that's not present in the Magic game
11:18:13  11   from the battle patents?
11:18:14  12   A.  First, there's no server.
11:18:15  13   Q.  How do you know that?
11:18:16  14   A.  There is nothing related to a server in the game.
11:18:20  15   Q.  All right.
11:18:21  16       MR. MOORE:  Can you go to the next slide, please?
11:18:23  17   Q.  (By Mr. Moore)  And is there anything in the manual
11:18:25  18   that you were shown that says that?
11:18:27  19   A.  Yes.
11:18:29  20   Q.  And what is that?
11:18:29  21   A.  So the game itself is describing the -- you know, it
11:18:33  22   may be in the future.  It says:  Soon enough, their game
11:18:39  23   will act as a platform in which players can play over the
11:18:42  24   Internet.
11:18:42  25   Q.  But did this 1997 Magic game that Supercell relied on
```

11:18:47   1   actually connect to the Internet and to a server?

11:18:49   2   A.  No, and even if it describes connection to the

11:18:52   3   Internet, you can have multiplayer without a server.  So

11:18:55   4   you can have two computers connect to each other and play.

11:18:59   5   So even when this feature comes in, it doesn't necessarily

11:19:05   6   mean there's going to be a server anyway.

11:19:06   7   Q.  Is that the peer-to-peer arrangement that we talked

11:19:09   8   about last week?

11:19:10   9   A.  Yes.

11:19:10  10   Q.  All right.  What's the next claim element that's not

11:19:13  11   present in Magic?

11:19:15  12   A.  Element 1b, 1c, 14b, and 14c of the '137 patent, and

11:19:22  13   Element 1a of the '481 patent.

11:19:27  14   Q.  And these are the elements that require plural kinds of

11:19:31  15   player characters, correct?

11:19:32  16   A.  Yes.

11:19:32  17   Q.  Why are there no player characters in Magic?

11:19:37  18   A.  Because all you have are cards, and then when you

11:19:39  19   select and deploy a card, it stays a card.  There is no

11:19:44  20   player character in that game.  You start with a card, you

11:19:46  21   end with a card, and all you have are cards.

11:19:48  22          MR. MOORE:  Could we please, Mr. Groat, pull up

11:19:51  23   DX-566 at Page 114 and blow up the image there?

11:20:05  24   Q.  (By Mr. Moore)  What is shown here?

11:20:10  25   A.  So you have cards and you -- you deploy cards and

| | | |
|---|---|---|
| 11:20:14 | 1 | select cards, but everything is just a card.  There is |
| 11:20:17 | 2 | no -- there is no player character. |
| 11:20:21 | 3 | Q.  And is that different from Clash Royale, for example, |
| 11:20:23 | 4 | where the cards will turn into these characters that will |
| 11:20:26 | 5 | walk across the battlefield? |
| 11:20:28 | 6 | A.  Yes. |
| 11:20:29 | 7 | Q.  All right.  What is the next element that is not |
| 11:20:33 | 8 | present in the Magic game? |
| 11:20:35 | 9 | A.  So when we talk about -- when we talk about player |
| 11:20:40 | 10 | cards -- sorry, player characters, it's also enemy |
| 11:20:45 | 11 | characters.  So on both sides, there are no -- on your side |
| 11:20:47 | 12 | or the other side. |
| 11:20:48 | 13 | Q.  All right.  And then let's move ahead to Element h? |
| 11:20:51 | 14 | A.  Yes. |
| 11:20:51 | 15 | Q.  What is -- why is this element not present? |
| 11:20:53 | 16 | A.  You have no sequence and predetermined timing.  So the |
| 11:20:57 | 17 | sequence is -- is also incorrect or not -- does not mirror |
| 11:21:00 | 18 | what's required by the claim.  And there is no |
| 11:21:02 | 19 | predetermined timing. |
| 11:21:03 | 20 | Q.  And why is that true? |
| 11:21:05 | 21 | A.  Because in the game, the way you get mana -- in the |
| 11:21:14 | 22 | game we call it mana -- is you click on the land cards. |
| 11:21:18 | 23 | Q.  How do you -- well, strike that. |
| 11:21:21 | 24 | When do you click on the land cards in comparison |
| 11:21:25 | 25 | to the sequence of how you're going to play your character |

11:21:28   1   card?

11:21:29   2   A.   So the user selects when they want to get the mana.   So

11:21:33   3   it's not that it's at a predetermined time where the

11:21:35   4   computer or the game is giving you a specific amount of

11:21:39   5   Elixir or mana in this game.   You decide when you want to

11:21:44   6   play a card to get mana and when you want more mana or less

11:21:47   7   mana.

11:21:48   8        MR. MOORE:   Could you please go to DX-566 again at

11:21:51   9   Page 121?   And blow up the first three paragraphs.

11:22:03  10   Q.   (By Mr. Moore)   If you could look at the middle

11:22:06  11   paragraph of the Magic manual.   Does that help support your

11:22:11  12   opinion?

11:22:11  13   A.   Yes, yes.

11:22:12  14   Q.   How so?

11:22:13  15   A.   So it says that you click on a highlighted card in your

11:22:16  16   hand to begin casting the spell, or in the case of land, to

11:22:20  17   put it into play.   That's the land card that's going to

11:22:23  18   give you mana.

11:22:24  19        Once you've selected a spell to cast, you must

11:22:27  20   draw enough mana from your mana pool, land in play, or

11:22:31  21   other mana-producing cards to power your spell.

11:22:34  22   Q.   So is the player drawing mana doing the add step in the

11:22:38  23   sequence?

11:22:38  24   A.   Yes.   So you want to play a card, you tap, for example,

11:22:42  25   the land card to get mana, and then you can play the card.

1259

11:22:46   1    So it's the -- a different sequence than what the claim

11:22:50   2    requires.

11:22:50   3    Q.   It's select, add, subtract, instead of the required

11:22:55   4    ones?

11:22:55   5    A.   Yes.

11:22:55   6    Q.   All right.   Now -- and how does the player selecting --

11:23:00   7    deciding to select mana or to -- to draw mana affect the

11:23:04   8    predetermined timing issue?

11:23:05   9    A.   So because a player decides when I want to get my mana,

11:23:08   10   not only does that make it out of sequence, but it also

11:23:11   11   makes it not meet the predetermined time that's also

11:23:16   12   required by the claim.

11:23:18   13   Q.   Okay.   Now, did you hear --

11:23:20   14           MR. MOORE:   Thank you.   You may take that down.

11:23:22   15   Q.   (By Mr. Moore)   Did you hear Mr. Friedman's opinion

11:23:25   16   that it would be -- would have been obvious to combine

11:23:30   17   Magic and BattleForge?

11:23:30   18   A.   Yes, I heard his opinion.

11:23:31   19   Q.   Do you agree with that?

11:23:33   20   A.   No.

11:23:33   21   Q.   Why not?

11:23:34   22   A.   Because when you want to combine two references, the

11:23:37   23   legal principles teach us that you're not supposed to use

11:23:40   24   hindsight.   So I can't take the patent itself and use it as

11:23:44   25   a recipe and see how I can find all these pieces in

11:23:50   1   multiple pieces of prior art and put them together.

11:23:53   2           The correct process is to forget the patent for a

11:23:57   3   second.  And if I put myself in the shoes of a person of

11:24:01   4   ordinary skill, would that person have combined these two

11:24:04   5   references together to get the claimed invention?

11:24:09   6           And -- and really there is no reason.  The -- the

11:24:12   7   games were 12 years apart.  There wasn't a problem in one

11:24:15   8   of the games that the other game would have fixed.  So

11:24:20   9   the -- the motivation to combine that Supercell puts

11:24:25   10  forward is an incorrect analysis.

11:24:27   11  Q.  In addition to there being no motivation to combine, do

11:24:31   12  each of these claims -- I'm sorry, in addition to there

11:24:34   13  being no motivation to combine, are each of these games

11:24:38   14  missing some of the elements of the battle patent claims?

11:24:40   15  A.  Yes.  So they're missing them separately, so there's no

