```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
2                     MARSHALL DIVISION

3
   GREE, INC.,                    )(   CIVIL ACTION NOS.
4                                 )(   2:19-CV-70-JRG-RSP
        PLAINTIFFS,               )(   2:19-CV-71-JRG-RSP
5                                 )(
   VS.                            )(
6                                 )(   MARSHALL, TEXAS
   SUPERCELL OY,                  )(   SEPTEMBER 17, 2020
7                                 )(   8:25 A.M.
        DEFENDANTS.               )(
8
9                 TRANSCRIPT OF JURY TRIAL

10                       VOLUME 11

11      BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

12          UNITED STATES CHIEF DISTRICT JUDGE

13

14   APPEARANCES:

15

16   FOR THE PLAINTIFFS:

17

18   MR STEVEN D. MOORE
     KILPATRICK TOWNSEND & STOCKTON LLP
19   Two Embarcadero Center, Suite 1900
     San Francisco, CA 94111
20

21   MS. TAYLOR HIGGINS LUDLAM
     KILPATRICK TOWNSEND & STOCKTON LLP
22   4208 Six Forks Road
     Raleigh, NC 27609
23

24

25
```

1  FOR THE PLAINTIFF:

2

3  MR. ALTON L. ABSHER III
   KILPATRICK TOWNSEND & STOCKTON LLP
4  1001 West Fourth Street
   Winston-Salem, NC 27101
5

6  MR. MICHAEL T. MORLOCK
   KILPATRICK TOWNSEND & STOCKTON LLP
7  1100 Peachtree Street, NE
   Suite 2800
8  Atlanta, GA 30309

9
   MS. TAYLOR J. PFINGST
10 KILPATRICK TOWNSEND & STOCKTON LLP
   Two Embarcadero Center, Suite 1900
11 San Francisco, CA 94111

12
   MS. MELISSA R. SMITH
13 GILLAM & SMITH, LLP
   303 South Washington Avenue
14 Marshall, TX 75670

15

16 FOR THE DEFENDANT:

17

18 MR. MICHAEL J. SACKSTEDER
   MR. BRYAN A. KOHM
19 MR. CHRISTOPHER L. LARSON
   MS. SHANNON E. TURNER
20 FENWICK & WEST LLP
   555 California Street, 12th Floor
21 San Francisco, CA 94104

22
   MR. GEOFFREY R. MILLER
23 FENWICK & WEST LLP
   902 Broadway, Suite 14
24 New York, NY 10010

25

1353

```
1   FOR THE DEFENDANT:

2
    MS. JESSICA M. KAEMPF
3   MR. JONATHAN T. MCMICHAEL
    FENWICK & WEST LLP
4   1191 Second Ave., 10th Floor
    Seattle, WA 98101
5

6   MR. DERON DACUS
    THE DACUS FIRM, P.C.
7   821 ESE Loop 323, Suite 430
    Tyler, TX 75701
8

9

10

11

12  COURT REPORTER:    Ms. Shelly Holmes, CSR, TCRR
                       Official Court Reporter
13                     United States District Court
                       Eastern District of Texas
14                     Marshall Division
                       100 E. Houston
15                     Marshall, Texas  75670
                       (903) 923-7464
16

17
    (Proceedings recorded by mechanical stenography, transcript
18  produced on a CAT system.)

19

20

21

22

23

24

25
```

```
08:23:47   1                 P R O C E E D I N G S
08:23:47   2          (Jury out.)
08:23:47   3          COURT SECURITY OFFICER:  All rise.
08:23:50   4          THE COURT:  Be seated, please.
08:25:40   5          Counsel, are you prepared to read into the record
08:25:40   6   those items from the list of pre-admitted exhibits used
08:25:54   7   during yesterday's portion of the trial?
08:25:54   8          MR. MOORE:  Good morning.  Yes, Your Honor.  My
08:25:57   9   colleague, Mr. Rinehart, will come to the podium and do
08:26:00  10   that.
08:26:01  11          THE COURT:  All right.  If you'll proceed,
08:26:02  12   Mr. Rinehart.
08:26:05  13          MR. MOORE:  Thank you.
08:26:06  14          MR. RINEHART:  Good morning, Your Honor.
08:26:17  15          THE COURT:  Good morning.
08:26:18  16          MR. RINEHART:  GREE would like to admit PTX-2,
08:26:25  17   PTX-5, PTX-72, PTX-73, PTX-142, PTX-561, PTX-566, PTX-600,
08:26:53  18   PTX-690.
08:26:55  19          THE COURT:  Thank you.
08:26:57  20          Is there any objection from the Defendant to that
08:27:00  21   rendition?
08:27:00  22          MR. DACUS:  No objection, Your Honor.
08:27:02  23          THE COURT:  All right.  Does the Defendant have a
08:27:04  24   similar rendition to read into the record?
08:27:06  25          MR. DACUS:  Yes, we do, Your Honor.
```

08:27:08   1         Mr. McMichael will read it in.

08:27:09   2         THE COURT:  All right.

08:27:10   3         Mr. McMichael, please proceed.

08:27:13   4         Thank you, Mr. Rinehart.

08:27:15   5         MR. RINEHART:  Thank you, Your Honor.

08:27:16   6         MR. MCMICHAEL:  Good morning, Your Honor.

08:27:24   7         THE COURT:  Good morning.

08:27:25   8         MR. MCMICHAEL:  Supercell introduced the following

08:27:29   9 exhibits from yesterday:  DX-237, DX-1217, DX-1218,

08:27:36   10 DX-1239, PTX-139, PTX-142, PTX-167, and PTX-480.

08:27:44   11         THE COURT:  All right.  Is there objection to that

08:27:46   12 rendition by the Plaintiff?

08:27:48   13         MR. MOORE:  No objections, Your Honor.

08:27:49   14         THE COURT:  All right.

08:27:51   15         MR. MCMICHAEL:  Thank you.

08:27:52   16         THE COURT:  Thank you, Mr. McMichael.

08:27:53   17         Ladies and gentlemen, including both counsel and

08:28:04   18 our guests in the gallery, I'm about to bring in the jury

08:28:07   19 and proceed to give them my final instructions.

08:28:14   20         Following my final jury instructions, counsel for

08:28:16   21 the parties will present their closing arguments.  Let me

08:28:19   22 make it clear to everyone present that the Court considers

08:28:23   23 its final charge to the jury and counsel's closing

08:28:25   24 arguments to be the most serious part of a very serious

08:28:29   25 process.

08:28:29    1        Consequently, once I bring in the jury, I expect

08:28:34    2   everyone to sit quietly and respectfully.  I don't want to

08:28:38    3   see movement.  I don't want to hear extraneous noise.  If

08:28:42    4   you need to get up and leave the courtroom for any reason,

08:28:46    5   do it now, not during the time -- or not during after --

08:28:50    6   after I've brought in the jury.

08:28:51    7        Is there anything from either Plaintiff or

08:28:54    8   Defendant before I bring in the jury?

08:28:56    9        MR. MOORE:  No, Your Honor.

08:28:58   10        MR. DACUS:  No, Your Honor.

08:28:58   11        THE COURT:  All right.  Each side has 40 minutes

08:29:04   12   for closing.  Plaintiff must use at least 20 minutes in its

08:29:08   13   first closing.

08:29:09   14        With that, let's bring in the jury,

08:29:12   15   Mr. Fitzpatrick.

08:29:13   16        COURT SECURITY OFFICER:  Yes, sir.

08:29:13   17        All rise.

08:29:15   18        (Jury in.)

08:29:15   19        THE COURT:  Good morning, ladies and gentlemen.

08:29:45   20   Please have a seat.

08:29:51   21        Ladies and gentlemen of the jury, you've now heard

08:29:59   22   all the evidence in this case, and I will now instruct you

08:30:03   23   on the law that you must apply.

08:30:05   24        Before we go any further, let me make clear to you

08:30:10   25   that you are each going to have your own individual,

08:30:14  1   printed, hard copy of these final jury instructions that

08:30:18  2   I'm about to give you orally, which means if you'd like to

08:30:21  3   take notes while I give them orally, you may, but you will

08:30:25  4   have a hard copy to review in case you would rather listen

08:30:28  5   carefully and not make notes.  Let me make that clear to

08:30:31  6   you.

08:30:31  7        It's your duty to follow the law as I give it to

08:30:36  8   you.  On the other hand, ladies and gentlemen, and as I've

08:30:40  9   said previously, you, the jury, are the sole judges of the

08:30:43  10  facts in this case.

08:30:45  11       You should not consider any statement that I have

08:30:49  12  made over the course of the trial or make during these

08:30:51  13  instructions as an indication to you that I have any

08:30:55  14  opinion about the ultimate facts in this case.

08:30:58  15       Now, you're about to hear closing arguments from

08:31:03  16  the attorneys.  Statements and arguments of the attorneys,

08:31:06  17  I remind you, are not evidence, and they are not

08:31:10  18  instructions on the law.  They're intended only to assist

08:31:15  19  the jury in understanding the evidence and the parties'

08:31:18  20  competing positions and contentions.

08:31:21  21       A verdict form has been prepared for you.  And

08:31:26  22  you'll take this verdict form with you to the jury room

08:31:28  23  when I instruct you to retire and deliberate on your

08:31:31  24  verdict.

08:31:32  25       And when you have reached a unanimous decision or

08:31:36   1   agreement as to your verdict, you'll have your foreperson

08:31:40   2   fill in the blanks in the verdict form, date it, sign it,

08:31:44   3   and then return it to the Court Security Officer -- or

08:31:49   4   notify the Court Security Officer.

08:31:49   5        Answer each question in the verdict form from the

08:31:53   6   facts as you find them to be.  Do not decide, ladies and

08:31:57   7   gentlemen, who you think should win the case and then

08:31:59   8   answer the questions to reach that result.  Again, your

08:32:05   9   answers and your verdict must be unanimous.

08:32:06  10        Now, in determining whether any fact has been

08:32:12  11   proven in this case, you may, unless otherwise instructed,

08:32:15  12   consider the testimony of all the witnesses, regardless of

08:32:20  13   who may have called them, and you may consider the effect

08:32:24  14   of all the exhibits received and admitted into evidence,

08:32:28  15   regardless of who may have produced or presented those

08:32:30  16   exhibits.

08:32:31  17        You, the jurors, are the sole judges of the

08:32:38  18   credibility and believability of each and every witness and

08:32:41  19   of the weight and effect to give to the evidence in this

08:32:44  20   case.

08:32:44  21        Now, during the course of the trial, you've been

08:32:49  22   shown documents with some portions that may have been

08:32:52  23   redacted or blacked out.  In those situations, you should

08:32:55  24   not speculate about what may have been redacted or why it

08:32:59  25   was redacted.  Those redactions were approved by the Court

08:33:03   1   prior to when the trial began.

08:33:05   2          As I've told you previously, the attorneys in this

08:33:09   3   case are acting properly as advocates for their competing

08:33:13   4   parties and those parties' competing claims.  And the

08:33:18   5   lawyers have a duty to object when they believe evidence is

08:33:21   6   offered that should not be admitted under the rules of the

08:33:26   7   Court.

08:33:26   8          When the Court has sustained an objection to a

08:33:28   9   question addressed to a witness, you are to disregard the

08:33:32  10   question entirely, and you may not draw any inference from

08:33:38  11   its wording or speculate about what the witness would have

08:33:40  12   said if the Court had allowed them to answer the question.

08:33:43  13          On the other hand, if I have overruled an

08:33:47  14   objection, then you're to treat the answer to the question

08:33:51  15   and the question itself just as if no objection had been

08:33:55  16   made, that is, like any other question and answer during

08:33:59  17   the trial.

08:33:59  18          Now, at times during the trial, it was necessary

08:34:04  19   for the Court to talk to the attorneys outside of your

08:34:07  20   presence and hearing.  In those cases, I asked you to

08:34:11  21   retire to the jury room.

08:34:13  22          When this happens in a trial like this one,

08:34:16  23   because there are things that sometimes arise that do not

08:34:19  24   involve the jury, you should not speculate, ladies and

08:34:23  25   gentlemen, about what was said during any discussions that

08:34:26  1  took place outside of your presence.

08:34:29  2          Now, there are two types of evidence that you may

08:34:33  3  properly consider in finding the truth as to the facts in

08:34:37  4  this case.  One is direct evidence, such as the testimony

08:34:42  5  of an eyewitness.  The other is indirect or circumstantial

08:34:45  6  evidence, that is, the proof of a chain of circumstances

08:34:50  7  that indicates the existence or non-existence of certain

08:34:55  8  other facts.

08:34:56  9          As a general rule, you should know that the law

08:35:00  10  makes no distinction between direct or indirect -- that is,

08:35:03  11  direct or circumstantial evidence -- but simply requires

08:35:06  12  that you, the jury, find the facts based on the evidence as

08:35:10  13  presented, both direct and circumstantial.

08:35:12  14          Now, the parties in this case may have stipulated

08:35:17  15  or agreed to certain facts in the case, and when the

08:35:22  16  lawyers for both sides stipulate as to the existence of a

08:35:26  17  fact, you must, unless otherwise instructed, accept that

08:35:29  18  stipulation as evidence and regard that fact as proven.

08:35:32  19          Certain testimony has been presented to you during

08:35:35  20  this case through what are called depositions.  A

08:35:38  21  deposition is the sworn, recorded answers to questions

08:35:42  22  asked to a witness in advance of the trial.

08:35:46  23          If a witness cannot be present to testify in

08:35:49  24  person from open court, then the witness's testimony may be

08:35:53  25  presented under oath in the form of a deposition.

08:35:55   1          As I told you earlier, before the trial begins,

08:36:02   2    attorneys representing both sides in this case questioned

08:36:04   3    these deposition witnesses under oath.  At that time, a

08:36:07   4    court reporter was present and the witness was sworn and

08:36:10   5    placed under oath.  Both sides had an opportunity to

08:36:14   6    contribute those portions of that testimony which were

08:36:18   7    ultimately played to you as a part of this trial in open

08:36:20   8    court.

08:36:20   9          Deposition testimony is entitled to be considered

08:36:25  10    by you as if it was just like the person had testified in

08:36:32  11    open court, and you must judge, as well as you can, the

08:36:36  12    credibility and believability of the witnesses presented by

08:36:41  13    deposition, as well as the witnesses who testified to you

08:36:44  14    live and in open court physically present.

08:36:47  15          Now, while you should consider only the evidence

08:36:51  16    in this case, ladies and gentlemen -- and this is

08:36:54  17    important -- you should understand that you are permitted

08:36:58  18    to draw such reasonable inferences from the testimony and

08:37:02  19    the exhibits that you feel are justified in the light of

08:37:06  20    common experience.

08:37:09  21          In other words, ladies and gentlemen, you may make

08:37:11  22    deductions and reach conclusions that reason and common

08:37:16  23    sense lead you to draw from the facts that have been

08:37:19  24    established by the testimony and the evidence in this case.

08:37:22  25          However, you should not base your decisions on any

08:37:27  1  evidence not presented by the parties in open court during

08:37:31  2  the course of the trial.

08:37:33  3      In deciding the facts in this case, you may have

08:37:37  4  to decide which testimony to believe and which testimony

08:37:41  5  not to believe.  You alone, ladies and gentlemen, are to

08:37:46  6  determine all questions of credibility or truthfulness as

08:37:50  7  to the witnesses.

08:37:51  8      In weighing the testimony of the witnesses, you

08:37:53  9  may consider the witness's manner and demeanor on the

08:37:57  10  witness stand, any feelings or interests in the case, any

08:38:01  11  prejudice or bias about the case that he or she may have,

08:38:08  12  and the consistency or inconsistency of his or her

08:38:11  13  testimony considered in the light of the circumstances.

08:38:13  14      Has the witness been contradicted by other

08:38:16  15  credible evidence?  Has he or she made statements at other

08:38:22  16  times and places contrary to the statements they made on

08:38:25  17  the witness stand?

08:38:25  18      You must give the testimony of each witness the

08:38:30  19  credibility that you think it deserves.  But keep in mind,

08:38:34  20  ladies and gentlemen, a simple mistake does not mean that a

08:38:37  21  witness was not telling the truth.  And you must consider

08:38:40  22  whether any misstatement made over the course of the trial

08:38:43  23  was an intentional falsehood or a simple lapse of memory,

08:38:48  24  and what significance should be attached to that testimony.

08:38:51  25      Now, unless I instruct you otherwise, you may

08:38:59    1    properly determine that the testimony of even a single

08:39:02    2    witness is sufficient to prove any fact, even if a greater

08:39:05    3    number of witnesses may have testified to the contrary, if

08:39:09    4    after considering all of the evidence you believe that

08:39:12    5    single witness.

08:39:15    6         Now, when knowledge of a technical subject may be

08:39:18    7    helpful to the jury, a person who has special training and

08:39:21    8    experience in that technical field, called an expert

08:39:25    9    witness, is permitted to state his or her opinions on those

08:39:31   10    technical matters to the jury.

08:39:33   11         However, ladies and gentlemen, you're not required

08:39:36   12    to accept those opinions.  As with any other witness, it's

08:39:41   13    solely up to you to decide who to believe and who you don't

08:39:44   14    believe and whether or not you want to rely on their

08:39:46   15    testimony.

08:39:46   16         Now, over the course of the trial, certain

08:39:51   17    documents and exhibits have been shown to you that were

08:39:56   18    illustrations.  We call these types of things demonstrative

08:39:59   19    exhibits.  Sometimes we simply refer to them as

08:40:05   20    demonstratives.

08:40:06   21         Demonstrative exhibits are a party's description,

08:40:08   22    picture, model, or drawing to describe something involved

08:40:13   23    in the trial.

08:40:15   24         If your recollection of the evidence differs from

08:40:17   25    the demonstratives, you should rely on your recollection.

08:40:22    1          Demonstrative exhibits are sometimes called jury

08:40:25    2    aids.  Remember, a demonstrative is not itself evidence,

08:40:30    3    but the witness's testimony which was given when a

08:40:34    4    demonstrative was used is evidence.

08:40:40    5          While demonstratives may be helpful to you in

08:40:42    6    determining the issues, the demonstrative exhibits from

08:40:45    7    both of the parties are not evidence, and they are not

08:40:47    8    proof of any facts.  Accordingly, ladies and gentlemen,

08:40:51    9    demonstratives will not be available for you to consider

08:40:55   10    during your deliberations in the jury room.

08:40:57   11          Now, in any legal action, facts must be proven by

08:41:04   12    a required amount of evidence known as the burden of proof.

08:41:08   13    The burden in -- of proof in this case is on the Plaintiff

08:41:12   14    for some issues and is on the Defendant for other issues.

08:41:17   15    And there are two burdens of proof that you are to apply in

08:41:20   16    this case.

08:41:21   17          One is the preponderance of the evidence, and the

08:41:24   18    other is clear and convincing evidence.

08:41:28   19          The Plaintiff in this case, GREE, Inc., who you've

08:41:32   20    heard referred to throughout the trial simply as GREE, has

08:41:36   21    the burden of proving patent infringement by a

08:41:39   22    preponderance of the evidence.

08:41:41   23          GREE also has the burden of proving willful patent

08:41:44   24    infringement by a preponderance of the evidence.  And GREE

08:41:48   25    has the burden of proof of proving damages for any patent

08:41:52  1    infringement by a preponderance of the evidence.

08:41:57  2         A preponderance of the evidence means evidence

08:42:01  3    that persuades you that the claim is more probably true

08:42:05  4    than not true.  We sometimes talk about this as being the

08:42:08  5    greater weight and degree of credible testimony.

08:42:11  6         The Defendant in this case, Supercell Oy, who

08:42:16  7    you've heard referred to in -- throughout the trial simply

08:42:20  8    as Supercell, has the burden of proving patent invalidity

08:42:26  9    by clear and convincing evidence.

08:42:28  10        Clear and convincing evidence means evidence that

08:42:31  11   produces in your mind an abiding conviction that the truth

08:42:35  12   of the parties' factual contentions are highly probable.

08:42:41  13        Although proof to an absolute certainty is not

08:42:44  14   required, the clear and convincing evidence standard

08:42:48  15   requires a greater degree of persuasion than is necessary

08:42:51  16   for the preponderance of the evidence standard.

08:42:55  17        Now, as I told you previously, neither of these

08:42:58  18   burdens of proof should be con -- confused with the burden

08:43:02  19   of proof of beyond a reasonable doubt, which is the burden

08:43:05  20   of proof applied in a criminal case.

08:43:08  21        The burden of proof of beyond a reasonable doubt

08:43:11  22   does not apply to this or any civil case.  You should not

08:43:15  23   confuse clear and convincing evidence with beyond a

08:43:21  24   reasonable doubt.

08:43:22  25        Clear and convincing evidence is not as high a

08:43:26   1   burden of proof as beyond a reasonable doubt, but it is a

08:43:28   2   higher burden of proof than the preponderance of the

08:43:31   3   evidence.

08:43:31   4          Now, in determining whether any fact has been

08:43:35   5   proven by a preponderance of the evidence or by clear and

08:43:38   6   convincing evidence, you may, unless otherwise instructed,

08:43:42   7   consider the stipulations of the parties, the testimony of

08:43:45   8   all the witnesses, regardless of who called them, and all

08:43:48   9   the exhibits which have been admitted into evidence by the

08:43:52   10  Court throughout the trial, and regardless of who may have

08:43:55   11  produced those exhibits.

08:43:56   12         Now, as I did at the beginning of the case, I'll

08:44:00   13  give you a summary of each side's contentions, and then

08:44:04   14  I'll provide you with detailed instructions about what each

08:44:07   15  side must prove to win on each of its contentions.

08:44:10   16         As I've previously told you, this is an action for

08:44:13   17  patent infringement.  And this case concerns five separate

08:44:18   18  United States patents.  They are:

08:44:22   19         United States Patent No. 9,597,594, which you've

08:44:27   20  heard referred to throughout the trial as the '594 patent.