11:24:44   16  anticipation; and they're missing them together, so there

11:24:48   17  is no obviousness.

11:24:49   18  Q.  Thank you.

11:24:50   19          Let's move on to the donation patent.  And did you

11:24:54   20  hear Dr. Zagal's testimony about that yesterday?

11:24:56   21  A.  Yes.

11:24:57   22  Q.  And let me skip ahead to the next slide.

11:25:00   23          What -- what do you recall him saying about this

11:25:03   24  display data element?

11:25:04   25  A.  So he is disputing that you can select cards possessed

11:25:11   1   from your own cards, that -- when -- when you look at the

11:25:17   2   claim language.

11:25:17   3   Q.  Okay.  Let's back up and look at that.

11:25:19   4          Is this -- which element are we talking about

11:25:22   5   there?

11:25:22   6   A.  We're looking at Element b.  For example, the claim

11:25:25   7   says:  First object -- the display data for selecting first

11:25:25   8   object from the possessed objects possessed by the first

11:25:33   9   user, and then you need to select a second user from the

11:25:38  10   plurality of users.  That's one of his dispute.

11:25:39  11   Q.  And why do you disagree with him on that?

11:25:42  12   A.  So he's saying that because -- for example, a user can

11:25:46  13   create a wish list.  So, for example, Voxel wants the bat

11:25:51  14   card.  I don't have a choice to meet the claim language,

11:25:56  15   but the claim language says I need to select one card from

11:25:59  16   my own possessed cards.

11:26:01  17          And so I can select this card, or I can select

11:26:03  18   that card.  So I am still meeting what the claim requires,

11:26:10  19   even though someone may have provided me a wish list.

11:26:12  20   Q.  Are you still also selecting the user to receive the

11:26:15  21   card?

11:26:16  22   A.  Yes.  So I can select this user.  I can select the

11:26:18  23   card.  I can select this -- the bat card with the Voxel.

11:26:23  24          And so when I hit donate, I am selecting a card

11:26:28  25   from the list of possessed cards.  And I am selecting a

1262

11:26:31   1   user from the list of users.  So I am making that

11:26:34   2   selection.

11:26:34   3   Q.  Okay.  Now, do you recall also Dr. Zagal arguing that

11:26:40   4   because a player has to choose to upgrade a card and also

11:26:43   5   pay gold to do so, there's no infringement?

11:26:45   6   A.  Yes.

11:26:48   7         MR. MOORE:  And could we please pull up PTX-3, the

11:26:51   8   donation patent?  And go to Figure 7B -- just page forward

11:27:13   9   if you would, please.

11:27:21   10   Q.  (By Mr. Moore)  Okay.  Do you recall seeing this

11:27:23   11   flowchart a few times yesterday?

11:27:25   12   A.  Yes.

11:27:25   13   Q.  First of all, do we look at whether a claim element is

11:27:29   14   met and infringed by looking at the figures of the patent?

11:27:32   15   A.  No.  We don't compare the figure to the accused

11:27:35   16   product.  We compare the claims to the accused product.

11:27:38   17   Q.  All right.  And then -- so then why does Clash Royale

11:27:40   18   infringe the claims of the donation patent, despite the

11:27:45   19   fact a user has to choose to upgrade and also spend gold?

11:27:48   20   A.  So just because you can add another requirement or

11:27:51   21   another restriction, does not get you out of infringement,

11:27:55   22   as long as you still do what the infringement requires.

11:27:57   23         So -- otherwise, it would be very easy to get out

11:28:01   24   of infringement.  You just -- everybody would just add an

11:28:06   25   extra step that may or may not be important.

11:28:08   1          So you still are meeting the claim language even

11:28:11   2   if there are extra steps that aren't required by the claim.

11:28:14   3   Q.  All right.  And do you also recall Dr. Zagal talking

11:28:20   4   about how he believes an upgraded card is not a second

11:28:23   5   object?

11:28:25   6   A.  Yes.

11:28:25   7   Q.  And why do you disagree with him on that?

11:28:27   8   A.  So it is a different object.  It is a second object.

11:28:28   9   It's a different level.  It has different points.  And in

11:28:29  10   computer science, everything is stored in a variable.

11:28:33  11          So when you get a new object, the fact that it is

11:28:36  12   a new card with new numbers and new levels, meets the claim

11:28:40  13   language.

11:28:40  14   Q.  All right.

11:28:41  15          MR. MOORE:  Could you go to Slide 31, please,

11:28:45  16   Mr. Groat?  Thank you.

11:28:46  17   Q.  (By Mr. Moore)  So what is your opinion on infringement

11:28:49  18   for the donation patent?

11:28:52  19   A.  That the patent infringes the game --

11:28:55  20   Q.  Other way around.

11:28:56  21   A.  Or the game infringes the patent.

11:28:58  22   Q.  Thank you.

11:29:00  23          This is Clash Royale, correct?

11:29:01  24   A.  Yes.

11:29:02  25   Q.  All right.  Now, you also recall testimony on

11:29:05  1    FarmVille?

11:29:05  2    A.  Yes.

11:29:05  3    Q.  And does FarmVille anticipate or -- or invalidate the

11:29:10  4    '655 patent?

11:29:10  5    A.  No.

11:29:10  6    Q.  Why not?

11:29:11  7    A.  Because the -- for a couple of different reasons.

11:29:15  8    There is no sending display data for selecting a first

11:29:20  9    object and a second user.  So there is a requirement in the

11:29:22  10   claim, which is not met by the game.

11:29:24  11          MR. MOORE:  Could you please bring up DX-561,

11:29:29  12   Mr. Groat, and -- and go to Page 85?

11:29:31  13   Q.  (By Mr. Moore)  And did you review the FarmVille for

11:29:33  14   Dummies book?

11:29:33  15   A.  Yes.

11:29:34  16   Q.  And I'll show you that?

11:29:38  17          MR. MOORE:  I'm sorry.  561.  Thank you.

11:29:44  18          Go to Page 85 [sic], please.  All right.  Please

11:29:49  19   pull up that image.

11:29:51  20   Q.  (By Mr. Moore)  Why does this image on Page 85 [sic]

11:29:54  21   support your opinion that the display data element is not

11:29:57  22   met?

11:29:57  23   A.  Because there are no pictures of users.  You cannot

11:30:00  24   select users on this display image.  You can only select

11:30:04  25   items.

| | | |
|---|---|---|
| 11:30:04 | 1 | Q.  All right.  Where do you have to go to select the user? |
| 11:30:06 | 2 | A.  You have to go somewhere else. |
| 11:30:08 | 3 | Q.  Okay. |
| 11:30:08 | 4 | MR. MOORE:  Could you go back to the slides, |
| 11:30:11 | 5 | please? |
| 11:30:11 | 6 | Q.  (By Mr. Moore)  Is there another claim element that is |
| 11:30:13 | 7 | not present in FarmVille? |
| 11:30:14 | 8 | A.  Yes. |
| 11:30:15 | 9 | Q.  Which one is that? |
| 11:30:16 | 10 | A.  Element 1e and 7e of the '655 patent. |
| 11:30:23 | 11 | Q.  And why are they not present? |
| 11:30:25 | 12 | A.  There is no determination that's made in response to |
| 11:30:27 | 13 | request to -- for transfer. |
| 11:30:29 | 14 | Q.  What does that mean? |
| 11:30:29 | 15 | A.  It means that the user has to accept versus the fact |
| 11:30:35 | 16 | that you send it and they get it. |
| 11:30:37 | 17 | Q.  Okay. |
| 11:30:38 | 18 | A.  And it expires after two weeks, so if you don't accept, |
| 11:30:41 | 19 | it goes away. |
| 11:30:42 | 20 | Q.  Right.  So, for example, if you compare on the |
| 11:30:43 | 21 | infringement side in Clash Royale, what happens if you |
| 11:30:44 | 22 | donate a card?  Does the user have to accept? |
| 11:30:46 | 23 | A.  No. |
| 11:30:46 | 24 | Q.  All right.  And in FarmVille, does the user have to |
| 11:30:49 | 25 | accept? |

1266

11:30:49  1  A.  Yes.

11:30:49  2       MR. MOORE:  Let's go to, please, DX-561 at