08:44:30   21         United States Patent 9,604,137, which you've heard

08:44:37   22  referred to throughout the trial as the '137 patent.

08:44:38   23         United States Patent 9,956,481, which you've heard

08:44:47   24  referred to throughout the trial as the '481 patent.

08:44:49   25         United States Patent 9,774,655, which you've heard

08:44:55  1  referred to throughout the trial as the '655 patent.

08:44:59  2  And United States Patent 9,9 -- excuse me,

08:45:06  3  9,795,873, which you've heard referred to throughout the

08:45:10  4  trial as the '873 patent.

08:45:12  5  I'll refer to these patents in these instructions

08:45:16  6  as the patents-in-suit or as the asserted patents, and in

08:45:21  7  so doing, I'm referring to all five of them collectively.

08:45:24  8  Now, the Plaintiff, GREE, has alleged that certain

08:45:29  9  of Supercell's games directly infringe the asserted claims

08:45:34  10 of the patents-in-suit.  Additionally, GREE seeks money

08:45:37  11 damages for infringement by Supercell involving three of

08:45:41  12 Supercell's games, which are Clash of Clans, Clash Royale,

08:45:47  13 and Brawl Stars, which GREE alleges use technology covered

08:45:51  14 by the claims of the asserted patents.

08:45:54  15 During these instructions you may hear these

08:46:02  16 products, these games referred to as the accused products,

08:46:08  17 and that's how I will try to refer to them throughout the

08:46:12  18 remainder of these instructions.

08:46:13  19 GREE contends that the accused products infringe

08:46:15  20 the following claims:

08:46:17  21 Claim 2 of the '594 patent.

08:46:20  22 Claim 1, 2, and 15 of the '137 patent.

08:46:24  23 Claim 4 and 5 of the '481 patent.

08:46:27  24 Claim 5 and 7 of the '655 patent.

08:46:30  25 And Claims 8 and 10 of the '873 patent.

08:46:33  1          These claims are sometimes called or referred to

08:46:38  2   as the asserted claims.

08:46:40  3          GREE also alleges that Supercell's infringement is

08:46:44  4   and has been willful.  GREE seeks damages in the form of a

08:46:49  5   reasonable royalty for Supercell's alleged infringement.

08:46:54  6          Now, Supercell, to be clear, denies that the

08:46:57  7   accused products infringe any of the asserted claims of the

08:47:02  8   five asserted patents.  Supercell further denies that it

08:47:06  9   willfully infringed any claim of the asserted patents.

08:47:10  10         Supercell also contends that the asserted claims

08:47:15  11  of patent -- of the '137, the '481, the '655, and the '873

08:47:22  12  patents are invalid.  Supercell denies that it owes GREE

08:47:27  13  any damages in this case.

08:47:30  14         Remember, ladies and gentlemen, invalidity is a

08:47:33  15  defense to infringement.  Invalidity and infringement are

08:47:38  16  separate and distinct issues.  And your job is to decide

08:47:42  17  whether any of the asserted claims has been infringed and

08:47:46  18  when -- and whether any of the asserted claims of those

08:47:50  19  four challenged patents are invalid.

08:47:52  20         It's your job as members of the jury to decide

08:47:56  21  whether GREE has proven that Supercell has infringed any of

08:48:00  22  the asserted claims of the asserted patents and whether

08:48:04  23  that infringement was willful.

08:48:06  24         You must also decide whether Supercell has proven

08:48:09  25  that any of the asserted claims of the '137, the '481, the

08:48:15   1   '655, and the '873 patents are invalid.

08:48:20   2        If you decide that any of the asserted claims have

08:48:23   3   been infringed and are not invalid, then you'll have to

08:48:29   4   decide what amount of money damages, if any, are to be

08:48:32   5   awarded to GREE to compensate it for that infringement.

08:48:36   6        Now, before you can decide many of the issues in

08:48:40   7   this case, you'll need to understand the role of the patent

08:48:42   8   claims.

08:48:44   9        The claims of the patent are the numbered

08:48:47  10   sentences at the end of the patent.  The claims define the

08:48:52  11   patent owner's rights under the law.  The claims are

08:48:57  12   important because it's the words of the claims themselves

08:48:59  13   that define what the patent covers.

08:49:02  14        The figures and the text in the rest of the patent

08:49:06  15   are intended to provide a description or examples of the

08:49:09  16   invention, and they provide a context for the claims.  But

08:49:13  17   it is the claims, ladies and gentlemen, that define the

08:49:16  18   breadth of the patent's coverage.

08:49:20  19        Each claim is effectively treated as if it were

08:49:24  20   its own separate patent, and each claim may cover more or

08:49:27  21   may cover less than any other claim.  Accordingly, what a

08:49:31  22   patent covers collectively or as a whole depends on what

08:49:35  23   each of its claims cover.

08:49:38  24        You'll first need to understand what each claim

08:49:40  25   covers in order to decide whether or not there is

08:49:43  1   infringement of that claim and to decide whether or not the
08:49:47  2   claim is invalid.
08:49:48  3        The first step is to understand the meaning of the
08:49:51  4   words used in the patent claim.
08:49:53  5        Now, the law says that it's my role as the Judge
08:49:56  6   to define the terms of the claims, but it's your role as
08:50:01  7   the jury to apply my definitions to the issues that you've
08:50:05  8   been asked to decide in this case.
08:50:07  9        Accordingly, and as I explained at the beginning
08:50:11  10  of the case, I have determined the meaning of certain claim
08:50:15  11  language, and I've provided those definitions to you of
08:50:18  12  those claim terms in your juror notebooks.
08:50:21  13       You must accept my definitions and constructions
08:50:26  14  of these words in the claims as being correct.  And it's
08:50:28  15  your job to take these definitions that I've supplied and
08:50:32  16  apply them to the issues that you are asked to decide,
08:50:36  17  including the issues of infringement and invalidity.
08:50:39  18       My interpretation of the claim terms should not be
08:50:43  19  taken by you as an indication that I have a view regarding
08:50:47  20  the issues of infringement and invalidity.  The decisions
08:50:53  21  regarding infringement and invalid -- and invalidity,
08:50:56  22  ladies and gentlemen, are yours alone to make.
08:50:58  23       Now, for claim limitations where I have not
08:51:01  24  construed -- that is, defined or interpreted -- any
08:51:04  25  particular term or language of the claims, you're to apply

08:51:08  1   the plain and ordinary meaning of the term as understood by

08:51:13  2   a person of ordinary skill in the art, which is to say in

08:51:17  3   the field of the technology of the patent at the time of

08:51:21  4   the alleged invention.

08:51:22  5        The meaning of the words of the patent claims must

08:51:27  6   be the same when deciding the issues of infringement and

08:51:31  7   when deciding the issues of invalidity.

08:51:35  8        I'll now explain what a claim covers -- excuse me,

08:51:38  9   I'll now explain how a claim covers -- I'll now explain how

08:51:44  10  a claim defines what it covers.  I got it right.

08:51:48  11       A claim sets forth in words a set of requirements.

08:51:53  12  Each claim sets forth its requirements in a single

08:51:56  13  sentence.  If a device satisfies each of these requirements

08:52:01  14  in the sentence, then it is covered by and infringes the

08:52:05  15  claim.

08:52:06  16       There can be several claims in a patent.  A claim

08:52:10  17  may be narrower or broader than any other claim by setting

08:52:14  18  forth more or fewer requirements.  The coverage of a patent

08:52:18  19  is assessed on a claim-by-claim basis.

08:52:24  20       In patent law, the requirement -- the requirements

08:52:27  21  of a claim are often referred to as the claim elements or

08:52:31  22  the claim limitations.  Those mean the same thing.

08:52:34  23       When a patent meets all the requirements or

08:52:38  24  limitations of a claim -- that is, it meets all of the

08:52:42  25  elements or all of the limitations of that claim -- it is

08:52:47  1   said to cover that product, and that product is said to

08:52:50  2   fall within the scope of that claim.

08:52:52  3        In other words, a claim covers a product where

08:52:56  4   each of the claim elements or limitations is present in

08:53:01  5   that product.

08:53:02  6        If a product is missing even one limitation or

08:53:05  7   element of a claim, the product is not covered by that

08:53:08  8   claim.

08:53:09  9        If a product is not covered by that claim, the

08:53:12  10  product does not infringe that claim.

08:53:15  11       Now, this case involves two types of patent

08:53:20  12  claims, independent claims and dependent claims.

08:53:24  13       An independent claim does not refer to any other

08:53:27  14  claim in the patent.  An independent claim sets forth all

08:53:31  15  the requirements that must be met in order to be covered by

08:53:34  16  the claim.  And it's not necessary to look to any other

08:53:38  17  claim to determine what an independent claim covers.

08:53:42  18       By contrast, a dependent claim does not by itself

08:53:46  19  recite all the requirements of the claim but refers to

08:53:50  20  another claim or claims for some of its requirements.  In

08:53:55  21  this way, the dependent claim depends on another claim.

08:54:00  22       The law considers a dependent claim to incorporate

08:54:03  23  all the requirements of the claim or claims to which it

08:54:07  24  refers or depends, as well as the additional claims set

08:54:12  25  forth in the dependent claim itself.

08:54:16  1        So to determine what a dependent claim covers,

08:54:19  2   it's necessary to look at both the dependent claim and any

08:54:24  3   other claim to which it refers, or as we sometimes say,

08:54:27  4   from which it depends.

08:54:28  5        A product that meets all the requirements of both

08:54:31  6   the dependent claim and the claim or claims to which it

08:54:35  7   refers or depends is covered by that dependent claim.

08:54:38  8        Now, certain claims of the asserted patents use

08:54:42  9   the word "comprising."  Comprising means including or

08:54:46  10  containing.  When the word "comprising" is used, a product

08:54:51  11  that includes all the limitations or elements of the claim,

08:54:55  12  as well as additional elements, is covered by the claim.

08:55:00  13       For example, if you take a claim that covers the

08:55:02  14  invention of a table, if the claim recites a table

08:55:06  15  comprising a tabletop, four legs, and nails to hold the

08:55:11  16  legs to the tabletop, the claim will cover any table

08:55:16  17  that -- that contains these specific structures, even if

08:55:20  18  the table also contains other structures, such as leaves to

08:55:25  19  go in the tabletop or wheels to go on the ends of the legs.

08:55:28  20       And that's a simple example using the word

08:55:31  21  "comprising" and what it means.  In other words, ladies and

08:55:34  22  gentlemen, it can have other features in addition to those

08:55:38  23  that are covered by the patent.

08:55:40  24       But if a product is missing even one element or

08:55:44  25  limitation of a claim, it does not meet all the

08:55:47  1  requirements of the claim and is not covered by the claim.

08:55:51  2  And if a product is not covered by the claim, it does not

08:55:54  3  infringe that claim.

08:55:55  4        I'll now instruct you on infringement in more

08:55:59  5  detail.

08:56:00  6        If a person makes, uses, sells, or offers for sale

08:56:04  7  within the United States or imports into the United States

08:56:09  8  what is covered by a patent claim without the patent

08:56:12  9  owner's permission, that person is said to infringe the

08:56:16  10  patent.

08:56:17  11        To determine whether there is infringement, you

08:56:20  12  must compare the asserted claims, as I've defined them for

08:56:25  13  you, to the accused products.  You should not compare the

08:56:30  14  accused products with any specific example set out or

08:56:34  15  described in the patent or within the prior art in reaching

08:56:39  16  your decision on infringement.

08:56:40  17        As I've reminded you, the only correct comparison

08:56:44  18  is between the accused products and the language of the

08:56:48  19  asserted claims themselves.

08:56:50  20        You must reach your decision as to each assertion

08:56:54  21  of infringement based on my instructions about the meanings

08:56:58  22  and scope of the claims, the -- the legal requirements for

08:57:02  23  infringement and the evidence presented to you by both of

08:57:06  24  the parties in this case.

08:57:10  25        I'll now instruct you on the specific rules that

08:57:12  1    you must follow to determine whether GREE has proven that

08:57:18  2    Supercell has infringed one or more of the patent claims

08:57:21  3    involved in this case.

08:57:22  4        In order to prove infringement of a patent claim,

08:57:27  5    GREE must show by a preponderance of the evidence that the

08:57:30  6    accused product includes each requirement or limitation of

08:57:35  7    the claim.

08:57:36  8        The issue of infringement is assessed on a

08:57:38  9    claim-by-claim basis within each patent.  Therefore, there

08:57:44  10   may be infringement as to a particular -- of a particular

08:57:47  11   patent as to one claim even if there is no infringement as

08:57:50  12   to other claims within that patent.

08:57:54  13       In this case, GREE contends that Supercell both

08:57:57  14   directly infringes and indirectly infringes the asserted

08:58:04  15   claims.

08:58:04  16       In order to directly infringe a patent claim, the

08:58:06  17   accused product must include or perform each and every

08:58:09  18   element of the claim.  Thus, in determining whether

08:58:14  19   Supercell infringes GREE's asserted claims, you must

08:58:17  20   determine if the accused products contain or perform each

08:58:21  21   and every element recited in a claim of the asserted

08:58:26  22   patent.

08:58:26  23       If a particular sequence is required by the

08:58:30  24   claims, the accused products must follow that sequence.

08:58:34  25       In the case of the asserted claims of the '137 and

08:58:39   1   '481 patents, selection must precede subtraction, and

08:58:44   2   subtraction must precede addition.

08:58:46   3          As to Claims 2 and 15 of the '137 patent and the

08:58:52   4   asserted claims of the '481 patent, selection must precede

08:58:57   5   game content removal, and game content removal must precede

08:59:03   6   game content update.

08:59:05   7          A claim element is literally present if it exists

08:59:09   8   in or is performed by the accused product as it is

08:59:13   9   described in the claim language either as I've explained it

08:59:18  10   to you, or if I did not, according to the plain and

08:59:21  11   ordinary meaning as understood by one of ordinary skill in

08:59:25  12   the art.

08:59:25  13          Now, a party can directly infringe a patent

08:59:29  14   without knowing of the patent or without knowing that what

08:59:33  15   a party is doing is patent infringement, and whether the

08:59:37  16   patent practices the patent -- excuse me, whether the

08:59:40  17   Plaintiff practices the patent is irrelevant to whether

08:59:44  18   there is infringement by the Defendant.

08:59:45  19          You must determine, ladies and gentlemen,

08:59:51  20   separately for each asserted claim, whether or not there is

08:59:55  21   infringement, because in order for a claim to be infringed,

08:59:58  22   each and every requirement of the claim must be present or

09:00:01  23   performed.  Even if a single requirement of the claim is

09:00:05  24   missing from the accused product, the claim is not

09:00:08  25   infringed.

09:00:10   1        For dependent claims, if you find that an

09:00:14   2   independent claim from which that dependent claim refers or

09:00:17   3   depends is not infringed, there cannot be infringement of

09:00:21   4   that dependent claim.

09:00:23   5        On the other hand, if you find that an independent

09:00:26   6   claim has been infringed, you must still decide separately

09:00:30   7   whether the product or process meets the additional

09:00:33   8   requirements set forth in a dependent claim to determine

09:00:38   9   whether that dependent claim has been infringed.

09:00:40  10        In this case, Claim 2 of the '594 patent,

09:00:47  11   Claims 14 and 15 of the '137 patent, and Claim 7 of the

09:00:55  12   '655 patent, and Claim 10 of the '873 patent recite method

09:01:00  13   claims.

09:01:00  14        Direct infringement of a method claim occurs where

09:01:04  15   all the steps of the claimed method are performed by or

09:01:11  16   attributable to a single party.

09:01:13  17        Direct infringement of a method claim can occur

09:01:16  18   where the Defendant performs certain steps of the method

09:01:18  19   and others are performed by equipment that the Defendant

09:01:21  20   controls but that it is in the hands of third parties.

09:01:25  21        Claims 1 and 2 of the '137 patent, Claims 4 and 5

09:01:32  22   of the '481 patent, and Claim 5 of the '655 patent, as well

09:01:37  23   as Claim 8 of the '7 -- excuse me, the '873 patent all

09:01:42  24   recite device or system claims.

09:01:45  25        To use a system for purposes of infringement,

09:01:49  1   Supercell must put the invention into service, that is,

09:01:53  2   control the system as a whole and obtain the benefit from

09:01:57  3   it.

09:01:58  4        GREE, the Plaintiff, also alleges that the def --

09:02:04  5   that the Defendant, Supercell, is liable for indirect

09:02:06  6   infringement by actively inducing its users to -- to

09:02:11  7   directly infringe the asserted claims.

09:02:15  8        As with direct infringement, you must determine

09:02:17  9   whether there has been induced infringement on a

09:02:20  10  claim-by-claim basis.

09:02:22  11       Supercell is liable for infringed -- excuse me,

09:02:28  12  induced infringement of a claim only if GREE proves by a

09:02:32  13  preponderance of the evidence that:

09:02:35  14       (1) the acts have been carried out by Supercell's

09:02:38  15  users and directly infringe that claim;

09:02:41  16       (2) Supercell has taken action intending to cause

09:02:45  17  the infringing acts by its users;

09:02:49  18       And (3) Supercell has been aware of the accused

09:02:58  19  patents and has known that the acts of its users constitute

09:03:03  20  infringement of the asserted patents or was willfully blind

09:03:05  21  to that infringement.

09:03:06  22       To establish induced infringement, it's not

09:03:10  23  sufficient that someone else directly infringes a claim,

09:03:12  24  nor is it sufficient that the company accused of inducing

09:03:16  25  another's direct infringement merely had knowledge or

09:03:19  1  notice of an asserted patent or had been aware of the acts

09:03:24  2  of another that allegedly constitute direct infringement.

09:03:27  3        And the mere fact that the company accused of

09:03:31  4  inducing another's direct infringement had known or should

09:03:34  5  have known that there was a substantial risk that someone

09:03:37  6  else's acts would infringe is not sufficient.

09:03:40  7        Rather, in order to find inducement, you must find

09:03:45  8  that Supercell specifically intended or was willfully blind

09:03:48  9  to that infringement.

09:03:55  10       GREE also alleges that Supercell is liable for

09:03:58  11  contributory infringement by contributing to the direct

09:04:03  12  infringement of the asserted claims by the players of the

09:04:06  13  accused products.  As with direct infringement, you must

09:04:12  14  determine contributory infringement on a claim-by-claim

09:04:15  15  basis.

09:04:15  16       Supercell is liable for contributory infringement

09:04:18  17  of a claim if GREE proves by a preponderance of the

09:04:24  18  evidence:

09:04:24  19       (1) Supercell offers to sell or imports into the

09:04:29  20  United States a component of a product or apparatus for use

09:04:34  21  in a process during the time the asserted patents were in

09:04:39  22  force;

09:04:39  23       (2) the component or apparatus has no substantial

09:04:44  24  non-infringing use;

09:04:45  25       (3) the component or apparatus constitutes a

09:04:49    1    material part of the invention;

09:04:53    2        (4) Supercell was aware of the asserted patents

09:04:56    3    and knew that the component or apparatus is especially made

09:05:00    4    or adapted for use in -- in -- adapted for use as an

09:05:05    5    infringement of the claim;

09:05:09    6        And (5) the players of the accused products used

09:05:12    7    the component or apparatus to directly infringe the claim.

09:05:15    8        In this case, GREE also contends that Supercell

09:05:20    9    willfully infringed its patents.  If you have decided that

09:05:26   10    Supercell has infringed, you must go on and separately

09:05:30   11    address the additional issue of whether or not Supercell's

09:05:37   12    infringement was willful.

09:05:38   13        GREE must prove willfulness by a preponderance of

09:05:41   14    the evidence.  In other words, you must determine whether

09:05:43   15    it is more likely than not that Supercell willfully

09:05:47   16    infringed.

09:05:49   17        You may not determine that the infringement was

09:05:51   18    willful just because Supercell knew of the asserted patents

09:05:55   19    and infringed them.  However, you may find that Supercell

09:05:59   20    willfully infringed if you find that it acted egregiously,

09:06:05   21    willfully, or wantonly.  You may find Supercell's actions

09:06:09   22    were egregious, willful or wanton if it acted in reckless

09:06:13   23    or callous disregard of or with indifference to the rights

09:06:18   24    of GREE.

09:06:18   25        A Defendant is indifferent to the rights of

09:06:22  1  another when it proceeds in disregard of a high or

09:06:27  2  excessive danger of infringement that was known to it or

09:06:31  3  was apparent to a reasonable person in its position.

09:06:35  4       Your determine -- your determination of

09:06:45  5  willfulness should incorporate the totality of the

09:06:45  6  circumstances based on all of the evidence presented during

09:06:47  7  the course of the trial.

09:06:49  8       Willfulness can be established by circumstantial

09:06:52  9  evidence.  If you decide that there was willful

09:06:54  10  infringement, that decision should not affect any damage

09:06:59  11  award that you might render in this case.

09:07:03  12       I'll now instruct you on the rules that you must

09:07:05  13  follow in deciding whether or not Supercell has proven by

09:07:11  14  clear and convincing evidence that the asserted claims of

09:07:13  15  the asserted patents are invalid.

09:07:15  16       An issued United States patent is accorded a

09:07:21  17  presumption of validity based on the presumption that the

09:07:24  18  U.S. Patent and Trademark Office, which you've heard

09:07:27  19  referred to throughout this trial as the PTO or as the

09:07:31  20  Patent Office, acted correctly in issuing the patent.

09:07:35  21       This presumption of validity extends to all issued

09:07:39  22  United States patents.  In order to overcome this

09:07:45  23  presumption, Supercell must establish by clear and

09:07:48  24  convincing evidence that the pat -- that the Plaintiff's

09:07:51  25  patent or any claim in the patent is not valid.

09:07:58  1        Even though the Patent and Trademark Office's

09:08:01  2    examiner has allowed the claims of a patent, you have the

09:08:04  3    ultimate responsibility, ladies and gentlemen, for deciding

09:08:08  4    whether the claims of the patent are valid.