11:30:54  3  Page 86 [sic], and blow up the bottom part there.

11:31:01  4  Q.  (By Mr. Moore)  And do you remember that I walked

11:31:02  5  through this yesterday with Dr. Zagal?

11:31:04  6  A.  Yes.

11:31:04  7  Q.  And did -- did you hear him talk about that in his

11:31:07  8  direct testimony?

11:31:08  9  A.  Yes.

11:31:08  10  Q.  This aspect?  I'm sorry, in his testimony, yes?

11:31:11  11       Okay.  And why does the fact that the user has to

11:31:14  12  accept, mean that FarmVille doesn't meet this claim

11:31:16  13  element?

11:31:17  14  A.  Because if a user doesn't accept, then you -- you

11:31:23  15  wouldn't have done the transfer.  So it would -- it's not

11:31:25  16  what the claim requires.

11:31:26  17  Q.  And what happens after two weeks if the user never

11:31:29  18  accepts?

11:31:30  19  A.  The -- the gift is not given to the user.  So you --

11:31:36  20  you can't -- you can't end up with a gift after that point

11:31:38  21  in time.

11:31:39  22  Q.  Okay.  So what is your opinion about whether FarmVille

11:31:42  23  invalidates the '655 patent donation patent?

11:31:44  24  A.  FarmVille does not.

11:31:45  25       MR. MOORE:  All right.  Let's move back to our

11:31:48   1   slides, please, No. 36.

11:31:52   2   Q.   (By Mr. Moore)   Finally, we have the -- the '873

11:31:53   3   patent.   What do you understand that Dr. Zagal disputes

11:31:59   4   regarding infringement by Brawl Stars of the '873?

11:32:02   5   A.   Claim -- Element c of Claim 8 and Element c of Claim 10

11:32:06   6   of the '873 patent.

11:32:06   7   Q.   All right.   And you understand he has two different

11:32:08   8   issues with that element?

11:32:10   9   A.   Yes.

11:32:11   10   Q.   What is the first issue?

11:32:12   11   A.   So the element is:   Control the display to display a

11:32:16   12   frame indicative of shooting effective range in accordance

11:32:20   13   with the first touch operation.

11:32:22   14        So it's the first touch operation that he

11:32:23   15   disputes.

11:32:23   16   Q.   All right.   Now, let's -- let's -- remind us, please --

11:32:27   17        MR. MOORE:   Mr. Groat, could you put up PDX-2 at

11:32:32   18   Slide 162 -- I'm sorry, Slide 161, and go --

11:32:39   19   Q.   (By Mr. Moore)   So this is the element --

11:32:41   20        MR. MOORE:   I'm sorry, go to the next slide.

11:32:43   21   Q.   (By Mr. Moore)   And is this the claim construction that

11:32:45   22   the Court presented for -- or entered for touch operation?

11:32:47   23   A.   Yes.

11:32:48   24   Q.   And what does that require?

11:32:49   25   A.   So the Court's construction, this requires operation

11:32:54  1    that involves the user's finger or other object, such as a

11:32:58  2    stylus on the touch panel.

11:33:00  3    Q.  And why does Dr. Zagal say that there's no first touch

11:33:03  4    operation under this construction when a player uses the

11:33:06  5    feature in Brawl Stars that you believe infringes?

11:33:08  6    A.  Right.  So if you remember, the cone only appears -- so

11:33:12  7    the first touch operation is the touch and drag or the

11:33:16  8    swipe.

11:33:16  9            Now, Dr. Zagal disagrees that touch and swipe is a

11:33:22  10   first touch operation.  And I disagree with his opinion

11:33:28  11   because you can't swipe in the air.  You have to touch to

11:33:34  12   swipe.  So the fact that you touch and swipe, and I'm

11:33:37  13   saying you have to touch and swipe, I'm just being precise,

11:33:40  14   you cannot swipe in the air.  So the touch and swipe

11:33:43  15   operation is the first touch operation.

11:33:48  16   Q.  All right.  And do you recall Dr. Zagal showing a page

11:33:51  17   from -- I think it's an Apple document on iPads?

11:33:54  18   A.  Yes.

11:33:54  19   Q.  Does that support your opinion about this being a first

11:33:57  20   touch operation?

11:33:57  21   A.  Yes.

11:33:58  22   Q.  Why?

11:34:00  23   A.  Because the same thing.  I think I called it touch and

11:34:03  24   drag, and he pointed to the Apple that called it a swipe.

11:34:06  25   So swiping or dragging or any sort of movement where you're

| | | |
|---|---|---|
| 11:34:11 | 1 | moving your finger, you have to touch the screen to move |
| 11:34:14 | 2 | your finger.  We're not waving our finger in the air. |
| 11:34:18 | 3 | So the first touch operation of touch and drag is |
| 11:34:19 | 4 | still meeting the Court's construction and is still a first |
| 11:34:24 | 5 | touch operation. |
| 11:34:24 | 6 | Q.  Thank you. |
| 11:34:25 | 7 | MR. MOORE:  Mr. Groat, could you please go to |
| 11:34:27 | 8 | Slide 165 in this same presentation? |
| 11:34:36 | 9 | Q.  (By Mr. Moore)  All right.  Now, the second piece of |
| 11:34:38 | 10 | this Element b, what is the second piece that Dr. Zagal |
| 11:34:42 | 11 | disputes in Brawl Stars? |
| 11:34:45 | 12 | A.  Control the display to display a frame indicative of a |
| 11:34:50 | 13 | shooting effective range in accordance with the position of |
| 11:34:52 | 14 | the first touch operation. |
| 11:34:53 | 15 | MR. MOORE:  Can we go to the next slide, please? |
| 11:34:55 | 16 | Q.  (By Mr. Moore)  Is this the Court's claim construction |
| 11:34:57 | 17 | for the aspects of that phrase? |
| 11:34:59 | 18 | A.  Yes. |
| 11:35:00 | 19 | Q.  All right.  Now, why does Dr. Zagal say that this isn't |
| 11:35:05 | 20 | met? |
| 11:35:06 | 21 | A.  So he -- when we go to, for example -- can we put up an |
| 11:35:12 | 22 | image of the game?  It makes it easier. |
| 11:35:16 | 23 | Q.  Yes. |
| 11:35:16 | 24 | MR. MOORE:  Could you please go to Dr. Akl's |
| 11:35:19 | 25 | slides at No. 37?  No, the slides for today, please, the |

11:35:34  1  rebuttal slides.  Thank you.

11:35:38  2  A.  Yes.

11:35:39  3  Q.  (By Mr. Moore)  How does this help your illustrated

11:35:42  4  testimony?

11:35:42  5  A.  So the swipe operation, the direction and the shape

11:35:50  6  where the position of the cone appears mirrors what I do

11:35:54  7  with my thumb.  So if I swipe in this direction, the cone

11:36:01  8  appears in that direction.  If I swipe in this direction,

11:36:05  9  the cone would appear in that direction.

11:36:07  10  Q.  All right.  And do you recall we showed a slow-motion

11:36:10  11  video during your original testimony that we illustrated

11:36:13  12  that?

11:36:13  13  A.  Yes.

11:36:13  14  Q.  All right.  Now -- so do the two reasons that Dr. Zagal

11:36:21  15  identified get Supercell out of infringement of the '873?

11:36:25  16  A.  No.

11:36:25  17  Q.  And let's move on to invalidity then?

11:36:28  18        On the Call of Mini Sniper game, what -- what are

11:36:32  19  they -- what's the first claim element that is not present

11:36:35  20  in that?

11:36:36  21  A.  Element 8b and 10b of the '873 patent.

11:36:40  22  Q.  Why are those not present in Call of Mini Sniper?

11:36:45  23  A.  There is no shooting effective range as defined by the

11:36:47  24  Court.

11:36:47  25  Q.  Why not?

11:36:48  1  A.  Because to have a shooting effective range, you need to

11:36:51  2  be able to hit anywhere in that region.  And the game

11:36:56  3  doesn't have that.  You can only hit in the crosshair.

11:36:59  4  Q.  Okay.

11:36:59  5  A.  So the scope doesn't give you a region where you can

11:37:02  6  hit.  It just -- you can only hit in the crosshair.

11:37:06  7          MR. MOORE:  Could you please pull up PTX-5, the

11:37:10  8  '873 patent?  And then go to I believe it's Figure 4.

11:37:14  9          Actually, just stay there.  Just blow up the

11:37:17  10 little crosshairs at the bottom right there, figure.  Thank

11:37:21  11 you.

11:37:21  12 Q.  (By Mr. Moore)  Do you recall that Dr. Zagal showed

11:37:25  13 this figure from the patent of the crosshairs?