09:08:09  5        Like infringement, invalidity is determined on a

09:08:14  6    claim-by-claim basis.  Claims are construed in the same way

09:08:18  7    for determining infringement as for determining invalidity.

09:08:23  8        You must apply the claim language consistently and

09:08:26  9    in the same manner for both the issues of infringement and

09:08:26  10   for the issues of invalidity.  You must determine

09:08:30  11   separately for each claim whether the claim is invalid.

09:08:36  12       If one asserted claim is invalid, this does not

09:08:39  13   mean that any other asserted claim is necessarily invalid.

09:08:44  14   However, if a dependent claim is invalid, then the

09:08:48  15   independent claim from which it depends is also invalid.

09:08:52  16       As I previously explained, to obtain a patent, one

09:08:58  17   must first file an application with the U.S. Patent and

09:09:02  18   Trademark Office, the PTO.  The process of obtaining a

09:09:05  19   patent is called patent prosecution.

09:09:08  20       The application submitted to the PTO includes

09:09:12  21   within it what's called a specification.  The specification

09:09:17  22   is required to contain a written description of the claimed

09:09:20  23   invention telling what the invention is, how it works, how

09:09:25  24   to make it, and how to use it.

09:09:27  25       The patent law contains certain requirements for

09:09:31   1   the part of the patent called the specification.  The
09:09:34   2   written description requirement is designed to ensure that
09:09:39   3   the inventor was in possession of the full scope of the
09:09:42   4   claimed invention as of the patent's effective filing date.
09:09:46   5         Supercell contends in this case that the asserted
09:09:51   6   claims of GREE's '873 patent are invalid because the
09:09:55   7   specification of the '873 patent does not contain an
09:10:00   8   adequate written description of the invention.
09:10:03   9         To succeed on this, Super -- Supercell must show
09:10:08   10  by clear and convincing evidence that a person having
09:10:10   11  ordinary skill in the field reading the patent
09:10:14   12  specification as of the effective date of February the
09:10:19   13  26th, 2013, would not have recognized that it describes the
09:10:24   14  full scope of the invention as it is claimed in the claims
09:10:27   15  of the '873 patent.  If a patent claim lacks adequate
09:10:35   16  description, it is invalid.
09:10:37   17        In deciding whether a patent satisfies this
09:10:42   18  written description requirement, you must consider the
09:10:45   19  description from the viewpoint of a person having ordinary
09:10:48   20  skill in the field of the technology of the patent as of
09:10:52   21  the effective filing date.
09:10:55   22        The specification must describe the full scope of
09:10:58   23  the claimed invention, including each element thereof,
09:11:01   24  either expressly or inherently.
09:11:05   25        A claimed element is disclosed inherently if a

09:11:08  1   person having ordinary skill in the field of the patent as

09:11:12  2   of the effective date, would have understood that the

09:11:15  3   element is necessarily present in what the specification

09:11:19  4   discloses.  It's not sufficient that the specification

09:11:23  5   discloses only enough to make the claimed invention obvious

09:11:27  6   to the person having ordinary skill.

09:11:29  7       The written description does not have to be in the

09:11:34  8   exact words of the claim.  The requirement may be satisfied

09:11:38  9   by any combination of words, structures, figures, diagrams,

09:11:43  10  formulas, et cetera, contained in the patent specification.

09:11:51  11      Adequate written description does not require

09:11:53  12  either examples or an actual reduction to practice of the

09:11:57  13  claimed invention.

09:11:59  14      However, a mere wish or plan for obtaining a

09:12:02  15  claimed invention is not an adequate written description.

09:12:07  16  Rather, the level of disclosure required depends on a

09:12:10  17  variety of factors, such as the existing knowledge in the

09:12:13  18  particular field, the extent and content of the prior art,

09:12:17  19  the maturity of the science or technology, and other

09:12:20  20  considerations appropriate to the subject matter.

09:12:23  21      Now, at times, you'll hear me make references to

09:12:29  22  prior art.  In patent law, a previous device, system,

09:12:35  23  method, publication, or patent that predates the claimed

09:12:41  24  invention is generally called prior art.  It's sometimes

09:12:44  25  called a prior art reference.  Prior art may include any of

09:12:48  1   the following items:

09:12:50  2          (1) Any products or system that was known or used

09:12:55  3   by others in the United States before the patented

09:12:58  4   inventions were made;

09:13:00  5          (2) any patent that issued or any printed

09:13:03  6   publication that published or -- that was published or any

09:13:08  7   patent that was issued anywhere in the world before the

09:13:12  8   patented inventions were made;

09:13:14  9          (3) any product or system that was in public use

09:13:19  10  or on sale in the United States more than one year before

09:13:22  11  the applications for the asserted patents were filed;

09:13:26  12         (4) any patents that issued or any pub -- any

09:13:32  13  printed publications that were published anywhere in the

09:13:35  14  world more than one year before the application for the

09:13:39  15  asserted patents were filed;

09:13:42  16         (5) any patent application that was filed in the

09:13:45  17  United States by someone other than the inventors of the

09:13:49  18  asserted patents before the invention was made.

09:13:50  19         Now, the earliest possible priority dates of the

09:13:57  20  asserted patents in this case are as follows:

09:13:59  21         March 4, 2013, for the '481 patent.

09:14:03  22         March 4, 2013, for the '137 patent.

09:14:07  23         September 20, 2012, for the '655 patent.

09:14:10  24         February 26, 2013, for the '873 patent.

09:14:16  25         In order for someone to be entitled to a patent,

09:14:20  1  the invention must actually be new and not obvious over

09:14:25  2  what came before, which is referred to as the prior art.

09:14:30  3        Prior art is considered in determining whether the

09:14:32  4  asserted claims of the asserted patents are -- are -- are

09:14:37  5  anticipated or are obvious.

09:14:38  6        Now, you have heard evidence of prior art that the

09:14:44  7  Patent Office may or may not have evaluated.  The fact that

09:14:50  8  any particular reference was or was not considered by the

09:14:54  9  Patent Office does not change Supercell's burden of proof.

09:14:58 10        However, in making your decision as to whether

09:15:00 11  Supercell has met its burden of proof by clear and

09:15:04 12  convincing evidence as to a particular patent claim, you

09:15:08 13  may take into account the fact that the prior art was not

09:15:12 14  considered by the Patent Office.

09:15:14 15        Prior art differing from the prior art considered

09:15:17 16  by the Patent Office may, but does not always, carry more

09:15:22 17  weight than the prior art that was considered by the Patent

09:15:24 18  Office.

09:15:28 19        Again, ladies and gentlemen, the ultimate

09:15:29 20  responsibility for deciding whether the claims of the

09:15:32 21  patent are valid is up to you, the members of this jury.

09:15:36 22        Keep in mind that everyone has the right to use

09:15:42 23  existing knowledge and principles.  A patent cannot remove

09:15:45 24  from the public the availability to use what was known or

09:15:47 25  obvious before the invention was made or patent protection

09:15:53  1   was sought.

09:15:53  2          Infringement, like -- excuse me.

09:15:58  3          Like infringement, invalidity is determined on a

09:16:00  4   claim-by-claim basis.  In making your determination as to

09:16:04  5   invalidity, you should consider each claim separately.

09:16:08  6          If one claim of a patent is invalid, that does not

09:16:11  7   mean that any other claim is necessarily invalid.  Claims

09:16:17  8   are construed the same way for determining infringement as

09:16:19  9   for determining invalidity.

09:16:22  10         Supercell, the Defendant, contends that the '137,

09:16:27  11   the '481, the '655, and the '837 [sic] patents are invalid

09:16:33  12   as being either anticipated or as being obvious.

09:16:38  13         Anticipation must be determined on a

09:16:43  14   claim-by-claim basis.  Supercell must prove by clear and

09:16:46  15   convincing evidence that all of the requirements of a claim

09:16:49  16   are present in a single piece of prior art.

09:16:54  17         To anticipate the invention, the prior art does

09:16:57  18   not have to use the same words as in the claim, but all the

09:17:02  19   requirements of the claim must have been disclosed and

09:17:06  20   arranged as in the claim.

09:17:09  21         The claim requirements may either be disclosed

09:17:13  22   expressly or inherently, that is, necessarily implied, such

09:17:17  23   that a person having ordinary skill in the art in the

09:17:19  24   technology of the invention looking at that one single

09:17:25  25   reference could make and use the claimed invention.

09:17:28    1          Where Supercell is relying on prior art that was

09:17:32    2    not considered by the Patent Office during the examination,

09:17:38    3    you may consider whether that prior art is significantly

09:17:41    4    different and more relevant than the prior art that the

09:17:45    5    PTO, the Patent Office, did consider.

09:17:48    6          If you decide it is different and more relevant,

09:17:51    7    you may weigh that prior art more heavily when considering

09:17:58    8    whether the challenger has carried its clear and convincing

09:18:04    9    burden of proof as to invalidity.

09:18:05   10          If a dependent claim is anticipated by the prior

09:18:07   11    art, then the claims from which it depends are necessarily

09:18:13   12    anticipated, as well.

09:18:16   13          Additionally, even though an invention may not

09:18:20   14    have been identically disclosed or described before it was

09:18:23   15    made by an inventor in order to be patentable, the

09:18:28   16    invention also must not have been obvious to a person of

09:18:32   17    ordinary skill in the field of technology of the patent at

09:18:35   18    the time the invention was made or before the filing date

09:18:40   19    of the patent.

09:18:43   20          Supercell is required to establish that a patent

09:18:46   21    claim is invalid by showing by clear and convincing

09:18:48   22    evidence that the claimed invention would have been obvious

09:18:57   23    to persons having ordinary skill in the art at the time the

09:19:00   24    invention was made or patent was filed in the field of the

09:19:03   25    invention.

09:19:04  1        In determining whether a claimed invention is

09:19:07  2   obvious, ladies and gentlemen, you must consider the level

09:19:09  3   of ordinary skill in the field of the invention that

09:19:12  4   someone would have had at the time the invention was made

09:19:16  5   or the patent was filed, the scope and content of the prior

09:19:21  6   art, and any differences between the prior art and the

09:19:23  7   claimed invention.

09:19:24  8        Keep in mind that the existence of each and every

09:19:32  9   element of the claimed invention in the prior art does not

09:19:36  10  necessarily prove obviousness.  Most, if not all,

09:19:39  11  inventions rely on the building blocks of prior art.

09:19:43  12       In considering whether a claimed invention is

09:19:45  13  obvious, you may, but you are not required, to find

09:19:49  14  obviousness if you find that at the time of the claimed

09:19:52  15  invention or the patent's filing date there was a reason

09:19:56  16  that would have prompted a person having ordinary skill in

09:19:59  17  the field of the invention to combine the known elements in

09:20:07  18  the way the claimed invention does, taking into account

09:20:10  19  such factors as:

09:20:11  20       (1) Whether the claimed invention was merely the

09:20:14  21  predictable result of using prior art elements according to

09:20:17  22  their known function;

09:20:18  23       (2) whether the claimed invention provides an

09:20:21  24  obvious solution to the known problem in the relevant

09:20:26  25  field;

09:20:26 1          (3) whether the prior art teaches or suggests the

09:20:31 2   desirability of combining elements in the claimed

09:20:35 3   invention, such as where there is a motivation to combine;

09:20:40 4          (4) whether the prior art teaches away from

09:20:44 5   combining elements in the claimed invention;

09:20:46 6          And (5) whether it would have been obvious to try

09:20:49 7   the combinations in the claimed invention, such as where

09:20:53 8   there is a design incentive or market pressure to solve a

09:20:57 9   problem and there are a finite number of identified,

09:21:01 10  predictable solutions, although obvious to try is not

09:21:05 11  sufficient in unpredictable technologies.

09:21:08 12          To -- to find that it renders the invention

09:21:13 13  obvious, you must find that the prior art provided a

09:21:16 14  reasonable expectation of success.

09:21:22 15          In determining whether the claimed invention was

09:21:23 16  obvious, consider each claim separately.  Do not use

09:21:26 17  hindsight.  In other words, ladies and gentlemen, you

09:21:32 18  should not consider what a person of ordinary skill in the

09:21:34 19  art would know now or what has been learned from the

09:21:37 20  teaching of the asserted patents.

09:21:39 21          In making these assessments, you should take into

09:21:43 22  account any objective evidence, sometimes called secondary

09:21:51 23  considerations, that may shed light on the obviousness or

09:21:54 24  not of the claimed invention, such as:

09:21:58 25          (1)  Whether the invention was commercially

09:22:01  1   successful;

09:22:02  2          (2) whether the invention satisfied a long-felt

09:22:05  3   need in the art;

09:22:06  4          (3) whether others had tried and failed to make

09:22:09  5   the claimed invention;

09:22:11  6          (4) whether others invented the claimed invention

09:22:15  7   at roughly the same time;

09:22:17  8          (5) whether there were changes or related

09:22:22  9   technologies or market needs contemporaneous with the

09:22:25  10  claimed invention;

09:22:26  11         (6) whether others in the field praised the

09:22:29  12  claimed invention;

09:22:30  13         And (7), whether others sought or obtained rights

09:22:37  14  to the patent from the patentholder.

09:22:40  15       No factor alone is dispositive, and you must

09:22:43  16  consider the obviousness or non-obviousness of the

09:22:46  17  inventions as a whole.  These factors are relevant only if

09:22:49  18  there is a connection or a nexus between the factor and the

09:22:52  19  asserted claims of the asserted patents.

09:22:54  20       Even if you conclude that some of the above

09:22:58  21  indicators have been established, those factors should be

09:23:01  22  considered along with all the other evidence in the case in

09:23:05  23  determining whether Supercell has proved that the claimed

09:23:07  24  invention would have been obvious.

09:23:10  25         In determining whether the claimed invention was

1392

09:23:13  1   obvious, consider each claim separately, but understand

09:23:18  2   that if a dependent claim is obvious, then the claims from

09:23:21  3   which it depends are necessarily obvious, as well.

09:23:25  4        Now, several times in these instructions I

09:23:31  5   referred to a person of ordinary skill in the field of the

09:23:33  6   invention.  It's up to you to decide, ladies and gentlemen,

09:23:36  7   the level of ordinary skill in the field of the invention.

09:23:40  8        In deciding the level of ordinary skill -- in

09:23:44  9   deciding what it is, you should consider all the evidence

09:23:47 10   introduced during the course of the trial including:

09:23:52 11        (1) The levels of education and experience of the

09:23:55 12   inventors and other persons working in the field;

09:23:59 13        (2) the types of problems encountered in the

09:24:02 14   field;

09:24:02 15        (3) prior art solutions to those problems;

09:24:06 16        (5) [sic] rapidity with which inventions are made;

09:24:14 17        And (5) the sophistication of the technology.

09:24:18 18        A person of ordinary skill in the art is a

09:24:20 19   hypothetical person who is presumed to be aware of all the

09:24:26 20   relevant prior art at the time of the claimed invention.

09:24:28 21        If you find that GREE has proven that Supercell

09:24:32 22   has infringed any of the asserted claims and that Supercell

09:24:37 23   has failed to show that the asserted claims are invalid,

09:24:41 24   you must then consider the proper amount of damages, if

09:24:44 25   any, to award to GREE.

09:24:46  1        I'll now instruct you about the measure of

09:24:49  2  damages.  However, by instructing you on damages, ladies

09:24:54  3  and gentlemen, I am not suggesting which party should win

09:24:56  4  this case on any issue.

09:25:00  5        If you find that Supercell has not infringed any

09:25:03  6  of the asserted claims or that all of the infringed claims

09:25:07  7  are invalid, then GREE is not entitled to any damages.

09:25:12  8        If you award damages, they must be adequate to

09:25:16  9  compensate GREE for any infringement of the asserted claims

09:25:20  10 you may find.  You may not award and you must not award

09:25:26  11 GREE more damages than are adequate to compensate it for

09:25:31  12 the infringement, nor should you include any additional

09:25:33  13 amount for the purpose of punishing Supercell.

09:25:37  14        The patent law specifically provides that damages

09:25:40  15 for infringement may not be less than a reasonable royalty.

09:25:46  16        GREE has the burden to establish the amount of its

09:25:50  17 damages by a preponderance of the evidence.  In other

09:25:51  18 words, you should award only those damages that GREE

09:25:55  19 establishes that it, more likely than not, suffered as a

09:26:00  20 result of Supercell's infringement of the asserted claims.

09:26:05  21        While GREE is not required to prove the amount of

09:26:07  22 its damages with mathematical precision, it must prove them

09:26:12  23 with reasonable certainty.  GREE is not entitled to damages

09:26:17  24 that are remote or are speculative.

09:26:19  25        There are different types of damages that GREE may

09:26:25  1  be entitled to recover.

09:26:26  2       In this case, GREE seeks damages in the form of a

09:26:29  3  reasonable royalty.

09:26:30  4       A reasonable royalty is the amount of royalty

09:26:33  5  payment that a patentholder and the alleged infringer would

09:26:38  6  have agreed to in a hypothetical negotiation taking place

09:26:43  7  at a time immediately prior to when the infringement first

09:26:46  8  began.

09:26:47  9       You've heard references throughout this trial to

09:26:51  10  whether GREE should be entitled to a running royalty or a

09:26:56  11  lump sum royalty.  If you -- if you find that GREE is

09:26:59  12  entitled to damages, you must decide whether the parties

09:27:02  13  would have agreed to a running royalty or a fully paid-up

09:27:07  14  lump sum royalty at the time of the hypothetical

09:27:10  15  negotiation.

09:27:10  16       A running royalty is a fee paid for the right to

09:27:14  17  use the patent that is paid for each unit of the infringing

09:27:20  18  products that have been sold.  A running royalty can be

09:27:23  19  based on the revenue from or the volume of sales of

09:27:26  20  licensed products.

09:27:28  21       If there are additional units sold in the future,

09:27:32  22  any damages for these sales will not be addressed by you.

09:27:35  23  If you decide that a running royalty is appropriate, then

09:27:38  24  you must -- then the damages you award, if any, should

09:27:42  25  reflect the total amount necessary to compensate GREE for

09:27:46  1   Supercell's past infringement.

09:27:48  2        However, a lump sum royalty is when the infringer

09:27:53  3   pays a single price for a license covering both past and

09:27:57  4   future infringing sales.  If you decide that a lump sum

09:28:02  5   royalty is appropriate, then the damages you award, if any,

09:28:06  6   should reflect the total amount necessary to compensate

09:28:11  7   GREE for Supercell's past and future infringement.

09:28:13  8        In determining the reasonable royalty, you should

09:28:18  9   consider all the facts known -- known and available to the

09:28:22  10  parties at the time the infringement began.  Some kinds of

09:28:27  11  the factors that you may consider in making your

09:28:30  12  determination are:

09:28:31  13        (1) the value of the claim -- the value that the

09:28:36  14  claimed invention contributes to the accused product;

09:28:40  15        (2) the value that factors other than the claimed

09:28:43  16  invention contribute to the accused product;

09:28:44  17        (3) comparable license agreements or other

09:28:49  18  transactions, such as those covering the use of the claimed

09:28:52  19  invention or similar technology;

09:28:54  20        (4) the utility and advantages of patented

09:29:01  21  property over the old modes or devices, if any, that had

09:29:05  22  been used for working out similar results;

09:29:07  23        (5) the nature of the patented invention, the

09:29:11  24  character of the commercial embodiment of it as owned and

09:29:15  25  produced by the licensor, and the benefits to those who

09:29:17  1  have used the invention;

09:29:19  2          (6) the extent to which the infringer has made use

09:29:22  3  of the invention and any evidence probative of the value of

09:29:26  4  that use;

09:29:26  5          (7) the portion of the realizable profits that

09:29:31  6  should be credited to the invention as distinguished from

09:29:35  7  the non-patented elements, the manufacturing process,

09:29:39  8  business risks, or significant features or improvements

09:29:42  9  added by the infringer;

09:29:44  10         And (8) the amount that a licensor, such as the

09:29:48  11  patentee, and a licensee, such as the infringer, would have

09:29:52  12  agreed upon at the time the infringement began if both had

09:29:57  13  been reasonably and voluntarily trying to reach an

09:29:59  14  agreement, that is, the amount which a prudent licensee who

09:30:06  15  desired as a business proposition to obtain a license to

09:30:09  16  manufacture and sell a particular article embodying the

09:30:12  17  patented invention would have been willing to pay as a

09:30:16  18  royalty and yet be able to make a reasonable profit and

09:30:21  19  which amount would have been acceptable to a prudent

09:30:24  20  patentee who was willing to grant a license.

09:30:26  21         Now, no one of these factors is dispositive,

09:30:31  22  ladies and gentlemen, and you can and should consider all

09:30:34  23  the evidence that's presented to -- been presented to you

09:30:37  24  in this case on each of these factors.

09:30:40  25         You may also consider any other factors which in

09:30:43  1  your mind would have increased or decreased the royalty the

09:30:46  2  alleged infringer would have been willing to pay and the

09:30:49  3  patent owner would have been willing to accept, acting as

09:30:57  4  normally prudent business people.

09:30:59  5       You've heard throughout the trial references to

09:31:03  6  whether the reasonable royalty should be a running royalty

09:31:06  7  or lump sum.

09:31:07  8       If you find that GREE is entitled to damages, you

09:31:09  9  must decide whether the parties would have agreed to a

09:31:13  10 running royalty or a fully paid-up lump sum royalty at the

09:31:16  11 time of the hypothetical negotiation.

09:31:16  12      GREE is entitled to damages for at least as early

09:31:21  13 as the date of first infringement after the issuance of the

09:31:26  14 asserted patents.

09:31:27  15      In addition to seeking damages for alleged

09:31:29  16 infringement after the asserted patents issued, GREE also

09:31:33  17 contends that it should be awarded damages for the '137 and

09:31:38  18 the '655 patents before those two patents issued.