11:37:29  14 A.  Yes.

11:37:30  15 Q.  Now, again, do we compare a figure of the patent to the

11:37:33  16 prior art or the claims?

11:37:34  17 A.  The claims.

11:37:34  18 Q.  And so does the fact that these prior art games might

11:37:37  19 have also shown a crosshair and so does this '873 patent,

11:37:41  20 does that mean that the patent is invalid?

11:37:42  21 A.  No.

11:37:43  22 Q.  Why not?

11:37:43  23 A.  Because, again, the -- just the presence of the

11:37:47  24 crosshair and the scope in the game isn't what's required

11:37:50  25 in the claim.  The claim requires that you need to have

| | | |
|---|---|---|
| 11:37:53 | 1 | a -- a range that you end up hitting.  And in the game, you |
| 11:37:58 | 2 | don't. |
| 11:37:58 | 3 | So the scope cannot meet the claim language |
| 11:38:02 | 4 | because it does appear, but you don't end up hitting a |
| 11:38:05 | 5 | target that appears anywhere in the scope.  It has to be in |
| 11:38:07 | 6 | the middle -- in the crosshair. |
| 11:38:09 | 7 | Q.  In the prior art, you're saying? |
| 11:38:11 | 8 | A.  In the prior art, yes, that's why the Call of Mini |
| 11:38:15 | 9 | Sniper doesn't meet it. |
| 11:38:18 | 10 | Q.  All right. |
| 11:38:19 | 11 | MR. MOORE:  Please take that down and go to |
| 11:38:21 | 12 | Slide 39 of the rebuttal presentation. |
| 11:38:23 | 13 | Q.  (By Mr. Moore)  Why is -- why in Call of Mini Sniper |
| 11:38:27 | 14 | does the server not control to attack, as required by |
| 11:38:30 | 15 | Element d? |
| 11:38:31 | 16 | A.  Because there is no -- there is no sniper that controls |
| 11:38:36 | 17 | the user in that game. |
| 11:38:37 | 18 | Q.  No server -- |
| 11:38:38 | 19 | A.  Server, sorry, there's no server that controls the |
| 11:38:41 | 20 | user. |
| 11:38:41 | 21 | Q.  Right.  It's not a connected game, correct? |
| 11:38:43 | 22 | A.  Yes. |
| 11:38:43 | 23 | Q.  Do you recall Dr. Zagal saying that you -- you could |
| 11:38:46 | 24 | combine it with this Sakurai patent? |
| 11:38:48 | 25 | A.  Yes. |

1273

| 11:38:48 | 1 | Q. And is that patent on the face of the '873, meaning the |
| 11:38:52 | 2 | patent examiner considered it already? |
| 11:38:54 | 3 | A. Yes. |
| 11:38:54 | 4 | Q. Now, lastly, Sniper vs. Sniper prior art, does this |
| 11:38:59 | 5 | prior art game -- before we get to this element, does it |
| 11:39:03 | 6 | have the shooting effective range element that you talked |
| 11:39:04 | 7 | about before? |
| 11:39:05 | 8 | A. No. |
| 11:39:05 | 9 | Q. And is -- is that for the same reasons as Call of Mini? |
| 11:39:08 | 10 | A. Yes. |
| 11:39:09 | 11 | Q. All right. And why does the Sniper vs. Sniper prior |
| 11:39:12 | 12 | art not use a server to control the attack? |
| 11:39:16 | 13 | A. Also, there is no -- there's no server that's being |
| 11:39:19 | 14 | used to control the attack. |
| 11:39:20 | 15 | Q. And what did Dr. Zagal in his report say actually |
| 11:39:23 | 16 | controls the attack? |
| 11:39:24 | 17 | A. He -- he admits that the phone -- he says: Sniper vs. |
| 11:39:29 | 18 | Sniper discloses a device, like the phone controlling the |
| 11:39:32 | 19 | attack. |
| 11:39:32 | 20 | Q. All right. And would it have been obvious to combine |
| 11:39:35 | 21 | any of this prior art? |
| 11:39:36 | 22 | A. No, there is no motivation to combine. |
| 11:39:39 | 23 | Q. All right. For the same reason you described on the |
| 11:39:41 | 24 | other patent? |
| 11:39:42 | 25 | A. Yes. |

| | | |
|---|---|---|
| 11:39:42 | 1 | Q.  Okay.  Now, lastly, Dr. Akl, you heard some testimony |
| 11:39:46 | 2 | yesterday and this morning about non-infringing |
| 11:39:49 | 3 | alternatives? |
| 11:39:49 | 4 | A.  Yes. |
| 11:39:49 | 5 | Q.  Are there any non-infringing alternatives that are |
| 11:39:53 | 6 | acceptable that the Defendants have identified? |
| 11:39:55 | 7 | A.  No. |
| 11:39:55 | 8 | Q.  And is that for all the reasons you testified last |
| 11:39:58 | 9 | week? |
| 11:39:58 | 10 | A.  Yes. |
| 11:39:59 | 11 | Q.  Thank you. |
| 11:40:01 | 12 | MR. MOORE:  I pass the witness, Your Honor. |
| 11:40:02 | 13 | THE COURT:  Cross-examination by the Defendant? |
| 11:40:05 | 14 | MR. SACKSTEDER:  Thank you, Your Honor. |
| 11:40:16 | 15 | THE COURT:  Please proceed. |
| 11:40:16 | 16 | CROSS-EXAMINATION |
| 11:40:17 | 17 | BY MR. SACKSTEDER: |
| 11:40:17 | 18 | Q.  Good morning, Dr. Akl. |
| 11:40:19 | 19 | A.  Good morning. |
| 11:40:20 | 20 | Q.  You just showed a slide with Dr. Zagal's face on it, |
| 11:40:25 | 21 | correct? |
| 11:40:25 | 22 | A.  Yes. |
| 11:40:27 | 23 | MR. SACKSTEDER:  Mr. Smith, can you pull up -- I |
| 11:40:29 | 24 | think it's Slide 42 from Dr. Akl's slides? |
| 11:40:34 | 25 | Q.  (By Mr. Sacksteder)  And you have a highlighted quote |

| | | |
|---|---|---|
| 11:40:40 | 1 | from Dr. Zagal's expert report, correct? |
| 11:40:43 | 2 | A.  Yes. |
| 11:40:43 | 3 | Q.  And you are talking about what it is that performs the |
| 11:40:46 | 4 | control to attack claim limitation, correct? |
| 11:40:48 | 5 | A.  Yes. |
| 11:40:48 | 6 | Q.  And you are suggesting that because Sniper vs. Sniper |
| 11:40:53 | 7 | discloses a smartphone means that it does not also have a |
| 11:40:58 | 8 | server controlling to attack, correct? |
| 11:41:00 | 9 | A.  Yes. |
| 11:41:02 | 10 | Q.  You would agree that a client device executing code can |
| 11:41:06 | 11 | still cause instructions to be executed on the server, |
| 11:41:10 | 12 | correct? |
| 11:41:10 | 13 | A.  Yes. |
| 11:41:12 | 14 | Q.  In fact, you testified to that regarding your review of |
| 11:41:15 | 15 | source code or not, earlier in the trial, correct? |
| 11:41:17 | 16 | A.  Yes. |
| 11:41:18 | 17 | Q.  And you would agree that in a client-server |
| 11:41:22 | 18 | architecture, as a result of executing code on a client |
| 11:41:26 | 19 | device, you end up with code executing on the server, as |
| 11:41:30 | 20 | well, correct? |
| 11:41:31 | 21 | A.  If that's how it's programmed. |
| 11:41:35 | 22 | Q.  The portion of Dr. Zagal's expert report that you are |
| 11:41:42 | 23 | relying on here is talking about Claim 1 of the '873 |
| 11:41:49 | 24 | patent, correct? |
| 11:41:50 | 25 | A.  I would have to check.  But I'll take your word for it. |

11:41:54  1   Q.  All right.

11:41:55  2         MR. SACKSTEDER:  Can we go to Paragraph 939 of the

11:41:58  3   expert report?

11:42:02  4   Q.  (By Mr. Sacksteder)  And it says:  Element 1-D.

11:42:06  5   Correct?

11:42:06  6   A.  Yes.

11:42:06  7   Q.  All right.  So you're talking about a claim that isn't

11:42:09  8   even asserted in this case, correct?

11:42:14  9         MR. MOORE:  Your Honor, I would object as

11:42:15  10  irrelevant to the extent we're getting into claims that are

11:42:20  11  previously asserted and may not be at the moment.

11:42:21  12        MR. SACKSTEDER:  It's in this witness's slides,

11:42:23  13  Your Honor.

11:42:23  14        THE COURT:  All right.  I'll overrule it.

11:42:25  15        MR. MOORE:  Thank you, Your Honor.

11:42:27  16  A.  Can you repeat the question, please?

11:42:29  17  Q.  (By Mr. Sacksteder)  The heading on Paragraph 939 of

11:42:34  18  Dr. Zagal's report upon which you just relied says:

11:42:39  19  Element 1-D.  Correct?

11:42:40  20  A.  Yes.

11:42:40  21  Q.  And that is referring to "Element 1-D" of Claim 1,

11:42:44  22  correct?

11:42:44  23  A.  Yes.

11:42:45  24  Q.  Which is not asserted, correct?

11:42:46  25  A.  Yes.

1277

| | | |
|---|---|---|
| 11:42:47 | 1 | MR. SACKSTEDER:  Can we go to Page 9 -- 349 of |
| 11:42:50 | 2 | Dr. Zagal's report? |
| 11:42:52 | 3 | Q.  (By Mr. Sacksteder)  And at the bottom there, he's |
| 11:42:56 | 4 | discussing Claim 8, correct -- Element 8d? |
| 11:43:02 | 5 | A.  Yes. |
| 11:43:03 | 6 | MR. SACKSTEDER:  Can we go to the paragraph right |
| 11:43:05 | 7 | after that, which I think is Paragraph 962? |