09:31:43  19      To be entitled to damages before the issuance of a

09:31:47  20 patent, GREE must prove that:

09:31:49  21      (1) Supercell had actual notice of a published

09:31:54  22 patent application for that patent;

09:31:56  23      And (2) the asserted claims of the issued patent

09:32:00  24 are substantially identical to the claims of the published

09:32:03  25 application.

09:32:04  1        Actual notice does not require any affirmative act

09:32:09  2   by GREE notifying Supercell of the published patent

09:32:13  3   application and may be proven by circumstantial evidence.

09:32:19  4        The dates on which these damages begin are:

09:32:23  5        For the -- for the '594 patent, June the 11th,

09:32:28  6   2018.

09:32:28  7        For the '137 and '481 patents, September the 12th,

09:32:33  8   2016, or at the latest, March the 28th, 2017.

09:32:37  9        For the '655 patent, September the 12th, 2016, or

09:32:43  10  at the latest, September the 26th, 2017.

09:32:47  11       And for the '873 patent, December the 12th, 2018.

09:32:51  12       Now, in considering this hypothetical negotiation,

09:32:55  13  you should focus on what the expectations of the

09:32:57  14  patentholder and the alleged infringer would have been had

09:33:02  15  they entered into an agreement at that time and had they

09:33:05  16  acted reasonably in their negotiations.

09:33:07  17       In determining this, you must assume that both

09:33:12  18  believe the asserted claims were valid and infringed, and

09:33:16  19  both parties were willing to enter into an agreement.

09:33:20  20       The reasonable royalty that you determine must be

09:33:23  21  a royalty that would have resulted from the hypothetical

09:33:27  22  negotiation and not simply a royalty that either party

09:33:29  23  would have preferred.

09:33:32  24       The law requires that any damages awarded to GREE

09:33:36  25  correspond to the value of the alleged inventions within

09:33:39  1    the accused products as distinct from other unpatented

09:33:43  2    features of the accused products or other features, such as

09:33:47  3    marketing or advertising or Supercell's size or market

09:33:51  4    position.

09:33:52  5          This is particularly true where the accused

09:33:55  6    products have multiple features and multiple components not

09:33:59  7    covered by the patent or where the accused products work in

09:34:03  8    conjunction with other non-patented items.  Therefore, the

09:34:09  9    amount you find as damages must be on the value

09:34:15  10   attributable to the patented technology alone.

09:34:18  11         Now, ladies and gentlemen, having given you these

09:34:21  12   instructions, we will proceed to hear closing arguments

09:34:23  13   from the parties.

09:34:24  14         Plaintiff, you may now present your first closing

09:34:27  15   argument to the jury.

09:34:28  16         MR. MOORE:  Thank you, Your Honor.

09:34:28  17         THE COURT:  Would you like a warning on your time,

09:34:30  18   Mr. Moore?

09:34:31  19         MR. MOORE:  Yes, Your Honor, three minutes -- with

09:34:34  20   three minutes remaining, please.

09:34:36  21         THE COURT:  Three minutes remaining out of your

09:34:37  22   total?

09:34:38  23         MR. MOORE:  Out of 20, please --

09:34:39  24         THE COURT:  Three out of -- so when 17 minutes

09:34:41  25   have been used?

```
09:34:42   1              MR. MOORE:  Yes, sir.  Thank you.

09:34:43   2              THE COURT:  Okay.  Please proceed.

09:34:44   3              MR. MOORE:  Thank you.

09:35:10   4              THE COURT:  You may proceed when you're ready,

09:35:13   5    counsel.

09:35:13   6              MR. MOORE:  Thank you, Your Honor.

09:35:13   7              Good morning, ladies and gentlemen.

09:35:17   8              Thank you very much for your service throughout

09:35:20   9    this trial this past week.

09:35:23  10              On behalf of my client, Mr. Eiji Araki and GREE,

09:35:28  11    and my co-counsel, Ms. Smith, and my law partner,

09:35:35  12    Ms. Ludlam, we thank you very much, and it's been our

09:35:39  13    privilege and honor to present this important case to you.

09:35:43  14              You've all been very attentive, and you've all

09:35:46  15    been very patient with us as we've worked through this

09:35:49  16    trial.  And we cannot thank you enough for the civic

09:35:52  17    service that you are rendering in our system of justice,

09:35:56  18    because this is an important case on an important issue in

09:35:58  19    our country's system of justice.

09:36:02  20              Patents are in the U.S. Constitution, as I

09:36:05  21    mentioned in the opening statement, and they're there to

09:36:08  22    protect new ideas.

09:36:09  23              And GREE has had new ideas, new ideas for mobile

09:36:14  24    social games throughout its history and how to make those

09:36:17  25    games more engaging for users that play them.  We are here
```

09:36:22  1  because of five U.S. patents that GREE received on those

09:36:27  2  ideas.

09:36:27  3      And we presented to you GREE's story, how it was

09:36:32  4  founded, what its businesses are.

09:36:34  5      You heard from Mr. Araki, GREE's senior vice

09:36:38  6  president and a member of its board of directors, who has

09:36:40  7  been here at trial the entire time.  And you heard him on

09:36:44  8  the witness stand last Friday explain to you all about GREE

09:36:48  9  and what it's about and why innovation is so important to

09:36:52  10  GREE and why GREE files for united -- for patents both in

09:36:56  11  the United States and around the world, to protect its

09:36:59  12  inventions, its innovations, and protect them from

09:37:03  13  competition in the industry.

09:37:04  14      And we've also seen and heard that four of these

09:37:11  15  five patents, they went through an extensive examination

09:37:14  16  process in the United States Patent Office.  In fact, four

09:37:17  17  different patent examiners looked at the applications that

09:37:22  18  GREE filed for these patents, and that was after it went

09:37:25  19  through five levels of internal approval in the first

09:37:28  20  place.

09:37:29  21      These expert examiners at the Patent Office

09:37:32  22  searched for the prior art and made sure that the patents

09:37:34  23  deserved to be protected.  And at the end of that process,

09:37:39  24  each of those four examiners concluded that GREE's

09:37:42  25  inventions were new and worthy of protection under United

09:37:45  1   States law.

09:37:45  2        And you've heard a lot about these five patents

09:37:50  3   throughout this case.  You've heard all about what they

09:37:54  4   relate to, what their claims are, and how they're involved

09:37:57  5   in the gaming industry, such as the '594 template patent,

09:38:02  6   which allows players of certain types of games, these city

09:38:06  7   building games, to save a lot of time by copying and saving

09:38:11  8   different types of layouts, including from other players,

09:38:15  9   rather than spending the time, upwards of 20, 30 minutes to

09:38:20 10   do it themselves.

09:38:22 11        It helps them -- keep them engaged in the game,

09:38:24 12   helps the use more -- users more interested.  It also helps

09:38:28 13   the game maker retain more users, which as you've heard is

09:38:32 14   a benefit to the game makers, as well, by having more users

09:38:36 15   play their games and some portion of them decide they want

09:38:38 16   to pay to play the games more.

09:38:41 17        The '137 and '481 battle patents, you've heard how

09:38:45 18   these make these card battle games more interesting and

09:38:49 19   engaging, and they do that through a fairly complex series

09:38:52 20   of mechanics for how the points are handled, how resources

09:38:57 21   are allocated in the game, how cards are played and

09:38:59 22   updated, and how the battle takes place.

09:39:02 23        You've heard about the '655 donation patent, which

09:39:05 24   increases social engagement in games.  You've heard a lot

09:39:09 25   of testimony about keeping players engaged and keeping them

09:39:13    1    social, making them make friends, making them interact in

09:39:17    2    groups or clans; really helps the engagement of the

09:39:22    3    players, makes them enjoy the game.  And, again, it also

09:39:24    4    helps the makers of the game add more users in the game.

09:39:26    5          And the donation patent has systems and methods

09:39:29    6    that do that by encouraging gifting among users,

09:39:34    7    encouraging one user to give to another, and then giving

09:39:37    8    the recipient an incentive to perhaps encourage the

09:39:40    9    receiver of the gift to do the same thing in return.

09:39:43    10          And, lastly, you heard about the '873 patent and

09:39:46    11    how it increases the user playability and engagement of

09:39:52    12    shooting games on a small touchscreen, how it helps the

09:39:55    13    controls work so that these games actually work on your

09:39:58    14    phone, and how that helps players be more engaged and more

09:40:02    15    interested and also helps the makers of the games, as well.

09:40:05    16          Now, GREE played by the rules.  When it came up

09:40:10    17    with new ideas, it sought patents, and it got those

09:40:13    18    patents.

09:40:13    19          Supercell did not play by the rules, and that's

09:40:16    20    what this case is about.  We're ask -- we're going to ask

09:40:19    21    you to hold Supercell responsible for that decision.

09:40:22    22          Now, the trial started off last week after you

09:40:27    23    were selected and sworn in and we presented our opening

09:40:32    24    statements, the trial started off with us addressing why we

09:40:34    25    are all here.  As His Honor told you the very first day

09:40:40   1   when all of you, along with many others, were gathered out

09:40:46   2   there in the audience, this is a patent infringement case.

09:40:48   3          So what did we do?  Our very first witness came up

09:40:51   4   on the stand to talk about patent infringement, Dr. Robert

09:40:54   5   Akl.  And he testified, I think, for over five hours last

09:40:58   6   Thursday afternoon, Friday morning, into Friday afternoon.

09:41:01   7   It was a long time on the stand.  I was tired, I'm sure he

09:41:06   8   was tired, no doubt many of you may have been tired, as

09:41:08   9   well.

09:41:09  10          But why did we do that?  We did that because we

09:41:12  11   wanted to show you beyond any doubt that Supercell

09:41:15  12   infringes each of GREE's five patents.

09:41:18  13          And we took the time to do that.  We took the time

09:41:21  14   in our case, nearly half of the time that we spent in our

09:41:25  15   case under the time we were allotted was spent on this

09:41:28  16   question of infringement, and we showed you exhaustive

09:41:32  17   evidence of that.

09:41:33  18          We showed you the games.  We showed you many

09:41:35  19   videos.  We -- we paused them.  We played them over again.

09:41:39  20   We wanted you to understand how these games work and why

09:41:42  21   they infringe.  And we showed you each and every word of

09:41:44  22   the 10 patent claims in the five patents that we are here

09:41:47  23   to prove that Supercell infringes.

09:41:49  24          We also showed you their source code.  And as you

09:41:55  25   saw, that was -- involved a little bit more than showing

09:41:57  1   the videos.  We had to seal the courtroom.  We had to get

09:42:01  2   out paper, present it on the ELMO, I had to move it around.

09:42:04  3   And Dr. Akl walked through the source code for each of

09:42:07  4   the -- that was relevant to each of the three games that

09:42:10  5   infringe GREE's five patents.  And he showed you where in

09:42:13  6   the code Supercell has GREE's patented technology.  He

09:42:18  7   showed you that in detail.

09:42:19  8        And you heard a lot about source code in this

09:42:22  9   trial and why it is important.

09:42:25  10       This is testimony from Supercell's own expert,

09:42:29  11  Dr. Mark Claypool, who was one of the witnesses who

09:42:32  12  testified by video.

09:42:33  13       And Dr. Claypool I thought perhaps said it best:

09:42:39  14  To know what the game is really doing, you look at the

09:42:42  15  code.

09:42:42  16       And that's what we did, and we showed you that,

09:42:46  17  and we showed you that infringement that Supercell has by

09:42:51  18  having GREE's inventions in its code.

09:42:53  19       Now, what did Supercell bring?  It had four

09:42:56  20  Supercell witnesses testify at this trial, one live, and

09:43:00  21  three by video.

09:43:01  22       Mr. Harper, who came in for a brief time last

09:43:04  23  Monday and took the stand and is on the board, doesn't know

09:43:09  24  anything about source code.

09:43:09  25       Mr. Joas, who is the game lead for Clash of Clans,

09:43:13  1    admitted he doesn't know anything about source code.

09:43:15  2          Mr. Ahlgren, the game lead for Clash Royale, also

09:43:22  3    admitted doesn't know anything about source code.

09:43:24  4          These are the people who lead the teams, who write

09:43:26  5    the code and program the games, the most important evidence

09:43:30  6    in the case, and Supercell presented nothing from them.

09:43:32  7          Now, its fourth witness, Mr. Franzas, did know

09:43:37  8    about the source code for Brawl Stars, but I think it's

09:43:39  9    important what he said.  As he testified, he testified that

09:43:44  10   the code works exactly how Dr. Akl describes it.

09:43:47  11         And this is one example of that testimony where he

09:43:50  12   said that a particular source code function had to be

09:43:53  13   called in order for an enemy to hit -- be hit in the Brawl

09:43:58  14   Stars game.

09:43:59  15         Nobody else walked through that door or showed up

09:44:02  16   on the video screen from Supercell to talk about the most

09:44:05  17   important evidence in the case.

09:44:06  18         So what did Supercell do instead?  They presented

09:44:10  19   a number of excuses on the question of infringement.  They

09:44:14  20   played some word games, they pointed you to some of the

09:44:17  21   figures in the patents, and they ignored a very important

09:44:20  22   instruction from the Court you just heard, and I'll walk

09:44:26  23   through examples of each of those.

09:44:27  24         The instruction that you just heard relates to

09:44:32  25   this question of comprising.  And "comprising" is a term

09:44:42  1   that is in each of the patents.

09:44:44  2        What that means is that the patent claim lists

09:44:48  3   the -- the minimum checklist.  All of the words in the

09:44:52  4   claim must be present for there to be infringement, but

09:44:56  5   there could be other things.  So this is just the minimum

09:44:58  6   of what the product must do.  If you do that minimum

09:45:01  7   checklist, you infringe.

09:45:02  8        And when you get back to the jury room and receive

09:45:04  9   your copy of the final jury instructions, I would like to

09:45:07  10  ask you to look on the top of Page 11 of those

09:45:10  11  instructions, because that's where this instruction is

09:45:12  12  found.

09:45:12  13       And there's an example that follows that says --

09:45:16  14  and His Honor just read it -- if you take a claim that

09:45:19  15  covers the invention of a table, if -- if the claim recites

09:45:23  16  a tabletop, four legs, and nails that hold them together,

09:45:25  17  then the claim covers any table that contains those

09:45:28  18  structures, even if it also has other things, like leaves

09:45:32  19  or wheels.

09:45:33  20       So, in other words, the table with the structure

09:45:39  21  in the claim infringes the claim.  If you put wheels on the

09:45:46  22  table, it still infringes the claim.  You don't get out of

09:45:49  23  an infringement by doing something else.  If you infringe,

09:45:52  24  you infringe.  If you infringe even once, you infringe.  If

09:45:55  25  other times you don't infringe but you've infringed before,

09:45:59  1   you still infringe.

09:46:00  2        And if I get a speeding ticket, I can't go to

09:46:04  3   court and say, well, I wasn't speeding yesterday.  That

09:46:07  4   doesn't get me out of a speeding ticket.  It's the same

09:46:10  5   thing with infringement.  If you infringe, you infringe,

09:46:13  6   even if sometimes you do other things.

09:46:14  7        And that's what we heard from Supercell in this

09:46:19  8   case.  For example, they spent a lot of time talking about

09:46:23  9   Clash of Clans and how when you use the copy layout

09:46:26  10  feature, sometimes you might get this pop-up, and that's

09:46:29  11  because there's some buildings that aren't in your

09:46:32  12  inventory that your clan mate may have.

09:46:35  13        Well, you heard there's plenty of times that this

09:46:38  14  pop-up doesn't happen.  And all those times there's

09:46:40  15  infringement.  The game infringes because it infringes,

09:46:42  16  even if other times maybe it doesn't infringe.  This pop-up

09:46:48  17  is the wheels on Supercell's table.

09:46:50  18        And now, we don't agree with this.  As Dr. Akl

09:46:54  19  explained, the pop-up also infringes.  But the point is

09:46:58  20  they infringe, regardless.  The pop-up doesn't always

09:47:03  21  happen, and when it does, it's the wheels on their table.

09:47:05  22        The word games they played are maybe exemplified

09:47:11  23  best by an argument they made that in Clash of Clans.  When

09:47:14  24  you apply the layout editor, after you've moved a building,

09:47:19  25  that the building does not move.  And they said that.

| | | |
|---|---|---|
| 09:47:19 | 1 | There's no moving in Claim 1 because the -- when you -- |
| 09:47:22 | 2 | when you change the layout, it first goes blank and then |
| 09:47:26 | 3 | the new layout then comes up. |
| 09:47:28 | 4 | Well, even Dr. Claypool couldn't keep up those |
| 09:47:32 | 5 | word games. He said: They are moved to a different |
| 09:47:34 | 6 | location. |
| 09:47:34 | 7 | And so there's infringement of the '594 patent |
| 09:47:36 | 8 | based on Supercell's own expert. |
| 09:47:41 | 9 | On the battle patents, one of the contentions that |
| 09:47:43 | 10 | Supercell made was that you can select Elixir even if the |
| 09:47:48 | 11 | amount of -- sorry, you can select a card, even if the |
| 09:47:51 | 12 | amount of cost of the card is greater than the amount of |
| 09:47:55 | 13 | Elixir you have, and that that doesn't mean the less than |
| 09:47:57 | 14 | or equal to claim requirement. |
| 09:48:05 | 15 | But Mr. Ahlgren, its own game lead, didn't agree |
| 09:48:06 | 16 | with that. He said: You can only play a card when its |
| 09:48:09 | 17 | cost is less than or equal to. |
| 09:48:12 | 18 | And the basis for their argument otherwise is it's |
| 09:48:14 | 19 | saying that their own expert called Future Play, but even |
| 09:48:17 | 20 | he admitted Future Play rarely happens. You don't do it |
| 09:48:21 | 21 | all the time. Most of the time when you go to select a |
| 09:48:24 | 22 | card, if you don't have enough Elixir, it says: You don't |
| 09:48:27 | 23 | have enough Elixir. If you do, then it plays the card. |
| 09:48:30 | 24 | Only in a very rare situation because of the delay |
| 09:48:32 | 25 | between the phone and the server, the -- the game might let |

09:48:35  1   you actually bring the card out, but even then, it waits to

09:48:40  2   drop it down until you have enough Elixir.

09:48:42  3         Well, Clash Royale infringes regardless of Future

09:48:46  4   Play.  It infringes because they infringe.  They infringe

09:48:48  5   every time Future Play doesn't come up.  Future Play is the

09:48:52  6   wheels on their table.  And that's a distraction from the

09:48:56  7   question of infringement.

09:48:57  8         On the sequence question, you heard some testimony

09:49:01  9   about this yesterday.  Supercell tried to persuade you that

09:49:03  10  Clash Royale doesn't subtract before it adds, but you heard

09:49:08  11  Dr. Akl explain through the source code all they're

09:49:10  12  pointing to is a timer that tells you when the next Elixir

09:49:15  13  is going to come.  That's what the code says.  That's what

09:49:18  14  the best evidence shows.  So there's infringement of the

09:49:22  15  battle patents, as well.

09:49:23  16        For the '655 donation patent, we spent a lot of

09:49:27  17  time looking at Figure 7b, which is a flowchart, and

09:49:27  18  particularly, the bottom of that.  Again, we don't look at

09:49:30  19  figures for infringement.  We look at the claims.  Every

09:49:33  20  word in the claim must be present, and that's what we

09:49:36  21  compare to the product.

09:49:39  22        So it doesn't matter if the product exact -- works

09:49:43  23  exactly like a figure.  It matters if it has every word in

09:49:46  24  the claims.  And that's what we showed you.

09:49:47  25        All of their arguments about the '655 patent are

09:49:50   1   wheels.  The argument that a player has to spend gold in

09:49:54   2   order to upgrade a card, that's wheels.  It doesn't matter.

09:49:58   3   There's still infringement even if they have to do that.

09:50:01   4   The minimum checklist is met in Clash Royale.

09:50:04   5          And you'll see this instruction, as well, Page 19.

09:50:10   6   As His Honor just said, the only correct comparison is

09:50:13   7   between the products and the language of the claim, not the

09:50:16   8   figures.  Not anything else in the patent.

09:50:20   9          There's infringement of the '655, as well.

09:50:21   10          Now, on the '873 patent, they point to the fact

09:50:27   11   that this brawler Shelly is only one of 39 brawlers.  But

09:50:33   12   she's the first one every player uses.  And the game

09:50:36   13   infringes because they use her and the cone that is the

09:50:38   14   shooting effective range.  That's the table.  These other

09:50:41   15   38 brawlers are the wheels.

09:50:42   16          Now, many of them also infringe because they have

09:50:44   17   the same type or a similar type of shooting range.  But

09:50:52   18   Shelly is the table.  That's what everyone uses.  The game

09:50:53   19   infringes.  They infringe because they infringe even if

09:50:57   20   they have wheels on the table.

09:50:58   21          They also argue that somehow touch doesn't mean

09:51:01   22   touch; that -- that there's not a touch operation because

09:51:04   23   you've actually got to touch and -- and drag your finger or

09:51:08   24   swipe your finger in order to move this cone around.

09:51:12   25          Well, that's touching.  This is a touchscreen.

09:51:14  1  You touch the screen.  Even if you end up dragging your

09:51:17  2  finger or swiping, that's still a touch operation.  Touch

09:51:20  3  means touch.  You touch the game to play it.  And when you

09:51:23  4  do that, that cone moves exactly in the direction of your

09:51:27  5  finger.  You saw that slow-motion video.

09:51:29  6       And the claim doesn't -- as the Court has

09:51:32  7  interpreted, the claim does not require that the cone

09:51:34  8  come -- that -- that the -- your finger be on your player.

09:51:38  9  It can be off to the right, as long as the cone from the

09:51:42  10  player moves in the direction your finger moves.  And

09:51:44  11  that's exactly what Dr. Akl showed.

09:51:46  12       They also for this one focus on the figures.  They

09:51:50  13  showed you this Figure 5 a lot with the targeting circle.