| 11:43:09 | 8 | Q.  (By Mr. Sacksteder)  And, here, he says that an online |
| 11:43:13 | 9 | server can control to attack.  Correct? |
| 11:43:16 | 10 | A.  He says it's possible. |
| 11:43:17 | 11 | Q.  Yeah.  It says:  The online server may be configured to |
| 11:43:21 | 12 | perform certain operations with a game, including |
| 11:43:25 | 13 | controlling to attack? |
| 11:43:26 | 14 | Correct? |
| 11:43:27 | 15 | A.  Yes. |
| 11:43:27 | 16 | Q.  And you didn't show that part, correct? |
| 11:43:30 | 17 | A.  Correct. |
| 11:43:30 | 18 | Q.  You showed a part about a claim that is not asserted, |
| 11:43:33 | 19 | correct? |
| 11:43:33 | 20 | A.  Yes. |
| 11:43:45 | 21 | MR. SACKSTEDER:  Your Honor, I am not going to |
| 11:43:47 | 22 | show source code, but I'm going to discuss it a bit, and so |
| 11:43:50 | 23 | I would like to seal, if we could. |
| 11:43:53 | 24 | THE COURT:  All right.  Based on counsel's request |
| 11:43:56 | 25 | and to protect confidential information, I'll order the |

| | | |
|---|---|---|
| 11:44:00 | 1 | courtroom sealed at this time. |
| 11:44:01 | 2 | Those present not subject to the protective order |
| 11:44:03 | 3 | that's been entered by the Court in this case should excuse |
| 11:44:06 | 4 | themselves and remain outside the courtroom until the |
| 11:44:11 | 5 | courtroom is unsealed. |
| 11:44:12 | 6 | (Courtroom sealed.) |
| 11:44:12 | 7 | (This portion of the transcript is sealed |
| 11:44:12 | 8 | and filed under separate cover as |
| 11:44:13 | 9 | Sealed Portion No. 7.) |
| 11:52:37 | 10 | (Courtroom unsealed.) |
| 11:52:38 | 11 | A.  I'm there. |
| 11:52:42 | 12 | Q.  (By Mr. Sacksteder)  All right.  And do you see the |
| 11:52:44 | 13 | part beginning at Line 4 and down to Line 13? |
| 11:52:53 | 14 | A.  Yes. |
| 11:52:53 | 15 | Q.  Do you see that you drew a distinction between |
| 11:52:56 | 16 | selecting a card and deploying it? |
| 11:53:01 | 17 | A.  Yes. |
| 11:53:04 | 18 | Q.  I'll ask you again.  Selecting and deploying are two |
| 11:53:10 | 19 | different things, right? |
| 11:53:12 | 20 | A.  Yes. |
| 11:53:15 | 21 | Q.  And you relied on code for deploying, correct? |
| 11:53:21 | 22 | A.  Yes. |
| 11:53:27 | 23 | MR. SACKSTEDER:  Take a look at Slide 6 of |
| 11:53:29 | 24 | Dr. Akl's slides. |
| 11:53:58 | 25 | Q.  (By Mr. Sacksteder)  While we're looking for that -- |

| | | |
|---|---|---|
| 11:54:00 | 1 | oh, here we go -- let's -- yeah, this is actually fine? |
| 11:54:03 | 2 | Let's talk about the -- Slide 37 of your slides, |
| 11:54:06 | 3 | but it happens to be what I was also going to ask you |
| 11:54:09 | 4 | about. |
| 11:54:09 | 5 | So you expressed some opinions about the '873 |
| 11:54:13 | 6 | patent this morning, correct? |
| 11:54:14 | 7 | A.  Yes. |
| 11:54:14 | 8 | Q.  And one of the things that you said was when you move |
| 11:54:17 | 9 | your thumb in a particular direction, then the cone appears |
| 11:54:20 | 10 | in that direction.  Did I hear you right? |
| 11:54:23 | 11 | A.  Yes. |
| 11:54:23 | 12 | Q.  All right.  And that was your sworn testimony, correct? |
| 11:54:25 | 13 | A.  Yes. |
| 11:54:26 | 14 | Q.  Thank you, sir. |
| 11:54:28 | 15 | MR. SACKSTEDER:  I need Slide 6 of these slides. |
| 11:54:36 | 16 | Q.  (By Mr. Sacksteder)  All right.  And this is where you |
| 11:54:37 | 17 | were talking about the template related to the different |
| 11:54:40 | 18 | player, correct? |
| 11:54:41 | 19 | A.  Yes. |
| 11:54:41 | 20 | Q.  All right.  And -- and that is in the '594 patent, |
| 11:54:45 | 21 | correct? |
| 11:54:45 | 22 | A.  Yes. |
| 11:54:45 | 23 | Q.  In the '594 patent, the only claim that is asserted in |
| 11:54:49 | 24 | Claim 2, right? |
| 11:54:50 | 25 | A.  Yes. |

11:54:50   1   Q.   And you agree with me that that relates -- or that is

11:54:54   2   asserted against the copy layout feature, correct?

11:54:59   3   A.   From a second player.

11:55:03   4   Q.   Related to a second player is what the claim says,

11:55:07   5   right?

11:55:07   6   A.   Yes.

11:55:08   7   Q.   And the feature that is accused of infringing that is

11:55:11   8   the copy layout feature in Clash of Clans, right?

11:55:15   9   A.   Yes.

11:55:16   10   Q.   And you prepared in part of your analysis of this -- of

11:55:21   11   this patent, you prepared a video where you went through

11:55:26   12   the process of visiting another player's layout and making

11:55:31   13   a copy of it and then dropping it into a slot of the layout

11:55:37   14   editor.   Correct?

11:55:37   15   A.   Yes.

11:55:37   16   Q.   And then you got sent to a place called village edit

11:55:43   17   mode, right?

11:55:44   18   A.   Yes.

11:55:44   19   Q.   And there were a whole bunch of blue boxes.   We looked

11:55:47   20   at them a little bit before, at the bottom of the screen,

11:55:50   21   right?   And you couldn't go any further than that, and you

11:55:53   22   could not set that layout as active because you hadn't

11:55:57   23   gotten rid of those blue boxes by moving your buildings to

11:56:01   24   the layout and dealing with the buildings you didn't have,

11:56:04   25   correct?

11:56:04   1   A.  Yes.

11:56:04   2   Q.  All right.  So in that video, you never actually set

11:56:11   3   the layout as active, correct?

11:56:20   4   A.  No.

11:56:22   5   Q.  Meaning you -- are you saying you did set the layout as

11:56:26   6   active?

11:56:27   7   A.  No, I said I did not in that video.  I did it in

11:56:30   8   another video.

11:56:31   9   Q.  Sometimes when I -- you did it in another, video but

11:56:35  10   you were talking about a layout that you copied from

11:56:37  11   yourself, right?

11:56:38  12   A.  Yes.  I was showing the functionality of how you can

11:56:42  13   copy and you set as active, that is correct.

11:56:44  14   Q.  But in that case, you were copying your own layout,

11:56:47  15   correct?

11:56:47  16   A.  Yes.  The -- the original was mine.  The steps are the

11:56:51  17   same, regardless of where you get it from.  So that was the

11:56:55  18   point.

11:56:56  19          MR. SACKSTEDER:  Move to strike everything after

11:56:58  20   "yes" as non-responsive.

11:57:01  21          THE COURT:  Sustained.

11:57:03  22   Q.  (By Mr. Sacksteder)  So the video showing you actually

11:57:13  23   being able to set a layout as active was the video where

11:57:18  24   you were copying your own layout, right?

11:57:21  25   A.  Yes, for Claim 1.

| | | |
|---|---|---|
| 11:57:22 | 1 | Q.  And Claim 1 is not asserted in this case? |
| 11:57:24 | 2 | A.  Correct. |
| 11:57:25 | 3 | Q.  And then in the video where you were trying to show |
| 11:57:29 | 4 | copying of a layout related to another player, you were |
| 11:57:34 | 5 | unable to set that layout as active, correct? |
| 11:57:41 | 6 | A.  I didn't do it.  I wouldn't say I was unable.  I could |
| 11:57:50 | 7 | have, but I didn't. |
| 11:57:51 | 8 | Q.  You could have done it, but only if you had moved your |
| 11:57:54 | 9 | existing buildings to places in the layout, correct? |
| 11:57:58 | 10 | A.  Yes. |
| 11:57:58 | 11 | Q.  And in your deposition, you said if you did that to |
| 11:58:00 | 12 | somebody else's layout, then that would no longer be a |
| 11:58:04 | 13 | layout related to another player, correct? |
| 11:58:10 | 14 | A.  If I modify it further, it becomes my own. |
| 11:58:17 | 15 | Q.  Right.  Rather than a layout related to another player? |
| 11:58:20 | 16 | A.  Yes. |
| 11:58:20 | 17 | Q.  And you swore that in your deposition, correct? |
| 11:58:22 | 18 | A.  Yes. |
| 11:58:22 | 19 | Q.  So if you had set those buildings, it wouldn't have |
| 11:58:31 | 20 | satisfied Claim 2, right? |
| 11:58:36 | 21 | A.  I don't know. |
| 11:58:38 | 22 | Q.  You don't have an opinion about that? |