09:51:53  14  And I think they're doing that because they want you to

09:51:55  15  think that they found some old videos on YouTube that --

09:51:55  16  where they were some older shooting games that also shoot

09:51:55  17  targeting circles.

09:52:03  18       But the patent is not just relating to a targeting

09:52:05  19  circle.  It's the claims that matter.  Don't be fooled by

09:52:10  20  their arguments about the figures.

09:52:11  21       And so on the question of infringement, we will

09:52:13  22  ask that you check "yes" and find that Supercell infringes.

09:52:18  23       The question is:  Do they infringe any of the

09:52:20  24  asserted claims?  We believe that we've proven they

09:52:26  25  infringe all 10.

1413

09:52:26    1            THE COURT:  17 minutes have been used.

09:52:28    2            MR. MOORE:  Thank you, Your Honor.

09:52:29    3            But if they -- if you find even one infringed,

09:52:31    4    then you should check "yes."

09:52:33    5            On the question of validity, they don't even argue

09:52:35    6    this for the '594 patent.  And as you heard, the patent --

09:52:40    7    the other four patents are presumed valid.

09:52:45    8            There is a higher burden of proof of clear and

09:52:47    9    convincing evidence because of the experts at the Patent

09:52:53   10    Office.

09:52:53   11            And what did we not see on the question of

09:52:55   12    invalidity?  They presented no source code for any of the

09:52:57   13    prior art games that they relied on.  They told you six

09:53:02   14    different games invalidate the patents but showed you no

09:53:04   15    source code.  They didn't play any of those games

09:53:06   16    themselves.  And as Dr. Akl showed you, a lot of the claim

09:53:11   17    elements are missing.

09:53:13   18            So for this questions, you should check "no" on

09:53:15   19    the question of invalidity.

09:53:16   20            On the question of willfulness, the instruction

09:53:21   21    the Court has just given is that there was willfulness if

09:53:24   22    Supercell acts recklessly or with indifference to GREE's

09:53:28   23    rights.  And that's exactly what we've shown you.  This is

09:53:32   24    the timeline I've showed you in the opening statement.

09:53:35   25            After Supercell knew of the patent, it very

09:53:37    1    quickly started talking about the copy layout feature

09:53:41    2    internally.

09:53:41    3         And then we saw the internal message -- excuse

09:53:46    4    me -- then they -- we'll show you the internal message

09:53:49    5    where they admit it was in GREE's patent, and then they

09:53:52    6    added the copy layout feature.

09:53:53    7         Now, what was their party line?  Their witnesses

09:53:56    8    all sang from the same sheet of music.  They all said, we

09:54:01    9    don't monitor GREE or GREE's games of GREE's patents.

09:54:04   10    Mr. Joas, Mr. Ahlgren, Mr. Franzas all answered the same

09:54:09   11    questions.

09:54:10   12         But we showed you Plaintiff's Exhibit 68.  They

09:54:12   13    knew about the GREE '594 patent.  They knew it covered the

09:54:18   14    copy layout.  And they went ahead and put it in the product

09:54:20   15    anyway.  And we showed you they knew of all of the other

09:54:23   16    patents, as well, and they went ahead and kept infringing

09:54:26   17    anyway.

09:54:26   18         There was some reference to the right to defend

09:54:29   19    themselves, and anybody's wrongfully accused has that

09:54:33   20    right.  And that's certainly true.  But we wrote them in

09:54:35   21    2016, and told them that they infringed.  They didn't write

09:54:38   22    back and say, well, let me show you how we're wrongfully

09:54:42   23    accused.  Let me defend myself now.  Here's why we don't

09:54:46   24    infringe.  Here's why your patent are invalid.  They

09:54:49   25    ignored us.

```
09:54:50   1        And in 2019, when they signed a license in Japan
09:54:53   2   to all of our patents there, they didn't do the same thing
09:54:56   3   and say, well, let me now sit down and show you why we
09:54:58   4   don't infringe in the United States, why your patents are
09:55:01   5   invalid.  They had that right to defend themselves.  They
09:55:04   6   made us come here for them to present that.  They could
09:55:06   7   have done that a lot earlier.
09:55:08   8        On the question of -- on the question of
09:55:11   9   willfulness, then, we would ask that you check "yes" to
09:55:14  10   that question.
09:55:14  11        On the question of damages, you heard that
09:55:23  12   Supercell makes a lot of revenue on these games in the
09:55:29  13   United States, almost $1.2 billion from the three games
09:55:34  14   just in the United States.
09:55:35  15        And you heard GREE's evidence on that.  GREE
09:55:37  16   presented the best evidence that you saw in this trial on
09:55:41  17   damages, showed the features were important, players liked
09:55:44  18   them, they help engagement.
09:55:47  19        Dr. Neal testified to his survey.
09:55:48  20        Dr. Becker presented a detailed economic analysis.
09:55:51  21   He went through all the evidence, crunched a lot of data,
09:55:52  22   and presented precise royalties for each patent, royalties
09:55:56  23   between .7 and 2.4 percent, and a total royalty of between
09:56:04  24   18-and-a-half million and 24-and-a-half million, again,
09:56:06  25   depending for two of the patents on when you find the first
```

09:56:10  1   date the royalty should be begin, whether it's the

09:56:13  2   September 26 letter or whether it's the issue or grant date

09:56:18  3   of the patent.

09:56:18  4        And so those are the royalties that we will ask

09:56:22  5   you to fill in on the verdict form.  You will see -- and

09:56:27  6   I'll move ahead to this.  You will see on the verdict form

09:56:31  7   the question about what sum of money paid in cash would

09:56:34  8   compensate GREE for its -- for damages, and we would ask

09:56:38  9   you to write the larger sum that we presented,

09:56:41  10  $24,666,002.00.

09:56:47  11       Now, another question will be, what is the form of

09:56:50  12  damages?  And that's a question of a lump sum or -- or a

09:56:54  13  running royalty.  And on that question, we would ask that

09:56:57  14  you find a reasonable royalty for past sales.

09:57:01  15       And the reason for that, is that allows Supercell

09:57:05  16  to make a decision.  Are these features really not that

09:57:09  17  valuable as they say?  Because if that's the case, then

09:57:13  18  they can pay us for what they've done.  And they can take

09:57:16  19  them out tomorrow, and they cannot pay another dime.

09:57:20  20       But if they are valuable, then they should keep

09:57:24  21  paying for their use of the features, because these patents

09:57:29  22  don't expire for another 14 years.

09:57:33  23       A lump sum would give Supercell 14 years of free

09:57:36  24  infringement.  And we think the right result is that they

09:57:39  25  pay for what they use.  And if they really don't think the

09:57:42   1   patents are valuable -- or the patented features are

09:57:46   2   valuable, they can take them out of the products tomorrow.

09:57:48   3        You're going to hear from me again following

09:57:53   4   Supercell's argument.  And I will have the chance to

09:57:55   5   address you one more time then and to thank you again for

09:57:58   6   your service.

09:57:59   7        But for right now, thank you for listening to me

09:58:01   8   and for listening to our case throughout this trial.

09:58:06   9        THE COURT:  Thank you, counsel.

09:58:07  10        Defendant may now present its closing argument to

09:58:11  11   the jury.

09:58:12  12        MR. SACKSTEDER:  Thank you, Your Honor.

09:58:13  13        THE COURT:  Mr. Sacksteder, would you like a

09:58:20  14   warning on your time?

09:58:21  15        MR. SACKSTEDER:  I would, Your Honor.  Could you

09:58:24  16   give me a warning at 15 minutes and five minutes.

09:58:26  17        THE COURT:  I will.

09:58:28  18        MR. SACKSTEDER:  Thank you very much.

09:58:29  19        THE COURT:  Please proceed when you're ready.

09:58:31  20        MR. SACKSTEDER:  May it please the Court.

09:58:32  21        Good morning, ladies and gentlemen.  I haven't had

09:58:35  22   the opportunity to speak directly to you before, though I

09:58:40  23   think you've heard me speak to some of the witnesses in

09:58:44  24   this case.

09:58:44  25        My name is Mike Sacksteder.  I grew up in a small

09:58:51  1   town in Southern Indiana, and I have the great honor and

09:58:55  2   privilege to represent Supercell in this case.  And I

09:58:57  3   wanted to, on behalf of myself and my team and Supercell,

09:59:01  4   thank you all very much.  As the Court has said, as the

09:59:03  5   parties have said, your service is essential to making our

09:59:08  6   system work.

09:59:08  7        I did agree with one thing that you just heard, I

09:59:15  8   agree that patents are in the United States Constitution.

09:59:18  9        But you know what else is in the United States

09:59:21  10  Constitution, the right to a jury trial, the right to stand

09:59:25  11  up to a bully if you don't think you need to knuckle under.

09:59:30  12  If you think that you have defenses to their claims,

09:59:35  13  everyone has the absolute right to take those defenses, the

09:59:41  14  defenses that were called excuses by the Plaintiff,

09:59:46  15  defenses to a jury, and have a jury decide them.  And that

09:59:52  16  also is in the United States Constitution, and that is very

09:59:55  17  important.

09:59:55  18        I have a lot to get through, so I'm going to move

10:00:01  19  pretty fast today, and I apologize for that.

10:00:04  20        I want to talk about the experts that you heard

10:00:08  21  from during the trial, and there was some discussion about

10:00:12  22  not hearing about source code.

10:00:14  23        Well, all three of Supercell's technical experts

10:00:16  24  reviewed the source code in this case, so they came and

10:00:20  25  testified that the source code supports exactly what you

10:00:23   1   see on the screen of the phone when the games are

10:00:25   2   operating.

10:00:27   3           And so these three experts provided that

10:00:31   4   testimony, which is what they're here for.

10:00:34   5           I also want to emphasize these are all experts in

10:00:37   6   video games, and indeed in particular areas of video games

10:00:41   7   that are relevant to the patents.  And you heard from all

10:00:44   8   three of them.

10:00:44   9           From GREE, you heard from Dr. Akl.  He has taught

10:00:50  10   some one-week-long summer camps on video games to children,

10:00:56  11   but he doesn't have any professional video game experience

10:00:59  12   in the industry.

10:01:00  13           What he does have experience with is talking to

10:01:05  14   juries.  He's done that in many, many cases, and so that's

10:01:09  15   what he does for a living.  He gets paid by the -- his

10:01:14  16   university, but you heard him testify he got paid more

10:01:17  17   money by GREE this year.

10:01:19  18           And when you consider his testimony, I want you to

10:01:22  19   think about a couple of things.  One, I want you to think

10:01:24  20   about his demeanor on cross-examination.  When I had the

10:01:27  21   opportunity to question him about his theories, he acted

10:01:33  22   differently than he did on direct.  He started acting

10:01:37  23   uncomfortable, and I think that's because he knew that we

10:01:40  24   had caught him in some issues with his testimony.

10:01:43  25           And I also want you to think about the consistency

| | | |
|---|---|---|
| 10:01:46 | 1 | of his testimony because there were places where he said |
| 10:01:49 | 2 | one thing, and, in fact, spent a lot of time on one thing. |
| 10:01:53 | 3 | And then he said, oh, don't pay attention to that when we |
| 10:01:55 | 4 | pointed out the problems with what he was saying, and he |
| 10:01:58 | 5 | changed his story. |
| 10:02:00 | 6 | And that should weigh into your consideration of |
| 10:02:02 | 7 | his testimony. |
| 10:02:02 | 8 | All right.  I'm going to go through |
| 10:02:05 | 9 | non-infringement of each patent followed by validity of |
| 10:02:07 | 10 | each patent, one patent at a time. |
| 10:02:10 | 11 | You heard in opening that you have to have |
| 10:02:12 | 12 | everything in the claim.  I like to say that it takes one |
| 10:02:15 | 13 | needle to pop a balloon when it comes to patent |
| 10:02:19 | 14 | infringement.  And you have to have everything, or there is |
| 10:02:23 | 15 | no infringement, and you heard that in your jury |
| 10:02:27 | 16 | instructions, as well. |
| 10:02:28 | 17 | Let's talk about the '137 and '481 patents first. |
| 10:02:30 | 18 | Those have been called the battle patents, and I think that |
| 10:02:33 | 19 | is a complete mischaracterization.  They don't cover a |
| 10:02:37 | 20 | battle.  They cover a very specific way of determining |
| 10:02:39 | 21 | whether you have enough Elixir or enough mana or enough |
| 10:02:44 | 22 | points to get another card.  And you have to perform |
| 10:02:49 | 23 | exactly that specific method in order to infringe any claim |
| 10:02:52 | 24 | of that patent. |
| 10:02:52 | 25 | This is very important from the jury instructions. |

| | | |
|---|---|---|
| 10:02:56 | 1 | If a particular sequence is required by the claims, the |
| 10:02:59 | 2 | accused products must follow that sequence.  Must, not can. |
| 10:03:06 | 3 | Not, can sometimes and can't sometimes, must.  Selection |
| 10:03:10 | 4 | must precede subtraction, and subtraction must precede |
| 10:03:17 | 5 | addition. |
| 10:03:18 | 6 | And Dr. Akl agreed that if that doesn't happen, |
| 10:03:21 | 7 | there is no infringement of all the asserted claims. |
| 10:03:21 | 8 | So he spent 21 minutes of his original direct |
| 10:03:25 | 9 | testimony walking you through a particular video that he |
| 10:03:29 | 10 | said showed infringement, 21 minutes.  And then we put him |
| 10:03:34 | 11 | on cross-examination, and we took it frame-by-frame, and we |
| 10:03:38 | 12 | showed that it didn't happen.  Remember, selection, |
| 10:03:42 | 13 | subtraction, addition. |
| 10:03:43 | 14 | And you see that in the Elixir bar at the bottom, |
| 10:03:48 | 15 | the Elixir is still going up.  It's at 8 here.  Dr. Akl has |
| 10:03:51 | 16 | already taken his finger completely off the screen, not |
| 10:03:55 | 17 | only has he selected the card from the tray below, he's |
| 10:03:58 | 18 | played it in the screen, and he's taken his finger off. |
| 10:04:01 | 19 | The Elixir is still going up.  Selection, addition, |
| 10:04:05 | 20 | subtraction.  Not selection, subtraction, addition. |
| 10:04:08 | 21 | And, finally, it even goes up to 9, it goes up the |
| 10:04:12 | 22 | next full number on the Elixir bar, and it's still adding. |
| 10:04:18 | 23 | So it finally subtracts after that, but it's the wrong |
| 10:04:21 | 24 | sequence, and he admitted that in his testimony. |
| 10:04:23 | 25 | And he said about this video that it was to |

10:04:32  1  explicitly show the sequence of how things happen in the

10:04:35  2  game, the sequence, explicitly show it.  He spent 21

10:04:40  3  minutes on it.  He said, yes.  Then he saw that he had a

10:04:44  4  problem with it.

10:04:46  5        So he went and said, oh, wait, the source code

10:04:48  6  doesn't do that.  But -- but Mr. Friedman showed you that,

10:04:54  7  yes, the source code does do that, and he walked through

10:04:57  8  it.  I'm not going to have time to go through the complete

10:05:00  9  loop here, but he walked through and showed, well, because

10:05:02 10  the system is waiting for messages to be 20 ticks old that

10:05:07 11  addition keeps happening before the subtraction happens.

10:05:09 12        And Dr. Akl then said, oh, wait, that is only a

10:05:13 13  timer; that's not actually adding Elixir.  He hadn't said

10:05:16 14  that to you before, but he's wrong.  And there's a problem

10:05:19 15  with that testimony, as well, and we'll point that out.

10:05:22 16        So you have this period of time where you have

10:05:24 17  selection, then there's a bunch of addition, and then

10:05:28 18  there's subtraction, and that means that the claim is not

10:05:30 19  satisfied.

10:05:31 20        So when he's talking about -- he tried to

10:05:35 21  rehabilitate himself by saying, well, this is just a timer,

10:05:38 22  and he looked at the source code.  And he was asked by

10:05:41 23  counsel for GREE:  Is this related to the selection

10:05:46 24  process?  And he said:  Yes, this is where you actually --

10:05:51 25  key word "deploy" the card, and it's being used, meaning

10:05:54  1  you put it in the field.  Not when you select it out of the

10:05:56  2  tray.

10:05:56  3       And he admitted when I cross-examined him that

10:06:03  4  selecting and deploying are two different things, and he

10:06:05  5  relied on the source code for deploying, not the source

10:06:07  6  code for selecting.  So he doesn't have evidence to support

10:06:10  7  his position, and it isn't there.

10:06:12  8       Again, particular sequence required by the claims,

10:06:20  9  and he says elsewhere:  Selection has not been completed at

10:06:24  10  this point, and the card is removed from the hand of cards

10:06:27  11  at this point.  So there's also another sequence that is

10:06:30  12  selection and then removal.  He says that selection has not

10:06:36  13  been completed before removal.  So it has to be one way or

10:06:40  14  the other, and either way there's no infringement.

10:06:42  15       I'm not going to have a lot of time to go through

10:06:45  16  invalidity.  Mr. Friedman talked about the game Magic which

10:06:49  17  was available in the 1990s.  He talked about the game

10:06:53  18  BattleForge, which was available in the 2000s, before 2010,

10:06:59  19  and he combined them where he needed to.  If there were

10:07:02  20  issues raised by GREE with this, he -- he combined them and

10:07:05  21  showed that it would be obvious to practice the claimed

10:07:08  22  invention.

10:07:09  23       And the videos that we've seen, there's been some

10:07:11  24  complaint about the videos, but those are prior art

10:07:17  25  publications, just like anything else.

10:07:20  1          And one other thing that is not relevant and you

10:07:23  2    heard a lot of from GREE, is that, oh, Supercell didn't do

10:07:27  3    this or GREE didn't do this or the expert wasn't aware of

10:07:30  4    it.  None of that matters.  It has to have been available

10:07:33  5    to the public.  And if it was on a YouTube channel, for

10:07:36  6    instance, it was available to the public.

10:07:37  7          Moving on to the '655 patent.  First, you heard

10:07:43  8    late Friday from the inventor on the '655 patent, and he's

10:07:46  9    the only inventor.  And, remember, at the beginning of the

10:07:51  10   trial, you were told that these were technologies that

10:07:55  11   added to the enhancement of the video games.

10:07:57  12         This inventor had no technical background

10:07:59  13   whatsoever, and he didn't really know how a server even

10:08:04  14   works, didn't know how a computer stores data.  His

10:08:09  15   invention is not technology, ladies and gentlemen.

10:08:14  16         Non-infringement of the '655 patent.  The claim

10:08:19  17   requirement is that there has to be display data for

10:08:22  18   selecting a first object from the possessed objects

10:08:26  19   possessed by the first user and selecting a second user

10:08:30  20   from the plurality of users.

10:08:31  21         And Dr. Zagal took you through this where you have

10:08:36  22   a donating user who has no choice.  And Dr. Akl admitted

10:08:40  23   this, too.  If somebody has requested a card, you don't get

10:08:43  24   to pick the card to give to the person, which is what the

10:08:45  25   claim is talking about.  You just have to pick the person,

10:08:50   1   and their response to this is, well, it's -- you're picking

10:08:53   2   the person, so you're picking the card, too.  But that's

10:08:56   3   not right.  It says you pick a user and you pick an object.

10:08:59   4        Here they are picking a user, but they have no

10:09:04   5   choice whatsoever what card to give to the second user.

10:09:10   6        The other issue with infringement here is that --

10:09:18   7   looking at Claim 7f, the second object is granted when the

10:09:24   8   transfer information of the second user satisfies the

10:09:27   9   condition.  And the condition is you get -- you know, I

10:09:30  10   think sometimes it said you need to get 800 cards before

10:09:33  11   you can get an upgrade -- an opportunity to upgrade the

10:09:38  12   card.

10:09:38  13        But all you get is the opportunity, and you have

10:09:40  14   to pay gold.  And if you don't have any, you have to

10:09:43  15   acquire some in order to have this be even a possibility.

10:09:48  16   So it doesn't happen when, which is what the claim says,

10:09:53  17   the condition is satisfied.

10:09:55  18        A lot of people played FarmVille.  Nobody is

10:10:00  19   saying that that is not a well-known game.  And it has, as

10:10:04  20   you heard from Dr. Zagal, the same process.