| 11:58:40 | 23 | A.  I don't know if we're arguing semantics.  This is why I |
| 11:58:47 | 24 | don't want to answer incorrectly. |
| 11:58:49 | 25 | Q.  So the reason why -- well, strike that. |

11:59:05  1         We're talking about setting the layout as active,

11:59:08  2  right?

11:59:08  3  A.  Sure.

11:59:08  4  Q.  And that's the thing that you say is applying the

11:59:12  5  template from the patent claim, right?

11:59:13  6  A.  That's the command.  I think it's from Claim 1 because

11:59:20  7  Claim 2 depends on Claim 1.  So we have to go back to

11:59:23  8  Claim 1 even though Claim 1 is not asserted.  I think the

11:59:27  9  language is in Claim 1.

11:59:28  10  Q.  You have to -- in order to apply the template in your

11:59:31  11  theory, you have to set the layout as active in Clash of

11:59:34  12  Clans, right?

11:59:34  13  A.  Yes.

11:59:41  14  Q.  In fact, you -- you spoke to Dr. Neal, the survey

11:59:45  15  expert, right?

11:59:46  16  A.  Yes.

11:59:46  17  Q.  And you described what the accused feature in Clash of

11:59:49  18  Clans was, right?

11:59:50  19  A.  Yes.

11:59:50  20  Q.  And what you said was, setting -- being able to save

11:59:56  21  somebody else's layout, copy it, and set it as active as

12:00:00  22  your own layout, correct?

12:00:01  23  A.  Yes.

12:00:01  24  Q.  And you can't do that unless you place all those

12:00:04  25  buildings, right?

| | | |
|---|---|---|
| 12:00:04 | 1 | A.  If you have an error message with the buildings, yes. |
| 12:00:09 | 2 | Q.  And -- and when that happens, then if you do set the |
| 12:00:12 | 3 | buildings, it is not a layout related to the other player, |
| 12:00:21 | 4 | correct? |
| 12:00:21 | 5 | A.  That's where I'm not sure if I can answer yes or no |
| 12:00:26 | 6 | because of related can be -- you can still be related or |
| 12:00:33 | 7 | cannot, depending on how we look at related. |
| 12:00:33 | 8 | Q.  We discussed this in your deposition regarding |
| 12:00:35 | 9 | invalidity, correct? |
| 12:00:36 | 10 | A.  I -- I don't remember.  We can go there if you want. |
| 12:00:39 | 11 | It's been awhile. |
| 12:00:40 | 12 | Q.  And -- and you said, I think we discussed this earlier |
| 12:00:42 | 13 | in the week, too, you said that if it is -- if -- if you |
| 12:00:46 | 14 | have to change it, it's not -- it's your own.  You just |
| 12:00:49 | 15 | said that, right? |
| 12:00:51 | 16 | A.  It becomes your own if you do change it, but it comes |
| 12:00:55 | 17 | from someone else's.  So it is somewhat related.  This is |
| 12:01:01 | 18 | what I'm trying to answer on the record accurately. |
| 12:01:03 | 19 | Q.  But you have not offered an opinion that if you change |
| 12:01:07 | 20 | the buildings, it is related to another player, correct? |
| 12:01:10 | 21 | A.  I'm not sure. |
| 12:01:11 | 22 | Q.  You don't know one way or the other? |
| 12:01:12 | 23 | A.  I'm not sure. |
| 12:01:13 | 24 | Q.  Thank you, Dr. Akl. |
| 12:01:16 | 25 | MR. SACKSTEDER:  I'll pass the witness. |

| | | |
|---|---|---|
| 12:01:18 | 1 | THE COURT:  Redirect, Mr. Moore? |
| 12:01:20 | 2 | MR. MOORE:  Yes, Your Honor.  Thank you. |
| 12:01:29 | 3 | THE COURT:  By my calculations, you have seven |
| 12:01:31 | 4 | minutes of trial time remaining. |
| 12:01:33 | 5 | MR. MOORE:  Thank you, Your Honor. |
| 12:01:34 | 6 | THE COURT:  Please proceed. |
| 12:01:34 | 7 | MR. MOORE:  Thank you. |
| 12:01:34 | 8 | REDIRECT EXAMINATION |
| 12:01:35 | 9 | BY MR. MOORE: |
| 12:01:35 | 10 | Q.  Dr. Akl, could you just please explain this last |
| 12:01:46 | 11 | exchange that you and counsel for Defendant had? |
| 12:01:48 | 12 | A.  Yes.  So Claim 2, which is dependent from Claim 1, |
| 12:01:55 | 13 | Claim 1 requires you to copy a layout, and you can set it |
| 12:02:00 | 14 | as active.  And I walked through all the elements of |
| 12:02:03 | 15 | Claim 1 and did a video where I can copy my own layout, set |
| 12:02:09 | 16 | it as active, and that's perfectly good. |
| 12:02:12 | 17 | For Claim 2, you have the additional limitation |
| 12:02:14 | 18 | that you have to go and get another player's template.  And |
| 12:02:18 | 19 | so I've shown in the video that feature where I can go and |
| 12:02:21 | 20 | get another player's template, and you get it back. |
| 12:02:24 | 21 | Once you get that template, you are in the |
| 12:02:28 | 22 | template editor.  And then I can do exactly what I did for |
| 12:02:32 | 23 | Claim 1.  I can set it as active, I can make a copy of it, |
| 12:02:36 | 24 | I can move things around. |
| 12:02:38 | 25 | And my understanding is, I've already shown those |

1286

| | | |
|---|---|---|
| 12:02:40 | 1 | features.  So I don't necessarily need to show them again |
| 12:02:43 | 2 | for Claim 2.  Because Claim 2 deals with the second player, |
| 12:02:46 | 3 | there may be buildings that you have to deal with.  There |
| 12:02:49 | 4 | may not be.  They may be a lower level than me and have the |
| 12:02:53 | 5 | same buildings. |
| 12:02:54 | 6 | So the issue with the buildings doesn't really |
| 12:02:57 | 7 | relate to the claim.  And this is why I felt we were |
| 12:03:00 | 8 | arguing semantics, and I didn't want to answer incorrectly |
| 12:03:03 | 9 | on the record. |
| 12:03:04 | 10 | So I don't have an opinion about the semantic |
| 12:03:07 | 11 | aspect, but I have no -- no -- I'm trying to think of the |
| 12:03:17 | 12 | word -- there is no -- in my mind, there is no dispute that |
| 12:03:23 | 13 | the game infringes, and I've shown how it infringes when I |
| 12:03:26 | 14 | look at Claim 1 and Claim 2. |
| 12:03:27 | 15 | Q.  And does the fact that sometimes you may have to deal |
| 12:03:30 | 16 | with buildings that are in -- in your inventory get |
| 12:03:35 | 17 | Supercell out of infringement? |
| 12:03:36 | 18 | A.  No.  And so then after you did that, if it's still -- |
| 12:03:40 | 19 | you can then call it your own -- |
| 12:03:42 | 20 | THE COURT:  Slow -- slow down, Dr. Akl. |
| 12:03:44 | 21 | THE WITNESS:  Sorry. |
| 12:03:45 | 22 | A.  It's because someone copied someone's homework and then |
| 12:03:48 | 23 | changed something.  This is where it's still copied, but |
| 12:03:52 | 24 | you've changed something.  So how much do you penalize |
| 12:03:54 | 25 | them?  That was the semantic question I wasn't comfortable |

12:03:58   1   answering on the fly.

12:03:59   2   Q.   (By Mr. Moore)   Okay.   Now, you also discussed Page 242

12:04:02   3   of your deposition about this select and deploy exchange

12:04:05   4   that you had?

12:04:05   5            Could you please explain that interchange that you

12:04:09   6   had, as well?

12:04:09   7   A.   Yes.   The reason I was a little reluctant to answer is

12:04:14   8   because the claim requires you to select to attack.   And

12:04:18   9   the "to attack" in the game is the deploying.

12:04:24   10            So when I say selecting, I am not using it in the

12:04:27   11   claim term where you're just selecting.   Because I can grab

12:04:31   12   something and I can move it, and then once I deploy, those

12:04:35   13   steps of grabbing, moving, and deploying, is the select to

12:04:39   14   attack that the claim requires.

12:04:41   15            So, again, I was -- I wasn't sure what the

12:04:45   16   semantics.   Are we talking about just selecting in vacuum

12:04:49   17   or the select to attack, which I've shown correctly is the

12:04:53   18   deploy?

12:04:53   19   Q.   So is this just another semantical issue?

12:04:57   20   A.   Yes, and I may be overthinking the questions.

12:05:01   21            MR. MOORE:   Okay.   Pass the witness, Your Honor.

12:05:02   22   Thank you.

12:05:07   23            THE COURT:   Any additional cross, Mr. Sacksteder

12:05:10   24   in your remaining three minutes?

12:05:12   25            MR. SACKSTEDER:   Thank you, Your Honor.   Extremely