10:10:07  21        And this on the -- on the right-hand side is

10:10:11  22   actually what the named inventor on the patent said.  This

10:10:14  23   is my invention.  You have somebody that buys a gift, gives

10:10:17  24   it to somebody else.  And if it satisfies a condition, then

10:10:20  25   the somebody else, the recipient, gets something in

| | | |
|---|---|---|
| 10:10:25 | 1 | addition to that.  And that's it.  You know, that's what he |
| 10:10:27 | 2 | disclosed.  That's what FarmVille did.  And FarmVille did |
| 10:10:30 | 3 | also everything else that the patent lawyers later put into |
| 10:10:33 | 4 | the patent claims. |
| 10:10:33 | 5 | And Dr. Zagal walked you through that process. |
| 10:10:40 | 6 | The '873 patent, the aim and shoot patent -- first |
| 10:10:48 | 7 | of all, I would like to mention Shelly.  Shelly is the |
| 10:10:52 | 8 | first brawler. |
| 10:10:53 | 9 | You just heard an assertion that other brawlers |
| 10:10:58 | 10 | also operate in the same way that Shelly does.  There was |
| 10:11:01 | 11 | no evidence -- you didn't hear anything from the witness |
| 10:11:04 | 12 | stand.  You didn't see any documents that said, oh, yeah, |
| 10:11:08 | 13 | there are other -- other brawlers that operate that way. |
| 10:11:10 | 14 | So they have 1 out of 38 brawlers that they are accusing of |
| 10:11:16 | 15 | infringement.  And Shelly does not infringe. |
| 10:11:18 | 16 | And here's why.  And -- and this came up |
| 10:11:25 | 17 | yesterday.  This was in Dr. Akl's direct testimony and his |
| 10:11:28 | 18 | cross-examination.  The patent requires that the -- the -- |
| 10:11:42 | 19 | that the frame is displayed in response to and based on the |
| 10:11:48 | 20 | position of the first touch operation. |
| 10:11:51 | 21 | And Dr. Akl testified both in direct and on cross, |
| 10:11:54 | 22 | and I confirmed it on cross because I was surprised he said |
| 10:11:57 | 23 | it, one of the things he said was that when you move your |
| 10:12:00 | 24 | thumb in a particular direction, then the cone appears in |
| 10:12:06 | 25 | that direction.  Did I hear you right? |

| | | |
|---|---|---|
| 10:12:08 | 1 | Answer:  Yes. |
| 10:12:09 | 2 | Well, the reason that matters is that Dr. Zagal |
| 10:12:12 | 3 | said:  Well, position and direction in computer science are |
| 10:12:15 | 4 | two different things, and it has to be based on the |
| 10:12:18 | 5 | position of the first touch operation and not on the |
| 10:12:21 | 6 | direction. |
| 10:12:21 | 7 | And Dr. Akl admitted that it was based on the |
| 10:12:25 | 8 | direction, not the position.  So there can't be any |
| 10:12:29 | 9 | infringement. |
| 10:12:29 | 10 | The other issue is that when you touch the screen, |
| 10:12:32 | 11 | you don't even see the frame.  There has to be two |
| 10:12:35 | 12 | operations, a first and a second operation, before you even |
| 10:12:38 | 13 | see the cone that is supposed to be the frame in this case. |
| 10:12:42 | 14 | And then a third one, taking your finger off the |
| 10:12:44 | 15 | screen in order to file -- in order to fire. |
| 10:12:48 | 16 | So there was some discussion just now about |
| 10:12:54 | 17 | showing the -- the rifle scope, the target circles in the |
| 10:13:02 | 18 | '873 patent.  But those show -- and I agree that -- that |
| 10:13:06 | 19 | the claims are what's important, but those show an |
| 10:13:11 | 20 | embodiment of the claims.  So this is at least what the |
| 10:13:14 | 21 | '873 patent says that it covers. |
| 10:13:16 | 22 | When you have a frame indicative of a shooting |
| 10:13:19 | 23 | effective range, the patent says that frame is this target |
| 10:13:23 | 24 | circle.  It is this rifle scope that probably many people |
| 10:13:31 | 25 | who have hunted have seen a rifle scope before.  And we've |

10:13:34  1   also seen it in these two games, Sniper vs. Sniper and Call

10:13:40  2   of Mini Sniper.

10:13:40  3         And the specific way that that scope is displayed

10:13:42  4   in those two prior art games and the specific way that the

10:13:48  5   shooting is done in those prior art games is exactly what

10:13:50  6   is claimed in the patent.

10:13:52  7         The thing that they say is missing is the server

10:13:58  8   apparatus to control to attack.

10:14:01  9         And so Dr. Zagal showed you the Sakurai patent.

10:14:07  10  And the Sakurai patent says:  Well, you want to do this.

10:14:09  11  You want to have the control for things like this on the

10:14:12  12  server.

10:14:14  13        And so if a person of ordinary skill in the art

10:14:16  14  had both the game and wanted to make this a game over the

10:14:21  15  Internet and it had the Sakurai, which was concerned about

10:14:25  16  people hacking the game and cheating in the game, it would

10:14:28  17  have been obvious for those two to be combined.

10:14:33  18        And you got a little misdirection here with the

10:14:37  19  Sakurai patent because the Sakurai patent was actually

10:14:41  20  considered by the Patent Office in the prosecution of the

10:14:44  21  '873 patent.  It's the only prior art reference that you

10:14:47  22  heard about that was considered by the Patent Office in any

10:14:51  23  of these.

10:14:51  24        And this one, remember, we're just using it for

10:14:55  25  (d) down below.  It isn't the heart of the claim.  It isn't

10:14:58   1   the shooting effective range.  It isn't the frame.  It

10:15:04   2   isn't the touch operations.  It's just doing this on a

10:15:06   3   server.

10:15:07   4          And, of course, if the Patent Office considered

10:15:09   5   the Sakurai patent and they didn't have the games, they

10:15:14   6   wouldn't have anything to combine it with.  And so it's --

10:15:18   7   it means nothing that the Sakurai patent was considered

10:15:21   8   because the games that are actually the heart of the claims

10:15:23   9   were not.

10:15:24  10          Moving on to the '594 patent.  So the issue here

10:15:36  11   is that the claim that is asserted is Claim 2.  Claim 2 is

10:15:44  12   asserted only against the copy layout feature of Clash of

10:15:49  13   Clans.

10:15:50  14          In the copy layout feature, you go to another

10:15:53  15   player's layout and you copy that layout, and then

10:15:57  16   according to everyone -- according to Dr. Akl, according to

10:16:00  17   the survey expert of GREE, the way that you actually apply

10:16:07  18   that layout is to set it as active.  And that does not

10:16:14  19   happen.  Dr. Akl admitted that.

10:16:15  20          So what happens instead is you go in -- when you

10:16:20  21   borrow somebody's layout, you go into village edit mode

10:16:24  22   because you have all these conflicts between your layout

10:16:27  23   and the layout that you're borrowing.

10:16:30  24          And when that happens, you can't set it as active

10:16:35  25   until you've fixed all this.  And when you fix it, the

10:16:39  1  other thing in the claim is that the layout that you copied

10:16:42  2  has to be related to the other player.

10:16:44  3       And Dr. Akl said:  Well, it's not really.  It's

10:16:46  4  not really related to the other player -- or he came pretty

10:16:53  5  close to that.

10:16:53  6       And this is where you heard in the jury

10:16:55  7  instructions that the words of the claims matter.

10:16:59  8       And I asked Dr. Akl:  Well, if you change the

10:17:02  9  buildings around -- he said:  Well, yes, now I've made it

10:17:07 10  my own layout.

10:17:07 11       And I said:  Well, it's not related to the other

10:17:10 12  player anymore.

10:17:11 13       And he said:  I don't know.

10:17:13 14       They have the burden of proof.  I don't know.  And

10:17:16 15  then -- then I said:  You don't have an opinion about that?

10:17:19 16       And he said:  I don't know if we're arguing

10:17:21 17  semantics.

10:17:24 18       This is not semantics.  This is the heart of

10:17:27 19  determining whether a patent is infringed, and Dr. Akl

10:17:30 20  didn't know.

10:17:32 21       Again, he said:  I'm not sure.  I'm not sure.

10:17:35 22       You heard about indirect infringement.  A couple

10:17:44 23  of things.  There cannot be indirect infringement unless

10:17:48 24  there was an underlying act of direct infringement.  So for

10:17:54 25  all of these patents, there is no underlying act of direct

| | | |
|---|---|---|
| 10:17:56 | 1 | infringement, so there cannot be any indirect infringement |
| 10:18:00 | 2 | either. |
| 10:18:00 | 3 | Also, there has to be evidence that Supercell |
| 10:18:03 | 4 | actually intended for there to be infringement by somebody |
| 10:18:07 | 5 | else and knew of the patents at the time.  And I don't |
| 10:18:13 | 6 | think they have proven any of that. |
| 10:18:15 | 7 | Okay.  The reason -- this section on damages is |
| 10:18:27 | 8 | entitled Lack of Damages for a reason.  In our view, there |
| 10:18:33 | 9 | are no damages.  If you don't infringe, if there is a |
| 10:18:37 | 10 | patent that is invalid, you don't owe damages for that |
| 10:18:40 | 11 | patent. |
| 10:18:41 | 12 | And we've told you why Supercell does not |
| 10:18:45 | 13 | infringe.  We've told you why the patents are not valid. |
| 10:18:49 | 14 | So you don't need to get to the issue of damages if you |
| 10:18:54 | 15 | agree with Supercell that there's no infringement or that |
| 10:18:58 | 16 | the patents are invalid. |
| 10:18:59 | 17 | But we have to talk about it because GREE is |
| 10:19:04 | 18 | talking about it, and you may have noticed they're asking |
| 10:19:06 | 19 | for quite a bit of money. |
| 10:19:09 | 20 | So the place to start in analyzing damages, |
| 10:19:14 | 21 | according to GREE's damages expert, Dr. Becker, is with |
| 10:19:18 | 22 | technology in the lawsuit that has already been licensed. |
| 10:19:23 | 23 | He says that it's the first question you should |
| 10:19:26 | 24 | ask in performing this analysis. |
| 10:19:29 | 25 | And we provided real-world licensing evidence; |

1432

10:19:38   1   three licenses with Thompson Licensing, and then the

10:19:42   2   licensing agreement in Japan between GREE and Supercell.

10:19:45   3   All of those, you'll note on the right, are for

10:19:53   4   lump sums.  They're not for running royalties.  That's the

10:19:56   5   way that in this industry it is typically done, and that's

10:19:59   6   the way that it was consistently done by Supercell and the

10:20:02   7   way it was done by Supercell and GREE when they negotiated

10:20:05   8   a license.

10:20:08   9   So, again, the GREE/Supercell license in Japan was

10:20:14  10   for a lump sum.  It was for 1,079 patents and patent

10:20:22  11   applications, not the five that are asserted here.  It's

10:20:26  12   for $4.5 million for that license, a perpetual license.  It

10:20:32  13   doesn't matter if the patents doesn't expire in -- until

10:20:37  14   2034.  It's for that whole period of time.  It's a lump

10:20:40  15   sum.  And GREE gave Supercell a license to those patents in

10:20:45  16   Japan for $4.5 million for more than a thousand patents.

10:20:49  17   So we heard some evidence about what Supercell

10:20:58  18   thought, for instance, the copy layout feature might --

10:21:02  19   what impact it might have on the game.  But then we heard

10:21:05  20   evidence from two different surveys, surveys that were

10:21:08  21   performed one on behalf of GREE and one on behalf of

10:21:12  22   Supercell by survey experts who testified about surveying

10:21:19  23   game players and what kind of impact that would have had.

10:21:22  24   And Dr. Becker relied on Dr. Neal's survey, but he

10:21:30  25   only relied on half of it.  He ignored the part that didn't

1433

10:21:34  1  support his position.  He just threw it away and said:

10:21:37  2  Here's the good half that I want to rely on.  And the other

10:21:40  3  half, he threw it in the trash.  He didn't use it at all.

10:21:45  4        And Dr. Becker said, for instance, that for

10:21:49  5  certain patents, the value that he determined based on the

10:21:54  6  survey, which is actual users after the feature is in the

10:21:57  7  product, the value for that survey would have been zero,

10:22:01  8  nothing.  Not surprising in light of the evidence.

10:22:07  9        And the attempt to rebut that that you hear from

10:22:20 10  GREE is, well, in Dr. Neal's survey, he said you would

10:22:23 11  play -- you know, he asked whether you would play more or

10:22:27 12  you would play less if the feature weren't in the game.

10:22:30 13  And a lot of people said:  Yeah, I'd play more if that

10:22:33 14  feature weren't in the game.

10:22:35 15        And Dr. Becker looked at that and assumed that

10:22:37 16  meant they would play more because they would have to spend

10:22:40 17  more time setting up their layout or something like that.

10:22:43 18  But that's not consistent with Dr. Klein's results.

10:22:47 19        In fact, Dr. Klein's results and Dr. Neal's

10:22:50 20  results came out very similarly, but Dr. Klein asked a

10:22:53 21  different question.  And he asked how much it would

10:22:57 22  increase or decrease the player's interest if the feature

10:23:02 23  were taken out of the -- of the game.

10:23:07 24        And he found that it would increase -- in fact, a

10:23:13 25  net positive increase in interest, for instance, for the

10:23:17  1   copy layout function if it were removed from the game.

10:23:22  2         So that's not, you know, this grinding stuff you

10:23:26  3   heard before.  That's people saying, you know what, I'd --

10:23:29  4   I'd happy if that happened.  I would like it if this

10:23:32  5   feature that GREE says is covered by its patent wasn't

10:23:35  6   there.  And more people said that than didn't.

10:23:37  7         And so, really, Dr. Neal's evidence, the part that

10:23:44  8   was ignored by Dr. Becker when GREE calculated its damages,

10:23:47  9   that was exactly consistent with that.  They were saying we

10:23:49  10  would play more if the feature weren't there because our

10:23:53  11  interest would be increased.

10:23:55  12        THE COURT:  15 minutes remaining.

10:23:58  13        MR. SACKSTEDER:  Thank you, Your Honor.

10:23:59  14        So here is the calculation that Dr. Becker did,

10:24:04  15  for instance, for the '594 patent.  And he actually figured

10:24:08  16  that the net -- if you look at that line that says net

10:24:12  17  overall reduction to player playing time in the game, it's

10:24:17  18  actually a negative, but that actually means you would play

10:24:19  19  more.  So there would be a negative reduction.  So people

10:24:22  20  would play the game more if copy layout weren't in the

10:24:24  21  game.

10:24:24  22        And it's supported by Dr. Klein's survey which

10:24:29  23  says people would have higher interest in the game if the

10:24:32  24  feature weren't there.

10:24:32  25        So the incremental revenue, that's the amount of

10:24:36  1   money that you would make if the feature weren't in the

10:24:39  2   game or that is attributed to the feature being in the game

10:24:42  3   is negative .01 percent.  So it's a little bit -- you'd

10:24:49  4   lose a little money if you had the feature in the game

10:24:55  5   versus not having it in the game.

10:24:55  6        Again, Dr. Neal's evidence when Dr. Becker

10:25:00  7   considered it, came out to a goose egg, came out to

10:25:04  8   nothing, zero.  And Dr. Becker didn't rely on that part.

10:25:09  9   He swept it under the rug.

10:25:12  10        Another thing that Dr. Becker did that was

10:25:16  11   inconsistent with the way surveys are normally used, and

10:25:20  12   Dr. Neal said this himself, is that he didn't have any

10:25:25  13   survey data for the '873 patent or for the '137 or the '481

10:25:30  14   patent, and, you know, sometimes you can't survey that, and

10:25:33  15   Dr. Klein said, well, I couldn't survey the '137 patent

10:25:36  16   because if you changed it so it didn't even get alleged to

10:25:40  17   be infringed, nobody would even notice.  It'd be such a

10:25:45  18   small change to the game that it wouldn't matter at all.

10:25:48  19        But Dr. Becker, instead of doing that, he took

10:25:52  20   surveys for the '655 patent, completely different feature.

10:25:57  21   You know, card donation upgrades when you get to -- you

10:26:00  22   know, when you get a certain level of cards in your deck

10:26:04  23   versus a target on the screen or versus the way that you

10:26:10  24   sort of measure the points that you need to play a card.

10:26:16  25   Completely different.  And he came up with different

10:26:19  1  royalty numbers for each one.

10:26:20  2      But he -- he tried to bootstrap that survey that

10:26:23  3  Dr. Neal did do on the '655 patent and apply it to patents

10:26:28  4  that were for different features, and for the '873 patent,

10:26:32  5  a different game.

10:26:34  6      That is not the kind of methodology that is

10:26:39  7  accepted in the industry, and you heard Dr. Neal himself

10:26:43  8  agree to that.

10:26:43  9      Now, there's been from GREE from time to time

10:26:56  10  discussion about the evidence that shows that GREE itself

10:26:59  11  was not using its patents, or when they tried to use them

10:27:02  12  in their games, the games were unsuccessful.

10:27:05  13      We are not asserting -- and Supercell is not

10:27:08  14  asserting that that has anything to do with whether the

10:27:11  15  patents are infringed or not.  We're just saying if these

10:27:15  16  patents are so valuable to games, how come you didn't put

10:27:18  17  them in your own games?  If these patents are so valuable

10:27:22  18  to games, how come when you did put them in your own games,

10:27:26  19  the games flopped?

10:27:28  20      That indicates, you heard, the value of the

10:27:32  21  accused feature compared to the rest of the game.  And,

10:27:35  22  here, they have these inventions that they have patents on,

10:27:40  23  and those inventions when they were put in games, the games

10:27:44  24  didn't succeed.  And often, they weren't even put in the

10:27:46  25  games.

10:27:47  1          A very wise person once told me that some of the

10:27:54  2   most important evidence in a trial is the evidence you

10:28:00  3   didn't hear.

10:28:02  4          We heard from Andrew Sheppard.  He was the chief

10:28:06  5   executive officer of the GREE U.S. subsidiary, and he had

10:28:13  6   to make a difficult decision in 2017.  He had to decide to

10:28:16  7   shut down the company and recommend that to GREE in Japan.

10:28:20  8          And you would think if anybody who had to do that,

10:28:23  9   and basically lost his job, if he thought it was

10:28:26  10  Supercell's fault, if he thought that Supercell had

10:28:30  11  somehow, you know, infringed patents and driven them out of

10:28:33  12  business or anything like that, he would have said it.

10:28:37  13         He didn't say that at all.  You know what he said?

10:28:40  14  He said that Clash of Clans from Supercell was already a

10:28:46  15  successful game long before any of these issues came up.

10:28:50  16  You know, it was successful a couple years before he joined

10:28:53  17  GREE, and it was successful the whole time he was there,

10:28:56  18  long before copy layout was even added to the game.

10:29:00  19         And that indicates the value of the rest of the

10:29:04  20  game compared to this feature that people didn't really

10:29:10  21  want in the game any more than they wanted it out of the

10:29:12  22  game, and he said it over and over.  You know, he said he

10:29:21  23  was very complimentary about Supercell and about Clash of

10:29:26  24  Clans, and he testified truthfully about that.

10:29:31  25         Talked about Clash of Clans having a strong

10:29:32  1    internally-created IP.

10:29:36  2              Yes, definitely Clash of Clans is strong.

10:29:39  3              Said the same thing about Clash Royale.

10:29:41  4              So you can also learn a lot from a company's own

10:29:48  5    documents and what they did.  And GREE admired Clash of

10:29:54  6    Clans long before the copy layout feature was added, long

10:29:58  7    before the patent that they're asserting came about.

10:30:03  8              So here's a document from 2012 from a GREE

10:30:11  9    employee saying:  My biggest concern is that CoC, Clash of

10:30:13  10   Clans, is a very, very well-done game from a game design

10:30:19  11   perspective.

10:30:19  12             Mr. Araki testified about DX-200, the document

10:30:22  13   that has Clash of Clans and GREE's Tenmega game, has their

10:30:31  14   characters side-by-side, and he testified that that

10:30:34  15   document came from Mr. Eda who's the named inventor on the

10:30:38  16   '594 patent.

10:30:38  17             GREE was looking at Clash of Clans long before,

10:30:50  18   doing exercises.  Each specification other than that must

10:30:53  19   be compliant to the latest Clash of Clans.

10:30:55  20             They were attending industry conferences and being

10:30:59  21   startled by how well Clash of Clans was doing.  This was

10:31:02  22   before this patent ever issued.

10:31:04  23             This document from 2015 talks about a member of

10:31:11  24   the team working on a deep-dive analysis on metastructure

10:31:17  25   on Clash of Clans and mentioned that he had analyzed it in

10:31:20  1   the past.

10:31:20  2          All right.  We are almost to the end.  There are a

10:31:24  3   couple other issues.  There were discussions about notice

10:31:27  4   that was provided to Supercell and whether Supercell

10:31:29  5   negotiated with GREE.

10:31:31  6          You've also seen a settlement agreement between

10:31:36  7   GREE and Supercell in Japan.  And I think it's reasonable

10:31:44  8   to infer that that settlement agreement resulted from some

10:31:47  9   negotiation.

10:31:47  10         Now, that settlement agreement actually happened

10:31:51  11  when GREE had sued Supercell more than 30 times in Japan in

10:32:00  12  GREE's home court, and most importantly in GREE's home

10:32:03  13  court without a jury, right?  There was no jury trial on

10:32:09  14  patent cases in Japan.  And so Supercell and GREE

10:32:12  15  negotiated that agreement, again, for 1,079 patents and

10:32:18  16  patent applications for $4.5 million.

10:32:22  17         Counsel walked you through the verdict form, and I

10:32:25  18  want to take you through that, as well.

10:32:27  19         Supercell believes it has proven -- not only

10:32:31  20  proven that it doesn't infringe but has certainly shown

10:32:35  21  that GREE can't prove it, that Supercell does infringe any

10:32:39  22  claim of the asserted patents.

10:32:41  23         We walked through all five of those patents and

10:32:45  24  showed you that one pinprick that pops the balloon, and

10:32:49  25  sometimes more than one, that not all the claim elements

1440

10:32:53  1   are there in these limited patents, and so there can't be

10:32:57  2   any infringement.  And if you find that, we'd like you to

10:32:59  3   check "no" on Question 1.

10:33:01  4        Supercell's experts have also walked you through

10:33:04  5   in great detail why the claims of each patent -- the

10:33:07  6   asserted claims of each patent are invalid.  And we'd like

10:33:14  7   you on Question 2 to write in "yes" on each of those.

10:33:17  8        There's a question about whether Supercell

10:33:21  9   willfully infringed on the patents.  Again, Supercell

10:33:23  10  received a letter that identified a bunch of Japanese

10:33:26  11  patents in 2016.  There was negotiation that led to an

10:33:33  12  agreement in 2019.  And so I don't think there's been any

10:33:38  13  proof, even if you find infringement, that any infringement

10:33:42  14  was willful.  Supercell believed it had the right to take

10:33:45  15  this case to you, and it followed that process which the

10:33:50  16  Constitution guarantees.

10:33:51  17        THE COURT:  Five minutes remaining.

10:33:53  18        MR. SACKSTEDER:  Thank you, Your Honor.

10:33:54  19        So even if that -- you know, even if you find

10:33:56  20  infringement of any of the claims of the patent, which we

10:33:58  21  think you shouldn't, there was certainly no willful

10:34:00  22  infringement.  And if you find no infringement, obviously

10:34:04  23  there can't be any willful infringement.