```
12:05:17   1    briefly.

12:05:17   2                         RECROSS-EXAMINATION

12:05:18   3    BY MR. SACKSTEDER:

12:05:18   4    Q.  The way we discussed selection today, or the way you

12:05:21   5    did, that includes subtraction; do you agree with that?

12:05:29   6    A.  In what context?

12:05:31   7    Q.  Well, the way you discussed it and the way you

12:05:33   8    discussed it in your -- your deposition, does it include

12:05:36   9    subtraction?

12:05:37  10    A.  I still don't understand the question.

12:05:43  11    Q.  Is subtraction part of the selection process?

12:05:45  12    A.  No.

12:05:46  13    Q.  Thank you, sir.

12:05:50  14              MR. SACKSTEDER:  No more questions, Your Honor.

12:05:52  15              THE COURT:  Any redirect, additionally?

12:05:57  16              MR. MOORE:  Nothing further, Your Honor.  Thank

12:05:59  17    you.

12:05:59  18              THE COURT:  Dr. Akl, you may step down, sir.

12:06:01  19              THE WITNESS:  Thank you, Your Honor.

12:06:04  20              MR. MOORE:  And, Your Honor, may Dr. Akl be

12:06:06  21    excused?

12:06:06  22              THE COURT:  Any objection?

12:06:08  23              MR. DACUS:  No objection, Your Honor.

12:06:09  24              THE COURT:  The witness may be excused.