10:34:06  24        Question No. 4A, we hope you will leave it blank

10:34:12  25  because there's no infringement, the patents are invalid.

10:34:15  1        And if that's the case, then they get nothing.

10:34:21  2    They don't deserve anything.  So we don't think there are

10:34:24  3    any damages for any amount in this case.

10:34:27  4        You've heard the evidence regarding the existing

10:34:31  5    license.  I'm not going to do the math for you, but there

10:34:34  6    are -- you know, it's pretty easy to do.

10:34:37  7        You've heard the evidence from Mr. Bakewell about

10:34:40  8    the value or lack thereof of the patents compared to the

10:34:43  9    rest of the games.  And so if you do find infringement of

10:34:46  10   any valid claims, then we leave it in your hands.  That's

10:34:52  11   the way the system works.  But we think that you should

10:34:55  12   leave this question blank.

10:34:56  13       Question 4B, again, if you do find any damages, it

10:35:01  14   should be a lump sum.  You saw that every single license

10:35:05  15   that's relevant to this case has been a lump sum license.

10:35:08  16   That's the way they do it in this industry, and that's what

10:35:11  17   we ask you to do if you reach that point.

10:35:13  18       Again, we really thank you for this opportunity.

10:35:20  19   Supercell is relying on the jury system that's guaranteed

10:35:25  20   by the Constitution of this country, and we've seen the

10:35:29  21   attention that the jury has approached this case with, and

10:35:34  22   we leave the case now in your hands.

10:35:36  23       Thank you very much.

10:35:38  24       THE COURT:  That completes Defendant's closing

10:35:43  25   argument.

| 10:35:43 | 1 | Plaintiff may now present its final closing |
| 10:35:46 | 2 | argument. |
| 10:35:48 | 3 | You have 17 minutes and 10 seconds remaining, |
| 10:35:51 | 4 | Mr. Moore. |
| 10:35:51 | 5 | MR. MOORE:  Thank you, Your Honor. |
| 10:35:52 | 6 | THE COURT:  Would you like a warning on your final |
| 10:35:54 | 7 | argument? |
| 10:35:54 | 8 | MR. MOORE:  Yes, sir.  Would you mind giving me |
| 10:35:57 | 9 | five minutes and one minute? |
| 10:35:59 | 10 | THE COURT:  I will. |
| 10:36:00 | 11 | MR. MOORE:  Thank you. |
| 10:36:18 | 12 | THE COURT:  You may proceed. |
| 10:36:19 | 13 | MR. MOORE:  Thank you, Your Honor. |
| 10:36:20 | 14 | Ladies and gentlemen, I was hoping that |
| 10:36:35 | 15 | Mr. Sacksteder would focus more on what matters and not |
| 10:36:38 | 16 | more of the same. |
| 10:36:39 | 17 | Could we please go to Slide 47? |
| 10:36:43 | 18 | Because they've added some additional excuses to |
| 10:36:49 | 19 | the excuse sign that I showed you in the opening. |
| 10:36:51 | 20 | On the question of infringement, he just played a |
| 10:36:53 | 21 | lot of word games with you.  He pointed to the wheels on |
| 10:36:57 | 22 | their table, things like Shelly the brawler, the fact that |
| 10:37:01 | 23 | that's the only brawler that people start with, the Future |
| 10:37:05 | 24 | Play issue, all the other issues I already covered. |
| 10:37:08 | 25 | And, you know, as -- as someone in his position |

10:37:11  1   would do, he spent a lot of time criticizing Dr. Akl.

10:37:15  2          You heard Dr. Akl say in -- his deposition that

10:37:19  3   Mr. Sacksteder took was 15 hours long, and I told you he

10:37:22  4   spent five hours on the stand.  And as you heard yourself,

10:37:25  5   he has a tendency to speak quickly.  So that's 20 hours of

10:37:30  6   testimony.  A lot of words.

10:37:32  7          They've got a lot of people there who go through

10:37:34  8   all those transcripts and try to figure out, is there a

10:37:38  9   statement that he said that he's not quite as accurate as

10:37:38  10  he could be that we could then throw it up on a few slides

10:37:38  11  and show it to you?

10:37:39  12         But you heard the entirety of his testimony.  You

10:37:43  13  heard the thorough analysis he did, and you shouldn't let

10:37:45  14  the sound bites distract you that you just saw.

10:37:51  15         We also even saw a criticism of GREE's own

10:37:58  16  inventor, Mr. Takeuchi, that somehow his patent is not

10:37:58  17  worthy because he studied fashion design instead of

10:37:58  18  computer networking.

10:38:01  19         Well, there's no rule in the Constitution or the

10:38:03  20  patent laws that you have to have any particular

10:38:06  21  educational background to be an inventor of a patent.  You

10:38:09  22  don't have to be a Ph.D.  You can have any de -- any

10:38:13  23  background if you have a good idea.  But that's the type of

10:38:17  24  arguments that they're making because they know that they

10:38:19  25  infringe.

| | | |
|--|--|--|
| 10:38:19 | 1 | And they also make a lot of arguments about the |
| 10:38:27 | 2 | damages issues, and I want to go back to what their own |
| 10:38:29 | 3 | damages expert said.  And that's Mr. Bakewell, who is |
| 10:38:35 | 4 | the -- you saw yesterday. |
| 10:38:36 | 5 | He said that the damages in this case are |
| 10:38:40 | 6 | de minimis.  And I went and looked that up last night.  And |
| 10:38:45 | 7 | here's one definition, too trivial or minor to merit |
| 10:38:48 | 8 | consideration. |
| 10:38:50 | 9 | He's essentially saying we've just wasted our |
| 10:38:53 | 10 | time.  We've wasted all of your time being here for a whole |
| 10:38:58 | 11 | week on this case because it's trivial.  We never should |
| 10:39:01 | 12 | have been here to begin with. |
| 10:39:03 | 13 | But Mr. Bakewell didn't actually present you any |
| 10:39:06 | 14 | financial analysis.  He didn't do any economic analysis |
| 10:39:10 | 15 | like Dr. Becker did.  He didn't crunch any numbers.  You |
| 10:39:15 | 16 | recall Dr. Becker crunched million of lines of user data |
| 10:39:21 | 17 | and other financial data and then performed a number of |
| 10:39:23 | 18 | calculations taking all of that into account. |
| 10:39:25 | 19 | Mr. Bakewell didn't do any of that.  He didn't |
| 10:39:28 | 20 | discuss any internal Supercell documents showing how |
| 10:39:32 | 21 | valuable these features are to Supercell.  And he didn't |
| 10:39:35 | 22 | present a precise number to you as an alternative for you |
| 10:39:39 | 23 | to consider, besides the only economic analysis data in the |
| 10:39:42 | 24 | record. |
| 10:39:42 | 25 | But he did say that Supercell paid him |

10:39:45  1   $400,000.00, and it did that for him to deliver these

10:39:50  2   talking points.

10:39:51  3          And one of the talking points he said, and you

10:39:53  4   just heard it from Supercell's counsel, is that somehow

10:39:57  5   some of these features would be better -- the games would

10:40:00  6   be better off without them.

10:40:02  7          The way they spinning -- they're spinning the

10:40:05  8   data, the survey shows that if you take copy layout out,

10:40:08  9   more players would -- would play it.  And if you change the

10:40:12  10  design of the shooting cone in Brawl Stars, more players

10:40:15  11  would pay it.

10:40:16  12         Now, Supercell paid Mr. Bakewell 400,000, and I

10:40:21  13  don't know how much they paid Mr. Klein, but they paid a

10:40:23  14  lot of money for these people to tell them that.

10:40:26  15         Now, forget about this lawsuit.  If you paid

10:40:28  16  somebody $400,000.00 to tell you how you could make your

10:40:28  17  product better, how you could get more people to play it,

10:40:34  18  and, therefore, earn more revenue, wouldn't you do it?  But

10:40:37  19  have they done it?  No.

10:40:39  20         They haven't made a single change.  Copy layout is

10:40:41  21  still in the game.  The Brawl Stars cone hasn't changed.

10:40:44  22  None of the other changes they've mentioned have happened

10:40:47  23  either.  These are just excuses.  This is not real

10:40:51  24  analysis.  This is just an excuse and spinning the data

10:40:53  25  without telling you the whole story.

10:40:55  1          Dr. Becker explained how he treated the data the

10:40:59  2  players using -- using the copy -- without the copy layout

10:41:02  3  feature using the game more.  They'd have to spend more

10:41:05  4  time grinding.  You heard all of that evidence, and they

10:41:08  5  just want you to forget it.

10:41:09  6          Now, they also talk about GREE's own situation in

10:41:15  7  the market and GREE's own games.  But the question here on

10:41:19  8  damages is, what is the value of the patented inventions to

10:41:23  9  Supercell?  That's in the Court's instructions.  What is

10:41:26  10  the value to the infringer?  And that value is quite high.

10:41:32  11          They complain that we're seeking too high of a

10:41:35  12  royalty, but as you've heard, they make a lot of money on

10:41:39  13  their games; close to $1.2 billion in the last few years

10:41:43  14  alone just for these three games in the U.S.  And some of

10:41:47  15  it is due to our technology.

10:41:48  16          And we did a little math.  Just in 2019, the last

10:41:51  17  full calendar year where we have data, they made over $450

10:41:56  18  million just for these three games just in the U.S.  That

10:42:01  19  equates to 1.25 million a day, over $52,000.00 an hour,

10:42:05  20  and -- may I approach, Your Honor?

10:42:06  21          THE COURT:  You may.

10:42:07  22          MR. MOORE:  $872.00 per minute that Supercell

10:42:32  23  makes just on these games.

10:42:34  24          Now, Mr. Bakewell, he said:  Well, by de minimis,

10:42:37  25  I mean you should just award $5,000.00 per patent, no more

10:42:42  1   than that, in a lump sum.

10:42:44  2        Well, I did some math, and Supercell makes

10:42:47  3   $25,000.00 every 28 minutes just in the U.S., just on these

10:42:55  4   three games.  So they made more than $25,000.00 in the time

10:42:59  5   that you heard Mr. Sacksteder speak to you.

10:43:02  6        And the reason that they're saying that is they

10:43:05  7   want to say, well, look at the license in Japan.

10:43:05  8        Now, we all agree on a couple of things.  This

10:43:08  9   license is just for Japan, not the United States.  And

10:43:10  10  Supercell's U.S. revenues, if I flip this chart over, you

10:43:13  11  would see my large 7X.  The U.S. revenues are seven times

10:43:19  12  higher here than in Japan.

10:43:23  13        But there's one other thing that's important, and

10:43:25  14  you heard some testimony on this.

10:43:27  15        What happened in Japan when GREE and Supercell

10:43:30  16  signed that license with a lump sum?  You will recall

10:43:35  17  there's some testimony that in Japan during the lawsuits,

10:43:38  18  Supercell removed the layout editor from Clash of Clans.

10:43:41  19  And what happened?  People were unhappy.

10:43:43  20        When they signed this lump sum license, what's the

10:43:46  21  very next thing they did?  They put it back.  So all of

10:43:50  22  these stories about the features not being valuable and the

10:43:54  23  games would be better without them, they haven't done it.

10:43:57  24  And in Japan they put it right back.

10:44:04  25        Well, I think for us that kind of goes in the

10:44:06  1  category of fool me once, shame on you; fool me twice,

10:44:10  2  shame on me.  That's why a lump sum is not right here

10:44:12  3  because they say these patent features aren't valuable but

10:44:15  4  they haven't taken them out.

10:44:17  5       They want 14 more years of free infringement by

10:44:20  6  just paying $25,000.00 which they make in 28 minutes.

10:44:24  7  That's not fair.  The fair result here is a running

10:44:27  8  royalty.

10:44:27  9       And, yes, nobody's going to deny it's a -- $24

10:44:35  10  million is a lot of money, but let's put it in context to

10:44:40  11  their revenues.  We're asking for .7 percent of their Clash

10:44:43  12  of Clans revenues over the right period.  Between the three

10:44:47  13  patents, we're asking for 2.7 percent for Clash Royale and

10:44:52  14  2.4 percent for Brawl Stars.  They keep 97 to 99 percent of

10:44:57  15  their revenue.  We're not saying the games aren't

10:44:59  16  successful for other reasons.  They clearly are.

10:45:02  17       But our patented technology is in their source

10:45:05  18  code, and they should pay a fair running royalty for that.

10:45:08  19       And as I said earlier, if they're really not

10:45:12  20  valuable features, take them out and stop paying us.  Put

10:45:15  21  your money where your mouth is.  That's their decision.

10:45:19  22       Frankly, the $25,000.00 lump sum that they offered

10:45:23  23  us is insulting.  It ignores the seven times U.S. revenues

10:45:30  24  that they have.  If anything, if a lump sum were

10:45:32  25  appropriate here, you should multiply 4.5 million by seven.

10:45:36  1  That would be 31-and-a-half million dollars.  That's the

10:45:39  2  scaling that would be appropriate.  And that's the scaling

10:45:41  3  Dr. Becker talked about.

10:45:42  4       We're not asking for that.  Let me be clear, we're

10:45:46  5  asking for a running royalty.  But if you want to scale a

10:45:49  6  license, that's what Dr. Becker said.  You have to account

10:45:51  7  for differences in the revenues.  He talked about

10:45:54  8  differences in the legal systems.

10:45:55  9       So as much it is true there is no jury trial in

10:45:58  10  Japan, but there's also not very high patent royalties.

10:46:02  11  Dr. Becker cited a study where U.S. patent royalties in --

10:46:05  12  in various industries are typically 10 times higher than in

10:46:10  13  Japan.  So the number in Japan is another side show,

10:46:14  14  another distraction.

10:46:14  15       We're here to talk about these five GREE patents,

10:46:18  16  the five you see on the table before you.  And those five

10:46:22  17  patents give a lot of value to Supercell.  The documents

10:46:27  18  show it.  Their own internal messages show it.  All of the

10:46:30  19  evidence shows that value.

10:46:32  20       And the instructions you have from the Court are

10:46:35  21  that you are to take into account the value of the patented

10:46:38  22  features to Supercell.  And that's the right question -- or

10:46:41  23  that's the right answer on the question of damages.

10:46:43  24       Now, let me back up a little bit and go back to

10:46:53  25  where we started, which is the origins of the parties and

10:46:56  1  who you heard from.

10:46:57  2      You heard a lot of this, and I'll recount some of

10:47:01  3  this evidence.  And you heard from Mr. Araki, who's been

10:47:05  4  here, as I said, the whole trial.  Senior executive, board

10:47:08  5  member, fourth or fifth employee of the company.  Started

10:47:12  6  coding when he was 8.  Writes and creates a lot of video

10:47:14  7  games, including ones that are still on the market today.

10:47:17  8  And he was here the entire trial.  So that's who you heard

10:47:20  9  from from GREE.

10:47:21  10      From Supercell, the only person you heard from

10:47:23  11  live in this courtroom is Greg Harper.  He's also a senior

10:47:27  12  executive at Supercell, also on the board of directors.

10:47:30  13  And he came in very briefly Monday afternoon and talked to

10:47:33  14  us about Supercell.  And then when he was done, he walked

10:47:37  15  right out that door.

10:47:38  16      And so let's see what they said about who did

10:47:41  17  what.  GREE was founded in 2004, Supercell in 2010.  GREE's

10:47:48  18  first mobile social game, Fishing Star, was in 2007.

10:47:52  19  Supercell's in 2012.

10:47:55  20      GREE opened an office in the U.S. in 2011.

10:47:58  21  Supercell did the same thing in 2012.  GREE filed for its

10:48:03  22  application for the '594 patent and then got that patent in

10:48:07  23  2017.  That patent has copy layout, which Supercell didn't

10:48:11  24  add to Clash of Clans until after the patent.  And I showed

10:48:14  25  you the exhibit where they knew -- they knew full well

| | | |
|---|---|---|
| 10:48:18 | 1 | about the patent when they did it. |
| 10:48:19 | 2 | So one of the reasons that our jury system is such |
| 10:48:25 | 3 | a good system is it allows citizens like you to be judges |
| 10:48:29 | 4 | of the facts, as His Honor has told you.  You are judges of |
| 10:48:32 | 5 | credibility. |
| 10:48:33 | 6 | What do we know from the witnesses?  What do we |
| 10:48:35 | 7 | know from their demeanors?  What do we know from their |
| 10:48:39 | 8 | motivations when they're testifying? |
| 10:48:46 | 9 | And one thing -- I want you to think back on |
| 10:48:48 | 10 | Monday afternoon -- that Mr. Harper said and all their |
| 10:48:49 | 11 | witnesses said this -- I showed you earlier -- |
| 10:48:49 | 12 | THE COURT:  Five minutes remaining. |
| 10:48:51 | 13 | MR. MOORE:  Thank you, Your Honor. |
| 10:48:51 | 14 | He said that they don't monitor GREE.  That's what |
| 10:48:53 | 15 | he told you. |
| 10:48:54 | 16 | But then on cross-examination, we showed that |
| 10:48:57 | 17 | wasn't correct.  I showed him an interview with Mr. Araki |
| 10:49:00 | 18 | that he had forwarded to the CEO.  I showed him a document |
| 10:49:04 | 19 | where they talked about one of the GREE U.S. games at |
| 10:49:07 | 20 | Supercell.  I showed him a document where CEOs -- |
| 10:49:13 | 21 | Supercell's CEO was forwarding articles about GREE and |
| 10:49:17 | 22 | calling it a giant in the market. |
| 10:49:19 | 23 | That's what the documents show, not what |
| 10:49:21 | 24 | Mr. Harper said on his direct examination, only to be |
| 10:49:24 | 25 | contradicted by his own writings and those of the CEO. |

10:49:27   1           Now, Mr. Harper also said this case is very

10:49:29   2   important to Supercell.  But if that's true, why hasn't he

10:49:32   3   been here the whole trial?  Why did he march right out

10:49:37   4   after his testimony leaving his right-hand man to sit with

10:49:42   5   us and never take the stand and talk to you during the

10:49:46   6   trial.  We were here all week.  He was not.  And that

10:49:48   7   speaks volumes about whether Supercell cares about this

10:49:50   8   case.

10:49:50   9           One other thing, and it happened fairly quickly,

10:49:54  10   but I think it's -- it indicates the difference between

10:49:56  11   these two companies.

10:49:57  12           Mr. Harper discussed some of the GREE games in the

10:49:59  13   United States, and he discussed -- and you also heard from

10:50:03  14   Mr. Sheppard that some of the games that GREE had released

10:50:07  15   in the United States are from a company called Funzio.  And

10:50:12  16   Funzio is a company that GREE acquired.  And, in fact,

10:50:15  17   Mr. Harper was impressed by Funzio, so he went to meet with

10:50:15  18   them to get some advice.

10:50:18  19           Well, why do I tell you about this now?  Because

10:50:18  20   it tells you a lot about GREE.  This is what happened when

10:50:21  21   GREE saw technology that it liked that someone else had in

10:50:26  22   the market.  It invested.  It bought the company.  And it

10:50:29  23   worked with the engineers of those companies to release

10:50:31  24   games that were successful for a number of years.

10:50:33  25           Now, it's true that success did not last, and as

10:50:37  1    you heard from Mr. Sheppard, they weren't able to make it

10:50:40  2    last.  It didn't work out.  And they had to leave the

10:50:42  3    market.

10:50:43  4         But that speaks to GREE's character.  When it sees

10:50:45  5    technology that someone else has that it finds interesting,

10:50:49  6    it does the right thing.  It pays for it.  It doesn't

10:50:52  7    trespass.

10:50:53  8         Supercell has acted differently.  You didn't hear

10:50:56  9    a single word in this trial about Supercell having any

10:50:59  10   patents on its own inventions.  They don't respect GREE's

10:51:04  11   property rights.  And they don't respect the Patent Office.

10:51:06  12        They're telling you that, on this verdict form,

10:51:09  13   you should say that the Patent Office made a mistake nine

10:51:13  14   times; that three different examiners on the four patents

10:51:16  15   where invalidity is a question made nine different

10:51:20  16   mistakes.  And Supercell doesn't respect this process and

10:51:22  17   this trial because they're not here.

10:51:24  18        Now, I want to talk for a moment about what this

10:51:29  19   case is really about -- about somewhat behind the curtain.

10:51:33  20   And that's another thing that Mr. Harper admitted to me on

10:51:37  21   his cross-examination.

10:51:38  22        You saw pictures of a bunch of Supercellians in

10:51:42  23   fields looking very happy.  But they didn't tell you who

10:51:45  24   owns Supercell.  You didn't hear that until Mr. Harper got

10:51:48  25   on the stand, and I asked him on cross-examination:  Who

| | | |
|---|---|---|
| 10:51:51 | 1 | owns Supercell?  And he said:  It's a company called |
| 10:51:55 | 2 | Tencent, a very large overseas conglomerate with interest |
| 10:52:00 | 3 | in media, gaming, social media, with over 60,000 employees. |
| 10:52:06 | 4 | And so, again, we saw this slide.  It's not the |
| 10:52:10 | 5 | full story.  I had to get Mr. Harper to admit the truth. |
| 10:52:15 | 6 | Now, I think at the beginning of Mr. -- |
| 10:52:19 | 7 | Mr. Sacksteder's summation, closing argument, he called us |
| 10:52:22 | 8 | a bully.  That's what he said, that we're a bully.  I'm not |
| 10:52:28 | 9 | going to respond with name-calling to that. |
| 10:52:32 | 10 | But I want you to know who is doing the name |
| 10:52:36 | 11 | calling.  It's Tencent.  They own Supercell.  60,000-person |
| 10:52:44 | 12 | conglomerate, also in the gaming business from overseas, |
| 10:52:49 | 13 | and they hold three of the five Supercell board seats. |
| 10:52:52 | 14 | THE COURT:  One minute -- one minute left. |
| 10:52:54 | 15 | MR. MOORE:  Thank you, Your Honor. |
| 10:52:54 | 16 | Why didn't you know that until Monday?  It's |
| 10:52:57 | 17 | Tencent pulling the strings.  If they wanted Supercell to |
| 10:53:00 | 18 | pay for a license for the U.S. patents, those three board |
| 10:53:04 | 19 | members would have outvoted Supercell and said go ahead and |
| 10:53:05 | 20 | do it.  That's what's really happening here. |
| 10:53:07 | 21 | So this shows Supercell and Tencent's indifference |
| 10:53:12 | 22 | to the entire process.  Supercell refused to stop |
| 10:53:15 | 23 | infringing in 2016 when we sent them the letter.  They |
| 10:53:18 | 24 | refused to stop infringing here in the United States when |
| 10:53:20 | 25 | they signed a license in 2019.  They refused to take the |

10:53:23  1    infringing features out of their source code right now,

10:53:25  2    even though they tell you they could do it easily and it

10:53:28  3    would make it better.  Instead it's a lot of excuses.