12:06:11  25              MR. MOORE:  Thank you.
```

12:06:12  1            THE WITNESS:  Thank you.

12:06:12  2            THE COURT:  Plaintiff, call your next rebuttal

12:06:17  3    witness.

12:06:17  4            MR. MOORE:  Your Honor, the Plaintiff rests its

12:06:19  5    case.

12:06:19  6            THE COURT:  All right.  Both Plaintiff and

12:06:22  7    Defendant rest and close, subject to final jury

12:06:25  8    instructions and closing arguments?

12:06:28  9            MR. MOORE:  Yes, sir.

12:06:29 10            MR. DACUS:  Yes, Your Honor, Supercell rests and

12:06:30 11    closes.

12:06:31 12            THE COURT:  All right.  Ladies and gentlemen of

12:06:34 13    the jury, you have now heard all the evidence in this case.

12:06:41 14    There are things that the rules of the Court require me to

12:06:45 15    take up with counsel that do not require your presence at

12:06:49 16    this point.  And that means I have good news for you.  You

12:06:54 17    get the afternoon off.

12:06:57 18            I'm told by the clerk that your boxed lunches are

12:07:00 19    in the jury room if you want them.  You may go in there and

12:07:05 20    eat them, you may go through there and pick them up, you

12:07:07 21    may walk out and ignore them.  It is strictly up to you,

12:07:11 22    but they're there.

12:07:13 23            I expect that I will spend probably until early

12:07:16 24    evening with the lawyers working through all the procedural

12:07:23 25    things that we need to get done, but we will do that no

12:07:26  1  matter how long it takes.  Because it is my intention that

12:07:30  2  when you return tomorrow -- and I will want you back ready

12:07:33  3  to go at 8:30 in the morning, to be consistent -- it's my

12:07:37  4  intention when you return tomorrow, that we will begin with

12:07:42  5  my final instructions to the jury.

12:07:44  6         As I told you, it's sometimes called the Court's

12:07:47  7  charge to the jury.  And that will be followed by closing

12:07:50  8  arguments by Plaintiff and Defendant.

12:07:53  9         Then after those closing arguments are presented,

12:07:56  10  I will instruct you to retire to the jury room and to

12:07:59  11  deliberate on your verdict.

12:07:59  12         So we are getting close to the end of the process.

12:08:04  13  Please, ladies and gentlemen, remember and follow all the

12:08:08  14  instructions I've given you about your conduct during the

12:08:11  15  trial, including, among all those instructions, not to

12:08:16  16  discuss this case or communicate about it in any way with

12:08:20  17  anyone, including the eight of you.

12:08:22  18         Please enjoy your afternoon, and we will see you

12:08:24  19  in the morning at 8:30.

12:08:25  20         At this time and with those instructions, the jury

12:08:28  21  is excused for the day.

12:08:30  22         COURT SECURITY OFFICER:  All rise.

12:08:31  23         (Jury out.)

12:08:31  24         THE COURT:  Please be seated.

12:09:01  25         Just by way of information, Plaintiff had 3

1291

| | | |
|---|---|---|
| 12:09:15 | 1 | minutes remaining on their trial time, and Defendant had 3 |
| 12:09:18 | 2 | minutes remaining on their trial time. |
| 12:09:22 | 3 | I'm going to break for recess, counsel -- excuse |
| 12:09:27 | 4 | me, I'm going to break for lunch.  It's 9 minutes after |
| 12:09:29 | 5 | 12:00.  We're going to reconvene at 1:30.  At 1:30, we'll |
| 12:09:34 | 6 | take up motions under Rule 50(a) that either Plaintiff or |
| 12:09:39 | 7 | Defendant care to offer. |
| 12:09:44 | 8 | After the Court has heard and ruled on any motions |
| 12:09:47 | 9 | offered under Rule 50(a), then the Court will conduct an |
| 12:09:52 | 10 | informal charge conference in chambers with counsel from |
| 12:09:55 | 11 | both sides participating where I can receive full and |
| 12:09:59 | 12 | informal input from the competing parties through their |
| 12:10:03 | 13 | counsel as to any areas in their proposed final jury |
| 12:10:08 | 14 | instructions and verdict where they're not in agreement. |
| 12:10:11 | 15 | After I've received the benefit of that fulsome |
| 12:10:16 | 16 | input, I'll consider the same, and I will generate what I |
| 12:10:19 | 17 | believe to be the appropriate charge to the jury and |
| 12:10:22 | 18 | verdict form, and I'll give you a copy of it. |
| 12:10:24 | 19 | I'll give you an opportunity to review it.  And |
| 12:10:27 | 20 | then I'll conduct a formal charge conference on the record |
| 12:10:32 | 21 | where each side can offer any resulting objections that |
| 12:10:37 | 22 | they feel the interest of their client require them to |
| 12:10:40 | 23 | make. |
| 12:10:42 | 24 | After I've heard and ruled on all formal |
| 12:10:46 | 25 | objections to the charge and the verdict on the record as a |

12:10:49   1   part of that formal charge conference, then, in all

12:10:51   2   likelihood, we will recess until tomorrow morning at that

12:10:56   3   point.

12:10:56   4          It is my practice and it is my intention to give

12:10:59   5   to the jury when they retire eight clean, separate, printed

12:11:05   6   copies of the charge so that they will each have their own

12:11:08   7   copy to review; and they will not feel compelled to take

12:11:12   8   notes during the time I'm orally instructing them on the

12:11:16   9   charge.

12:11:18  10          I'll also send back one clean copy of the verdict

12:11:21  11   form for their use while they deliberate.

12:11:24  12          As I indicated yesterday, those of you involved in

12:11:28  13   presenting closing arguments are not required to be present

12:11:31  14   for the remainder of today unless you choose to, as long as

12:11:35  15   each side adequately staffs through their various counsel

12:11:40  16   these intermediate steps that I've just outlined.

12:11:45  17          Are there questions from either party?

12:11:48  18          MR. MOORE:  No, Your Honor.  Thank you.

12:11:50  19          MR. DACUS:  No, Your Honor.  Thank you.

12:11:52  20          THE COURT:  And let me say this:  At this juncture

12:11:55  21   in many trials, I often get counsel before me under -- when

12:12:00  22   motions are raised under Rule 50(a) who have not been

12:12:04  23   actively involved in the presentation of the evidence.  I

12:12:07  24   certainly want to hear your motions, and I certainly want

12:12:09  25   to hear a succinct recital of the bases why you believe

12:12:14  1  those motions are proper.

12:12:16  2         I do not want a 15-page motion read into the

12:12:19  3  record by an associate who stayed up all night working on

12:12:23  4  it.  Can I make that clear?

12:12:25  5         MR. DACUS:  May I --

12:12:27  6         THE COURT:  Mr. Dacus?

12:12:28  7         MR. DACUS:  -- may I ask for some clarification in

12:12:29  8  that regard, Your Honor?  If we file something -- a written

12:12:33  9  50(a) motion before submission to the jury --

12:12:35  10        THE COURT:  If you file -- if you file it before I

12:12:37  11  take them up at 1:30, I will certainly look at it.

12:12:40  12        MR. DACUS:  And I guess my question is a little

12:12:42  13  bit different.  If we file our 50(a) written motion before

12:12:46  14  the Court submits the case to the jury tomorrow, does the

12:12:50  15  Court consider that 50(a) timely?  I'm -- and let me get --

12:12:54  16  let me --

12:12:54  17        THE COURT:  I don't intend to reopen motions on

12:12:58  18  Rule 50(a) once I've heard argument and ruled on them from

12:13:01  19  the bench.

12:13:02  20        MR. DACUS:  Understood.

12:13:02  21        And I'm addressing the Court's request to us to be

12:13:05  22  succinct in our oral delivery.  And I guess what I'm

12:13:09  23  asking -- or attempting to ask -- is, can we file a more

12:13:12  24  fulsome 50(a)?

12:13:15  25        THE COURT:  You can and you could have at any

12:13:18  1   time, and I will certainly look at whatever has been filed.

12:13:23  2   But we have one time set to hear arguments, presentations,

12:13:27  3   and for the Court to rule.

12:13:29  4        And after I've ruled on motions under Rule 50(a),

12:13:33  5   whether you have presented everything in writing that you

12:13:38  6   might in a perfect world wish to or not, I'm not going to

12:13:42  7   reopen the issue of Rule 50(a) motions.

12:13:45  8        MR. DACUS:  Understood, Your Honor.  And we will

12:13:47  9   endeavor to file that immediately.

12:13:49  10       THE COURT:  All right.

12:13:50  11       MR. DACUS:  Thank you.

12:13:50  12       THE COURT:  Any other questions?

12:13:52  13       Then those of you participating in everything I've

12:13:55  14   outlined, except closing arguments for tomorrow, I will see

12:13:58  15   you at 1:30.

12:13:59  16       Everyone else presenting closing arguments

12:14:02  17   tomorrow, I assume I will see you in the morning.

12:14:04  18       With that, the Court stands in recess.

12:14:06  19       COURT SECURITY OFFICER:  All rise.

12:14:11  20       (Recess.)

          21

          22

          23

          24

          25

1                           CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes                    9/16/2020
     SHELLY HOLMES, CSR, TCRR              Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25