10:53:31  4         GREE has done the right thing to get patents to

10:53:33  5    protect our innovations.  Supercell has not.  Now this is

10:53:37  6    your opportunity to hold them responsible for those

10:53:39  7    decisions.

10:53:40  8         Thank you, again, very, very much, ladies and

10:53:43  9    gentlemen of the jury.  It's been my honor to speak with

10:53:45  10   you and to present this case to you.

10:53:48  11        Thank you.

10:53:50  12        Thank you, Your Honor.

10:53:50  13        THE COURT:  All right.  Ladies and gentlemen, that

10:53:52  14   completes closing arguments for both Plaintiff and

10:53:55  15   Defendant.

10:53:55  16        I'd now like to provide you with a few final

10:53:59  17   instructions before you begin your deliberations.

10:54:04  18        You must perform your duty as jurors without bias

10:54:07  19   or prejudice as to any party.  The law does not permit you

10:54:11  20   to be controlled by sympathy, prejudice, or public opinion.

10:54:15  21        All parties expect that you will carefully and

10:54:19  22   impartially consider all the evidence, follow the law as I

10:54:24  23   have given it to you, and reach a just verdict, regardless

10:54:28  24   of the consequences.

10:54:29  25        Answer each question in the verdict form based on

10:54:34  1  the facts as you find them to be, following the

10:54:37  2  instructions that the Court has given you on the law.

10:54:39  3        Again, do not decide who you think should win the

10:54:43  4  case and then answer the questions to reach that result.

10:54:49  5  I'll remind you one more time your answers and your verdict

10:54:53  6  in this case must be unanimous.

10:54:55  7        You should consider and decide this case as a

10:54:57  8  dispute between persons of equal standing in the community,

10:55:01  9  of equal worth, and holding the same or similar stations in

10:55:05  10  life.  This is true in patent cases between corporations,

10:55:10  11  partnerships, or individuals.

10:55:11  12        A patent owner is entitled to protect his or her

10:55:15  13  rights under the laws of the United States, and this

10:55:18  14  includes bringing a suit in a United States District Court

10:55:21  15  for money damages for infringement.

10:55:23  16        The law recognizes no distinction among types of

10:55:27  17  parties.  All corporations, partnerships, other

10:55:31  18  organizations stand equal before the law, regardless of

10:55:36  19  their size or who owns them and are to be treated as

10:55:41  20  equals.

10:55:42  21        Now, when you retire to the jury room in a few

10:55:44  22  minutes to deliberate on your verdict, as I've told you,

10:55:46  23  you will each have a written copy -- an individual, written

10:55:50  24  copy of this charge that I'm giving you.

10:55:52  25        If you desire during your deliberations to review

| 10:55:55 | 1 | any of the exhibits that have been admitted into evidence |

10:55:55    1    any of the exhibits that have been admitted into evidence

10:56:00    2    over the course of the trial, then you should give a

10:56:02    3    written note signed by your foreperson to the Court

10:56:06    4    Security Officer, who will bring it to me, and I will then

10:56:08    5    send the -- that exhibit or those exhibits to you in the

10:56:12    6    jury room.

10:56:12    7          Once you retire, you should first select your

10:56:17    8    foreperson and then conduct your deliberations.

10:56:21    9          During your deliberations, if you should take a

10:56:25   10    recess, follow all the instructions the Court has given you

10:56:28   11    about your conduct during the trial.

10:56:32   12          After you've reached a unanimous verdict, your

10:56:35   13    foreperson is to fill out those unanimous answers in the

10:56:38   14    verdict form, sign the verdict form on the last page, date

10:56:43   15    it, and then notify the Court Security Officer.

10:56:46   16          Do not reveal your answers until the time you have

10:56:53   17    been discharged by me, unless I direct otherwise.  And you

10:56:55   18    must never disclose to anyone, not even to me, your

10:56:59   19    numerical division on any question.

10:57:01   20          Any notes that you've taken over the course of the

10:57:04   21    trial are aids to your memory only.  If your memory should

10:57:09   22    differ from your notes, you should rely on your memory and

10:57:12   23    not your notes.

10:57:13   24          Notes are not evidence, and a juror who has not

10:57:17   25    taken notes should rely on his or her own independent

10:57:20   1   recollection of the evidence and should not be unduly

10:57:23   2   influenced by the notes of other jurors.  Notes are not

10:57:27   3   entitled to any greater weight than the recollection or

10:57:30   4   impression of each juror about the testimony.

10:57:33   5        If you want to communicate with me at any time

10:57:39   6   during your deliberations, you should give a written

10:57:42   7   message or a question in writing signed by the -- by your

10:57:45   8   foreperson to the Court Security Officer, who will then

10:57:47   9   bring it to me.

10:57:49   10       I will then respond to you as promptly as

10:57:53   11  possible, either in writing or by having you brought back

10:57:56   12  into the courtroom where I can address you orally.  And I

10:57:59   13  will always disclose to the attorneys in the case your

10:58:03   14  question and my response before I answer your question.

10:58:06   15       After you've reached your verdict and I have

10:58:14   16  accepted it and I have discharged you from your position as

10:58:18   17  jurors, please understand you are not required to talk with

10:58:20   18  anyone about your service in the case.

10:58:22   19       However, at that time, you will be free to talk

10:58:25   20  with anyone about your service in the case, and that will

10:58:28   21  be your decision and your decision only at that time.

10:58:32   22       I'll now hand eight printed copies of this final

10:58:37   23  jury charge and one clean copy of the verdict form to the

10:58:41   24  Court Security Officer to deliver to you in the jury room.

10:58:47   25       Ladies and gentlemen of the jury, you may now

| | | |
|---|---|---|
| 10:58:50 | 1 | retire and begin your deliberations.  We await your |
| 10:58:53 | 2 | verdict. |
| 10:58:53 | 3 | COURT SECURITY OFFICER:  All rise. |
| 10:59:04 | 4 | (Jury out.) |
| 10:59:23 | 5 | THE COURT:  Please be seated. |
| 10:59:25 | 6 | Counsel, we have cell numbers to reach both trial |
| 10:59:28 | 7 | teams in the event of a question from the jury or the |
| 10:59:36 | 8 | return of a verdict.  Consequently, you are welcome to wait |
| 10:59:39 | 9 | off-site if you'd like.  By the same token, you are |
| 10:59:45 | 10 | welcome, in whole or in part, to wait here in the |
| 10:59:49 | 11 | courtroom. |
| 10:59:49 | 12 | Thank you for your participation in this trial. |
| 10:59:51 | 13 | Awaiting either a note or a question from the jury |
| 10:59:54 | 14 | or a return of their unanimous verdict, the Court stands in |
| 10:59:57 | 15 | recess. |
| 10:59:58 | 16 | COURT SECURITY OFFICER:  All rise. |
| 10:59:59 | 17 | (Recess.) |
| 03:46:48 | 18 | (Jury out.) |
| 04:04:05 | 19 | COURT SECURITY OFFICER:  All rise. |
| 04:04:06 | 20 | THE COURT:  Be seated, please. |
| 04:07:04 | 21 | After approximately five hours of deliberation, we |
| 04:07:12 | 22 | have our first note.  And, actually, counsel, we have two |
| 04:07:17 | 23 | notes, because before I could get you here on the first |
| 04:07:20 | 24 | note, I got a second note. |
| 04:07:21 | 25 | And I'm going to give copies of these notes to |

1460

04:07:26   1   counsel, and then we're going to discuss them.

04:07:30   2        I have two copies of the first note and two copies

04:07:36   3   of the second note.  I'm going to hand those to the

04:07:41   4   courtroom deputy.

04:07:41   5        And if a representative of each side will

04:07:44   6   approach, we'll hand you two copies so that each side can

04:07:47   7   look at the notes that have been received.

04:07:51   8        It should be one of each, Ms. Lockhart.

04:07:55   9        MS. SMITH:  Thank you.  Thanks.

04:08:03  10        THE COURT:  All right.  Let's discuss these

04:08:59  11   briefly.

04:09:00  12        The first note says:  Can we please have DX-71,

04:09:09  13   first touch, and PTX-480, DX-1218, DX-1217, internal

04:09:20  14   emails?  Can we have the deposition of Jon Franzas?

04:09:26  15        The second note says:  Can we see PDX-162,

04:09:34  16   PDX-165, PTX-139?

04:09:38  17        If I'm reading it right.

04:09:40  18        Both of these are signed by Rachel Leathers, who

04:09:44  19   is Juror No -- who is Juror No. 7, who is the apparent

04:09:49  20   foreperson.

04:09:50  21        PTX-480, PTX -- excuse me, DTX-1217 and DTX-1218

04:10:02  22   appear to me to be what they're asking for in the first

04:10:05  23   email.  They don't put a "T" between the "D" and the "X" on

04:10:10  24   1218 and 1217, but they note that they're internal emails.

04:10:19  25   And DTX-1217 and DTX-1218 are internal emails.

1461

04:10:24  1          It appears to the Court that these three exhibit

04:10:27  2   numbers correspond with what the jury is asking for.

04:10:29  3          I do not know what they mean by DX-71.  It doesn't

04:10:35  4   identify it as DDX or DTX, and I don't think there is a

04:10:42  5   DTX-71, according to my quick look at the list of exhibits

04:10:48  6   that have been used during the course of the trial.

04:10:51  7          So I think I will have to ask them for further

04:10:54  8   clarification on what they mean by DX-71.

04:10:59  9          PDX-162 and 165 are clearly demonstratives.  I

04:11:06 10   don't think they're entitled to those.

04:11:08 11          They're not entitled to the deposition testimony

04:11:10 12   of Mr. Franzas or anybody else, and I'll tell them that.

04:11:13 13          PTX-139, which appears at the end of the request

04:11:23 14   in the second note, if I'm reading it right -- because the

04:11:26 15   "X" is awfully small the way they've written it -- is a

04:11:31 16   videoclip.  And I don't know any way to present that to

04:11:34 17   them, rather than if that is what they truly want to see,

04:11:39 18   to bring them back into the courtroom and to play it on the

04:11:42 19   screens in the jury box so they can see it again.

04:11:44 20          Now, I'm aware that both sides' IT people have

04:11:48 21   closed up shop and left.  I hope they are somewhere close

04:11:53 22   by and we can get them back if that's what we need to do.

04:11:57 23          Those are my thoughts.  I'd be happy to hear

04:12:00 24   thoughts from counsel for Plaintiff and Defendant before we

04:12:03 25   go any further.

1462

| | | |
|---|---|---|
| 04:12:06 | 1 | Mr. Moore, do you have a -- |
| 04:12:07 | 2 | MR. MOORE:  Yes. |
| 04:12:07 | 3 | THE COURT:  -- do you have a thought with regard |
| 04:12:09 | 4 | to these two notes and what I've just indicated? |
| 04:12:12 | 5 | MR. MOORE:  No, we -- we agree.  We will need to |
| 04:12:14 | 6 | check on the -- the numbers ourselves.  But I agree with |
| 04:12:17 | 7 | Your Honor about DX-71, that seems to be a little bit |
| 04:12:21 | 8 | unclear. |
| 04:12:22 | 9 | And on the -- on the PDX-162 and 165, I certainly |
| 04:12:28 | 10 | agree that the "D" indicates demonstratives.  I'll have to |
| 04:12:31 | 11 | double-check that, though.  I think we might want to check |
| 04:12:36 | 12 | to make sure they -- they didn't mean PTX.  But I |
| 04:12:40 | 13 | certainly -- I see what the note says, and I see it clearly |
| 04:12:43 | 14 | says DX, and they -- they seem to understand, I think, the |
| 04:12:43 | 15 | difference between that, given the other note. |
| 04:12:45 | 16 | THE COURT:  Now, the first note says, DX-71, first |
| 04:12:50 | 17 | touch.  Does the notation "first touch" mean anything to |
| 04:12:53 | 18 | you as far as possible clarification of what they're |
| 04:12:58 | 19 | looking for? |
| 04:12:58 | 20 | MR. MOORE:  I certainly -- I'd have to consult the |
| 04:12:58 | 21 | list.  I certainly understand, I think, what patent it |
| 04:12:59 | 22 | relates to, but whether that's a -- a video or something |
| 04:13:01 | 23 | else, I'm not certain off the top of my head.  We can |
| 04:13:08 | 24 | consult our exhibit list and -- and determine that. |
| 04:13:09 | 25 | THE COURT:  All right.  Mr. Sacksteder, do you |

04:13:12   1   have a thought about this?

04:13:13   2          MR. SACKSTEDER:  We are trying to determine

04:13:16   3   whether it would be DDX-7.1, which would be a

04:13:22   4   demonstrative, and we are trying to pull that up right now,

04:13:25   5   Your Honor.

04:13:25   6          THE COURT:  Well, if it is, they're not going to

04:13:27   7   get a demonstrative.

04:13:28   8          MR. SACKSTEDER:  Understood.

04:13:28   9          THE COURT:  Let -- let me do this, counsel:  I

04:13:30  10   know that you got here as quickly as you could.  But I've

04:13:33  11   just given you these two notes, and you have complete

04:13:36  12   copies of what I have.

04:13:38  13          I'm going to go off the record for a couple

04:13:41  14   minutes and let you confer with each other here in the

04:13:43  15   courtroom, and then when you've had a minute to talk, I'll

04:13:46  16   come back and see if we have any additional clarity as to

04:13:52  17   how to proceed, okay?

04:13:54  18          MR. SACKSTEDER:  Yes, sir.

04:13:56  19          MR. MOORE:  Thank you, Your Honor.

04:13:57  20          THE COURT:  We're off the record.

04:13:58  21          COURT SECURITY OFFICER:  All rise.

04:14:03  22          THE COURT:  I'm not going anywhere.

04:14:06  23          (Off-the-record discussion.)

04:19:58  24          THE COURT:  Then let's go back on the record.

04:26:35  25          Counsel, I've given you an opportunity off the

04:26:39  1    record to discuss both of the notes from the jury.

04:26:43  2             For clarity on the record, I'm going to take the

04:26:46  3    first note I received, which begins with the phrase "can we

04:26:50  4    please see DX-71, first touch," I'm marking that in the

04:26:56  5    upper right-hand corner as Item 1 for identification.

04:26:59  6             And the second note that says "can we see PDX-162,

04:27:04  7    PDX-165, PTX-139," I'm marking that in the upper right-hand

04:27:13  8    corner as Item 2 for identification.

04:27:15  9             I'm handing both original notes from the jury to

04:27:18  10   the courtroom deputy to be included in the records in this

04:27:21  11   case.

04:27:22  12            I have discussed with you briefly, while we were

04:27:24  13   off the record and after you've met and conferred and

04:27:27  14   looked at your respective materials, what we collectively

04:27:31  15   think the jury is asking for.

04:27:34  16            I'm going to ask Mr. Dacus and Ms. Smith to

04:27:37  17   approach, and I'm going to hand you a copy of a proposed

04:27:41  18   response, which I think is based on the consensus of what

04:27:49  19   I've heard during our off-the-record discussion.  And I

04:27:52  20   want to read it, and then I'll take your comments on it.

04:27:55  21            This says:  Response to Jury Notes 1 and 2.

04:28:01  22   Members of the jury, in response to your two separate

04:28:04  23   notes, I'm sending you these exhibits as requested,

04:28:09  24   PTX-480, DTX-1218, DTX-1217.

04:28:16  25            D -- excuse me, PDX-162, PDX-165, and DX-71, being

04:28:25  1  DDX-7.1, are each demonstratives.  They are not evidence.

04:28:28  2  I cannot send them to you, as I indicated in my final jury

04:28:32  3  instructions.

04:28:32  4       Next paragraph:  The testimony -- the deposition

04:28:35  5  testimony of Jon Franzas is something for which you will

04:28:40  6  have to rely on your memories.  This is the case with all

04:28:42  7  witness testimony presented during the trial, both live

04:28:48  8  testimony and deposition testimony.  I cannot send that to

04:28:50  9  you.

04:28:51  10      Next paragraph:  PTX-139 is a videoclip which will

04:29:00  11  be played to you again in the courtroom.  I will bring you

04:29:03  12  back in court -- into the courtroom for this single purpose

04:29:03  13  presently.

04:29:07  14      Let me hear a response from both sides as to the

04:29:10  15  accuracy of that note from your viewpoint.

04:29:10  16      MS. SMITH:  No objection from Plaintiff,

04:29:11  17  Your Honor.

04:29:11  18      THE COURT:  How about from Defendant?

04:29:16  19      MR. DACUS:  We have no objection, Your Honor.

04:29:17  20      THE COURT:  All right.  Do we have the IT set up

04:29:20  21  to play that videoclip, and do we have it ready?

04:29:46  22      While you're working on a response to that

04:29:48  23  question, I'm going to hand a signed copy of the written

04:29:52  24  response that I just read to you and I gave you copies of

04:29:57  25  previously, to the courtroom deputy to be included in the

| | | |
|---|---|---|
| 04:29:59 | 1 | record. |
| 04:30:00 | 2 | And I'm going to take a signed copy of that same |
| 04:30:04 | 3 | written response with the three exhibits called out, being |
| 04:30:11 | 4 | PTX-480, DTX-1217 and DTX-1218, and I'm going to send them |
| 04:30:18 | 5 | back to the jury with, again, a signed copy of the written |
| 04:30:22 | 6 | response by way of the Court Security Officer.  And I'll |
| 04:30:27 | 7 | give them a few minutes, and then we'll bring them in and |
| 04:30:30 | 8 | show them this videoclip. |
| 04:30:33 | 9 | Any objections from either party? |
| 04:30:34 | 10 | MS. SMITH:  No, Your Honor. |
| 04:30:35 | 11 | MR. DACUS:  No, Your Honor. |
| 04:30:36 | 12 | THE COURT:  All right.  Mr. Fitzpatrick, if you'll |
| 04:30:39 | 13 | deliver these to the jury. |
| 04:30:41 | 14 | COURT SECURITY OFFICER:  Yes, sir. |
| 04:30:43 | 15 | THE COURT:  And if you will tell them I'll be |
| 04:30:45 | 16 | bringing them back into the courtroom shortly.  They should |
| 04:30:50 | 17 | just leave their notebooks in the courtroom [sic].  They're |
| 04:30:53 | 18 | only going to be in here long enough to watch a videoclip |
| 04:31:00 | 19 | and then go back to the jury room. |
| 04:31:05 | 20 | COURT SECURITY OFFICER:  Yes, sir. |
| 04:31:05 | 21 | THE COURT:  Are both sides satisfied that the clip |
| 04:31:08 | 22 | on the screen I'm seeing now is the right clip, and it's |
| 04:31:16 | 23 | prepared -- it's ready to be shown as it was shown during |
| 04:31:17 | 24 | the trial? |
| 04:31:18 | 25 | MS. SMITH:  Plaintiff is, Your Honor. |

04:31:21  1          MS. KAEMPF:  Can you play it?

04:31:24  2          MR. MORLOCK:  Yeah, sure.

04:31:31  3          MR. SACKSTEDER:  Defendants are, Your Honor.

04:31:33  4          THE COURT:  Okay.  If both sides are ready, let's

04:31:36  5  back it up to the beginning, and then I'll bring in the

04:31:39  6  jury.

04:31:40  7          All right.  Mr. Fitzpatrick, please bring in the

04:31:42  8  jury.

04:31:42  9          COURT SECURITY OFFICER:  Yes, sir.

04:31:44  10         All rise.

04:31:45  11         (Jury in.)

04:31:45  12         THE COURT:  Please be seated.

04:32:32  13         We're going to play PTX-139 for the jury, as

04:32:40  14  requested.

04:32:40  15         As soon as this is over, ladies and gentlemen,

04:32:43  16  I'll direct you to retire to the jury room again and

04:32:45  17  continue your deliberations.

04:32:46  18         Let's play the videoclip, please.

04:32:52  19         (Videoclip played.)

04:33:11  20         THE COURT:  All right.  That completes the

04:35:45  21  videoclip, PTX-139.

04:35:47  22         Ladies and gentlemen, you may now retire to the

04:35:50  23  jury room and continue your deliberations.

04:35:52  24         COURT SECURITY OFFICER:  All rise.

04:35:53  25         (Jury out.)

1468

04:36:14  1          THE COURT:  All right.  Counsel, awaiting either
04:36:17  2  another note from the jury or the return of a verdict, we
04:36:20  3  stand in recess.
04:36:23  4          (Recess.)
         5          (Jury sent home at 6:00 p.m.  Court in recess
         6          until September 18, 2020.)
         7
         8
         9                      CERTIFICATION
        10
        11          I HEREBY CERTIFY that the foregoing is a true and
        12  correct transcript from the stenographic notes of the
        13  proceedings in the above-entitled matter to the best of my
        14  ability.
        15
        16
        17   /S/ Shelly Holmes                    9/17/2020
            SHELLY HOLMES, CSR, TCRR              Date
        18  OFFICIAL REPORTER
            State of Texas No.: 7804
        19  Expiration Date: 12/31/20
        20
        21
        22
        23
        24
        25